E-FILED
Monday, 15 December, 2014, 03:32:56 PM
NOAH DIETCHWEILER
Clerk, U.S. District Court, ILCD

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  STATE OF ILLINOIS

 3

 4    NOAH DIETCHWEILER, by Michael)
      Dietchweiler, his father and )
 5    next friend; and            )
      ANN DIETCHWEILER,           )
 6                                )
              Plaintiffs,         )
 7                                )
         -vs-                     )    No. 2013-CV-2062
 8                                )
      STEVE LUCAS, in his official )
 9    and individual capacities;  )
      JAMES BUNTING, in his official
10    and individual capacities;  )
      KENNETH LEE, in his official )
11    and individual capacities;  )
      IROQUOIS COUNTY COMMUNITY   )
12    UNIT SCHOOL DISTRICT No. 9. )
      IROQUOIS COUNTY, ILLINOIS;  )
13    JAMES BRUNS; in his official )
      capacity; DON BECKER, in his )
14    official capacity;          )
      BRENNA JOHNSON, in her      )
15    official capacity; CRYSTAL  )
      BLAIR, in her official      )
16    capacity; BOB BURD, in his  )
      official capacity; KIRK     )
17    McTAGGERT, in his official  )
      capacity; and DEE SCHIPPERT, )
18    in her official capacity,   )

19            Defendants.

20

21

           DEPOSITION OF NOAH DIETCHWEILER
22              January 2nd, 2014
                   11:00 AM
23
           Deann K. Parkinson:  CSR 84-002089
24

25
```

Page 2

1

APPEARANCES:

2

FOR THE PLAINTIFFS:

3

MR. MICHAEL TAGUE
4    Flynn, Palmer, Tague
     402 W. Church Street
5    Champaign, IL  61824
     mtague@aol.com
6

7

FOR THE DEFENDANTS:

8

MS. SHARI D. GOGGIN-WARD
9    Law Offices of Lawrence Cozzi
     27201 Bella Vista Parkway Suite 410
10   Warrenville, IL  60555
     630-791-6407
11   shari.goggin-ward@libertymutual.com

12

13   Also Present:  Michael and Ann Dietchweiler

14

     EXAMINATION BY MS. GOGGIN-WARD....page 5
15

16

17

18

19

20

21

22

23

24

25

```
 1                    EXHIBIT INDEX

 2
      Exhibit 1........................page 7
 3    (Answers to interrogatories)

 4    (No Exhibit 2 referred to.)

 5    Exhibit 3........................page 90
      (Supplemental 26 A disclosures)
 6

 7

 8
      ALL EXHIBITS TO THE DEPOSITION RETAINED BY MS.
 9    GOGGIN-WARD.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    DEPOSITION

 2

 3              NOAH DIETCHWEILER, a citizen of the

 4    State of Illinois, a witness of lawful age;

 5    produced, sworn, and examined upon his corporeal

 6    oath, at 402 W. Church, Champaign, Illinois, on

 7    January 2nd, 2014, before Deann K. Parkinson, CSR,

 8    Notary Public in and for the County of Champaign

 9    and State of Illinois, as a witness in a certain

10    suit and matter now pending and undetermined in

11    the United States District Court for the Central

12    District of Illinois.

13              CSR License No. 84-002089

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  (The time is 11:32 AM.)
 2
 3                     NOAH DIETCHWEILER,
 4     the deponent herein, called as a witness, after
 5     having been first duly sworn, testified as
 6     follows:
 7                     DIRECT EXAMINATION
 8                     BY MS. GOGGIN-WARD:
 9         Q.    For the record, this is the deposition
10     of Noah Dietchweiler taken pursuant to notice and
11     by agreement of all parties.  It will also be
12     taken pursuant to all applicable United States
13     District Court for the Central District of
14     Illinois rules, Urbana division.
15               Noah, could you please state and spell
16     your name for the record?
17         A.    Noah Dietchweiler.  N-O-A-H.
18     D-I-E-T-C-H-W-E-I-L-E-R.
19         Q.    I'm going to go out on a limb here, and
20     I assume that you've never given a deposition
21     before?
22         A.    That is true.
23         Q.    I'm sure your dad, who is an attorney,
24     as well as your attorney, has gone over the rules
25     for giving and taking a deposition?
```

```
 1      A.    Correct.

 2      Q.    But I'm going to go ahead and do it for

 3  the record so we're all on the same page, okay?

 4      A.    Yes.

 5      Q.    You have done very well so far; you have

 6  to answer my questions out loud as opposed to

 7  uh-uh or uh-huh because our court reporter is

 8  taking down everything that's said by everyone,

 9  including myself and you? Okay?

10      A.    Yes.

11      Q.    The next thing you need to do is wait

12  until I finish my question before you start your

13  answer, and I'll try to let you finish your answer

14  before I start my question, because it's very

15  difficult for the court reporter to take down two

16  people talking at the same time, okay?

17      A.    Yes.

18      Q.    Most important rule is if you don't

19  understand one of my questions, or I talk too fast

20  or it's confusing to you, I'm not here to confuse

21  you or trick you or do anything like that.  I just

22  need the answers to my questions.  So, if you

23  don't understand something, let me know.  Because

24  if you do answer it, we're all going to assume

25  here that you have understood it unless you tell
```

1    me otherwise; is that fair?

2         A.    Correct, yes.

3         Q.    What is your current home address?

4         A.    1849 North, 1800 East Road, Watseka,

5    Illinois.

6         Q.    Is that 60970?

7         A.    Yes.

8         Q.    Do you have a home phone number?

9         A.    Yes.   815-432-4999.

10        Q.    And you are presently at Culver Academy,

11   is that correct?

12        A.    Yes.

13        Q.    Is that located in Culver, Indiana?

14        A.    Yes.

15        Q.    The address provided I believe was 1330

16   Academy Road in Culver, Indiana, is that correct?

17        A.    Yes.

18        Q.    Are you still in room number 138?

19        A.    No.   I was never in room 138.   I'm in

20   room 203.

21        Q.    Okay.   And it's not that big of a deal

22   to me, but I'm going to show you Exhibit 1 for

23   identification, which are your answers to

24   interrogatories, as well as a response to request

25   to produce, which probably mean nothing to you.

1    But I'm going to show your counsel, and it's

2    double sided, Mike, so just make sure you check

3    both pages.

4            For the record, Noah's counsel is

5    tendering to him Exhibit 1, which purports to be

6    plaintiffs, plural, answers to interrogatories,

7    and request for production of documents.  And I

8    know that your dad signed these for you 'cuz

9    you're a minor, but I just wanted you to take a

10   look at interrogatory number one, and that is

11   simply listed your suite or address at Culver

12   Academy as being in room 138.  Were you ever in

13   room 138 at Culver Academy?

14      A.   No.

15      Q.   What was your first -- do you live in a

16   dorm there?

17      A.   Yes.  It's called a barracks, but it's

18   basically a dorm.

19            MICHAEL DIETCHWEILER: Shari, 138 is his

20   post box number at Culver.  They have a post

21   office with individual box numbers.  And 138 was

22   listed as that.

23            MS. GOGGIN-WARD: Okay.

24            MICHAEL DIETCHWEILER:  Just so you

25   understand, that's not room number.  It has a hash

```
 1   mark, 138.

 2   BY MS. GOGGIN-WARD:

 3       Q.    I took that to mean room number, but

 4   apparently I was incorrect.  Did you have a post

 5   box at Culver Academy?

 6       A.    Yes.

 7       Q.    That was number 138?

 8       A.    Yes.

 9       Q.    Now, you're in room 203; you indicated

10   that that was a barracks?

11       A.    Yes.

12       Q.    How many other boys do you room with in

13   room 203?

14       A.    One.

15       Q.    Who is your current roommate?

16       A.    Rodrigo Ramirez.

17       Q.    Where is Rodrigo from?

18       A.    Acapulco, Mexico.  Or is he from --

19   Veracruz, Mexico.

20       Q.    And just for the record, I know both

21   your parents are here.  They can't answer for you.

22   So if you don't know something, it's okay that you

23   don't know it, and maybe your parents will chime

24   in when I ask them the same question, okay?

25       A.    Okay.
```

1      Q.    But for the record right now you're the

2   only sworn witness in the room, so only you can

3   answer, and I know they're just trying to be

4   helpful.

5      A.    Yes.

6      Q.    But I just need to know what you know at

7   this point in time, okay?

8      A.    Yes.

9      Q.    So, Rodrigo is from Veracruz?

10     A.    Yes.

11     Q.    Has he been your roommate since the

12   start of fall semester of 2013?

13     A.    Yes.

14     Q.    Do you anticipate him being your

15   roommate this semester in January of 2014?

16     A.    Yes.

17     Q.    Did you also attend Culver Academy back

18   in the spring semester of 2013?

19     A.    No.

20     Q.    So your first semester there was in fact

21   fall of 2013?

22     A.    Yes.

23     Q.    When was your first day there?

24     A.    I believe it was August 25th.

25     Q.    Did you enter Culver Academy as a

1    sophomore?

2         A.    Yes.

3         Q.    Have you successfully completed your

4    first semester, being the fall of 2013 semester,

5    at Culver?

6         A.    Yes.

7         Q.    Did you pass all your classes?

8         A.    Yes.

9         Q.    Good.  How many credit hours did you

10   take?

11        A.    I do not know.

12        Q.    How many classes did you have?

13        A.    Six.

14        Q.    Do you study any particular course or

15   curriculum at Culver, or is it just you're a

16   sophomore and you take classes that are given to

17   you?

18        A.    We have the ability to choose which

19   classes we take.  So yes, I'm taking some of my

20   own classes.

21        Q.    Okay.  And what classes did you have for

22   the fall of 2013 semester?

23        A.    I was in equine science, basically

24   equine science.  Physics.  Global perspectives.

25   Humanities.  Digital citizenship.  Foundations of

1    health.  And leadership.

2         Q.    Boy, times have changed.  Do you have

3    the equivalent of driver's education offered

4    through Culver?

5         A.    It is offered there, yes.

6         Q.    Have you taken it yet?

7         A.    No.

8         Q.    I have your birthday as being April 3rd

9    of 1997, is that correct?

10        A.    Yes.

11        Q.    So you are how old right now?

12        A.    Sixteen.

13        Q.    So you will be 17 on April 3rd?

14        A.    Yes.

15        Q.    When you attended school through

16   Iroquois Community Unit School District Number 9,

17   did you take or were you offered -- strike that.

18   Did you take driver's education?

19        A.    Yes.

20        Q.    Had you passed it?

21        A.    Yes.

22        Q.    What year and semester did you take

23   driver's education?

24        A.    Freshman year 2012 is when I took the

25   course.

1    Q.    So, fall of 2012 it would have been?

2    A.    Yes.

3    Q.    What was the name of the high school

4    that you went to prior to attending Culver

5    Academy?

6    A.    Watseka Community High School.

7    Q.    Do you have any siblings?

8    A.    No.

9    Q.    And your folks are sitting next to you,

10   is that correct?

11   A.    Yes.

12   Q.    And that is Michael and Ann

13   Dietchweiler?

14   A.    Yes.

15   Q.    According to your answers to

16   interrogatories, before attending Watseka

17   Community High School, what school did you go to?

18   A.    Crescent City Community Grade School.

19   Q.    And was that a K through 8 school?

20   A.    Yes.

21   Q.    Did you attend it K through 8?

22   A.    Yes.

23   Q.    I take it that's located, according to

24   your answers, 600 South Street in Crescent City,

25   Illinois, is that correct?

```
1      A.    Yes.
2      Q.    To the best of your knowledge did you
3    successfully complete all grades from kindergarten
4    through 8th grade?
5      A.    Yes.
6      Q.    Were you ever held back for any reason
7    in any of those grades?
8      A.    No.
9      Q.    For K through 8 was there a period of
10   time at Crescent City where you changed from
11   actually just going to see one teacher and maybe
12   going to art or music or gym, to actually changing
13   classes as if you were in high school?
14     A.    Yes.
15     Q.    What grade was that?
16     A.    Sixth grade was the first year we did
17   that.
18     Q.    And I take it that occurred 6th, 7th and
19   8th grade, is that correct?
20     A.    Yes.
21     Q.    Did you change buildings or you were
22   still within the same building?
23     A.    Same building.
24     Q.    Did you have a home room or primary
25   teacher in 8th grade that you had every day?
```

NOAH DIETCHWEILER

Page 15

1    A.    Yes.

2    Q.    Who was that?

3    A.    Mrs. Pam Martin.

4    Q.    Through any time in 8th grade, which I

5  guess would have been what, 2011-2012, is that

6  correct?

7    A.    Yes.

8    Q.    Were you disciplined in any way that you

9  know of at Crescent City grade school?

10   A.    No.

11   Q.    Were you ever called to the principal's

12 office?

13   A.    No.

14   Q.    Were you ever suspended?

15   A.    No.

16   Q.    Did you ever lose any privileges for any

17 reason at the school while you were in 8th grade?

18   A.    No.

19   Q.    How about any time before that?

20   A.    No.

21   Q.    Do you remember who the principal was

22 when you were there at Crescent City grade school?

23   A.    Mr. Mann.

24   Q.    So when you entered Watseka in the fall

25 of 2012 you were a freshman, is that correct?

NOAH DIETCHWEILER

Page 16

1     A.    Yes.

2     Q.    Do you remember how many classes you

3   took that fall semester?

4     A.    Seven, not counting the advisory period,

5   which is basically an afternoon study hall.

6     Q.    Okay.  What time did you start school?

7     A.    8:13.

8     Q.    And what time did school get out?

9     A.    3:09.

10     Q.    How did you get to and from school?

11     A.    My parents would drive me; one of them

12   or both.

13     Q.    And then pick you up, I take it?

14     A.    Yes.

15     Q.    Would that always occur or were there

16   some exceptions to that?

17     A.    That would always occur.

18     Q.    In addition to obviously going to school

19   full time, did you have any extracurricular

20   activities through the school?

21     A.    Yes.

22     Q.    And I'm talking specifically in fall of

23   2012?

24     A.    Yes.

25     Q.    What were those?

```
 1        A.    Band and show choir.

 2        Q.    What instrument do you play?

 3        A.    Trumpet.

 4        Q.    Were you in band at Crescent City grade

 5   school too?

 6        A.    Yes.

 7        Q.    For band, were you in marching band and

 8   concert band, or just marching band?

 9        A.    Both.

10        Q.    And how about show choir?  Was that for

11   the whole semester or just --

12        A.    It started late in the semester, and

13   would have went through late in the second

14   semester.

15        Q.    Who is the band director, if you know,

16   at Watseka?

17        A.    Mr. Parment.  P-A-R-M-E-N-T.

18        Q.    Do you know if that's P-A-R-M-E-N-T-E-R?

19        A.    Yes.

20        Q.    Do you know, were you first trumpet,

21   second trumpet, third trumpet?

22        A.    Second trumpet.

23        Q.    How many people were in the marching

24   band?

25        A.    48.
```

1      Q.    Does Culver Academy have a marching

2   band?

3      A.    Yes.

4      Q.    And are you currently a member of that?

5      A.    No.

6      Q.    Why not?

7      A.    We have units there, and the marching

8   band is a unit.  And I'm in the unit of troop,

9   which is cavalry; we ride horses.  And because I'm

10  in that unit, I can't also do the marching band.

11  I just don't have the ability to do both.

12     Q.    It just conflicts in your schedule?

13     A.    Yes.

14     Q.    For the fall of 2012 at Watseka

15  Community High School were you ever disciplined to

16  the best of your knowledge in any way?

17     A.    No.

18     Q.    Did you also have the equivalent of a

19  home room teacher that you would see daily for the

20  fall of 2012?

21     A.    Yes.

22     Q.    Who was that?

23     A.    Mr. Flaherty.

24     Q.    Did he also teach one of your classes?

25     A.    Yes.

```
 1        Q.    And what did he teach?

 2        A.    World history.

 3              COURT REPORTER: How do you spell that?

 4        A.    F-L-A-H-R-E-T-Y.

 5        Q.    I think it's E-R-T-Y actually, but we

 6   can check.  In addition to world history, what

 7   were your other classes at Watseka in the fall of

 8   2012?

