E-FILED
Monday, 15 December, 2014  03:32:56 PM
Clerk, U.S. District Court, ILCD

# In The Matter Of:

*DIETCHWEILER v.*
*LUCAS, ET AL.*

---

## MICHAEL DIETCHWEILER
*February 20, 2014*

---

*Area Wide Reporting and Video Conferencing*
*800-747-6789*

Original File 0220diem_1.TXT

Min-U-Script® with Word Index

1

```
1              IN THE UNITED STATES DISTRICT COURT
2           FOR THE CENTRAL DISTRICT OF ILLINOIS
                     STATE OF ILLINOIS
3

4    NOAH DIETCHWEILER, by          )
     Michael Dietchweiler, his      )
5    father and next friend; and    )
     ANN DIETCHWEILER,              )
6          Plaintiffs,              ) No. 2013-CV-2062
           vs.                      )
7    STEVE LUCAS, in his            )
     official and individual        )
8    capacities; JAMES BUNTING,     )
     in his official and           )
9    individual capacities;         )
     KENNETH LEE, in his            )
10   official and individual        )
     capacities; IROQUOIS COUNTY    )
11   COMMUNITY UNIT SCHOOL          )
     DISTRICT NO. 9, IROQUOIS       )
12   COUNTY, ILLINOIS; JAMES        )
     BRUNS, in his official         )
13   capacity; DON BECKER, in       )
     his official capacity;         )
14   BRENNA JOHNSON, in her         )
     official capacity; CRYSTAL     )
15   BLAIR, in her official         )
     capacity; BOB BURD, in his     )
16   official capacity; KIRK        )
     McTAGGERT, in his official     )
17   capacity; and DEE             )
     SCHIPPERT, in her official     )
18   capacity,                     )
           Defendants.             )
19
             DEPOSITION OF MICHAEL DIETCHWEILER
20                  February 20, 2014
                       10:00 AM
21
              Amy Prillaman:  CSR #084-003275
22       Area Wide Reporting and Video Conferencing
                  301 West White Street
23             Champaign, Illinois  61820
                    (800) 747-6789
24
```

2

1                              INDEX

2
              APPEARANCES:

3
                    FLYNN, PALMER, TAGUE, LYKE & JACOBSON
4                   BY: Mr. Michael J. Tague
                    402 West Church Street
5                   Champaign, Illinois 61824-1517
                    (217) 352-5181
6                   Appearing for the Plaintiffs

7                   LAW OFFICES OF LAWRENCE COZZI
                    BY:  Ms. Shari D. Goggin-Ward
8                   27201 Bella Vista Parkway, Suite 410
                    Warrenville, Illinois  60555
9                   (630) 791-6407
                    Shari.goggin-ward@libertymutual.com
10                  Appearing for the Defendants

11                  ALSO PRESENT:
                    Ann Dietchweiler
12

13                  EXAMINATION BY:

14   Examination                              Page

15    BY: MS. SHARI D. GOGGIN-WARD                 4

16   Exhibits                                 Page

17       Michael Dietchweiler 1                   29
         Michael Dietchweiler 2                   39
18

19

20

21

22

23

24

3

1                                        STIPULATION

2

3              IT IS HEREBY EXPRESSLY STIPULATED AND
     AGREED by and between the parties that the deposition
     of MICHAEL DIETCHWEILER may be taken on
4    February 20, 2014, at the offices of Flynn, Palmer,
     Tague, Lyke & Jacobson, 402 West Church, Champaign,
5    Illinois, pursuant to the Rules of the Federal Court
     and the Rules of Federal Procedure governing said
6    depositions.
                   IT IS FURTHER STIPULATED that the
7    necessity for calling the Court Reporter for
     impeachment purposes is waived.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

1                    (Commencing at 9:59 a.m.)
2                    MICHAEL DIETCHWEILER,
3     having been first duly sworn, testified as follows:
4     EXAMINATION,
5     BY: MS. SHARI D. GOGGIN-WARD:
6          Q.    For the record, this is the deposition of
7     Michael Dietchweiler taken pursuant to notice and
8     agreement of all parties.  It will also be taken
9     pursuant to all applicable Federal Code of Civil
10    Procedure Rules and local court rules.
11                Mr. Dietchweiler, can you please state and
12    spell your full name for the record?
13         A.    Michael Louis Dietchweiler, M-I-C-H-A-E-L,
14    L-O-U-I-S, D-I-E-T-C-H-W-E-I-L-E-R.
15         Q.    Have you ever given a deposition before?
16         A.    Yes.
17         Q.    How many times?
18         A.    Multiple.
19         Q.    Under what occasions or circumstances have
20    you given depositions in the past?
21         A.    I was a practicing attorney for 34 years.
22    It would take me hours to tell you in every situation
23    what depositions I either conducted or gave in
24    certain cases.

5

1          Q.   I wasn't asking about the ones you
2      conducted, just the ones you were deposed in.
3          A.   I was a transactional attorney and inhouse
4      corporate attorney for many years.  It would take me
5      a long time to research those things and tell you
6      every single time.  I have testified in depositions
7      and in court cases for testimony in excess of three
8      dozen times and I cannot tell you what cases they
9      were.  And I don't know that those are of any
10     material issue in this case and I don't know that
11     they will lead to any evidence that would be deduced
12     at trial and I think they are beyond the scope of any
13     federal questions that can be answered at a
14     legitimate deposition.
15         Q.   You have an attorney representing you in
16     this case; is that correct?
17         A.   I do.
18         Q.   Okay.  And I'm sure your attorney will be
19     objecting from time to time, as you know, during the
20     course of the deposition.  Is that your understanding
21     as well?
22         A.   He may and he may not.  I don't know.
23         Q.   Reason being is that you are a party to
24     this lawsuit.  You haven't entered your personal

6

1   appearance in this lawsuit, have you?

2        A.    Not yet.

3        Q.    Do you intend to do so?

4        A.    I may.

5        Q.    Well, until you do, however, the only

6   person who has the basis to make any objections for

7   the record would be your counsel at this time.

8        A.    I would appreciate it, counsel, if you

9   didn't instruct me as to what your position of the

10  law is.  I will listen to a judge who will tell me

11  what the law is, but your opinion to me is not worth

12  much at this point.

13       Q.    Are you making an objection for the record

14  for some reason at this point in time?

15       A.    If I make an objection, I will tell you I

16  make an objection.

17       Q.    Okay.  Well, just for the record, I will

18  not be listening or regarding your objections.  I

19  will, however, regard your attorney's objections at

20  this time because he is the only one counsel of

21  record.

22            However, my point being is have you ever

23  given a deposition in a federal court case before?

24       A.    No.

1      Q.    Under your practice as an attorney have you

2  practiced in federal court in the Central District of

3  Illinois?

4      A.    I have been a member of the trial bar in

5  Chicago since 1987.  I practiced extensively as a

6  trial attorney in federal and state venues, both in

7  Illinois and throughout the country.  I was admitted

8  as pro hac vice in 13 different federal courts.  I

9  have practiced extensively in the Central District of

10 Illinois since probably 1989.

11     Q.    Are you a member of the trial bar in the

12 Central District of Illinois Federal Court system?

13     A.    I don't believe there is one.

14     Q.    Are you a member, practicing member, and do

15 you hold a license with the Central District of

16 Illinois Federal Court system?

17     A.    I do.

18     Q.    When did you receive that designation?

19     A.    Probably in '88 or 1989.

20     Q.    Since you have given depositions before and

21 are a member of the federal bar here in the Central

22 District, I can review for you the rules for giving

23 and taking a deposition or you can waive them for the

24 record.

8

| | | |
|---|---|---|
| 1 | A. | I am familiar with those rules. |
| 2 | Q. | So you will be waiving my reading of them |

3  to you for the record?

| 4 | A. | I am. |
| 5 | Q. | What is your current address? |
| 6 | A. | 1849 North 1800 East, Watseka, Illinois, |

7  60970.

| 8 | Q. | Who do you live there with? |
| 9 | A. | My wife. |
| 10 | Q. | What's your wife's name? |
| 11 | A. | Adrenne Dietchweiler. |
| 12 | Q. | How do you spell Adrenne? |
| 13 | A. | A-D-R-E-N-N-E. |
| 14 | Q. | Does anybody else reside with you there |

15  now?

| 16 | A. | Our son resides with us when he is home on |

17  leave.

| 18 | Q. | And your son's name is Noah? |
| 19 | A. | Our son's name is Noah. |
| 20 | Q. | What is Noah's middle name? |
| 21 | A. | Pombert. |
| 22 | Q. | How do you spell that? |
| 23 | A. | P-O-M-B-E-R-T. |
| 24 | Q. | What is his date of birth? |

9

1      A.   It would be April 3rd, 1997.

2      Q.   We are here for a lawsuit that you and your

3 wife have filed on behalf of your son against several

4 members of the Board of Education of Iroquois County

5 Community School District, the school district

6 itself, as well as the principal and several other

7 members of Watseka High School.  Is that correct?

8      A.   That is correct.

9      Q.   Your son was suspended due to certain

10 incidents that occurred at the school on January 25th

11 of 2013; is that correct?

12      A.   No.

13      Q.   Okay.  Your son was suspended from school;

14 is that correct?

15      A.   Yes.

16      Q.   Do you know why?

17      A.   Yes.

18      Q.   Why?

19      A.   Because of the prejudice and stupidity and

20 ignorance of both the administrators and the Board of

21 Education.

22      Q.   Is that the reason they gave you for

23 suspending your son?

24      A.   That is the reason I took away from

10

1   everything I learned, yes.

2       Q.   What did any member of the school or any of

3   the defendants tell you is the reason they suspended

4   your son?

5       A.   Well, they told my wife that they suspended

6   him because he didn't tell an adult member of the

7   school that there was some sort of drug activity on

8   the 25th of January, 2013 or '12, whichever.  They

9   told me it was because he took drugs at school on

10  February 25th, 2013, I believe.  And they told the

11  Board of Education when I was present that he took

12  drugs sometime, but they believed it was on the 24th

13  of January, 2013.  So I don't know what they actually

14  told me except conflicting information.

15      Q.   Okay.  Who told your wife that information

16  or statement?

17      A.   I believe Mr. Lucas testified that he told

18  her that in his testimony before the Board of

19  Education.

20      Q.   Is that what your wife told you as well?

21      A.   Yes.

22      Q.   And who told you that there was drug --

23  that Noah failed to report drug activity, I think you

24  said, on February 25th of 2013?

11

1      A.    My son told me that, my wife told me that

2  and Mr. Bunting told me that.

3      Q.    When did Mr. Bunting tell you that?

4      A.    When he called me in a conference call on

5  February 25th.

6      Q.    When you're saying February 25th --

7      A.    I meant January 25th.

8      Q.    Of 2013; is that correct?

9      A.    2013, yes.

10      Q.    Where were you when you received any

11  notification that Noah had been taken either to the

12  principal's office or Mr. Bunting's or Mr. Lucas's

13  office on January 25th, 2013?

14      A.    I was in my law office.

15      Q.    Where is that located?  Or where was that

16  located I should say.

17      A.    My office is located at 200 East Court

18  Street, seventh floor, Kankakee, Illinois, 60970.

19      Q.    Do you have other attorneys practicing with

20  you in that law office?

21      A.    I no longer practice.  I am of counsel.

22      Q.    Okay.  Did you in January of 2013?

23      A.    Yes.  Well, no, I did not.  I think I was

24  of counsel at that time.  I think I had retired.  I'm

12

1    still licensed, I still carry malpractice insurance,

2    I am listed of counsel on my firm's letterhead, but I

3    am retired.

4         Q.    When did you retire from the active

5    practice of law?

6         A.    October 31st, 2010.

7         Q.    Where did you go to law school?

8         A.    John Marshall.

9         Q.    Where did you do your undergraduate work?

10        A.    Drake University.

11        Q.    What was your major?

12        A.    I had five majors.

13        Q.    What were they?

14        A.    History -- excuse me.  I had one major,

15   five minors.  Excuse me.  History was my major.

16        Q.    What year did you graduate from Drake?

17        A.    1975.

18        Q.    I'm sorry.  What's your date of birth?

19        A.    8-14-53.

20        Q.    And just the last four digits of your

21   social?

22        A.    7034.

23        Q.    When did you start John Marshall, what

24   year?

13

1      A.    1983, I believe.

2      Q.    What did you do between 1975 and 1983 for a

3  living?

4      A.    I was a structural steel ironworker with

5  U. S. Steel/American Bridge.  I was a design

6  consultant for Sargent & Lundy for all of the

7  retrofits for Three Mile Island, Braidwood, Bryon.

8      Q.    In 1983 when you joined John Marshall did

9  you have an intended area of practice?

10      A.    Yes.

11      Q.    What was that?

12      A.    Construction law.

13      Q.    Do you hold any degrees beyond your law

14  degree from John Marshall?

15      A.    No.

16      Q.    Have you ever been convicted of a felony?

17      A.    No.

18      Q.    Have you ever been convicted of a

19  misdemeanor involving theft or deception?

20      A.    No.

21      Q.    Have you ever practiced in the area of

22  criminal law?

23      A.    Yes.

24      Q.    When was that?

14

1      A.     From 2001, 2002, until I retired.  Wasn't
2  an exclusive practice but I did practice in that
3  area.
4      Q.     About what percent of your practice was
5  criminal law during that time?
6      A.     Very, very small.
7      Q.     Less than five percent?
8      A.     Yes.
9      Q.     What type of criminal cases did you take
10  on?
11      A.     Just about all of them.  In two thousand
12  something I went to the Illinois State Police Academy
13  and became a sworn police officer and it was that
14  that sparked my interest in criminal law.
15      Q.     Have you practiced in felony courts in
16  Illinois or federal court?
17      A.     Yes.
18      Q.     Have you tried any felony cases?
19      A.     Yes.
20      Q.     And I take it also misdemeanors?
21      A.     Yes.
22      Q.     Have you ever practiced in school law?
23      A.     No.
24      Q.     You indicated you were at your office on

1   January 25th of 2013.   Do you remember specifically

2   what you were doing?

3       A.    No.

4       Q.    Because you are of counsel at that time did

5   you have a specific start time or a time that you had

6   to leave the office?

7       A.    No.

8       Q.    In your of counsel practice what did you

9   do?

10      A.    Basically nothing.

11      Q.    Do you recall why you were at the office

12  that day?

13      A.    Probably it was -- probably was a social

14  visit to see my partner of 30 some years.

15      Q.    Okay.   So to the best of your memory you

16  could have left the office pretty much at any time

17  you wanted, come and gone?

18      A.    Aside from social obligations, yes.

19      Q.    How far is it from your law office to

20  Watseka High School?

21      A.    35 to 40 miles.

22      Q.    I always forget in Central Illinois we go

23  by miles and not minutes.   About how many minutes

24  would that be?   About the same?

16

1       A.   No, it would be a little longer.  It would
2   probably be somewhere around 45 minutes I would
3   think.
4       Q.   Were you in your office when you received a
5   phone call from either the school or your wife on
6   January 25th of 2013?
7       A.   That's actually two questions.  I think I
8   received the call from my wife and I was in a hallway
9   and I told her to hang up and have the school call me
10  on a land line and I would answer it in my office.
11      Q.   Okay.  So your wife, I take it, called you
12  on your cell phone; is that correct?
13      A.   I believe so, yes.
14      Q.   How much time did it take in between those
15  two phone calls?
16      A.   Less than five minutes.
17      Q.   What did your wife say to you and what did
18  you say to your wife during that first cell phone
19  call?
20      A.   She said I'm in the Watseka school, Noah
21  has had a disciplinary problem.
22      Q.   Did she be more specific than that?
23      A.   No.
24      Q.   Had Noah ever had a disciplinary problem at

17

1  Watseka High School before January 25th of 2013 that

2  you were aware of?

3      A.   Never.  As a matter of fact, after this he

4  received an award, after he was suspended, for being

5  a student having high grades and never having a

6  discipline problem at an all-school assembly and it

7  was quite ridiculous because it was after the

8  suspension.

9      Q.   Did you attend that assembly?

10     A.   No.  We were barred from school.

11     Q.   And how did you know that that was awarded

12  then?

13     A.   Multiple people called us up and said this

14  is so strange, because Noah has been suspended, that

15  he got this award.

16     Q.   Do you recall the names of any of those

17  people?

18     A.   Sure.  His girlfriend, Kelly Boatman.

19     Q.   Anybody else?

20     A.   I believe Polly Storm.

21     Q.   And who is Polly Storm?

22     A.   Just a personal friend.

23     Q.   Is she an adult?

24     A.   She is an adult.  She does an after school

1  daycare.

2        Q.    Anyone else you can recall?

3        A.    Not that I can recall.  But there were

4  other people.

5        Q.    Okay.  To the best of your knowledge, in

6  any school system before January 25th of 2013, had

7  Noah ever had a disciplinary problem?

8        A.    No.  He always got awards for being a

9  student of -- a well-disciplined student and being --

10  being a well -- being a student of high academic

11  caliber.

12        Q.    Had you ever known Noah to take any illegal

13  drugs at any time before January 25th of 2013?

14        A.    No.  And I still don't.

15        Q.    Were you present during your son's

16  deposition about a month ago, month and a half ago?

17        A.    I was.

18        Q.    Were you present when he testified that he

19  had in fact consumed marijuana prior to January 25th

20  of 2013?

21        A.    I was.

22        Q.    Would you like to amend your prior

23  statement then?

24        A.    No.

1      Q.   You don't believe him when he says that?

2      A.   I don't know whether to believe him or not.

3  I mean what students may think is marijuana and they

4  smoke may in fact not be marijuana.  I don't know

5  what to think.  He has never exhibited to me any

6  signs of being high or being drunk or being under the

7  influence of any substance.

8      Q.   After your wife informed you on your cell

9  phone on January 25th of 2013 that Noah had a

10 disciplinary problem, what did you say to her?

11     A.   I said have -- have the school call me on a

12 land line in my office.

13     Q.   Did you inquire with your wife as to what

14 the disciplinary problem was about?

15     A.   No.

16     Q.   Did you have any idea what the disciplinary

17 problem was about?

18     A.   No.  I don't think so.

19     Q.   Do you know about what time your wife

20 called you?

21     A.   It was between 3:30 and 4:00.

22     Q.   What time had you planned on leaving the

23 office that day?

24     A.   I usually don't make any plans.

1      Q.    When the school called back, who was on the
2   phone initially?
3      A.    Mr Bunting.
4      Q.    How many times had you had any personal
5   contact with Mr. Bunting before January 25th of 2013?
6      A.    Twice.
7      Q.    And when was the first time?
8      A.    October, November, of 2012.
9      Q.    What was the purpose of that contact?
10     A.    To try and gain the school's help in
11  finishing the application procedure for Culver
12  Academies for Noah.
13     Q.    What did you need from the school at that
14  time?
15     A.    The school had apparently told teachers
16  that they were not to help Noah apply for Culver and
17  that's -- that's a -- that was known because a
18  teacher had told Noah that he was not allowed to give
19  him a recommendation, although Noah had gotten an A+
20  in his class.
21     Q.    What teacher was that?
22     A.    Mr. Harvey, I believe, his math teacher.
23     Q.    Was a reason given for that?
24     A.    No.

21

1       Q.    Did you inquire of Mr. Bunting as to that?

2       A.    Yes.

3       Q.    What did he say?

4       A.    He said that never happened.  But then

5    there was also an English teacher who told us she was

6    instructed not to do so also.

7       Q.    And who was that?

8       A.    I can't remember her name, but it was

9    Noah's English teacher.

10      Q.    So it would have been his English teacher

11   in the fall of 2012?

12      A.    Correct.

13      Q.    What did she say to you about that subject?

14      A.    She said she could not give a

15   recommendation.

16      Q.    Did she say why?

17      A.    No.  I believe it was even in an e-mail,

18   but I'm not sure.

19      Q.    Would you still have that e-mail?

20      A.    I doubt it.  I mean it might be in the

21   trash can, could be -- but I don't have it on an

22   e-mail I'm sure.

23      Q.    When Noah signed up for Watseka High

24   School, did you and/or your wife give them your

22

1  e-mail address?

2       A.   Oh, yes.

3       Q.   Okay.  Do you know what e-mail address

4  would have been given to the school district?

5       A.   Farm1849@sbcglobal.net.

6       Q.   Did you contact Mr. Bunting in

7  October/November of 2012 or did he contact you?

8       A.   I contacted him.

9       Q.   And what did you say to him at that time

10  and what did he say to you?

11       A.   Well, I asked him if there was a policy of

12  not giving recommendations.

13       Q.   What did he say?

14       A.   No.

15       Q.   And what happened after that, what was the

16  result of that phone call?

17       A.   He told me if there was any problems --

18  that if there were any problems that I should contact

19  him and he would try and solve them.

20       Q.   Did he?

21       A.   No.

22       Q.   Were any recommendations given by any of

23  Noah's teachers to Culver Academy in the fall

24  semester of 2012?

23

1      A.    Yes.

2      Q.    And who gave those recommendations?

3      A.    Both his math teacher and his English

4   teacher.

5      Q.    Did anything that the school did or didn't

6   do prevent Noah from getting accepted at Culver

7   Academy?

8      A.    No.

9      Q.    Is there anything else about that first

10   contact or one of the prior contacts with Mr. Bunting

11   that you haven't discussed yet?

12      A.    No.

13      Q.    What was the second contact with

14   Mr. Bunting?

15      A.    It was about Culver Academy.

16      Q.    And was that before or after the

17   October/November 2012 call?

18      A.    I don't know whether it was a call or

19   whether I went to his office.  I'm not sure.  On one

20   of the occasions I went to his office.  I needed a

21   document from Mr. Bunting, being the head

22   administrator of the school, certifying his records.

23   And we had asked for it a number of times and we had

24   not gotten that.

24

1      Q.   Okay.  So you went to his office.  Did he
2  give you those certified records?
3      A.   No.  He said that he would work on it.
4      Q.   Okay.  Did you eventually get them?
5      A.   I don't know.
6      Q.   Were they required for Culver Academy?
7      A.   Yes, they were.
8      Q.   And Noah was accepted, correct?
9      A.   Yes.
10     Q.   Any other contacts then with Mr. Bunting
11  before January 25th of 2013?
12     A.   No.
13     Q.   Okay.  Do you know Mr. Bunting's title at
14  the school?
15     A.   I believe he's the principal.
16     Q.   So when Principal Bunting got on the phone
17  with you on January 25th of 2013, what's the first
18  thing that he told you?
19     A.   What was that question again?
20     Q.   Can you read that back, please?
21          (Whereupon the requested portion of the
22  record was read by the reporter.)
23     A.   He introduced himself, Mr. Lucas, and he
24  said that Ann and Noah were on the phone and I was on

25

1    the speaker phone.

2         Q.   And Ann, you mean your wife; is that

3    correct?

4         A.   That's correct.

5         Q.   And it appears you are referring to some

6    handwritten notes to refresh your recollection; is

7    that correct?

8         A.   Yes.

9         Q.   Do you have an independent memory of the

10   conversation between yourself and Mr. Bunting without

11   the use of those notes?

12        A.   I do.

13        Q.   At this point in time I'm asking for your

14   independent recollection.  If you don't have an

15   independent recollection of the conversation, then

16   feel free to refer to those notes.  However, formally

17   for the record we would be requesting copies of those

18   handwritten notes.

19             When did you first write those notes?

20        A.   The night of the 25th.  This is -- this is

21   a rewriting of those notes that I wrote on

22   January 25th.

23        Q.   Do you have the original notes?

24        A.   I believe I do.

26

1       Q.   I would request you turn over both the
2    original and rewriting.
3            MR. TAGUE:   I don't have a problem with
4    those requests.   I would ask that you put those in
5    some form of writing --
6            MS. GOGGIN-WARD:   Of course.
7            MR. TAGUE:   They don't even need to be a
8    formal discovery request, but if you send something
9    in writing they won't fall through the cracks if I
10   don't get around to reviewing the transcript.
11           MS. GOGGIN-WARD:   We will send you a
12   letter, Michael, no problem.
13   BY MS. GOGGIN-WARD:
14       Q.   So you initially drafted notes concerning
15   your conversations and, I take it, what happened on
16   January 25th of 2013; is that correct?
17       A.   I don't understand what you mean by
18   initially.
19       Q.   Well, apparently you rewrote them.   When
20   did you rewrite your notes?
21       A.   I rewrote them sometime in the last -- it
22   was sometime before Noah's deposition.
23       Q.   What was the purpose of rewriting your
24   notes?

27

1        A.    To put them in a cogent form with other
2    notes so that I didn't have to shuffle through
3    multiple papers.
4        Q.    Did Mr. Bunting inform you that anybody
5    else was in the room besides Ann and Noah?
6        A.    No.   Yes.   He said Mr. Lucas was in the
7    room.
8        Q.    And who is your understanding as to who
9    Mr. Lucas is?
10       A.    I believe he is the Dean of Students.
11       Q.    Had you ever met Mr. Lucas at any time
12   before January 25th of 2013?
13       A.    I have never met Mr. Lucas.
14       Q.    Anybody else that you know of in the room
15   when you were on speaker phone besides Mr. Lucas,
16   Mr. Bunting, your wife and Noah?
17       A.    Not to my knowledge.
18       Q.    Did Mr. Bunting say anything else to you?
19       A.    Yes.   He then said, quote, Noah has fully
20   cooperated with us in a school investigation of drug
21   use.   He has admitted to taking drugs here at school
22   today and we are suspending him for ten days.
23       Q.    Did he say anything else at that time?
24       A.    No.

28

1      Q.   Okay.  And what did you say in response to
2    that, if anything?
3      A.   I said I understand you cannot have
4    students on drugs at your school.  It is a danger to
5    students, your faculty and other staff.
6      Q.   Did you ask to speak to Noah or your wife
7    at that time?
8      A.   No.
9      Q.   Did Noah or your wife say anything during
10   that phone call when you were on speaker?
11     A.   I don't believe so.
12     Q.   Did you ever ask Noah when you were on
13   speaker phone if the -- what Mr. Bunting had said was
14   true or not?
15     A.   No.
16     Q.   Were you informed that Noah was presented
17   with a document to sign concerning the allegations of
18   possessing and consuming drugs?
19     A.   No.
20     Q.   Did your wife tell you that there was
21   something in front of Noah to sign?
22     A.   No.
23     Q.   If you would have directed Noah not to sign
24   anything or say anything further, is it your

29

1  understanding that Noah would have followed your
2  directions?
3          A.    Possibly.   Most likely.
4          Q.    Did you ever tell your wife to not have
5  your son sign or say anything further to the school?
6          A.    No.   The decision had already been made.
7  Mr. Bunting said we're suspending your son for ten
8  days.   There was nothing else to be said.
9          Q.    Did you tell them that you wanted a further
10  investigation into that at that time?
11          A.    I did not.
12          Q.    Did you request a suspension hearing at
13  that time?
14          A.    I did not.
15          Q.    Was anything else said by Mr. Bunting or
16  Mr. Lucas during that speaker phone conversation?
17          A.    No.
18          Q.    Did you say anything else?
19          A.    No.
20          Q.    What was the length of that conversation?
21          A.    Very short.
22          Q.    I don't know if this has been marked but
23  I'll go ahead and mark it.
24              (Whereupon Michael Dietchweiler 1 was

1  marked for identification.)