 9        A.    Geometry, Spanish I, a health course,

10   I'm not sure which health it was.  Wellness,

11   physical education, and I don't recall what my

12   other course.  And band was one of the courses.

13        Q.    Did you have an English or math class?

14        A.    Yes.

15        Q.    I'm sorry, you had geometry?

16        A.    And I also had English honors.

17        Q.    Did you have any other honors classes

18   besides English?

19        A.    I was in an honors geometry class.

20        Q.    Okay.  So you actually had taken

21   geometry your freshman year in high school,

22   correct?

23        A.    No.  I was placed in one of the high

24   placement geometry classes from algebra one.

25        Q.    Okay.  So you like tested out of it for
```

NOAH DIETCHWEILER

Page 20

```
 1   something?  Tested out of algebra one?
 2       A.    You didn't have to go through geometry
 3   before to get in honors geometry.  It was just
 4   like by doing as well as I did in algebra one, I
 5   was able to go into honors geometry.
 6       Q.    Now, when did you take algebra one?
 7       A.    Freshman year.
 8       Q.    So how long were you a student in
 9   algebra one before you were promoted to honors
10   geometry?
11       A.    A full year.
12       Q.    So, I'm kind of harkening back to the
13   fall of 2012, you were a sophomore at that time,
14   correct?
15       A.    Yes.
16       Q.    And for the fall of 2012 did you
17   successfully pass all of those classes?
18       A.    Yes.
19       Q.    And then for the January of 2013, do you
20   remember what the first day back at school was
21   that semester?
22       A.    I do not.
23       Q.    Do you know if it was like the Monday
24   after the holidays were over?
25       A.    I believe so.
```

1    Q.    In addition to being in show choir for

2    that semester at Watseka, were you still in band?

3    A.    Yes.

4    Q.    Any other extracurricular activities

5    besides those two?

6    A.    No.

7    Q.    And what classes were you registered for

8    in the January of 2013 semester at Watseka?

9    A.    They would have been the same as the

10   first semester. Geometry honors, English honors,

11   band, a health course, world history, and I just

12   remembered one from before that; the one from

13   before I had left was chemistry.

14   Q.    And was Mr. Flaherty still your world

15   history teacher?

16   A.    Yes.

17   Q.    And was he still your home room teacher?

18   A.    Yes.

19   Q.    At any time up to January 25th of 2013

20   were you ever disciplined at Watseka Community

21   High School?

22   A.    No.

23   Q.    Do you currently hold a valid Illinois

24   driver's license?

25   A.    Yes.

NOAH DIETCHWEILER

Page 22

1      Q.    Has that driver's license ever been

2  suspended or revoked for any reason?

3      A.    I had one ticket for speeding. I'm not

4  sure what it was called. The process that it went

5  through. But I did go through some law process

6  with that.

7      Q.    Do you know if as you sit here today

8  your license is still valid?

9      A.    Correct. Yes, it is.

10      Q.    We are here for an incident that

11  allegedly took place at Watseka Community High

12  School on January 25th of 2013. You had been in

13  school two or three weeks prior to that time for

14  that semester, is that correct?

15      A.    Yes.

16      Q.    At any time before January 25th of 2013

17  had you ever taken any type of prescription

18  medication that was not prescribed for you?

19      A.    No.

20      Q.    Had you ever taken any illegal

21  substance?

22      A.    Yes.

23      Q.    And what illegal substance did you take

24  and when?

25      A.    Marijuana prior to the school year.

NOAH DIETCHWEILER

Page 23

1        Q.      And that would have been before the fall
2    of 2012 semester?
3        A.      Yes.
4        Q.      Where did that take place?
5        A.      I do not recall.
6        Q.      Was it on any type of school grounds to
7    the best of your memory?
8        A.      No.
9        Q.      Was there any legal involvement because
10   of that usage?
11       A.      No.
12       Q.      And you said before the semester taking
13   place; was it during the summer of 2012?
14       A.      Yes.
15       Q.      During the summer of 2012, and might be,
16   were you employed anywhere outside the home that
17   summer?
18       A.      Yes.
19       Q.      Where did you work?
20       A.      I worked with Team Corn, corn
21   detassling, and on an X-Line gun range.  I was a
22   trap puller there.
23       Q.      That would have been in the summer of
24   2012?
25       A.      Yes.

Page 24

```
 1      Q.    For the corn detassling, where was that
 2  job located?
 3      A.    It was based in Gillman, Illinois.
 4      Q.    Do you know who your supervisor was back
 5  then?
 6      A.    Yes.  It would have been Reilly, I don't
 7  recall her last name, was the job supervisor for
 8  that year.
 9      Q.    And the name of the facility was called
10  Team Corn?
11      A.    Yes.
12      Q.    Team?
13      A.    Yes.
14      Q.    Okay.  Do you know who the owner of that
15  facility would be?
16      A.    I do not recall.
17      Q.    Did you work there more than one summer
18  or just one summer?
19      A.    Yes.  I worked there more than one
20  summer.
21      Q.    From what summer to what summers did you
22  work there?
23      A.    It would have been summer of 2010,
24  summer of 2011, and summer of 2012.  And this past
25  summer.
```

```
1        Q.    So 2013 as well?

2        A.    Yes.

3        Q.    How about X-Line guns?  Who was your

4   supervisor there?

5        A.    Jack Miller.

6        Q.    You said you were a trap puller?

7        A.    Yes.

8        Q.    Where is that located?

9        A.    Kankakee, Illinois.

10       Q.    And in addition to the summer of 2012,

11  did you work there any other summers?

12       A.    2011, 2012, 2013.

13       Q.    Did your job duties or responsibilities

14  change at all during those three summers?

15       A.    No.

16       Q.    I take it as a corn detassler you were

17  still a corn detassler, correct?

18       A.    Correct.

19       Q.    Any place you've worked in the last two

20  years besides those two facilities?

21       A.    No.

22       Q.    Do you have any job outside of your

23  school responsibilities at Culver?

24       A.    No.

25       Q.    Did you hold a job over Christmas break
```

1    anywhere?

2        A.    No.

3        Q.    Other than the marijuana usage that you

4    spoke of, have you ever ingested any other illegal

5    substances?

6        A.    No.

7        Q.    And how many times had you ingested

8    marijuana before the fall of 2012 semester at

9    Watseka?

10       A.    A very few.  I don't recall the exact

11   number.

12       Q.    Less than ten?

13       A.    Yes.

14       Q.    And I take it you don't recall any of

15   the locations that you ingested the substance at?

16       A.    I do not.

17       Q.    At any time before the fall semester of

18   2012 had you ingested alcohol?

19       A.    No.

20       Q.    You probably don't remember; do you

21   remember what day of the week January 25th of 2013

22   was?

23       A.    Yes.  It was Friday.

24       Q.    I take it, it was a school day, correct?

25       A.    Yes.

NOAH DIETCHWEILER

Page 27

1     Q.    Did your band or show choir

2  responsibilities require you to show up early or

3  stay late after the school hours that you just

4  told me about?

5     A.    No.

6     Q.    What time, even though I know you

7  started at 8:13, what time did you actually get to

8  school?

9     A.    Around 8 o'clock.

10     Q.    Okay.  To the best of your knowledge

11  would you have gotten to school on January 25th,

12  2013, about 8 o'clock?

13     A.    Yes.

14     Q.    Did you have a locker at the high

15  school?

16     A.    Yes.

17     Q.    Is that the first place you would go to

18  when you got dropped off?

19     A.    Yes.

20     Q.    Do you remember what your first class

21  was?

22     A.    I do not.

23     Q.    Were you required at Watseka high school

24  to actually show up for home room first, and then

25  go to your first class afterwards?

NOAH DIETCHWEILER

Page 28

```
 1        A.     No.
 2        Q.     Was your first period class in the
 3   second semester, I'm sorry, in January of 2013
 4   semester the same as your first class in the fall
 5   of 2012?
 6        A.     Yes.
 7        Q.     When was your lunch period?
 8        A.     After third period.  I don't recall what
 9   time that was.
10        Q.     Okay.  Do you remember what class you
11   would have had before lunch period?
12        A.     I do not.
13        Q.     I take it Watseka had a cafeteria, is
14   that correct?
15        A.     Yes.
16        Q.     Were students at Watseka allowed to go
17   off campus for lunch at all?
18        A.     No.
19        Q.     Did you typically bring your lunch or
20   did you buy?
21        A.     Bought the lunch.
22        Q.     Was there a group of people that you
23   would typically eat lunch with during the
24   semester, January semester, of 2013 at Watseka?
25        A.     Yes.
```

```
 1      Q.    Who did you eat lunch with?

 2      A.    Brett Short, Dakota Papineau, Michael

 3  Gregorash, Jessie Hurst, and that was pretty much

 4  our group that we ate lunch with.

 5      Q.    I'm going to have to go through each of

 6  those.  Brett Short?

 7      A.    Yes.

 8      Q.    B-R-E-T-T, last name S-H-O-R-T?

 9      A.    Yes.

10      Q.    Second name?

11      A.    D-A-K-O-T-A.  P-A-P-I-N-E-A-U.

12      Q.    Okay.  Who else?

13      A.    Michael Gregory.  Or McKay is his legal

14  name now.  M-I-C-H-A-E-L.  M-C-K-A-Y.

15      Q.    What did you know him by?  What was his

16  other last name?

17      A.    Gregorash.  G-R-E-G-O-R-A-S-H.

18      Q.    Do you know why his name changed?

19      A.    He lives with his grandparents.  And

20  Gregorash was his mother's last name, and since he

21  was living with his grandparents, he had it

22  changed to his grandparents last name.

23      Q.    Gotcha.  And who was the fourth person

24  that you ate with?

25      A.    Jessie Hurst.
```

Page 30

```
1       Q.      Is that a boy or girl?

2       A.      Boy.

3       Q.      Is that J-E-S-S-I-E, then H-E-A-R-S-T?

4       A.      H-U-R-S-T.

5       Q.      Had you known either Brett, Dakota,

6    Michael or Jessie before entering Watseka

7    Community High School?

8       A.      Yes.

9       Q.      Who did you know?

10       A.      Michael.

11       Q.      How long had you known Michael before

12   entering Watseka high school?

13       A.      Since kindergarten.

14       Q.      So he kind of came over with you after

15   graduating from your K through 8 school, is that

16   correct?

17       A.      Yes.

18       Q.      At the time back in the fall of 2012 and

19   January of 2013, would he have been considered

20   your best friend?

21       A.      Yes.

22       Q.      Other than Michael being your best

23   friend, who else would you have considered at

24   Watseka Community High School to have been one of

25   your best friends?
```

Page 31

1      A.     Dakota Papineau.

2      Q.     How long had you known Dakota?

3      A.     Since freshman year of high school.

4      Q.     Okay.  And anybody else at the table?

5      A.     I wouldn't consider them to be best

6   friends, no.

7      Q.     So other than Dakota and Michael, you

8   would deem those two boys to be your best friend,

9   at least while you were at Watseka?

10      A.     Yes.

11      Q.     In addition to going to school together

12   and obviously eating lunch together, what other

13   kinds of things did you do with Michael and

14   Dakota?

15      A.     Go to games together for the school.  We

16   would hang out outside of school.  I didn't have

17   my license at the time.  And would ride home with

18   Dakota a lot of the time.  That was basically all

19   that happened.

20      Q.     So when you said that your folks used to

21   pick you up from school every day, I asked if

22   there were any exceptions; Dakota would sometimes

23   give you a ride home?

24      A.     Yes, that is true.  Never to school

25   though.  That's what I took it to mean.

NOAH DIETCHWEILER

Page 32

```
 1      Q.    When did you get your license?
 2      A.    April 3rd, 2013.
 3      Q.    Did you take driver's ed through
 4 Watseka?
 5      A.    Yes.
 6      Q.    What semester?
 7      A.    Fall of -- or it would have been spring
 8 of 2013.
 9      Q.    Okay.  Did you complete driver's
10 education in the spring of 2013?
11      A.    Yes.
12      Q.    Where did you complete it?
13      A.    Watseka.
14      Q.    Did you successfully complete all of
15 your classes in the spring of 2013 from Watseka?
16      A.    Yes.
17            MR. TAGUE: Are you going to interrupt
18 him?  I think it's obvious that there's a semester
19 off.
20      Q.    You didn't go to school the entire time
21 of spring of 2013 at Watseka, isn't that correct?
22      A.    Correct.  When I've been saying 2013
23 here, I have meant 2012, when I would have turned
24 15, because I had my permit for a long time.  I
25 got the years mixed up there.
```

1       Q.      That's okay.

2       A.      Yes.

3       Q.      But you did get your license on April

4    3rd of 2013?

5       A.      Yes.  And I would have got my permit

6    April 3rd of 2012.

7       Q.      Gotcha.  So on January 25th of 2013,

8    after getting to school that day, at least for the

9    first three periods, did you attend all first

10   three periods?

11      A.      Yes.

12      Q.      You just don't remember as you sit here

13   what they were, correct?

14      A.      Correct.

15      Q.      And then how long was your lunch period

16   supposed to be?

17      A.      I believe it was -- I believe we had 40

18   minutes.

19      Q.      Okay.  Were you required to check in

20   with any teacher or supervisor before actually

21   going to lunch, or you just walked to the

22   cafeteria?

23      A.      Just walked to the cafeteria.

24      Q.      Were you free not to go to the cafeteria

25   during lunch period and go to the library or some

NOAH DIETCHWEILER

Page 34

1    place else in the school?

2        A.    Yes.

3        Q.    For those 40 minutes after leaving the

4    last class before lunch on January 25th of 2013,

5    where did you go?

6        A.    To the lunch room.

7        Q.    Directly?

8        A.    Yes.

9        Q.    Did you stop at your locker?

10       A.    Not before lunching, no.

11       Q.    Do you remember what your next class was

12   after lunch?

13       A.    Spanish I.

14       Q.    Did you have any classes with Mike and

15   Dakota?

16       A.    With Michael, yes.  With Dakota, no.

17       Q.    What classes did you have with Mike?

18       A.    Spanish I.  Geometry.  Wellness,

19   physical education, and that was it.

20       Q.    Okay.  So he also was in the honors

21   geometry?

22       A.    Yes.

23       Q.    At any time before January 25th of 2013

24   to the best of your knowledge was Michael McKay

25   ever arrested?

```
 1      A.    Yes.

 2      Q.    And do you know when that was?

 3      A.    No.

 4      Q.    Do you know how long before January 25th

 5   of 2013?

 6      A.    No.

 7      Q.    Within two years?

 8      A.    Yes.

 9      Q.    Within a year?

10      A.    I do not know.

11      Q.    Do you know what he was arrested for?

12      A.    Stealing.

13      Q.    Do you know what the results of that

14   arrest were?

15      A.    No.

16      Q.    Do you know if he had ever been arrested

17   for anything else before January 25th of 2013?

18      A.    No, he had not.

19      Q.    Would Michael McKay have been one of the

20   individuals that you would have smoked marijuana

21   or ingested marijuana with?

22      A.    No.

23      Q.    How about Dakota?

24      A.    No.

25      Q.    Had you ever known Michael McKay any
```

NOAH DIETCHWEILER

Page 36

```
1    time before January 25th of 2013 to ever ingest an

2    illegal substance?

3        A.    No.

4        Q.    Had you ever known Michael McKay at any

5    time before January 25th of 2013 to sell an

6    illegal substance?

7        A.    No.

8        Q.    Did you ever know Dakota Papineau at any

9    time before January 25th of 2013 to ingest an

10   illegal substance?

11       A.    No.

12       Q.    How about to sell an illegal substance?

13       A.    No.

14       Q.    On January 25th of 2013 did Michael

15   McKay ever show you any type of pill or other

16   illegal substance at lunch or any time before

17   then?

18       A.    No.

19       Q.    At any time before or during lunch of

20   January 25th of 2013, did you ever discuss with

21   Michael McKay any pills or illegal substance that

22   he had with him?