2      A.   Before we proceed, I just thought of

3  something.  Counsel, you had asked me earlier if I

4  had ever practiced in the area of school law and I

5  responded no.  And I believe that I had represented a

6  young man in front of the Watseka School Board

7  probably 15 years ago and the case was a case where

8  there was some Ku Klux Klan activity at school and

9  multiple children were suspended for that activity

10  for I think five days.

11          Outside the -- before the school board

12  hearing a very large man came up to me and his -- his

13  ex-wife had hired me to represent her son.  And he

14  came up to me and he said this is a bunch of bullshit

15  and I've got to get to the bottom of this.  Who are

16  these people telling us who we can associate and why

17  and, you know, these are all a bunch of Jews here and

18  this is crazy.

19          And I said hold it.  I happen to be the

20  only Jew in Watseka and if you don't like Jews, you

21  might not like me and I'm just telling you straight

22  up that I'm Jewish.  And he said I've got no choice

23  but to go with you, you are the only attorney that we

24  got here.  And then there was a -- a negotiated

1    settlement of that case.

2              Later at Christmas that boy called me up

3    and said thank you for saving me from getting

4    expelled from school.  And his father called and told

5    me that for a Jew you ain't so bad.  Which was

6    insulting but nonetheless was said.

7        Q.    I'm going to hand you what's been marked as

8    your Deposition Exhibit No. 1 for identification.

9    First off, do you know what that document is?

10       A.    Yes.  It is a notice of student

11   disciplinary action.

12       Q.    When did you first see that document?

13       A.    The night of January 25th, 2013.

14       Q.    Who presented that document to you?

15       A.    My son, Noah.

16       Q.    Was it your understanding then that Noah

17   was given a copy of that document on January 25th of

18   2013 by the school?

19       A.    Yes.  When they said that he was suspended,

20   this is what they gave him.

21       Q.    Do you know at what point in time during

22   Noah's meeting with Mr. Bunting and Mr. Lucas that

23   Noah signed that document?

24       A.    Yes.  It was immediately before my wife and

1   Noah exited the school.  As a matter of fact, I

2   believe that Mr. Lucas had to call them back to step

3   into the office to sign it.

4        Q.   Who told you that?

5        A.   I believe my wife told me that, but I think

6   it's also in the transcript of the school board

7   hearing that Mr. Lucas testified to that.

8        Q.   Are you familiar with your son's signature?

9        A.   No.

10       Q.   Did your son tell you that he signed this

11  document?

12       A.   Yes.

13       Q.   So the signatures that are located on

14  Exhibit No. 1 representing to spell out the words

15  Noah Dietchweiler, you don't recognize those as your

16  son's signature?

17       A.   I have no reason to believe they are not

18  his, but I'm not very familiar with my son's

19  signature.  But as a side note, he told me he was

20  coerced into signing this and that he was threatened

21  by Mr. Lucas and Mr. Bunting into signing this and I

22  believe him.

23       Q.   Do you know how long after you were on

24  speaker phone that Noah signed this document?

33

1      A.    I believe it was shortly after, within
2   minutes after.
3      Q.    Do you know if any further conversation
4   took place between Mr. Bunting and Mr. Lucas and your
5   wife and Noah after they hung up with you but before
6   Noah signed this document?
7      A.    According to Noah and my wife, Noah shook
8   their hands and left.
9      Q.    Did Noah or your wife ever indicate to you
10  while you were on speaker phone that Mr. Bunting and
11  Mr. Lucas had coerced Noah into signing this
12  document?
13     A.    No, they did not.  There was nothing said
14  about Noah signing a document or that he had signed a
15  document.  There was nothing said about that.
16     Q.    Do you know if Noah had been presented this
17  document before you were on speaker phone?
18     A.    Yes.
19     Q.    And how do you know that?
20     A.    Because he told me he had not.
21     Q.    In looking at this document it says this is
22  to --
23     A.    Wait a minute.  Wait a minute.  Excuse me.
24  The last answer, he told me that -- and I have two

34

1    things confused here.  He told me that after he said

2    whatever, they may have pushed at him the document

3    which was pre-filled out.  Mr. Lucas hadn't signed it

4    and he hadn't signed it.  But I'm not sure of that.

5    But I know that he and Mr. Lucas signed it after

6    initially my wife and Noah got up to leave and then

7    they came back to sign it.

8        Q.   Okay.  And I take it do you know whose

9    handwriting is located on this document aside from

10   Noah's two signatures?

11       A.   I assume that that's Mr. Lucas, but I don't

12   know his signature.

13       Q.   Okay.  This indicates that the notice of

14   the student disciplinary action is to you and your

15   wife.  Do you see that?

16       A.   I do.

17       Q.   And it's dated January 25th of 2013; is

18   that correct?

19       A.   That's correct.

20       Q.   And it's to inform you that your child,

21   Noah Dietchweiler, has been suspended from Watseka

22   High School for ten days, specifically your child has

23   been suspended for possession of drugs and

24   consumption of drugs.  Do you see that?

1       A.   I see that.

2       Q.   And you were informed by Mr. Bunting that

3   Noah had admitted during his initial conversation

4   with him and Mr. Lucas that he had taken drugs?

5       A.   Mr. Bunting said Noah has fully cooperated

6   with us in a school investigation of drug use.  He

7   has admitted to taking drugs here at school today and

8   we are suspending for ten days.  That's exactly what

9   he said.

10       Q.   When he said that, Noah was presumably

11   present in the room; is that correct?  You were on

12   speaker phone?

13       A.   That's what I was told.  I wasn't in the

14   room but that's what I was told.

15       Q.   Did Noah ever say anything that he had not

16   admitted taking drugs at school that day?

17       A.   Noah did not speak during that conversation

18   at all.

19       Q.   It was also your understanding that Noah

20   could return to school on Monday, February 11th,

21   2013, following that suspension, correct?

22       A.   That's what the document says.

23       Q.   There's been a circle around the word yes

24   and it says I agree to stay, something, to make up

36

1    any missed school work while I was on suspension.

2    And you believe that that's Noah's signature; is that

3    correct?

4        A.    I have no reason to believe it's not.

5        Q.    Looking at the bottom of the document, it

6    says that a student suspension hearing was held on

7    January 25th of 2013 and attended by Steven Lucas and

8    Noah.  Do you see that?

9        A.    I do.

10       Q.    Was that your understanding as well?

11       A.    No.

12       Q.    Okay.  What is your understanding of a

13   student suspension hearing at Watseka High School?

14       A.    The school handbook and the state law

15   provides that a student is to be given in writing the

16   charges, the reasons therefore, and a written

17   statement that he has a right to contest those

18   charges.

19             In this particular case, Noah was told we

20   know what you did.  You can either admit to it and

21   get a suspension or we're going to expel you for the

22   rest of the year.  And that's coercion.  So there was

23   no hearing that was held.

24       Q.    And you --

37

1          A.    This was a mere coercion like Nazis in a

2     room beating somebody up with a pipe.  When two old

3     men take a kid and put him in a room and threaten

4     him, it's no worse than the Gestapo beating you or me

5     up with a pipe saying sign here.  And that's exactly

6     what happened.  And that's what every student that

7     was involved in this action told me happened to them

8     too and I have their affidavits and you've seen them.

9          Q.    And you knew the school suspension policy

10    and the state law prior to Mr. Bunting and Mr. Lucas

11    contacting you about Noah; is that correct?

12         A.    No.

13         Q.    You said that you -- you just gave a nice

14    story about your representation of a student at

15    Watseka High School 15 years prior for being

16    suspended and threatened to be expelled; is that

17    correct?

18         A.    That is correct.

19         Q.    It wasn't -- you didn't know what the rules

20    were of suspension and the laws back when you --

21         A.    At the time --

22         Q.    You have to let me finish.  At the time

23    that you defended that student before the school

24    board?

38

1      A.    That was 12, 15 years before, I didn't

2  remember those things.  I did not refresh myself of

3  the rules, I didn't have any time.  I got a phone

4  call that I didn't even know what it was about and

5  had seconds to think about what to do.  And my

6  thought pattern was that if I were in Mr. Bunting's

7  and Mr. Lucas's shoes and some kid in a legitimate

8  fact-finding hearing had confessed to taking drugs at

9  school, if I were in their shoes I wouldn't want

10  other students, teachers or other staff members to be

11  exposed to a person on drugs and suspension would be

12  appropriate.  And I also thought to myself after that

13  phone call occurred, why the hell didn't they take

14  him to the hospital if they thought he was on drugs?

15          And it appeared to me at that time that

16  something was out of kilter here, something was not

17  right that you wait until after school was over when

18  there's no legitimate purpose to protect other

19  people.  You can't take a kid who I've given my child

20  to for the purposes of in loco parentis and then they

21  don't follow through with what I would think is a

22  legitimate protective activity of taking the kid to a

23  hospital if they legitimately think he is on drugs.

24  They wait until after the school day is over.

1           But I went home and then talked to my kid
2    and, no, I did not believe my child at that time.  I
3    figured if the school told me this is what happened,
4    then I'm going to believe the adults.  And it was
5    only until after I had a drug test that
6    scientifically proved without a doubt that my kid
7    didn't do what they said that I believed my kid's
8    story.

9           And then I started getting affidavits from
10   other students and they backed Noah's statements up
11   100 percent about being coerced and about having the
12   same thing said to them, either you sign this
13   document or you're expelled or sign the document and
14   you can make up your work and just be suspended for
15   ten days.

16      Q.   Going to have this marked as Deposition
17   Exhibit No. 2 for identification.

18           (Whereupon Michael Dietchweiler 2 was
19   marked for identification.)

20      A.   So in answer -- in further answer to that
21   last question, after I got the drug test, the drug
22   screening report from Riverside pathology that Noah
23   had not taken any drugs and that there were no
24   metabolites in his system, for the recent past he

40

1   could not possibly have taken any drugs, then I

2   e-mailed Mr. Bunting and I said I want to come in

3   Monday and talk to you about this.  I have a drug

4   test that conclusively shows Noah has no drug

5   metabolites in his system whatsoever and this is

6   scientifically impossible.

7           I got no response to my e-mail.  I showed

8   up at school an hour early at the exact time that my

9   e-mail was sent to Mr. Bunting.  I was made to wait

10  for an hour and a half in his office.  I was told by

11  his staff he was in the school and that he would come

12  when he thought it was appropriate.

13          When he finally did come, I tried to hand

14  him the test results and he said he didn't care what

15  the test results said and to get out of his school,

16  that there was a procedure that I could do, that I

17  was an attorney and I could find out what that

18  procedure was and that I could contest this, but I

19  had to leave his school.

20          And I said I cannot believe that you won't

21  even look at a test that scientifically, conclusively

22  shows this kid didn't do what you have charged him

23  with and what you have suspended him for.

24          And he said leave my school before I have

1   to call the police.  And that's when I told him to

2   his face, I said Mr. Bunting, game on.  And that's

3   why we're here today.

4        Q.   Can a person possess drugs without

5   consuming drugs?

6        A.   It is possible to possess drugs without

7   consuming drugs.  Noah was charged with possessing

8   drugs by way of consumption.  What Mr. Bunting told

9   me on the 25th was your kid took drugs at school

10  today.

11       Q.   He told you that Noah had admitted to

12  taking drugs to him that day, correct?

13       A.   He said Noah admitted taking drugs today,

14  meaning that he took the drugs on the 25th.  And then

15  we show up for the hearing before the board and

16  Bunting says, oh, we screwed up when we told you

17  that.  It's actually the 24th that he said he took

18  the drugs.  It's actually the 24th.  Well, I can tell

19  you conclusively when Bunting talked to me on the

20  phone, he told me Noah had taken the drugs on the

21  25th.

22       Q.   Okay.  I'm going to hand you what's been

23  marked as Deposition Exhibit No. 2 for

24  identification.  These were actually provided in some

42

1   of your discovery responses and it's a page taken

2   from the Watseka School District Suspension

3   Procedures and student handbook.  Do you see that?

4        A.   I see this and I disagree with you.  This

5   is not from the student handbook.

6        Q.   What is that from?

7        A.   I have absolutely no idea.  This is a

8   fraud.  This is what was presented to the school

9   board in writing as to what the standard was.  The

10  actual -- the actual handbook itself, and I have it

11  right here, the actual handbook says they are to give

12  Noah in writing the charges.  And I'll quote from the

13  book:  The suspending official shall give the student

14  verbal and written notice of the charges which

15  constitute the basis for the proposed suspension and

16  a summary of all evidence which supports such charges

17  prior to the initiation of said hearing.

18           And on the page that you just gave me,

19  which is Exhibit No. 2, it says nothing about that

20  whatsoever.  And this is what they presented to the

21  school board and told them the standard was and they

22  fraudulently did that to railroad these kids.

23       Q.   This cites two legal references, as well as

24  a Supreme Court case and the Illinois State Statute

43

1    105 ILCS 5/10-20.14, indicating that before a

2    suspension the student shall be provided conference,

3    during which the charges will be explained and the

4    student will be given an opportunity to respond to

5    the charges.

6            Is that what was presented to the school

7    board at the hearing?

8        A.    What was presented to the school board was

9    that piece of paper and that statement saying that

10   that was the published policy of Watseka school.

11   That is untrue and that is fraud in writing and that

12   is fraud in a public hearing and it's a fraud on the

13   court.

14       Q.    To the best of your understanding, Noah was

15   in fact given a copy of the notice of student

16   disciplinary action; is that correct?

17       A.    After they had decided that there was going

18   to be discipline.  You cannot give a person notice of

19   the things that are required under the handbook and

20   under the state law if you've already made a decision

21   about whether he's going to be suspended or not.

22   This says a decision has already been made.  Either

23   there's civil procedure here and there's due process

24   of law under our constitution or there isn't.  You

44

1   can take it one way or the other, but you can't have
2   it both ways.
3        Q.   What state law are you referring to?
4        A.   The Illinois state law and the federal law.
5        Q.   Okay.  What statute are you referring to?
6        A.   I'd have to look that up, counsel.  Just
7   like you had to look it up two seconds ago.
8        Q.   And I guess what I'm saying is are you
9   referring to any other statute besides the one that I
10  just cited 105 ILCS 5/10-20.14?
11       A.   I don't know.  I'd have to look that up.
12  But -- but when a school board publishes more
13  restrictive rules than the state law provides for, it
14  is the more restrictive rules that are to be used in
15  a hearing procedure and that's well-established law.
16            And what they did was they said these
17  lesser rules are what the school board is to go by
18  and they instructed the school board as to that when
19  in fact their own rules of procedure have a more
20  restrictive set of rules which they did not follow
21  because they were fraudulently led to believe that
22  they didn't have to.
23       Q.   Who fraudulently led them to believe that?
24       A.   The administrators of the school and the

45

1   attorney for the school board, which would be

2   Mr. Funk.  So it would be the Superintendent of

3   Schools, Mr. Bunting, Mr. Lucas, and Mr. Funk.

4        Q.    Did you present at the school board hearing

5   a copy of the student handbook?

6        A.    Yes.

7        Q.    Exhibit 1 goes on to state at this hearing

8   Noah was afforded his procedural due process rights,

9   the opportunity to present a defense, to explain the

10  circumstances of the actions in question and/or prove

11  his innocence.  Was that your understanding as well?

12       A.    No.  He was coerced into signing that.

13       Q.    Did Noah ever deny to you that he admitted

14  taking drugs on the date of the incident or the day

15  before the incident?

16       A.    Noah denied he had taken drugs the day of

17  the incident, the day before the incident or any time

18  before that.  And the tests that he took showed that

19  that was true.

20       Q.    That wasn't quite my question.  Did Noah

21  deny to you that he told Mr. Bunting and Mr. Lucas

22  that he had taken drugs on the day of or the day

23  before January 25th of 2013?

24       A.    Yes.  He said that the only word he ever

46

1  spoke in that -- in that hearing, if you will,
2  regarding the charges was one word and that was
3  "whatever".  And that was in response to their
4  threat.
5      Q.   The suspension was reported immediately to
6  your wife on January 25th of 2013, as soon as it
7  happened; is that correct?
8      A.   I believe so.
9      Q.   And upon the request of you and your wife a
10  review of suspension was conducted by the school
11  board; is that correct?
12      A.   No.
13      Q.   A review of the suspension was not
14  conducted by the school board?
15      A.   No.  This was a kangaroo court.  They
16  didn't review anything.  They had decided this way
17  before.  And this -- there was no legitimate
18  procedure that was undertaken to decide what was
19  going to happen with the suspension that was already
20  given.  It was a foregone conclusion that they were
21  just going to sustain the suspension and they didn't
22  listen to one bit of evidence that was produced and
23  everything that Bunting and Lucas said had absolutely
24  no logic to it, they didn't have one fact for it.

47

1    And when we presented scientific, unrefutable proof

2    that this didn't happen, they didn't care.

3        Q.   Now, I think you indicated in your prior

4    testimony that other students were similarly charged

5    as Noah; is that correct?

6        A.   That is correct.

7        Q.   Who else?

8        A.   You know who else.  It's all set forth in

9    the complaint, it's set forth in Noah's deposition,

10   it's set forth in Lucas's and Bunting's -- Lucas's

11   and Bunting's statements to you.  You know

12   specifically.  This is not a test of what I learned

13   and I don't know specifically.

14       Q.   That's all I needed to know.

15            You indicated that other students were

16   coerced into signing a document similar to your

17   Exhibit 1.  Is that correct?

18       A.   Every person that I talked to said the

19   exact same thing, I was told by Mr. Bunting and/or

20   Mr. Lucas that if I didn't admit to taking drugs at

21   school and having part in this drug affair that

22   happened on January 25th that I would be expelled

23   from school for the year.  If I admitted to it, I

24   would be only suspended for ten days and could make

48

1  up my school work.

2          And you have the affidavits from the

3  students that gave them.  There was one student who

4  did not give them, his last name is Schunke, and

5  Mr. Schunke is one of the star football players for

6  Mr. Lucas.  And I went to his house and his father

7  said we have a deal with Mr. Lucas.  My son is not

8  signing anything.

9          And as a matter of fact, then Mr. Schunke

10  goes to all the football practices, goes to all the

11  games, which the Illinois law says he cannot do, and

12  then he gets an award at the end of the year for

13  being a football player, okay?  When he's not even

14  supposed to be involved in this stuff.  He got to go

15  to the Winter Ball that year.  None of these other

16  kids did.  So there's selective enforcement of the

17  punishment here too.

18      Q.  Do you recall which students or students'

19  parents you spoke with concerning you said that every

20  person who was talked to was talked to the same way?

21      A.  Yes.  I talked to the parents first before

22  I talked to any children, as I thought that would be

23  most appropriate.  The first parent I talked to was

24  Dakota Papineau's mother.  She said that she was

49

1  called in with Dakota, who was talked to before Noah,

2  and that they didn't start the questioning until she

3  got there; that she told Mr. Lucas and Bunting that

4  my kid's not going to have anything to do with this,

5  he had nothing to do with this. This is a bunch of

6  crap and we're walking out of here. They walked out

7  of there, nothing ever happened to them.

8       Q. So Dakota Papineau did not get expelled; is

9  that correct?

10       A. That's correct. But he was -- he has an

11  affidavit and he told me and his mother told me that

12  he was told the exact same thing, that if you don't

13  take this and sign this piece of paper, you're going

14  to be expelled. And then --

15       Q. I have another question. I'm sorry.

16       A. You didn't let me finish the other one.

17  You asked me who I talked to. The other one was

18  Brett Short's parents and she told me exactly the

19  same thing. And then I talked to a Konce kid, I

20  think, and his mother told me the exact same thing

21  and I got an affidavit from him also.

22       And as a matter of fact, the Konce kid was

23  on probation for some issue with the Watseka court

24  system and he had to drop urine and drop urine on

1  Saturday after this and his -- his sample turned up

2  negative for everything also.  And he was made to

3  sign the same piece of paper saying exactly what Noah

4  did and then his sample showed up negative also and

5  his suspension was for consumption of drugs and

6  possession of drugs also.

7       Q.   It's your understanding that the Konce kid

8  was also suspended?

9       A.   Yes.

10      Q.   And it's your understanding that Dakota was

11 not suspended or expelled?

12      A.   That's correct.

13      Q.   And Dakota did not admit to taking drugs,

14 to the best of your understanding, when you talked to

15 Dakota's mother --

16      A.   His mother told him not to say anything.

17 She was the only parent who was allowed to come in

18 before the questioning started.

19      Q.   Did she explain why she was the only parent

20 who was allowed to come in before the questioning

21 started?

22      A.   She said she barged in.  She was there and

23 she barged in.

24      Q.   And she directed her son not to sign

51

1  anything either; is that correct?

2     A.   She said not to talk to them and not to

3  sign anything.

4     Q.   And how about Brett Short?  Did he sign a

5  document similar to the one your son signed?

6     A.   No.  Yes, yes.  He signed the document with

7  the school, but his mother would not let him give an

8  affidavit.  She was afraid of reprisals by the

9  school.

10     Q.   Was Brett Short, to the best of your

11  knowledge, suspended as well for ten days?

12     A.   Yes.

13     Q.   Do you know if he appealed that suspension?

14     A.   No.

15     Q.   Do you know if anybody else besides

16  yourself on behalf of Noah appealed their

17  suspensions?

18     A.   I do not know.  I know that the Konce

19  family had asked me about attorneys and I don't know

20  how far that went.  I don't know if they had the

21  resources to do so.  And I also know that Michael

22  Gregorash's grandmother called me and she actually

23  asked me to represent them in the expulsion hearing

24  and I told her that was impossible because of the

52

1    facts of the case and potential conflict.

2         Q.    Who is --

3         A.    And I didn't practice anymore.

4         Q.    Who is Michael Gregorash?

5         A.    He is one of the kids involved in this, as

6    I understand it.

7         Q.    Okay.  To your understanding did he also

8    sign a document similar to your son's?

9         A.    I don't know.  I don't believe so.  He was

10   expelled.  I believe he did not sign the document and

11   he was expelled.

12        Q.    He was also arrested; is that correct?

13        A.    I don't know.  At that time I was not a

14   member of the police department.

15        Q.    Did Noah ever explain to you that Michael

16   was arrested for drug possession?

17        A.    At the time that you took his deposition

18   that's what he said.

19        Q.    You didn't know that before then?

20        A.    I don't know if I did or not.  I don't

21   remember.  I had talked to his grandma's boyfriend or

22   fiancé or husband, I'm not sure which, very nice guy,

23   who told me -- who called me up and said I filled the

24   prescription and I didn't fill it until Thursday

53

1   night.  There's no way that Michael could have given

2   Noah drugs on the 24th because that prescription

3   hadn't been filled.

4          And had the school had the -- you know, had

5   the school had the duty to tell us what day they were

6   talking about, then the procedure that should have

7   been followed would have allowed us to bring in that

8   exculpatory evidence.  But because the school

9   violated their own procedures and didn't tell us, we

10  were denied that opportunity to bring that evidence

11  into the hearing.

12      Q.   Do you know the name of that gentleman who

13  you spoke with on the phone?

14      A.   Tom.

15      Q.   Do you know his last name?

16      A.   No.  It's either Gregorash or something.  I

17  don't know.

18      Q.   Did Tom tell you that Michael had actually

19  taken pills from him?

20      A.   It was not his prescription as I understand

21  it.  It was Michael's mother's prescription.  And

22  Michael's mother was living with her mother,

23  Michael's grandmother, and Tom.

24      Q.   Did Tom indicate to you during this phone

54

1    conversation that it was his understanding Michael

2    had actually taken pills from his mother's

3    prescription?

4        A.   Yes.  I don't think he said it that way,

5    but it was -- it was -- it was understood at least in

6    the conversation that that had happened.

7        Q.   Was it also your understanding that Michael

8    had in fact brought drugs to school that day?

9        A.   I did not discuss that with Tom.  From what

10   the school has said and what -- what I understand,

11   that is a possibility.  I don't know.  And by that

12   day, if you are talking about the 24th, that is not

13   my understanding.  If you are talking about the 25th,

14   I don't know.

15       Q.   Did Noah ever tell you that Michael had

16   brought drugs to school on January 25th of 2013?

17       A.   No.

18       Q.   What time, if you know, did Noah and your

19   wife get home that day?

20       A.   I don't know.  Before me.

21       Q.   How far is Watseka High School from your

22   home?

23       A.   Three, four miles.

24       Q.   What did you do after the phone call with

1  the school, after you hung up?

2      A.   I believe I went in and told my partner

3  what the contents of the phone call were and said I

4  had to leave.  And both of us couldn't believe it and

5  I left and -- immediately and came home.

6      Q.   Who is your partner?

7      A.   Robert LaBeau.

8      Q.   How do you spell his last name?

9      A.   L-A, capital B, E-A-U.

10      Q.   Does he still practice in Kankakee?

11      A.   Yes.

12      Q.   Are you still of counsel at his firm?

13      A.   It is my firm also and I still am of

14  counsel.  He is retiring and we are dissolving the

15  firm within -- within 2014.  We have decided that.

16      Q.   Does he live in the Kankakee area?

17      A.   Yes.

18      Q.   After you talked to your partner, what time

19  approximately did you leave the office?

20      A.   I would think it was probably a quarter to

21  5:00, maybe 5:00, somewhere around there.  Maybe even

22  4:30.  I don't know.

23      Q.   Do you know if your wife and your son went

24  anywhere in between school and home?

1          A.    I don't believe they did.

2          Q.    Did you go anywhere between your office and

3     home?

4          A.    No.

5          Q.    How long did it take you to get home that

6     day?

7          A.    Probably less than it should have.

8          Q.    What's the typical time?

9          A.    Probably half an hour to 40 minutes.

10         Q.    Did you make any further phone calls about

11    your son's charges or case on your way home?

12         A.    I don't remember.  I don't think so.  At

13    some point I did talk to Denise McKay, which would be

14    Michael's grandmother.

15         Q.    When did you talk to Denise -- well, I

16    should say was this before or after you talked to

17    your son that night?

18         A.    I think it was -- I'm not sure whether it

19    was before or whether it was after, but it was

20    certainly before the drug test.  But I don't remember

21    whether it was -- I think it was before, but I'm not

22    sure.

23         Q.    How did you know to call Ms. McKay?

24         A.    I don't know.  I don't remember.

57

1          Q.    The only thing that you were informed on
2     the phone by Mr. Bunting or Mr. Lucas was the fact
3     that Noah had been charged with possession of drugs
4     and consumption of drugs, that he had admitted to
5     this and that that was the substance of the
6     conversation, correct?
7          A.    That is correct.
8          Q.    Was Michael McKay or any other student's
9     name brought up during that phone call?
10         A.    No.
11         Q.    So when you talked to your partner and then
12    left the office, why would you call Denise McKay?
13         A.    I don't know that that's when it happened.
14    I told you I don't remember.  It might have been
15    after I talked to my wife, it might have been after
16    I -- I don't remember.  That is confusing to me the
17    timing of that.  I was extremely angry at that point
18    with my son.  I did not believe him that he had not
19    taken drugs.  I believed that a person who confesses
20    to something is generally guilty of that and that a
21    person would not confess to something like that,
22    especially when they've already been admitted to a
23    school like Culver and he knows that could jeopardize
24    everything.  I couldn't understand it.