23       A.    No.

24       Q.    Or could get?

25       A.    No.
```

NOAH DIETCHWEILER

Page 37

```
1      Q.    Michael was arrested on or about January
2   25th of 2013, is that correct?
3      A.    Yes.
4      Q.    Do you know what he was arrested for?
5      A.    I do not know exactly, but it had to do
6   with the drugs that were found with him at school.
7   That's all I know.
8      Q.    Do you know what kind of drugs were
9   found with him at school?
10     A.    ADD medicine.  That's all I know.
11     Q.    And how did you find that out?
12     A.    When I was in the dean and principal's
13  office; late in the dean and principal's office.
14     Q.    At any time on or after January 25th of
15  2013 did you ever talk to Michael about his
16  arrest?
17     A.    No.
18     Q.    How about, about the drugs he was
19  carrying?
20     A.    No.
21     Q.    Did you ever have any conversation at
22  all concerning any circumstances surrounding those
23  drugs?
24     A.    Not around the drugs, no.
25     Q.    Okay.  How about around any people that
```

1   he may have given these pills to or anything that

2   happened to you afterwards?

3       A.   No.

4       Q.   When you say ADD medication or medicine,

5   what do you mean by that?

6       A.   A medication used to treat ADD, or ADHD.

7   I don't know if there's a difference or which one

8   it is.

9       Q.   Okay.  What's Michael's date of birth,

10  if you know?

11      A.   December 24th of 1996.

12      Q.   So he's slightly older?

13      A.   1997.

14      Q.   So he's slightly younger than you?

15      A.   Yes.

16      Q.   Were you ever called as a witness to

17  testify in Michael McKay's criminal trial?

18      A.   No.

19      Q.   Do you know if he had a trial?

20      A.   No.

21      Q.   Bad question.  No, you don't know; or

22  no, he didn't?

23      A.   No, I do not know.

24      Q.   Were you ever questioned by the police

25  concerning Michael's arrest?

Page 39

```
 1       A.    No.
 2       Q.    Do you know if Michael pled guilty to
 3  anything?
 4       A.    No.  I do not know.
 5       Q.    You don't know?  Do you know the results
 6  of his arrest for that?
 7       A.    I do not know.
 8       Q.    Did you ever talk to him about it?
 9       A.    No.
10       Q.    Have you seen Michael at all since
11  January 25th of 2013?
12       A.    Yes.
13       Q.    That was the last day you were at
14  Watseka Community High School, is that correct?
15       A.    Yes.
16       Q.    How did you contact him?
17       A.    We live not too far from them.  So,
18  occasionally I would stop by and say hi to his
19  grandparents, and just see how things were going
20  with their family and whatnot.  So I'd say hi to
21  him then.
22       Q.    Is he still a student at Watseka
23  Community High School?
24       A.    No.
25       Q.    Do you know if he finished out the
```

1    semester at Watseka?

2        A.    He did not.

3        Q.    Where does he go to high school now, if

4    you know?

5        A.    On-line home schooling.

6        Q.    And that's still true this semester?

7        A.    Yes.

8        Q.    About how often per week did you see him

9    between January 25th of 2013 up to the time that

10   you left for Culver in August of 2013?

11       A.    Once a week.  Less than that even.

12       Q.    Did he work with you at either of your

13   jobs?

14       A.    Yes.

15       Q.    Which ones?

16       A.    Corn detassling.

17       Q.    How many days a week would you corn

18   detassle in the summer of 2013?

19       A.    Seven.

20       Q.    Did you see Michael while you were corn

21   detassling?

22       A.    I would see him but never come into

23   direct contact with him, or very rarely.

24       Q.    Why not?

25       A.    Just because we divide up into squads,

1   and if you're in a different squad you don't

2   really work with him.  So --

3        Q.   Okay.  How did you get to and from your

4   corn detassling job in the summer of 2013?

5        A.   I would drive myself because I had my

6   license.

7        Q.   Did you ever drive Michael?

8        A.   No.

9        Q.   Do you know how he got there?

10       A.   His grandparents would drive him, or

11  sometimes one of the other guys on the job would

12  drive him there that I don't know.

13       Q.   Do you know why you wouldn't have driven

14  him if he was close by to you?

15       A.   It's not really on my way into town, and

16  I just didn't really keep in contact with him

17  enough.

18       Q.   When you would see him once a week to

19  maybe less than once a week between January 25th

20  of 2013, and the time that you left for school to

21  go to Culver, was that typically at his

22  grandparents house?

23       A.   Yes.

24       Q.   And how long would those visits

25  typically be?

```
1       A.      Maybe an hour, one to two hours.

2       Q.      And what would you do?  Video games?

3       A.      Talk with everybody for a little bit.

4   And then video games or watch TV.

5       Q.      How about Dakota?  How often would you

6   see Dakota after January 25th of 2013?

7       A.      I would say five to seven times a week.

8       Q.      Did he stay at Watseka?

9       A.      Yes.

10      Q.      Do you know if he is still there now?

11      A.      Yes, he is.

12      Q.      Do you know if Dakota was also suspended

13  as a result --

14      A.      He was not.

15      Q.      Let me finish my question.

16      A.      Sorry.

17      Q.      Do you know if Dakota was also suspended

18  as a result of any activity that took place on

19  January 25th of 2013 at Watseka?

20      A.      He was not.

21      Q.      Besides yourself and Michael, was

22  anybody else suspended as a result of any events

23  on January 25th of 2013?

24      A.      Yes.

25      Q.      Do you know who those students were?
```

Page 43

1        A.      I could name a few.  But, I do not know

2    if I'll name the whole list.

3        Q.      Okay.  Why don't you give me the ones

4    that you know.

5        A.      Michael McKay.  Myself.  Grayson

6    Schunke.  Brett Short.  David Tolbert.  Kevin

7    A-I-L-E-Y.  And that is all that I recall.

8        Q.      Okay.  The one I'm going to need help

9    with, Grayson's last name?

10       A.      Schunke.

11       Q.      Do you know how to spell that?

12       A.      S-C-H-U-N-K-E.

13       Q.      And Tolbert for David, is T-O-L-B-E-R-T?

14       A.      Yes.

15       Q.      How about Kevin?

16       A.      A-I-L-E-Y.  And one more that I

17   remembered is Rolando Salizar.

18       Q.      Would any of those other students,

19   either Grayson, I think we talked about Brett,

20   David, Ken or Rolando, would you have considered

21   any of those friends?

22       A.      Brett, I would have considered a friend,

23   but he would not be a "best friend", quote,

24   unquote.

25       Q.      How about Grayson, David, Kevin or

1    Rolando?

2         A.    No.

3         Q.    Would they be acquaintances?  You know

4    who they were?

5         A.    Yes, I know them.

6         Q.    Would you have known any of those other

7    students who were suspended, either Grayson,

8    Brett, David, Ken or Rolando, to have ever been

9    previously arrested?

10        A.    Yes.

11        Q.    Who was previously arrested on that

12   list?

13        A.    Rolando had been arrested, and I believe

14   David Tolbert had been arrested.

15        Q.    And do you know the reasons for their

16   arrests?

17        A.    I do not.

18        Q.    Do you know if besides Michael, any of

19   the other students who were suspended were

20   arrested for any incidents that occurred at the

21   school on January 25th of 2013?

22        A.    I do not know.

23        Q.    And this may take a while, so I don't

24   know if you guys want to take a break, or it's up

25   to you?

1    A.    I'm fine.

2    Q.    Just chime in.  I forget to let you know

3  that before the dep started; if at any time you

4  need a break, just let me know.

5          MR. TAGUE: The other one we never ask is

6  the court reporter, who probably needs it.

7          COURT REPORTER:  I'm good.

8  BY MS. GOGGIN-WARD:

9    Q.    So on January 25th of 2013 after your

10  third period of time, you go directly to the

11  cafeteria, correct?

12    A.    Yes.

13    Q.    And are you the first one of your group

14  of friends to arrive, or are you --

15    A.    I typically was one of the first ones,

16  if not the first one.

17    Q.    And you don't remember specifically that

18  day, I take it?

19    A.    No, I do not.

20    Q.    Did you guys get a table first or did

21  you go in your lunch line?

22    A.    We would go to the lunch line first.

23  The tables, we always sat at pretty much the same

24  table.

25    Q.    Okay.  And where did you sit in the

1   cafeteria typically?

2       A.    It would have been on the north side of

3   the cafeteria, two tables from the entrance.  So

4   two tables down from the entrance on the north

5   side.

6       Q.    Did Watseka divide the lunches into like

7   a first lunch, second lunch, third one, that kind

8   of thing?

9       A.    Yes.

10      Q.    You had first lunch it sounds like?

11      A.    Yes.

12      Q.    Did any of the people that you went to

13  lunch with, did they typically buy their lunch or

14  bring their lunch?

15      A.    Typically bought their lunch.

16      Q.    Did that include Michael?

17      A.    Yes.

18      Q.    Did you all have your backpacks with you

19  at lunch?

20      A.    No.

21      Q.    And that would be all of you?  I can go

22  through individually, but nobody had their

23  backpacks?

24      A.    No.

25      Q.    How about books for the period following

1    lunch?

2        A.    I don't recall.

3        Q.    Since you hadn't gone to your locker

4    after third period, you went directly to lunch,

5    right?

6        A.    Yes.

7        Q.    What would you have been carrying with

8    you from third period to the cafeteria?

9        A.    I would have had my binder, and if there

10   were any books required for the class before,

11   considering I don't recall what class it was.  The

12   books that I would need for that class.

13       Q.    And then you sat with all of the kids

14   that you listed beforehand that same day on

15   January 25th?

16       A.    Yes.

17       Q.    Do you know if any of those kids were

18   out sick?

19       A.    I do not.  I don't think so.

20       Q.    How big was the table that you sat at?

21       A.    I don't know the exact dimensions.  It

22   was a typical, like a typical length style school

23   lunch table.

24       Q.    Square or round?

25       A.    Rectangle.

Page 48

1      Q.    Rectangle?

2      A.    Yes.

3      Q.    Did it have like seats attached to both

4   sides of it?

5      A.    Yes.

6      Q.    That fold down?  Did you typically sit

7   in the same seat?

8      A.    Yes.

9      Q.    Where did you sit then at lunch in

10   January of 2013?

11      A.    I sat on the side away from the door,

12   the entrance to the cafeteria.  About three people

13   from the edge.  Three people from the south edge

14   of the table.

15      Q.    Okay.  And did you have kids sitting on

16   either side of you?

17      A.    Yes.

18      Q.    Who would have sat to your left, first

19   of all?

20      A.    Dakota Papineau.

21      Q.    How about to your right?

22      A.    I don't recall on this day.  To the

23   right was never a certain person.

24      Q.    Used to change up?

25      A.    Yes.

1      Q.     Where did Michael usually sit?

2      A.     Michael usually sat across from me.

3      Q.     Directly?

4      A.     No, he would have been more to the left.

5      Q.     Okay.  So right in front of Dakota it

6   sounds like?

7      A.     Yes.

8      Q.     And you said your lunch period was 40

9   minutes, is that correct?

10     A.     Yes.

11     Q.     At any time during the January 25th of

12  2013 lunch period did you ever see Michael pass

13  anything to anybody?

14     A.     No.

15     Q.     And I take it he never showed anybody

16  any pills or other types of substances during that

17  lunch?

18     A.     No.

19     Q.     At any time before January 25th of 2013

20  did you ever purchase anything from Michael?

21     A.     No.

22     Q.     Was there anything unusual that happened

23  during the lunch period that you remember?

24     A.     No.

25     Q.     Were there any teachers or monitors or

NOAH DIETCHWEILER

Page 50

```
 1    supervisors during the lunch period of January

 2    25th of 2013?

 3        A.    Yes.

 4        Q.    Who are they?

 5        A.    I do not recall exactly who it was, but

 6    there were always two monitors for each lunch

 7    period.

 8        Q.    Were they typically the same during the

 9    lunch period that you had?

10        A.    Not always, no.

11        Q.    Do you remember who any of those

12    teachers or monitors would have been?

13        A.    Yes.

14        Q.    Who?

15        A.    Coach Lucas, the dean of students

16    monitored quite commonly.  And sometimes Mr.

17    Bunting, the principal, would sit in on the

18    lunches personally.  And Mr. Nick Harvey would

19    also sit in on lunches quite a bit.

20        Q.    Is it Harvey?

21        A.    Harvey.

22        Q.    Who is that?

23        A.    He was a math teacher.

24        Q.    Okay.  Do you know about how many

25    students ate lunch during the first period for the
```

1    January 25th of 2013 day?

2        A.    I couldn't say how many.

3        Q.    Was it more than less 100?

4        A.    I would say less than 100.  I'm not sure

5    about that though.

6        Q.    How many total students attended Watseka

7    back in January, 2013?

8        A.    I don't recall exactly.  I know it was

9    just over 200.

10       Q.    Where did Coach Lucas, Mr. Bunting and

11   Nick Harvey, what was their typical location

12   during lunch?

13       A.    On the side; it would have been the west

14   side of the lunch room, all the way across from

15   the door.  There was like a couple steps up to

16   like a platform at the edge of the lunch room.

17   And a stage sort of thing, I guess you could call

18   it.  And one of them would always stand there.

19   And one of the lunch monitors would walk around

20   and roam the whole lunch room.

21       Q.    Did you actually finish your lunch on

22   January 25th of 2013?

23       A.    Yes.

24       Q.    And then you went to your locker after

25   lunch was done?

Page 52

1      A.    Yes.

2      Q.    I take it you dropped off your books

3   from the first three periods, or binder or

4   whatever, and then picked up the ones for the rest

5   of the day?

6      A.    Yes.

7      Q.    Where was your locker located in

8   relationship to the cafeteria?

9      A.    Second floor; so one floor up, and on

10  basically on the other edge of the school.

11     Q.    And then you attended Spanish I?

12     A.    Yes.

13     Q.    Which I guess would have been

14  technically fourth period after lunch?

15     A.    Yes.

16     Q.    Did you complete Spanish I that day?

17     A.    The class.

18     Q.    Went through the whole class?

19     A.    Yes.

20     Q.    Would you have walked there with Michael

21  since he also had Spanish I?

22     A.    Yes.

23     Q.    Where was his locker in relationship to

24  yours?

25     A.    A few lockers down away from the

NOAH DIETCHWEILER

Page 53

1    cafeteria from my locker on the other side of the

2    hallway.

3        Q.    Did anybody else walk with you to

4    Spanish I besides Michael?

5        A.    No.

6        Q.    Who was your Spanish I teacher?

7        A.    Miss Nutter, N-U-T-T-E-R.

8        Q.    And what class, if you remember, did you

9    have after Spanish I?

10       A.    I do not recall.

11       Q.    When was the first time that you had any

12   indication that I guess you were in trouble on

13   January 25th of 2013?

14       A.    That I personally was in trouble?

15       Q.    Okay.  We'll go with when did you first

16   find out that anybody was in trouble?

17       A.    The first time I ever knew anything was

18   up was I went to Spanish I, and Michael got,

19   before class actually started, before the bell

20   rang, Michael got pulled out of class and his

21   books were still at his desk, but he wasn't.  And

22   a few minutes later Mr. Bunting walked in, grabbed

23   his books, and said Michael won't be returning for

24   the day and left.  That was when anything

25   strange -- the first time anything strange had

1    happened that day.

2         Q.    Who came, if you know, who came into

3    Spanish I and took Michael out of class?

4         A.    Mr. Bunting.

5         Q.    Now, did Mr. Bunting return after some

6    period of time and get Michael's books?

7         A.    Yes.

8         Q.    Or did he take them with him at the same

9    time?

10        A.    It was after some period of time.

11        Q.    But you were still in Spanish I,

12   correct?

13        A.    Yes.

14        Q.    Was there any indication as to why

15   Michael was being pulled out of Spanish I on that

16   day?

17        A.    No.

18        Q.    So then I take it you finished out

19   Spanish I, correct?

20        A.    Yes.

21        Q.    When was the next indication you had

22   anything was wrong with anybody, including

23   yourself, after Michael got pulled out of Spanish

24   I?

25        A.    Nothing more until 3:00, it would have

1   been right before the end of the day.  So, I guess

2   it would have been 2:50 to 3:00, somewhere in

3   there.  The dean of students, Mr. Lucas, came to

4   the class, and pulled me out of the classroom.

5   And that was the next time that I was -- I knew

6   that anything was going wrong, or was happening.

7       Q.   So that was last period?

8       A.   Yes.

9       Q.   And what class were you in at that time?

10      A.   Advisory period.

11      Q.   That's study hall?

12      A.   Yes.  And it was in my home room, Mr.

13  Flaherty's room.

14      Q.   Was Mr. Flaherty there?

15      A.   Yes.

16      Q.   So typically, on a typical day, you

17  would have been in last period with Mr. Flaherty,

18  you would have been dismissed at whatever time you

19  were usually dismissed, and then your folks would

20  have come picked you up from school, or you would

21  have gotten a ride home from Dakota?

22      A.   Yes, and on this day I was getting

23  picked up by my parents.

24      Q.   Where did they typically pick you up at?

25      A.   Right outside of the school by the main

NOAH DIETCHWEILER

1    office.

2       Q.    Were your parents usually waiting for

3    you?

4       A.    Yes.

5       Q.    What time would you usually get out to

6    the car?

7       A.    By 3:15.

8       Q.    Did you have a cell phone back in

9    January 25th of 2013?

10      A.    Yes.

11      Q.    Who was your provider at that time?

12      A.    Verizon.

13      Q.    Do you still have that same cell phone?

14      A.    Yes.

15      Q.    What was your number?

16      A.    815-867-1148.

17      Q.    How long had you had that cell phone

18   before January 25th of 2013?

19      A.    I don't recall.

20      Q.    I take it, it had texting capabilities?

21      A.    Yes.

22      Q.    So, while you're in advisory period how

23   many other students would have been in that period

24   with you?

25      A.    I would say ten to 15.

NOAH DIETCHWEILER

Page 57

1      Q.    I take it Michael wasn't in that period
2   that day, correct?
3      A.    Correct.
4      Q.    Would he have typically been?
5      A.    No.
6      Q.    How about Dakota?
7      A.    No.
8      Q.    Did you have any friends or people that
9   you consider friends in that advisory period?
10     A.    Yes.  My girlfriend, Kelly Boatman.
11     Q.    How do you spell her last name?
12     A.    K-E-L-L-Y.  B-O-A-T-M-A-N.
13     Q.    Is she still your girlfriend?
14     A.    Yes.
15     Q.    Does she still go to Watseka?
16     A.    Yes.
17     Q.    And is she a junior or sophomore?
18     A.    No, freshman.  Well, she would have been
19  a freshman at the time.  She is a sophomore now.
20     Q.    So, it sounds like they, for advisory
21  periods, it wasn't necessarily class specific?  It
22  could have been any grade?
23     A.    Yes.
24     Q.    Did you usually do your homework during
25  that period?

NOAH DIETCHWEILER

Page 58

1      A.    Yes.

2      Q.    Was that held in a classroom?

3      A.    Yes.

4      Q.    How far was that classroom located from

5 the main office?

6      A.    Directly above it.

7      Q.    How long into that period was it before

8 Mr. Lucas came in to get you?

9      A.    It would have been half an hour.

10     Q.    And where were you sitting?

11     A.    I was sitting next to the window, in the

12 western corner.

13     Q.    What did you have with you at that time?

14     A.    A binder and whatever, a binder with my

15 school supplies in it, and whatever books I would

16 have had for homework that day.  I don't recall

17 exactly what they were.

18     Q.    Did you have a backpack?

19     A.    Yes.  But not with me in the classroom.

20     Q.    Okay.  So it sounds like after you would

21 have been dismissed from that period you would

22 have had to have returned from your locker, it was

23 anticipated to get your backpack and then go meet

24 your folks outside?

25     A.    Yes.

NOAH DIETCHWEILER

Page 59