58

1              I mean it was -- it was a total anathema to
2     me.   And I was very, very angry.   I did not believe
3     my son didn't do what they said he did until after he
4     passed the drug test.   The drug test that was done at
5     my -- at my direction to a zero tolerance, federal
6     aviation test, I have been a pilot for 40 years, 35,
7     40 years, and the flight surgeon in Kankakee is
8     Dr. Olafson, that's who I go to for my flight
9     physicals.

10             So I was familiar with the -- with the
11    procedures being an attorney and I did practice in
12    the aviation field for my whole career and so I was
13    familiar with the testing for substances in incidents
14    and accidents.   And I called the FAA certified
15    representative, who was Dr. Olafson, and I asked him
16    if he had the wherewithal to do an FAA procedural
17    drug test and he said yes.   And I said can you do
18    that to a zero tolerance?   And he said absolutely.
19    And I said can you arrange it?   And he said yes.   And
20    I said what do I have to do?   And he said come to the
21    emergency room.

22             And we went to the emergency room and the
23    drug test was done.   It was a two-sample test.   The
24    first sample -- it was either first or second sample

59

 1 | was taken to Riverside pathology department at my
 2 | direction and a drug screening was done.  The second
 3 | test was sent to the FAA designated testing lab,
 4 | which is Quest, and I have attached all the FAA
 5 | forms, all the government forms.  That test came back
 6 | after -- now this is an extensive test with gas
 7 | chromatography and every possible test you could do,
 8 | and it came back zero for every single known
 9 | prescription medication, nonprescription medication
10 | and illegal substance.
11 |     Q.   Okay.  Did you call your wife or son on the
12 | way home from the office?
13 |     A.   No.
14 |     Q.   About what time did you get home?
15 |     A.   Sometime between 4:30 and 5:30 I would
16 | guess.  I don't have an exact answer for that.
17 |     Q.   Who did you talk to first, wife or son?
18 |     A.   Noah.  I yelled at him.
19 |     Q.   Where was your wife at the time?
20 |     A.   I don't know.  Hiding probably.
21 |     Q.   Where was Noah when you were yelling at
22 | him?
23 |     A.   Sitting at the kitchen table.
24 |     Q.   And what did you yell at him about at that

60

1  time?

2      A.   I told him -- I asked him what the fuck was

3  going on.

4      Q.   And what did Noah say?

5      A.   I didn't do it.

6      Q.   And what did you say in response?

7      A.   I said then what did you admit to this kind

8  of crap for?

9      Q.   And what did he say?

10     A.   They threatened me.

11     Q.   Did he actually tell you that he admitted

12  to it?

13     A.   No, he said -- I said why did you admit

14  this if you didn't do it?  And he said they

15  threatened me.

16     Q.   Okay.  In response to that was it your

17  assumption that Noah had actually admitted to

18  possessing or consuming drugs on --

19     A.   Yes.

20     Q.   -- on January 25th of 2013?

21     A.   Yes.

22     Q.   It's your understanding that he admitted to

23  this because he was threatened, correct?

24     A.   No.  At that time I didn't believe him.

61

 1       Q.    That's what he told you, though, correct?

 2       A.    That is what he told me.

 3       Q.    And did he tell you what the threat was

 4   during that conversation?

 5       A.    Yes.  I asked him, I said what did they

 6   threaten you with?

 7       Q.    And what did he say?

 8       A.    He said they told me if I didn't admit to

 9   it that I would be expelled for the whole year.  And

10   if I did admit to it I would get a 10-day suspension

11   and could make up all my work and I said whatever.

12       Q.    And what did you say after that?

13       A.    I said I don't believe you.

14       Q.    Did Noah say anything else?

15       A.    He started crying.

16       Q.    And what did you do after that?

17       A.    I said Noah, I've been doing -- I've been

18   doing work as an attorney and a policeman for so

19   long, I said when somebody confesses, I don't believe

20   them.  And he said, dad, I promise you the only

21   reason I did this was because they threatened me that

22   I would be thrown out of school for the whole year.

23   And I said then we're going to go take a drug test

24   and we're going to do it right now.

62

1      Q.    When had you contacted Dr. Olafson or your
2   contacts in the FAA about the drug test?
3      A.    After I talked to -- after that last
4   statement was made, Noah told me, he said fine.  He
5   said that will show you I didn't do anything.  And I
6   said then I'm setting it up and you better not be
7   lying to me because this is going to cost money.  And
8   he said I'm not lying to you, dad, I promise.  And
9   that's when I called Dr. Olafson.
10     Q.    And where was Dr. Olafson located?
11     A.    His office is at 500 Wall Street, Kankakee,
12  Illinois.  I think it's Wall Street.  I think
13  that's -- it's on the papers we gave you, whatever
14  that --
15     Q.    And you had Dr. Olafson's telephone number
16  because you had dealt with him in the past?
17     A.    It's in the phone book.
18     Q.    So you give him -- about what time did you
19  call him?
20     A.    It was probably 6:00, quarter till,
21  something like that.
22     Q.    So it's now 6:00 PM, you call Dr. Olafson.
23  How long does that conversation last?
24     A.    It lasted longer than a few minutes.  It

63

1    was probably five, seven minutes, something like

2    that.  He asked me about what was going on.  I told

3    him.  He told me that -- he told me this was an

4    expensive procedure to do this and I said I don't

5    care.  He told me to come to Riverside to the

6    emergency room, that he would meet us there, that he

7    was still at the office and he would come down and

8    meet us there.

9         Q.   Okay.  Did you talk to your wife during

10   this time before taking Noah to the emergency room?

11        A.   I think at the time I called Dr. Olafson

12   she had come into the kitchen, I believe so.  So I

13   hadn't directly talked to her, but she knew what was

14   going on.

15        Q.   Anybody else in the house?

16        A.   No.

17        Q.   Was anybody else present in the room when

18   Mr. Bunting contacted you and you were on speaker

19   phone with your wife and Noah and Mr. Bunting and

20   Mr. Lucas?

21        A.   No.

22        Q.   How much longer did you have stay at home

23   before you left for the hospital?

24        A.   Just long enough to get our things together

64

1    and we left.  I mean it wasn't even ten minutes.

2         Q.   Do you know if Noah had eaten or drank

3    anything from the time he got home to the time that

4    you got home?

5         A.   I don't know about before I got home except

6    for what he has told me.  After we got home I know he

7    did not eat.

8         Q.   You mean after you got home.

9         A.   After I got home.

10        Q.   What did he tell you?  Did he eat or drink

11   after he got home from school?

12        A.   I never asked him, he never said anything.

13   But if you are trying to use that to undue the drug

14   tests, the drug test to a zero tolerance is good for

15   eight days and I was told it doesn't matter what you

16   take, you're not going to get rid of the metabolites.

17   And I was told that by both the pathologist at

18   Riverside who reviewed the drug screening results and

19   the pathologist at Quest with Dr. Olafson on the

20   phone.

21        Q.   How long did it take you to get to the

22   hospital?

23        A.   Probably close to an hour.

24        Q.   When you got there was Dr. Olafson already

1  there or did you have to wait for him?

2       A.   We had to wait for him.

3       Q.   How long did you have to wait?

4       A.   Seemed like forever.

5       Q.   More than an hour?

6       A.   No.

7       Q.   Did you go through the emergency room

8  itself?  Was Noah admitted through the emergency

9  room?

10      A.   I don't believe he was admitted through the

11  emergency room.  We went to the information desk,

12  they asked us what we were there for, we told them,

13  they called Dr. Olafson.

14      Q.   Would it be your understanding that Noah

15  was never a registered patient at the emergency room

16  at Riverside?

17      A.   Pardon me?

18      Q.   Was he a registered patient?

19      A.   He didn't have one of those arm band things

20  on so I don't know.

21      Q.   Did you have to talk to a nurse as to the

22  reason why Noah was at the emergency room and get

23  examined, things along those lines?

24      A.   He was not -- he was -- because we told

66

1    them he was there for a drug test, he was not

2    triaged, if that's what you are getting at.

3         Q.   Okay.  And where did Noah have his test

4    done?

5         A.   In Dr. Olafson's office.

6         Q.   And how long have you known Dr. Olafson

7    again?  Sorry.

8         A.   He had a partner, Dr. Janevicius, who used

9    to do my flight physicals up until probably two

10   thousand something.  And then after Dr. Janevicius

11   retired, I started going to Dr. Olafson and he did my

12   flight physicals.  I am assuming it would have been

13   sometime between 2000 and 2005.  But I had known

14   Dr. Olafson as a -- as a pilot before that and I

15   believe I may have -- I may have seen him for the

16   first time as a patient in the year 2001 or '02,

17   something like that.

18        Q.   But you had known him before then as a

19   pilot?

20        A.   As a pilot I had met him maybe two or three

21   times, yes.  Just met him occasionally before the

22   year 2001 or '02.

23        Q.   Was it a blood test draw or was it a urine?

24        A.   It was urine only.

67

1      Q.   And you said it was done in Dr. Olafson's
2  office.  Was that Dr. Olafson's office at Riverside?
3      A.   Correct.
4      Q.   He had a private office?
5      A.   Yes.
6      Q.   And where was the bathroom that Noah went
7  into?
8      A.   In his office.
9      Q.   And who went into the bathroom with Noah to
10  make sure it was Noah's urine?
11      A.   Dr. Olafson went in with him.  Prior to
12  that the nurse had gone into the bathroom and taped
13  all of the receptacles so that water could not be
14  used to dilute a sample or whatever it is.  There is
15  an FAA procedure for that.  And she followed a check
16  list on a piece of paper, taping everything, and
17  doing what she had to do for that test.
18      Q.   But Dr. Olafson was the actual individual
19  who went into the bathroom with Noah?
20      A.   That is correct.
21      Q.   Okay.
22      A.   And if you have read the transcript from
23  the kangaroo hearing before the school board, you
24  would see that I told them that there was a frozen

68

1    sample that Quest keeps for a period of time so that

2    they could do DNA sampling and so that they could do

3    their own testing.

4         Q.   Do you know why a urinalysis was chosen

5    over a blood draw?

6         A.   That is the FAA test for any drug use as

7    the metabolites show up for a longer period of time

8    and they show up more succinctly than they do in

9    bloodwork.

10        Q.   Okay.  I guess was that by your request, by

11   what Dr. Olafson suggested?  How did that get

12   decided?

13        A.   That was decided by the FAA procedures for

14   accidents and incidents involving aircraft in the

15   United States.

16        Q.   I understand that.  But for specifically

17   Noah's test, did Dr. Olafson say we are doing the FAA

18   test or did you say --

19        A.   I ordered the FAA test as it's the most

20   reliable and the most irrefutable in the world.  And

21   I was told by Dr. Olafson that that would be much

22   more expensive than just doing a test at Riverside

23   and I said I don't care.  I want the one that nobody

24   can question.

69

1       Q.   Any other tests performed on Noah on the
2    night of January 25th of 2013 besides the urinalysis
3    test?
4       A.   I don't know if they took his blood
5    pressure and did all that stuff, I don't know.  If
6    the forms show that, they show that.  I don't
7    remember.
8       Q.   How long were you and Noah in Dr. Olafson's
9    office?
10      A.   My wife, Noah and myself were in
11   Dr. Olafson's office for probably two hours.
12      Q.   Other than the urinalysis and maybe a blood
13   pressure, was anything else done during those two
14   hours?
15      A.   Yes.
16      Q.   What?
17      A.   A sample was taken to the Riverside
18   pathology department.  And whatever the Riverside
19   pathology department does with drug sampling, that's
20   what they did and we waited for the test results.
21      Q.   So Dr. Olafson was able to contact the
22   pathology department at Riverside and get you
23   results, at least the initial results for the
24   urinalysis test?

1      A.    Dr. Olafson, prior to taking Noah's

2  samples, called the pathology department, had a

3  conversation with them and then told me that there

4  were people working in the pathology department and

5  that when Noah's sampling had been accomplished that

6  he and I would seal the samples, that sample for

7  Riverside, and walk it down and hand deliver it to

8  them and they would later call with results and he

9  would ask for an expedited drug analysis when we go

10  down there.

11      Q.    What's Ativan?

12      A.    It is Lorazepam.

13      Q.    And what is that or your understanding of

14  it?

15      A.    It is a benzodiazapine.

16      Q.    For what purpose or taken for what purpose?

17      A.    It is a mild tranquilizer.

18      Q.    And how fast does Ativan metabolize in the

19  system?

20      A.    I was told by the pathologists both at

21  Riverside and Quest that the -- that Ativan has a

22  half life of 18 to 20 hours and that metabolites

23  would be present to a zero tolerance for eight days

24  after taking the said drug in any quantity.

1      Q.   When were you told this by the pathology

2   department at Riverside?

3      A.   It was the night of the test.  And then the

4   pathologist wrote a letter, which was attached to

5   materials that we sent to Watseka, and then Quest was

6   sometime after that.  That was a phone call that I

7   made on my own to Quest to their pathology department

8   and talked to a pathologist there.  I don't remember

9   his name.  They both said to a zero tolerance eight

10  days; to a 50 to 150 nanogram sample, 5 days.

11     Q.   Had you talked to Denise McKay before Noah

12  submitted the urinalysis test?

13     A.   Yes.

14     Q.   And was that from your cell phone?

15     A.   I don't remember.  I don't -- I don't -- I

16  don't think so.

17     Q.   Okay.

18     A.   I'm paralyzed on my left side and I don't

19  use a cell phone as much as possible.  I can't dial

20  it.

21     Q.   Okay.  So what is your understanding of the

22  time that you talked to Denise McKay?

23     A.   It was sometime either immediately

24  before -- it was either a short time before talking

1   to Noah when I -- or yelling at Noah when I got home

2   and calling Dr. Olafson.  It was sometime in between

3   then.

4       Q.   And what -- first of all, why did you call

5   Denise McKay?

6       A.   To find out what the heck was going on

7   here, what are the -- the school didn't give us any

8   information, I had to get it from somebody.

9       Q.   And how did you know Denise McKay was

10  somehow involved in all this?

11      A.   I'm not sure.  I think Noah told me, but

12  I'm not sure.  I mean that's foggy.  I mean I was so

13  angry, I don't -- I don't remember how I know that

14  Michael was involved in this, but somehow I -- I

15  think Noah gave me that, but I'm not sure about that.

16          She may have even called me at that point

17  and asked me to represent Michael.  And I think that

18  that's probably what happened, but I can't remember

19  specifically.  But I know I talked to her before I

20  talked to Dr. Olafson.

21      Q.   Okay.  So Denise either calls you or you

22  call her for some unknown reason.  What does she say

23  to you and you say to her?

24      A.   She asked me to represent Michael and she

73

1    told me the story.  She says, you know, Michael was

2    arrested at school and they're going to try and throw

3    him out of school for the whole year.  And -- and I

4    said stop, you know, Noah has the same problem and I

5    said except he's just been suspended, but, I said,

6    this is going to ruin everything that he wants to do

7    with his whole life.  And I said what is -- what is

8    this all about or something to that effect.

9            And she said, well, Michael had some, and I

10   don't remember how she described the substance,

11   whether it was Ativan, Adderall, Lorazepam, but she

12   told me what the substance was in some way and she

13   said it was a one milligram tablet, which is a really

14   low dosage, and -- and I said, well, you know, what

15   else?

16           And she said I don't know.  Do you know

17   anybody that can help me with this if you can't?  And

18   I said -- I think I gave her two or three names of

19   people who might be able to help her and that was

20   about the end of the conversation I think.

21       Q.   Did she tell you that Michael had been

22   previously arrested for drugs or alcohol?

23       A.   No.

24       Q.   Did she tell you that when she called you

1  Michael was in jail?

2      A.    No.

3      Q.    Did she tell you any information about how

4  Noah was or was not involved?

5      A.    I think she told me that Michael said that

6  Michael gave Noah some pills or a pill and Noah

7  swallowed them in his presence and that she had --

8  that Michael had told the principal that.  I think

9  that's what she -- she told me that.

10      Q.    And had you told Ms. McKay that Noah had

11  also been accused of taking and possessing drugs?

12      A.    Yes.

13      Q.    And was that what she said in response to

14  you telling her that, that Michael said that he gave

15  Noah pills and that Noah took those pills in his

16  presence?

17      A.    I don't know.  I don't know whether she

18  told me that to something I said or whether she just

19  spontaneously told me that in telling me the story to

20  try and get me to represent her son.

21      Q.    Did you tell Noah that's what Ms. McKay

22  said?

23      A.    Yes.

24      Q.    And what did Noah say in response to that?

75

1      A.    That's bullshit.  And he said Michael never
2  would have said that, he's like my brother.
3      Q.    Was Denise still on the phone when you told
4  Noah what she had said?
5      A.    No.
6      Q.    Did you ever contact Ms. McKay after that
7  day to let them know that Noah disagreed with what
8  she said Michael told him -- told her?
9      A.    No.  I told Tom, but I never -- I did not
10 tell her that.
11     Q.    Okay.  Did you ever talk to Ms. McKay again
12 after that night about either her son or Noah's
13 incident?
14     A.    I don't remember, but I'm going to say no
15 because I don't remember it.  But if there was a
16 conversation, I would have avoided it.  I would not
17 have -- I would have tried not to talk to her about
18 it whatsoever.  But I cannot remember whether she
19 ever tried to talk to me about it.  I just don't
20 remember that.
21     Q.    Did you ever talk to Michael about it?
22     A.    No.
23     Q.    Besides the people at the school and
24 Ms. McKay indicating to you that Noah had been given

1   some pills and taken some pills or drugs, did anybody

2   else provide you with that information that Noah had

3   in fact taken drugs or possessed drugs at school?

4        A.   By anybody, who do you mean?

5        Q.   I mean any other witnesses, anybody else

6   call you, anything along those lines?

7        A.   No.  Everybody -- everybody that I talked

8   to said that it was impossible that Noah took the

9   pills.  We got affidavits from all of his friends and

10  acquaintances and people at his lunch table and

11  with -- to a T they all said that he did not seem

12  impaired, that he did not take drugs, that they did

13  not see him with any drugs and that they didn't think

14  he had anything to do with drugs.

15       Q.   Did you ever get an affidavit from Michael?

16       A.   No.

17       Q.   Did you ever approach Michael for an

18  affidavit?

19       A.   No.  I thought it would be worthless if he

20  was the person who got arrested for it.

21       Q.   Well, just because you get arrested doesn't

22  mean you are guilty, right?

23       A.   That is true.  But --

24       Q.   Do you know if he was found guilty of the

77

1  crime?

2      A.   My understanding much later was that he was

3  arrested and had the drugs in his possession at

4  school, which is a Class X felony, and I felt it

5  was -- that would not be a good affidavit to take.

6  It would have no evidentiary purpose whatsoever.

7      Q.   Do you know what drugs he was charged with

8  possessing at school?

9      A.   It's my understanding now that it was

10  Lorazepam.

11          (Whereupon a break was taken and the

12  deposition continued as follows:)

13  BY MS. GOGGIN-WARD:

14      Q.   After your visit to the doctor's office and

15  the emergency room, what time do you all get back to

16  home?

17      A.   It was later in the evening.  It was after

18  10:00 and before midnight, I believe.

19      Q.   Do you call anybody else about any

20  additional information concerning your son's case

21  that night?

22      A.   No.

23      Q.   When is the next time that you do any

24  further investigation into your son's case?

78

1         A.    Well, I called Dr. Olafson on Monday, I
2    think, to ask about whether he had got the Quest
3    diagnostics back yet.

4         Q.    Had he?

5         A.    I don't believe he did until Tuesday or
6    Wednesday or Thursday, but I did call Monday.  But in
7    further investigation I wrote an e-mail to
8    Mr. Bunting on Friday night and I told him that we
9    had taken a drug test and that it showed conclusively
10   that Noah had no drug metabolites in his system and
11   that it was impossible that he could have taken any
12   drugs, let alone -- and I don't know whether I called
13   it benzodiazapine or Lorazepam, but that particular
14   drug within the last week and that I wanted to come
15   in and talk to him on Monday and I would come in at
16   my earliest convenience as soon as school had opened.

17        Q.    Is what time did you write that e-mail?

18        A.    After we got back from the hospital.  I
19   don't -- it --

20        Q.    So after 10:00 PM but before midnight?

21        A.    Yes.  I don't know whether I sent it that
22   night or I sent it in the morning, but I -- I wrote
23   it on Friday and I sent it when I -- whenever it says
24   I sent it, that's when I sent it.

1          Q.   Did you attach a copy of the drug results?

2          A.   No, I did not scan that in.  It was one of

3     those forms that has the carbon on it and it would

4     not have scanned well.  I told him in the e-mail I

5     would bring him a copy, which I did.

6          Q.   And did he e-mail you back?

7          A.   No, he did not.

8          Q.   Did you perform any other investigation

9     over the weekend before that Monday in calling

10    Dr. Olafson about the Quest Diagnostic results?

11         A.   I don't remember, I may have contacted some

12    of the parents and then if they gave approval, some

13    of the students that were involved in the incident,

14    but I don't remember if it was that weekend.  It

15    could have been, but I -- I don't specifically

16    remember.

17         Q.   Did you have any further discussions with

18    Noah about the incident that weekend?

19         A.   I'm sure I did.

20         Q.   Do you remember the substance of those

21    conversations?

22         A.   I do not.

23         Q.   Was Noah punished in any way over that

24    weekend?

80

1      A.   Was he what?

2      Q.   Punished.

3      A.   I don't think so.  I don't remember

4 punishing him.

5      Q.   The computer wasn't taken away?

6      A.   No.

7      Q.   Telephone, things like that?

8      A.   No.  No.

9      Q.   Do you know if he went out and visited any

10 friends that weekend?

11      A.   I'm sure he saw his girlfriend.  I don't

12 know whether she came over or whether he went there.

13 I'm sure he saw his girlfriend.  And he probably saw

14 I would -- no, I don't specifically remember.

15      Q.   Back in January of 2013 did you or your

16 wife monitor Noah's phone use?

17      A.   What do you mean by monitor?

18      Q.   Check his messages, check his texts, look

19 at his billing for any unusual texts, telephone

20 numbers, anything along those lines?

21      A.   I did not.

22      Q.   Do you know if your wife did?

23      A.   I don't believe she did.

24      Q.   Did you or your wife ever monitor in

81

1    January of 2013 Noah's computer usage?

2         A.    I did not.

3         Q.    Do you know if your wife did?

4         A.    I don't think so.  But I don't know.  She

5    may have.

6         Q.    And your son's girlfriend at that time and

7    currently today is Kelly Boatman; is that correct?

8         A.    That is correct.

9         Q.    Is Kelly still a student at Watseka?

10        A.    Yes.

11        Q.    When did Noah get accepted to Culver?

12        A.    November of 2012.

13        Q.    And when was it his intent to start?

14        A.    In August of 2013.

15        Q.    After that weekend you may or may not have

16   spoken to the parents.  Did you do any other

17   investigation besides possibly speaking to other

18   parents?

19        A.    Well, I mean obtaining the affidavits from

20   the kids whose parents had agreed to allow their

21   children to do so.

22        Q.    Then Monday morning happens, you wake up.

23   What was -- what did you do that day?  Did you go to

24   work?

82

1       A.   No.

2       Q.   What did Noah do, did he just stay home?

3       A.   Yes.

4       Q.   And I take it your wife stayed home as
5  well?

6       A.   Yes.

7       Q.   Did you do any further investigation other
8  than calling Dr. Olafson to see if the Quest
9  Diagnostic test results were in Monday morning?

10      A.   Yes.

11      Q.   What did you do?

12      A.   Went to the school.

13      Q.   Did you call them in advance to let them
14  know you were coming?

15      A.   I e-mailed Mr. Bunting and told him I was
16  coming.

17      Q.   Did you call him, though, too?

18      A.   No.

19      Q.   Besides Mr. Bunting did you e-mail anybody
20  else at the school to let them know that you were
21  coming?

22      A.   No.

23      Q.   Did you in your e-mail to Mr. Bunting, did
24  you let him know what time you were going to be

83

1    there?

2        A.    Yes.

3        Q.    What time was that?

4        A.    As soon as school opened.

5        Q.    What time did school open?

6        A.    I assume it opened around 7:30.  I was

7    there probably quarter till 8:00.

8        Q.    And where did you go to in the school

9    itself?

10       A.    To the main administration office.

11       Q.    Was there a secretary there?

12       A.    Yes.

13       Q.    And what did you say to her and she say to

14   you?

15       A.    I said I'm here to see Mr. Bunting.

16       Q.    And what did she say?

17       A.    He's out walking around the school right

18   now.

19       Q.    Did she say when he would be back?

20       A.    She said she would page him.

21       Q.    Did you see her page him?

22       A.    No.

23       Q.    Did you request to see anybody else but

24   Mr. Bunting?

84

1      A.    No.

2      Q.    Did you see Mr. Lucas on that Monday

3  morning?

4      A.    No.

5      Q.    Did you eventually see Mr. Bunting?

6      A.    Yes.

7      Q.    Approximately what time?

8      A.    About an hour after I got there.

9      Q.    So about 8:45?

10      A.    8:30, 8:45, yes.

11      Q.    Where did you two meet?

12      A.    In the administration office.

13      Q.    Was it within his own office or just the

14  main part of the office?

15      A.    Main part of the office.

16      Q.    Who else was present during that

17  conversation?

18      A.    My wife.

19      Q.    Anybody else?

20      A.    No.

21      Q.    Where was the secretary?

22      A.    Behind the wall where the window is for the

23  reception area.  I didn't even notice that she was at

24  any specific desk or anything.  I assume that she was

1  back there.

2      Q.   Any other people present besides then your

3  wife and perhaps the secretary behind a wall and

4  Mr. Bunting?

5      A.   No.

6      Q.   Noah was still at home at this time,

7  correct?

8      A.   Correct.

9      Q.   No other students were in the office?

10      A.   No.

11      Q.   Is the office enclosed?

12      A.   Yes.

13      Q.   And who spoke first?

14      A.   I did.

15      Q.   What did you say?

16      A.   I asked if he got my e-mail.

17      Q.   What did he say?

18      A.   Yes.

19      Q.   What did you say after that?

20      A.   Here's the test results.

21      Q.   Did you hand him a copy?

22      A.   I tried to.

23      Q.   Okay.  He didn't take it?

24      A.   He waved his hands and said I don't want to

86

1  see it.

2       Q.   And what else was said?

3       A.   I said how can you do this?  It has to be

4  false.  And he said --

5       Q.   What did he say?

6       A.   He said there's a procedure for this.  And

7  I said I can't believe you're not going to look at

8  this.  And he said your son has been suspended, you

9  and your son are not allowed on school property while

10  he's suspended, leave my school.

11       Q.   How long did the conversation take?

12       A.   Less than two minutes.

13       Q.   Had you raised your voice at any time

14  during the conversation?

15       A.   No.

16       Q.   Did you use any profanity during the

17  conversation?