```
 1        Q.    And when you say binder, can you
 2   describe that for me?
 3        A.    It's technically called a trapper
 4   keeper.  It's like got a three-ring binder in it,
 5   but on one side it also has like multiple folders
 6   they can place papers in.  And a little pouch that
 7   you can keep your pencils in or whatever.
 8        Q.    So does it zip up or kind of snap shut?
 9        A.    It Velcroes shut.  Yes.
10        Q.    So after Mr. Lucas walks in, do you see
11   him approach Mr. Flaherty first?
12        A.    No.
13        Q.    Where does he go when he walks in the
14   room?
15        A.    He stayed right by the door and he
16   signaled me to come out.
17        Q.    How did he signal you?
18        A.    He looked right at me, and just kind of
19   waved to me for me to come out.
20        Q.    Was he actually in the classroom at that
21   time or outside the door?
22        A.    He was in the classroom, but not much
23   past the door.  Like he was right by the door.
24        Q.    Like the doorway?
25        A.    Yes.
```

1      Q.    He didn't say anything specifically?

2      A.    No.

3      Q.    Just kind of used his hand and a finger

4  and told you to come over?

5      A.    Yes.

6      Q.    Did you gather your things or did you

7  just walk over to him?

8      A.    I gathered my things and walked over.

9      Q.    Did you know why he was beckoning to

10 you?

11     A.    No.

12     Q.    When you approached him, did he say

13 anything to you?

14     A.    No.

15     Q.    Did you say anything to him?

16     A.    No.

17     Q.    What did you do next?

18     A.    We walked out of the classroom and he

19 just said follow me down to the office.  I don't

20 recall if those were his exact words.  But,

21 something along those lines.  And we walked down

22 to the office.

23     Q.    When you say the office, was that his

24 office or the main office?

25     A.    The main office right outside, Mr.

1  Bunting's.

2      Q.    You just followed him, I take it?

3      A.    Correct, yes.

4      Q.    And when you walked into the main

5  office, Mr. Bunting's office, are there like

6  little sub offices in that office?

7      A.    Yes.

8      Q.    And where did you go when you went in?

9      A.    I sat down right on the outermost

10  office, right outside Mr. Bunting's door.  And it

11  would have been like the secretaries' area that I

12  was at.

13      Q.    And where did Mr. Lucas go at that time?

14      A.    He instructed the secretary to not let

15  me leave or talk to anybody, even after the bell

16  had rang.  And then left.  I would assume that he

17  went to his office.  But, I do not know for sure.

18      Q.    Okay.  And do you know who the secretary

19  was?

20      A.    I do not recall.

21      Q.    I take it, it's a female?

22      A.    Yes.

23      Q.    Do you know what she looked like?

24      A.    I do not recall.

25      Q.    Tall?  Short?  Fat?  Thin?

1        A.    A taller thin lady.

2        Q.    Any approximate age?  I know it's tough

3   when you're sixteen.  We all look old.

4        A.    I'd say forties to fifties.

5        Q.    Gray or dark hair or what?

6        A.    I recall darker hair.

7        Q.    Do you know if she was a specific

8   secretary to any of the people in that main

9   office?

10       A.    I do not.

11       Q.    Where was her desk located in

12  relationship to where you were sitting?

13       A.    Straight in front of me.

14       Q.    Okay.  Do you know if she still works

15  there?

16       A.    I don't recall.  Or I don't know if she

17  does.

18       Q.    Was anybody else in the office when Mr.

19  Bunting said what you just indicated?

20       A.    It would have been Mr. Lucas that said

21  that.

22       Q.    I'm sorry, Mr. Lucas.

23       A.    And I don't believe so.

24       Q.    So no other students were sitting in any

25  other chairs that you know of?

1      A.     No.   Mr. Bunting's office door was

2   closed, but nobody was in the office that I was

3   in.

4      Q.     How long did you sit in that seat?

5      A.     Until about 3:25.

6      Q.     By yourself?

7      A.     Yes.

8      Q.     Did you have your things with you?

9      A.     My binder and books from school, yes.

10     Q.     And where would your cell phone have

11  been located at that time?

12     A.     In my locker.

13     Q.     Did a school rule prevent you from

14  taking your cell phone into class?

15     A.     Correct.

16     Q.     For the main office itself can you see

17  into it from the outer hallways?

18     A.     Yes.

19     Q.     It's like surrounded by glass?

20     A.     Yes, on two sides.

21     Q.     Could you see out of the office from

22  where you were sitting?

23     A.     Yes.

24     Q.     So you sat down there, it sounds like

25  for about half hour, is that right?

```
1      A.    Yes.
2      Q.    And did anybody approach you during that
3   time?
4      A.    One person did.  Another student.  Leah
5   Graham.  And she came in to the office, she had
6   got her cell phone taken away.  So she came into
7   the office to get her cell phone back and saw me
8   sitting there.
9      Q.    And what did Leah say to you and you say
10  to Leah at that time?
11     A.    I just told her to tell Kelly, her and
12  Kelly were friends, and I told her to tell Kelly
13  that I would get ahold of her as soon as I could.
14  And that I didn't know like what it was all about.
15  And at that time the secretary told Leah to leave,
16  and that she couldn't talk to me.
17     Q.    Okay.  In addition to telling Leah to
18  tell Kelly that you would get ahold of her as soon
19  as possible, did you tell Leah that your folks
20  were waiting outside for you?
21     A.    I did not.
22     Q.    Had you ever been or had you ever gotten
23  out of school late at any time before January 25th
24  of 2013 when your folks were picking you up?
25     A.    Perhaps just like a few minutes later
```

1   for getting some help from a teacher, or whatever

2   it may have been.  But, never like substantially

3   late.

4       Q.    Okay.  Did your folks typically during

5   those rare circumstances just wait in the car for

6   you?

7       A.    Yes.

8       Q.    They never came in?

9       A.    Correct.

10      Q.    And about how late would you have been

11  under those prior circumstances?  Just a few

12  minutes or --

13      A.    It would have been always less than half

14  an hour for sure.

15      Q.    After school is dismissed, and then you

16  would have been late for that half hour, would you

17  have been allowed to have your cell phone with you

18  to let your folks know you were going to be late?

19      A.    Would I have been under the rules, or

20  was I on the specific day?

21      Q.    No, not this specific day.  Under the

22  rules?

23      A.    Yes, I would have been.

24      Q.    Anybody else come in or out of the

25  office besides Leah?

```
1      A.    No.
2      Q.    Not a teacher?  Nobody else?
3      A.    There was one parent.
4      Q.    Whose parent was that?
5      A.    Brett Short's mother.
6      Q.    And do you know why she was there?
7      A.    I do not.
8      Q.    Did you ever overhear any conversation
9   that she had with anybody in the office?
10     A.    I don't recall.
11     Q.    Do you know how long she was in the
12  office?
13     A.    I don't recall.  I don't believe it was
14  very long at all.
15     Q.    And do you know when she got there if
16  anybody else came and talked to her besides one of
17  the secretaries or anything like that?
18     A.    I don't recall that.
19     Q.    Okay.  Did she leave with Brett?
20     A.    I did not see.
21     Q.    When she left the office, did you see
22  her leave with anybody?
23     A.    No.
24     Q.    And you don't know why she was there?
25     A.    No.
```

1    Q.    Besides then Brett's mom and Leah

2    Graham, did you see anybody else come in and out

3    of the office while you were sitting there?

4        A.    I remember Mr. Bunting came in and out a

5    number of times. But, never was in there for any

6    long period of time. He was more or less running

7    in and out.

8        Q.    Okay. So he's going in and out. Do you

9    know where he was going?

10       A.    No.

11       Q.    Did he ever bring any other students

12   back with him?

13       A.    No.

14       Q.    He then left by himself, I take it?

15       A.    Yes.

16       Q.    He would come back by himself?

17       A.    Yes.

18       Q.    Did he ever talk to you on those

19   occasions?

20       A.    No.

21       Q.    Did you ever ask the secretary during

22   that half hour or have any other conversations

23   with her during that time?

24       A.    No.

25       Q.    So at about 3:25 did Mr. Bunting come

1    back out and get you?

2        A.    Yes.

3        Q.    And where did you go at that time?

4        A.    To the -- it was across the hallway,

5    kind of tucked away in a corner, Mr. Lucas's

6    office.

7        Q.    Is that still within the main office?

8        A.    No.

9        Q.    So that's outside the main office like

10   down the hallway?

11       A.    Yes, it's directly across the hallway.

12       Q.    Is that also surrounded by glass windows

13   or --

14       A.    No.

15       Q.    Is that completely enclosed?

16       A.    That is completely enclosed.

17       Q.    When you left was the secretary still in

18   the main office?

19       A.    Yes.

20       Q.    Do you know if anybody else was?

21       A.    I don't believe so.

22       Q.    Do you know how long the main office is

23   open?

24       A.    I do not.

25       Q.    And when you went to Mr. Lucas's office,

1   who else was in there besides Mr. Lucas and Mr.

2   Bunting and yourself?

3       A.   Nobody.

4       Q.   And what was the first thing said by

5   anybody?

6       A.   It was Mr. Lucas who spoke. And he said

7   something along the lines of, I believe you know

8   why you're here. Or I'm sure that you know why

9   you're here.

10      Q.   Okay. And did you say anything in

11  response to that?

12      A.   I told them no, I do not know why I'm

13  here. What's going on.

14      Q.   And what did either of them say back to

15  you?

16      A.   Mr. Lucas said back, a number of

17  students have provided us with reason to believe

18  that you've been involved with drugs here at

19  Watseka.

20      Q.   And what did you say to that?

21      A.   I said something along the lines of

22  whoa, what? What's going on here. I don't, like,

23  I didn't have anything to do with the drugs.

24      Q.   Did you know that there were drugs being

25  sold or bought at Watseka?

1    A.    No.   I had no idea.  And I told them, I
2  don't even know who had drugs here today.
3    Q.    Did you know who had drugs there in the
4  past?
5    A.    You would hear occasionally if somebody
6  got caught.  But, I never knew anybody personally.
7    Q.    And what else did they say after that?
8    A.    Mr. Bunting told me at that point that I
9  had a choice of either a ten day suspension for
10  admitting to taking the drugs, or expulsion for
11  denial of taking the drugs.
12    Q.    And did he tell you what drugs he was
13  referring to?
14    A.    He did not.
15    Q.    Did he indicate to you when any of these
16  incidents took place?
17    A.    No.
18    Q.    And what did you do after that?
19    A.    I sat back in my chair and it had just
20  been all so overwhelming and I was still like
21  getting the situation.  So I sat back in my chair
22  and I just said, whatever.  That's the exact and
23  only word I used.
24    Q.    And what did they do after that?
25    A.    They had a printed out paper, or they

1    printed out a paper and placed it in front of me,

2    and asked me how I could contact either of my

3    parents.  Or if I had a ride there, is the first

4    thing they asked me.  And I told them yes, my

5    parents.  And they said is there any way you can

6    contact them?  I told them yes, I know their phone

7    numbers.

8        Q.    So this printed out piece of paper, when

9    did they hand that to you?

10       A.    It would have been after I said

11   whatever.

12       Q.    Okay.  And what did that printed out

13   piece of paper say?

14       A.    I know it was the paper for the

15   suspension.  It basically just said I can not come

16   on to school property for any school events.  Or I

17   just can't step on school property for ten days.

18       Q.    And did they ask for your folks cell

19   phone number before or after you got that piece of

20   paper?

21       A.    It would have been after.  They never

22   handed it to me in my hands.  But they placed it

23   on the desk in front of me.  And they would have

24   asked for my parents phone number after that.

25       Q.    Did you read it?

NOAH DIETCHWEILER

Page 72

1      A.    The paper?

2      Q.    Uh-huh.

3      A.    Not until later.

4      Q.    Did you sign it before you read it?

5      A.    No.

6      Q.    Did you sign it at all?

7      A.    Yes.

8      Q.    When did you sign it?

9      A.    At the very last second before I walked

10   out.  It was after my mom had came in, and we had

11   had a phone call with my dad, and we were just

12   standing up to walk out, and Mr. Lucas gave her

13   the paper, saying I still needed to sign it, and I

14   was just at that point ready to get out of the

15   office any way possible, so I signed the piece of

16   paper.

17     Q.    How long were you in the office the

18   entire time?

19     A.    I believe we left at just after four

20   o'clock.

21     Q.    So you would have gotten into that

22   specific office, into Mr. Lucas's office, about

23   3:25?

24     A.    Yes.

25     Q.    And how long was it after 3:25 that you

1    were handed this, or the piece of paper was put in

2    front of you?

3         A.    I believe around quarter to 4:00.

4         Q.    So about 3:45?

5         A.    Yes.

6         Q.    And did one or more of your parents come

7    into Mr. Lucas's room between 3:25 and 3:45?

8         A.    No.

9         Q.    When did either one of your parents

10   first come into the room?

11        A.    After 3:45.  It was my mother.

12        Q.    Okay.  And do you know how she got

13   notified or directed to Mr. Lucas's office?

14        A.    Mr. Bunting called her on the school's

15   phone.

16        Q.    So, it sounds like you got into the

17   room, you had the conversation that you just

18   described with Mr. Lucas and Mr. Bunting, they

19   placed this piece of paper in front of you, is

20   that correct?

21        A.    Yes.

22        Q.    And then right, or at some point in time

23   after they put this piece of paper in front of

24   you, you gave them your folks' cell phone numbers,

25   is that correct?

1      A.    Correct.

2      Q.    You hadn't signed this piece of paper

3  yet, is that correct?

4      A.    Correct.

5      Q.    Okay.  And then after they gave you this

6  piece of paper, and you gave them your folks' cell

7  phone numbers, before your mom actually walked in

8  the room, was anything else said by anybody?

9      A.    Mr. Lucas and Mr. Bunting stepped out of

10  the office.  I do not know if they had any

11  conversation, but there was none with me there.

12     Q.    So no additional conversation with

13  either of them, correct?

14     A.    Correct.  Involving me.

15     Q.    With just you?

16     A.    With me present.

17     Q.    Okay.  So you gave them your folks cell

18  phone numbers; did the piece of paper stay in

19  front of you?

20     A.    Yes.

21     Q.    When Mr. Lucas and Mr. Bunting left the

22  room, did you read that piece of paper?

23     A.    I did after my mom came in.

24     Q.    And that's good.  But I'm talking about

25  before your mom came in.  Did you read it?

1      A.    No.

2      Q.    So, they then left the room, presumably

3    to call your mom because your mom showed up,

4    right?

5      A.    Yes.

6      Q.    How long after they left the room did

7    your mom show up?

8      A.    Less than five minutes after.

9      Q.    So we're looking at like 3:50 PM now?

10     A.    Yes, it was relatively short.

11     Q.    Did anyone else enter Mr. Lucas's room

12   then between the time that they left to go call

13   your folks, and the time that your mom walked in?

14     A.    Mr. Lucas and Mr. Bunting came back in.

15     Q.    Okay.  Was anything else said by them

16   before your mom came in?

17     A.    No.

18     Q.    And the paper remained unsigned at that

19   point in time, correct?

20     A.    Correct.

21     Q.    So your mom walks in the room, correct?

22     A.    Yes.

23     Q.    And that's the woman seated to your left

24   right now, is that correct?

25     A.    Yes.

NOAH DIETCHWEILER

Page 76