18       A.   Absolutely not.

19       Q.   Did Mr. Bunting use profanity during the

20  conversation?

21       A.   No.  But it was very clear he didn't want

22  me there.  He never -- he never shook my hand, never

23  sat down, never did anything but open the door to

24  where we were and keep it open as if to tell us

1  you've got to get out of here.  And then the

2  conversation mostly took place outside of that office

3  area as he was kind of pushing us out the door.

4      Q.   Did he ever touch you or your wife in any

5  way?

6      A.   No.

7      Q.   Did your wife say anything?

8      A.   I don't think so, no.

9      Q.   Why did you bring your wife with?

10      A.   I mean she's Noah's parent, you know, she

11  is my wife, she is involved in this just the way I

12  am.

13      Q.   Do you know if your wife did any

14  independent investigation other than speaking with

15  you concerning the accusations against Noah and the

16  incident involved in this case?

17      A.   She may have talked to some of the other

18  parents, I don't know.  She may have talked to the

19  other students, I don't know.

20      Q.   So after you left Mr. Bunting's office,

21  what did you do?

22      A.   Went home.

23      Q.   Did you perform any additional

24  investigation that day?

88

1    A.    Probably not during the day.  Maybe after

2  school.  I'd have to look at the dates of the -- of

3  the affidavits to see whether any were taken on that

4  day or not.  But you have those affidavits, you can

5  look as well as I can.

6    Q.    And I'm not just talking affidavits --

7    A.    There was nothing else other than the

8  affidavits and talking to other students that I did

9  up until the time that I talked to Michael Tague.

10    Q.    When did you first request a review of the

11  suspension for Noah?

12    A.    We had not received the letter that is --

13  we never did receive the letter that the handbook

14  says that you are supposed to receive for -- for a

15  review, suggesting that parents have the right to a

16  review, and that the student has the right for

17  review.  The handbook sets out the actual language of

18  the notification.  We have never, ever received that

19  whatsoever.

20    Q.    When did you first look at Noah's handbook?

21    A.    I'm sure I looked at it last -- the year

22  before, I'm sure that I looked at it this year.

23    Q.    Okay.

24    A.    Last year.

1      Q.    When is the first time you looked at it
2   after Noah was charged with possessing and consuming
3   drugs?
4      A.    It was the weekend of the drug test.  It
5   would have been either that evening before I wrote
6   the e-mail to Mr. Bunting.  Or in the alternative it
7   would have been -- and I believe it was before I
8   wrote the e-mail to Mr. Bunting because in that
9   e-mail I believe I referenced all of the problems
10  that the school had -- all of the things that the
11  schoolbook mandates that they do that they failed to
12  do and I think I referred to all of those things.
13          And I also referred to Mr. Bunting and
14  Mr. Lucas intimidating Noah into -- and threatening
15  Noah into signing this paper.  So I'm sure I looked
16  at it Friday night.
17     Q.    So based on that handbook you knew that you
18  were going to get or supposed to get some type of
19  letter concerning Noah's right to review the
20  suspension?
21     A.    Absolutely.  The handbook lays out word for
22  word what that letter is supposed to say.
23     Q.    So at least as of Friday you knew Noah had
24  a right to a review; is that correct?

1      A.    I knew that Noah was supposed to get notice
2    that he had a right to review.
3      Q.    When was anything actually sent to the
4    school after that weekend concerning your request to
5    review Noah's suspension?
6      A.    I sent a letter to the superintendent and
7    whatever the date of that letter is, that would be
8    the date of the letter.
9      Q.    Okay.
10      A.    The letter would speak for itself.
11      Q.    And the actual suspension review hearing,
12    or whatever you want to call it, was February 5th of
13    2013; is that correct?
14      A.    The kangaroo court was February 5th, yeah.
15      Q.    What time was it?
16      A.    An hour and a half later than it was
17    supposed to be.  They kept us waiting outside in
18    February, freezing cold weather, while they were
19    discussing whatever they were discussing before our
20    hearing.
21      Q.    What time was the hearing?
22      A.    An hour and a half after they had noticed
23    it.
24      Q.    I understand.  What time was it supposed to

91

1  be for?

2       A.   Can you find the notice for me, counsel,

3  and I will take a look at it.

4       Q.   Do you have any independent recollection of

5  that?

6       A.   It was late in the evening.

7       Q.   Did you drive to it?

8       A.   Yes.

9       Q.   Were you with Noah and your wife?

10      A.   No.

11      Q.   Who were you with?

12      A.   Mr. Tague.

13      Q.   Was it just you and Mr. Tague present for

14  the hearing?

15      A.   No.

16      Q.   Okay.  Who did you go to the hearing with

17  besides Mr. Tague?

18      A.   I went to the hearing with Mr. Tague.  He

19  and I drove together.

20      Q.   Was Noah present at this hearing?

21      A.   Noah was present at the hearing.

22      Q.   How did Noah get to the hearing?

23      A.   He went with his mother.

24      Q.   Was there a reason that you drove

92

1  separately?

2      A.    Not that I recall.  I believe it was

3  because Mr. Tague didn't know where the building was

4  where the hearing was going to be held.  So I drove

5  with -- I -- I think Mr. Tague drove and I was a

6  passenger in his vehicle.

7      Q.    Where was the hearing held?

8      A.    At the school -- at the school district

9  office.

10     Q.    Had you contacted other witnesses to appear

11 for Noah at this hearing?

12     A.    Absolutely.

13     Q.    Did you meet with those witnesses before

14 the hearing?

15     A.    No.  I had met with them at the time that

16 their affidavits were taken, but I did not meet with

17 them on February 5th.

18     Q.    Do you know if Mr. Tague did?

19     A.    I don't believe he did.

20     Q.    Did the witnesses testify in front of

21 yourself, Mr. Tague, Noah and your wife?

22     A.    They did not testify at all except for

23 Noah -- Dakota Papineau anyway.

24     Q.    And when Dakota testified, was that in

93

1    front of yourself, your wife, Noah and Mr. Tague?

2        A.    Yes.

3        Q.    Were you allowed to submit the affidavits

4    of the other students or parents?

5        A.    Whether we were allowed to or not, we did.

6        Q.    Did you request that the other parents or

7    students testify?

8        A.    We had parents and students there to

9    testify, but then the school officials changed the

10   information that they had told us and instead of the

11   25th being the alleged date of any drug use or

12   possession, they said it was the 24th and therefore

13   we were deprived of our constitutional right to due

14   process in that they changed the date without telling

15   us, even though we had asked them those questions.

16   And Mr. Funk sent us a letter and said you are not

17   entitled to know anything, just go to the hearing.

18       Q.    So the parents and the students had filled

19   out affidavits concerning Noah's drug usage alleged

20   to be on January 25th of 2013; is that correct?

21       A.    Yes.

22       Q.    It was that specific?

23       A.    It was that specific.

24       Q.    Okay.

94

1      A.    Because that's what Mr. Bunting told us the
2  charges were.
3      Q.    And those students and parents were present
4  to testify to January 25th of 2013, correct?
5      A.    Yes.
6      Q.    Okay.  Did you ever ask them since they
7  were there at the hearing if they had ever observed
8  any behavior concerning Noah about the 24th?
9      A.    Yes.
10     Q.    Okay.  What did they say?
11     A.    They said they didn't know anything about
12 the 24th, that they could think about it, but they
13 didn't know anything.
14     Q.    And that was all of the witnesses who had
15 affidavits that you had presented?
16     A.    No.  I believe that Brett Short's mother
17 would not let him testify.  I believe it was the
18 Nathan, whatever his last name was, he was there.  He
19 was the one that also took a drug test on Saturday
20 and passed and that they made him say that he had
21 taken drugs at school.
22         And then there was Dakota Papineau and
23 Dakota Papineau's mother to testify as to what
24 happened on the 25th.  But when Mr. Bunting and

95

1   Mr. Lucas said, oh, no, we made a mistake in telling

2   them it was the 25th, we really meant the 24th,

3   that's when it became apparent that those -- those

4   witnesses were not prepared to testify for anything

5   relative to the 24th.  It was surprise, prejudicial,

6   unconstitutional and in every way improper and

7   illegal.

8       Q.   Did they ever come back to you after this

9   day and say, yes, we also now remember the 24th and

10  we don't recall Noah having any effects or seeing

11  Noah on drugs the day before January 25th of 2013?

12      A.   Every single one of them.

13      Q.   How long did it take them to get back to

14  you?

15      A.   Usually they didn't get back to me, it was

16  when I would initially contact them and say I'm sorry

17  about this thing with showing up and then them

18  changing the dates, but what about the 24th?  And

19  they said nothing about the 24th, there were no

20  signs, nothing about the 24th.

21      Q.   Okay.  And did you approach them at the

22  hearing and ask them that?

23      A.   We weren't allowed to talk to them.  They

24  wanted them to not even come into the room.  They

96

1  wanted them to stay out in the freezing cold and be

2  called when they would be called.  It took -- it took

3  a three or four sentence from each party to allow

4  them to use a conference room to stay inside rather

5  than whatever the temperature was that night, 20

6  degrees below zero, waiting outside.

7      Q.   Did you or your wife or Mr. Tague at any

8  time go into that conference room and speak to those

9  witnesses about any allegations concerning Noah on

10  January 24th of 2013?

11     A.   Yes.

12     Q.   Who did?

13     A.   I did.

14     Q.   And who was present in the conference room

15  at that time?

16     A.   Nathan Konce, his mother and father.

17  Dakota and his mother.

18     Q.   Were those the only witnesses that you had

19  summoned for affidavits to come testify at the

20  hearing or were there more?

21     A.   That's two questions.  Those were not all

22  the people that I had obtained affidavits from.

23  Those were all the people that we had asked to come

24  to the hearing.

97

1       Q.   So when you went into this conference room
2   was your wife present?
3       A.   No.
4       Q.   Mr. Tague?
5       A.   No.
6       Q.   Noah?
7       A.   No.
8       Q.   And what did you -- was it in a group or
9   did you speak to them individually?
10      A.   They were in a group.
11      Q.   What did you say to them, what did they say
12  to you?
13      A.   I said I'm sorry, this is the first time we
14  have ever heard this is the 24th.  They told us it
15  was about the 25th.  And, you know, your kids and you
16  guys have information about the 25th and I don't know
17  whether we can use you guys tonight except for Noah's
18  appearances, et cetera, and -- on the 24th.  But if
19  you guys don't mind, would you mind waiting here for
20  a while to see what happens?  They haven't told us
21  and will not tell us any of the facts that they are
22  supposed to under the handbook rules and under the
23  state rules.  They haven't told us what day, what
24  type of drug, what time, whether he had it, whether

1  he didn't, any information whatsoever.

2          So I don't know what these bozos are going

3  to try and do at this hearing so, you know, if you

4  don't mind, would you wait?  We might be wasting our

5  time.  And they said we don't mind.

6          Then after we got into the hearing, it

7  became apparent that there was nothing that the Konce

8  family could really add to the situation.  And during

9  a break that the hearing officer, who was also the

10  prosecutor, who was also the advisor to the board,

11  Mr. Funk, which is another illegal problem you guys

12  got, he wanted a break, took a break.  And as he was

13  conducting the proceedings I said is it okay if I go

14  back and tell these people to leave?  He said fine.

15          I told the Konces to leave, that there was

16  nothing that we could use them for.  Dakota's mother

17  and Dakota stayed.

18     Q.    The first time that you had talked to

19  Nathan Konce and his parents and Dakota and his mom

20  in the conference room and you asked if they had any

21  information on the 24th, what did they tell you about

22  that?

23     A.    They didn't say anything.

24     Q.    They didn't say that Noah looked like he

99

1  was on drugs on the 24th?  They didn't have any
2  information, they didn't see Noah on the 24th?  What
3  did they say?
4      A.   They didn't say anything.  I said this is
5  the first time we heard this is about the 24th, I
6  don't know what they're going to say went on on the
7  24th.
8      Q.   Did you ever ask them specifically if they
9  had any information if Noah appeared to be on drugs
10 or had taken drugs on January 24th of 2013?
11     A.   I did.
12     Q.   And what they say?
13     A.   They said no.
14     Q.   Did you present that information to the
15 board?
16     A.   No, I didn't have the chance.  I asked them
17 that after the hearing.  This was all sprung on us at
18 the last minute.  We didn't have any time.  They were
19 starting the hearing.  I walked back and talked to
20 these people for two seconds and then walked back
21 into the hearing to protect my son as best I could.
22     Q.   When were you first aware that the alleged
23 charges were on the 24th and not the 25th?
24     A.   About ten minutes into this hearing, into

100

1    the hearing before the school board.

2         Q.    Then you went back to the witnesses with

3    that information, that you believe now that the

4    school board was talking about the 24th, not the

5    25th, correct?

6         A.    I believe so, yes.

7         Q.    Okay.  So after just ten minutes into the

8    hearing you went back to the conference room and you

9    asked them, as you just testified, if they had any

10   information about the 24th.  They said no, Noah

11   appeared fine on the 24th, but you didn't bring that

12   information back to the board; is that correct?

13        A.    Correct.  I didn't know what they were

14   going to say about the 24th.  You have to remember,

15   they denied us any information about what they were

16   charging Noah with whatsoever.  Anything.  They never

17   gave it to us in writing as they were supposed to.

18   They never told us the correct date.  They never told

19   us that he was under the influence and the teachers

20   saw him under the influence.

21             And in fact, every teacher I talked to,

22   which was just about all of them, said he didn't look

23   like he was under the influence, but we didn't know

24   it was the 24th until February 5th.

101

1        Q.   You did know that he was being charged
2   with, however, from Exhibit 1, possession and
3   consumption of drugs, correct?
4        A.   I knew that that's what they were charging
5   him with, but I knew it was scientifically
6   impossible.
7        Q.   For him to have consumed drugs, correct?
8        A.   For him to have had possession of drugs by
9   way of consumption or to have consumed drugs.  And
10  that's what he was charged with.  Not having the
11  drugs in hand, ma'am.  He was charged with putting
12  them in his mouth, swallowing them and having
13  possession by that means.  That is what Mr. Lucas
14  told me.  And that's what the paper says.
15       Q.   When did he tell you that?
16       A.   He told me that on the phone conversation
17  when my wife and my son were in his office and he had
18  me on the speaker phone and his exact words to me
19  were Noah has fully cooperated with us in a school
20  investigation of drug use.  He has admitted to taking
21  drugs here at school today and we are suspending him
22  for ten days.  And that was on the 25th.
23       Q.   So who was the first witness called at the
24  hearing?

102

1      A.   Mr. Bunting.  Or Mr. Lucas I believe.  The
2   record will speak for itself.
3      Q.   Okay.  I just need your recollection.  I
4   understand the record speaks for itself.  I wasn't
5   there, however.
6      A.   But you can read.  And if you would have
7   prepared for this you would know.
8      Q.   So Mr. Lucas goes first and then he
9   testifies.  Mr. Tague cross-examines him I take it?
10     A.   Yes.
11     Q.   Okay.  Did you also cross-examine him?
12     A.   No.
13     Q.   Mr. Bunting testifies as well?
14     A.   Yes.
15     Q.   Your attorney had an opportunity to
16   cross-examine him as well?
17     A.   And he did.
18     Q.   Did you as well?
19     A.   No.
20     Q.   Anybody else question him?
21     A.   Mr. Funk because he was acting as the
22   hearing officer, advisor to the board and the
23   prosecutor.
24     Q.   We've heard.

1     A.   Which again is illegal.

2     Q.   Anybody from the school district or school

3 board question any of those two witnesses?

4     A.   Yes.

5     Q.   Who?

6     A.   Whatever the record says.

7     Q.   Okay.  So there's other people who were

8 also questioning him?

9     A.   Yep.

10     Q.   You testified?

11     A.   Yep.

12     Q.   Your attorney questioned you as well as

13 Mr. Funk; is that correct?

14     A.   Yes.

15     Q.   The school board members also had questions

16 for you?

17     A.   I don't remember, but the record speaks for

18 itself.

19     Q.   Did your wife testify?

20     A.   Yes.

21     Q.   Then you said Dakota Papineau testified,

22 correct?

23     A.   Yes.

24     Q.   And your attorney had the opportunity to

104

1    question Mr. Papineau; is that correct?

2        A.    Yes.  I believe he was our witness so he

3    would have questioned him.

4        Q.    And Mr. Funk cross-examined him; is that

5    correct?

6        A.    I don't remember whether Mr. Funk

7    cross-examined him or not.  The record would speak

8    for itself.

9        Q.    Any other witnesses testify besides those

10   that I have listed?

11       A.    I don't believe so.

12       Q.    The school board then adjourned, is that

13   correct, to a back room?

14       A.    No.

15       Q.    What happened next?

16       A.    They went for an executive session in the

17   back room.  Our court reporter was not -- they did

18   not adjourn the meeting.  They -- they went for an

19   executive session to deliberate.  Our court reporter

20   was not allowed in the room.  And Mr. Funk attended

21   those deliberations, which again is illegal.

22       Q.    How long did that take?

23       A.    Very short time because they never -- they

24   never considered any of the evidence that was

105

1  presented.

2      Q.   What's your best estimate as to what you

3  mean by short time?

4      A.   Less than 15 minutes.

5      Q.   Did they then come back out to the public

6  area of the hearing?

7      A.   There was no public area.

8      Q.   How about where the testimony was held.

9      A.   That is in a closed hearing.

10     Q.   Did they come back out?

11     A.   Yes.

12     Q.   Did they tell you what their decision was?

13     A.   Yes.

14     Q.   Who spoke for the board?

15     A.   Mr. Funk, I believe.  But I believe each

16  one of the board members stated their vote in open

17  session.

18     Q.   Have you ever personally questioned any of

19  the board members after the hearing?

20     A.   No.  We were prohibited from saying --

21  Mr. Funk sent a letter very early on saying you are

22  hereby prohibited from contacting any administrator

23  at the school, the school superintendent and any

24  board member or any person in contact with the board

1    members.

2         Q.   So Noah was allowed to go back to school as

3    of February 11th of 2013; is that correct?

4         A.   No.

5         Q.   No?

6         A.   No.

7         Q.   When was he allowed to go back to school?

8         A.   To what school?

9         Q.   Watseka.

10        A.   He was never allowed to go back to Watseka.

11        Q.   On what basis do you believe that your son

12   was never allowed to go back to Watseka High School?

13        A.   Because I would not let him go back to

14   Watseka and be treated like this by a bunch of Nazis

15   ever again.

16        Q.   Per the school suspension and from Watseka

17   High School to your son, he was allowed back on the

18   premises by Watseka and to attend school as of

19   February 11th of 2013; is that correct?

20        A.   Absolutely not.  And counsel, you know

21   that's not true because you tried to keep him from

22   going to a dance a year and a half after the

23   suspension.

24        Q.   Can I have my question read pack, please?

107

1           (Whereupon the requested portion of the
2    record was read by the reporter.)

3        Q.    Is that correct or not?

4        A.    No.   And you know it's not correct because
5    you were involved in trying to keep him off of school
6    premises in the year 2014 pursuant to this incident
7    that we are talking about today.

8        Q.    So --

9        A.    And it was only under my threat of saying I
10   don't care what it costs, go in and see Judge Baker,
11   let's get an emergency injunction to get him into
12   that dance because there's no darned reason, myself
13   being a taxpayer, that he shouldn't be able to go to
14   that dance.   And it was only after that that we got
15   him to go to the dance.

16       Q.    So on February 11th of 2013, your son did
17   not return to Watseka High School; is that correct?

18       A.    That is correct.

19       Q.    Did he enroll in any school as of
20   February 11th of 2013?

21       A.    Yes.

22       Q.    Where did he enroll?

23       A.    Allied High School.

24       Q.    How do you spell Allied High School?

1     A.   A-L --

2     Q.   You mean Allied, A-L-L-I-E-D?

3     A.   That's Allied.

4     Q.   Is that an online high school?

5     A.   Yes.

6     Q.   How did you come to find Allied High

7 School?

8     A.   Through researching high schools.  It is a

9 fully accredited 50-state high school.

10     Q.   Had Noah ever been home schooled before

11 February 11th of 2013?

12     A.   No.

13     Q.   When was his official enrollment date at

14 Allied High School?

15     A.   Probably the 12th of February or shortly

16 thereafter.

17     Q.   Did he take a full course schedule through

18 Allied High School?

19     A.   Yes.

20     Q.   How many credits did he take?

21     A.   He took four classes, I believe.  I don't

22 know what their credit system is.

23     Q.   Did you contact Culver Academy to determine

24 before enrolling in Allied High School whether or not

109

1    those credits could be transferred over to Culver?

2        A.    They could not.

3        Q.    Did you contact Culver Academy before you

4    enrolled Noah at Allied High School to determine if

5    those credits could be transferred over to Culver?

6        A.    I don't remember whether it was before or

7    after, but I contacted the admissions counselor and

8    the admissions counselor told me that they do not

9    accept home schooling as -- as credits and that Noah

10   was one of 40 kids that had been accepted as a junior

11   for Culver Academy unconditionally.  460 children had

12   applied for those -- I think there were 160 positions

13   but only 40 of them unconditionally.  And then 120

14   were conditional -- were conditional admissions for

15   the junior year.  But he had been accepted

16   unconditionally.  And with what had happened at

17   Watseka and being home schooled, he could not be

18   admitted at all as a junior.

19       Q.    Okay.  Did you ever contact anybody at

20   Watseka High School to get Noah transferred to

21   another school that would have been credits

22   transferable to Culver?

23       A.    No.  Watseka High School has no

24   jurisdiction over Noah.  They are not within his

1   school district.

2        Q.   Did you ever contact any other school in

3   the spring semester of 2013 to enroll Noah into who

4   would have given credits to Noah that would have been

5   transferable to Culver Academy?

6        A.   Yes.

7        Q.   Who?

8        A.   Mr. Mann.

9        Q.   And who is Mr. Mann?

10       A.   He is the superintendent of the Crescent

11   City School District.

12       Q.   When did you first contact Mr. Mann?

13       A.   During the time Noah was suspended.

14       Q.   And what was the purpose of contacting

15   Mr. Mann?

16       A.   To find out what Noah's options were to be

17   placed in another school.

18       Q.   And what did Mr. Mann say to you?

19       A.   He could be placed in a school only after

20   he got a certificate of good standing from Watseka

21   High School.

22       Q.   And did he indicate to you what it would

23   take for Noah to get a certificate of good standing

24   from Watseka High School?

111

1      A.    Yeah.   He thought that it would be after

2  Noah had completed the work that he missed but he

3  wasn't sure.

4      Q.    Did you then ever contact anybody at

5  Watseka High School to get that certificate of good

6  standing after Noah completed the work that he had

7  missed while suspended?

8      A.    Noah was never allowed to complete the work

9  he missed while he was at Watseka High School.

10      Q.    And by whom was Noah not allowed to

11  complete the work?

12      A.    He was never given the assignments.   How

13  can you complete something when you don't get the

14  assignments?

15      Q.    Did Noah contact anybody at Watseka to

16  obtain those assignments?

17      A.    You will have to ask Noah that.

18      Q.    Did you ever contact anybody at Watseka to

19  obtain those assignments?

20      A.    No.   I contacted Mr. Mann.   I was done with

21  Watseka.   As soon as they pulled this kangaroo court

22  crap and as soon as they lied and as soon as you

23  signed lying papers that are sanctionable under

24  Rule 11, that's when I stop --

112

1        Q.    Excuse me.  Right now --

2        A.    That's when I stop, counsel.

3        Q.    Right now you are going to stop, okay?

4   Because --

5        A.    Don't you tell me what to do, counsel.

6        Q.    Oh, I can absolutely tell you what to do.

7        A.    You can try, but let's get the judge on the

8   phone because I am not going to sit here and let you

9   tell me anything.

10       Q.    For what?

11       A.    To -- if we have to have somebody that's

12  going to supervise this deposition, that's fine.  But

13  I don't take directions from you.  You have no

14  jurisdiction over me and you better start addressing

15  me just as -- just as properly as I have been

16  addressing you.  And I maintain that your signatures

17  on both the answers and the requests to admit facts

18  are sanctionable under Rule 11.  You lied.

19       Q.    First of all, for the record, the witness

20  is yelling at counsel for the defense for absolutely

21  no reason.  He has been treated with respect

22  throughout the course of this deposition and, quite

23  frankly, given a great deal of leeway in all of his

24  responses to my questions.

113

1        I would request that his counsel now speak
2   to his client to cease and desist all of these types
3   of activities or we can call Judge Baker and
4   reinstate the deposition at a later date.  If you
5   would like to continue, I'm almost done, however I
6   will give that direction to Mr. Tague.

7        A.   And I would like to say for the record that
8   counsel has been raising her voice.  She has
9   addressed me snidely.  She makes snide remarks to me
10  and she makes snide facial expressions to me.  And I
11  am not going to be treated any less than I treat
12  anybody else.  And I have not yelled at her, I have
13  not called her any derogatory names.  I merely said
14  that she lied and that she lied under oath and that
15  she signed papers in direct violation of Rule 11,
16  which I know my counsel and counsel have had
17  discussions about.

18        MS. GOGGIN-WARD:  Michael, I'm leaving this
19  up to you.

20        MR. TAGUE:  I would suggest you ask a
21  question and I'm going to tell Mike to answer the
22  question.

23        MS. GOGGIN-WARD:  That's a great idea.  Can
24  I have my last question read back, please?

114

1              (Whereupon the requested portion of the

2      record was read by the reporter.)

3              MS. GOGGIN-WARD:  Note for the record that

4      Mr. Dietchweiler is smiling at this time.

5          A.   I don't think I have been smiling more than

6      I have been throughout this whole proceeding.

7      BY MS. GOGGIN-WARD:

8          Q.   You said that you contacted Mr. Mann,

9      however, before the hearing; is that correct?  You

10     said it was sometime while Noah was suspended.

11         A.   I think so.

12         Q.   So before the hearing did you, your wife or

13     Noah ever contact anybody at Watseka to get his

14     school assignments?

15         A.   Before the hearing?

16         Q.   Uh-huh.

17         A.   We were not allowed to be in the school or

18     contact the school.  By their own rules we could not.

19         Q.   So after you spoke with Mr. Mann about

20     enrolling Noah in a different school, what did you

21     do?  Did you call anybody else?

22         A.   Mr. Mann said that he could proctor Noah

23     for all exams if we were going to do an online school

24     and that's what we did.

115

1       Q.    So to the best of your knowledge, the only
2  thing that you would have needed from Watseka school
3  was the certificate of good standing that he
4  completed those assignments and then he could have
5  transferred to a different school that would have had
6  credits transferable to Culver; is that correct?
7       A.    No.
8       Q.    What is incorrect about that statement?
9       A.    Noah would never have been able to make up
10  the work at a separate school.  He would have been
11  starting a school at another school two months after
12  the semester had started and be held to the same
13  standard of those children that had been schooled in
14  that school for two months prior.
15            And he never would have been fairly treated
16  by Watseka for those outstanding assignments and he
17  was doomed to any public school scenario, which may
18  have been technically available to him as far as
19  enrollment; but as far as maintaining his grades of a
20  straight A student, it would have been impossible.
21       Q.    So it's your understanding that the fall of
22  2012 Noah got straight A's?
23       A.    He got all A's and one B I believe.  Noah
24  was an A student.  Noah, at Culver, which is one of

116

1    the five best schools in the country, maintains a

2    3.89 average.  He is one of the top three cadets

3    there.  Noah has never been a discipline problem and

4    Noah has always been an excellent student.

5        Q.   So in the spring of 2013 you then enroll

6    Noah in this online school.  Did he complete that

7    semester successfully on the online school?