```
1        Q.     And what, if any, additional

2    conversation took place then in front of you

3    between Mr. Lucas, Mr. Bunting and your mom?

4        A.     Mr. Bunting told me, or told my mom

5    that, I don't recall the exact words he used, but

6    he told her that I was only in trouble for, I

7    forget the exact word he used, but it meant not

8    knowing about something that was going on without

9    telling anybody.

10       Q.     Okay.  You mean knowing something about

11   what was going on without telling anybody?

12       A.     He told my mother that I knew, that I

13   knew about the drugs that Michael had, without

14   telling an adult or somebody, like somebody that

15   could take correct action towards it.

16       Q.     Okay.  And did your mom say anything in

17   response?

18       A.     No.  She was pretty shocked and just

19   kind of -- well, she's always kind of quiet, and

20   she was in shock, so just didn't really say a

21   whole lot.

22       Q.     Do you know if she said anything?

23       A.     I don't recall.  At that time I don't

24   believe so.  The first thing that I recall her

25   saying was that we needed to have my father on the
```

1   phone, so that all three of us could be there.

2        Q.   Okay.  Do you know if your dad had been

3   called before your mom had gotten into the room?

4        A.   I do not know.

5        Q.   And after your mom walked in the room

6   and was shocked, was anything else said besides

7   what you just said by Mr. Bunting?

8        A.   I don't believe so, no.

9        Q.   And how much longer were you in the room

10  then between the time your mom walked in at about

11  3:50 to the time you signed your piece of paper?

12       A.   It would have been, I signed the piece

13  of paper right before we left.  So, it would have

14  been 15 minutes or so; 15 to 20 minutes.

15       Q.   So about 4:15?

16       A.   Yes.

17       Q.   Was your dad called at some point in

18  time between the time your mom was brought in the

19  room, and 4:15?

20       A.   Yes.

21       Q.   And how do you know your dad was called?

22       A.   They did it on Mr. Lucas's phone in his

23  office, and put it on speaker phone so that we all

24  could hear and talk.

25       Q.   Okay.  So, during the conversation with

1    your dad on speaker phone, your mom would have

2    been present, you would have been present, Mr.

3    Lucas and Mr. Bunting?

4         A.    Correct.

5         Q.    So they called your dad, he's on speaker

6    phone, what did they say to him and he say to

7    them?

8         A.    They told him that I was being suspended

9    for ten days for possession and use of illegal

10   drugs.

11        Q.    Okay. And at that point in time did

12   your mom indicate that that's not what Mr. Bunting

13   and Mr. Lucas had told her?

14        A.    She did not.

15        Q.    Did you indicate that?

16        A.    I did not.

17        Q.    Why not?

18        A.    We were all just shocked and didn't -- I

19   still didn't know what was being spoken of, what

20   the events were that they had talked of, and I

21   guess we all felt we had no other choice besides

22   to comply with what they were saying.

23        Q.    So, was it Mr. Bunting or Mr. Lucas who

24   said that you were being accused of or charged

25   with possession of and use of pills?

1    A.    I don't recall which one it was that

2  said that.

3    Q.    And did your dad talk on the speaker

4  phone then after that?

5    A.    Yes.

6    Q.    What did your dad say?

7    A.    He said that he understood that it was

8  unacceptable for his son to be using drugs at

9  school.  And that he understood the discipline

10  they were doing.

11    Q.    Did your dad in any way question on the

12  speaker phone the validity of the charges against

13  you?

14    A.    He did not.

15    Q.    Did your dad, at any point during that

16  conversation, indicate that he didn't want you to

17  sign anything or talk to them any more?

18    A.    He did not.

19    Q.    Did your dad on the telephone ever

20  indicate to anyone over the speaker phone that he

21  believed a hearing was warranted concerning these

22  charges?

23    A.    He did not.

24    Q.    Did your dad, when he was on the speaker

25  phone, tell either you or your mother directly not

1    to sign anything?

2         A.    He did not.

3         Q.    And up until the point that your father

4    was on the phone you hadn't signed a thing, is

5    that correct?

6         A.    Correct.

7         Q.    If your dad would have indicated to you

8    not to sign anything before you signed that piece

9    of paper, would you have followed your dad's

10   instructions?

11        A.    Yes.

12        Q.    If your mom had indicated at any time

13   after she showed up in the office to not sign

14   anything or say anything, would you have followed

15   your mom's instructions?

16        A.    Yes.

17        Q.    I forgot, if your dad had indicated to

18   you not to say anything else, would you have

19   followed your dad's instructions?

20        A.    Yes.

21        Q.    How long was your dad on speaker phone

22   with Mr. Lucas, Mr. Bunting, your mom and yourself

23   present?

24        A.    I would say a matter of ten minutes.

25        Q.    Other than stating what you said your

1   dad had said, did he say anything else during that

2   conversation that you recall?

3       A.    I do not recall.

4       Q.    Do you know if Mr. Bunting or Mr. Lucas

5   ever indicated that Michael McKay was in any way

6   involved in this situation?

7       A.    I don't recall.

8       Q.    Did your dad ever indicate during the

9   speaker phone conversation that he would come to

10  the school and to not do anything until he got

11  there?

12      A.    He did not.

13      Q.    So, you then signed this piece of paper,

14  as you described before, and left with your mom,

15  is that correct?

16      A.    Yes, after the phone call had ended.

17      Q.    After the phone call ended, and you

18  can't recall anything else that your dad said, I

19  think you just testified, how much time passed

20  between the time that the phone call ended and you

21  signed the piece of paper?

22      A.    A matter of minutes.

23      Q.    Did you then during that matter of

24  minutes actually then read the document in front

25  of you before you signed it?

1    A.    Yes.

2    Q.    Did your mom also have to sign a piece

3  of paper?

4    A.    She did not.

5    Q.    Did they ask her to?

6    A.    No.

7    Q.    Do you know if there were any other

8  signatures like Mr. Bunting's or Mr. Lucas's

9  signature on it?

10    A.    I don't believe so, no.

11    Q.    How long was this piece of paper?  What

12  did it look like?

13    A.    I had one page in front of me.  One

14  front side page.

15    Q.    Okay.  I'm going to hand you what is

16  marked as group exhibit -- I'm sorry, group

17  Exhibit 3 for identification.  I'm going to show

18  your counsel this.

19          Group Exhibit 3, and you don't know what

20  this is, but they are tendered by your counsel

21  pursuant to federal rules of procedure 26 A, and

22  those are documents tendered to me as being

23  somehow related or involved in this occurrence.

24  And I'm going to have you go through that, and

25  maybe we can take a break while we're doing that,

NOAH DIETCHWEILER

Page 83

1   because that may take a couple minutes, to find

2   the piece of paper that you're talking about that

3   you signed concerning your suspension, okay?

4            (A break was taken at 1:04 p.m.)

5   BY MS. GOGGIN-WARD:

6       Q.    Back on the record.  After you and your

7   mom left the office, where did you go?

8       A.    Directly back to my house.

9       Q.    Did you go back to your locker at all?

10      A.    Before leaving, yes.  I stood up -- I

11  signed the piece of paper, stood up, walked out of

12  the office, shook hands with Mr. Bunting, Mr.

13  Lucas, went up to my locker, got my backpack, and

14  left the school.

15      Q.    Other than what you indicated by Mr.

16  Bunting or Mr. Lucas that you were facing

17  expulsion, or a ten day suspension if you signed

18  the piece of paper, were you physically threatened

19  in any way by either of them?

20      A.    No.

21      Q.    Were you threatened in any other way

22  besides that one statement?

23      A.    No.

24      Q.    Other than that one statement, was

25  anything else said to force you to sign that piece

NOAH DIETCHWEILER

Page 84

1    of paper?

2        A.    No.

3        Q.    Did you ever ask Mr. Bunting or Mr.

4    Lucas during the meeting that you were at in Mr.

5    Lucas's office concerning why you were there?

6        A.    No.

7        Q.    Did either your mom or your dad on

8    speaker phone ever question, other than what was

9    said by Mr. Lucas and Mr. Bunting, why you were

10   there?

11       A.    No.

12       Q.    Before you left with your mom after

13   signing the piece of paper, was anything else said

14   by Mr. Bunting or Mr. Lucas to you?

15       A.    I don't recall.  I don't believe so

16   though.

17       Q.    Okay.  So you shook their hands, and

18   left with your mom, and you and your mom went to

19   your locker, correct?

20       A.    Correct.

21       Q.    What did you pick up from your locker?

22       A.    Put my books back and got my backpack.

23       Q.    And where did you go after that?

24       A.    Out the office doors to the truck and we

25   went back home.

1       Q.      How far was your home from school?

2       A.      I believe it's like eight miles outside

3    of town.

4       Q.      Did you talk to your mom during the car

5    ride home?

6       A.      Yes.

7       Q.      And what did she say to you and you say

8    to her during that time?

9       A.      She basically asked what all, like what

10   I knew about this.  And I told her nothing.

11      Q.      Did she ask you why you signed the piece

12   of paper then?

13      A.      No.

14      Q.      Did she ever ask about any of the other

15   friends who may have been involved or anything

16   along those lines?

17      A.      No.

18      Q.      Did you or her call your dad during the

19   car ride home?

20      A.      Not during the car ride home, no.

21      Q.      Do you know where your dad was during

22   this time?

23      A.      Yes.

24      Q.      Where was he?

25      A.      At his law office in Kankakee.

```
1        Q.    How far, if you know, is that law office

2    from the school?

3        A.    I believe between 20 and 30 miles.

4        Q.    Do you remember what the weather was

5    like that day?

6        A.    I do not recall.

7        Q.    So, was anything else said between you

8    and your mom on the car ride home?

9        A.    No.

10       Q.    Did you stop anywhere on the way home?

11       A.    No.

12       Q.    So what time had you gotten home, about

13   five?

14       A.    Yes.

15       Q.    Was your dad home when you got home?

16       A.    No.

17       Q.    Anybody else home besides you and your

18   mom then at that time?

19       A.    No.

20       Q.    What did you do when you got home?

21       A.    I basically went up to my room and kept

22   quiet until my dad came home.  That was basically

23   all I did.

24       Q.    Did you have your cell phone with you at

25   the time?
```

```
1       A.    Yes.

2       Q.    Did you make any calls?

3       A.    No.

4       Q.    Did anybody call you?

5       A.    No.

6       Q.    Get any texts from anybody?

7       A.    I texted my girlfriend, and that's all

8    that I recall texting.

9       Q.    Did you ever hear from Michael McKay or

10   any of your friends from school?

11      A.    I did not.

12      Q.    Did you ever make any attempts to call

13   or text them before your dad got home?

14      A.    I did not.

15      Q.    Okay.  Do you have a computer in your

16   room?

17      A.    Yes.

18      Q.    Did you have Internet connection at that

19   time?

20      A.    Yes.

21      Q.    Did you have an e-mail address?

22      A.    Yes.

23      Q.    What was your e-mail address at the

24   time?