8        A.   Yes.

9        Q.   When?

10       A.   I don't know.  There was an issue about

11   grades.  He completed the semester.  I don't know if

12   grades were ever posted, but he did complete the

13   semester.

14       Q.   What did Noah do during the summer of 2013?

15   Did he have a job?

16       A.   Noah had two jobs in the summer of 2013.

17   And he also went to school for sailing and he also

18   went to school for his advanced diving certificate.

19       Q.   And where were those schools located?

20       A.   In the Caribbean, British Virgin Islands.

21       Q.   And when was -- when were those schools?

22       A.   From June to the end of July, something

23   like that.

24       Q.   Do you know if the completion of course

117

1    work at Allied in any way conflicted with the scuba

2    diving and sailing certificate school in the

3    Caribbean?

4         A.    I believe the timing of it did.

5         Q.    Is it your understanding that Noah did not

6    complete the Allied online courses because of those

7    two courses down in the Caribbean?

8         A.    I believe Noah completed the online courses

9    but did not receive his grades for some timing issue

10   with Allied.  But he completed the work he was

11   supposed to do.

12        Q.    Other than online, do you have a contact

13   person at Allied school?

14        A.    There is one.

15        Q.    Who is that?

16        A.    I don't know.

17        Q.    Did Mr. Mann proctor the examinations for

18   Allied school for Noah?

19        A.    Most of them.

20        Q.    When is the last time that you talked to

21   Mr. Mann concerning Noah?

22        A.    We were having some issues on getting

23   Mr. Mann to proctor some of the exams for Noah and I

24   talked to him about those and he said that there were

118

1  some computer issues between Allied's computer and
2  his and they were trying to work through it.
3       Q.   Is that the last time you ever had any
4  contact with Mr. Mann about Noah?
5       A.   Yes.
6       Q.   Noah started school at Culver in August of
7  2013, correct?
8       A.   That's correct.
9       Q.   He started as a sophomore?
10      A.   Yes.
11      Q.   Did he -- is he in the process of repeating
12 or taking his entire sophomore year between the fall
13 of 2013 and the spring semester of 2014?
14      A.   Yes.
15      Q.   Were any of the credits that were earned at
16 Watseka in the fall of 2012 transferred over to
17 Culver Academy?
18      A.   No.
19      Q.   Who is Noah's counselor now at Culver?
20      A.   He has a couple of different counselors.
21      Q.   Who did you speak with at Culver concerning
22 the transferring of credits for Noah either from
23 Watseka or the online school?
24      A.   I can't remember his name.  He was the

119

1    admissions counselor.

2        Q.   Have you ever received anything in writing

3    from Culver Academy concerning the transferability of

4    online school credits or the half credits from

5    Watseka High School?

6        A.   No.   We were told that Culver does not do

7    half years, that Culver only does full year

8    regiments.   Culver is a military school and Culver is

9    also an academic school.   Culver's military side of

10   the school has to be done in conjunction with the

11   scholastic side of the school, the academic side of

12   the school, and they -- they must start in August and

13   complete the full year.   They don't have half years.

14   I was explicitly told that a number of times.

15       Q.   Let me show you what's previously marked as

16   Group Exhibit No. 1 for identification and it's an

17   interrogatory response No. 4.

18       A.   Okay.

19       Q.   Do you see your response indicates that --

20   it says my reputation was damaged in the community.

21   Whose reputation are you referring to?

22       A.   I'd have to see this full set of

23   interrogatories to know what you are speaking of.

24       Q.   There you go.

120

1      A.   Let the record reflect that counsel just

2 threw over the desk a group of papers at me.

3         I don't see the heading.  Is it somewhere

4 in this group of papers, counsel?

5      Q.   So we'll ask it this way.  Was your

6 reputation damaged in any way by the accusations

7 against Noah?

8      A.   Absolutely.

9      Q.   Okay.  How was your reputation damaged?

10      A.   Well, I have -- we own farmground.  I have

11 had our farmers come up to me, ask me why Noah was

12 kicked out of school for smoking pot in the bathroom,

13 for snorting coke in the bathroom, for taking drugs,

14 selling drugs, from people that we hire to do our

15 farming work.  I have had probably less than -- no

16 less than 15 or 20 people who are just people in the

17 community that have said the same thing.

18      Q.   I'm going to stop you there.  Who has said

19 that to you?

20      A.   One of our farmers would be Ozzie Storm.

21      Q.   Is it O-Z-Z-I-E?

22      A.   I think so.

23      Q.   S-T-O-R-M?

24      A.   Yes.

121

1      Q.    Where does Ozzie live?

2      A.    In Iroquois county.

3      Q.    Do you know what town?

4      A.    He lives rural.  I don't think there is a

5    town there.  I don't know what his address is.

6      Q.    How long has he worked for you?

7      A.    He and his cousin have worked for us for

8    probably ten years.

9      Q.    And Ozzie specifically asked you why Noah

10   was kicked out of school and that Noah had been

11   snorting cocaine and using marijuana at school?

12     A.    I think he actually said for using drugs at

13   school.

14     Q.    Okay.

15     A.    Our neighbor --

16     Q.    I'm sorry.  I'm not done with Ozzie.  What

17   did you say to Ozzie?

18     A.    I told him that's not true, we had a drug

19   test done and that they had threatened Noah.  And he

20   kind of smiled and laughed and says, yeah, that's

21   pretty much their MO.

22     Q.    And how was your reputation damaged by

23   that?

24     A.    Well, I think any time that you have

122

1    somebody that you are in commerce with, when they're

2    accusing you and your family of having some sort of

3    contact with drug use and abuse, that's -- that's a

4    damage to your reputation.

5         Q.   Did he leave your employ because of it?

6         A.   No.

7         Q.   Did you seek any counseling because of it?

8         A.   No.

9         Q.   Has any member of your family ever sought

10   counseling --

11        A.   Yes.

12        Q.   -- after this incident?

13        A.   Yes.

14        Q.   Who is that?

15        A.   I think Noah did.

16        Q.   Who did Noah see?

17        A.   I think his name was Bruce.  He was a

18   counselor with some group up in Kankakee.  I think

19   that was disclosed to you earlier in the

20   interrogatories or maybe under the Rule 26

21   disclosures, I am not sure, but it was disclosed.

22        Q.   Any other counselors besides Bruce?

23        A.   No.

24        Q.   Did you ever go to any of the counseling

123

1   sessions with Noah?

2        A.   Yes.

3        Q.   How many?

4        A.   I think one.

5        Q.   And when did Noah -- when -- this session

6   that you attended, when did that occur?

7        A.   Sometime in 2013.

8        Q.   Before or after he started at Culver?

9        A.   Before.

10        Q.   During the summer or while he was doing the

11   Allied online courses?

12        A.   I don't know.

13        Q.   What was discussed?

14        A.   Well, I mean Noah's -- Noah's perception of

15   himself was discussed, his pride was discussed,

16   his -- his status as far as substance abuse, be it

17   alcohol, drugs, tobacco, et cetera, his thoughts

18   about going to Culver, all of that was discussed.

19        Q.   Okay.  Anybody else who you claim stated to

20   you that your reputation -- you feel that your

21   reputation was damaged besides Ozzie Storm?

22        A.   Oh, yeah.  Yeah.  I mean our neighbor.

23        Q.   Okay.  Who is your neighbor?

24        A.   Greg Martin.  His family owns the First

124

1  Trust Bank and the radio station.

2      Q.   What did Greg say to you?

3      A.   He said so Noah kind of got the wrath of

4  the big boys at the high school, huh?  And I said

5  what do you mean?  He says I heard he was caught

6  dealing drugs at Watseka.  I said who told you that?

7  He said, well, I can't tell you who, but, he said, it

8  was one of the muckety-mucks up at Watseka.

9      Q.   Did he ever tell you who?

10     A.   No.  His daughter goes to Watseka too and

11  I'm sure had he said so she would have had problems

12  so I never pursued that.

13     Q.   Anybody else?

14     A.   Oh, yeah, there are more people.  I just

15  can't remember who they -- I mean who they were at

16  this time.  There is one guy who is on the county

17  board, Troy Crumwoody (phonetic).

18     Q.   How do you spell his last name?

19     A.   I have no idea.  And he said his daughter

20  had the same thing happen to her last year, the year

21  before this.  They called her in, didn't tell her

22  what the charges were, said you can either admit or

23  deny taking drugs.  Or if you don't admit it you are

24  kicked out forever or kicked out for the year.  And

1    if you do admit it, it's only a ten day.  And that he

2    wasn't allowed there, his wife wasn't allowed there

3    and that she came home crying and that he pulled her

4    out of school and she never went back to Watseka.

5         Q.    How did those statements hurt your

6    reputation?

7         A.    Well, he was -- here's a guy who is on the

8    county board that says, you know, everybody in town

9    knows about this and, you know, I'm sorry to hear it

10   happened to you because the same thing happened to

11   me.  The mere fact that it happens to somebody in a

12   small town is enough to cause severe damage, not to

13   even mention that I had volunteered time for a period

14   of a year and a half as a police officer in Watseka.

15        Q.    Are you claiming any loss of business or

16   income as a result of this damage to your reputation?

17        A.    No.  I was already retired and I had -- I

18   had stopped volunteering time as a police officer.  I

19   had a severe accident and I am paralyzed on my left

20   side.  So I stopped.  And that happened before this.

21             But still it's a reputation -- it's a

22   reputation with the general population and with

23   specific portions of the population that are your

24   friends and colleagues.  I mean the judges in

126

1    Watseka, I consider them friends and colleagues.  You

2    know, we go to social events and, you know, I can

3    just tell the difference in the way people look at

4    you and the way people treat you, you know, because

5    they are thinking your son's a druggy, you know?

6    Your son got kicked out of school, your son isn't the

7    Eagle Scout that you always thought he was, your son

8    isn't the best that you ever thought he was.

9            And you can just tell in everybody's

10   contact with you that you've been damaged.

11   Everybody.  From the store clerk that you get your

12   groceries from, from the guy who pumps your gas, from

13   the guy who washes your car, to the judges who are my

14   friends and colleagues of 35 years.

15       Q.   Have any of those people said those things

16   to you?

17       A.   They don't have to.  I see it on their

18   faces, I see it in their attitudes, I see it in the

19   tone of their conversation when -- when our kids come

20   up, and I see it also that the conversations about my

21   kids never come up.  It's absolutely apparent.

22       Q.   You said kids.  Do you have another child

23   besides Noah?

24       A.   I was talking about kids, meaning the other

127

1    judges, other attorneys' kids, along with my child.

2            MS. GOGGIN-WARD:   That's all I have.

3        A.    I'll waive.

4    (Concluding at 12:41 p.m.)

5    AND FURTHER THE DEPONENT SAITH NOT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

128

1    STATE OF ILLINOIS   )
                          )
2    COUNTY OF VERMILION)

3
          I, Amy Prillaman Buhr, a Certified Shorthand
4    Reporter, in and for the County of Vermilion, State
     of Illinois, do hereby certify that MICHAEL
5    DIETCHWEILER, the deponent herein, was by me first
     duly sworn to tell the truth, the whole truth and
6    nothing but the truth, in the aforementioned cause of
     action.
7               That the foregoing deposition was taken on
     behalf of the Defendant, at the offices of Flynn,
8    Palmer, Tague, Lyke & Jacobson, 402 West Church,
     Champaign, Illinois,, on February 20, 2014;
9         That said deposition is a true record of the
     testimony given by the deponent and was taken down in
10   stenograph notes and afterwards reduced to
     typewriting under my instruction; and that it was
11   agreed by and between the witness and attorneys that
     said signature on said deposition would be waived.
12        I do hereby certify that I am a disinterested
     person in this cause of action; that I am not a
13   relative of any party or any attorney of record in
     this cause, or an attorney for any party herein, or
14   otherwise interested in the event of this action, and
     am not in the employ of the attorneys for either
15   party.
               IN WITNESS WHEREOF, I have hereunto set my hand
16   this 28th day of February, 2014.

17
                   _____
18                 AMY PRILLAMAN BUHR, CSR, FCRR

19

20

21

22

23

24

**A**

**A+ (1)**
20:19
**able (4)**
69:21;73:19;
107:13;115:9
**absolutely (11)**
42:7;46:23;58:18;
86:18;89:21;92:12;
106:20;112:6,20;
120:8;126:21
**abuse (2)**
122:3;123:16
**academic (3)**
18:10;119:9,11
**Academies (1)**
20:12
**Academy (11)**
14:12;22:23;23:7,
15;24:6;108:23;
109:3,11;110:5;
118:17;119:3
**accept (1)**
109:9
**accepted (5)**
23:6;24:8;81:11;
109:10,15
**accident (1)**
125:19
**accidents (2)**
58:14;68:14
**accomplished (1)**
70:5
**According (1)**
33:7
**accredited (1)**
108:9
**accusations (2)**
87:15;120:6
**accused (1)**
74:11
**accusing (1)**
122:2
**acquaintances (1)**
76:10
**acting (1)**
102:21
**action (4)**
31:11;34:14;37:7;
43:16
**actions (1)**
45:10
**active (1)**
12:4
**activities (1)**
113:3
**activity (5)**
10:7,23;30:8,9;
38:22
**actual (6)**
42:10,10,11;67:18;

88:17;90:11
**actually (12)**
10:13;16:7;41:17,
18,24;51:22;53:18;
54:2;60:11,17;90:3;
121:12
**add (1)**
98:8
**Adderall (1)**
73:11
**additional (2)**
77:20;87:23
**address (4)**
8:5;22:1,3;121:5
**addressed (1)**
113:9
**addressing (2)**
112:14,16
**adjourn (1)**
104:18
**adjourned (1)**
104:12
**administration (2)**
83:10;84:12
**administrator (2)**
23:22;105:22
**administrators (2)**
9:20;44:24
**admissions (4)**
109:7,8,14;119:1
**admit (11)**
36:20;47:20;50:13;
60:7,13;61:8,10;
112:17;124:22,23;
125:1
**admitted (18)**
7:7;27:21;35:3,7,
16;41:11,13;45:13;
47:23;57:4,22;60:11,
17,22;65:8,10;
101:20;109:18
**Adrenne (2)**
8:11,12
**A-D-R-E-N-N-E (1)**
8:13
**adult (3)**
10:6;17:23,24
**adults (1)**
39:4
**advance (1)**
82:13
**advanced (1)**
116:18
**advisor (2)**
98:10;102:22
**affair (1)**
47:21
**affidavit (6)**
49:11,21;51:8;
76:15,18;77:5
**affidavits (15)**
37:8;39:9;48:2;
76:9;81:19;88:3,4,6,

8;92:16;93:3,19;
94:15;96:19,22
**afforded (1)**
45:8
**afraid (1)**
51:8
**again (6)**
24:19;66:7;75:11;
103:1;104:21;106:15
**against (3)**
9:3;87:15;120:7
**ago (4)**
18:16,16;30:7;44:7
**agree (1)**
35:24
**agreed (1)**
81:20
**agreement (1)**
4:8
**ahead (1)**
29:23
**ain't (1)**
31:5
**aircraft (1)**
68:14
**A-L (1)**
108:1
**alcohol (2)**
73:22;123:17
**allegations (2)**
28:17;96:9
**alleged (3)**
93:11,19;99:22
**Allied (15)**
107:23,24;108:2,3,
6,14,18,24;109:4;
117:1,6,10,13,18;
123:11
**A-L-L-I-E-D (1)**
108:2
**Allied's (1)**
118:1
**allow (2)**
81:20;96:3
**allowed (19)**
20:18;50:17,20;
53:7;86:9;93:3,5;
95:23;104:20;106:2,
7,10,12,17;111:8,10;
114:17;125:2,2
**all-school (1)**
17:6
**almost (1)**
113:5
**alone (1)**
78:12
**along (4)**
65:23;76:6;80:20;
127:1
**alternative (1)**
89:6
**although (1)**
20:19

always (4)
15:22;18:8;116:4;
126:7
**amend (1)**
18:22
**analysis (1)**
70:9
**anathema (1)**
58:1
**and/or (3)**
21:24;45:10;47:19
**angry (3)**
57:17;58:2;72:13
**Ann (3)**
24:24;25:2;27:5
**answered (1)**
5:13
**anymore (1)**
52:3
**apparent (3)**
95:3;98:7;126:21
**apparently (2)**
20:15;26:19
**appealed (2)**
51:13,16
**appear (1)**
92:10
**appearance (1)**
6:1
**appearances (1)**
97:18
**appeared (3)**
38:15;99:9;100:11
**appears (1)**
25:5
**applicable (1)**
4:9
**application (1)**
20:11
**applied (1)**
109:12
**apply (1)**
20:16
**appreciate (1)**
6:8
**approach (2)**
76:17;95:21
**appropriate (3)**
38:12;40:12;48:23
**approval (1)**
79:12
**approximately (2)**
55:19;84:7
**April (1)**
9:1
**area (9)**
13:9,21;14:3;30:4;
55:16;84:23;87:3;
105:6,7
**arm (1)**
65:19
**around (6)**
16:2;26:10;35:23;

55:21;83:6,17
**arrange (1)**
58:19
**arrested (7)**
52:12,16;73:2,22;
76:20,21;77:3
**A's (2)**
115:22,23
**Aside (2)**
15:18;34:9
**assembly (2)**
17:6,9
**assignments (7)**
111:12,14,16,19;
114:14;115:4,16
**associate (1)**
30:16
**assume (3)**
34:11;83:6;84:24
**assuming (1)**
66:12
**assumption (1)**
60:17
**Ativan (4)**
70:11,18,21;73:11
**attach (1)**
79:1
**attached (2)**
59:4;71:4
**attend (2)**
17:9;106:18
**attended (3)**
36:7;104:20;123:6
**attitudes (1)**
126:18
**attorney (15)**
4:21;5:3,4,15,18;
7:1,6;30:23;40:17;
45:1;58:11;61:18;
102:15;103:12,24
**attorneys (2)**
11:19;51:19
**attorney's (1)**
6:19
**attorneys' (1)**
127:1
**August (3)**
81:14;118:6;119:12
**available (1)**
115:18
**average (1)**
116:2
**aviation (2)**
58:6,12
**avoided (1)**
75:16
**award (3)**
17:4,15;48:12
**awarded (1)**
17:11
**awards (1)**
18:8
**aware (2)**

17:2;99:22
**away (2)**
9:24;80:5

## B

**back (35)**
20:1;24:20;32:2;
34:7;37:20;59:5,8;
77:15;78:3,18;79:6;
80:15;83:19;85:1;
95:8,13,15;98:14;
99:19,20;100:2,8,12;
104:13,17;105:5,10;
106:2,7,10,12,13,17;
113:24;125:4
**backed (1)**
39:10
**bad (1)**
31:5
**Baker (2)**
107:10;113:3
**Ball (1)**
48:15
**band (1)**
65:19
**Bank (1)**
124:1
**bar (3)**
7:4,11,21
**barged (2)**
50:22,23
**barred (1)**
17:10
**based (1)**
89:17
**Basically (1)**
15:10
**basis (3)**
6:6;42:15;106:11
**bathroom (6)**
67:6,9,12,19;
120:12,13
**beating (1)**
37:2,4
**became (3)**
14:13;95:3;98:7
**behalf (2)**
9:3;51:16
**behavior (1)**
94:8
**Behind (2)**
84:22;85:3
**below (1)**
96:6
**benzodiazapine (2)**
70:15;78:13
**besides (14)**
27:5,15;44:9;51:15;
69:2;75:23;81:17;
82:19;85:2;91:17;
104:9;122:22;123:21;
126:23

**best (10)**
15:15;18:5;43:14;
50:14;51:10;99:21;
105:2;115:1;116:1;
126:8
**better (2)**
62:6;112:14
**beyond (2)**
5:12;13:13
**big (1)**
124:4
**billing (1)**
80:19
**birth (2)**
8:24;12:18
**bit (1)**
46:22
**blood (4)**
66:23;68:5;69:4,12
**bloodwork (1)**
68:9
**Board (37)**
9:4,20;10:11,18;
30:6,11;32:6;37:24;
41:15;42:9,21;43:7,8;
44:12,17,18;45:1,4;
46:11,14;67:23;
98:10;99:15;100:1,4,
12;102:22;103:3,15;
104:12;105:14,16,19,
24,24;124:17;125:8
**Boatman (2)**
17:18;81:7
**book (2)**
42:13;62:17
**both (10)**
7:6;9:20;23:3;26:1;
44:2;55:4;64:17;
70:20;71:9;112:17
**bottom (2)**
30:15;36:5
**boy (1)**
31:2
**boyfriend (1)**
52:21
**boys (1)**
124:4
**bozos (1)**
98:2
**Braidwood (1)**
13:7
**break (4)**
77:11;98:9,12,12
**Brett (4)**
49:18;51:4,10;
94:16
**Bridge (1)**
13:5
**bring (5)**
53:7,10;79:5;87:9;
100:11
**British (1)**
116:20

**brother (1)**
75:2
**brought (3)**
54:8,16;57:9
**Bruce (2)**
122:17,22
**Bryon (1)**
13:7
**building (1)**
92:3
**bullshit (2)**
30:14;75:1
**bunch (4)**
30:14,17;49:5;
106:14
**Bunting (55)**
11:2,3;20:3,5;21:1;
22:6;23:10,14,21;
24:10,16;25:10;27:4,
16,18;28:13;29:7,15;
31:22;32:21;33:4,10;
35:2,5;37:10;40:2,9;
41:2,8,16,19;45:3,21;
46:23;47:19;49:3;
57:2;63:18,19;78:8;
82:15,19,23;83:15,24;
84:5;85:4;86:19;89:6,
8,13;94:1,24;102:1,13
**Bunting's (6)**
11:12;24:13;38:6;
47:10,11;87:20
**business (1)**
125:15

## C

**cadets (1)**
116:2
**caliber (1)**
18:11
**call (34)**
11:4;16:5,8,9,19;
19:11;22:16;23:17,
18;28:10;32:2;38:4,
13;41:1;54:24;55:3;
56:23;57:9,12;59:11;
62:19,22;70:8;71:6;
72:4,22;76:6;77:19;
78:6;82:13,17;90:12;
113:3;114:21
**called (24)**
11:4;16:11;17:13;
19:20;20:1;31:2,4;
49:1;51:22;52:23;
58:14;62:9;63:11;
65:13;70:2;72:16;
73:24;78:1,12;96:2,2;
101:23;113:13;
124:21
**calling (3)**
72:2;79:9;82:8
**calls (3)**
16:15;56:10;72:21

**came (8)**
30:12,14;34:7;55:5;
59:5,8;80:12;125:3
**can (33)**
4:11;5:13;7:22,23;
18:2,3;21:21;24:20;
30:16;36:20;39:14;
41:4,18;44:1;58:17,
19;68:24;73:17;86:3;
88:4,5;91:2;97:17;
102:6;106:24;111:13;
112:6,7;113:3,23;
124:22;126:2,9
**capital (1)**
55:9
**car (1)**
126:13
**carbon (1)**
79:3
**care (5)**
40:14;47:2;63:5;
68:23;107:10
**career (1)**
58:12
**Caribbean (3)**
116:20;117:3,7
**carry (1)**
12:1
**case (13)**
5:10,16;6:23;30:7,
7;31:1;36:19;42:24;
52:1;56:11;77:20,24;
87:16
**cases (5)**
4:24;5:7,8;14:9,18
**caught (1)**
124:5
**cause (1)**
125:12
**cease (1)**
113:2
**cell (5)**
16:12,18;19:8;
71:14,19
**Central (6)**
7:2,9,12,15,21;
15:22
**certain (2)**
4:24;9:9
**certainly (1)**
56:20
**certificate (6)**
110:20,23;111:5;
115:3;116:18;117:2
**certified (2)**
24:2;58:14
**certifying (1)**
23:22
**cetera (2)**
97:18;123:17
**chance (1)**
99:16
**changed (2)**

93:9,14
**changing (1)**
95:18
**charged (9)**
40:22;41:7;47:4;
57:3;77:7;89:2;101:1,
10,11
**charges (12)**
36:16,18;42:12,14,
16;43:3,5;46:2;56:11;
94:2;99:23;124:22
**charging (2)**
100:16;101:4
**check (3)**
67:15;80:18,18
**Chicago (1)**
7:5
**child (6)**
34:20,22;38:19;
39:2;126:22;127:1
**children (5)**
30:9;48:22;81:21;
109:11;115:13
**choice (1)**
30:22
**chosen (1)**
68:4
**Christmas (1)**
31:2
**chromatography (1)**
59:7
**circle (1)**
35:23
**circumstances (2)**
4:19;45:10
**cited (1)**
44:10
**cites (1)**
42:23
**City (1)**
110:11
**Civil (2)**
4:9;43:23
**claim (1)**
123:19
**claiming (1)**
125:15
**class (2)**
20:20;77:4
**classes (1)**
108:21
**clear (1)**
86:21
**clerk (1)**
126:11
**client (1)**
113:2
**close (1)**
64:23
**closed (1)**
105:9
**cocaine (1)**
121:11

**Code (1)**
4:9
**coerced (5)**
32:20;33:11;39:11;
45:12;47:16
**coercion (2)**
36:22;37:1
**cogent (1)**
27:1
**coke (1)**
120:13
**cold (2)**
90:18;96:1
**colleagues (1)**
125:24;126:1,14
**coming (3)**
82:14,16,21
**Commencing (1)**
4:1
**commerce (1)**
122:1
**Community (3)**
9:5;119:20;120:17
**complaint (1)**
47:9
**complete (7)**
111:8,11,13;116:6,
12;117:6;119:13
**completed (6)**
111:2,6;115:4;
116:11;117:8,10
**completion (1)**
116:24
**computer (4)**
80:5;81:1;118:1,1
**concerning (13)**
26:14;28:17;48:19;
77:20;87:15;89:19;
90:4;93:19;94:8;95;
117:21;118:21;119:3
**Concluding (1)**
127:4
**conclusion (1)**
46:20
**conclusively (4)**
40:4,21;41:19;78:9
**conditional (2)**
109:14,14
**conducted (4)**
4:23;5:2;46:10,14
**conducting (1)**
98:13
**conference (8)**
11:4;43:2;96:4,8,
14;97:1;98:20;100:8
**confess (1)**
57:21
**confessed (1)**
38:8
**confesses (2)**
57:19;61:19
**conflict (1)**
52:1