25      A.    Pheasantsforever,
```

1    P-H-E-A-S-E-N-T-S-F-O-R-E-V-E-R @sbcglobal.net.

2        Q.    Do you still have that account?

3        A.    Yes.

4        Q.    That's your personal e-mail address?

5        A.    Yes.

6        Q.    Did that go through your family or not?

7        A.    No.

8        Q.    In January of 2013 did you have a

9    Facebook page?

10       A.    Yes.

11       Q.    What was your Facebook ID?

12       A.    Noah Dietchweiler.

13       Q.    Spelled just like your name?

14       A.    Yes.

15       Q.    Was that a completely public Facebook

16   page, or were there some private settings?

17       A.    I had it on -- it was the pre-set

18   setting, where it was, unless they were your

19   friends, there were some things I couldn't see,

20   more personal things, but they could still view

21   your page.

22       Q.    Gotcha.  So friends could view pretty

23   much anything on your page, correct?

24       A.    Correct.

25       Q.    But the general public could only see

1    certain things?

2        A.    Correct.

3        Q.    Was Michael McKay a friend of yours on

4    Facebook?

5        A.    Yes.

6        Q.    How about Brett Short?

7        A.    Yes.

8        Q.    How about Dakota Papineau?

9        A.    Yes.

10        Q.    Jessie Hurst?

11        A.    Yes.

12        Q.    How about Grayson Schunke?

13        A.    Yes.

14        Q.    David Tolbert?

15        A.    Yes.

16        Q.    Kevin Ailey?

17        A.    Yes.

18        Q.    And Rolando, can't remember his last

19    name?  Salizar?

20        A.    Yes.

21        Q.    I take it your girlfriend would have

22    been a Facebook friend too, correct?

23        A.    Yes.

24        Q.    How about Leah?

25        A.    Yes.

1      Q.    Did you ever receive any type of

2   electronic communication from any of them, or did

3   you send them any type of electronic communication

4   concerning this incident after you got home and

5   before the time your dad got home?

6      A.    No.

7      Q.    Did you do any investigation on your own

8   when you were at home before your dad got home

9   concerning what this was all about?

10     A.    No.

11     Q.    What did you do?

12     A.    As I said, sat up in my room.  Turned

13  the TV on.  And just tried to get it through my

14  mind what was going on.

15     Q.    Did your mom come in at any time before

16  your dad got home?

17     A.    No.

18     Q.    How long was it until your dad got home?

19     A.    I don't recall exactly.

20     Q.    Okay.  Within a couple hours at least?

21     A.    Yes.

22     Q.    Okay.  And actually your attorney just

23  reminded me that I didn't finish my line of

24  questioning.

25            Did you have a chance to take a look at

1    group Exhibit 3 for identification, which were the

2    supplemental 26 A disclosures?

3        A.    Yes.

4        Q.    Were you able to find the piece of paper

5    that you signed in Mr. Bunting and Mr. Lucas --

6    I'm sorry, Mr. Lucas's office?

7        A.    Yes.

8        Q.    Okay.  Where is that?  Why don't you

9    hand that to me?  That's labeled, correct me if

10   I'm wrong, as Exhibit 1, and it says Watseka high

11   school across the top, correct?

12       A.    Yes.

13       Q.    And it's a notice of student

14   disciplinary action, is that correct?

15       A.    Yes.

16       Q.    And it was to Mr. and Mrs. Dietchweiler,

17   which are your folks, correct?

18       A.    Yes.

19       Q.    And I'm just going to read into the

20   record, then hand it to you, you can tell me if I

21   read it correctly.  It says notice of student

22   disciplinary action to Mr. and Mrs. Dietchweiler

23   from Mr. Steven Lucas, V-E-N, Dean of students,

24   re:  Student suspension notice dated January 25th

25   of 2013.  Am I right so far?

Page 92

1      A.    Yes.

2      Q.    And that states to your parents, this is

3   to inform you that your child, Noah Dietchweiler,

4   has been suspended from Watseka high school for

5   ten days.  Specifically your child has been

6   suspended for possession of drugs, consumption of

7   drugs.  Noah may return to school on Monday

8   February 11th, 2013.  As a result of this

9   suspension, Noah will not be permitted on any unit

10  school grounds until the suspension is over.  And

11  there's a circle that says yes, I agree to stay

12  late to make up any missed school work while I was

13  on suspension.  And then there's an X and a

14  signature by that X.  Do you see that?

15     A.    Yes, I do.

16     Q.    Is that your signature?

17     A.    Yes, it is.

18     Q.    Okay.  Is that what you were talking

19  about when you said you signed that piece of paper

20  before leaving the room?

21     A.    One of the signatures, yes.

22     Q.    Is there another one at the bottom of

23  that piece of paper?

24     A.    Yes.

25     Q.    It then says the suspension will be

NOAH DIETCHWEILER

Page 93

1  served out of school.  Then there's a line that

2  indicates the student suspension hearing was held

3  on January 25th of 2013, and attended by Steven

4  Lucas and Noah.  At this hearing Noah was afforded

5  his procedural due process rights, and it says

6  i.e., the opportunity to present a defense, to

7  explain the circumstances of the actions in

8  question, and/or prove innocence.  Then it says

9  student's signature.  And there's a signature line

10  for the dean of students where it has Mr. Lucas's

11  signature.  Is that your signature again at the

12  bottom of that piece of paper?

13      A.    Yes, it is.

14      Q.    And I don't know if you know Mr. Lucas's

15  signature, but it's a name that is signed Steven

16  Lucas, correct?

17      A.    Yes.  And I did not recall that earlier.

18  But, there is a signature there.

19      Q.    As well?

20      A.    Yes.  His signature is there as well as

21  mine.

22      Q.    And there's two signatures on this piece

23  of paper then by you, correct?

24      A.    Yes.

25      Q.    And those are both your signatures?

1      A.    Yes.

2      Q.    And did you sign both of those signature

3   lines at the same time before you walked out of

4   the room?

5      A.    Yes.

6      Q.    So it wasn't signed separately?

7      A.    Correct.

8      Q.    Okay.  And you indicated that you read

9   that piece of paper before signing it twice, is

10  that correct?

11     A.    Yes.

12     Q.    Did you understand the piece of paper

13  that you were signing?

14     A.    I believe so.  Yes.

15     Q.    Was that piece of paper signed with your

16  mom in the room?

17     A.    Yes.

18     Q.    Was that piece of paper signed with your

19  dad still on speaker phone?

20     A.    No.

21     Q.    So it was signed afterward?

22     A.    Yes.

23     Q.    Do you know if your dad was made aware

24  that you were going to sign this piece of paper?

25     A.    I do not recall.

Page 95

```
1        Q.    Do you know if your dad was made aware

2   that you were going to sign any piece of paper?

3        A.    I do not recall.

4        Q.    Your dad was aware while he was on

5   speaker phone that you were being suspended

6   however, is that correct?

7        A.    Correct.

8        Q.    And I take it you didn't sign any other

9   piece of paper that day besides this Exhibit 1,

10  which is part of group Exhibit 3, is that correct?

11       A.    Correct.

12       Q.    Were you aware during this meeting with

13  Mr. Lucas on January 25th of 2013 that a

14  subsequent hearing was going to be held concerning

15  these charges?

16       A.    I did not.

17       Q.    And you had never been suspended from

18  school before, is that correct?

19       A.    Correct.

20       Q.    So you then get home, dad comes home a

21  couple hours later, you hadn't talked to your mom

22  or communicated with anybody else until your dad

23  got home, right?

24       A.    Correct.

25       Q.    When is the first time you see your dad?
```

NOAH DIETCHWEILER

Page 96

1    What happens?

2        A.    I heard him come in, and went downstairs

3    as usual.  And most likely meet up with him in the

4    kitchen.

5        Q.    Where is your mom at this time?  Is she

6    making dinner?

7        A.    She was there, yes, with us.

8        Q.    And who said what first?

9        A.    I don't recall exactly what my dad said.

10   But, he was not happy with me for obvious reasons,

11   and came in very mad.  But I do not recall exactly

12   what he said.

13       Q.    Okay.  Do you recall anything that you

14   had said to him during this conversation?

15       A.    Yes.

16       Q.    What did you say to him?

17       A.    I recall telling him that I did not do

18   any of this.  I do not even know what they were

19   talking about.  They didn't tell me what it was

20   exactly that I had supposedly happened.  I didn't

21   even know what I had supposedly been a part of.

22   That's what I told him.

23       Q.    Okay.  And did you indicate to him that

24   you were unsure what you had admitted to?

25       A.    Correct.  And I also, I did not know if

1    I had admitted to anything.

2        Q.    Did your dad ask if you had signed

3    anything?

4        A.    Yes.

5        Q.    And what did you say?

6        A.    Yes.

7        Q.    And what about your mom during this

8    conversation?  Did she say anything?

9        A.    No.  It was mainly between me and my

10   dad.

11       Q.    Okay.  And about how long did this

12   conversation take place?

13       A.    Maybe five to ten minutes.

14       Q.    And what were the results of the

15   conversation?  What was going to happen after

16   that?

17       A.    After repeatedly telling my dad that I

18   didn't do anything, or know what was going on, and

19   he told me that he didn't believe me.  And of

20   course you're going to take the schools official's

21   word before mine.  He said that we would, if I

22   really didn't do it, we would have a drug test

23   done on me.  And if it came back negative, then we

24   could talk about like what we could do about it.

25       Q.    Okay.  And when you say of course your

1    dad would take the school official's word over

2    yours, why would you say that?

3         A.    Because you would normally think that a

4    kid would be trying to deny it, whether they did

5    it or not I suppose.

6         Q.    So, for this drug test, did you get a

7    copy of this piece of paper by the way that day?

8         A.    Yes.  I believe so.

9         Q.    So after you signed it you were given a

10   copy of it?

11        A.    Yes.

12        Q.    Did you show it to your dad that night?

13        A.    I believe so.

14        Q.    Okay. And that indicated that you, for

15   lack of a better word, were charged with

16   possession of drugs and consumption of drugs,

17   correct?

18        A.    Actually I don't recall -- now that I

19   think about it more, I don't recall ever showing

20   him the piece of paper.  And therefore, I don't

21   recall if I had got one.

22        Q.    Okay.  It's possible; you just don't

23   remember one way or the other?

24        A.    Yes.

25        Q.    Okay.  So your dad said something about

1    a drug test, and that if it was negative, that

2    there was something to talk about apparently?

3        A.    Correct.

4        Q.    Okay.  So, I take it you agreed to a

5    drug test, correct?

6        A.    Yes.

7        Q.    How did that all come about?  What did

8    you do?

9        A.    My dad said okay, then we can have that

10   done.  And called the doctor, and we went to the

11   hospital to have the test done.

12       Q.    And that was that night?

13       A.    Yes.

14       Q.    What hospital did you go to?

15       A.    It was Riverside, I believe.

16       Q.    Okay.  About what time did you get

17   there?

18       A.    I don't recall.

19       Q.    Did you have dinner before going?

20       A.    I do not recall.

21       Q.    On January 25th of 2013 were you taking

22   any prescription medications for any reason?

23       A.    No.

24       Q.    Were you taking anything

25   over-the-counter?

```
 1        A.    No.

 2        Q.    Had you ingested marijuana within 30

 3    days before January 25th of 2013?

 4        A.    No.

 5        Q.    How about any alcohol?

 6        A.    No.

 7        Q.    So then you arrived at the Riverside

 8    medical center, did you go to the emergency room?

 9        A.    Yes.  That's where we met with the

10    doctor.

11        Q.    Okay.  And what doctor did you meet

12    with?

13        A.    Dr. Brian Olafson.

14        Q.    Did your dad know this doctor it seemed

15    like before for some reason?

16        A.    Yes.

17        Q.    Had you ever been drug tested by him

18    before?

19        A.    No.

20        Q.    Had you ever been drug tested before?

21        A.    No.

22        Q.    What did they do during the test?

23        A.    The nurse brought out the test itself,

24    then went into a bathroom and sealed off all of

25    the -- like the faucet and the toilet, anything
```

NOAH DIETCHWEILER

Page 101

1  that had to do with the water.  And then the

2  doctor and I went in there, both of us, and he

3  watched me go to the bathroom into the test

4  container, and then went out of the bathroom.

5  They sealed the test, and I signed something

6  saying that I had watched them seal the test.  And

7  it then was part of -- there were two separate

8  containers.  One part of the test went down to the

9  lab.  And the other was the federal part of the

10  drug test, which I do not know what they do with

11  that from there on out.

12      Q.    At any time between the time that you

13  had left Mr. Bunting and Mr. Lucas's office to the

14  time you had that drug test, did you go to the

15  bathroom?

16      A.    Most likely.  I don't recall exactly.

17      Q.    And you can't recall if you had had any

18  food in between leaving Mr. Lucas's office and

19  going to the hospital, is that correct?

20      A.    I don't recall.  No.

21      Q.    Or drink, I take it?

22      A.    Correct.

23      Q.    So, how long were you at the hospital

24  total?

25      A.    I don't recall.  It was over an hour,

1    I'd say.

2        Q.    And did you have any more conversations

3    with your dad about what happened or what was

4    going on?

5        A.    Yes.

6        Q.    What did you say to him and he say to

7    you?

8        A.    He asked at that point exactly what had

9    happened at the school.  And I just walked him

10   through everything that had happened that day from

11   the time that I got pulled out of class to the

12   time that we left the office.

13       Q.    Okay.  Just like you told me today,

14   right?

15       A.    Yes.

16       Q.    And obviously he knew he had called in

17   to the -- on speaker phone during the meeting,

18   correct?

19       A.    Yes.

20       Q.    And what did you say to him, other than

21   that?

22       A.    I basically told him that I felt I was

23   not given a choice.  I had no choice but to sign

24   the paper and be suspended for 10 days.  And that

25   I still didn't know what all had happened, or why

1    I was being accused of this.

2        Q.    So, after you got home then did you have

3    any further conversation with your dad or your

4    mom?

5        A.    I don't recall.

6        Q.    What did you do the rest of that night?

7        A.    By the time I got home it was fairly

8    late seeing as the hospital was decently far away

9    from our office, and so I basically went to bed.

10       Q.    Did you get the test results yet that

11   night, or did you have to wait for them?

12       A.    We got the lab test results that night.

13       Q.    Do you know what drugs they tested for?

14       A.    I do not know specifically.

15       Q.    Do you know if the tests were run for

16   any prescription medications, as opposed to

17   marijuana or any other type of illegal substance?

18       A.    It was for all drugs.

19       Q.    Okay.  And for the lab test results,

20   what were those results told to you?

21       A.    Negative.

22       Q.    Did you and your dad discuss that on the

23   way home?

24       A.    Yes.

25       Q.    And what did you say to him and he say

1   to you about that?

2       A.    I basically told him that, I told you

3   that it would come back negative.  And that I had

4   never taken these drugs, and that I don't know

5   what's going on here.  And that's when he started

6   to give credibility to my side of the story.

7       Q.    Okay.  When you say taken these drugs,

8   what drugs were you referring to?

9       A.    Any drugs in general.  And specifically

10  the drugs that they had said that day, that I

11  still didn't know what they were.

12      Q.    Okay.  So when you said I told you that

13  it was going to come back clean, so to speak, and

14  that I had never taken these drugs, were you

15  taking about any drugs or specifically with

16  respect to drugs that they were accusing you of?

17      A.    I haven't taken drugs, period.

18      Q.    Did at any time Mr. Bunting or Mr. Lucas

19  indicate to you what drugs they were accusing you

20  of taking?

21      A.    No.

22      Q.    So, at least as of the time that you

23  were getting drug tested you had no clue what type

24  of drug you were being accused of taking or

25  holding on to?

NOAH DIETCHWEILER

Page 105

1      A.    Correct.

2      Q.    Including ADD drugs or medication or

3  anything like that?

4      A.    Correct.

5      Q.    So, what was that weekend then?  Did you

6  ever have any communication with Michael or any of

7  your friends concerning this incident?

8      A.    Yes.

9      Q.    Who did you talk to?

10     A.    Dakota Papineau, I had talked to.  I

11  talk to him quite regularly.

12     Q.    Anybody else?

13     A.    I don't believe so, no.

14     Q.    Did you talk to Mike?

15     A.    No.

16     Q.    And how did you talk to Dakota that

17  weekend?  Was it phone?  Text?  Facebook?  In

18  person?

19     A.    It would have been a mixture of all,

20  including in person.

21     Q.    Okay.  And where did you talk to Dakota

22  in person?

23     A.    At my house.

24     Q.    What day did Dakota come over?

25     A.    I don't recall.

NOAH DIETCHWEILER

Page 106

1      Q.    When you got back from Riverside that

2  night, did you talk to any of your friends that

3  night?

4      A.    No.

5      Q.    So, it would have either been Saturday

6  or Sunday?

7      A.    Correct.

8      Q.    And what was the first type of

9  communication that you had with Dakota?  Was it

10  phone, text?

11      A.    Text.

12      Q.    And what did the text say?  Was it

13  Dakota texting you or you texting Dakota?

14      A.    I don't recall.

15      Q.    Okay.  Do you know what that text said?

16      A.    It was arranging when we would hang out

17  in person.

18      Q.    Was there any reference to what had

19  happened at school the day before?

20      A.    I don't recall.

21      Q.    About how many texts would there have

22  been?

23      A.    I don't recall.

24      Q.    Did he come over the same day that you

25  guys texted each other, or was it the following

NOAH DIETCHWEILER

Page 107

1    day?

2        A.    I believe the same day.

3        Q.    About what time did Dakota come to your

4    house?

5        A.    I don't recall.

6        Q.    What did you do during the day before

7    Dakota got there?

8        A.    Basically had a normal day.  Just woke

9    up and ate breakfast.  And was doing like just

10   hanging out around my house, I guess you could

11   say.

12       Q.    Were you e-mailing anybody?  Facebooking

13   anybody?  IM'ing anybody?  Anything along those

14   lines?

15       A.    No.

16       Q.    Was there anything on-line about what

17   had happened the day before at school in any

18   source?

19       A.    I don't recall.

20       Q.    So there wasn't anything on Facebook

21   going around like Michael got arrested or this is

22   happening or any rumors like that?

23       A.    Not that I recall.

24       Q.    All right.  So Dakota shows up, does he

25   talk to your folks first or just you?

```
1       A.     I don't recall.

2       Q.     Was anything discussed between Dakota

3   and your parents concerning the incident at school

4   that day?

5       A.     I'm not sure.

6       Q.     Did you then go to your room with

7   Dakota?

8       A.     Yes.

9       Q.     Okay.  What did you talk about?

10      A.     At that point we did talk about what had

11  happened at the school the day before.

12      Q.     Okay.  And what did Dakota say to you

13  and you say to Dakota?

14      A.     We basically were -- he was in the same

15  situation that I was.  Had no idea about anything

16  that was going on.  And Mr. Bunting and Lucas had

17  apparently got him into his office, but his mother

18  was there, and his mother told him, he had talked

19  to his mother beforehand and told her the

20  situation.  And afterwards -- or his mother and

21  him went in the office, and his mother said you

22  have no evidence of this, my son didn't do this.