**conflicted (1)**
117:1
**conflicting (1)**
10:14
**confused (1)**
34:1
**confusing (1)**
57:16
**conjunction (1)**
119:10
**consider (1)**
126:1
**considered (1)**
104:24
**constitute (1)**
42:15
**constitution (1)**
43:24
**constitutional (1)**
93:13
**Construction (1)**
13:12
**consultant (1)**
13:6
**consumed (3)**
18:19;101:7,9
**consuming (5)**
28:18;41:5,7;60:18;
89:2
**consumption (6)**
34:24;41:8;50:5;
57:4;101:3,9
**contact (25)**
20:5,9;22:6,7,18;
23:10,13;69:21;75:6;
95:16;105:24;108:23;
109:3,19;110:2,12;
111:4,15,18;114:13,
18;117:12;118:4;
122:3;126:10
**contacted (8)**
22:8;62:1;63:18;
79:11;92:10;109:7;
111:20;114:8
**contacting (1)**
37:11;105:22;
110:14
**contacts (3)**
23:10;24:10;62:2
**contents (1)**
55:3
**contest (2)**
36:17;40:18
**continue (1)**
113:5
**continued (1)**
77:12
**convenience (1)**
78:16
**conversation (23)**
25:10,15;29:16,20;
33:3;35:3,17;54:1,6;
57:6;61:4;62:23;70:3;

73:20;75:16;84:17;
86:11,14,17,20;87:2;
101:16;126:19
**conversations (3)**
26:15;79:21;126:20
**convicted (2)**
13:16,18
**cooperated (3)**
27:20;35:5;101:19
**copies (1)**
25:17
**copy (6)**
31:17;43:15;45:5;
79:1,5;85:21
**corporate (1)**
5:4
**cost (1)**
62:7
**costs (1)**
107:10
**counsel (23)**
6:7,8,20;11:21,24;
12:2;15:4,8;30:3;
44:6;55:12,14;91:2;
106:20;112:2,5,20;
113:1,8,16,16;120:1,4
**counseling (3)**
122:7,10,24
**counselor (5)**
109:7,8;118:19;
119:1;122:18
**counselors (2)**
118:20;122:22
**country (2)**
7:7;116:1
**County (4)**
9:4;121:2;124:16;
125:8
**couple (1)**
118:20
**course (5)**
5:20;26:6;108:17;
112:22;116:24
**courses (4)**
117:6,7,8;123:11
**court (16)**
4:10;5:7;6:23;7:2,
12,16;11:17;14:16;
42:24;43:13;46:15;
49:23;90:14;104:17,
19;111:21
**courts (2)**
7:8;14:15
**cousin (1)**
121:7
**cracks (1)**
26:9
**crap (3)**
49:6;60:8;111:22
**crazy (1)**
30:18
**credit (1)**
108:22

**credits (11)**
108:20;109:1,5,9,
21;110:4;115:6;
118:15,22;119:4,4
**Crescent (1)**
110:10
**crime (1)**
77:1
**criminal (4)**
13:22;14:5,9,14
**cross-examine (2)**
102:11,16
**cross-examined (2)**
104:4,7
**cross-examines (1)**
102:9
**Crumwoody (1)**
124:17
**crying (2)**
61:15;125:3
**Culver (28)**
20:11,16;22:23;
23:6,15;24:6;57:23;
81:11;108:23;109:1,
3,5,11,22;110:5;
115:6,24;118:6,17,19,
21;119:3,6,7,8,8;
123:8,18
**Culver's (1)**
119:9
**current (1)**
8:5
**currently (1)**
81:7

**D**

**dad (2)**
61:20;62:8
**Dakota (13)**
48:24;49:1,8;50:10,
13;92:23,24;94:22,
23;96:17;98:17,19;
103:21
**Dakota's (2)**
50:15;98:16
**damage (3)**
122:4;125:12,16
**damaged (6)**
119:20;120:6,9;
121:22;123:21;
126:10
**dance (4)**
106:22;107:12,14,
15
**danger (1)**
28:4
**darned (1)**
107:12
**date (10)**
8:24;12:18;45:14;
90:7,8;93:11,14;
100:18;108:13;113:4

**dated (1)**
34:17
**dates (2)**
88:2;95:18
**daughter (2)**
124:10,19
**day (24)**
15:12;19:23;35:16;
38:24;41:12;45:14,
16,17,22,22;53:5;
54:8,12,19;56:6;75:7;
81:23;87:24;88:1,4;
95:9,11;97:23;125:1
**daycare (1)**
18:1
**days (13)**
27:22;29:8;30:10;
34:22;35:8;39:15;
47:24;51:11;64:15;
70:23;71:10,10;
101:22
**deal (2)**
48:7;112:23
**dealing (1)**
124:6
**dealt (1)**
62:16
**Dean (1)**
27:10
**deception (1)**
13:19
**decide (1)**
46:18
**decided (5)**
43:17;46:16;55:15;
68:12,13
**decision (4)**
29:6;43:20,22;
105:12
**deduced (1)**
5:11
**defendants (1)**
10:3
**defended (1)**
37:23
**defense (2)**
45:9;112:20
**degree (1)**
13:14
**degrees (2)**
13:13;96:6
**deliberate (1)**
104:19
**deliberations (1)**
104:21
**deliver (1)**
70:7
**denied (3)**
45:16;53:10;100:15
**Denise (9)**
56:13,15;57:12;
71:11,22;72:5,9,21;
75:3

**deny (3)**
45:13,21;124:23
**department (9)**
52:14;59:1;69:18,
19,22;70:2,4;71:2,7
**DEPONENT (1)**
127:5
**deposed (1)**
5:2
**deposition (17)**
4:6,15;5:14,20;
6:23;7:23;18:16;
26:22;31:8;39:16;
41:23;47:9;52:17;
77:12;112:12,22;
113:4
**depositions (4)**
4:20,23;5:6;7:20
**deprived (1)**
93:13
**derogatory (1)**
113:13
**described (1)**
73:10
**design (1)**
13:5
**designated (1)**
59:3
**designation (1)**
7:18
**desist (1)**
113:2
**desk (3)**
65:11;84:24;120:2
**determine (2)**
108:23;109:4
**Diagnostic (2)**
79:10;82:9
**diagnostics (1)**
78:3
**dial (1)**
71:19
**DIETCHWEILER (10)**
4:2,7,11,13;8:11;
29:24;32:15;34:21;
39:18;114:4
**D-I-E-T-C-H-W-E-I-L-E-R (1)**
4:14
**difference (1)**
126:3
**different (4)**
7:8;114:20;115:5;
118:20
**digits (1)**
12:20
**dilute (1)**
67:14
**direct (1)**
113:15
**directed (2)**
28:23;50:24
**direction (3)**
58:5;59:2;113:6

**directions (2)**
29:2;112:13
**directly (1)**
63:13
**disagree (1)**
42:4
**disagreed (1)**
75:7
**disciplinary (9)**
16:21,24;18:7;
19:10,14,16;31:11;
34:14;43:16
**discipline (3)**
17:6;43:18;116:3
**disclosed (2)**
122:19,21
**disclosures (1)**
122:21
**discovery (2)**
26:8;42:1
**discuss (1)**
54:9
**discussed (5)**
23:11;123:13,15,
15,18
**discussing (2)**
90:19,19
**discussions (2)**
79:17;113:17
**dissolving (1)**
55:14
**District (13)**
7:2,9,12,15,22;9:5,
5;22:4;42:2;92:8;
103:2;110:1,11
**diving (2)**
116:18;117:2
**DNA (1)**
68:2
**doctor's (1)**
77:14
**document (26)**
23:21;28:17;31:9,
12,14,17,23;32:1,4;
33:6,12,14,15,17,21;
34:2,9;35:22;36:5;
39:13,13;47:16;51:5,
6;52:8,10
**done (11)**
58:4,23;59:2;66:4;
67:1;69:13;111:20;
113:5;119:10;121:16,
19
**doomed (1)**
115:17
**door (2)**
86:23;87:3
**dosage (1)**
73:14
**doubt (2)**
21:20;39:6
**down (5)**
63:7;70:7,10;86:23;

117:7
**dozen (1)**
5:8
**Dr (33)**
58:8,15;62:1,9,10,
15,22;63:11;64:19,
24;65:13;66:5,6,8,10,
11,14;67:1,2,11,18;
68:11,17,21;69:8,11,
21;70:1;72:2,20;78:1;
79:10;82:8
**drafted (1)**
26:14
**Drake (2)**
12:10,16
**drank (1)**
64:2
**draw (2)**
66:23;68:5
**drink (1)**
64:10
**drive (1)**
91:7
**drop (2)**
49:24,24
**drove (4)**
91:19,24;92:4,5
**drug (40)**
10:7,22,23;27:20;
35:6;39:5,21,21;40:3,
4;47:21;52:16;56:20;
58:4,4,17,23;59:2;
61:23;62:2;64:13,14,
18;66:1;68:6;69:19;
70:9,24;78:9,10,14;
79:1;89:4;93:11,19;
94:19;97:24;101:20;
121:18;122:3
**druggy (1)**
126:5
**drugs (71)**
10:9,12;18:13;
27:21;28:4,18;34:23,
24;35:4,7,16;38:8,11,
14,23;39:23;40:1;
41:4,5,6,7,8,9,12,13,
14,18,20;45:14,16,22;
47:20;50:5,6,13;53:2;
54:8,16;57:3,4,19;
60:18;73:22;74:11;
76:1,3,3,12,13,14;
77:3,7;78:12;89:3;
94:21;95:11;99:1,9,
10;101:3,7,8,9,11,21;
120:13,14;121:12;
123:17;124:6,23
**drunk (1)**
19:6
**due (4)**
9:9;43:23;45:8;
93:13
**duly (1)**
4:3

**during (24)**
5:19;14:5;16:18;
18:15;28:9;29:16;
31:21;35:3,17;43:3;
53:24;57:9;61:4;63:9;
69:13;84:16;86:14,
16,19;88:1;98:8;
110:13;116:14;
123:10
**duty (1)**
53:5

**E**

**Eagle (1)**
126:7
**earlier (2)**
30:3;122:19
**earliest (1)**
78:16
**early (2)**
40:8;105:21
**earned (1)**
118:15
**East (2)**
8:6;11:17
**eat (2)**
64:7,10
**eaten (1)**
64:2
**E-A-U (1)**
55:9
**Education (4)**
9:4,21;10:11,19
**effect (1)**
73:8
**effects (1)**
95:10
**eight (3)**
64:15;70:23;71:9
**either (16)**
4:23;11:11;16:5;
36:20;39:12;43:22;
51:1;53:16;58:24;
71:23,24;72:21;
75:12;89:5;118:22;
124:22
**else (33)**
8:14;17:19;18:2;
23:9;27:5,14,18,23;
29:8,15,18;47:7,8;
51:15;61:14;63:15,
17;69:13;73:15;76:2,
5;77:19;82:20;83:23;
84:16,19;86:2;88:7;
102:20;113:12;
114:21;123:19;
124:13
**e-mail (17)**
21:17,19,22;22:1,3;
40:7,9;78:7,17;79:4,
6;82:19,23;85:16;
89:6,8,9

**e-mailed (2)**
40:2;82:15
**emergency (11)**
58:21,22;63:6,10;
65:7,8,11,15,22;
77:15;107:11
**employ (1)**
122:5
**enclosed (1)**
85:11
**end (3)**
48:12;73:20;116:22
**enforcement (1)**
48:16
**English (4)**
21:5,9,10;23:3
**enough (2)**
63:24;125:12
**enroll (4)**
107:19,22;110:3;
116:5
**enrolled (1)**
109:4
**enrolling (2)**
108:24;114:20
**enrollment (2)**
108:13;115:19
**entered (1)**
5:24
**entire (1)**
118:12
**entitled (1)**
93:17
**especially (1)**
57:22
**estimate (1)**
105:2
**et (2)**
97:18;123:17
**even (12)**
21:17;26:7;38:4;
40:21;48:13;55:21;
64:1;72:16;84:23;
93:15;95:24;125:13
**evening (3)**
77:17;89:5;91:6
**events (1)**
126:2
**eventually (2)**
24:4;84:5
**Everybody (4)**
76:7,7;125:8;
126:11
**everybody's (1)**
126:9
**evidence (6)**
5:11;42:16;46:22;
53:8,10;104:24
**evidentiary (1)**
77:6
**exact (5)**
40:8;47:19;49:12,
20;59:16;101:18

**exactly (4)**
35:8;37:5;49:18;
50:3
**EXAMINATION (1)**
4:4
**examinations (1)**
117:17
**examined (1)**
65:23
**exams (2)**
114:23;117:23
**excellent (1)**
116:4
**except (5)**
10:14;64:5;73:5;
92:22;97:17
**excess (1)**
5:7
**exclusive (1)**
14:2
**exculpatory (1)**
53:8
**excuse (4)**
12:14,15;33:23;
112:1
**executive (2)**
104:16,19
**Exhibit (9)**
31:8;32:14;39:17;
41:23;42:19;45:7;
47:17;101:2;119:16
**exhibited (1)**
19:5
**exited (1)**
32:1
**expedited (1)**
70:9
**expel (1)**
36:21
**expelled (10)**
31:4;37:16;39:13;
47:22;49:8,14;50:11;
52:10,11;61:9
**expensive (2)**
63:4;68:22
**explain (3)**
45:9;50:19;52:15
**explained (1)**
43:3
**explicitly (1)**
119:14
**exposed (1)**
38:11
**expressions (1)**
113:10
**expulsion (1)**
51:23
**extensive (1)**
59:6
**extensively (2)**
7:5,9
**extremely (1)**
57:17

**ex-wife (1)**
30:13

# F

**FAA (10)**
58:14,16;59:3,4;
62:2;67:15;68:6,13,
17,19
**face (1)**
41:2
**faces (1)**
126:18
**facial (1)**
113:10
**fact (14)**
17:3;18:19;19:4;
32:1;43:15;44:19;
46:24;48:9;49:22;
54:8;57:2;76:3;
100:21;125:11
**fact-finding (1)**
38:8
**facts (3)**
52:1;97:21;112:17
**faculty (1)**
28:5
**failed (2)**
10:23;89:11
**fairly (1)**
115:15
**fall (6)**
21:11;22:23;26:9;
115:21;118:12,16
**false (1)**
86:4
**familiar (5)**
8:1;32:8,18;58:10,
13
**family (5)**
51:19;98:8;122:2,9;
123:24
**far (6)**
15:19;51:20;54:21;
115:18,19;123:16
**Farm1849@sbcglobalnet (1)**
22:5
**farmers (2)**
120:11,20
**farmground (1)**
120:10
**farming (1)**
120:15
**fast (1)**
70:18
**father (3)**
31:4;48:6;96:16
**February (16)**
10:10,24;11:5,6;
35:20;90:12,14,18;
92:17;100:24;106:3,
19;107:16,20;108:11,
15

**Federal (12)**
4:9;5:13;6:23;7:2,6,
8,12,16,21;14:16;
44:4;58:5
**feel (2)**
25:16;123:20
**felony (4)**
13:16;14:15,18;
77:4
**felt (1)**
77:4
**few (1)**
62:24
**fiancé (1)**
52:22
**field (1)**
58:12
**figured (1)**
39:3
**filed (1)**
9:3
**fill (1)**
52:24
**filled (3)**
52:23;53:3;93:18
**finally (1)**
40:13
**find (5)**
40:17;72:6;91:2;
108:6;110:16
**fine (4)**
62:4;98:14;100:11;
112:12
**finish (2)**
37:22;49:16
**finishing (1)**
20:11
**firm (3)**
55:12,13,15
**firm's (1)**
12:2
**first (28)**
4:3;16:18;20:7;
23:9;24:17;25:19;
31:9,12;48:21,23;
58:24,24;59:17;
66:16;72:4;85:13;
88:10,20;89:1;97:13;
98:18;99:5,22;
101:23;102:8;110:12;
112:19;123:24
**five (7)**
12:12,15;14:7;
16:16;30:10;63:1;
116:1
**flight (4)**
58:7,8;66:9,12
**floor (1)**
11:18
**foggy (1)**
72:12
**follow (2)**
38:21;44:20

**followed (3)**
29:1;53:7;67:15
**following (1)**
35:21
**follows (2)**
4:3;77:12
**football (3)**
48:5,10,13
**foregone (1)**
46:20
**forever (2)**
65:4;124:24
**forget (1)**
15:22
**form (2)**
26:5;27:1
**formal (1)**
26:8
**formally (1)**
25:16
**forms (4)**
59:5,5;69:6;79:3
**forth (3)**
47:8,9,10
**found (1)**
76:24
**four (4)**
12:20;54:23;96:3;
108:21
**frankly (1)**
112:23
**fraud (4)**
42:8;43:11,12,12
**fraudulently (3)**
42:22;44:21,23
**free (1)**
25:16
**freezing (2)**
90:18;96:1
**Friday (4)**
78:8,23;89:16,23
**friend (1)**
17:22
**friends (5)**
76:9;80:10;125:24;
126:1,14
**front (4)**
28:21;30:6;92:20;
93:1
**frozen (1)**
67:24
**fuck (1)**
60:2
**full (5)**
4:12;108:17;119:7,
13,22
**fully (4)**
27:19;35:5;101:19;
108:9
**Funk (11)**
45:2,3;93:16;98:11;
102:21;103:13;104:4,
6,20;105:15,21

**further (11)**
28:24;29:5,9;33:3;
39:20;56:10;77:24;
78:7;79:17;82:7;
127:5

# G

**gain (1)**
20:10
**game (1)**
41:2
**games (1)**
48:11
**gas (2)**
59:6;126:12
**gave (7)**
4:23;9:22;23:2;
31:20;37:13;42:18;
48:3;62:13;72:15;
73:18;74:6,14;79:12;
100:17
**general (1)**
125:22
**generally (1)**
57:20
**gentleman (1)**
53:12
**Gestapo (1)**
37:4
**gets (1)**
48:12
**girlfriend (4)**
17:18;80:11,13;
81:6
**given (18)**
4:15,20;6:23;7:20;
20:23;22:4,22;31:17;
36:15;38:19;43:4,15;
46:20;53:1;75:24;
110:4;111:12;112:23
**giving (2)**
7:22;22:12
**goes (5)**
45:7;48:10,10;
102:8;124:10
**GOGGIN-WARD (10)**
4:5;26:6,11,13;
77:13;113:18,23;
114:3,7;127:2
**good (6)**
64:14;77:5;110:20,
23;111:5;115:3
**government (1)**
59:5
**grades (5)**
17:5;115:19;
116:11,12;117:9
**graduate (1)**
12:16
**grandma's (1)**
52:21
**grandmother (3)**

51:22;53:23;56:14
**great (2)**
112:23;113:23
**Greg (2)**
123:24;124:2
**Gregorash (2)**
52:4;53:16
**Gregorash's (1)**
51:22
**groceries (1)**
126:12
**group (6)**
97:8,10;119:16;
120:2,4;122:18
**guess (3)**
44:8;59:16;68:10
**guilty (5)**
57:20;76:22,24
**guy (5)**
52:22;124:16;
125:7;126:12,13
**guys (4)**
97:16,17,19;98:11

**H**

**hac (1)**
7:8
**half (11)**
18:16;40:10;56:9;
70:22;90:16,22;
106:22;119:4,7,13;
125:14
**hallway (1)**
16:8
**hand (7)**
31:7;40:13;41:22;
70:7;85:21;86:22;
101:11
**handbook (13)**
36:14;42:3,5,10,11;
43:19;45:5;88:13,17,
20;89:17,21;97:22
**hands (2)**
33:8;85:24
**handwriting (1)**
34:9
**handwritten (2)**
25:6,18
**hang (1)**
16:9
**happen (4)**
30:19;46:19;47:2;
124:20
**happened (18)**
21:4;22:15;26:15;
37:6,7;39:3;46:7;
47:22;49:7;54:6;
57:13;72:18;94:24;
104:15;109:16;
125:10,10,20
**happens (3)**
81:22;97:20;125:11

**Harvey (1)**
20:22
**head (1)**
23:21
**heading (1)**
120:3
**hear (1)**
125:9
**heard (4)**
97:14;99:5;102:24;
124:5
**hearing (53)**
29:12;30:12;32:7;
36:6,13,23;38:8;
41:15;42:17;43:7,12;
44:15;45:4,7;46:1;
51:23;53:11;67:23;
90:11,20,21;91:14,16,
18,20,21,22;92:4,7,
11,14;93:17;94:7;
95:22;96:20,24;98:3,
6,9;99:17,19,21,24;
100:1,8;101:24;
102:22;105:6,9,19;
114:9,12,15
**heck (1)**
72:6
**held (6)**
36:6,23;92:4,7;
105:8;115:12
**hell (1)**
38:13
**help (4)**
20:10,16;73:17,19
**hereby (1)**
105:22
**Here's (2)**
85:20;125:7
**Hiding (1)**
59:20
**High (32)**
9:7;15:20;17:1,5;
18:10;19:6;21:23;
34:22;36:13;37:15;
54:21;106:12,17;
107:17,23,24;108:4,6,
8,9,14,18,24;109:4,
20,23;110:21,24;
111:5,9;119:5;124:4
**himself (2)**
24:23;123:15
**hire (1)**
120:14
**hired (1)**
30:13
**History (2)**
12:14,15
**hold (3)**
7:15;13:13;30:19
**home (29)**
8:16;39:1;54:19,22;
55:5,24;56:3,5,11;
59:12,14,22;63:22;64:3,

**4,5,6,8,9,11;72:1;**
77:16;82:2,4;85:6;
87:22;108:10;109:9,
17;125:3
**hospital (5)**
38:14,23;63:23;
64:22;78:18
**hour (8)**
40:8,10;56:9;64:23;
65:5;84:8;90:16,22
**hours (4)**
4:22;69:11,14;
70:22
**house (2)**
48:6;63:15
**huh (1)**
124:4
**hung (2)**
33:5;55:1
**hurt (1)**
125:5
**husband (1)**
52:22

**I**

**idea (4)**
19:16;42:7;113:23;
124:19
**identification (6)**
30:1;31:8;39:17,19;
41:24;119:16
**ignorance (1)**
9:20
**ILCS (2)**
43:1;44:10
**illegal (6)**
18:12;59:10;95:7;
98:11;103:1;104:21
**Illinois (14)**
7:3,7,10,12,16;8:6;
11:18;14:12,16;
15:22;42:24;44:4;
48:11;62:12
**immediately (4)**
31:24;46:5;55:5;
71:23
**impaired (1)**
76:12
**impossible (6)**
40:6;51:24;76:8;
78:11;101:6;115:20
**improper (1)**
95:6
**incident (10)**
45:14,15,17,17;
75:13;79:13,18;
87:16;107:6;122:12
**incidents (3)**
9:10;58:13;68:14
**income (1)**
125:16
**incorrect (1)**

115:8
**independent (5)**
25:9,14,15;87:14;
91:4
**indicate (3)**
33:9;53:24;110:22
**indicated (3)**
14:24;47:3,15
**indicates (2)**
34:13;119:19
**indicating (2)**
43:1;75:24
**individual (1)**
67:18
**individually (1)**
97:9
**influence (4)**
19:7;100:19,20,23
**inform (2)**
27:4;34:20
**information (18)**
10:14,15;65:11;
72:8;74:3;76:2;77:20;
93:10;97:16;98:1,21;
99:2,9,14;100:3,10,
12,15
**informed (4)**
19:8;28:16;35:2;
57:1
**inhouse (1)**
5:3
**initial (2)**
35:3;69:23
**initially (5)**
20:2;26:14,18;34:6;
95:16
**initiation (1)**
42:17
**injunction (1)**
107:11
**innocence (1)**
45:11
**inquire (2)**
19:13;21:1
**inside (1)**
96:4
**instead (1)**
93:10
**instruct (1)**
6:9
**instructed (2)**
21:6;44:18
**insulting (1)**
31:6
**insurance (1)**
12:1
**intend (1)**
6:3
**intended (1)**
13:9
**intent (1)**
81:13
**interest (1)**

14:14
**interrogatories (2)**
119:23;122:20
**interrogatory (1)**
119:17
**intimidating (1)**
89:14
**into (26)**
29:10;32:3,20,21;
33:11;45:12;47:16;
53:11;63:12;67:7,9,
12,19;77:24;89:14,
15;95:24;96:8;97:1;
98:6;99:21,24,24;
100:7;107:11;110:3
**introduced (1)**
24:23
**investigation (11)**
27:20;29:10;35:6;
77:24;78:7;79:8;
81:17;82:7;87:14,24;
101:20
**involved (10)**
37:7;48:14;52:5;
72:10,14;74:4;79:13;
87:11,16;107:5
**involving (2)**
13:19;68:14
**ironworker (1)**
13:4
**Iroquois (2)**
9:4;121:2
**irrefutable (1)**
68:20
**Island (1)**
13:7
**Islands (1)**
116:20
**issue (4)**
5:10;49:23;116:10;
117:9
**issues (2)**
117:22;118:1

**J**

**jail (1)**
74:1
**Janevicius (2)**
66:8,10
**January (36)**
9:10;10:8,13;11:7,
13,22;15:1;16:6;17:1;
18:6,13,19;19:9;20:5;
24:11,17;25:22;
26:16;27:12;31:13,
17;34:17;36:7;45:23;
46:6;47:22;54:16;
60:20;69:2;80:15;
81:1;93:20;94:4;
95:11;96:10;99:10
**jeopardize (1)**
57:23

**Jew (2)**
30:20;31:5
**Jewish (1)**
30:22
**Jews (2)**
30:17,20
**job (1)**
116:15
**jobs (1)**
116:16
**John (4)**
12:8,23;13:8,14
**joined (1)**
13:8
**judge (4)**
6:10;107:10;112:7;
113:3
**judges (3)**
125:24;126:13;
127:1
**July (1)**
116:22
**June (1)**
116:22
**junior (3)**
109:10,15,18
**jurisdiction (2)**
109:24;112:14

**K**

**kangaroo (4)**
46:15;67:23;90:14;
111:21
**Kankakee (6)**
11:18;55:10,16;
58:7;62:11;122:18
**keep (3)**
86:24;106:21;107:5
**keeps (1)**
68:1
**Kelly (3)**
17:18;81:7,9
**kept (1)**
90:17
**kicked (5)**
120:12;121:10;
124:24,24;126:6
**kid (11)**
37:3;38:7,19,22;
39:1,6;40:22;41:9;
49:19,22;50:7
**kids (11)**
42:22;48:16;52:5;
81:20;97:15;109:10;
126:19,21,22,24;
127:1
**kid's (2)**
39:7;49:4
**kilter (1)**
38:16
**kind (4)**
60:7;87:3;121:20;

124:3
**kitchen (2)**
59:23;63:12
**Klan (1)**
30:8
**Klux (1)**
30:8
**knew (7)**
37:9;63:13;89:17,
23;90:1;101:4,5
**knowledge (4)**
18:5;27:17;51:11;
115:1
**known (6)**
18:12;20:17;59:8;
66:6,13,18
**knows (2)**
57:23;125:9
**Konce (7)**
49:19,22;50:7;
51:18;96:16;98:7,19
**Konces (1)**
98:15
**Ku (1)**
30:8