23  And they didn't continue interrogating him or

24  suspend him.  He did not end up getting a

25  suspension.
```

1    Q.    Did Dakota indicate to you if he was

2  told the same thing by Mr. Bunting and Mr. Lucas

3  as you were?

4    A.    He was.

5    Q.    And Dakota was presented with the same

6  choice apparently of indicating that look, if you

7  don't sign this, or accept a ten day suspension,

8  that you're going to get expelled?

9    A.    He was.

10    Q.    And Dakota did not sign the piece of

11  paper, is that correct?

12    A.    Correct.  His --

13    Q.    Sounds like his mom, who was there with

14  him, indicated that he wasn't going to sign

15  something, right?

16    A.    Correct.

17    Q.    Is that what Dakota told you?

18    A.    Correct.

19    Q.    And because of that, then Dakota, as a

20  result of this whole incident, was not suspended,

21  correct?

22    A.    Correct.

23    Q.    And he did not sign anything, correct?

24    A.    Correct.

25    Q.    Anything else said between you and

1    Dakota about what happened?

2        A.    Yes.

3        Q.    What?

4        A.    He told me that his mother had said that

5    if Mr. Bunting and Lucas wouldn't accept the

6    truth, and were going to threaten people like

7    that, and force admissions that weren't true out

8    of people, that he could be expelled from Watseka

9    and she would rather have him go to another high

10   school and then lose his funding, because they

11   don't deserve to have him there.

12       Q.    Lose what funding?

13       A.    Or like whatever money they get, just

14   lose another student from their school.

15       Q.    And what is Dakota's mom's name?

16       A.    Lauri Papineau.

17       Q.    Lauri?

18       A.    Yes.

19       Q.    L A U R I E --

20       A.    L-A-U-R-I.  I believe.

21       Q.    Darn it.  So close.  And does Dakota's

22   dad live with them as well?

23       A.    Yes.  It's Dakota's mom's boyfriend.

24   They're engaged, so soon to be stepdad.

25       Q.    Gotcha.  What is Dakota's dad's name?

1       A.      John Dubin.

2       Q.      Does he live close by or what?

3       A.      He lives with Dakota and his mother.

4       Q.      So dad lives with Dakota and mom and

5    boyfriend?

6       A.      Dakota's father?

7       Q.      Yes.

8       A.      No, Dakota's father does not.  He lives

9    in Manteno.

10      Q.      There we go.

11      A.      Yes.

12      Q.      I thought, that would have been

13   interesting.

14      A.      No, Dakota and his mom and his mom's

15   boyfriend live together.  His father lives in

16   Manteno.

17      Q.      Okay.  So, besides what they just said

18   and Dakota told you what his mom said, did you

19   guys talk about anything else?

20      A.      I don't recall.

21      Q.      Okay.  When did you find out Michael was

22   arrested?

23      A.      It would have been after the hearing, I

24   believe.

25      Q.      Did you ever talk to Michael at any time

1    before that hearing?

2        A.    No.

3        Q.    So Saturday or Sunday you talked to

4    Dakota, did you have any more discussions that

5    weekend with your dad and your mom about what

6    happened?

7        A.    I don't recall.

8        Q.    Did you ever talk to Lauri Papineau?

9        A.    I don't recall.

10       Q.    Do you know if your folks did?

11       A.    I don't know.

12       Q.    So then Monday you're technically

13   suspended, right?

14       A.    Correct.

15       Q.    When is the next time that you talked to

16   anybody about this incident?  After the weekend

17   that you talked to Dakota?

18       A.    I don't recall.

19       Q.    When is the first time that you were

20   made aware that there was going to be a hearing?

21       A.    A few days prior to the hearing.  I

22   don't -- actually I take that back.  It would have

23   been once we started, once my dad started taking

24   legal action, and preparing for the hearing, and

25   preparing me for what we needed to do at the

1  hearing.

2      Q.    Okay.  And when was that exactly?  Was

3  it the Monday after that weekend?

4      A.    It was as soon as we got the drug test

5  results back from the federal drug test results

6  back.

7      Q.    And you just don't know what day that

8  was, correct?

9      A.    Correct.

10     Q.    Do you know the day of the hearing

11  itself?

12     A.    I do not.

13     Q.    Okay.  Up until the day of the hearing,

14  what did you do around the house?

15     A.    Helped out with, we heat our house with

16  wood.  Helped out with wood.  Basically did house

17  chores and stayed around, like hung out around the

18  house.  That's all there was for me to do.

19     Q.    I have the suspension hearing in this

20  case set for February 5th of 2013, does that sound

21  about right?

22     A.    Yes.  Or what was the date?

23     Q.    February 5th of 2013.

24     A.    I don't recall if that was correct or

25  not.

NOAH DIETCHWEILER

Page 114

1      Q.      So for ten days your suspension was due

2    to be up when, February 11 of 2013?

3      A.      Yes.

4      Q.      Okay.  Other than the suspension itself,

5    to the best of your knowledge being out for ten

6    days, you still had to do and make up all your

7    missed school work, correct?

8      A.      Correct.

9      Q.      Did you get kicked out of band or show

10   choir?

11     A.      I got notice from the Illinois

12   Extracurricular Association, I don't know the name

13   of it, but that I couldn't be in any

14   extracurricular activities for a full year.

15     Q.      Okay.  Anything else then that you know

16   of to be as a result of the suspension?

17     A.      Not that I recall.

18     Q.      Okay.  During the days that you were out

19   of school, at least up until the day of this

20   hearing on February 5th of 2013, were you still

21   doing your school work?

22     A.      I was not allowed to at home, no.

23     Q.      Okay.  And how do you know that?

24     A.      I wasn't allowed on the school property

25   to get any of my items that were needed for class,

```
 1    or any of the information that I needed to do
 2    class work.
 3        Q.    Do you know if your folks would have
 4    been allowed on school property to pick up your
 5    stuff?
 6        A.    They had went on school property to
 7    present the drug tests to him on Monday morning,
 8    and Mr. Bunting kicked them off of the school
 9    property.
10        Q.    And that's what your folks said?
11        A.    Yes.
12        Q.    And that was the Monday following
13    Friday?
14        A.    Yes.
15        Q.    And you weren't with them at the time,
16    correct?
17        A.    Correct.
18        Q.    So, you can believe me, the date of the
19    school hearing was February 5th of 2013, unless
20    you have some reason to think it was a different
21    day?  Unless I'm wrong, it says February 5th.
22              MR. TAGUE: Let me see.
23        Q.    Okay.  Do you know how this whole thing
24    got started to actually have a suspension review
25    hearing?
```

Page 116

```
1        A.      I do not.

2        Q.      When was the first time that your dad

3   came to you indicating to you there was going to

4   be a suspension review hearing?

5        A.      I don't recall.

6        Q.      I think you told me that you and your

7   dad started preparing for it, however, correct?

8        A.      Correct.

9        Q.      And how did you do that?

10        A.      He basically prepped me on what would

11   happen at the hearing and told me the evidence

12   that I needed to present, and what I needed to --

13   basically how I needed to go about presenting it.

14        Q.      Did he tell you that you would have an

15   attorney at that hearing?

16        A.      Yes.

17        Q.      And that's Mr. Tague right here,

18   correct?

19        A.      Correct.

20        Q.      Did he also indicate to you that he was

21   going to be at the hearing?

22        A.      Correct.  Yes.

23        Q.      And was your mom there too?

24        A.      Yes.

25        Q.      Did you or your dad or anybody on your
```

1   behalf contact any other witnesses that were going

2   to appear with you at the hearing?

3       A.   We had affidavits from a number of

4   people.

5       Q.   Okay.  And do you know who those people

6   were?

7       A.   I do not know if I will name all of

8   them, but I could provide you with a list of some

9   of them.

10      Q.   Just what you know.

11      A.   Dakota Papineau.  Kelly Boatman.  Tim

12  Branchini.  Marcus Pace.  Jake Anderson.  That's

13  all that I recall at this time.

14      Q.   Okay.  Do you know how to spell Tim's

15  last name?

16      A.   B-R-A-N-C-H-I-N-I.

17      Q.   And Marcus Pace is P-A-C-E?

18      A.   Yes.

19      Q.   And Jake Anderson?

20      A.   Yes.

21      Q.   Okay.  And I know who Dakota is; who is

22  Tim Branchini?

23      A.   A friend of mine that has -- I've been

24  going to school with him since first grade.  He

25  came from Crescent City grade school.

1       Q.     So, also sounds like a pretty close

2    friend, if not a best friend?

3       A.     Yes.

4       Q.     And how was he involved in all of this?

5       A.     He was at the other end of the lunch

6    table, which also allegedly was involved in the

7    drug incident.

8       Q.     When did you find out, or how did you

9    know to get an affidavit from Tim Branchini?

10      A.     It was after just the whole thing had

11   kind of surfaced, and everybody had heard about

12   it, everybody was asking me about it.  When we

13   started going about people for affidavits, he was

14   one of the ones that would have seen me, talked to

15   me, and would know, would have had some evidence

16   whether I was involved with drugs or not.

17      Q.     And I take it the same for Marcus Pace

18   and Jake Anderson?

19      A.     Correct.

20      Q.     How do you know Marcus?

21      A.     High school.

22      Q.     Also friend?

23      A.     Yes.

24      Q.     And Jake Anderson?

25      A.     High school also.

NOAH DIETCHWEILER

Page 119

1      Q.    Okay.  Are Tim, Marcus and Jake also

2  Facebook friends?

3      A.    Yes.

4      Q.    And were Tim, Marcus or Jake also

5  accused of anything in regard to this incident on

6  January 25th of 2013?

7      A.    None of them were.

8      Q.    Okay.  Did Tim, Marcus or Jake have any

9  specific information that you know of concerning

10  whether or not you possessed or used drugs on or

11  before January 25th of 2013?

12      A.    The evidence that they had would have

13  been that we, they would have talked to me and

14  seen me throughout the day, and certain ones of

15  them would have seen me, were with me throughout

16  lunch.  So they would have seen if I had received

17  any pills, and if I had taken any pills or seen

18  the effects of the pills on me if I was under the

19  influence of any drugs.

20      Q.    Okay.  How did you know the time frame

21  as to when you were supposedly handed or received

22  these pills?

23      A.    I did not.

24      Q.    So why did you focus on lunch?

25      A.    Because we had heard that Michael had

Page 120

1    been caught throwing -- or dealing drugs just

2    through rumor, that he had been caught dealing

3    drugs at lunch.  That's why lunch was focused on.

4         Q.    Okay.  And who did you hear that from?

5         A.    I do not recall.

6         Q.    Was it sometime between January 25th of

7    2013, and I take it getting all these affidavits?

8         A.    Correct.

9         Q.    Okay.  And you don't recall who you

10   heard that from, correct?

11        A.    Correct.

12        Q.    And from your statement to me, correct

13   me if I'm wrong, it would be caught dealing drugs

14   during the lunch period on January 25th of 2013,

15   correct?

16        A.    Correct.

17        Q.    And for Michael McKay, when you had

18   lunch with him that day, is that correct?

19        A.    Correct.

20        Q.    Did you see him during the entire lunch

21   period?

22        A.    Correct.

23        Q.    Did you ever see him deal or sell drugs

24   during that time?

25        A.    I did not.

Page 121

```
 1      Q.    And that would be to anyone, correct?
 2      A.    Correct.
 3      Q.    And you actually would have left the
 4  lunch room with him and then gone to your locker
 5  and gone to Spanish together, correct?
 6      A.    Correct.
 7      Q.    So you wouldn't have seen him deal or
 8  sell drugs on the way after lunch to either your
 9  lockers or to Spanish I, is that correct?
10      A.    Correct.
11      Q.    Did you have a class with Michael before
12  lunch as well?
13      A.    Not the one directly before, no.
14      Q.    So you actually would have met up with
15  him at lunch in the cafeteria?
16      A.    I believe so, yes.
17      Q.    Up until the point of the hearing did
18  you ever have any contact of any type whatsoever
19  with Michael McKay?
20      A.    No.
21      Q.    When did you first come to learn that he
22  was arrested as a result of this incident on
23  January 25th of 2013?
24      A.    I don't recall.
25      Q.    Was it before the hearing?
```

1      A.    I do not recall.

2      Q.    And meaning the February 5th hearing?

3      A.    Yes, I don't recall.

4      Q.    And do you know what the results were of

5  Michael's arrest for this incident January 25th of

6  2013?

7      A.    Other than he was expelled for a year

8  from Watseka high school, that's all that I know.

9      Q.    Did you have to testify in his expulsion

10  hearing?

11     A.    No.

12     Q.    Do you know if he had one?

13     A.    No.

14     Q.    Do you know what the results of the

15  actual arrest were?

16     A.    No.

17     Q.    Had you ever come to learn that Michael

18  had talked to anybody at the school, being Mr.

19  Bunting or Mr. Lucas, concerning him selling or

20  giving you drugs, either on January 25th of 2013

21  or at sometime before then?

22     A.    What's the question?

23     Q.    Did you ever hear that Michael told Mr.

24  Bunting and Mr. Lucas that he had given you or

25  sold you drugs at any time before, on or before

1    January 25th of 2013?

2        A.    No.

3        Q.    Have you ever come to learn that?

4        A.    Yes.

5        Q.    How did you learn it?

6        A.    Just through all of the information that

7    we've attained for the case.

8        Q.    Okay.  I'm talking outside the lawsuit;

9    outside your dad or your attorney.

10           Did any of your friends ever indicate to

11   you that Michael had indicated that he had sold or

12   given you drugs on or about January 25th of 2013?

13       A.    I believe that I had heard that a

14   version of the story that way.  But once again,

15   there were so many versions of everything through

16   the rumors that I don't know.

17       Q.    And you don't know who would have said

18   that or when or anything like that?

19       A.    No, I don't.

20       Q.    So the hearing takes place on February

21   5th of 2013, do you know what time the hearing is?

22       A.    I don't recall.

23       Q.    Your attorney was there and your dad and

24   your mom I think we already said, correct?

25       A.    Correct.

NOAH DIETCHWEILER

Page 124