**L**

**L-A (1)**
55:9
**lab (1)**
59:3
**LaBeau (1)**
55:7
**land (2)**
16:10;19:12
**language (1)**
88:17
**large (1)**
30:12
**last (19)**
12:20;26:21;33:24;
39:21;48:4;53:15;
55:8;62:3,23;78:14;
88:21,24;94:18;
99:18;113:24;117:20;
118:3;124:18,20
**lasted (1)**
62:24
**late (1)**
91:6
**Later (6)**
31:2;70:8;77:2,17;
90:16;113:4
**laughed (1)**
121:20
**law (24)**
6:10,11;11:14,20;
12:5,7;13:12,13,22;
14:5,14,22;15:19;
30:4;34:6;14;37:10;
43:20,24;44:3,4,4,13,
15;48:11

**laws (1)**
37:20
**lawsuit (3)**
5:24;6:1;9:2
**lays (1)**
89:21
**lead (1)**
5:11
**learned (2)**
10:1;47:12
**least (3)**
54:5;69:23;89:23
**leave (11)**
8:17;15:6;34:6;
40:19,24;55:4,19;
86:10;98:14,15;122:5
**leaving (2)**
19:22;113:18
**led (2)**
44:21,23
**leeway (1)**
112:23
**left (9)**
15:16;33:8;55:5;
57:12;63:23;64:1;
71:18;87:20;125:19
**legal (1)**
42:23
**legitimate (5)**
5:14;38:7,18,22;
46:17
**legitimately (1)**
38:23
**length (1)**
29:20
**Less (8)**
14:7;16:16;56:7;
86:12;105:4;113:11;
120:15,16
**lesser (1)**
44:17
**letter (12)**
26:12;71:4;88:12,
13;89:19,22;90:6,7,8,
10;93:16;105:21
**letterhead (1)**
12:2
**license (1)**
7:15
**licensed (1)**
12:1
**lied (4)**
111:22;112:18;
113:14,14
**life (2)**
70:22;73:7
**likely (1)**
29:3
**line (2)**
16:10;19:12
**lines (3)**
65:23;76:6;80:20
**list (1)**

67:16
**listed (2)**
12:2;104:10
**listen (2)**
6:10;46:22
**listening (1)**
6:18
**little (1)**
16:1
**live (3)**
8:8;55:16;121:1
**lives (1)**
121:4
**living (2)**
13:3;53:22
**local (1)**
4:10
**located (7)**
11:15,16,17;32:13;
34:9;62:10;116:19
**loco (1)**
38:20
**logic (1)**
46:24
**long (14)**
5:5;32:23;56:5;
61:19;62:23;63:24;
64:21;65:3;66:6;69:8;
86:11;95:13;104:22;
121:6
**longer (5)**
11:21;16:1;62:24;
63:22;68:7
**look (12)**
40:21;44:6,7,11;
80:18;86:7;88:2,5,20;
91:3;100:22;126:3
**looked (5)**
88:21,22;89:1,15;
98:24
**looking (2)**
33:21;36:5
**Lorazepam (4)**
70:12;73:11;77:10;
78:13
**loss (1)**
125:15
**Louis (1)**
4:13
**L-O-U-I-S (1)**
4:14
**low (1)**
73:14
**Lucas (35)**
10:17;24:23;27:6,9,
11,13,15;29:16;
31:22;32:2,7,21;33:4,
11;34:3,5,11;35:4;
36:7;37:10;45:3,21;
46:23;47:20;48:6,7;
49:3;57:2;63:20;84:2;
89:14;95:1;101:13;
102:1,8

**Lucas's (4)**
11:12;38:7;47:10,
10
**lunch (1)**
76:10
**Lundy (1)**
13:6
**lying (3)**
62:7,8;111:23

**M**

**ma'am (1)**
101:11
**main (3)**
83:10;84:14,15
**maintain (1)**
112:16
**maintaining (1)**
115:19
**maintains (1)**
116:1
**major (3)**
12:11,14,15
**majors (1)**
12:12
**makes (2)**
113:9,10
**making (1)**
6:13
**malpractice (1)**
12:1
**man (2)**
30:6,12
**mandates (1)**
89:11
**Mann (13)**
110:8,9,12,15,18;
111:20;114:8,19,22;
117:17,21,23;118:4
**many (6)**
4:17;5:4;15:23;
20:4;108:20;123:3
**marijuana (4)**
18:19;19:3,4;
121:11
**mark (1)**
29:23
**marked (7)**
29:22;30:1;31:7;
39:16,19;41:23;
119:15
**Marshall (4)**
12:8,23;13:8,14
**Martin (1)**
123:24
**material (1)**
5:10
**materials (1)**
71:5
**math (2)**
20:22;23:3
**matter (5)**

17:3;32:1;48:9;
49:22;64:15
**may (16)**
5:22,22;6:4;19:3,4;
34:2;66:15,15;72:16;
79:11;81:5,15,15;
87:17,18;115:17
**maybe (6)**
55:21,21;66:20;
69:12;88:1;122:20
**McKay (13)**
56:13,23;57:8,12;
71:11,22;72:5,9;
74:10,21;75:6,11,24
**mean (22)**
19:3;21:20;25:2;
26:17;58:1;64:1,8;
72:12,12;76:4,5,22;
80:17;81:19;87:10;
105:3;108:2;123:14,
22;124:5,15;125:24
**meaning (2)**
41:14;126:24
**means (1)**
101:13
**meant (2)**
11:7;95:2
**medication (2)**
59:9,9
**meet (5)**
63:6,8;84:11;92:13,
16
**meeting (2)**
31:22;104:18
**member (10)**
7:4,11,14,14,21;
10:2,6;52:14;105:24;
122:9
**members (7)**
9:4,7;38:10;103:15;
105:16,19;106:1
**memory (2)**
15:15;25:9
**men (1)**
37:3
**mention (1)**
125:13
**mere (2)**
37:1;125:11
**merely (1)**
113:13
**messages (1)**
80:18
**met (5)**
27:11,13;66:20,21;
92:15
**metabolites (6)**
39:24;40:5;64:16;
68:7;70:22;78:10
**metabolize (1)**
70:18
**MICHAEL (33)**
4:2,7,13;26:12;

29:24;39:18;51:21;
52:4,15;53:1,18;54:1,
7,15;57:8;72:14,17,
24;73:1,9,21;74:1,5,6,
8,14;75:1,8,21;76:15,
17;88:9;113:18
**M-I-C-H-A-E-L (1)**
4:13
**Michael's (4)**
53:21,22,23;56:14
**middle (1)**
8:20
**midnight (2)**
77:18;78:20
**might (6)**
21:20;30:21;57:14,
15;73:19;98:4
**Mike (1)**
113:21
**mild (1)**
70:17
**Mile (1)**
13:7
**miles (3)**
15:21,23;54:23
**military (2)**
119:8,9
**milligram (1)**
73:13
**mind (4)**
97:19,19;98:4,5
**minors (1)**
12:15
**minute (3)**
33:23,23;99:18
**minutes (13)**
15:23,23;16:2,16;
33:2;56:9;62:24;63:1;
64:1;86:12;99:24;
100:7;105:4
**misdemeanor (1)**
13:19
**misdemeanors (1)**
14:20
**missed (4)**
36:1;111:2,7,9
**mistake (1)**
95:1
**MO (1)**
121:21
**mom (1)**
98:19
**Monday (9)**
35:20;40:3;78:1,6,
15;79:9;81:22;82:9;
84:2
**money (1)**
62:7
**monitor (3)**
80:16,17,24
**month (2)**
18:16,16
**months (2)**

115:11,14
**more (10)**
16:22;44:12,14,19;
65:5;68:8,22;96:20;
114:5;124:14
**morning (4)**
78:22;81:22;82:9;
84:3
**Most (5)**
29:3;48:23;68:19,
20;117:19
**mostly (1)**
87:2
**mother (14)**
48:24;49:11,20;
50:15,16;51:7;53:22,
22;91:23;94:16,23;
96:16,17;98:16
**mother's (2)**
53:21;54:2
**mouth (1)**
101:12
**much (8)**
6:12;15:16;16:14;
63:22;68:21;71:19;
77:2;121:21
**muckety-mucks (1)**
124:8
**Multiple (4)**
4:18;17:13;27:3;
30:9
**must (1)**
119:12
**myself (4)**
38:2,12;69:10;
107:12

**N**

**name (16)**
4:12;8:10,18,19,20;
21:8;48:4;53:12,15;
55:8;57:9;71:9;94:18;
118:24;122:17;
124:18
**names (3)**
17:16;73:18;113:13
**nanogram (1)**
71:10
**Nathan (3)**
94:18;96:16;98:19
**Nazis (2)**
37:1;106:14
**need (3)**
20:13;26:7;102:3
**needed (3)**
23:20;47:14;115:2
**negative (2)**
50:2,4
**negotiated (1)**
30:24
**neighbor (3)**
121:15;123:22,23

next (2)
77:23;104:15
**nice (2)**
37:13;52:22
**night (12)**
25:20;31:13;53:1;
56:17;69:2;71:3;
75:12;77:21;78:8,22;
89:16;96:5
**Noah (193)**
8:18,19;10:23;
11:11;16:20,24;
17:14;18:7,12;19:9;
20:12,16,18,19;21:23;
23:6;24:8,24;27:5,16,
19;28:6,9,12,16,21,
23;29:1;31:15,16,23;
32:1,15,24;33:5,6,7,7,
9,11,14,16;34:6,21;
35:3,5,10,15,17,19;
36:8,19;37:11;39:22;
40:4;41:7,11,13,20;
42:12;43:14;45:8,13,
16,20;47:5;49:1;50:3;
51:16;52:15;53:2;
54:15,18;57:3;59:18,
21;60:4,17;61:14,17;
62:4;63:10,19;64:2;
65:8,14,22;66:3;67:6,
9,19;69:1,8,10;71:11;
72:1,1,11,15;73:4;
74:4,4,6,6,10,15,15,21,
24;75:4,7,24;76:2,8;
78:10;79:18,23;
81:11;82:2;85:6;
87:15;88:11;89:2,14,
15,23;90:1;91:9,20,
21,22;92:11,21,23;
93:1;94:8;95:10,11;
96:9;97:6;98:24;99:2,
9;100:10,16;101:19;
106:2;108:10;109:4,
9,20,24;110:3,4,13,
23;111:2,6,8,10,15,
17;114:10,13,20,22;
115:9,22,23,24;116:3,
4,6,14,16;117:5,8,18,
21,23;118:4,6,22;
120:7;11;121:9,10,19;
122:15,16;123:1,5;
124:3;126:23
**Noah's (28)**
8:20;21:9;22:23;
26:22;31:22;34:10;
36:2;39:10;47:9;
67:10;68:17;70:1,5;
75:12;80:16;81:1;
87:10;88:20;89:19;
90:5;93:19;97:17;
110:16;118:19;
123:14,14
**nobody (1)**
68:23

**None (1)**
48:15
**nonetheless (1)**
31:6
**nonprescription (1)**
59:9
**North (1)**
8:6
**note (2)**
32:19;114:3
**notes (11)**
25:6,11,16,18,19,
21,23;26:14,20,24;
27:2
**notice (9)**
4:7;31:10;34:13;
42:14;43:15,18;
84:23;90:1;91:2
**noticed (1)**
90:22
**notification (2)**
11:11;88:18
**November (2)**
20:8;81:12
**number (3)**
23:23;62:15;119:14
**numbers (1)**
80:20
**nurse (2)**
65:21;67:12

**O**

**oath (1)**
113:14
**objecting (1)**
5:19
**objection (3)**
6:13,15,16
**objections (3)**
6:6,18,19
**obligations (1)**
15:18
**observed (1)**
94:7
**obtain (2)**
111:16,19
**obtained (1)**
96:22
**obtaining (1)**
81:19
**occasionally (1)**
66:21
**occasions (2)**
4:19;23:20
**occur (1)**
123:6
**occurred (2)**
9:10;38:13
**October (2)**
12:6;20:8
**October/November (2)**
22:7;23:17

**off (2)**
31:9;107:5
**office (44)**
11:12,13,14,17,20;
14:24;15:6,11,16,19;
16:4,10;19:12,23;
23:19,20;24:1;32:3;
40:10;55:19;56:2;
57:12;59:12;62:11;
63:7;66:5;67:2,2,4,8;
69:9,11;77:14;83:10;
84:12,13,14,15;85:9,
11;87:2,20;92:9;
101:17
**officer (5)**
14:13;98:9;102:22;
125:14,18
**official (2)**
42:13;108:13
**officials (1)**
93:9
**Olafson (25)**
58:8,15;62:1,9,10,
22;63:11;64:19,24;
65:13;66:6,11,14;
67:11,18;68:11,17,21;
69:21;70:1;72:2,20;
78:1;79:10;82:8
**Olafson's (6)**
62:15;66:5;67:1,2;
69:8,11
**old (1)**
37:2
**one (32)**
6:20;7:13;12:14;
23:10,19;44:1,9;46:2,
22,24;48:3,5;49:16,
17;51:5;52:5;65:19;
68:23;73:13;79:2;
94:19;95:12;105:16;
109:10;115:23,24;
116:2;117:14;120:20;
123:4;124:8,16
**ones (2)**
5:1,2
**online (10)**
108:4;114:23;
116:6,7;117:6,8,12;
118:23;119:4;123:11
**only (20)**
6:5,20;30:20,23;
39:5;45:24;47:24;
50:17,19;57:1;61:20;
66:24;96:18;107:9,
14;109:13;110:19;
115:1;119:7;125:1
**open (4)**
83:5;86:23,24;
105:16
**opened (3)**
78:16;83:4,6
**opinion (1)**
6:11

**opportunity (5)**
43:4;45:9;53:10;
102:15;103:24
**options (1)**
110:16
**ordered (1)**
68:19
**original (2)**
25:23;26:2
**out (27)**
32:14;34:3;38:16;
40:15,17;49:6,6;
61:22;72:6;73:3;80:9;
83:17;87:1,3;88:17;
89:21;93:19;96:1;
105:5,10;110:16;
120:12;121:10;
124:24,24;125:4;
126:6
**Outside (4)**
30:11;87:2;90:17;
96:6
**outstanding (1)**
115:16
**over (13)**
26:1;38:17,24;68:5;
79:9,23;80:12;109:1,
5,24;112:14;118:16;
120:2
**own (7)**
44:19;53:9;68:3;
71:7;84:13;114:18;
120:10
**owns (1)**
123:24
**Ozzie (6)**
120:20;121:1,9,16,
17;123:21
**O-Z-Z-I-E (1)**
120:21

**P**

**pack (1)**
106:24
**page (4)**
42:1,18;83:20,21
**paper (6)**
43:9;49:13;50:3;
67:16;89:15;101:14
**papers (6)**
27:3;62:13;111:23;
113:15;120:2,4
**Papineau (5)**
49:8;92:23;94:22;
103:21;104:1
**Papineau's (2)**
48:24;94:23
**paralyzed (2)**
71:18;125:19
**Pardon (1)**
65:17
**parent (4)**

48:23;50:17,19;
87:10
**parentis (1)**
38:20
**parents (15)**
48:19,21;49:18;
79:12;81:16,18,20;
87:18;88:15;93:4,6,8,
18;94:3;98:19
**part (3)**
47:21;84:14,15
**particular (2)**
36:19;78:13
**parties (1)**
4:8
**partner (6)**
15:14;55:2,6,18;
57:11;66:8
**party (2)**
5:23;96:3
**passed (2)**
58:4;94:20
**passenger (1)**
92:6
**past (3)**
4:20;39:24;62:16
**pathologist (4)**
64:17,19;71:4,8
**pathologists (1)**
70:20
**pathology (9)**
39:22;59:1;69:18,
19,22;70:2,4;71:1,7
**patient (3)**
65:15,18;66:16
**pattern (1)**
38:6
**people (22)**
17:13,17;18:4;
30:16;38:19;70:4;
73:19;75:23;76:10;
85:2;96:22,23;98:14;
99:20;103:7;120:14,
16,16;124:14;126:3,4,
15
**Per (1)**
106:16
**percent (3)**
14:4,7;39:11
**perception (1)**
123:14
**perform (2)**
79:8;87:23
**performed (1)**
69:1
**perhaps (1)**
85:3
**period (3)**
68:1,7;125:13
**person (11)**
6:6;38:11;41:4;
43:18;47:18;48:20;
57:19,21;76:20;

105:24;117:13
**personal (3)**
5:24;17:22;20:4
**personally (1)**
105:18
**phone (39)**
16:5,12,15,18;19:9;
20:2;22:16;24:16,24;
25:1;27:15;28:10,13;
29:16;32:24;33:10,
17;35:12;38:3,13;
41:20;53:13,24;
54:24;55:3;56:10;
57:2,9;62:17;63:19;
64:20;71:6,14,19;
75:3;80:16;101:16,
18;112:8
**phonetic (1)**
124:17
**physicals (3)**
58:9;66:9,12
**piece (3)**
43:9;49:13;50:3;
67:16
**pill (1)**
74:6
**pills (8)**
53:19;54:2;74:6,15,
15;76:1,1,9
**pilot (1)**
58:6;66:14,19,20
**pipe (2)**
37:2,5
**place (2)**
33:4;87:2
**placed (2)**
110:17,19
**planned (1)**
19:22
**plans (1)**
19:24
**player (1)**
48:13
**players (1)**
48:5
**please (4)**
4:11;24:20;106:24;
113:24
**PM (3)**
62:22;78:20;127:4
**point (8)**
6:12,14,22;25:13;
31:21;56:13;57:17;
72:16
**Police (6)**
14:12,13;41:1;
52:14;125:14,18
**policeman (1)**
61:18
**policy (3)**
22:11;37:9;43:10
**Polly (2)**
17:20,21

**Pombert (1)**
8:21
**P-O-M-B-E-R-T (1)**
8:23
**population (2)**
125:22,23
**portion (3)**
24:21;107:1;114:1
**portions (1)**
125:23
**position (1)**
6:9
**positions (1)**
109:12
**possess (2)**
41:4,6
**possessed (1)**
76:3
**possessing (6)**
28:18;41:7;60:18;
74:11;77:8;89:2
**possession (9)**
34:23;50:6;52:16;
57:3;77:3;93:12;
101:2,8,13
**possibility (1)**
54:11
**possible (3)**
41:6;59:7;71:19
**Possibly (3)**
29:3;40:1;81:17
**posted (1)**
116:12
**pot (1)**
120:12
**potential (1)**
52:1
**practice (11)**
7:1;11:21;12:5;
13:9;14:2,2,4;15:8;
52:3;55:10;58:11
**practiced (7)**
7:2,5,9;13:21;
14:15,22;30:4
**practices (1)**
48:10
**practicing (3)**
4:21;7:14;11:19
**pre-filled (1)**
34:3
**prejudice (1)**
9:19
**prejudicial (1)**
95:5
**premises (2)**
106:18;107:6
**prepared (2)**
95:4;102:7
**prescription (3)**
52:24;53:2,20,21;
54:3;59:9
**presence (2)**
74:7,16

**present (17)**
10:11;18:15,18;
35:11;45:4,9;63:17;
70:23;84:16;85:2;
91:13,20,21;94:3;
96:14;97:2;99:14
**presented (10)**
28:16;31:14;33:16;
42:8,20;43:6,8;47:1;
94:15;105:1
**pressure (2)**
69:5,13
**presumably (1)**
35:10
**pretty (2)**
15:16;121:21
**prevent (1)**
23:6
**previously (2)**
73:22;119:15
**pride (1)**
123:15
**principal (4)**
9:6;24:15,16;74:8
**principal's (1)**
11:12
**prior (10)**
18:19,22;23:10;
37:10,15;42:17;47:3;
67:11;70:1;115:14
**private (1)**
67:4
**pro (1)**
7:8
**probably (22)**
7:10,19;15:13,13;
16:2;30:7;55:20;56:7,
9;59:20;62:20;63:1;
64:23;66:9;69:11;
72:18;80:13;83:7;
88:1;108:15;120:15;
121:8
**probation (1)**
49:23
**problem (12)**
16:21,24;17:6;18:7;
19:10,14,17;26:3,12;
73:4;98:11;116:3
**problems (4)**
22:17,18;89:9;
124:11
**procedural (2)**
45:8;58:16
**Procedure (12)**
4:10;20:11;40:16,
18;43:23;44:15,19;
46:18;53:6;63:4;
67:15;86:6
**Procedures (4)**
42:3;53:9;58:11;
68:13
**proceed (1)**
30:2

**proceeding (1)**
114:6
**proceedings (1)**
98:13
**process (4)**
43:23;45:8;93:14;
118:11
**proctor (3)**
114:22;117:17,23
**produced (1)**
46:22
**profanity (2)**
86:16,19
**prohibited (2)**
105:20,22
**promise (2)**
61:20;62:8
**proof (1)**
47:1
**properly (1)**
112:15
**property (1)**
86:9
**proposed (1)**
42:15
**prosecutor (2)**
98:10;102:23
**protect (2)**
38:18;99:21
**protective (1)**
38:22
**prove (1)**
45:10
**proved (1)**
39:6
**provide (1)**
76:2
**provided (2)**
41:24;43:2
**provides (2)**
36:15;44:13
**public (4)**
43:12;105:5,7;
115:17
**published (1)**
43:10
**publishes (1)**
44:12
**pulled (2)**
111:21;125:3
**pumps (1)**
126:12
**punished (2)**
79:23;80:2
**punishing (1)**
80:4
**punishment (1)**
48:17
**purpose (7)**
20:9;26:23;38:18;
70:16,16;77:6;110:14
**purposes (1)**
38:20

**pursuant (3)**
4:7,9;107:6
**pursued (1)**
124:12
**pushed (1)**
34:2
**pushing (1)**
87:3
**put (3)**
26:4;27:1;37:3
**putting (1)**
101:11

**Q**

**quantity (1)**
70:24
**quarter (3)**
55:20;62:20;83:7
**Quest (9)**
59:4;64:19;68:1;
70:21;71:5,7;78:2;
79:10;82:8
**quite (3)**
17:7;45:20;112:22
**quote (2)**
27:19;42:12

**R**

**radio (1)**
124:1
**railroad (1)**
42:22
**raised (1)**
86:13
**raising (1)**
113:8
**rather (1)**
96:4
**read (8)**
24:20,22;67:22;
102:6;106:24;107:2;
113:24;114:2
**reading (1)**
8:2
**really (3)**
73:13;95:2;98:8
**Reason (14)**
5:23;6:14;9:22,24;
10:3;20:23;32:17;
36:4;61:21;65:22;
72:22;91:24;107:12;
112:21
**reasons (1)**
36:16
**recall (7)**
15:11;17:16;18:2,3;
48:18;92:2;95:10
**receive (4)**
7:18;88:13,14;
117:9
**received (7)**

**11:10;16:4,8;17:4;**
88:12,18;119:2
**recent (1)**
39:24
**receptacles (1)**
67:13
**reception (1)**
84:23
**recognize (1)**
32:15
**recollection (5)**
25:6,14,15;91:4;
102:3
**recommendation (2)**
20:19;21:15
**recommendations (3)**
22:12,22;23:2
**record (21)**
4:6,12;6:7,13,17,
21;7:24;8:3;24:22;
25:17;102:2,4;103:6,
17;104:7;107:2;
112:19;113:7;114:2,
3;120:1
**records (2)**
23:22;24:2
**refer (1)**
25:16
**referenced (1)**
89:9
**references (1)**
42:23
**referred (2)**
89:12,13
**referring (5)**
25:5;44:3,5,9;
119:21
**reflect (1)**
120:1
**refresh (2)**
25:6;38:2
**regard (1)**
6:19
**regarding (2)**
6:18;46:2
**regiments (1)**
119:8
**registered (2)**
65:15,18
**reinstate (1)**
113:4
**relative (1)**
95:5
**reliable (1)**
68:20
**remarks (1)**
113:9
**remember (32)**
15:1;21:8;38:2;
52:21;56:12,20,24;
57:14,16;69:7;71:8,
15;72:13,18;73:10;
75:14,15,18,20;79:11,

**11:10;16:4,8;17:4;**
94:3;95:9;100:14;103:17;
104:6;109:6;118:24;
124:15
**repeating (1)**
118:11
**report (2)**
10:23;39:22
**reported (1)**
46:5
**reporter (5)**
24:22;104:17,19;
107:2;114:2
**represent (5)**
30:13;51:23;72:17,
24;74:20
**representation (1)**
37:14
**representative (1)**
58:15
**represented (1)**
30:5
**representing (2)**
5:15;32:14
**reprisals (1)**
51:8
**reputation (12)**
119:20,21;120:6,9;
121:22;122:4;123:20,
21;125:6,16,21,22
**request (10)**
26:1,8;29:12;46:9;
68:10;83:23;88:10;
90:4;93:6;113:1
**requested (3)**
24:21;107:1;114:1
**requesting (1)**
25:17
**requests (2)**
26:4;112:17
**required (2)**
24:6;43:19
**research (1)**
5:5
**researching (1)**
108:8
**reside (1)**
8:14
**resides (1)**
8:16
**resources (1)**
51:21
**respect (1)**
112:21
**respond (1)**
43:4
**responded (1)**
30:5
**response (9)**
28:1;40:7;46:3;
60:6,16;74:13,24;
119:17,19
**responses (1)**

Min-U-Script®

42:1;112:24
**rest (1)**
36:22
**restrictive (3)**
44:13,14,20
**result (2)**
22:16;125:16
**results (11)**
40:14,15;64:18;
69:20,23,23;70:8;
79:1,10;82:9;85:20
**retire (1)**
12:4
**retired (5)**
11:24;12:3;14:1;
66:11;125:17
**retiring (1)**
55:14
**retrofits (1)**
13:7
**return (2)**
35:20;107:17
**review (13)**
7:22;46:10,13,16;
88:10,15,16,17;89:19,
24;90:2,5,11
**reviewed (1)**
64:18
**reviewing (1)**
26:10
**rewrite (1)**
26:20
**rewriting (3)**
25:21;26:2,23
**rewrote (1)**
26:19,21
**rid (1)**
64:16
**ridiculous (1)**
17:7
**right (14)**
36:17;38:17;42:11;
61:24;76:22;83:17;
88:15,16;89:19,24;
90:2;93:13;112:1,3
**rights (1)**
45:8
**Riverside (13)**
39:22;59:1;63:5;
64:18;65:16;67:2;
68:22;69:17,18,22;
70:7,21;71:2
**Robert (1)**
55:7
**room (28)**
27:5,7,14;35:11,14;
37:2,3;58:21,22;63:6,
10,17;65:7,9,11,15,
22;77:15;95:24;96:4,
8,14;97:1;98:20;
100:8;104:13,17,20
**ruin (1)**
73:6

**Rule (4)**
111:24;112:18;
113:15;122:20
**Rules (14)**
4:10,10;7:22;8:1;
37:19;38:3;44:13,14,
17,19,20;97:22,23;
114:18
**rural (1)**
121:4