```
1       Q.      Mr. Bunting and Mr. Lucas were there,
2    correct?
3       A.      Correct.
4       Q.      Lauri and Dakota Papineau were there?
5       A.      Correct.
6       Q.      It says Neil Stacy and Nathan Konce, who
7    are they?
8       A.      Nathan Konce was another one that I just
9    remembered was involved in the incident.
10      Q.      Was he also accused of taking or having
11   drugs?
12      A.      Yes.
13      Q.      And do you know what the results of his
14   accusation was?
15      A.      I do not.
16      Q.      So was he also suspended?
17      A.      I believe so.
18      Q.      Did you ever talk to Nathan Konce,
19   K-O-N-C-E about his meeting, if he had one, with
20   Mr. Bunting and Mr. Lucas?
21      A.      No.
22      Q.      Do you know if he signed a piece of
23   paper?
24      A.      I do not.
25      Q.      I take it there were also school
```

NOAH DIETCHWEILER

Page 125

1    district people there, correct?

2        A.    Yes.

3        Q.    Oh, it actually says that the hearing

4    took place at 7:06 PM.  Was it at night?  Does

5    that sound about right?

6        A.    Yes.

7        Q.    And there were the school board members,

8    is that correct?

9        A.    Yes.

10       Q.    Do you know where this hearing took

11   place?

12       A.    The headquarters of the school, I guess

13   you would call them.

14       Q.    Okay.  Were you given any documents that

15   were tendered by anybody at the school at the

16   hearing to either you or your attorney?  Did you

17   see any documents?

18       A.    I don't recall.

19       Q.    Okay.  Other than the document that we

20   took a look at that you signed, had you seen any

21   other documents from the school concerning this

22   incident?

23       A.    I don't recall.

24       Q.    Do you know if the school presented a

25   handwritten list that Michael McKay allegedly had

Page 126

1  which had your name on it?

2     A.    I don't recall.

3     Q.    Had you ever seen a document which

4  purportedly was from or by Michael McKay that had

5  your name on it?

6     A.    No.

7     Q.    Do you know if you received a notice, or

8  your attorneys received, and you may not know, if

9  you or your attorneys received a notice of this

10 particular suspension review hearing?

11    A.    I don't know.

12    Q.    And obviously you don't know what it

13 contained, is that correct?

14    A.    Correct.

15    Q.    And then there were witnesses prepped on

16 your behalf, is that correct?

17    A.    Correct.

18    Q.    And were they questioned by your

19 attorney?

20    A.    I don't recall how that proceeded.

21    Q.    Okay.  Did the board members, did the

22 board members question witnesses?

23    A.    I also don't recall.

24    Q.    Did Mr. Bunting and Mr. Lucas testify at

25 the hearing as well?

1      A.    Yes.

2      Q.    And did your attorney and/or your father

3    have an opportunity to question Mr. Bunting and

4    Mr. Lucas during that time?

5      A.    Yes.

6      Q.    And on your behalf was testimony

7    presented by Neil Stacy and or Nathan Konce?

8      A.    I don't recall.

9      Q.    And how about Lauri and Dakota Papineau?

10     A.    I also don't recall.

11     Q.    Did your dad testify?

12     A.    Yes.

13     Q.    How about your mom?

14     A.    Yes.

15     Q.    Do you know how long the hearing took

16   place?

17     A.    No.

18     Q.    Did you testify?

19     A.    Yes.

20     Q.    And were you sworn under oath at that

21   time to tell the truth?

22     A.    Yes.

23     Q.    And were you the first person to

24   testify, or last, or where did you end up in the

25   mix?

1      A.    I don't recall.

2      Q.    On pages 54 and 55 of the transcript,

3  and I will show them to you, a question was asked

4  of you, I believe it was by Mr. Tague, who was

5  your attorney.  Question -- do you have it in

6  front of you, a copy of it or not?

7            MR. TAGUE: No.

8      Q.    On page 55, and just let me know if I'm

9  wrong when I read it.  The question starts on line

10  nine.

11           Was there anything unusual that day up

12  until you were called into the dean's office?  And

13  the answer that it says you gave was, there was

14  one unusual thing, which was in 5th hour right

15  after lunch, which is my Spanish class one I have

16  with Michael McKay, who was the guy who had the

17  drugs at school that day.

18           And so I go into Spanish every day, and

19  I'm -- I go to have to go up to my locker and then

20  back down, so I'm usually one of the later people

21  to get there.

22           And I'm going to show you that, page 55,

23  lines 9 through 17; that's your answer.  Just let

24  me know if that is what it says.

25      A.    Yes, and I appear to have got -- it's

1    lunch must have been after fourth hour, rather

2    than after third.

3        Q.    That's fine.

4        A.    But, yes, that is correct.

5        Q.    Do you have any other corrections to

6    that answer that I read?

7        A.    No.

8        Q.    Okay.  I'm not that bad, I don't care

9    what period it was.  In looking at it, it says,

10   which is my Spanish class I have with Michael

11   McKay, then you said who was the guy who had the

12   drugs at school that day.  Why did you say that?

13       A.    Because at that point I had known he had

14   drugs at school that day.

15       Q.    How did you find that out?

16       A.    Just through hearsay and through --

17   well, through all the evidence gathered for the

18   hearing and whatnot.

19       Q.    So, at least as of what you had heard as

20   of that time, at least as of the time of the

21   hearing, which is February 5th of 2013, you knew

22   that Michael had had drugs at school that day,

23   correct?

24       A.    As of the hearing?

25       Q.    Yes?

1     A.    Correct.

2          Q.    And then you indicate after that, so I

3     get in there that day--and it looks like you're

4     referring to Spanish--and I sit across from

5     Michael, and I notice at his desk his books

6     weren't there, but -- his books were there, but he

7     wasn't.  And class had just started.  We have bell

8     ringers in there, which is like little questions

9     at the beginning of the day to get us thinking

10    about Spanish, so we were working on the bell

11    ringer.  And Mr. Bunting came in and grabbed

12    Michael's books.  And as he was walking out said

13    to Ms. Nutter, the teacher, Michael won't be

14    returning for today, and walked out with his

15    books.  And until then nothing unusual in the day

16    had happened.  And there was nothing after that

17    until I got called down to the dean's office that

18    seemed out of the ordinary to me.

19         Q.    So I guess my question to you is, had

20    Michael actually shown up then and dropped off his

21    books?

22    A.    Yes.

23         Q.    After everybody testified, what happened

24    at the hearing?  Like everybody was done

25    testifying, what happened?

1      A.    I don't recall up until the point when

2    they told -- made us aware that the suspension

3    still stood.  And nothing was changed.

4      Q.    Okay.  Did they leave the room at some

5    point in time?

6      A.    Yes, they did.

7      Q.    Okay.  How long were they gone?

8      A.    I don't recall.

9      Q.    Did you have a handbook from Watseka

10   community high school?

11     A.    At the hearing, or in general?

12     Q.    Were you given a handbook?

13     A.    Yes.

14     Q.    Do you get that like at the beginning of

15   the school year when you're a freshman or

16   something like that?

17     A.    At the beginning of every school year,

18   yes.

19     Q.    And does that handbook outline the

20   procedures for what you can and can't do at the

21   school, like possessing drugs or having a cell

22   phone during class, some things along those lines?

23     A.    Yes.

24     Q.    When you were informed after they got

25   back that the suspension was continued, what did

1    you do after that?

2         A.    I don't recall exactly.

3         Q.    Now, you were supposed to go back and

4    you were allowed to go back to Watseka Community

5    High School February 11th of 2013, is that about

6    right?

7         A.    Correct.

8         Q.    Did you go back?

9         A.    No.

10        Q.    Why not?

11        A.    Due to what's happened and the situation

12   that was ongoing, my parents and I felt that if I

13   went back there I would be harassed, be treated

14   unfairly, and just wouldn't have a fair shake at

15   the school.

16        Q.    Okay.  And harassed by whom?

17        A.    Mr. Bunting and Mr. Lucas primarily, as

18   well as anybody else at the school who was, I

19   guess you could say in the same boat as them.

20        Q.    And them, being Mr. Bunting and Mr.

21   Lucas?

22        A.    Correct.

23        Q.    So you didn't anticipate that you were

24   going to be harassed by other students?

25        A.    Correct.

NOAH DIETCHWEILER

```
 1      Q.    I'm right in that?

 2      A.    No.

 3      Q.    You didn't think the kids were going to

 4   tease you about it, or outcast you or anything

 5   like that, correct?

 6      A.    No.

 7      Q.    And you said treated unfairly; that

 8   you're also implying would be by Mr. Bunting and

 9   Mr. Lucas?

10      A.    Yes, as well as any other school --

11      Q.    School person?

12      A.    School official, yes.

13      Q.    After, or actually during the time of

14   your suspension, did you ever have any contact

15   from Mr. Bunting personally or Mr. Lucas or

16   anybody at the school?

17      A.    No.

18      Q.    Do you know if your parents did?

19      A.    Yes.  When they went into the school

20   that Monday morning to present the drug test,

21   first over the weekend I believe it was Saturday,

22   my father sent Mr. Bunting an e-mail informing him

23   of the drug test, and then Monday morning they

24   went into the school.  That's when Mr. Bunting

25   kicked them out.  And I'm not aware of any other
```

NOAH DIETCHWEILER

Page 134

1    contact until the hearing.

2        Q.    Okay.  How about after the hearing?  Do

3    you know if your dad or mom had any contact with

4    Mr. Bunting or Mr. Lucas or anybody at the school?

5        A.    I'm not aware of any contact, no.

6        Q.    Do you know if your mom and dad ever

7    contacted the school to let them know you weren't

8    coming back on February 11th of 2013?

9        A.    I don't know.

10       Q.    And when February 11th of 2013 rolled

11   around did you enroll in any type of school or

12   on-line school or change schools or anything like

13   that?

14       A.    Yes.  On-line home schooling through

15   Allied National High School.

16       Q.    And did you immediately enroll in

17   classes on-line?

18       A.    Yes.

19       Q.    And what classes were you enrolled in?

20       A.    English, geometry, chemistry, Spanish I,

21   I believe that's it.

22       Q.    Okay.  So you had enrolled in less

23   classes than you had been taking?

24       A.    And one more was geography.  And that's

25   all, yes.

1       Q.     So that's --

2       A.     Five classes.

3       Q.     And you had had seven classes at

4    Watseka?

5       A.     Correct, yes.

6       Q.     What two didn't you take at Allied

7    National on-line high school that you were taking?

8       A.     The physical education.

9       Q.     And band?

10      A.     Correct.

11      Q.     Gotcha.  So, for English and geometry

12   and chemistry and Spanish I and geography, did you

13   pass all those classes that semester?

14      A.     I had passing grades in all of the

15   classes, but I was not able, due to the time

16   shortage, I was not able to finish all of the

17   classes.

18      Q.     And what was the time frame, if you

19   know, that you had to finish those classes by?

20      A.     I had, I don't know the exact amount of

21   time that was allotted for it, but due to the fact

22   that I got kicked out of school, suspended from

23   school so late, and that I enrolled in an on-line

24   high school so late.  And I was also enrolled in a

25   summer sailing and diving program to get sailing

1   and -- a sailing permit, and a higher

2   classification in diving license, due to the fact

3   that I was scheduled for a trip for that to the

4   Caribbean, I was not able to finish the on-line

5   schooling in that time frame.

6       Q.   When were you scheduled to do your

7   program in the Caribbean for?

8       A.   I don't recall the exact date, but I

9   left late in June.

10      Q.   Okay.  And that would have been June of

11  2013, correct?

12      A.   Correct.

13      Q.   And when did you sign up for that?

14      A.   It would have been at the very beginning

15  of the school year even.

16      Q.   Was it before you were suspended?

17      A.   Yes.

18      Q.   So, sometime in early January of 2013

19  your folks signed you up for the sailing and

20  diving program in the Caribbean to start at the

21  end of June of 2013, correct?

22      A.   I may have been signed up even the year

23  prior, seeing as I had went to the sailing program

24  the year before.

25      Q.   Okay.  But regardless, you were to go do

2:13-cv-02062-HAB  # 36-3  Page 137 of 142

NOAH DIETCHWEILER

Page 137

```
1   that at the end of June of 2013, correct?

2       A.    Correct.

3       Q.    Okay.  And for Allied, did you

4   immediately enroll in Allied on February 11th of

5   2013?

6       A.    I don't recall if it was that exact day.

7       Q.    Was it within on a week or two after

8   that?

9       A.    Yes.

10      Q.    And you don't recall how much time they

11  give you to complete that school's assignments to

12  get credit?

13      A.    I do not.

14      Q.    But, at least from what you've told me

15  it wasn't enough time to also go to your sailing

16  and diving program at the end of June of 2013,

17  correct?

18      A.    Correct.

19      Q.    Okay.  If you would have completed all

20  of the work at Allied for the classes that you

21  just listed for me, would you have entered I guess

22  Culver in the fall of 2013 as a junior as opposed

23  to a sophomore?

24      A.    No.

25      Q.    Why not?
```

AREA WIDE REPORTING & VIDEO CONFERENCING

1      A.    I'm not -- Culver doesn't accept home

2   schooling as a way to get in, let alone be

3   accepted as a junior.  So, unless I had finished

4   my sophomore year at Watseka, without the

5   suspension that was there, there's no way possible

6   that I could have gotten in to Culver as a junior.

7      Q.    Okay.  Just to kind of clarify in my

8   mind.  You obviously got into Culver and you had

9   the suspension on your record, correct?

10     A.    Correct.

11     Q.    So it wasn't the suspension that was

12   preventing you from getting into Culver as a

13   junior, so to speak, or as a sophomore, correct?

14     A.    Correct.  As a junior.

15     Q.    Correct.  But, you're just indicating to

16   me that they don't accept any home schooling

17   whatsoever, correct, credits?

18     A.    Correct.

19     Q.    So when you got accepted into Culver, it

20   was as a sophomore, as opposed to junior?

21     A.    I was already accepted unconditionally

22   as a junior until this event took place, and I

23   wasn't going to finish my sophomore year at

24   Watseka.

25     Q.    So you were intending to go to Culver

NOAH DIETCHWEILER

Page 139

1    regardless of the suspension, correct?

2       A.    Correct.

3       Q.    However, you were only being accepted as

4    a sophomore because you hadn't finished out the

5    year at Watseka, correct?

6       A.    Correct.

7       Q.    And the reason you didn't finish out the

8    year at Watseka is because your folks thought that

9    you would be harassed or not treated fairly by the

10   personnel at Watseka, correct?

11      A.    It wasn't just my folks that felt that.

12   I also felt the same way.

13      Q.    And you did not return to Watseka at any

14   time after January 25th of 2013, correct?

15      A.    Correct.

16      Q.    Since entering Culver have you ever been

17   suspended or disciplined for any reason?

18      A.    No.

19      Q.    And now that you've completed your fall

20   semester of 2013, are you now a junior at Culver?

21      A.    No.

22      Q.    Still a sophomore?

23      A.    Correct.

24      Q.    Why is that?

25      A.    Rather than simply doing over a half of

```
 1    a year, I felt it would be at least in my interest

 2    to go over my sophomore year completely there;

 3    just the whole sophomore year entirely.

 4        Q.    Okay.  And that's by your choice, as

 5    opposed to a requirement of Culver?

 6        A.    No.   They don't allow half years there.

 7        Q.    Is that what you were told by somebody

 8    at Culver?

 9        A.    Yes.

10        Q.    Who is that?

11        A.    I do not recall who told me that.  But,

12    it was made aware to us that you can't do a half

13    year there.

14        Q.    Okay.  I'm almost done, by the way.

15    Since leaving the school, have you ever been

16    contacted by anybody from the school?  You

17    personally?

18        A.    As in school personnel?

19        Q.    Yes.

20        A.    No.

21        Q.    As in anybody?  Students obviously, but

22    exclusive of students?

23        A.    Other than the students, no.

24        Q.    Okay.  If this suspension is expunged

25    from your record, does that in any way change your
```

2:13-cv-02062-HAB   # 36-3   Page 141 of 142

1    status at Culver?

2         A.    No.

3         Q.    Have you ever seen a counselor or talked

4    to anybody concerning any emotional distress that

5    you claim to have suffered from this incident?

6         A.    No.

7         Q.    Have you ever seen any medical personnel

8    for any emotional distress you claimed to have

9    suffered from this incident?

10        A.    No.

11        Q.    Have you ever talked to a school

12   counselor or anybody at Culver or anybody at

13   Watseka for that matter concerning any emotional

14   distress that you claim to have resulted from this

15   incident?

16        A.    No.

17        Q.    I'm done.

18             MR. TAGUE: I have no questions.   You

19   have the right to read the transcript for

20   transcription accuracy.   I don't think that that's

21   necessary.

22             MICHAEL DIETCHWEILER:   We'll waive.

23             MR. TAGUE: Waive signature.

24             (The time is 2:12 p.m.)

25             (Deposition adjourned.)

NOAH DIETCHWEILER

Page 142

```
 1   STATE OF ILLINOIS    )
                          )   SS
 2   COUNTY OF CHAMPAIGN  )

 3              I, DEANN K. PARKINSON, a Notary Public
     in and for the County of Champaign State of
 4   Illinois, do hereby certify that NOAH
     DIETCHWEILER, the deponent herein, was by me first
 5   duly sworn to tell the truth, the whole truth and
     nothing but the truth in the aforementioned cause
 6   of action.
                That the foregoing deposition was taken
 7   on behalf of the Defendant on January 2, 2014.
                That said deposition was taken down in
 8   stenographic notes and afterwards reduced to
     typewriting under my instruction and said
 9   transcription is a true record of the testimony
     given; and that it was agreed by and between the
10   witness and attorneys that said signature on said
     deposition would be waived.
11              I do hereby certify that I am a
     disinterested person in this cause of action; that
12   I am not a relative of any party or any attorney
     of record in this cause, or an attorney for any
13   party herein, or otherwise interested in the event
     of this action, and am not in the employ of the
14   attorneys for either party.
                In witness whereof, I have hereunto set
15   my hand and affixed my notarial seal January 7th,
     2014.

16

17                          _____
                            DEANN K. PARKINSON, CSR
18                          NOTARY PUBLIC

19

20

21

22

23

24

25
```

AREA WIDE REPORTING & VIDEO CONFERENCING