**S**

**sailing (2)**
116:17;117:2
**SAITH (1)**
127:5
**same (13)**
15:24;39:12;47:19;
48:20;49:12,19,20;
50:3;73:4;115:12;
120:17;124:20;
125:10
**sample (9)**
50:1,4;58:24,24;
67:14;68:1;69:17;
70:6;71:10
**samples (2)**
70:2,6
**sampling (3)**
68:2;69:19;70:5
**sanctionable (2)**
111:23;112:18
**Sargent (1)**
13:6
**sat (1)**
86:23
**Saturday (2)**
50:1;94:19
**saving (1)**
31:3
**saw (4)**
80:11,13,13;100:20
**saying (8)**
11:6;37:5;43:9;
44:8;50:3;105:20,21;
107:9
**scan (1)**
79:2
**scanned (1)**
79:4
**scenario (1)**
115:17
**schedule (1)**
108:17
**scholastic (1)**
119:11
**School (191)**
9:5,5,7,10,13;10:2,
7,9;12:7;14:22;15:20;
16:5,9,20;17:1,10,24;
18:6;19:11;20:1,13,
15;21:24;22:4;23:5,

22;24:14;27:20,21;
28:4;29:5;30:4,6,8,
11;31:4,18;32:1,6;
34:22;35:6,7,16,20;
36:1,13,14;37:9,15,
23;38:9,17,24;39:3;
40:8,11,15,19,24;
41:9;42:2,8,21;43:6,8,
10;44:12,17,18,24;
45:1,4;46:10,14;
47:21,23;48:1;51:7,9;
53:4,5,8;54:8,10,16,
21;55:1,24;57:23;
61:22;64:11;67:23;
72:7;73:2,3;75:23;
76:3;77:4,8;78:16;
82:12,20;83:4,5,8,17;
86:9,10;88:2;89:10;
90:4;92:8,8;93:9;
94:21;100:1,4;
101:19,21;103:2,2,15;
104:12;105:23,23;
106:2,7,8,12,16,17,
18;107:5,17,19,23,24;
108:4,7,9,14,18,24;
109:4,20,21,23;110:1,
2,11,17,19,21,24;
111:5,9;114:14,17,18,
20,23;115:2,5,10,11,
11,14,17;116:6,7,17,
18;117:2,13,18;118:6,
23;119:4,5,8,9,10,11,
12;120:12;121:10,11,
13;124:4;125:4;126:6
**schoolbook (1)**
89:11
**schooled (3)**
108:10;109:17;
115:13
**schooling (1)**
109:9
**Schools (5)**
45:3;108:8;116:1,
19,21
**school's (1)**
20:10
**Schunke (3)**
48:4,5,9
**scientific (1)**
47:1
**scientifically (4)**
39:6;40:6,21;101:5
**scope (1)**
5:12
**Scout (1)**
126:7
**screening (3)**
39:22;59:2;64:18
**screwed (1)**
41:16
**scuba (1)**
117:1
**seal (1)**

70:6
**second (3)**
23:13;58:24;59:2
**seconds (3)**
38:5;44:7;99:20
**secretary (3)**
83:11;84:21;85:3
**seeing (1)**
95:10
**seek (1)**
122:7
**seem (1)**
76:11
**Seemed (1)**
65:4
**selective (1)**
48:16
**selling (1)**
120:14
**semester (7)**
22:24;110:3;
115:12;116:7,11,13;
118:13
**send (2)**
26:8,11
**sent (12)**
40:9;59:3;71:5;
78:21,22,23,24,24;
90:3,6;93:16;105:21
**sentence (1)**
96:3
**separate (1)**
115:10
**separately (1)**
92:1
**session (4)**
104:16,19;105:17;
123:5
**sessions (1)**
123:1
**set (5)**
44:20;47:8,9,10;
119:22
**sets (1)**
88:17
**setting (1)**
62:6
**settlement (1)**
31:1
**seven (1)**
63:1
**seventh (1)**
11:18
**several (2)**
9:3,6
**severe (2)**
125:12,19
**shall (2)**
42:13;43:2
**SHARI (1)**
4:5
**shoes (2)**
38:7,9

**shook (2)**
33:7;86:22
**short (6)**
29:21;51:4,10;
71:24;104:23;105:3
**shortly (2)**
33:1;108:15
**Short's (2)**
49:18;94:16
**show (7)**
41:15;62:5;68:7,8;
69:6,6;119:15
**showed (4)**
40:7;45:18;50:4;
78:9
**showing (1)**
95:17
**shows (2)**
40:4,22
**shuffle (1)**
27:2
**side (6)**
32:19;71:18;119:9,
11,11;125:20
**sign (16)**
28:17,21,23;29:5;
32:3;34:7;37:5;39:12,
13;49:13;50:3,24;
51:3,4;52:8,10
**signature (5)**
32:8,16,19;34:12;
36:2
**signatures (3)**
32:13;34:10;112:16
**signed (13)**
21:23;31:23;32:10,
24;33:6,14;34:3,4,5;
51:5,6;111:23;113:15
**signing (8)**
32:20,21;33:11,14;
45:12;47:16;48:8;
89:15
**signs (2)**
19:6;95:20
**similar (3)**
47:16;51:5;52:8
**similarly (1)**
47:4
**single (3)**
5:6;59:8;95:12
**sit (1)**
112:8
**Sitting (1)**
59:23
**situation (2)**
4:22;98:8
**small (2)**
14:6;125:12
**smiled (1)**
121:20
**smiling (2)**
114:4,5
**smoke (1)**

19:4
**smoking (1)**
120:12
**snide (1)**
113:9,10
**snidely (1)**
113:9
**snorting (2)**
120:13;121:11
**social (4)**
12:21;15:13,18;
126:2
**solve (1)**
22:19
**somebody (6)**
37:2;61:19;72:8;
112:11;122:1;125:11
**somehow (2)**
72:10,14
**sometime (10)**
10:12;26:21,22;
59:15;66:13;71:6,23;
72:2;114:10;123:7
**somewhere (3)**
16:2;55:21;120:3
**son (33)**
8:16;9:3,9,13,23;
10:4;11:1;29:5,7;
30:13;31:15;32:10;
48:7;50:24;51:5;
55:23;56:17;57:18;
58:3;59:11,17;74:20;
75:12;86:8,9;99:21;
101:17;106:11,17;
107:16;126:6,6,7
**son's (12)**
8:18,19;18:15;32:8,
16,18;52:8;56:11;
77:20,24;81:6;126:5
**soon (6)**
46:6;78:16;83:4;
111:21,22,22
**sophomore (2)**
118:9,12
**sorry (7)**
12:18;49:15;66:7;
95:16;97:13;121:16;
125:9
**sort (2)**
10:7;122:2
**sought (1)**
122:9
**sparked (1)**
14:14
**speak (9)**
28:6;35:17;90:10;
96:8;97:9;102:2;
104:7;113:1;118:21
**speaker (11)**
25:1;27:15;28:10,
13;29:16;32:24;
33:10,17;35:12;
63:18;101:18

**speaking (3)**
81:17;87:14;119:23
**speaks (2)**
102:4;103:17
**specific (6)**
15:5;16:22;84:24;
93:22,23;125:23
**specifically (10)**
15:1;34:22;47:12,
13;68:16;72:19;
79:15;80:14;99:8;
121:9
**spell (7)**
4:12;8:12,22;32:14;
55:8;107:24;124:18
**spoke (6)**
46:1;48:19;53:13;
85:13;105:14;114:19
**spoken (1)**
81:16
**spontaneously (1)**
74:19
**spring (3)**
110:3;116:5;118:13
**sprung (1)**
99:17
**staff (3)**
28:5;38:10;40:11
**standard (3)**
42:9;21;115:13
**standing (4)**
110:20,23;111:6;
115:3
**star (1)**
48:5
**start (6)**
12:23;15:5;49:2;
81:13;112:14;119:12
**started (9)**
39:9;50:18,21;
61:15;66:11;115:12;
118:6,9;123:8
**starting (2)**
99:19;115:11
**state (12)**
4:11;7:6;14:12;
36:14;37:10;42:24;
43:20;44:3,4,13;45:7;
97:23
**stated (2)**
105:16;123:19
**statement (6)**
10:16;18:23;36:17;
43:9;62:4;115:8
**statements (3)**
39:10;47:11;125:5
**States (1)**
68:15
**station (1)**
124:1
**status (1)**
123:16
**Statute (3)**

42:24;44:5,9
**stay (5)**
35:24;63:22;82:2;
96:1,4
**stayed (2)**
82:4;98:17
**steel (1)**
13:4
**Steel/American (1)**
13:5
**step (1)**
32:2
**Steven (1)**
36:7
**still (12)**
12:1,1;18:14;21:19;
55:10,12,13;63:7;
75:3;81:9;85:6;
125:21
**stop (5)**
73:4;111:24;112:2,
3;120:18
**stopped (2)**
125:18,20
**store (1)**
126:11
**Storm (4)**
17:20,21;120:20;
123:21
**S-T-O-R-M (1)**
120:23
**story (4)**
37:14;39:8;73:1;
74:19
**straight (3)**
30:21;115:20,22
**strange (1)**
17:14
**Street (3)**
11:18;62:11,12
**structural (1)**
13:4
**student (25)**
17:5;18:9,9,10;
31:10;34:14;36:6,13,
15;37:6,14,23;42:3,5,
13;43:2,4,15;45:5;
48:3;81:9;88:16;
115:20,24;116:4
**students (19)**
19:3;27:10;28:4,5;
38:10;39:10;47:4,15;
48:3,18;79:13;85:9;
87:19;88:8;93:4,7,8,
18;94:3
**student's (1)**
57:8
**students' (1)**
48:18
**stuff (2)**
48:14;69:5
**stupidity (1)**
9:19

**subject (1)**
21:13
**submit (1)**
93:3
**submitted (1)**
71:12
**substance (7)**
19:7;57:5;59:10;
73:10,12;79:20;
123:16
**substances (1)**
58:13
**successfully (1)**
116:7
**succinctly (1)**
68:8
**suggest (1)**
113:20
**suggested (1)**
68:11
**suggesting (1)**
88:15
**summary (1)**
42:16
**summer (3)**
116:14,16;123:10
**summoned (1)**
96:19
**Superintendent (4)**
45:2;90:6;105:23;
110:10
**supervise (1)**
112:12
**supports (1)**
42:16
**supposed (10)**
48:14;88:14;89:18,
22;90:1,17,24;97:22;
100:17;117:11
**Supreme (1)**
42:24
**sure (22)**
5:18;17:18;21:18,
22;23:19;34:4;52:22;
56:18,22;67:10;
72:11,12,15;79:19;
80:11,13;88:21,22;
89:15;111:3;122:21;
124:11
**surgeon (1)**
58:7
**surprise (1)**
95:5
**suspended (24)**
9:9,13;10:3,5;17:4,
14;30:9;31:19;34:21,
23;37:16;39:14;
40:23;43:21;47:24;
50:8,11;51:11;73:5;
86:8,10;110:13;
111:7;114:10
**suspending (6)**
9:23;27:22;29:7;

35:8;42:13;101:21
**suspension (27)**
17:8;29:12;35:21;
36:1,6,13,21;37:9,20;
38:11;42:2,15;43:2;
46:5,10,13,19,21;
50:5;51:13;61:10;
88:11;89:20;90:5,11;
106:16,23
**suspensions (1)**
51:17
**sustain (1)**
46:21
**swallowed (1)**
74:7
**swallowing (1)**
101:12
**sworn (2)**
4:3;14:13
**system (9)**
7:12,16;18:6;39:24;
40:5;49:24;70:19;
78:10;108:22

---

**T**

**table (2)**
59:23;76:10
**tablet (1)**
73:13
**TAGUE (17)**
26:3,7;88:9;91:12,
13,17,18;92:3,5,18,
21;93:1;96:7;97:4;
102:9;113:6,20
**talk (13)**
34:3;51:2;56:13,15;
59:17;63:9;65:21;
75:11,17,19,21;78:15;
95:23
**talked (33)**
39:1;41:19;47:18;
48:20,20,21,22,23;
49:1,17,19;50:14;
52:21;55:18;56:16;
57:11,15;62:3;63:13;
71:8,11,22;72:19,20;
76:7;87:17,18;88:9;
98:18;99:19;100:21;
117:20,24
**talking (9)**
53:6;54:12,13;
71:24;88:6,8;100:4;
107:7;126:24
**taped (1)**
67:12
**taping (1)**
67:16
**taxpayer (1)**
107:13
**teacher (9)**
20:18,21,22;21:5,9,
10;23:3,4;100:21

**teachers (4)**
20:15;22:23;38:10;
100:19
**technically (1)**
115:18
**telephone (3)**
62:15;80:7,19
**telling (6)**
30:16,21;74:14,19;
93:14;95:1
**temperature (1)**
96:5
**ten (13)**
27:22;29:7;34:22;
35:8;39:15;47:24;
51:11;64:1;99:24;
100:7;101:22;121:8;
125:1
**test (41)**
39:5,21;40:4,14,15,
21;47:12;56:20;58:4,
4,6,17,23,23;59:3,5,6,
7;61:23;62:2;64:14;
66:1,3,23;67:17;68:6,
17,18,19,22;69:3,20,
24;71:3,12;78:9;82:9;
85:20;89:4;94:19;
121:19
**testified (9)**
4:3;5:6;10:17;
18:18;32:7;92:24;
100:9;103:10,21
**testifies (2)**
102:9,13
**testify (11)**
92:20,22;93:7,9;
94:4,17,23;95:4;
96:19;103:19;104:9
**testimony (4)**
5:7;10:18;47:4;
105:8
**testing (3)**
58:13;59:3;68:3
**tests (3)**
45:18;64:14;69:1
**texts (2)**
80:18,19
**theft (1)**
13:19
**thereafter (1)**
108:16
**therefore (2)**
36:16;93:12
**thinking (1)**
126:5
**though (3)**
61:1;82:17;93:15
**thought (10)**
30:2;38:6,12,14;
40:12;48:22;76:19;
111:1;126:7,8
**thoughts (1)**
123:17

**thousand (2)**
14:11;66:10
**threat (3)**
46:4;61:3;107:9
**threaten (2)**
37:3;61:6
**threatened (7)**
32:20;37:16;60:10,
15,23;61:21;121:19
**threatening (1)**
89:14
**three (7)**
5:7;13:7;54:23;
66:20;73:18;96:3;
116:2
**threw (1)**
120:2
**throughout (3)**
7:7;112:22;114:6
**throw (1)**
73:2
**thrown (1)**
61:22
**Thursday (2)**
52:24;78:6
**till (2)**
62:20;83:7
**times (6)**
4:17;5:8;20:4;
23:23;66:21;119:14
**timing (3)**
57:17;117:4,9
**title (1)**
24:13
**tobacco (1)**
123:17
**today (8)**
27:22;35:7;41:3,10,
13;81:7;101:21;107:7
**together (2)**
63:24;91:19
**told (99)**
10:5,9,10,14,15,17,
20,22;11:1,1,2;16:19;
20:15,18;21:5;22:17;
24:18;31:4;32:4,5,19;
33:20,24;34:1;35:13,
14;36:19;37:7;39:3;
40:10;41:1,8,11,16,
20;42:21;45:21;
47:19;49:3,11,11,12,
18,20;50:16;51:24;
52:23;55:2;57:14;
60:2;61:1,2,8;62:4;
63:2,3,3,5;64:6,15,17;
65:12,24;67:24;
68:21;70:3,20;71:1;
72:11;73:1,12;74:5,8,
9,10,18,19;75:3,8,8,9;
78:8;79:4;82:15;
93:10;94:1;97:14,20,
23;98:15;100:18,18;
101:14,16;109:8;

119:6,14;121:18;
124:6
**tolerance (5)**
58:5,18;64:14;
70:23;71:9
**Tom (6)**
53:14,18,23,24;
54:9;75:9
**tone (1)**
126:19
**tonight (1)**
97:17
**took (18)**
9:24;10:9,11;33:4;
41:9,14,17;45:18;
52:17;69:4;74:15;
76:8;87:2;94:19;96:2,
2;98:12;108:21
**top (1)**
116:2
**total (1)**
58:1
**touch (1)**
87:4
**town (4)**
121:3,5;125:8,12
**tranquilizer (1)**
70:17
**transactional (1)**
5:3
**transcript (3)**
26:10;32:6;67:22
**transferability (1)**
119:3
**transferable (3)**
109:22;110:5;115:6
**transferred (5)**
109:1,5,20;115:5;
118:16
**transferring (1)**
118:22
**trash (1)**
21:21
**treat (2)**
113:11;126:4
**treated (4)**
106:14;112:21;
113:11;115:15
**triaged (1)**
66:2
**trial (4)**
5:12;7:4,6,11
**tried (6)**
14:18;40:13;75:17,
19;85:22;106:21
**Troy (1)**
124:17
**true (5)**
28:14;45:19;76:23;
106:21;121:18
**Trust (1)**
124:1
**try (6)**

20:10;22:19;73:2;
74:20;98:3;112:7
**trying (3)**
64:13;107:5;118:2
**Tuesday (1)**
78:5
**turn (1)**
26:1
**turned (1)**
50:1
**Twice (1)**
20:6
**two (22)**
14:11;16:7,15;
33:24;34:10;37:2;
42:23;44:7;66:9,20;
69:11,13;73:18;
84:11;86:12;96:21;
99:20;103:3;115:11,
14;116:16;117:7
**two-sample (1)**
58:23
**type (3)**
14:9;89:18;97:24
**types (1)**
113:2
**typical (1)**
56:8

**U**

**unconditionally (3)**
109:11,13,16
**unconstitutional (1)**
95:6
**Under (16)**
4:19;7:1;19:6;
43:19,20,24;97:22,22;
100:19,20,23;107:9;
111:23;112:18;
113:14;122:20
**undergraduate (1)**
12:9
**understood (1)**
54:5
**undertaken (1)**
46:18
**undue (1)**
64:13
**United (1)**
68:15
**University (1)**
12:10
**unknown (1)**
72:22
**unrefutable (1)**
47:1
**untrue (1)**
43:11
**unusual (1)**
80:19
**up (41)**
16:9;17:13;21:23;

30:12,14,22;31:2;
33:5;34:6;35:24;37:2,
5;39:10,14;40:8;
41:15,16;44:6,7,11;
48:1;50:1,4;52:23;
55:1;57:9;61:11;62:6;
66:9;68:7,8;81:22;
88:9;95:17;113:19;
115:9;120:11;122:18;
124:8;126:20,21
**upon (1)**
46:9
**urinalysis (5)**
68:4;69:2,12,24;
71:12
**urine (5)**
49:24,24;66:23,24;
67:10
**usage (2)**
81:1;93:19
**use (15)**
25:11;27:21;35:6;
64:13;68:6;71:19;
80:16;86:16,19;
93:11;96:4;97:17;
98:16;101:20;122:3
**used (3)**
44:14;66:8;67:14
**using (2)**
121:11,12
**usually (2)**
19:24;95:15

**V**

**vehicle (1)**
92:6
**venues (1)**
7:6
**verbal (1)**
42:14
**vice (1)**
7:8
**violated (1)**
53:9
**violation (1)**
113:15
**Virgin (1)**
116:20
**visit (2)**
15:14;77:14
**visited (1)**
80:9
**voice (2)**
86:13;113:8
**volunteered (1)**
125:13
**volunteering (1)**
125:18
**vote (1)**
105:16

**W**

**Wait (9)**
33:23,23;38:17,24;
40:9;65:1,2,3;98:4
**waited (1)**
69:20
**waiting (3)**
90:17;96:6;97:19
**waive (2)**
7:23;127:3
**waiving (1)**
8:2
**wake (1)**
81:22
**walk (1)**
70:7
**walked (3)**
49:6;99:19,20
**walking (2)**
49:6;83:17
**Wall (4)**
62:11,12;84:22;
85:3
**wants (1)**
73:6
**washes (1)**
126:13
**wasting (1)**
98:4
**water (1)**
67:13
**Watseka (46)**
8:6;9:7;15:20;
16:20;17:1;21:23;
30:6,20;34:21;36:13;
37:15;42:2;43:10;
49:23;54:21;71:5;
81:9;106:9,10,12,14,
16,18;107:17;109:17,
20,23;110:20,24;
111:5,9,15,18,21;
114:13;115:2,16;
118:16,23;119:5;
124:6,8,10;125:4,14;
126:1
**waved (1)**
85:24
**way (19)**
41:8;44:1;46:16;
48:20;53:1;54:4;
56:11;59:12;73:12;
79:23;87:5,11;95:6;
101:9;117:1;120:5,6;
126:3,4
**ways (1)**
44:2
**weather (1)**
90:18
**Wednesday (1)**
78:6
**week (1)**

78:14
**weekend (8)**
79:9,14,18,24;
80:10;81:15;89:4;
90:4
**well-disciplined (1)**
18:9
**well-established (1)**
44:15
**weren't (1)**
95:23
**What's (9)**
8:10;12:18;24:17;
31:7;41:22;56:8;
70:11;105:2;119:15
**whatsoever (7)**
40:5;42:20;75:18;
77:6;88:19;98:1;
100:16
**whenever (1)**
78:23
**Whereupon (6)**
24:21;29:24;39:18;
77:11;107:1;114:1
**wherewithal (1)**
58:16
**whichever (1)**
10:8
**whole (6)**
58:12;61:9,22;73:3,
7;114:6
**whose (3)**
34:8;81:20;119:21
**wife (60)**
8:9;9:3;10:5,15,20;
11:1;16:5,8,11,17,18;
19:8,13,19;21:24;
25:2;27:16;28:6,9,20;
29:4;31:24;32:5;33:5,
7,9;34:6,15;46:6,9;
54:19;55:23;57:15;
59:11,17,19;63:9,19;
69:10;80:16,22,24;
81:3;82:4;84:18;85:3;
87:4,7,9,11,13;91:9;
92:21;93:1;96:7;97:2;
101:17;103:19;
114:12;125:2
**wife's (1)**
8:10
**window (1)**
84:22
**Winter (1)**
48:15
**within (6)**
33:1;55:15,15;
78:14;84:13;109:24
**without (5)**
25:10;39:6;41:4,6;
93:14
**witness (3)**
101:23;104:2;
112:19

**witnesses (11)**
76:5;92:10,13,20;
94:14;95:4;96:9,18;
100:2;103:3;104:9
**word (5)**
35:23;45:24;46:2;
89:21,22
**words (2)**
32:14;101:18
**work (17)**
12:9;24:3;36:1;
39:14;48:1;61:11,18;
81:24;111:2,6,8,11;
115:10;117:1,10;
118:2;120:15
**worked (2)**
121:6,7
**working (1)**
70:4
**world (1)**
68:20
**worse (1)**
37:4
**worth (1)**
6:11
**worthless (1)**
76:19
**wrath (1)**
124:3
**write (2)**
25:19;78:17
**writing (8)**
26:5,9;36:15;42:9,
12;43:11;100:17;
119:2
**written (2)**
36:16;42:14
**wrote (6)**
25:21;71:4;78:7,22;
89:5,8

**Y**

**year (24)**
12:16,24;36:22;
47:23;48:12,15;61:9,
22;66:16,22;73:3;
88:21,22,24;106:22;
107:6;109:15;118:12;
119:7,13;124:20,20,
24;125:14
**years (12)**
4:21;5:4;15:14;
30:7;37:15;38:1;58:6,
7;119:7,13;121:8;
126:14
**yell (1)**
59:24
**yelled (2)**
59:18;113:12
**yelling (3)**
59:21;72:1;112:20
**Yep (2)**

103:9,11
**young (1)**
30:6

**Z**

**zero (7)**
58:5,18;59:8;64:14;
70:23;71:9;96:6

**0**

**02 (2)**
66:16,22

**1**

**1 (7)**
29:24;31:8;32:14;
45:7;47:17;101:2;
119:16
**10:00 (2)**
77:18;78:20
**100 (1)**
39:11
**105 (2)**
43:1;44:10
**10-day (1)**
61:10
**11 (3)**
111:24;112:18;
113:15
**11th (6)**
35:20;106:3,19;
107:16,20;108:11
**12 (2)**
10:8;38:1
**12:41 (1)**
127:4
**120 (1)**
109:13
**12th (1)**
108:15
**13 (1)**
7:8
**15 (5)**
30:7;37:15;38:1;
105:4;120:16
**150 (1)**
71:10
**160 (1)**
109:12
**18 (1)**
70:22
**1800 (1)**
8:6
**1849 (1)**
8:6
**1975 (2)**
12:17;13:2
**1983 (1)**
13:1,2,8
**1987 (1)**

7:5
**1989 (2)**
7:10,19
**1997 (1)**
9:1

**2**

**2 (4)**
39:17,18;41:23;
42:19
**20 (3)**
70:22;96:5;120:16
**200 (1)**
11:17
**2000 (1)**
66:13
**2001 (3)**
14:1;66:16,22
**2002 (1)**
14:1
**2005 (1)**
66:13
**2010 (1)**
12:6
**2012 (8)**
20:8;21:11;22:7,24;
23:17;81:12;115:22;
118:16
**2013 (52)**
9:11;10:8,10,13,24;
11:8,9,13,22;15:1;
16:6;17:1;18:6,13,20;
19:9;20:5;24:11,17;
26:16;27:12;31:13,
18;34:17;35:21;36:7;
45:23;46:6;54:16;
60:20;69:2;80:15;
81:1,14;90:13;93:20;
94:4;95:11;96:10;
99:10;106:3,19;
107:16,20;108:11;
110:3;116:5,14,16;
118:7,13;123:7
**2014 (3)**
55:15;107:6;118:13
**24th (29)**
10:12;41:17,18;
53:2;54:12;93:12;
94:8,12;95:2,5,9,18,
19,20;96:10;97:14,
18;98:21;99:1,2,5,7,
10,23;100:4,10,11,14,
24
**25th (47)**
9:10;10:8,10,24;
11:5,6,7,13;15:1;
16:6;17:1;18:6,13,19;
19:9;20:5;24:11,17;
25:20,22;26:16;
27:12;31:13,17;
34:17;36:7;41:9,14,
21;45:23;46:6;47:22;

DIETCHWEILER v.
LUCAS, ET AL.

MICHAEL DIETCHWEILER
February 20, 2014

54:13,16;60:20;69:2;
93:11,20;94:4,24;
95:2,11;97:15,16;
99:23;100:5;101:22
**26 (1)**
  122:20

62:20,22
**60970 (2)**
  8:7;11:18

**7**

**7:30 (1)**
  83:6
**7034 (1)**
  12:22

---

**3**

**3.89 (1)**
  116:2
**3:30 (1)**
  19:21
**30 (1)**
  15:14
**31st (1)**
  12:6
**34 (1)**
  4:21
**35 (3)**
  15:21;58:6;126:14
**3rd (1)**
  9:1

**8**

**8:00 (1)**
  83:7
**8:30 (1)**
  84:10
**8:45 (2)**
  84:9,10
**8-14-53 (1)**
  12:19
**88 (1)**
  7:19

---

**4**

**4 (1)**
  119:17
**4:00 (1)**
  19:21
**4:30 (2)**
  55:22;59:15
**40 (6)**
  15:21;56:9;58:6,7;
  109:10,13
**45 (1)**
  16:2
**460 (1)**
  109:11

**9**

**9:59 (1)**
  4:1

---

**5**

**5 (1)**
  71:10
**5/10-20.14 (2)**
  43:1;44:10
**5:00 (2)**
  55:21,21
**5:30 (1)**
  59:15
**50 (1)**
  71:10
**500 (1)**
  62:11
**50-state (1)**
  108:9
**5th (4)**
  90:12,14;92:17;
  100:24

---

**6**

**6:00 (2)**