## In The Matter Of:

*DIETCHWEILER v.*

*LUCAS, ET AL.*

---

*ANN DIETCHWEILER*

*February 20, 2014*

---

*Area Wide Reporting and Video Conferencing*

*800-747-6789*

Original File 0220diea.txt

Min-U-Script® with Word Index

1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
2                 STATE OF ILLINOIS

3

4   NOAH DIETCHWEILER, by            )
    Michael Dietchweiler, his       )
    father and next friend; and     )
5   ANN DIETCHWEILER,               )
                Plaintiffs,         )  No. 2013-CV-2062
6           vs.                     )
    STEVE LUCAS, in his             )
7   official and individual         )
    capacities; JAMES BUNTING,      )
8   in his official and             )
    individual capacities;          )
9   KENNETH LEE, in his             )
    official and individual         )
10  capacities; IROQUOIS COUNTY     )
    COMMUNITY UNIT SCHOOL           )
11  DISTRICT NO. 9, IROQUOIS        )
    COUNTY, ILLINOIS; JAMES         )
12  BRUNS, in his official          )
    capacity; DON BECKER, in        )
13  his official capacity;          )
    BRENNA JOHNSON, in her          )
14  official capacity; CRYSTAL      )
    BLAIR, in her official          )
15  capacity; BOB BURD, in his      )
    official capacity; KIRK         )
16  McTAGGERT, in his official      )
    capacity; and DEE               )
17  SCHIPPERT, in her official      )
    capacity,                       )
18          Defendants.             )

19        DEPOSITION OF ANN DIETCHWEILER
                February 20, 2014
20                 2:30 PM

21    Amy Prillaman Buhr:  CSR #084-003275
    Area Wide Reporting and Video Conferencing
22            301 West White Street
            Champaign, Illinois  61820
23               (800) 747-6789

24

2

1                           INDEX

2

              APPEARANCES:

3
                     FLYNN, PALMER, TAGUE, LYKE & JACOBSON
4                    BY: Mr. Michael J. Tague
                     402 West Church Street
5                    Champaign, Illinois 61824-1517
                     (217) 352-5181
6                    Appearing for the Plaintiffs
                     LAW OFFICES OF LAWRENCE COZZI
7                    BY:   Ms. Shari D. Goggin-Ward
                     27201 Bella Vista Parkway, Suite 410
8                    Warrenville, Illinois   60555
                     (630) 791-6407
9                    Shari.goggin-ward@libertymutual.com
                     Appearing for the Defendants
10

11                   ALSO PRESENT:
                     Michael Dietchweiler
12

13                   EXAMINATION BY:

14   Examination                                  Page

15    BY: MS. SHARI D. GOGGIN-WARD:                 4
                (No exhibits marked)
16

17

18

19

20

21

22

23

24

3

1                              STIPULATION

2
                         IT IS HEREBY EXPRESSLY STIPULATED AND
3      AGREED by and between the parties that the deposition
       of ANN DIETCHWEILER may be taken on
4      February 20, 2014, at the offices of Flynn, Palmer,
       Tague, Lyke & Jacobson, 402 West Church, Champaign,
5      Illinois, pursuant to the Rules of the Federal Court
       and the Rules of Federal Procedure governing said
6      depositions.
                         IT IS FURTHER STIPULATED that the
7      necessity for calling the Court Reporter for
       impeachment purposes is waived.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

1               (Commencing at 2:31 p.m.)
2                    ANN DIETCHWEILER,
3   having been first duly sworn, testified as follows:
4   EXAMINATION,
5   BY: MS. SHARI D. GOGGIN-WARD:
6       Q.   For the record, this is the deposition of
7   Adrenne Dietchweiler, taken pursuant to notice and
8   agreement of all parties, taken pursuant to all
9   applicable local court, U.S. District Court rules and
10  federal court rules of the Code of Civil Procedure.
11              Miss Dietchweiler, could you please state
12  your full name and spell it for the record?
13      A.   Adrenne Rae Dietchweiler.  A-D-R-E-N-N-E,
14  R-A-E, D-I-E-T-C-H-W-E-I-L-E-R.
15      Q.   Miss Dietchweiler, have you ever given a
16  deposition before?
17      A.   I don't believe so.
18      Q.   I'm sure your attorney has gone over this
19  with you, but to review the rules for giving and
20  taking a deposition you have to answer all of my
21  questions out loud as opposed to with a gesture
22  because our court reporter is taking down everything
23  that we say, is that okay?
24      A.   Yes.

5

1       Q.    Excellent.  You also have to let me finish
2   my question before you start your answer because it's
3   very difficult for the court reporter taking down two
4   people talking at the same time.  And if you don't
5   understand one of my questions, please let me know
6   because I will be happy to repeat it or rephrase it
7   for you.
8            I don't know how long this is going to
9   take, kind of depends on you sometimes, but at any
10  time during the course of the deposition please feel
11  free to request a break.  My only request to you is
12  if there is a question pending you have to answer it
13  and then feel free to take your break, okay?
14       A.    Yes.
15       Q.    What is your current address?
16       A.    1849 North 1800 East Road, Watseka,
17  Illinois, 60970.
18       Q.    You live there with your husband and your
19  son; is that correct?
20       A.    Yes.
21       Q.    And your son goes away to school now at
22  Culver Academy; is that correct?
23       A.    Yes.
24       Q.    How long has he been at Culver Academy?

6

1      A.    Since August.

2      Q.    Of 2013?

3      A.    Yes.

4      Q.    We are obviously here about a lawsuit that

5  was filed on behalf of your son by your husband and

6  apparently yourself concerning an incident that

7  happened at Watseka High School.  You are aware of

8  that incident; is that correct?

9      A.    Yes.

10     Q.    Your son Noah, how did he get to and from

11 school back in the fall semester of 2012 at Watseka?

12     A.    I would drive him and pick him up.

13     Q.    Would that be you personally?

14     A.    Yes.

15     Q.    Was there a specific pickup area at Watseka

16 High School that you would do that at?

17     A.    Yes.

18     Q.    Where is that located?

19     A.    Right across from the front doors of the

20 school.

21     Q.    Is there a driveway that you park in or is

22 there a parking lot you wait for him?

23     A.    No, on the road.

24     Q.    Had you done that the entire semester or

1   fall semester of 2012 for Noah?

2        A.   Pretty much.

3        Q.   Did you have a specific parking space on

4   that road that he would come meet you at?  Would you

5   go get him inside the school?  How did that work?

6        A.   It was usually the same parking space.

7        Q.   What time did school start for Noah?  And

8   we can go in the spring/fall semester at Watseka.

9        A.   I believe at 8:20.

10       Q.   What time would you typically drop him off

11  in the morning?

12       A.   Probably 8:10.

13       Q.   And what was the typical time that you

14  would pick up Noah from school?

15       A.   3:09.

16       Q.   Very specific.  How do you know it that

17  specifically?

18       A.   Because it's an unusual time.

19       Q.   Is that a time school was dismissed then at

20  Watseka?

21       A.   Yes.

22       Q.   How long did it usually take Noah to leave

23  school after the dismissal bell at 3:09?

24       A.   Two to three minutes.

8

1      Q.   Did Noah have any after school activities
2   in the spring semester of 2013 that would prevent him
3   from leaving the school and meeting you two to three
4   minutes after the 3:09 dismissal bell?
5      A.   No.
6      Q.   I believe the day of the week, correct me
7   if I'm wrong, of January 25th of 2013, was a Friday.
8   Is that correct?
9      A.   Yes.
10     Q.   Were there any different pick-up or
11   drop-off times on a Friday as opposed to any other
12   day of the week at Watseka?
13     A.   I don't know that I under --
14     Q.   Sure.  I'll rephrase it.  For you to pick
15   up Noah, was there any different time that you did it
16   on a Friday as opposed to a Monday through Thursday?
17     A.   No.
18     Q.   What time did you arrive, if you know, at
19   the school to pick up Noah on Friday, January 25th of
20   2013?
21     A.   I'd say 3:00.
22     Q.   What kind of car did you have back then?
23     A.   A green pickup truck.
24     Q.   Was anybody with you to help you pick up

1  Noah on January 25th of 2013?

2        A.    No.

3        Q.    Did Noah have a cell phone with him that he

4  was provided by you and your husband on January 25th

5  of 2013?

6        A.    Yes.

7        Q.    Did he take that phone to school?

8        A.    Yes.

9        Q.    To the best of your knowledge did he have

10  that phone with him on Friday, January 25th of 2013?

11        A.    What was the first part of your question?

12        Q.    Sorry.  To the best of your knowledge did

13  Noah have his phone with him on that day?

14        A.    Yes.

15        Q.    When you arrived at the school at about

16  3:00 PM, what did you do when you were waiting for

17  him in your car?  Did you talk to anybody on the

18  phone?

19        A.    No.

20        Q.    Did you have a cell phone on that day?

21        A.    Yes.

22        Q.    What was your cell phone number?

23        A.    (815) 867-0314.

24        Q.    Who was your cell phone provider back in

10

1  2013?

2      A.   Verizon.

3      Q.   Is that still your cell phone number now?

4      A.   Yes.

5      Q.   Still Verizon provider?

6      A.   Yes.

7      Q.   Would you typically have the radio on when

8  you were waiting for Noah?

9      A.   No.

10     Q.   Did you shut the car off typically?

11     A.   Pardon?

12     Q.   Did you shut your car off or your truck I

13  should say?

14     A.   Not at the beginning, no.

15     Q.   On that day how long did you wait to

16  receive any type of notification that Noah wasn't

17  coming out for a while?

18     A.   Well, it was I'd say 3:25 and I texted Noah

19  where are you?

20     Q.   Did you receive any type of text back?

21     A.   My phone started ringing and I got a text

22  from Noah at the same time and I know that I hung my

23  phone up by mistake trying to get the text from Noah.

24  And he said he needed me to come in the school.

1      Q.    So on the afternoon of January 25th of

2    2013, at about 3:25 PM, you did get a text from

3    Noah's cell phone, correct?

4      A.    Yes.

5      Q.    And that was a text that indicated that he

6    needed you to come inside the school?

7      A.    Right.

8      Q.    Anything else in that text that you can

9    recall?

10     A.    No.

11     Q.    The phone call that was coming in at the

12   same time, was that also from Noah's phone number?

13     A.    No.  I don't know actually.  I don't know.

14     Q.    But a call came in at the same time from

15   somebody?

16     A.    Right.  Right.

17     Q.    But regardless, because you got this text

18   from Noah or from Noah's cell phone, I take it you

19   got out of your car?

20     A.    I did.

21     Q.    Locked it?

22     A.    Uh-huh.

23     Q.    Yes?

24     A.    Yes.

12

1     Q.   Okay.  And then walked into the front doors
2  of the school?
3     A.   I walked to the front door.
4     Q.   Was it open or closed?
5     A.   There was a man there waiting for me, he
6  opened the door for me.
7     Q.   Do you know who that man was?
8     A.   I think it was Mr. Lucas.
9     Q.   Do you remember what he looked like?
10    A.   Vaguely.
11    Q.   Black, white, tall, short?
12    A.   He was Caucasian, he was a big guy, short
13 hair, brownish I'd say hair.
14    Q.   And did Mr. -- what you thought was
15 Mr. Lucas or probably was Mr. Lucas, did he say
16 anything to you or you say anything to him at that
17 time?
18    A.   I believe he asked me if I was Noah's
19 mother and I said yes.
20    Q.   And what did -- did he say anything else at
21 that time?
22    A.   He said we have Noah in the office here, I
23 want you to come back and as we were walking back,
24 and it was -- I mean it was a walk.  It was

13

1    intimidating to me because I didn't know where we

2    were going.  And as we were walking he said Noah has

3    had a problem here at school today and his only

4    infraction was that he knew there was drug activity

5    going on and he didn't tell an adult about it.

6        Q.   Okay.  And this is what Mr. Lucas told you

7    while you were walking down a hallway at school?

8        A.   Yes, walking down corridors.  I think we

9    took a couple of turns and, like I said, I had no

10   idea where we were going.

11       Q.   Had you been to -- inside the school

12   before?

13       A.   Yes.

14       Q.   And for what purposes before that day had

15   you been inside the school?

16       A.   Band recitals, band practice, show choir.

17   We went to fund raisers.

18       Q.   At any time before January 25th of 2013 did

19   you ever have a parent-teacher conference with

20   anybody, Noah's teachers or any faculty at Watseka

21   High School?

22       A.   Yes.

23       Q.   Do you remember with whom?

24       A.   His English teacher.

1  Q. Do you remember her name?

2  A. It was Miss Verkler, but she got married so

3 I don't know what her married name is.

4  Q. Did you say Berkler?

5  A. Verkler.

6  Q. With a V, okay.

7  A. And I believe we had maybe one other

8 meeting with a teacher.  I don't remember who or what

9 or why.

10  Q. Did you ever have any previous meetings

11 with anybody at Watseka before January 25th of 2013

12 concerning Noah's application to Culver Academy?

13  A. Yes.

14  Q. Okay.  When was that?

15  A. I couldn't tell you.

16  Q. I take it sometime during the fall semester

17 of 2012?

18  A. Yes.

19  Q. Do you remember who that contact was with?

20  A. No, I don't remember.

21  Q. Do you remember the substance of that

22 conversation?

23  A. Just to inform them that we were applying

24 for Noah to go to Culver and that they required, you

15

1  know, input from his instructors.

2       Q.    Okay.  Did you have any difficulty

3  receiving any of that information from Watseka

4  personally?

5       A.    Well, when we asked them to scan his

6  transcript to Culver, I know it took a long time and

7  we had to make repeated calls and they told us they

8  didn't have a scanner and finally somehow it got

9  done.

10      Q.    Okay.  And were references actually given

11 to Culver on Noah's behalf from personnel at Watseka?

12      A.    Could you ask me that again?

13      Q.    Sure.  Were references actually given from

14 Noah's teachers or somebody else at Watseka to

15 Culver?

16      A.    Yes.

17      Q.    So he could get into Culver?

18      A.    Yes.

19      Q.    And he did get into Culver, correct?

20      A.    Yes.

21      Q.    So then back to January 25th of 2013, did

22 Mr. Lucas or the person who you thought was Mr. Lucas

23 walking you down the hall say anything else?

24      A.    No.

16

1     Q.   Did you say anything in response to what he

2  had told you about Noah seeing or knowing about drug

3  activity at Watseka?

4     A.   No.

5     Q.   How long did the walk take?

6     A.   It seemed like it took forever.  It

7  probably took -- it probably took three minutes.

8     Q.   Did you still have your cell phone with you

9  during that time?

10    A.   Yes.

11    Q.   Did you have your purse?

12    A.   Yes.

13    Q.   Then I take it you were led to some type of

14 room or office --

15    A.   Right.

16    Q.   -- office or something like that?

17    A.   Some office.

18    Q.   Do you know whose office it was?

19    A.   I believe it was Mr. Lucas's office.

20    Q.   He opened the door?

21    A.   Yes.

22    Q.   Who was inside?

23    A.   Noah and Mr. Bunting.

24    Q.   Had you ever met Mr. Bunting before that

17

```
 1   day?
 2        A.   No, I don't believe I had.
 3        Q.   And where was Mr. Bunting seated at that
 4   time?
 5        A.   He was seated at the desk, behind the desk.
 6        Q.   Where was Noah?
 7        A.   He was sitting, it would be to his -- to
 8   Mr. Bunting's right.
 9        Q.   Okay.  Was he also seated at the desk?
10        A.   Well, he was sitting like I am.
11        Q.   Okay.  Across from him?
12        A.   Right.
13        Q.   And did Mr. Lucas stand or was he also
14   sitting after he got in the room?
15        A.   He went behind Noah and stood over in this
16   air, over to Noah's left.
17        Q.   Were you offered a seat?
18        A.   Yes.
19        Q.   Was anything on the desk when you sat down
20   that you noticed?
21        A.   Papers and books and...
22        Q.   Anything directly in front of Noah?
23        A.   No.
24        Q.   Did you say anything to Noah when you
```

18

1  walked in?

2       A.    No.   But I looked at Noah and he just

3  looked like he had been crushed, so I didn't say

4  anything.

5       Q.    Did he have tears in his eyes or running

6  down his face?

7       A.    Yes.  Yes.  He had tears in his eyes, his

8  eyes were red, he was slumped over and he was very --

9  I could tell he was very, very distressed.

10      Q.    Who said something first?

11      A.    When I walked in the room Mr. Bunting

12  introduced himself and he said that Noah confessed to

13  taking drugs at school today and he was going to be

14  suspended and that Noah had cooperated.  And because

15  he had cooperated, he would just have a 10-day

16  suspension.  And that the other students that had

17  been involved, if they didn't cooperate they were

18  going to receive much worse.

19      Q.    Did they tell what you type of drug Noah

20  was being accused of taking?

21      A.    No.

22      Q.    Did they tell you who the other students

23  were?

24      A.    No.

19

1      Q.   And what did you say in response to that?

2      A.   I said I want you to call my husband.

3      Q.   Did you provide them with your husband's

4  number?

5      A.   Yes, I did.

6      Q.   Did you call your husband first?

7      A.   No.

8      Q.   You were actually present in the room when

9  your husband testified, is that correct, just a

10 couple hours ago?  You were here when your husband

11 testified?

12     A.   Yes.

13     Q.   Okay.  Did you hear your husband testify

14 that he -- it was his understanding that you called

15 him on your cell phone and that he was standing in

16 the hallway and that about five minutes later then

17 the school called him on speaker phone, do you

18 remember that?

19     A.   I do now, yes.

20     Q.   Okay.  Do you remember calling your husband

21 first?

22     A.   I was very upset.

23     Q.   Okay.  So you don't remember?

24     A.   No.

20

1      Q.   So who did you give the cell phone
2  number -- your husband's cell phone number to?
3      A.   We didn't.  I don't think they called him
4  on it.  I think they called him at the office number.
5      Q.   How did they get his office number?
6      A.   I gave it to them.
7      Q.   And do you know if they called him first
8  outside of your presence and then brought in the
9  speaker phone or is the first knowledge of your
10  husband getting notice of this when the speaker phone
11  was on?
12      A.   When the speaker phone was on.
13      Q.   Okay.  So I take it there was a phone on
14  the desk and somebody dialed it?
15      A.   Actually it was like on a credenza behind
16  the desk.
17      Q.   So the numbers were dialed and what was the
18  first thing that was said to your husband, if you
19  know, or just in the room in general after your
20  husband answered the phone?
21      A.   I believe that Mr. Lucas and Mr. Bunting
22  said who they were.
23      Q.   Did you say anything at that time?
24      A.   No.

1      Q.    Did Noah say anything at that time?

2      A.    No.

3      Q.    What did Mr. Lucas or Mr. Bunting say then

4   to the room, I guess, with the speaker phone on?

5      A.    Then they told Michael that there was a

6   disciplinary problem with Noah and he had taken drugs

7   at school and he was going to be suspended.

8      Q.    Was he also told that Noah had admitted to

9   doing that earlier that day?

10     A.    I don't remember.

11     Q.    Well, was anything else said by them before

12  your husband said something?

13     A.    I don't remember.

14     Q.    What did your husband say?

15     A.    He said that he understood that their

16  school policy not to have someone, a student that had

17  taken drugs be in the school around other students or

18  staff, that it was a danger, and he understood that.

19     Q.    Did Mr. Bunting or Mr. Lucas say anything

20  after that?

21     A.    I really don't remember.

22     Q.    Did your husband on the speaker phone ever

23  tell you or Noah not to say anything to Mr. Lucas or

24  Mr. Bunting?

22

1      A.    Would you say that again, please?

2      Q.    Sure.  Did your husband, when he was on the

3  speaker phone, ever direct you or Noah not to say

4  anything else to Mr. Bunting or Mr. Lucas?

5      A.    No, he did not.

6      Q.    Did your husband ever advise you or your

7  son to not sign anything after that point in time?

8      A.    No, he did not.

9      Q.    If your husband would have done either of

10  those things would you have allowed Noah to sign any

11  document?

12      A.    I would not have.

13      Q.    If you would have -- if your husband would

14  have advised you and Noah not to say anything else to

15  Mr. Bunting or Mr. Lucas would you have continued to

16  talk to them?

17      A.    No.  I didn't want to talk to them as I was

18  there, I wanted to get my son out to the hospital,

19  thinking he had taken drugs and why is he still

20  sitting here half an hour after school has been let

21  out?

22      Q.    Did you ever call 911?

23      A.    No.

24      Q.    Did you drive Noah to the hospital after?

23

1     A.   No.

2     Q.   Did you ever express that to Mr. Bunting or

3 Mr. Lucas?

4     A.   No, because I knew that once I got him

5 outside of the school I could evaluate him and tell

6 whether he needed medical treatment or not.  I just

7 wanted to get him out of there.

8     Q.   How long in total were you in the room?

9     A.   Pardon?

10    Q.   How long were you inside that office?

11    A.   I would say ten minutes.

12    Q.   Do you know how long Noah had been there

13 before you got there?

14    A.   In the office?

15    Q.   Correct.

16    A.   No, I don't.  Long enough to make him look

17 like he had been shattered.

18    Q.   Did you see any other students in the hall

19 ways when you were walking back with Mr. Lucas?

20    A.   If I did it would not have registered.

21    Q.   Did your husband say anything else while he

22 was on speaker phone?

23    A.   I really couldn't tell you.

24    Q.   You just can't recall at this time?

24

1      A.    I can't.

2      Q.    So after your husband then hung up, what

3   was the next thing that happened in the room?

4      A.    I said Noah, come on, let's go.

5      Q.    And what did Noah do?

6      A.    He got up.

7      Q.    And what happened after that?

8      A.    Then they pushed a piece of paper over for

9   him to sign, said he had to sign.  Noah, you have to

10   sign here.

11      Q.    And what did Noah do?

12      A.    He looks at me.

13      Q.    Okay.

14      A.    And I said sign it, Noah, let's get out of

15   here.  I didn't care what he signed, I just wanted to

16   get him out of there.

17      Q.    Okay.  We'll show you what's been marked as

18   Deposition Exhibit No. 1.  I don't need to mark it

19   again.  Is that the piece of paper that you are

20   talking about?

21      A.    Yes.

22      Q.    And you were present in the room when Noah

23   signed that; is that correct?

24      A.    Yes, I was.

25

1      Q.   You are familiar with Noah's signature; is

2   that correct?

3      A.   Yes.

4      Q.   His signature is located in two places on

5   that document; is that correct?

6      A.   Yes.

7      Q.   Did he sign both of those places in front

8   of you in Mr. Lucas or Bunting's office?

9      A.   Yes.

10     Q.   Did you read that document before Noah

11  signed it?

12     A.   Actually I did -- I read it out loud to

13  Mr. Bunting and Mr. Lucas.  I said so this says that

14  Noah can make up any of his missed school work after

15  his suspension is over because I -- that to me was

16  what this was about.  And they said yes.  And I

17  remember reading it back to them.

18     Q.   Okay.  So after your husband hangs up, you

19  and Noah get up to leave, they place this -- push

20  this piece of paper toward Noah and said sign this.

21  Did you then reach over for that piece of paper and

22  read it?

23     A.   No, I just leaned over and read it.

24     Q.   Okay.  So you leaned over, you were leaning

26

1    over Noah's shoulder I take it?

2         A.   Well, I was right next to him.  Standing

3    right next to him.

4         Q.   Was he -- was he standing or seated when he

5    signed it?  Noah.

6         A.   I think he sat back down and signed it.

7         Q.   And so you are looking over Noah's

8    shoulder, correct?

9         A.   Well, not really his shoulder.

10        Q.   Well, you were looking at the piece of

11   paper?

12        A.   Right.

13        Q.   You could see it close enough to read it?

14        A.   Yes.

15        Q.   So you saw it was addressed to you and your

16   husband --

17        A.   No.

18        Q.   -- and the date and things like that?

19        A.   I did not even look at that.

20        Q.   Did you notice on the piece of paper what

21   Noah was being accused of doing?

22        A.   No.

23        Q.   Did Noah sign this document before or after

24   you read it out loud to Mr. Bunting and Mr. Lucas?

27

```
1         A.    He signed it after.

2         Q.    Okay.  Did you know whether or not Noah

3    read the document before he signed it?

4         A.    I don't believe he did.

5         Q.    After reading the part about the homework,

6    it looks like there is an X and Noah's signature; is

7    that correct?

8         A.    Yes.

9         Q.    Did you read this part out loud before Noah

10   signed it?

11        A.    The part, the --

12        Q.    About the homework.

13        A.    Yes.  That's what I read.

14        Q.    All right.  And then after you read the

15   part about the homework, there is then a bottom

16   section of this document; is that correct?

17        A.    Yes, there is.

18        Q.    Did you read that?

19        A.    No.

20        Q.    Why not?

21        A.    Because I just wanted to get my son out of

22   there.

23        Q.    So after you read the top part about the

24   homework, the bottom part Noah also signed; is that
```

28

1   correct?

2        A.   Yes.

3        Q.   Did he sign the bottom part after he signed

4   the top part?

5        A.   Yes.

6        Q.   Did you ever direct Noah not to sign this

7   document?

8        A.   No.  I felt very intimidated by them and I

9   felt that was the only way I was going to get him out

10  of the room and I wanted to get him out of there.

11       Q.   Did you ask Mr. Bunting or Mr. Lucas if

12  either of you could leave?

13       A.   No.

14       Q.   So Noah signed the document and then you

15  both left; is that correct?

16       A.   Yes.  After Noah shook their hands.

17       Q.   So Noah and Mr. Lucas shook hands?

18       A.   Yes.

19       Q.   And Noah and Mr. Bunting shook hands?

20       A.   Yes.  And I wanted to punch them both in

21  the face.

22       Q.   Did Noah reach out to shake both of their

23  hands first?  Or did they reach out to shake Noah's

24  hand first?

29

1      A.    Noah reached out to shake their hand.

2      Q.    After you were leaving their office, did

3  you then exit out the front door of the high school?

4      A.    Yes.

5      Q.    Did Noah have his backpack with him already

6  or did you have to go back and get it?

7      A.    I don't remember that.

8      Q.    Do you know if Noah took any homework or

9  school work with him at that time?

10     A.    I don't remember that.

11     Q.    Did you or Noah request that you get the

12 assignments for the next couple weeks for his school

13 classes before you guys left?

14     A.    It seems as though one of his friends

15 brought school books or something from his locker at

16 one point.  I don't know.

17     Q.    Was that that same day on January 25th or a

18 day -- or after that?

19     A.    I think it was after that.  Because I made

20 sure that the school got their books back.  I didn't

21 want to be held responsible for their school books.

22     Q.    So at some point in time during Noah's

23 suspension, one of Noah's friends got his school

24 books out of his locker for Noah?

30

1        A.    I believe so, but...

2        Q.    That's okay.  Do you know who that friend

3   was?

4        A.    Pardon?

5        Q.    Do you know who that friend was?

6        A.    No.

7        Q.    Was it a boy or a girl?

8        A.    You know, I really don't know.

9        Q.    Could it have been his girl friend, Kelly?

10       A.    It could have been Kelly.  It could have

11   been Jake.  It could have been Dakota.

12       Q.    But it sounds like the purpose of him or

13   one of his friends bringing his books back to him is

14   so he could do his homework, is that fair to say?

15       A.    Yes.

16       Q.    Do you know if they also brought back the

17   actual assignments for Noah to do?

18       A.    No, I believe that they said that they

19   wouldn't give it to him.

20       Q.    Do you know if Noah had access to Watseka's

21   high school online?

22       A.    I do not believe he did.

23       Q.    Do you know if Noah's teachers posted any

24   of their assignments online?

31

1    A.   Not that I am aware of.

2    Q.   Okay.  So you and Noah leave and you get

3  back in your truck, right?

4    A.   Yes.

5    Q.   What's the first thing you do?

6    A.   I said Noah, what's going on?

7    Q.   When did you assess him medically to see if

8  he needed to go to the hospital?

9    A.   As he was talking to me when we were out of

10  the truck out of there.

11    Q.   Are you medically trained?

12    A.   I am an RN.

13    Q.   Okay.  Where did you go to school?

14    A.   I went to KCC and Olivet and Governor

15  State.

16    Q.   Did you practice as a nurse?

17    A.   I'm sorry?

18    Q.   Did you actually practice as a nurse?

19    A.   Yes, I did.

20    Q.   Where did you work?

21    A.   Shapiro Developmental Center and Riverside

22  Medical Center.

23    Q.   So you're looking at Noah and assessing him

24  for what?

32

1        A.    For any sign of drugs.

2        Q.    And what signs or symptoms were you looking

3    for?

4        A.    Well, abnormal behavior, anything that is

5    different from his normal behavior, breathing, his

6    eyes, his -- if he had any kind of tremors, if there

7    was any gait difference.

8        Q.    I take it you didn't see any of those?

9        A.    No.

10       Q.    So after you did that, you asked him what

11   was going on, right?

12       A.    Right.

13       Q.    What did he say?

14       A.    He said, mom, he said they -- they forced

15   me to sign, to say that I took drugs at school and --

16   and to take a suspension or I would have been

17   expelled from school.  He said I had to -- what was I

18   supposed to do?  I can't be expelled from school.

19       Q.    Did he tell you they forced him to sign or

20   forced him to say?

21       A.    They forced him to say that he took drugs

22   at school.

23       Q.    And where were you in relationship to the

24   school when he told you that?

1      A.    Probably still backing out from the --

2      Q.    Still in your parking space?

3      A.    Right.

4      Q.    Or close to it?

5      A.    Right.

6      Q.    Did you stop the car?

7      A.    Did I stop the car?

8      Q.    Yeah.

9      A.    No.

10     Q.    Did you go back into the school after Noah

11  told you that?

12     A.    No.

13     Q.    Did you believe him?

14     A.    Yes.

15     Q.    Did you want to tell Mr. Bunting or

16  Mr. Lucas what Noah had just told you?

17     A.    No.  I was very intimidated by them, I

18  didn't want to go back there.  I was going to let my

19  husband handle it.

20     Q.    Okay.  Did you call your husband?

21     A.    Yes.

22     Q.    All right.  From the car, from your truck?

23     A.    I'm sure I probably did.

24     Q.    And what did you tell him during that phone

34

1  call?

2       A.    That he just better hurry and come home.

3       Q.    Did you tell him what Noah had just told

4  you?

5       A.    I don't know.

6       Q.    Did you drive right home?

7       A.    Did I drive right home?

8       Q.    Yes.

9       A.    Yes.

10       Q.    Did you have any further conversation with

11  Noah during the ride home?

12       A.    Well, we -- you know, I said tell me what

13  was going on.

14       Q.    And what did he say?

15       A.    He said that he had just heard that there

16  was something going on in the lunchroom and he didn't

17  notice anything unusual until his first class after

18  lunch and Michael wasn't there.  And then the

19  principal came in and got Michael's books and Michael

20  was gone from school the rest of the day.

21       Q.    And did he tell you anything else about him

22  or any of the other kids?

23       A.    Did he tell me anything else about what?

24       Q.    About what happened to him the rest of that

35

1    day or anybody other kids at school.

2        A.    He just said he went on to class like

3    normal for the rest of the day.  And then after class

4    they told him he couldn't leave and that he couldn't

5    call me.

6        Q.    Who did he say told him that?

7        A.    I don't know if it was Mr. Bunting or

8    Mr. Lucas.  He told me that they kept him in a room

9    separated from everybody and -- and he said Brett

10   Short's mother tried to talk to him and the secretary

11   said you can't talk to him, go away.

12       Q.    How did he know Brett Short's mom tried to

13   talk to him if he was in a different room?

14       A.    Because she started to come to the door.

15   She saw Noah sitting in there and she started to come

16   to the door.

17       Q.    Did Noah tell you where he was at that

18   time?

19       A.    No.

20       Q.    What else did Noah say on the ride home, if

21   anything?

22       A.    What else what?

23       Q.    What else did Noah tell you on the ride

24   home, if anything?

36

1      A.    That's all I remember.

2      Q.    And after that additional conversation with

3  Noah did you call your husband back --

4      A.    No.

5      Q.    -- and tell him -- you have to let me

6  finish my question.

7      A.    I'm sorry.

8      Q.    It's just hard for the court reporter to --

9      A.    I know, I'm sorry.

10     Q.    You are doing very well.  Did you then call

11  back your husband to let him know what Noah had just

12  told you additionally about what happened that day?

13     A.    No.  I have to keep all my phone

14  conversations short to my husband because of his

15  accident and the fact that he only can -- it's hard

16  for him to use the phone and especially do anything

17  else besides, so I just tell him briefly and then

18  hang up so he can do whatever he's doing.

19     Q.    Was Michael McKay a friend of your son's?

20     A.    Noah considered him a friend.

21     Q.    Had he ever been to your house?

22     A.    Occasionally.

23     Q.    Do you know if Michael had ever been

24  previously arrested for drugs or alcohol or other

1   charges?

2        A.   No.

3        Q.   Had you ever known that Noah had taken

4   drugs or drank alcohol before January 25th of 2013?

5        A.   No.

6        Q.   When was the first time that Noah had told

7   you he had done those things?

8        A.   He did what?

9        Q.   When was the first time you ever heard Noah

10  had done that before, had taken marijuana?

11       A.   Here.

12       Q.   Did you call anybody else besides your

13  husband?

14       A.   No.

15       Q.   What did you do after you got home with

16  Noah?

17       A.   I don't remember.

18       Q.   Okay.  Did Noah eat or drink anything until

19  your husband got home?

20       A.   I really don't remember.  We were both very

21  upset.  I don't think he did.  We were just waiting

22  for his dad to come home.

23       Q.   Did you make dinner or anything along those

24  lines?

38

1      A.    No.

2      Q.    Did you call anybody else from your house

3   after you got home?

4      A.    No.

5      Q.    How long did it take for your husband to

6   get home after you guys got there?

7      A.    I would say an hour.

8      Q.    Do you know what Noah did during that time?

9      A.    Walked around.

10      Q.    Did he go to his room?

11      A.    He went up there but he didn't stay up

12   there.  He came down and he was with me and...

13      Q.    Do you remember what was discussed, if

14   anything?

15      A.    Just -- not in particular.  Just the whole

16   situation.  I do remember saying to him, you know,

17   you won't be able to go to the Winter Ball tonight.

18   That was a dance he had planned to go to.  And he

19   said he didn't care.

20      Q.    At any time on or before January 25th of

21   2013 did you ever monitor Noah's phone or computer

22   usage?

23      A.    No.  Well, I shouldn't say that.  I did

24   occasionally, but it wasn't like I did it all the

39

```
 1   time.  I didn't do it regularly.
 2        Q.   Okay.  What would you do to monitor Noah's
 3   phone or computer usage, even if it was only
 4   occasionally?  What did you do?
 5        A.   Well, I would get on the site and look at
 6   the phone numbers, look at the usage time and things
 7   like that.
 8        Q.   Did you ever check the history on Noah's
 9   computer?
10        A.   Yes.
11        Q.   After your husband got home, what did you
12   say to him and he say to you?
13        A.   Well, he -- I think when I saw him he had
14   already talked to Noah and he said we're going to get
15   a drug test.  And I said that's fine, I think we
16   should.
17        Q.   I forgot to ask you, were you handed a copy
18   of this piece of paper after Noah signed it by
19   Mr. Bunting or Mr. Lucas?
20        A.   Yes.
21        Q.   That afternoon, correct?
22        A.   Yes.
23        Q.   All right.  So after Noah had signed this
24   in those two places, did Mr. Bunting or Mr. Lucas
```

40

1   have to take the original piece of paper and leave

2   the room and then bring back to you a copy?

3        A.   Yes.

4        Q.   Okay.  Did you show that to your husband

5   when he got home?

6        A.   Yes.

7        Q.   Did your husband say anything in particular

8   about that document to you or Noah?

9        A.   I think after he looked at it for a minute,

10  Noah grabbed it and ripped it up into pieces and

11  threw it in the garbage.  And I had to take it out of

12  the garbage and paste it, tape it back together.

13       Q.   Did your husband get a chance to actually

14  look at it before it got ripped up?

15       A.   I don't know.

16       Q.   How about after you taped it back together?

17       A.   I suppose at some point he did.

18       Q.   Did you hear any argument between your

19  husband and Noah?

20       A.   Well, I didn't -- I couldn't hear what they

21  were saying, but I heard yelling.

22       Q.   And where were you at this time?

23       A.   I was probably in our bedroom.

24       Q.   Where is your bedroom in relationship to

41

1   where they were?

2       A.    Well, that's a hard question to answer.   I

3   mean it's not like -- you want me to describe the

4   physical setting or what?

5       Q.    How far away were you?

6       A.    They were in the kitchen and I was in our

7   bedroom, which is --

8       Q.    We'll make it easy.  Was your bedroom on

9   the first floor or second floor?

10      A.    First.

11      Q.    So same floor as the kitchen, correct?

12      A.    Yes.

13      Q.    Just several feet away, correct?

14      A.    Yes.

15      Q.    Did you have the TV on or anything to block

16  your hearing?

17      A.    No.

18      Q.    So you heard yelling.  I take it it was

19  your husband?

20      A.    Yes.

21      Q.    Did Noah yell too?

22      A.    No.

23      Q.    Been how long did that last?

24      A.    Oh, probably -- probably 10, 15 minutes.

42

1      Q.   After the yelling died down from your

2  husband, what happened next?  Did you go back out and

3  see what was going on?

4      A.   Yes.

5      Q.   What did you see?

6      A.   I saw my husband and Noah in the kitchen

7  and, like I said, my husband said we are going to go

8  get a drug test and I said fine.

9      Q.   What did Noah look like at that time?

10     A.   He was just -- he looked much relieved.

11     Q.   So did you guys all get dressed and drive

12  up to the hospital then?

13     A.   Well, no, because Michael had to make some

14  phone calls.

15     Q.   Who did Michael call?

16     A.   Well, he called Dr. Olafson.

17     Q.   Did you know Dr. Olafson before this

18  incident?

19     A.   Yes.

20     Q.   How did you know him.

21     A.   I knew him professionally.

22     Q.   Did you work with him up at Riverside?

23     A.   I never worked directly with him, no.

24     Q.   So how did you know him professionally?

43

1      A.   Well, because he was in the hospital and I

2   knew as a nurse that he was Dr. Olafson.

3      Q.   What kind of doctor is he?

4      A.   What kind of doctor is he?  He is a GP.

5      Q.   Other than calling Dr. Olafson, who else

6   did your husband call?

7      A.   I don't know.

8      Q.   Were you ever present when your husband

9   contacted or was contacted by Denise McKay?

10      A.   I know at some point I -- I believe I was

11   in the room when he was telling her that he could not

12   represent Michael and he was giving her other

13   attorneys' names to maybe try.

14      Q.   When were you first aware that Michael had

15   been arrested at school that day?

16      A.   I don't know.  It was after Noah's hearing

17   or whatever in that evening.

18      Q.   Sometime that night?

19      A.   Well, not that night.  Whenever we had

20   that -- the school board hearing.  It was sometime

21   after that.

22      Q.   After you drove up to the hospital with

23   Noah were you present in the examination room with

24   the doctor and your husband?

44

1        A.    No.

2        Q.    Where were you?

3        A.    I was out in the waiting room.

4        Q.    So anything that transpired with regard to

5   the examination or the urinalysis, you weren't

6   personally present for, correct?

7        A.    I was not.

8        Q.    Were you present when the initial drug test

9   results came back?  Or were you in the waiting room

10  the whole time?

11       A.    I was in the waiting room the whole time.

12       Q.    Did you ever personally talk to

13  Dr. Olafson?

14       A.    No.

15       Q.    What did -- did you talk to your husband

16  about what happened in the examination room and the

17  results and things like that?

18       A.    Well, when we were driving home Noah

19  described to me what happened, you know, how it had

20  taken place.

21       Q.    And what did Noah describe to you?

22       A.    Just that they had to tape everything up

23  and the doctor was present and he gave a urine

24  specimen and it was sealed and they had to initial

45

1  it.

2      Q.   And were you at some point that night made

3  aware of the preliminary results of that test?

4      A.   Yes.

5      Q.   Okay.  And they came back that there were

6  no drugs in his system?

7      A.   Yes.

8      Q.   And what did you all do after that?  I take

9  it you drove home, right?

10     A.   Right.

11     Q.   After you got home did you make any phone

12  calls to anybody?

13     A.   No.

14     Q.   Were you present when your husband made any

15  phone calls to anybody?

16     A.   I don't believe so.

17     Q.   And how about Noah, did he just go to bed?

18     A.   No.

19     Q.   What did Noah do?

20     A.   He just kind of hung around with us.  I

21  mean we were all very upset.

22     Q.   Do you recall anything that was said at

23  that time?

24     A.   I couldn't recall.

46

1     Q.   Did you see your husband taking any notes

2 or typing any e-mails that night?

3     A.   I know he was on the computer and I know he

4 was taking notes.  He always takes copious amounts of

5 notes about everything.

6     Q.   Did you take any personal notes?

7     A.   No.

8     Q.   Did you ever personally perform any

9 investigation into contacting witnesses or calling

10 the school or anything along those lines?

11    A.   No.

12    Q.   Did anybody come visit Noah over the

13 weekend, any of his friends?

14    A.   I am sure Kelly came over at some point.  I

15 don't recall if anybody else -- I don't know.

16    Q.   Did you ever talk to Kelly about what had

17 happened at school that day?

18    A.   It seems like I did ask her if she heard

19 anything or knew of anything and she said that she

20 sat at a separate table so she didn't know what was

21 going on.

22    Q.   And that meant a separate lunch table I

23 take it?

24    A.   Yes.

47

1      Q.   Was anything more discussed that weekend
2    between you, Noah and/or Kelly concerning what
3    happened at school, including during that lunch
4    period?
5      A.   No.
6      Q.   Did Noah ever tell you that weekend that he
7    knew that Michael had been arrested?
8      A.   No.
9      Q.   So over that weekend, what was your plan
10   for Noah?  Did you intend for him to return back to
11   Watseka after the suspension was over?
12     A.   I didn't -- I didn't want him to go back to
13   Watseka, but I -- I -- I was not making any decisions
14   about anything.
15     Q.   It sounds like Monday morning you and your
16   husband went back to Watseka High School; is that
17   correct?
18     A.   Yes.
19     Q.   And what was the purpose of that visit?
20     A.   To show Mr. Bunting the test results.
21     Q.   Did you get there about 7:45?
22     A.   Yes.
23     Q.   Did you go into the school with your
24   husband?

1       A.   Yes, I did.

2       Q.   And did you eventually meet with

3  Mr. Bunting?

4       A.   Yes.

5       Q.   Were you present at that time?

6       A.   Yes.

7       Q.   What did -- did you say anything to

8  Mr. Bunting?

9       A.   No.

10       Q.   What do you recall your husband saying to

11  Mr. Bunting and Mr. Bunting saying to you or your

12  husband?

13       A.   My husband said that we had the test

14  results we wanted to give them, that it proved that

15  Noah had not taken drugs at school.  And Mr. Bunting

16  just shook his head and waved his hands and said I

17  don't -- I don't want to see it, I don't care, get

18  out of the school.  And there's a procedure if you

19  want to appeal this.

20       Q.   Did he tell you what that procedure was?

21       A.   No.

22       Q.   How long did that conversation take?

23       A.   About three minutes.

24       Q.   Was anything else said from you or your

49

1  husband?

2    A.   No.

3    Q.   Did you ask to meet with anybody else at

4  the school?

5    A.   No.

6    Q.   Where did you guys go after that?

7    A.   Home.

8    Q.   Did you ever have any more personal contact

9  yourself with anybody at the school until the meeting

10  on February 5th of 2013?

11    A.   No.

12    Q.   Did you ever personally talk to anybody

13  besides your husband or Noah about the incidents at

14  school between that day, that Monday, and

15  February 5th of 2013?

16    A.   I don't believe so.

17    Q.   Did you ever speak to Dakota Papineau's

18  mother?

19    A.   Somewhere along the line I talked to her.

20    Q.   Do you know if that was by phone or in

21  person?

22    A.   I saw her in person.

23    Q.   Where did you see her?

24    A.   I really don't remember.

50

1       Q.   Did you see her on purpose or did you just
2   run across her at a grocery store?
3       A.   I think I ran across -- ran into her.  I
4   don't know.
5       Q.   Do you remember what was said between you?
6       A.   No, I don't recall.
7       Q.   At some point in time you were aware that
8   Dakota was also spoken to by school personnel about
9   drugs in the school?
10      A.   Yes.
11      Q.   When did you become aware of that?
12      A.   Prior to that hearing.
13      Q.   And you were aware that Dakota did not sign
14  a document similar to the one your son signed; is
15  that correct?
16      A.   Yes.
17      Q.   And you were aware that Dakota's mom
18  actually had gone into that meeting and pulled her
19  son out of that meeting?
20      A.   Yes.
21      Q.   And you were also aware that after that
22  happened at the school, Dakota was not expelled; is
23  that correct?
24      A.   Yes.

51

1        Q.    He was also not suspended?

2        A.    That's correct.

3        Q.    Other than your son and Michael McKay

4   being -- well, Michael was expelled and your son

5   being suspended, do you know who else was suspended

6   by the school?

7        A.    That Konce, I can't remember his first

8   name.

9        Q.    Nathan?

10       A.    Pardon?

11       Q.    Nathan?

12       A.    Yes, Nathan Konce.  And there was a Goggins

13   kid.

14       Q.    No relation.

15       A.    And I don't know what his first name was.

16   I know there were several others, but I don't know

17   their names.

18       Q.    Did you ever personally talk with Nathan

19   Konce's parents about the incident with their son and

20   Noah?

21       A.    I spoke to Mrs. Konce because she called

22   the house wanting to -- an attorney's name to

23   represent her son.  But other than telling her, you

24   know, I would have Michael get back to her, we didn't

52

1    discuss it.

2         Q.   So you didn't discuss the circumstances

3    with her son or if he signed a piece of paper or

4    anything like that?

5         A.   No.

6         Q.   And you didn't tell her about what happened

7    to Noah I take it?

8         A.   No.

9         Q.   So what time was this meeting that you had

10   appeared for on February 5th of 2011?

11        A.   What meeting?

12        Q.   The one at the school board.

13        A.   What time was it?

14        Q.   Yeah.

15        A.   Oh.  I think that we were supposed to be

16   there between 6:30 and 7:00 and they didn't see us

17   until 8:00 or 8:30.

18        Q.   Do you know if other students' hearings

19   were also scheduled for that night?

20        A.   Michael McKay because we saw -- we saw them

21   there.  I mean we saw their vehicles.  I didn't

22   actually see them, but we saw the vehicles there.

23        Q.   So it sounds like Michael also had some

24   type of school board hearing over his suspension or

53

1   expulsion?

2        A.    Apparently.

3        Q.    Did you ever personally talk to Denise

4   McKay?

5        A.    Only when she called to ask for attorneys'

6   names.

7        Q.    Did you ever talk to Michael?

8        A.    No.

9        Q.    So you guys get into the meeting you said

10  between 8:00 and 8:30 that night, correct?

11       A.    Yes.

12       Q.    Did you speak to any of the witnesses in

13  this conference room like your husband did that

14  night?

15       A.    No.

16       Q.    How long was the hearing itself if you

17  recall?  Say it started at 8:00 or 8:30, when was it

18  done?

19       A.    I couldn't tell you.  I don't recall.

20       Q.    And you testified, correct?

21       A.    Yes.

22       Q.    Were you present during the entire hearing?

23       A.    Yes.

24       Q.    You didn't leave at some point in time?

54

1       A.   I did not leave.

2       Q.   Do you know if all the witnesses who

3  testified testified in front of each other or did the

4  witnesses have to wait outside and come in one at a

5  time?

6       A.   By the witnesses you are talking about

7  Dakota and his mom?

8       Q.   Correct.

9       A.   They -- they were together.  They didn't

10  come in one at a time.

11       Q.   Were you informed of the school board's

12  decision that night?

13       A.   Yes.

14       Q.   Did you also get something in writing on

15  their decision too?

16       A.   I couldn't tell you.  I mean I don't

17  recall.

18       Q.   So after the school board hearing and the

19  suspension was upheld, it was your understanding, at

20  least from Watseka, that Noah would have been allowed

21  to come back to school as of February 11th of 2013;

22  is that correct?

23       A.   Yes.

24       Q.   That would have been the serving of the ten

55

1  school day suspension?

2       A.    (Witness nods head).

3       Q.    Yes?

4       A.    Say that again.

5       Q.    Is that the serving of the ten-day school

6  suspension, five days one week and five days the next

7  week and he was supposed to come back the Monday

8  after that?

9       A.    I guess.

10      Q.    At what point in time did you and your

11  husband decide not to have Noah go back to Watseka?

12      A.    I don't know.  I didn't want him to go back

13  in the very beginning.

14      Q.    Okay.  What did you and your husband --

15  when did you and your husband decide to do -- what to

16  do with Noah the rest of the semester?

17      A.    I don't know.

18      Q.    I take it you had never home schooled Noah

19  before that time, correct?

20      A.    Correct.

21      Q.    Did you ever talk to anybody at your -- at

22  your prior school or the Crescent City School

23  District concerning home schooling Noah?

24      A.    We did have a meeting with Mr. Mann about

1    what our options were.

2         Q.    Okay.

3         A.    And I could not tell you when that was.

4         Q.    Was it at some point during Noah's initial

5    suspension?

6         A.    Yes.

7         Q.    Do you know if it was before or after the

8    hearing on February 5th?

9         A.    It was probably after.  Well, I don't -- I

10   shouldn't say that because I don't remember.  I

11   really don't remember.

12        Q.    During your meeting with Mr. Mann what were

13   presented as your options for Noah?

14        A.    Home schooling, possibly going to school in

15   Cissna Park.

16        Q.    Anything else?

17        A.    Pardon?

18        Q.    Anything else?

19        A.    Online school.

20        Q.    Did you ever -- did you have a preference

21   personally for one of those three options?

22        A.    No.

23        Q.    Did Noah?

24        A.    No.

57

1     Q.   Did your husband that you know of?

2     A.   I don't know.

3     Q.   Did you ever contact Culver Academy

4 concerning the transferring of credits from Watseka

5 to Culver?

6     A.   My husband did all the contacting.

7     Q.   Okay.  So I take it you also didn't contact

8 the school, meaning Culver, about the home schooling

9 versus Cissna Park versus online school concerning

10 those credits?

11     A.   That's correct.

12     Q.   What did Mr. Mann tell you about

13 transferring Noah to Cissna Park?

14     A.   He said that he would -- he could try.  He

15 didn't say that it, you know, would be just -- we can

16 do this without any problem.  He said he could try if

17 we were interested.

18     Q.   Okay.  Did you say you were interested?

19     A.   At that point we were just trying to figure

20 out the best option for Noah.  So I'm sure we told

21 him that we would be getting back to him with our

22 decision.

23     Q.   Okay.  And you decided that online was the

24 best way to go?

58

1      A.    Yes.

2      Q.    Why did you make that decision?

3      A.    Because it was so far into the semester and

4   we didn't want Noah to have to start at a school, a

5   new school, and at that point in the school year.  We

6   felt it would be a detriment to him.

7      Q.    Did Watseka have exams for first semester

8   before or after Christmas?

9      A.    I believe before.

10      Q.    Did Noah attend classes regularly then

11   following Christmas vacation up to January 25th of

12   2013?

13      A.    Yes.

14      Q.    When did school resume, if you recall,

15   after the holidays at Watseka?

16      A.    Possibly January 3rd.  I really don't know

17   for sure.

18      Q.    So you and your husband decide on online

19   school.  How did you make that happen?  Did you call

20   somebody?

21      A.    We started researching online.  Actually

22   Noah did.

23      Q.    And did Noah locate this Allied online

24   school?

59

1       A.    Michael told Noah to find five options and
2    then sit down with us so we could go over them.
3       Q.    So Allied was one of them; is that correct?
4       A.    Yes.
5       Q.    Were any of the options that you know of
6    for the credits for those classes transferable to
7    Culver?
8       A.    I don't believe any of them were.  I knew
9    that Culver's policy was you couldn't go in the
10   middle of a semester and they didn't take online
11   courses.
12      Q.    So for the online classes, was Noah also
13   starting the middle of a semester or did the semester
14   start for him as soon as he started taking classes
15   online?
16      A.    As soon as he started taking classes
17   online.
18      Q.    Do you know if he was required to complete
19   those classes within a period of time?
20      A.    Yes.
21      Q.    What was that period of time?
22      A.    I think he was -- late August.
23      Q.    So it's your understanding that he was
24   required to complete those classes to get credit for

60

1  them by late August of 2013?

2      A.   Yes.

3      Q.   Did he complete those classes by late

4  August of 2013?

5      A.   He -- there was -- because of the previous

6  scheduling of him being away during the summer, there

7  was some kind of a time problem.  He completed his

8  courses, but I don't know what happened after that.

9      Q.   If you wouldn't have gone away to these

10  other schools in the Caribbean to complete his

11  sailing and scuba diving certifications or classes,

12  is it your understanding that he could have completed

13  the online Allied High School classes on time?

14      A.   Yes.

15      Q.   When Noah began in August of 2013 at Culver

16  then he was a sophomore?

17      A.   Yes.

18      Q.   And he still currently is, correct?

19      A.   Yes.

20      Q.   I'll hand you Group Exhibit 3 for

21  identification and I am going to have you look at

22  one, two, three, four -- it's actually the last page.

23  This was previously marked at Noah's deposition.

24  Just let me know when you are done taking a look at

61

1    it.

2         A.    Yes.

3         Q.    Last page at the bottom has a copy of a

4    check; is that correct?

5         A.    Yes.

6         Q.    Who is the check made out to?

7         A.    Brian Olafson.

8         Q.    And to the best of your understanding, is

9    that for the drug test that was performed on Noah

10   that your husband requested?

11        A.    Well, I believe, yes.  I mean I -- isn't

12   all these things about --

13        Q.    This is what I got from you all so I'm just

14   asking you if you know what that is.

15        A.    Yes, I see drug screen charge.

16        Q.    And the check that -- that's one of your

17   checks, correct?

18        A.    Yes, it is.

19        Q.    And that's your signature at the bottom of

20   that check?

21        A.    Yes, it is.

22        Q.    And the amount on that check is what?

23        A.    $785.00.

24        Q.    Do you know if any of that was submitted to

62

1  insurance?

2        A.   It was not.

3             MR. DIETCHWEILER:   I object on the

4  Collateral Source Rule anyway.

5  BY MS. GOGGIN-WARD:

6        Q.   The date on that check appears to be

7  August 7th of 2013.  Do you see that?

8        A.   Yes.

9        Q.   Do you know why when the actual test was

10 January 25th of 2013 it took six or so months to have

11 Dr. Olafson paid?

12       A.   Well, because the -- I know the insurance

13 takes forever to decide whether they are not going to

14 pay.

15       Q.   Okay.  Do you know if any other services

16 were given to Noah on January 25th of 2011 besides

17 the actual drug screen test?

18       A.   No.

19       Q.   Do you know who Tom Barrie is?

20 B-A-R-R-I-E.

21       A.   That is Michael's grandmother's boyfriend.

22       Q.   Did you ever talk to Tom Barrie about the

23 incident involving Noah or Michael McKay?

24       A.   No.

63

1          Q.    Do you know if your husband did?

2          A.    Yes.

3          Q.    Did your husband ever tell you what Tom

4    Barrie told him about this incident?

5          A.    Just that the prescription, he had filled

6    the prescription the night of the 24th.

7          Q.    Do you know what that was for?

8          A.    The prescription, what the prescription was

9    for?  I don't recall.

10         Q.    Is the name of the Caribbean diver camp or

11   school that Noah was supposed to go to or did go to

12   the summer of 2013 the Sail Caribbean Divers?

13         A.    I think it's just Sail Caribbean.

14         Q.    Okay.

15               MS. GOGGIN-WARD:  I'm all done.

16               MR. TAGUE:  You have the right, just like

17   Mike had, to read the transcript for transcription

18   accuracy and based upon what he said I don't think

19   you need to read it, you can waive too.  I would

20   recommend that you do.

21         A.    Yes.

22               MR. DIETCHWEILER:  Waive.

23   (Concluding at 3:43 p.m.)

24   AND FURTHER THE DEPONENT SAITH NOT

64

1                    (Signature Waived)

2              ANN DIETCHWEILER

65

STATE OF ILLINOIS   )
                    )
COUNTY OF VERMILION)


        I, Amy Prillaman Buhr, a Certified Shorthand
Reporter, in and for the County of Vermilion, State
of Illinois, do hereby certify that ANN DIETCHWEILER,
the deponent herein, was by me first duly sworn to
tell the truth, the whole truth and nothing but the
truth, in the aforementioned cause of action.
        That the foregoing deposition was taken on
behalf of the Defendant, at the offices of Flynn,
Palmer, Tague, Lyke & Jacobson, 402 West Church,
Champaign, Illinois,, on February 20, 2014;
        That said deposition is a true record of the
testimony given by the deponent and was taken down in
stenograph notes and afterwards reduced to
typewriting under my instruction; and that it was
agreed by and between the witness and attorneys that
said signature on said deposition would be waived.
        I do hereby certify that I am a disinterested
person in this cause of action; that I am not a
relative of any party or any attorney of record in
this cause, or an attorney for any party herein, or
otherwise interested in the event of this action, and
am not in the employ of the attorneys for either
party.
        IN WITNESS WHEREOF, I have hereunto set my hand
this 28th day of February, 2014.


        _____
        AMY PRILLAMAN BUHR, CSR, FCRR

**$**

**$785.00 (1)**
61:23

**A**

**able (1)**
38:17
**abnormal (1)**
32:4
**Academy (4)**
5:22,24;14:12;57:3
**access (1)**
30:20
**accident (1)**
36:15
**accuracy (1)**
63:18
**accused (2)**
18:20;26:21
**across (4)**
6:19;17:11;50:2,3
**activities (1)**
8:1
**activity (2)**
13:4;16:3
**actual (3)**
30:17;62:9,17
**actually (12)**
11:13;15:10,13;
19:8;20:15;25:12;
31:18;40:13;50:18;
52:22;58:21;60:22
**additional (1)**
36:2
**additionally (1)**
36:12
**address (1)**
5:15
**addressed (1)**
26:15
**admitted (1)**
21:8
**Adrenne (2)**
4:7,13
**A-D-R-E-N-N-E (1)**
4:13
**adult (1)**
13:5
**advise (1)**
22:6
**advised (1)**
22:14
**afternoon (2)**
11:1;39:21
**again (4)**
15:12;22:1;24:19;
55:4
**ago (1)**
19:10
**agreement (1)**

**4:8**
**air (1)**
17:16
**alcohol (2)**
36:24;37:4
**Allied (3)**
58:23;59:3;60:13
**allowed (2)**
22:10;54:20
**along (3)**
37:23;46:10;49:19
**always (1)**
46:4
**amount (1)**
61:22
**amounts (1)**
46:4
**and/or (1)**
47:2
**ANN (1)**
4:2
**answered (1)**
20:20
**apparently (2)**
6:6;53:2
**appeal (1)**
48:19
**appeared (1)**
52:10
**appears (1)**
62:6
**applicable (1)**
4:9
**application (1)**
14:12
**applying (1)**
14:23
**area (1)**
6:15
**argument (1)**
40:18
**around (3)**
21:17;38:9;45:20
**arrested (3)**
36:24;43:15;47:7
**arrive (1)**
8:18
**arrived (1)**
9:15
**assess (1)**
31:7
**assessing (1)**
31:23
**assignments (3)**
29:12;30:17,24
**attend (1)**
58:10
**attorney (1)**
4:18
**attorney's (1)**
51:22
**attorneys' (2)**
43:13;53:5

**August (6)**
6:1;59:22;60:1,4,
15;62:7
**aware (9)**
6:7;31:1;43:14;
45:3;50:7,11,13,17,21
**away (6)**
5:21;35:11;41:5,13;
60:6,9

**B**

**back (34)**
6:11;8:22;9:24;
10:20;12:23,23;
15:21;23:19;25:17;
26:6;29:6,20;30:13,
16;31:3;33:10,18;
36:3,11;40:2,12,16;
42:2;44:9;45:5;47:10,
12,16;51:24;54:21;
55:7,11,12;57:21
**backing (1)**
33:1
**backpack (1)**
29:5
**Ball (1)**
38:17
**Band (2)**
13:16,16
**Barrie (3)**
62:19,22;63:4
**B-A-R-R-I-E (1)**
62:20
**based (1)**
63:18
**become (1)**
50:11
**bed (1)**
45:17
**bedroom (4)**
40:23,24;41:7,8
**began (1)**
60:15
**beginning (2)**
10:14;55:13
**behalf (2)**
6:5;15:11
**behavior (2)**
32:4,5
**behind (3)**
17:5,15;20:15
**bell (2)**
7:23;8:4
**Berkler (1)**
14:4
**besides (4)**
36:17;37:12;49:13;
62:16
**best (5)**
9:9,12;57:20,24;
61:8
**better (1)**

**34:2**
**big (1)**
12:12
**Black (1)**
12:11
**block (1)**
41:15
**board (4)**
43:20;52:12,24;
54:18
**board's (1)**
54:11
**books (7)**
17:21;29:15,20,21,
24;30:13;34:19
**both (5)**
25:7;28:15,20,22;
37:20
**bottom (5)**
27:15,24;28:3;61:3,
19
**boy (1)**
30:7
**boyfriend (1)**
62:21
**break (2)**
5:11,13
**breathing (1)**
32:5
**Brett (2)**
35:9,12
**Brian (1)**
61:7
**briefly (1)**
36:17
**bring (1)**
40:2
**bringing (1)**
30:13
**brought (3)**
20:8;29:15;30:16
**brownish (1)**
12:13
**Bunting (25)**
16:23,24;17:3;
18:11;20:21;21:3,19,
24;22:4,15;23:2;
25:13;26:24;28:11,
19;33:15;35:7;39:19,
24;47:20;48:3,8,11,
11,15
**Bunting's (2)**
17:8;25:8

**C**

**call (15)**
11:11,14;19:2,6;
22:22;23:20;34:1;
35:5;36:3,10;37:12;
38:2;42:15;43:6;
58:19
**called (8)**

**19:14,17;20:3,4,7;
42:16;51:21;53:5**
**calling (3)**
19:20;43:5;46:9
**calls (4)**
15:7;42:14;45:12,
15
**came (6)**
11:14;34:19;38:12;
44:9;45:5;46:14
**camp (1)**
63:10
**can (7)**
7:8;11:8;25:14;
36:15,18;57:15;63:19
**car (8)**
8:22;9:17;10:10,12;
11:19;33:6,7,22
**care (3)**
24:15;38:19;48:17
**Caribbean (4)**
60:10;63:10,12,13
**Caucasian (1)**
12:12
**cell (11)**
9:3,20,22,24;10:3;
11:3,18;16:8;19:15;
20:1,2
**Center (2)**
31:21,22
**certifications (1)**
60:11
**chance (1)**
40:13
**charge (1)**
61:15
**charges (1)**
37:1
**check (7)**
39:8;61:4,6,16,20,
22;62:6
**checks (1)**
61:17
**choir (1)**
13:16
**Christmas (2)**
58:8,11
**circumstances (1)**
52:2
**Cissna (3)**
56:15;57:9,13
**City (1)**
55:22
**Civil (1)**
4:10
**class (3)**
34:17;35:2,3
**classes (11)**
29:13;58:10;59:6,
12,14,16,19,24;60:3,
11,13
**close (2)**
26:13;33:4

closed (1)
12:4
Code (1)
4:10
Collateral (1)
62:4
coming (2)
10:17;11:11
Commencing (1)
4:1
complete (4)
59:18,24;60:3,10
completed (2)
60:7,12
computer (4)
38:21;39:3,9;46:3
concerning (6)
6:6;14:12;47:2;
55:23;57:4,9
Concluding (1)
63:23
conference (2)
13:19;53:13
confessed (1)
18:12
considered (1)
36:20
contact (4)
14:19;49:8;57:3,7
contacted (2)
43:9,9
contacting (2)
46:9;57:6
continued (1)
22:15
conversation (4)
14:22;34:10;36:2;
48:22
conversations (1)
36:14
cooperate (1)
18:17
cooperated (2)
18:14,15
copious (1)
46:4
copy (3)
39:17;40:2;61:3
corridors (1)
13:8
couple (3)
13:9;19:10;29:12
course (1)
5:10
courses (2)
59:11;60:8
court (6)
4:9,9,10,22;5:3;
36:8
credenza (1)
20:15
credit (1)
59:24

credits (3)
57:4,10;59:6
Crescent (1)
55:22
crushed (1)
18:3
Culver (14)
5:22,24;14:12,24;
15:6,11,15,17,19;
57:3,5,8;59:7;60:15
Culver's (1)
59:9
current (1)
5:15
currently (1)
60:18

**D**

dad (1)
37:22
Dakota (6)
30:11;49:17;50:8,
13,22;54:7
Dakota's (1)
50:17
dance (1)
38:18
danger (1)
21:18
date (2)
26:18;62:6
day (18)
8:6,12;9:13,20;
10:15;13:14;17:1;
21:9;29:17,18;34:20;
35:1,3;36:12;43:15;
46:17;49:14;55:1
days (2)
55:6,6
decide (4)
55:11,15;58:18;
62:13
decided (1)
57:23
decision (4)
54:12,15;57:22;
58:2
decisions (1)
47:13
Denise (2)
43:9;53:3
depends (1)
5:19
DEPONENT (1)
63:24
deposition (6)
4:6,16,20;5:10;
24:18;60:23
describe (2)
41:3;44:21
described (1)
44:19

desk (6)
17:5,5,9,19;20:14,
16
detriment (1)
58:6
Developmental (1)
31:21
dialed (2)
20:14,17
died (1)
42:1
DIETCHWEILER (7)
4:2,7,11,13,15;
62:3;63:22
D-I-E-T-C-H-W-E-I-L-E-R (1)
4:14
difference (1)
32:7
different (4)
8:10,15;32:5;35:13
difficult (1)
5:3
difficulty (1)
15:2
dinner (1)
37:23
direct (2)
22:3;28:6
directly (2)
17:22;42:23
disciplinary (1)
21:6
discuss (2)
52:1,2
discussed (2)
38:13;47:1
dismissal (2)
7:23;8:4
dismissed (1)
7:19
distressed (1)
18:9
District (2)
4:9;55:23
diver (1)
63:10
Divers (1)
63:12
diving (1)
60:11
doctor (4)
43:3,4,24;44:23
document (10)
22:11;25:5,10;
26:23;27:3,16;28:7,
14;40:8;50:14
done (8)
6:24;15:9;22:9;
37:7,10;53:18;60:24;
63:15
door (6)
12:3,6;16:20;29:3;
35:14,16

doors (2)
6:19;12:1
down (11)
4:22;5:3;13:7,8;
15:23;17:19;18:6;
26:6;38:12;42:1;59:2
Dr (6)
42:16,17;43:2,5;
44:13;62:11
drank (1)
37:4
dressed (1)
42:11
drink (1)
37:18
drive (5)
6:12;22:24;34:6,7;
42:11
driveway (1)
6:21
driving (1)
44:18
drop (1)
7:10
drop-off (1)
8:11
drove (2)
43:22;45:9
drug (9)
13:4;16:2;18:19;
39:15;42:8;44:8;61:9,
15;62:17
drugs (12)
18:13;21:6,17;
22:19;32:1,15,21;
36:24;37:4;45:6;
48:15;50:9
duly (1)
4:3
during (12)
5:10;14:16;16:9;
29:22;33:24;34:11;
38:8;47:3;53:22;56:4,
12;60:6

**E**

earlier (1)
21:9
East (1)
5:16
easy (1)
41:8
eat (1)
37:18
either (2)
22:9;28:12
else (23)
11:8;12:20;15:14,
23;21:11;22:4,14;
23:21;34:21,23;
35:20,22,23;36:17;
37:12;38:2;43:5;

46:15;48:24;49:3;
51:5;56:16,18
e-mails (1)
46:2
English (1)
13:24
enough (2)
23:16;26:13
entire (2)
6:24;53:22
especially (1)
36:16
evaluate (1)
23:5
even (2)
26:19;39:3
evening (1)
43:17
eventually (1)
48:2
everybody (1)
35:9
EXAMINATION (4)
4:4;43:23;44:5,16
exams (1)
58:7
Excellent (1)
5:1
Exhibit (2)
24:18;60:20
exit (1)
29:3
expelled (4)
32:17,18;50:22;
51:4
express (1)
23:2
expulsion (1)
53:1
eyes (4)
18:5,7,8;32:6

**F**

face (2)
18:6;28:21
fact (1)
36:15
faculty (1)
13:20
fair (1)
30:14
fall (3)
6:11;7:1;14:16
familiar (1)
25:1
far (2)
41:5;58:3
February (5)
49:10,15;52:10;
54:21;56:8
federal (1)
4:10

feel (2)
  5:10,13
feet (1)
  41:13
felt (3)
  28:8,9;58:6
figure (1)
  57:19
filed (1)
  6:5
filled (1)
  63:5
finally (1)
  15:8
find (1)
  59:1
fine (2)
  39:15;42:8
finish (2)
  5:1;36:6
first (20)
  4:3;9:11;18:10;
  19:6,21;20:7,9,18;
  28:23,24;31:5;34:17;
  37:6,9;41:9,10;43:14;
  51:7,15;58:7
five (4)
  19:16;55:6,6;59:1
floor (3)
  41:9,9,11
following (1)
  58:11
follows (1)
  4:3
forced (4)
  32:14,19,20,21
forever (2)
  16:6;62:13
forgot (1)
  39:17
four (1)
  60:22
free (2)
  5:11,13
Friday (5)
  8:7,11,16,19;9:10
friend (5)
  30:2,5,9;36:19,20
friends (4)
  29:14,23;30:13;
  46:13
front (7)
  6:19;12:1,3;17:22;
  25:7;29:3;54:3
full (1)
  4:12
fund (1)
  13:17
further (2)
  34:10;63:24

G

gait (1)
  32:7
garbage (2)
  40:11,12
gave (2)
  20:6;44:23
general (1)
  20:19
gesture (1)
  4:21
girl (1)
  30:7,9
given (4)
  4:15;15:10,13;
  62:16
giving (2)
  4:19;43:12
goes (1)
  5:21
Goggins (1)
  51:12
GOGGIN-WARD (3)
  4:5;62:5;63:15
Governor (1)
  31:14
GP (1)
  43:4
grabbed (1)
  40:10
grandmother's (1)
  62:21
green (1)
  8:23
grocery (1)
  50:2
Group (1)
  60:20
guess (2)
  21:4;55:9
guy (1)
  12:12
guys (5)
  29:13;38:6;42:11;
  49:6;53:9

H

hair (2)
  12:13,13
half (1)
  22:20
hall (2)
  15:23;23:18
hallway (2)
  13:7;19:16
hand (3)
  28:24;29:1;60:20
handed (1)
  39:17
handle (1)
  33:19
hands (5)
  28:16,17,19,23;

48:16
hang (1)
  36:18
hangs (1)
  25:18
happen (1)
  58:19
happened (13)
  6:7;24:3,7;34:24;
  36:12;42:2;44:16,19;
  46:17;47:3;50:22;
  52:6;60:8
happy (1)
  5:6
hard (3)
  36:8,15;41:2
head (2)
  48:16;55:2
hear (3)
  19:13;40:18,20
heard (5)
  34:15;37:9;40:21;
  41:18;46:18
hearing (9)
  41:16;43:16,20;
  50:12;52:24;53:16,
  22;54:18;56:8
hearings (1)
  52:18
held (1)
  29:21
help (1)
  8:24
High (7)
  6:7,16;13:21;29:3;
  30:21;47:16;60:13
himself (1)
  18:12
history (1)
  39:8
holidays (1)
  58:15
home (21)
  34:2,6,7,11;35:20,
  24;37:15,19,22;38:3,
  6;39:11;40:5;44:18;
  45:9,11;49:7;55:18,
  23;56:14;57:8
homework (6)
  27:5,12,15,24;29:8;
  30:14
hospital (6)
  22:18,24;31:8;
  42:12;43:1,22
hour (2)
  22:20;38:7
hours (1)
  19:10
house (3)
  36:21;38:2;51:22
hung (3)
  10:22;24:2;45:20
hurry (1)

34:2
husband (63)
  5:18;6:5;9:4;19:2,6,
  9,10,13,20;20:10,18,
  20;21:12,14,22;22:2,
  6,9,13;23:21;24:2;
  25:18;26:16;33:19,
  20;36:3,11,14;37:13,
  19;38:5;39:11;40:4,7,
  13,19;41:19;42:2,6,7;
  43:6,8,24;44:15;
  45:14;46:1;47:16,24;
  48:10,12,13;49:1,13;
  53:13;55:11,14,15;
  57:1,6;58:18;61:10;
  63:1,3
husband's (2)
  19:3;20:2

I

idea (1)
  13:10
identification (1)
  60:21
Illinois (1)
  5:17
incident (6)
  6:6,8;42:18;51:19;
  62:23;63:4
incidents (1)
  49:13
including (1)
  47:3
indicated (1)
  11:5
inform (1)
  14:23
information (1)
  15:3
informed (1)
  54:11
infraction (1)
  13:4
initial (3)
  44:8,24;56:4
input (1)
  15:1
inside (6)
  7:5;11:6;13:11,15;
  16:22;23:10
instructors (1)
  15:1
insurance (2)
  62:1,12
intend (1)
  47:10
interested (2)
  57:17,18
intimidated (2)
  28:8;33:17
intimidating (1)
  13:1

into (11)
  12:1;15:17,19;
  33:10;40:10;46:9;
  47:23;50:3,18;53:9;
  58:3
introduced (1)
  18:12
investigation (1)
  46:9
involved (1)
  18:17
involving (1)
  62:23

J

Jake (1)
  30:11
January (16)
  8:7,19;9:1,4,10;
  11:1;13:18;14:11;
  15:21;29:17;37:4;
  38:20;58:11,16;
  62:10,16

K

KCC (1)
  31:14
keep (1)
  36:13
Kelly (5)
  30:9,10;46:14,16;
  47:2
kept (1)
  35:8
kid (1)
  51:13
kids (3)
  34:22;35:1
kind (7)
  5:9;8:22;32:6;43:3,
  4;45:20;60:7
kitchen (3)
  41:6,11;42:6
knew (7)
  13:4;23:4;42:21;
  43:2;46:19;47:7;59:8
knowing (1)
  16:2
knowledge (3)
  9:9,12;20:9
known (1)
  37:3
Konce (3)
  51:7,12,21
Konce's (1)
  51:19

L

last (3)
  41:23;60:22;61:3

DIETCHWEILER v.
LUCAS, ET AL.

ANN DIETCHWEILER
February 20, 2014

**late (3)**
59:22;60:1,3
**later (1)**
19:16
**lawsuit (1)**
6:4
**leaned (2)**
25:23,24
**leaning (1)**
25:24
**least (1)**
54:20
**leave (8)**
7:22;25:19;28:12;
31:2;35:4;40:1;53:24;
54:1
**leaving (2)**
8:3;29:2
**led (1)**
16:13
**left (3)**
17:16;28:15;29:13
**line (1)**
49:19
**lines (2)**
37:24;46:10
**live (1)**
5:18
**local (1)**
4:9
**locate (1)**
58:23
**located (2)**
6:18;25:4
**Locked (1)**
11:21
**locker (2)**
29:15,24
**long (14)**
5:8,24;7:22;10:15;
15:6;16:5;23:8,10,12,
16;38:5;41:23;48:22;
53:16
**look (8)**
23:16;26:19;39:5,6;
40:14;42:9;60:21,24
**looked (5)**
12:9;18:2,3;40:9;
42:10
**looking (4)**
26:7,10;31:23;32:2
**looks (2)**
24:12;27:6
**lot (1)**
6:22
**loud (6)**
4:21;25:12;26:24;
27:9
**Lucas (24)**
12:8,15,15;13:6;
15:22,22;17:13;
20:21;21:3,19,23;
22:4,15;23:3,19;25:8,

13;26:24;28:11,17;
33:16;35:8;39:19,24
**Lucas's (1)**
16:19
**lunch (3)**
34:18;46:22;47:3
**lunchroom (1)**
34:16

**M**

**making (1)**
47:13
**man (2)**
12:5,7
**Mann (3)**
55:24;56:12;57:12
**marijuana (1)**
37:10
**mark (1)**
24:18
**marked (2)**
24:17;60:23
**married (2)**
14:2,3
**maybe (2)**
14:7;43:13
**McKay (6)**
36:19;43:9;51:3;
52:20;53:4;62:23
**mean (6)**
12:24;41:3;45:21;
52:21;54:16;61:11
**meaning (1)**
57:8
**meant (1)**
46:22
**medical (2)**
23:6;31:22
**medically (2)**
31:7,11
**meet (3)**
7:4;48:2;49:3
**meeting (10)**
8:3;14:8;49:9;
50:18,19;52:9,11;
53:9;55:24;56:12
**meetings (1)**
14:10
**met (1)**
16:24
**Michael (18)**
21:5;34:18,19;
36:19,23;42:13,15;
43:12,14;47:7;51:3,4,
24;52:20,23;53:7;
59:1;62:23
**Michael's (2)**
34:19;62:21
**middle (2)**
59:10,13
**Mike (1)**
63:17

**minute (1)**
40:9
**minutes (7)**
7:24;8:4;16:7;
19:16;23:11;41:24;
48:23
**Miss (3)**
4:11,15;14:2
**missed (1)**
25:14
**mistake (1)**
10:23
**mom (4)**
32:14;35:12;50:17;
54:7
**Monday (4)**
8:16;47:15;49:14;
55:7
**monitor (2)**
38:21;39:2
**months (1)**
62:10
**more (2)**
47:1;49:8
**morning (2)**
7:11;47:15
**mother (3)**
12:19;35:10;49:18
**Mrs (1)**
51:21
**much (3)**
7:2;18:18;42:10

**N**

**name (7)**
4:12;14:1,3;51:8,
15,22;63:10
**names (3)**
43:13;51:17;53:6
**Nathan (4)**
51:9,11,12,18
**need (2)**
24:18;63:19
**needed (4)**
10:24;11:6;23:6;
31:8
**new (1)**
58:5
**next (6)**
24:3;26:2,3;29:12;
42:2;55:6
**night (9)**
43:18,19;45:2;46:2;
52:19;53:10,14;
54:12;63:6
**Noah (130)**
6:10;7:1,7,14,22;
8:1,15,19;9:1,3,13;
10:8,16,18,22,23;
11:18;12:22;13:2;
14:24;16:2,23;17:6,
15,22,24;18:2,12,14,

19;21:1,6,8,23;22:3,
10,14,24;23:12;24:4,
5,9,11,14,22;25:10,
14,19,20;26:5,21,23;
27:2,9,24;28:6,14,16,
17,19,22;29:1,5,8,11,
24;30:17,20;31:2,6,
23;33:10,16;34:3,11;
35:15,17,20,23;36:3,
11,20;37:3,6,9,16,18;
38:8;39:14,18,23;
40:8,10,19;41:21;
42:6,9;43:23;44:18,
21;45:17,19;46:12;
47:2,6,10;48:15;
49:13;51:20;52:7;
54:20;55:11,16,18,23;
56:13,23;57:13,20;
58:4,10,22,23;59:1,
12;60:15;61:9;62:16,
23;63:11
**Noah's (23)**
11:3,12,18;12:18;
13:20;14:12;15:11,
14;17:16;25:1;26:1,7;
27:6;28:23;29:22,23;
30:23;38:21;39:2,8;
43:16;56:4;60:23
**nods (1)**
55:2
**normal (2)**
32:5;35:3
**North (1)**
5:16
**notes (4)**
46:1,4,5,6
**notice (4)**
4:7;20:10;26:20;
34:17
**noticed (1)**
17:20
**notification (1)**
10:16
**number (8)**
9:22;10:3;11:12;
19:4;20:2,2,4,5
**numbers (2)**
20:17;39:6
**nurse (3)**
31:16,18;43:2

**O**

**object (1)**
62:3
**obviously (1)**
6:4
**Occasionally (3)**
36:22;38:24;39:4
**off (3)**
7:10;10:10,12
**offered (1)**
17:17

**office (12)**
12:22;16:14,16,17,
18,19;20:4,5;23:10,
14;25:8;29:2
**Olafson (7)**
42:16,17;43:2,5;
44:13;61:7;62:11
**Olivet (1)**
31:14
**once (1)**
23:4
**one (15)**
5:5;14:7;29:14,16,
23;30:13;50:14;
52:12;54:4,10;55:6;
56:21;59:3;60:22;
61:16
**online (13)**
30:21,24;56:19;
57:9,23;58:18,21,23;
59:10,12,15,17;60:13
**only (6)**
5:11;13:3;28:9;
36:15;39:3;53:5
**open (1)**
12:4
**opened (2)**
12:6;16:20
**opposed (3)**
4:21;8:11,16
**option (1)**
57:20
**options (5)**
56:11,13,21;59:1,5
**original (1)**
40:1
**others (1)**
51:16
**out (29)**
4:21;10:17;11:19;
22:18,21;23:7;24:14,
16;25:12;26:24;27:9,
21;28:9,10,22,23;
29:1,3,24;31:9,10;
33:1;40:11;42:2;44:3;
48:18;50:19;57:20;
61:6
**outside (3)**
20:8;23:5;54:4
**over (17)**
4:18;17:15,16;18:8;
24:8;25:15,21,23,24;
26:1,7;46:12,14;47:9,
11;52:24;59:2

**P**

**page (2)**
60:22;61:3
**paid (1)**
62:11
**paper (9)**
24:8,19;25:20,21;

**DIETCHWEILER** v.
LUCAS, ET AL.

26:11,20;39:18;40:1;
52:3
**Papers (1)**
17:21
**Papineau's (1)**
49:17
**Pardon (5)**
10:11;23:9;30:4;
51:10;56:17
**parents (1)**
51:19
**parent-teacher (1)**
13:19
**park (4)**
6:21;56:15;57:9,13
**parking (4)**
6:22;7:3,6;33:2
**part (9)**
9:11;27:5,9,11,15,
23,24;28:3,4
**particular (2)**
38:15;40:7
**parties (1)**
4:8
**paste (1)**
40:12
**pay (1)**
62:14
**pending (1)**
5:12
**people (1)**
5:4
**perform (1)**
46:8
**performed (1)**
61:9
**period (3)**
47:4;59:19,21
**person (3)**
15:22;49:21,22
**personal (2)**
46:6;49:8
**personally (9)**
6:13;15:4;44:6,12;
46:8;49:12;51:18;
53:3;56:21
**personnel (2)**
15:11;50:8
**phone (39)**
9:3,7,10,13,18,20,
22,24;10:3,21,23;
11:3,11,12,18;16:8;
19:15,17;20:1,2,9,10,
12,13,20;21:4,22;
22:3;23:22;33:24;
36:13,16;38:21;39:3,
6;42:14;45:11,15;
49:20
**physical (1)**
41:4
**pick (5)**
6:12;7:14;8:14,19,
24

**pickup (2)**
6:15;8:23
**pick-up (1)**
8:10
**piece (9)**
24:8,19;25:20,21;
26:10,20;39:18;40:1;
52:3
**pieces (1)**
40:10
**place (2)**
25:19;44:20
**places (3)**
25:4,7;39:24
**plan (1)**
47:9
**planned (1)**
38:18
**please (4)**
4:11;5:5,10;22:1
**pm (4)**
4:1;9:16;11:2;
63:23
**point (13)**
22:7;29:16,22;
40:17;43:10;45:2;
46:14;50:7;53:24;
55:10;56:4;57:19;
58:5
**policy (2)**
21:16;59:9
**possibly (2)**
56:14;58:16
**posted (1)**
30:23
**practice (3)**
13:16;31:16,18
**preference (1)**
56:20
**preliminary (1)**
45:3
**prescription (4)**
63:5,6,8,8
**presence (1)**
20:8
**present (10)**
19:8;24:22;43:8,23;
44:6,8,23;45:14;48:5;
53:22
**presented (1)**
56:13
**Pretty (1)**
7:2
**prevent (1)**
8:2
**previous (2)**
14:10;60:5
**previously (2)**
36:24;60:23
**principal (1)**
34:19
**Prior (2)**
50:12;55:22

**Probably (10)**
7:12;12:15;16:7,7;
33:1,23;40:23;41:24,
24;56:9
**problem (4)**
13:3;21:6;57:16;
60:7
**Procedure (3)**
4:10;48:18,20
**professionally (2)**
42:21,24
**proved (1)**
48:14
**provide (1)**
19:3
**provided (1)**
9:4
**provider (2)**
9:24;10:5
**pulled (1)**
50:18
**punch (1)**
28:20
**purpose (3)**
30:12;47:19;50:1
**purposes (1)**
13:14
**purse (1)**
16:11
**pursuant (2)**
4:7,8
**push (1)**
25:19
**pushed (1)**
24:8

---

## R

**radio (1)**
10:7
**Rae (1)**
4:13
**R-A-E (1)**
4:14
**raisers (1)**
13:17
**ran (2)**
50:3,3
**reach (3)**
25:21;28:22,23
**reached (1)**
29:1
**read (14)**
25:10,12,22,23;
26:13,24;27:3,9,13,
14,18,23;63:17,19
**reading (2)**
25:17;27:5
**really (8)**
21:21;23:23;26:9;
30:8;37:20;49:24;
56:11;58:16
**recall (12)**

11:9;23:24;45:22,
24;46:15;48:10;50:6;
53:17,19;54:17;
58:14;63:9
**receive (3)**
10:16,20;18:18
**receiving (1)**
15:3
**recitals (1)**
13:16
**recommend (1)**
63:20
**record (2)**
4:6,12
**red (1)**
18:8
**references (2)**
15:10,13
**regard (1)**
44:4
**regardless (1)**
11:17
**registered (1)**
23:20
**regularly (2)**
39:1;58:10
**relation (1)**
51:14
**relationship (2)**
32:23;40:24
**relieved (1)**
42:10
**remember (26)**
12:9;13:23;14:1,8,
19,20,21;19:18,20,23;
21:10,13,21;25:17;
29:7,10;36:1;37:17,
20;38:13,16;49:24;
50:5;51:17;56:10,11
**repeat (1)**
5:6
**repeated (1)**
15:7
**rephrase (2)**
5:6;8:14
**reporter (3)**
4:22;5:3;36:8
**represent (2)**
43:12;51:23
**request (3)**
5:11,11;29:11
**requested (1)**
61:10
**required (3)**
14:24;59:18,24
**researching (1)**
58:21
**response (2)**
16:1;19:1
**responsible (1)**
29:21
**rest (4)**
34:20,24;35:3;

55:16
**results (5)**
44:9,17;45:3;47:20;
48:14
**resume (1)**
58:14
**return (1)**
47:10
**review (1)**
4:19
**ride (1)**
34:11;35:20,23
**Right (23)**
6:19;11:7,16,16;
16:15;17:8,12;26:2,3,
12;27:14;31:3;32:11,
12;33:3,5,22;34:6,7;
39:23;45:9,10;63:16
**ringing (1)**
10:21
**ripped (2)**
40:10,14
**Riverside (2)**
31:21;42:22
**RN (1)**
31:12
**Road (3)**
5:16;6:23;7:4
**room (21)**
16:14;17:14;18:11;
19:8;20:19;21:4;23:8;
24:3,22;28:10;35:8,
13;38:10;40:2;43:11,
23;44:3,9,11,16;53:13
**Rule (1)**
62:4
**rules (3)**
4:9,10,19
**run (1)**
50:2
**running (1)**
18:5

---

## S

**Sail (2)**
63:12,13
**sailing (1)**
60:11
**SAITH (1)**
63:24
**same (7)**
5:4;7:6;10:22;
11:12,14;29:17;41:11
**sat (3)**
17:19;26:6;46:20
**saw (9)**
26:15;35:15;39:13;
42:6;49:22;52:20,20,
21,22
**saying (4)**
38:16;40:21;48:10,
11

scan (1)
  15:5
scanner (1)
  15:8
scheduled (1)
  52:19
scheduling (1)
  60:6
school (85)
  5:21;6:7,11,16,20;
  7:5,7,14,19,23;8:1,3,
  19;9:7,15;10:24;11:6;
  12:2;13:3,7,11,15,21;
  18:13;19:17;21:7,16,
  17;22:20;23:5;25:14;
  29:3,9,12,15,20,21,
  23;30:21;31:13;
  32:15,17,18,22,24;
  33:10;34:20;35:1;
  43:15,20;46:10,17;
  47:3,16,23;48:15,18;
  49:4,9,14;50:8,9,22;
  51:6;52:12,24;54:11,
  18,21;55:1,5,22,22;
  56:14,19;57:8,9;58:4,
  5,5,14,19,24;60:13;
  63:11
schooled (1)
  55:18
schooling (3)
  55:23;56:14;57:8
schools (1)
  60:10
screen (2)
  61:15;62:17
scuba (1)
  60:11
sealed (1)
  44:24
seat (1)
  17:17
seated (4)
  17:3,5,9;26:4
second (1)
  41:9
secretary (1)
  35:10
section (1)
  27:16
seeing (1)
  16:2
seemed (1)
  16:6
seems (2)
  29:14;46:18
semester (12)
  6:11,24;7:1,8;8:2;
  14:16;55:16;58:3,7;
  59:10,13,13
separate (2)
  46:20,22
separated (1)
  35:9

services (1)
  62:15
serving (2)
  54:24;55:5
setting (1)
  41:4
several (2)
  41:13;51:16
shake (3)
  28:22,23;29:1
Shapiro (1)
  31:21
SHARI (1)
  4:5
shattered (1)
  23:17
shook (4)
  28:16,17,19;48:16
short (3)
  12:11,12;36:14
Short's (2)
  35:10,12
shoulder (3)
  26:1,8,9
show (4)
  13:16;24:17;40:4;
  47:20
shut (2)
  10:10,12
sign (15)
  22:7,10;24:9,9,10,
  14;25:7,20;26:23;
  28:3,6;32:1,15,19;
  50:13
signature (4)
  25:1,4;27:6;61:19
signed (15)
  24:15,23;25:11;
  26:5,6;27:1,3,10,24;
  28:3,14;39:18,23;
  50:14;52:3
signs (1)
  32:2
similar (1)
  50:14
sit (1)
  59:2
site (1)
  39:5
sitting (5)
  17:7,10,14;22:20;
  35:15
situation (1)
  38:16
six (1)
  62:10
slumped (1)
  18:8
somebody (4)
  11:15;15:14;20:14;
  58:20
somehow (1)
  15:8

someone (1)
  21:16
sometime (3)
  14:16;43:18,20
sometimes (1)
  5:9
Somewhere (1)
  49:19
son (14)
  5:19,21;6:5,10;
  22:7,18;27:21;50:14,
  19;51:3,4,19,23;52:3
son's (1)
  36:19
soon (2)
  59:14,16
sophomore (1)
  60:16
Sorry (4)
  9:12;31:17;36:7,9
sounds (3)
  30:12;47:15;52:23
Source (1)
  62:4
space (3)
  7:3,6;33:2
speak (2)
  49:17;53:12
speaker (8)
  19:17;20:9,10,12;
  21:4,22;22:3;23:22
specific (3)
  6:15;7:3,16
specifically (1)
  7:17
specimen (1)
  44:24
spell (1)
  4:12
spoke (1)
  51:21
spoken (1)
  50:8
spring (1)
  8:2
spring/fall (1)
  7:8
staff (1)
  21:18
stand (1)
  17:13
standing (3)
  19:15;26:2,4
start (4)
  5:2;7:7;58:4;59:14
started (7)
  10:21;35:14,15;
  53:17;58:21;59:14,16
starting (1)
  59:13
state (2)
  4:11;31:15
stay (1)

38:11
still (7)
  10:3,5;16:8;22:19;
  33:1,2;60:18
stood (1)
  17:15
stop (2)
  33:6,7
store (1)
  50:2
student (1)
  21:16
students (4)
  18:16,22;21:17;
  23:18
students' (1)
  52:18
submitted (1)
  61:24
substance (1)
  14:21
summer (2)
  60:6;63:12
suppose (1)
  40:17
supposed (4)
  32:18;52:15;55:7;
  63:11
sure (9)
  4:18;8:14;15:13;
  22:2;29:20;33:23;
  46:14;57:20;58:17
suspended (5)
  18:14;21:7;51:1,5,5
suspension (10)
  18:16;25:15;29:23;
  32:16;47:11;52:24;
  54:19;55:1,6;56:5
sworn (1)
  4:3
symptoms (1)
  32:2
system (1)
  45:6

## T

table (2)
  46:20,22
TAGUE (1)
  63:16
talk (15)
  9:17;22:16,17;
  35:10,11,13;44:12,15;
  46:16;49:12;51:18;
  53:3,7;55:21;62:22
talked (2)
  39:14;49:19
talking (4)
  5:4;24:20;31:9;
  54:6
tall (1)
  12:11

tape (1)
  40:12;44:22
taped (1)
  40:16
teacher (2)
  13:24;14:8
teachers (3)
  13:20;15:14;30:23
tears (2)
  18:5,7
telling (2)
  43:11;51:23
ten (2)
  23:11;54:24
ten-day (1)
  55:5
test (9)
  39:15;42:8;44:8;
  45:3;47:20;48:13;
  61:9;62:9,17
testified (6)
  4:3;19:9,11;53:20;
  54:3,3
testify (1)
  19:13
texted (1)
  10:18
thinking (1)
  22:19
though (1)
  29:14
thought (2)
  12:14;15:22
three (6)
  7:24;8:3;16:7;
  48:23;56:21;60:22
threw (1)
  40:11
Thursday (1)
  8:16
times (1)
  8:11
today (2)
  13:3;18:13
together (3)
  40:12,16;54:9
told (17)
  13:6;15:7;16:2;
  21:5,8;32:24;33:11,
  16;34:3;35:4,6,8;
  36:12;37:6;57:20;
  59:1;63:4
Tom (3)
  62:19,22;63:3
tonight (1)
  38:17
took (9)
  13:9;15:6;16:6,7,7;
  29:8;32:15,21;62:10
top (2)
  27:23;28:4
total (1)
  23:8

toward (1)
    25:20
trained (1)
    31:11
transcript (2)
    15:6;63:17
transcription (1)
    63:17
transferable (1)
    59:6
transferring (2)
    57:4,13
transpired (1)
    44:4
treatment (1)
    23:6
tremors (1)
    32:6
tried (2)
    35:10,12
truck (5)
    8:23;10:12;31:3,10;
    33:22
try (3)
    43:13;57:14,16
trying (2)
    10:23;57:19
turns (1)
    13:9
TV (1)
    41:15
two (6)
    5:3;7:24;8:3;25:4;
    39:24;60:22
type (5)
    10:16,20;16:13;
    18:19;52:24
typical (1)
    7:13
typically (3)
    7:10;10:7,10
typing (1)
    46:2

U

under (1)
    8:13
understood (2)
    21:15,18
unusual (2)
    7:18;34:17
up (21)
    6:12;7:14;8:15,19,
    24;10:23;24:2,6;
    25:14,18,19;36:18;
    38:11,11;40:10,14;
    42:12,22;43:22;
    44:22;58:11
upheld (1)
    54:19
upon (1)
    63:18

upset (3)
    19:22;37:21;45:21
urinalysis (1)
    44:5
urine (1)
    44:23
usage (3)
    38:22;39:3,6
use (1)
    36:16
usually (2)
    7:6,22

V

vacation (1)
    58:11
Vaguely (1)
    12:10
vehicles (2)
    52:21,22
Verizon (2)
    10:2,5
Verkler (2)
    14:2,5
versus (2)
    57:9,9
visit (2)
    46:12;47:19

W

wait (3)
    6:22;10:15;54:4
waiting (7)
    9:16;10:8;12:5;
    37:21;44:3,9,11
waive (2)
    63:19,22
walk (2)
    12:24;16:5
walked (5)
    12:1,3;18:1,11;38:9
walking (6)
    12:23;13:2,7,8;
    15:23;23:19
Watseka (21)
    5:16;6:7,11,15;7:8,
    20;8:12;13:20;14:11;
    15:3,11,14;16:3;
    47:11,13,16;54:20;
    55:11;57:4;58:7,15
Watseka's (1)
    30:20
waved (1)
    48:16
way (2)
    28:9;57:24
ways (1)
    23:19
week (4)
    8:6,12;55:6,7
weekend (4)

46:13;47:1,6,9
weeks (1)
    29:12
weren't (1)
    44:5
what's (3)
    24:17;31:5,6
Whenever (1)
    43:19
white (1)
    12:11
whole (3)
    38:15;44:10,11
whose (1)
    16:18
Winter (1)
    38:17
within (1)
    59:19
without (1)
    57:16
Witness (1)
    55:2
witnesses (5)
    46:9;53:12;54:2,4,6
work (5)
    7:5;25:14;29:9;
    31:20;42:22
worked (1)
    42:23
worse (1)
    18:18
writing (1)
    54:14
wrong (1)
    8:7

Y

year (1)
    58:5
yell (1)
    41:21
yelling (3)
    40:21;41:18;42:1

1

1 (1)
    24:18
10 (1)
    41:24
10-day (1)
    18:15
11th (1)
    54:21
15 (1)
    41:24
1800 (1)
    5:16
1849 (1)
    5:16

2

2:31 (1)
    4:1
2011 (2)
    52:10;62:16
2012 (3)
    6:11;7:1;14:17
2013 (24)
    6:2;8:2,7,20;9:1,5,
    10;10:1;11:2;13:18;
    14:11;15:21;37:4;
    38:21;49:10,15;
    54:21;58:12;60:1,4,
    15;62:7,10;63:12
24th (1)
    63:6
25th (15)
    8:7,19;9:1,4,10;
    11:1;13:18;14:11;
    15:21;29:17;37:4;
    38:20;58:11;62:10,16

3

3 (1)
    60:20
3:00 (2)
    8:21;9:16
3:09 (3)
    7:15,23;8:4
3:25 (2)
    10:18;11:2
3:43 (1)
    63:23
3rd (1)
    58:16

5

5th (4)
    49:10,15;52:10;
    56:8

6

6:30 (1)
    52:16
60970 (1)
    5:17

7

7:00 (1)
    52:16
7:45 (1)
    47:21
7th (1)
    62:7

8

8:00 (3)
    52:17;53:10,17
8:10 (1)
    7:12
8:20 (1)
    7:9
8:30 (3)
    52:17;53:10,17
815 (1)
    9:23
867-0314 (1)
    9:23

9

911 (1)
    22:22

# In The Matter Of:

*DIETCHWEILER v.*
*STEVE LUCAS ET AL*

---

*JAMES BRUNS*
*October 17, 2014*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Original File 1017BRUJ.txt
Min-U-Script® with Word Index

1

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE CENTRAL DISTRICT OF ILLINOIS
2                       STATE OF ILLINOIS

3

   NOAH DIETCHWEILER, by MICHAEL      )
4  DIETCHWEILER, his father and       )
   next friend, and ANN DIETCHWEILER)
5        Plaintiffs,                  )
                                      )  No. 2013-CV-2062
6            vs.                      )
                                      )
7  STEVE LUCAS, in his official and )
   individual capacities;            )
8  JAMES BUNTING, in his official    )
   and individual capacities;        )
9  KENNETH LEE, in his official      )
   and individual capacities;        )
10 IROQUOIS COUNTY COMMUNITY UNIT     )
   SCHOOL DISTRICT NO. 9, IROQUOIS    )
11 COUNTY ILLINOIS; JAMES BRUNS,      )
   in his official capacity; DON      )
12 BECKER, in his official capacity;)
   BRENNA JOHNSON, in her official    )
13 capacity; CRYSTAL BLAIR, in her    )
   official capacity; BOB BURD, in    )
14 his official capacity; KIRK        )
   McTAGGART, in his official         )
15 capacity; and DEE SCHIPPERT,       )
   in her official capacity,          )
16       Defendants.                  )
   ------------------------------
17

18

                 DEPOSITION OF JAMES BRUNS
19                    October 17, 2014
                        8:00 AM
20

21

22

23        June Haeme:  RMR, CRR, CSR # 084-003038
          Area Wide Reporting and Video Conferencing
24                 301 West White Street
                 Champaign, Illinois  61820
25                    800.747.6789

2

**INDEX**

APPEARANCES:

For the Plaintiff:
        Michael Tague
        Attorney at Law
        Flynn, Palmer & Tague Law Offices
        402 West Church Street
        P.O. Box 1517
        Champaign, IL  61824-1517
        217.352.5181
        fpt5law@aol.com

For the Defendant:
        Shari D. Goggin-Ward
        Attorney at Law
        Law Offices of Lawrence Cozzi
        27201 Bella Vista Parkway, Suite 410
        Warrenville, IL  60555-1619
        630.393.2145
        shari.goggin-ward@libertymutual.com

Also Present:
        Michael Dietchweiler


EXAMINATION BY:
        Mr. Tague................ 5, 74
        Ms. Goggin-Ward.......... 72


EXHIBITS:
        No. 1.................... 32
        No. 2....................  5
        No. 3....................  5
        No. 4.................... 52
        No. 5....................  5
        No. 6....................  5
        No. 7....................  5
        No. 8.................... 17
        No. 9.................... 60

3

1                         CERTIFIED QUESTIONS

2

3    Page 54:

4    BY MR. TAGUE:

5         Q.    Did your attorney tell you that was the

6    answer?

7

8    Page 68:

9    BY MR. TAGUE:

10        Q.    Was there any information provided in

11   those proceedings that Noah and his representatives

12   were not participants of that had not been discussed

13   in the session in which we have a verbatim

14   transcription?

15

16

17

18

19

20

21

22

23

24

25

4

1                    STIPULATION
2
3
4
5           IT IS HEREBY EXPRESSLY STIPULATED AND
6    AGREED by and between the parties that the
7    deposition of JAMES BRUNS may be taken on October
8    17, 2014, at the Iroquois County CUSD #9, 1411 West
9    Lafayette Street, Watseka, Illinois, pursuant to the
10   Rules of the Federal Court and the Rules of Federal
11   Procedure governing said depositions.
12
13
14           IT IS FURTHER STIPULATED that the
15   necessity for calling the Court Reporter for
16   impeachment purposes is waived.
17
18
19
20
21
22
23
24
25

5

1              (Exhibits No. 1 through 8 were marked by

2    the court reporter.)

3              (Commencing at 8:40 a.m.)

4                    JAMES BRUNS,

5    having first been duly sworn, testified as follows:

6              EXAMINATION BY

7              MR. TAGUE:

8         Q.   Would you state your name?

9         A.   James Bruns.

10        Q.   Okay, Mr. Bruns.  Let the record reflect

11   that this is the deposition of James Bruns taken

12   pursuant to the applicable Federal Rules of Civil

13   Procedure.

14             Would you please spell your last name?

15        A.   B-R-U-N-S.

16        Q.   Have you ever had your deposition taken

17   before?

18        A.   No.

19        Q.   Have you ever testified in court before?

20        A.   No.

21        Q.   I'm going to just go over a few general

22   ground rules so that we can make this go as

23   efficiently as possible.  I'm going to ask you

24   questions.  Some will be about background, some will

25   be about specifically the Watseka School District,

6

1    and some will be specifically about Noah's

2    disciplinary proceeding.  If at any time you don't

3    understand a question I ask you, tell me so.  I'll

4    be happy to repeat it.  We could have her read it

5    back.  It's important that you understand my

6    question because I'm not going to be likely able to

7    come back and ask you again if there's any

8    ambiguity.

9          We have to do everything verbally.  She's

10   going to make a verbatim transcript.  If there's a

11   nod of the head, a shake, an uh-uh, uh-huh, the -- I

12   will ask you to say does that mean yes or no, what

13   does your gesture mean, so that we don't have any

14   ambiguities when we all read it back.

15         If for any reason the -- you don't feel

16   the environment is conducive to us communicating,

17   let us know.  We can have breaks for the restroom,

18   if you need something to drink because you've been

19   talking for a long time, just let us know and

20   hopefully we can accommodate that here, and we'll do

21   it to the best of our ability since the school is

22   hosting us.

23         Do you have any questions about the

24   procedure?

25         A.   No.

7

1      Q.   Okay.  Did you do anything to prepare for
2   the deposition today other than simply showing up?
3      A.   No.
4      Q.   Did you review any documents between
5   Noah's suspension review hearing and today?
6      A.   No.
7      Q.   Have you spoken with Superintendent Lee
8   about this matter since the suspension review
9   hearing of Noah?
10      A.   No.
11      Q.   What is your address?
12      A.   2234 North 2430 East Road, Watseka,
13   Illinois, 60970.
14      Q.   Is that in Iroquois County?
15      A.   Yes.
16      Q.   What's your telephone number?
17      A.   815-432-2908.
18      Q.   What are the last four digits of your
19   social security number?
20      A.   8985.
21      Q.   Do you have any plans of moving from the
22   community in the next year?
23      A.   No.
24      Q.   Do you reside with anyone at the residence
25   you gave me?

1        A.    Yes.

2        Q.    Who resides with you?

3        A.    My spouse.

4        Q.    Okay.  And her name is?

5        A.    Connie.

6        Q.    Other than relatives that would have the

7    same last name as you, do you have any relatives in

8    east central -- well, how about Illinois?  I'm

9    interested if we might bump into any of your

10   relatives when we're picking a jury.

11       A.    I have two siblings or two daughters, so

12   -- and they live in Illinois, so...

13       Q.    Okay, what are their names?

14       A.    Laura Bruns.

15       Q.    Where does she live?

16       A.    She lives in Watseka.

17       Q.    Okay.

18       A.    And the other daughter is Leah Kanouce and

19   she lives in Germantown Hills.

20       Q.    Okay.  Do you have any siblings that live

21   in Illinois?

22       A.    Yes, actually I do.  I've got a sister.

23       Q.    And what's her name?  Where's she live?

24       A.    Carol Clark and she lives in Sheldon,

25   rural Sheldon.

9

1      Q.   And what county is that in?

2      A.   Iroquois.

3      Q.   Okay.  Other than a position with the

4  Watseka School District -- let me back up.  The

5  official name of the school district, is that

6  Iroquois County Community Unit School District No.

7  9?

8      A.   Correct.

9      Q.   If I use the term Watseka School District,

10  is that okay with you?

11      A.   That's fine with me.

12      Q.   Okay.  So I'll use the Watseka School

13  District in lieu of the official name which is more

14  of a tongue twister for me.  Other than your

15  affiliation with the school district, what's your

16  trade or occupation?

17      A.   I'm a banker.

18      Q.   And are you currently employed?

19      A.   Yes.

20      Q.   Which bank?

21      A.   Iroquois Farmers State Bank.

22      Q.   Do you have any employment or occupational

23  endeavors other than banking and whatever you do for

24  the school district?

25      A.   No.

1          Q.    What's the extent of your formal

2    education?

3          A.    College degree.

4          Q.    And where did you obtain that at?

5          A.    Illinois State University.

6          Q.    What year?

7          A.    1980.

8          Q.    Is that a bachelor's degree?

9          A.    Yeah, bachelor of science.

10         Q.    And what was that degree in?

11         A.    It was in business administration and a

12   minor in accounting.

13         Q.    Do you currently serve any -- in any

14   political office?

15         A.    No.

16         Q.    Are you affiliated with the school

17   district now?

18         A.    Yes.

19         Q.    Okay.  So you were elected to the school

20   board, were you not?

21         A.    Correct.

22         Q.    And when were you so elected?

23         A.    I think I was appointed in, I can't

24   remember the exact year, I'm thinking around 2007,

25   8.  I finished a term of somebody that had left the

11

1    board.

2         Q.   Okay.  And then you were elected

3    thereafter?

4         A.   Correct.

5         Q.   And were you elected once or twice?

6         A.   Once.

7         Q.   Okay, so what year did that term run?

8         A.   Well, let's see, I expire in -- let's see.

9    I've got two more years, so I expire in '16, that's

10   four years, so '12, I got elected in 2012.

11        Q.   Okay.  And then you filled out an

12   unexpired term prior to that election?

13        A.   Right, correct.

14        Q.   And have you ever held any elected office

15   other than school board member?

16        A.   No.

17        Q.   Have you ever run for public office other

18   than school board?

19        A.   No.

20        Q.   When did you actually begin -- well, let

21   me back up.  Are you currently the president of the

22   school board?

23        A.   Yes.

24        Q.   When did you become the president of the

25   school board?

1          A.    I do believe it was 2011, but I'm not

2    exactly sure.

3          Q.    And were you elected just once or are you

4    elected every year?

5          A.    Elected every two years.

6          Q.    When -- was Superintendent Lee hired while

7    you were on the school board?

8          A.    Yes.

9          Q.    What year was he hired?

10         A.    2010.

11         Q.    Okay.  Were you on the school board when

12   Steve Lucas was hired by the school district?

13         A.    Yes.

14         Q.    And what year was he hired?

15         A.    I do not recall.

16         Q.    Okay.  Who was involved in your

17   appointment to the school board?  Was there somebody

18   who nominated you, solicited you, how did you -- how

19   did that happen?

20         A.    Someone had approached me of possibly

21   joining the board, yes.

22         Q.    Was that someone affiliated with the

23   school district?

24         A.    Yes.

25         Q.    And did you apply and have interviews?

13

1   How did that process happen?

2        A.   They just asked me if I'd be interested in

3   running and I said I'd think about it.  And then it

4   was up to me to -- no, I guess since they appointed

5   me, yeah, I said I probably would take the

6   appointment if I was appointed.

7        Q.   Do you remember who was on the school

8   district board when you were appointed?

9        A.   Not all of them, no.

10       Q.   Okay.  Can you tell me the ones you do

11  remember?

12       A.   I think at that time Mr. Watts, Mr. Burd,

13  let me think, Mr. Reynolds, possibly Sherry Brutlag.

14  I'm not a hundred percent sure on that one.

15       Q.   Okay.

16       A.   Then I can't remember the rest.

17       Q.   In January 2013, let's say January 1st,

18  2013, to March 1st of 2013, you were the president

19  of the school board, correct?

20       A.   Correct.

21       Q.   Mr. Lee was the superintendent, correct?

22       A.   Yes.

23       Q.   And Steve Lucas was a dean of students and

24  teacher at Watseka High School, correct?

25       A.   Yes.

14

1      Q.   Prior to January -- let me back up.  You

2   became aware that there was an incident at Watseka

3   High School in the lunchroom involving a controlled

4   substance or narcotics or at least a violation of

5   the school policy relating to drugs, correct?

6      A.   Yes.

7      Q.   When did you first learn that there had

8   been an incident on January 25?

9      A.   I don't remember the exact date.

10      Q.   Was it the same day?

11      A.   Don't remember if it was or not, no, I

12   don't remember.  I assume Kenny informed me shortly

13   after the occurrence, but as far as exact date, I do

14   not recall.

15      Q.   Had there ever been similar incidents

16   prior to this one on January 25, 2013, involving a

17   high school investigation of drug activity at school

18   prior to the one that we're talking about on January

19   25, 2013?

20      A.   Restate that again.

21      Q.   Sure.  Prior to this incident on January

22   25, 2013, had you ever become aware that there had

23   been other previous investigations about exchange of

24   drugs at school?

25      A.   No.

15

1        Q.    So this is the first time that you became
2   aware that the administration had investigated drug
3   activity at school?
4        A.    Drug activity as far as?
5        Q.    Well, any type of drug activity.
6        A.    Any kind of drug activity?
7        Q.    Right.
8        A.    I can't recall any before then.
9        Q.    Okay.  Had there been any suspensions or
10  expulsions of students for violation of the student
11  code of conduct relating to drugs prior to January
12  25, 2013, while you were on the school board?
13       A.    While I was on the school board?
14       Q.    Yes.
15       A.    Yes, I do believe there was.
16       Q.    Okay.  And was the school board involved
17  in that at all?
18       A.    Involved in the --
19       Q.    Well, how many activities are we talking
20  about?  Do you recall one, more than one?
21       A.    I can only recall one.
22       Q.    Okay.  And what year was that?
23       A.    I -- there again, I can't remember
24  specifically exactly what year it was.
25       Q.    And did it involve a student being

16

1   suspended or expelled or do you remember?

2       A.    Did it involve a student?

3       Q.    A student or more than one student

4   being --

5       A.    Expelled.

6       Q.    -- suspended or expelled.

7       A.    I do believe so, yes.

8       Q.    And what do you remember about the

9   procedures or protocols in that case?

10      A.    I don't remember.

11      Q.    Would it be a fair statement that when

12  this incident happened on January 25, 2013, you were

13  not familiar with the custom and practice or was

14  there a custom and practice to your knowledge as to

15  how these investigations and procedures would be

16  handled?

17          MS. GOGGIN-WARD:   Object to the form of

18  the question, compound.

19      Q.    Well, let me break it down.   Prior to

20  January 25, 2013, were you familiar with any

21  investigation, custom or practice in the Watseka

22  School District relating to investigation of drug

23  activities?

24      A.    No.

25      Q.    Was there a policy or practice or are you

17

1   just saying you're not aware of what it was?

2        A.   I -- I guess I'm confused by the question.

3   Restate -- I'm not sure what you're asking.

4        Q.   Well, what I'm asking is is the -- I think

5   you indicated that to your knowledge there was one

6   investigation involving breach of the student policy

7   and code of conduct relating to drugs at school

8   prior to January 25, 2013.

9        A.   Okay.  Now, let me rephrase it.  Are you

10  saying investigation is a hearing?

11       Q.   No, I'm asking --

12       A.   Oh, okay, because that's totally different

13  then.

14       Q.   Right, the -- so first I want to know are

15  you aware of any investigations other than the one

16  you've told us about?

17       A.   No.

18       Q.   So my question is, did you know what the

19  custom and practice was for the administrators at

20  Watseka High School to utilize in investigating drug

21  activity at the high school?

22       A.   No.

23       Q.   This is Exhibit No. 8, and as I was

24  preparing today, I wanted to make three copies of

25  everything.  That's one that didn't get three copies

1   made.  I printed that off of the district's website

2   when we were doing our Rule 26(a) disclosures and I

3   believe that that is the Watseka High School

4   handbook from the electronic version.

5            Such a document existed, did it not, a

6   handbook for --

7       A.   I know one does, yes.

8       Q.   Okay.  And it was printed and bound, let

9   me see this one, something like this here

10  (indicating) in the copy that Mike has.  Is that in

11  accordance with your knowledge?

12      A.   Yes.

13      Q.   Did you have any involvement in

14  preparation of the contents of that handbook?

15      A.   Any involvement in the preparation of it?

16  No.

17      Q.   Is it the same handbook that existed -- or

18  let me ask you, has the handbook changed from the

19  time that you became a school board member to

20  present?

21      A.   Yes.  There have been changes.

22      Q.   Who would be able to determine the -- what

23  all the changes were in the handbook from the time

24  you came on board until present?

25      A.   That would be in the minutes of the board

1  meetings.

2      Q.   Okay.  Was there a particular officer or

3  employee of the school district that would be in

4  charge of reviewing the handbook from year to year

5  and recommending changes to the board?

6      A.   You would have to ask Mr. Lee about that,

7  the superintendent.

8      Q.   So your best --

9      A.   I know --

10     Q.   -- belief is Mr. Lee would be the person

11  that would know the answer to that if anybody.

12     A.   Right, correct.

13     Q.   Do you as a school board review or approve

14  the handbook that is to be delivered to high school

15  students each year?

16     A.   Yes.

17     Q.   And when was the last time that the

18  handbook was reviewed prior to January 25, 2013?

19     A.   You'd have to look at the board minutes

20  to --

21     Q.   Was the handbook approved prior to the

22  start of school each year?

23     A.   I can't recall that either, if it's prior

24  or during, you know, or -- I don't know exactly

25  when.

20

1      Q.   Okay.  And so the one version might be

2  only for one year or maybe for multiple years.  That

3  you just don't know, correct?

4      A.   Correct.

5      Q.   The -- prior to January 25, 2013, did you

6  have a copy of the handbook in your possession?

7      A.   No.

8      Q.   Any issues that you had to deal with as a

9  school board member come up prior to January --

10  prior to January 25, 2013, in which you needed to

11  refer to the student handbook?

12      A.   Restate that again because I --

13      Q.   Okay.  While you were a school board

14  member and prior to January 25, 2013, had you had to

15  deal with any school board business in which you

16  needed to review the high school handbook?

17      A.   Not that I can recall.

18      Q.   Did you review the high school handbook

19  before Noah's suspension review hearing?

20      A.   No.

21      Q.   Prior to January 25, 2013, had you -- what

22  had you done to learn what your duties were as a

23  school board member and what you would need to learn

24  or what skills you would need to develop to do your

25  duties as a school board member?

21

1        A.    What did I do?

2        Q.    Yes.

3        A.    Nothing.

4        Q.    Have you ever taken any workshops or

5    training or seminars on school board governance?

6        A.    I go to the school board convention every

7    year, take classes.

8        Q.    Okay.  And so you went to how many of

9    those prior to January 25, 2013?  Did you go every

10   year?

11       A.    I go every year.

12       Q.    And you've done that every year since

13   you've been on the school board?

14       A.    Yes.

15       Q.    Have they had any training or seminars on

16   how to deal with student disciplinary

17   investigations?

18       A.    None that I can recall, but like I say,

19   that's been probably five years, six years that I've

20   gone, gone to different classes, so I --

21       Q.    Okay.  So you don't recall?

22       A.    I don't recall.

23       Q.    Okay.  And if we wanted to actually see

24   what the curricula was for those seminars, do you

25   still have the course materials for any of the

22

1   years?

2        A.    No.

3        Q.    I asked you about investigations.  Do you

4   remember any programs, workshops, seminars, courses

5   that you took at the school board meetings that

6   would involve how school boards should conduct

7   disciplinary hearings?

8        A.    Not that I can recall, no.

9        Q.    Okay.  At some time after January -- I

10  shouldn't say after.  Either on January 25, 2013, or

11  afterwards, you learned that there had been student

12  disciplinary investigations or an investigation

13  relating to an incident on January 25, 2013, did you

14  not?

15       A.    Yes.

16       Q.    Okay.  And from whom did you learn that

17  there had been an unusual event at Watseka High?

18       A.    From the superintendent.

19       Q.    What was the form of that communication?

20       A.    Phone call.

21       Q.    Okay.  He called you from -- do you know

22  where he was at when he called you?

23       A.    No.  I -- no.

24       Q.    Did he call you on your home phone, your

25  cell phone, or where were you at when he called you?

1      A.   I do believe it was probably at my work

2    phone, but I'm not exactly sure.

3      Q.   When someone calls you at the bank, do you

4    usually have clerical people answer the phone?

5      A.   Yes.

6      Q.   Is there a protocol where the people that

7    answer the phone at your bank would document all of

8    the incoming calls?

9      A.   No.

10      Q.   So if somebody called the bank, they would

11    get a receptionist.  Would it be one person

12    specifically or could it be a variety of people?

13      A.   Could be a variety of people.

14      Q.   Okay, so whoever is available to answer

15    the phone answers the phone.  If they ask for you,

16    they'll find out if you're available.  Is that a

17    fair statement?

18      A.   Yes.

19      Q.   They would tell you who was calling and

20    you would decide whether or not you could take the

21    call or not.

22      A.   Yes.

23      Q.   Okay.  The -- your bank, does it have a

24    system that exists so that if we wanted to actually

25    match up Superintendent Lee's phone call with yours,

24

1    we would have a database to do that?

2        A.    Other than the phone records, I don't know

3    of any.  We don't have a recording system or

4    anything like that, so --

5        Q.    Okay.  The -- do you remember whether or

6    not he called you and you had to call him back or if

7    he actually called and got through to you?

8        A.    Don't recall.

9        Q.    Okay.  What did he tell you to the best of

10   your recollection?

11       A.    To the best of my recollection, he said

12   that we had a discipline issue at the high school

13   and that there would probably be a hearing on it.

14   That's the best of my recollection.

15       Q.    Did he tell you what the event was and

16   what they did to find out who all was involved?

17       A.    He didn't tell me what it was or who was

18   involved.

19       Q.    Did he tell you how many students were

20   involved?

21       A.    No.

22       Q.    Do you remember if he told you the date of

23   the incident?

24       A.    No.

25       Q.    And the -- did you respond to him at all?

1       A.    He just said he'd let me know further.

2       Q.    Okay.  Now, we had ultimately a

3  disciplinary hearing that involved Noah here in this

4  building, correct?

5       A.    Correct.

6       Q.    And I believe that that was on February 5,

7  2013.  Is that accurate?

8       A.    If that's what the records state.  I don't

9  recall the exact date.

10      Q.    Okay.  My question is did you have any

11  discussions with anyone between that initial

12  telephone conversation you told me about and the

13  evening of the proceedings at six o'clock p.m. on

14  February 5, 2013?

15      A.    No.

16      Q.    Did you receive any written communications

17  from anyone relative to the disciplinary matter or

18  matters prior to February 5, 2013?

19      A.    No.

20      Q.    How did you know that there was going to

21  be a hearing on that date and time?

22      A.    Because Kenny had informed me that there

23  was going to be a hearing.

24      Q.    Okay.  Did he inform you there was going

25  to be a hearing or more than one hearing?

26

1        A.    He just informed me that there -- best of
2    my recollection, there was going to be a hearing.
3        Q.    Okay.  And so he told you a time and a
4    place and said be here for a hearing.
5        A.    Correct.
6        Q.    Did you receive any written documentation
7    relating to the hearing prior to showing up on
8    February 5?
9        A.    No.
10       Q.    Who prepared the agenda for the hearing?
11       A.    Kenny or superintendent.
12       Q.    And did you approve it?
13       A.    I reviewed it, yes, so I guess if you're
14   saying if there -- I did receive anything, it would
15   be the hearing process, the steps, yes.
16       Q.    Okay.  So he prepared an agenda, you
17   approved it, and that agenda reflected that there
18   would be more than one hearing, did it not?
19       A.    I don't recall, but if it -- if there was
20   more than one, then it did.  I really don't
21   remember.
22       Q.    Well, were there more than one hearing
23   that evening?
24       A.    I do believe there was.
25       Q.    How many?

1      A.   I really don't remember.  Two?

2      Q.   Okay.  And then you were provided a --

3      A.   I don't remember.

4      Q.   Other than the agenda -- and maybe I

5  misunderstood.  You were provided with some form of

6  document that would identify what the procedure

7  would be?

8      A.   Correct.

9      Q.   And who prepared that?

10     A.   Kenny did, our superintendent.

11     Q.   Now, do you know if he actually did that

12  himself or somebody else prepared that?

13     A.   That I do not know.

14     Q.   Okay.  That particular document, do you

15  know whether or not it was actually presented at the

16  Dietchweiler hearing on February 5?

17     A.   Presented to who?

18     Q.   Well, presented to the family and

19  presented as part of the record of the proceedings.

20     A.   I -- I don't recall, but I assume we

21  followed all the procedures that were on that

22  document, so...

23     Q.   Okay.  The -- and why were you given that

24  document, do you know?

25     A.   To have an order to follow, a procedure to

28

1  follow.

2      Q.   Okay.  So the superintendent provided you

3  with a procedure with the expectation that you would

4  be the presiding hearing officer and you were to

5  implement that procedure.

6      A.   Yes.

7      Q.   Did you compare that procedure with the

8  required procedure in the student handbook?

9           MS. GOGGIN-WARD:  Object to the form of

10  the question.  You can answer.

11          THE WITNESS:  I can go ahead and answer?

12          MS. GOGGIN-WARD:  Go ahead, yes.

13     A.   Restate it again.

14     Q.   Did you compare the procedure that Mr. Lee

15  gave you to any procedure in the student handbook?

16     A.   No.

17     Q.   Did you know that there was a procedure

18  that was spelled out in the student handbook?

19     A.   No.

20     Q.   Did you know that there was a procedure

21  spelled out by state statute?

22     A.   I knew -- I'm aware that there is a

23  procedure that's classified by state statute, yes.

24     Q.   The -- did you review the state statute or

25  ask someone to give you the state statute so you

29

1    could review the procedure Mr. Lee gave you to

2    determine whether it was in conformance with that

3    statute?

4        A.    No.

5        Q.    Is it a fair statement that you assumed

6    Mr. Lee knew what the state statute was and what was

7    in the handbook and that the procedures he gave you

8    would comply with those requirements?

9        A.    I assumed that he did that along with

10   talking to our general counsel.

11       Q.    Okay.  And why did you make that

12   assumption if you really hadn't had any of these

13   procedures before?

14       A.    Hadn't had any what procedures?

15   Disciplinary procedures?

16       Q.    You hadn't -- well, had you ever had any

17   disciplinary procedures before this one with Noah on

18   February 5, 2013, in which Mr. Lee had given the

19   procedures and you followed those in some type of a

20   hearing?

21       A.    And I think I stated before that, yes, we

22   had one.

23       Q.    Okay.  And was it the same process

24   followed where he gave you procedures?

25       A.    The same process was followed, yes.

1      Q.   And the same process was followed by you

2   that you just accepted his procedures and that they

3   were in conformance with your handbook and the state

4   statutes?

5      A.   Yes.

6      Q.   Did you discuss the procedures with Mr.

7   Lee or Mr. Funk prior to the Dietchweiler hearing on

8   February 5?

9      A.   Yes, I think Kenny and I did go over the

10  procedures.

11     Q.   Okay.  When was that?

12     A.   Right before the meeting if I recall.

13     Q.   The same day?

14     A.   Yes.

15     Q.   Was it actually here you came early and

16  went over things?

17     A.   Yes.

18     Q.   Okay.  In the student handbook, there is a

19  section and I've marked it here with a yellow flag

20  that says P43.  It says suspension procedures.  It

21  starts with part of that page, then follows on the

22  next page.  And you can take as much time as you

23  need to look at that, but my question to you is can

24  you tell whether or not that was the same procedure

25  that Mr. Lee gave you?

1      A.   I can't tell.

2      Q.   Up at the top, this provision number C,

3  would you look at that?

4           MS. GOGGIN-WARD:  Just C you want him to

5  look at?

6           MR. TAGUE:  Uh-huh.

7           MS. GOGGIN-WARD:  Okay.

8      Q.   Okay?  Isn't it a correct statement that

9  Watseka schools and Watseka High School had a policy

10  that stated, using the verb shall, directed what

11  form of notice to the parents of a suspension should

12  be?

13      A.   Registered or certified mail, is that what

14  you're referring to?

15      Q.   No, what I'm -- let me just state that --

16  I'm not going to read everything into the record,

17  but this says the superintendent or principal shall

18  notify the student's parents of the suspension.  The

19  notification shall be in the form of verbal contact

20  and a written letter to the parents that shall be

21  sent by registered or certified mail.  Then it says

22  the letter shall be in the following format.  Then

23  it spells out a format in that.

24           So my question is that Watseka had a

25  policy that mandated how the format of the notice of

1  suspension to the parents was to be.  That's a

2  correct statement, is it not?

3      A.   From what I can tell, yes.

4      Q.   Okay.  I do have, I believe, copies of

5  these.  Plaintiff's Exhibit No. 1, the last page is

6  blank, but the second to last page which I'm showing

7  you, that is the actual notice of suspension that

8  was given to Noah's parents, is it not?

9      A.   I assume it is.  I have not seen it.

10      Q.   Well, let me ask you.  This Exhibit 1, if

11  you look at the first page of it, this was the

12  booklet that was given to everyone at Noah's

13  suspension review hearing.  There was such a notice

14  that was given, was there not?

15      A.   A notice given to who?

16      Q.   I'm sorry, there was such a booklet that

17  was given to everyone the night of the suspension,

18  was there not?

19      A.   I don't recall, but yeah.

20      Q.   Okay.  You haven't reviewed the transcript

21  of the proceedings that indicate you actually gave

22  one to everybody?

23      A.   Well, no, I haven't reviewed it since that

24  night, no, ever.

25      Q.   You don't dispute that it was handed out.

1        A.    No, I'm not disputing it at all.

2        Q.    You just don't remember it.

3        A.    I don't remember, yeah.

4        Q.    And you don't remember that you actually

5    passed them around to everybody.

6        A.    No, I don't.

7        Q.    Okay.  So the -- my question is, you're

8    assuming that that is -- you don't dispute that that

9    is the --

10       A.    No, I'm not --

11       Q.    -- document?

12       A.    -- disputing this letter, no.

13       Q.    Okay.  Well, my question is, it's not in

14   the format prescribed by your book, is it?  By your

15   handbook.

16       A.    Well, I'd have to read this and look at it

17   and look at this also.

18       Q.    You never did that before?

19       A.    No, I didn't send this out.  Mr. Lee did.

20       Q.    Okay.  And you --

21       A.    The superintendent.

22       Q.    You never compared them even though we

23   pointed that out at the hearing and objected that

24   this was not in the format of your handbook?

25       A.    No.

34

1      Q.    It's not the same format, is it?

2            MS. GOGGIN-WARD:  Objection, asked and

3  answered.  You can tell him again.

4      A.    Yeah, it -- I mean just look -- I'd have

5  to sit down and verbally look at it and go line by

6  line, but...

7      Q.    There's no mention in there, is there,

8  that this is pursuant to Section 10-22.6 of the

9  Illinois School Code and the discipline policy of

10  Iroquois Community Unit School District No. 4[sic]?

11     A.    No, there's no mention of that in the

12  letter.

13     Q.    And there's no language in the actual

14  notice that was given by Mr. Lee that states you

15  were advised that Noah Dietchweiler is or was

16  suspended for the following specific reasons, is

17  there?

18     A.    No, not in the letter.

19     Q.    Now, that is actually a provision that is

20  in the format and directed by your school handbook,

21  is it not?

22     A.    Yes.

23     Q.    And, in fact, the -- there is no

24  indication as to what Noah was charged with that was

25  going to be reviewed, is there, in the actual

35

1   notice?

2         A.    In this letter?

3         Q.    Correct.

4         A.    No.

5         Q.    You don't know whether or not the statute

6   that is referred to in the handbook as 10-22.6 of

7   the school code requires the same thing as your

8   policy or not, is that a correct statement?

9         A.    Am I aware of that?

10        Q.    Correct.

11        A.    No, I'm not aware of it.

12        Q.    Do you know why Superintendent Lee

13  prepared the actual notice to the parents in the

14  form that was given to the Dietchweilers rather than

15  in the format set forth as a requirement in your

16  handbook?

17        A.    No.

18        Q.    In the handbook there is also a provision

19  that -- up here at the top, and if you need to look

20  at the previous page you can, it talks about the

21  drug policy, and what I'm interested in -- talks

22  about suspension procedures, and it -- right before

23  D on the page I have flagged it says you will have

24  the right -- wait a minute, which one?

25        A.    Right before D?

36

1           MS. GOGGIN-WARD:   There is no D.

2       Q.   I'm sorry.

3       A.   You showed me this, the top of this, and

4   you said if -- that's B.   There is no D.

5       Q.   Yeah, I'm sorry.   Here's what I'm

6   interested in.   If a person has been found guilty of

7   use, if a drug test is presented, there would be an

8   automatic reconsideration.   Were you aware that that

9   policy existed in your handbook?

10      A.   No.

11      Q.   Were you aware that Mr. Lee had the

12  negative drug test in his possession the day after,

13  the first business day after Noah was suspended?

14      A.   No, I wasn't aware of it.

15      Q.   Are you aware that Mr. Lee did not reopen

16  the investigation and did not reconsider the charges

17  against Noah before the suspension review hearing?

18          MS. GOGGIN-WARD:   Objection, compound,

19  charges possession and ingestion.   Go ahead.

20      A.   What was the question again?

21          MR. TAGUE:   Read it back.

22          (Requested portion of the deposition was

23  read by the court reporter.)

24      A.   No.

25      Q.   And you didn't even know that he had a

37

1  policy that that was necessary?

2          MS. GOGGIN-WARD:  Objection, asked and

3  answered.  As to both charges or one?

4          MR. TAGUE:  Read the question back.

5          (Requested portion of the deposition was

6  read by the court reporter.)

7          MS. GOGGIN-WARD:  Same objection.

8      A.  No.

9          MR. TAGUE:  Are you going to instruct him

10  not to answer it?

11          MS. GOGGIN-WARD:  No, not right now.

12  BY MR. TAGUE:

13      Q.  Prior to the hearing on February 5, 2013,

14  you didn't know anything about the details of how

15  the investigation happened or what the interrogation

16  of Noah was?

17      A.  No.

18      Q.  The policy that you have again that talks

19  about the suspension procedures, A says that verbal

20  and written notice of the charges shall be provided.

21  What do you know -- well, do you know whether or not

22  that was done?

23      A.  Yes, I know the written notice was.

24      Q.  Okay.  And the written notice of the

25  charges is in Exhibit 1.

38

1          MR. DIETCHWEILER:  It's No. 5.  This one

2     (indicating).

3       Q.   Is it not?  And that is the -- it says on

4     the top Notice of Student Disciplinary Action, it

5     says to Mr. and Mrs. Dietchweiler, and it says

6     1/25/13, correct?

7       A.   Yes.

8       Q.   And it's your testimony that that was the

9     notice of -- the written notice of the charges

10    against Noah that was given to him?  And what I'm

11    interested in is your suspension procedures under

12    A1.  It says the suspending official shall give the

13    student verbal and written notice of the charges

14    which constitute the basis for the discipline,

15    correct?

16          MS. GOGGIN-WARD:  Which question do you

17    want him to answer?

18      A.   Yeah.

19      Q.   Well --

20      A.   What is the question?

21      Q.   Okay.  You have a suspension procedure

22    that states, A, except as set forth under

23    subparagraph B below, prior to the imposition of a

24    suspension, the following procedures shall be

25    observed.  1, the suspending official shall give the

1  student verbal and written notice of the charges

2  which constitute the basis for the proposed

3  suspension and a summary of evidence which supports

4  such charges.  Your policy provides that, correct?

5      A.  Yes.

6      Q.  And you're saying this document is the

7  written notice of charges which constituted the

8  basis of the proposed suspension.

9      A.  Yes.

10      Q.  And that wasn't given to him prior to the

11  suspension though, was it?

12      A.  I can't answer that because I wasn't there

13  when he was there and --

14      Q.  Well --

15      A.  -- they were there.  I don't know exactly

16  when it was given to him.

17      Q.  Okay.  Doesn't the plain language of that

18  document state you are suspended?

19          MS. GOGGIN-WARD:  Objection.  The document

20  speaks for itself.

21      Q.  Well, let me ask you, do you believe that

22  there's an interpretation, reasonable interpretation

23  of that document that it was given to him prior to

24  his actually being suspended?

25          MS. GOGGIN-WARD:  Same objection.

40

1      Q.   Was Noah given a written notice of his
2  suspension?
3          MS. GOGGIN-WARD:  Objection, asked and
4  answered.
5          MR. TAGUE:  He didn't answer that one.
6  Read that one back.
7          (Requested portion of the deposition was
8  read by the court reporter.)
9      A.   And I said as far as I know they gave him
10  one that day.  I wasn't there, I think that was my
11  response, I wasn't there to see or verify that he
12  received this written notice.
13     Q.   Okay.  He received that written notice.
14  You don't know whether he received that before they
15  suspended him or after they suspended him, do you?
16     A.   No.
17     Q.   Okay.  And the language of that --
18     A.   Wasn't there.
19     Q.   -- document says this is to notify that
20  your child has been suspended, correct?
21     A.   That's what the notice reads.
22     Q.   Okay.  Okay, your suspension procedures go
23  on to state that the suspending official shall give
24  the student an opportunity to explain the incident
25  after he is given the verbal and written notice of

41

1   the charges, correct?  That's what your policy says.

2       A.   If that's what it says, that's what it

3   says.

4       Q.   But he had already been suspended when he

5   had that opportunity, isn't that a correct

6   statement?

7       A.   I wasn't at that proceeding, so --

8       Q.   Okay.

9       A.   I don't know if he stated his case before

10  or after or when.

11      Q.   Okay.

12      A.   Or even the incident.

13      Q.   This notice indicates that Noah was

14  suspended for it says possession of drugs,

15  consumption of drugs, correct?

16      A.   That's what it says on the statement.

17      Q.   Okay.  Do you know whether or not the

18  charges were ever amended prior to the suspension

19  review hearing on February 5th?

20      A.   Not that I'm aware of --

21      Q.   Did the board --

22      A.   -- or can I recall.  I --

23      Q.   Okay.  Did the Board of Education find in

24  its review hearing Noah was guilty of consumption of

25  drugs?

42

1     A.   I don't recall if it was consumption
2  and/or possession or just possession.
3     Q.   You saw the drug testing documents, did
4  you not?
5     A.   Yes.
6     Q.   Did you not believe them?
7     A.   I -- they were irrelevant to me.
8     Q.   Why were they irrelevant to you?
9     A.   Because possession of drugs, according to
10  the testimony, was all I needed as far as a
11  suspension.
12     Q.   Okay.  So your school board hearing on
13  February 5th, 2013, for Noah's suspension review
14  happened.  There was at least one hearing before
15  that, was there not?
16     A.   I don't recall the order.
17     Q.   Okay.  So if I ask you what was presented
18  in the other hearings that was the same as Noah's
19  hearing, you couldn't answer that question?
20     A.   No, I could not.
21     Q.   And if I asked you the question what was
22  presented in the other hearings that was not
23  presented in Noah's hearing, you couldn't answer
24  that either, could you?
25     A.   No, I could not.

1      Q.    What is your understanding happened on
2   January 25, 2013?
3      A.    We had a disciplinary hearing.  The
4   administration stated their case.
5           MS. GOGGIN-WARD:  No, you have to listen
6   to the question.
7           THE WITNESS:  Oh, okay.
8           MS. GOGGIN-WARD:  Ask him again.
9      Q.    What is your understanding of what
10  happened on January 25, 2013?
11          MS. GOGGIN-WARD:  The hearing was on
12  February 5th.
13     A.    Oh, okay.  What date was it again?
14     Q.    Okay, let me back up.  There was an
15  incident in which student or students was involved
16  in what the administration felt was a violation of
17  the drug policies and student disciplinary code
18  relating to drug policies that happened on January
19  25, 2013, correct?
20     A.    Correct.
21     Q.    And you don't remember how many students
22  were involved?
23     A.    No, I don't.
24     Q.    It was more than one, was it not?
25     A.    Correct.

44

1      Q.   What is your understanding of what
2  happened that started the investigation?
3      A.   My best recollection is that one
4  individual had some drugs and other individuals
5  either purchased or took -- not took but got some of
6  the drugs from this other individual.
7      Q.   Okay.  The -- when did it happen and where
8  did it happen to the best of your knowledge?
9      A.   The best of my knowledge, it was January
10  25th, 2013.
11      Q.   Okay, and do you know what substance was
12  involved?
13      A.   Don't recall, no.
14      Q.   Was it heroin?
15      A.   Not that I can recall.
16      Q.   Cocaine?
17      A.   Not that I can recall.
18      Q.   Marijuana?
19      A.   Not that I can recall.
20      Q.   Was it a prescription medication?
21      A.   I don't know if it was prescription or
22  not.
23      Q.   And what did you ultimately learn was the
24  circumstances under which the administration became
25  aware of the problem?

45

1        A.    State that again.

2        Q.    Okay.  There was an activity at school.

3        A.    Okay.

4        Q.    Did -- was it your understanding that a

5    staff member witnessed this problem or how did the

6    problem come to the attention of --

7        A.    I don't recall --

8        Q.    -- the school?

9        A.    -- how it became aware, how the

10   administration became aware of it.  I do not recall

11   at this time.

12       Q.    Okay.  Do you know what the administration

13   then did to find out the details of the -- and

14   circumstances of the incident?

15       A.    All I know is they performed an

16   investigation.  I don't know how they did the

17   investigation or...

18       Q.    Okay.  Now, you said you don't know how.

19   Is that you don't remember how they did it or you

20   really don't know how they did it?

21       A.    I don't know exactly the procedures they

22   followed during the investigation --

23       Q.    Okay.

24       A.    -- because I was not there.

25       Q.    Okay.  Those procedures were discussed at

1  Noah's suspension review hearing, were they not?

2      A.   I honestly don't recall.

3      Q.   How was Noah involved in this incident to

4  your understanding?

5      A.   To my best recollection without going back

6  and reviewing the actual minutes, my best

7  recollection is he purchased some drugs, but that's

8  my best recollection.

9      Q.   Okay.  And what is your recollection of

10  when Noah purchased drugs and from whom?

11     A.   I don't recall exactly the individual's

12  name who it was, don't recall that, and exactly when

13  as far as day, don't recall that either.  I'm

14  assuming it was the same day as the notice was given

15  to him, but I can't recall.

16     Q.   Do you remember that this involved an

17  incident on the 25th that purportedly happened at

18  lunch?

19     A.   Don't recall.

20     Q.   What evidence do you remember was

21  available that Noah was involved in actually

22  purchasing drugs?

23     A.   I do not recall.

24     Q.   Do you remember at the hearing there was

25  testimony that -- from Mr. Lucas that Noah acquired

47

1   drugs on a different date than January 25, 2013?

2        A.   I don't recall.

3        Q.   Do you recall that we were quite upset

4   that we were not told that the incident was the day

5   before the lunchroom incident?

6        A.   No, I don't recall.

7        Q.   Well, obviously we could show you or you

8   could read the transcript, but let me ask you, what

9   would you need to refresh your recollection as to

10  what you based -- well, let me back up.

11            You ultimately voted to uphold the

12  suspension, correct?

13       A.   Yes.

14       Q.   As we sit here today, you can't give me

15  any details as to why you came to the conclusion

16  that you should have voted that way?

17       A.   As far as specific details, no.

18       Q.   Okay.  Is it -- do you remember that Noah

19  denied that he possessed or consumed drugs at

20  school?

21       A.   Do not recall.

22       Q.   Whose testimony did you rely upon in

23  concluding that he was guilty of possession or

24  consumption of drugs at school?

25       A.   Mr. Bunting and Mr. Lucas.

48

1          Q.    But you don't remember what they told you?

2          A.    Not verbatim and word for word, no.

3          Q.    Okay.

4          A.    Other than the fact that he was in

5     possession of drugs.

6          Q.    Okay.  Did they tell you they saw him buy

7     the drugs?

8          A.    I don't recall.

9          Q.    Did they tell you what their source of his

10    involvement was, some other student witness

11    identified him, that he confessed, or what was the

12    basis that they concluded that Noah had been in

13    possession or consumed drugs?

14         A.    I don't recall specifically without going

15    back and looking at the transcript.

16         Q.    And you chose to believe them -- well, let

17    me back up.  You don't deny, do you, that Noah

18    denied that he possessed or took drugs?

19              MS. GOGGIN-WARD:  Objection.  When?

20         Q.    Any time.

21         A.    I don't recall him denying if that's what

22    you're asking me.  I don't recall at the hearing

23    that night him denying.  And I'm not saying he

24    didn't, didn't say he denied it, but I don't recall.

25         Q.    Okay.  You simply cannot tell me why you

49

1  chose to believe that Noah was involved in this, can

2  you?

3          MS. GOGGIN-WARD:   Objection, asked and

4  answered.   Tell him again.

5     A.    I went on the testimony of Mr. Bunting and

6  Mr. Lucas and their investigation.

7     Q.    And you can't -- well, let me ask you.

8  You assume that their investigation was in

9  accordance with state law and the board policy,

10  correct?

11     A.    Yes.

12     Q.    You didn't go back and investigate for

13  yourself whether or not that was -- that, in fact,

14  they had followed the policy, did you?

15     A.    No.

16     Q.    Did you ever ask anyone other than --

17  well, let me ask you.   Did you ever ask Mr. Lee

18  directly did you follow the school board policy in

19  the suspension procedures for Noah Dietchweiler?

20     A.    No.

21     Q.    Did you ever ask Mr. Lucas that same

22  question?

23     A.    No.

24     Q.    Did you ever ask anybody that question?

25     A.    No.

50

1      Q.   At the suspension hearing of Noah
2   Dietchweiler, were there any documents presented to
3   support the charges against Noah that are not
4   contained in this Exhibit 1?
5      A.   I -- I have no idea.
6      Q.   There was no physical drugs produced, was
7   there?
8      A.   Not that I can recall, no.
9      Q.   Do you know whether or not any of the
10   children implicated in the investigation were
11   searched?
12      A.   I do not know.
13      Q.   Do you know whether or not anyone's locker
14   was searched?
15      A.   I do not recall.
16      Q.   Do you know whether or not anyone was
17   taken to the emergency room upon suspicion that they
18   ingested drugs on January 25, 2013?
19      A.   Not that I can recall.
20      Q.   Do you know what the school board policy
21   is if someone is suspected of ingesting drugs?
22   Whether or not they're taken to the emergency room?
23      A.   I do not know.
24      Q.   What is policy on calling police, do you
25   know that?

51

1      A.   No.

2      Q.   Do you know whether or not any of the

3   children involved in this instant on January 25,

4   2013, were referred to the criminal authorities?

5      A.   I do not know.

6      Q.   Was Noah Dietchweiler's name mentioned in

7   any disciplinary hearing on February 5, 2013, other

8   than his own?

9      A.   State that again.

10     Q.   Was Noah Dietchweiler's name mentioned in

11   any disciplinary hearing other than the one

12   involving his own suspension review?

13     A.   Not that I'm aware of.

14     Q.   Were there any documents introduced in any

15   suspension or expulsion hearing on February 5, 2013,

16   other than Noah's own?

17     A.   Not that I'm aware of.

18     Q.   Do you know what quantity of drugs was

19   exchanged on January 25, 2013?

20     A.   No.

21     Q.   Do you know how many -- well, let me ask

22   you, do you remember that it was -- involved pills?

23     A.   Yes.

24     Q.   Okay.  Do you know how many pills Noah was

25   accused of acquiring?

1      A.   No.

2      Q.   Had you known Noah Dietchweiler prior to

3  February 5, 2013?

4      A.   No.

5      Q.   What did you learn about Noah's academic

6  reputation at Watseka High School at any time?

7      A.   Restate that again.

8      Q.   Okay.  Were you aware that Noah was a good

9  student?

10     A.   No.

11     Q.   Were you aware that the -- after January

12 25, 2013, Noah received a certificate award at a

13 school assembly for being an exemplary student?

14     A.   No.

15     Q.   Let me show you Defendant's Exhibit No. 4.

16 During the course of these proceedings some written

17 questions were submitted and I believe that the

18 first several pages of this exhibit are written

19 answers that were provided and I think the seventh

20 page of that is where you signed, correct?

21     A.   Yes, that's my signature.

22     Q.   Okay.  So you looked at the questions and

23 the answers and then verified that they were true

24 and correct, correct?

25     A.   Yes.

1          Q.    Interrogatory No. 2, the question was

2    asked what was the drug, and the answer is the drug

3    which was one of the basis for Noah's suspension was

4    identified as Ativan.

5          A.    Okay.

6          Q.    Okay.  So that was a question and the

7    answer.  And the date of the verification was

8    February 25, 2014.

9          A.    Okay.

10          Q.    So you remembered what the drug was on

11    that date but don't remember the drug today?

12          A.    No.

13          Q.    That's not a correct statement or you knew

14    what the drug was on the 25th?

15          A.    I must have talked to somebody about it at

16    that time, but I've since forgot it since February

17    25th.  I never --

18          Q.    Okay.  So my question is when you answered

19    that question, did somebody tell you what the drug

20    was and you just accepted that or did you actually

21    remember that that's what the drug was?

22          A.    I accepted that.

23          Q.    Okay.  Then on No. 3 we ask the day and

24    time Noah was accused, and then the -- you state on

25    information and belief, January 25, 2013, at

1  approximately 3:00 p.m. Noah was informed of the
2  allegations against him.  Okay, now you say on
3  information and belief.  Is that because you didn't
4  know on that date of February 2014, somebody told
5  you and you said I accept it?
6      A.   Yes.
7      Q.   Who told you the answer to that question?
8           MS. GOGGIN-WARD:  Objection, calls for
9  privilege, attorney/client privilege.
10          MR. TAGUE:  Well, it calls for
11 attorney/client privilege if you or somebody in your
12 office told him.
13     Q.   Did your attorney tell you that was the
14 answer?
15          MS. GOGGIN-WARD:  Same objection.  Direct
16 him not to answer.
17          MR. DIETCHWEILER:  Certify the question.
18          MS. GOGGIN-WARD:  You're not the attorney
19 here, sir.
20          MR. DIETCHWEILER:  I asked him to certify
21 the question and I can talk to my attorney.
22          MS. GOGGIN-WARD:  Never said you couldn't.
23          MR. DIETCHWEILER:  And don't -- well,
24 don't get in the way of me talking to my attorney.
25          MS. GOGGIN-WARD:  I'm not getting in the

55

1    way, sir.

2              MR. DIETCHWEILER:  I think you are, ma'am.

3              MS. GOGGIN-WARD:  Go ahead.

4              MR. TAGUE:  Do certify that one.

5    BY MR. TAGUE:

6         Q.   Okay, No. 4, we wanted to know all

7    physical evidence, circumstancial evidence and

8    statements of Noah and a chain of custody for the

9    physical evidence, and you provided an answer after

10   an objection.  Is that information that you

11   remembered or did somebody tell you that?

12        A.   Restate the question again.

13        Q.   Okay, my question is that there was a

14   written question which obviously you've read.  There

15   was a written answer.

16        A.   Uh-huh.

17        Q.   My question to you is is the written

18   answer something that you remembered or did you take

19   that statement from information provided to you?

20        A.   I remembered pretty much all of that

21   answer, yes.

22        Q.   Okay, so you remembered that Noah made a

23   statement admitting he received pills from Michael

24   McKay --

25        A.   Yes.

56

1      Q.   -- and took them?  Okay.  And where did

2   you hear that Noah made that statement?

3      A.   That came out of the testimony from Mr.

4   Lucas or Mr. Bunting, one of the two.

5      Q.   Okay.  And you remember more details of

6   that statement at the hearing as to when and where

7   Mr. Lucas or Mr. Bunting claimed Noah admitted

8   taking pills from Michael McKay and ingesting them?

9      A.   You mean when he did it or --

10     Q.   Yes.

11     A.   -- when he admitted to it?

12     Q.   Well, I want to know the answer to both,

13  so let's start with the first one.  When did he

14  allegedly admit he received and ingested pills?

15     A.   I do believe it was in the office.  I

16  don't know exactly what time, specific time.

17     Q.   Okay.  So this was when they were

18  interrogating -- well, it's your understanding they

19  interrogated Noah on January 25, 2013?

20     A.   My understanding was they investigated the

21  situation.

22     Q.   Okay.  So you don't know whether or not

23  they actually called Noah in to speak with him?

24     A.   No, I know they did that, yes.

25     Q.   Okay, and -- but you don't know all of the

1    details of what happened in that discussion?

2         A.    Not every word, no.

3         Q.    Okay.  Tell me to the best of your ability

4    what you remember happened in that discussion.

5    First of all, who was present to your understanding?

6         A.    My understanding was Mr. Lucas, Mr.

7    Bunting and Noah and his mother.

8         Q.    Okay.  So during that meeting it's your

9    understanding while all of them were present that

10   Noah admitted receiving pills from Michael McKay and

11   ingesting them?

12        A.    My recollection, that's what the report

13   says and that's what Mr. Bunting and Mr. Lucas said.

14        Q.    Okay.  And do you remember what date Noah

15   allegedly told this group that he received the pills

16   from Michael McKay and ingested them?

17        A.    Not the exact date, no.

18        Q.    Okay.  Do you remember that it was not --

19   well, let me ask you.  Was it alleged he confessed

20   to taking and receiving pills on the 25th or some

21   other day?

22        A.    I don't recall.  What's the report say?

23        Q.    The report doesn't talk about an admission

24   at all.  You say the report.  What report are you

25   talking about?

58

1      A.    The notice, the notice of suspension.

2      Q.    Okay.  The notice of suspension doesn't

3  refer to admitting to taking, ingesting pills at

4  all, does it?

5           MS. GOGGIN-WARD:  Objection, form of the

6  question, the document speaks for itself, but you

7  can answer.  Oh, and asked and answered as well.

8      A.    It says he's being suspended for

9  possession of drugs, consumption of drugs.

10     Q.    Okay, but it doesn't --

11     A.    With his signature.

12     Q.    Okay.  He -- so is it a correct statement

13  that your conclusion that Noah possessed drugs at

14  school is based upon either Mr. Bunting or Mr. Lucas

15  relating that Noah confessed to possessing and

16  taking drugs?

17     A.    Yes.

18     Q.    Now, the statement here indicated that

19  supposedly Noah admitted to receiving and taking

20  pills, and based upon that recitation of confession,

21  you found that he should be suspended.  But we had

22  the drug test that was there also.  So do you

23  believe that Noah simply possessed pills and did not

24  take them or do you believe this recitation of

25  confession that he received and took the pills in

59

1    spite of the drug test?

2          MS. GOGGIN-WARD:  Objection, irrelevant.

3    You can answer.

4       A.    State the question again.

5          MR. TAGUE:  Read it back.

6          (Requested portion of the deposition was

7    read by the court reporter.)

8       A.    My belief is that he possessed the pills,

9    and as far as whether he took them or didn't take

10   them was irrelevant.

11      Q.    Okay, you go on in that answer to state

12   that there was a statement made by MM, which I'm

13   sure is Michael McKay, and that statement was a

14   statement that you actually had or somebody told you

15   existed?

16      A.    I don't recall.

17      Q.    And what was the statement that Michael

18   McKay made that led you to the conclusion that he

19   possessed pills?

20      A.    Without going back to the minutes and

21   transcripts specifically, I couldn't tell you

22   exactly word for word what the statement was.

23      Q.    Was it written?

24      A.    I do not recall.

25      Q.    Then you go, the paper provided by MM with

1    Noah's name on it.  Okay, you had that document, did

2    you not?

3         A.    Had what document?

4         Q.    Well, you refer to a paper provided by MM

5    with Noah's name on it.  What is that?

6         A.    My best recollection is MM had a paper

7    with a list of names on it.

8         Q.    Okay.  Have you ever seen that?

9         A.    Don't recall, but...

10             (Exhibit No. 9 was marked by the court

11   reporter.)

12   BY MR. TAGUE:

13        Q.    Okay, let me show you No. 9.  These were

14   documents that were produced that we asked for.  Is

15   that what we're talking about?

16        A.    You've got two different ones here.

17        Q.    Okay.  Not trying to hide anything.

18   That's the -- a written statement from Michael

19   McKay, correct?

20        A.    Looks like it, yes.

21        Q.    Okay.  So you had that when you decided

22   that Noah was guilty of possession?

23        A.    Don't recall, but if saying -- I don't

24   recall if it was included in the documents or not.

25        Q.    Have you ever seen that before today?

61

1     A.    I can't -- I can't recall, cannot
2  remember.
3     Q.    Now, that's a document that has -- says
4  Greyson equals $8, Noah equals $10, DP $5, Kunce $4.
5  Is that what you refer to in your answer as the
6  paper provided by MM with Noah's name on it?
7     A.    I do not recall.
8     Q.    So you don't know why there are different
9  numbers for different people?
10     A.    No.
11     Q.    Do you know whether or not the list with
12  numbers and the written statement that is attached
13  to Exhibit No. 9 were provided to Noah or Noah's
14  parents prior to Noah signing the suspension
15  notification on January 25, 2013?
16     A.    What was the question?  Am I --
17          MR. TAGUE:  Read it back.
18          (Requested portion of the deposition was
19  read by the court reporter.)
20     A.    No.
21          MS. GOGGIN-WARD:  Want to take a break,
22  get some water?
23          THE WITNESS:  Is that all right?
24          MR. TAGUE:  No, that's okay, yeah.  No, I
25  told you any time we need to do that --

62

1          THE WITNESS:  Yeah, and I've got to make a

2     phone call.

3               (Recess at 10:11 a.m. to 10:14 a.m.)

4     BY MR. TAGUE:

5          Q.   Before the board made its decision to

6     uphold the suspension, you were aware of the Michael

7     McKay statement, were you not?

8          A.   Yes.

9          Q.   You were aware of the existence of the

10    paper with the names and numbers on it, correct?

11         A.   Yes.

12         Q.   You can't tell me whether you actually saw

13    the documents before then or not, did I understand

14    that correctly, or did you actually see the

15    documents?

16         A.   I do not recall seeing the actual

17    documents.

18         Q.   Okay.  Do you know if anyone else other

19    than Michael McKay and his statement implicated

20    Noah?

21         A.   I do not recall.

22         Q.   Okay, I want you to go back to the Exhibit

23    No. 4 and look at Question No. 9.  We asked about

24    the letter with the numbers that you've just looked

25    at.  We asked when that was given to Noah.  And

63

1    ultimately after objection and defining what -- how

2    you want the answer given is stated "It was given to

3    Noah's counsel."  Now, is that something you know

4    happened or did somebody relate that to you?

5         A.    Someone related that to me.

6         Q.    Was it Mr. Lee?

7         A.    I do not recall.

8         Q.    You don't remember who did that?

9         A.    No.

10        Q.    Then we asked was that list referred to in

11   the school board hearing relating to Noah, and you

12   said it was not referred to in the school board

13   meeting concerning Noah.  Now, you were there, so is

14   that answer based upon your recollection of having

15   been present or did somebody tell you that?

16        A.    You're still talking about Question 9?

17        Q.    Question 9.

18        A.    B?

19        Q.    Uh-huh.

20        A.    As far as a notice being given to his

21   counsel, correct?

22        Q.    No, the -- I'm asking for B now.  In A,

23   the specific question says identify when the letter

24   of Michael McKay identifying the students to whom he

25   had provided pills was, and then in A we ask given

1   to Noah and we talked about that, but the B part of
2   that question was --
3       A.   Was it referred to in the school board
4   meeting.
5       Q.   Right, and you said it was not.  And I
6   know you were there.  I think you agree you were
7   there.  My question is when you answered that
8   question, did you remember that or did somebody tell
9   you that?
10      A.   As far as the answer on this?
11      Q.   Correct.
12      A.   At that time I guess I remember it not
13  being in the meeting I guess.
14      Q.   I'm sorry, you remember --
15      A.   Well, I remember -- I answered this
16  question, so --
17      Q.   Okay, and --
18      A.   That's what you're referring to.
19      Q.   Yeah, and my question is the answer was
20  that the document was not referred to in the school
21  board meeting concerning Noah Dietchweiler, and my
22  question is when you answered this question did you
23  actually remember that or was that something
24  somebody told you and you didn't dispute it?
25      A.   Can't remember, don't recall.  Because

1  this was filled out in February?  Yeah.

2       Q.   Okay.   Then looking at Interrogatory 12,

3  we asked if any defendant relied upon the list of

4  students owing money, and you state that you did not

5  take the document into consideration.

6       A.   That's a fair statement.

7       Q.   You didn't take the document into

8  consideration.   What do you mean?

9       A.   On my decision.

10       Q.   Okay.   No. 13, we asked you the letter

11  that you've seen, did you rely upon that in making

12  your decision, and you eventually say you did not

13  take that document into consideration.

14       A.   That is correct.

15       Q.   So what did you take into consideration if

16  you did not consider those two documents?

17       A.   The testimony of Mr. Lucas and Mr. Bunting

18  and the signature on the notice of student

19  disciplinary action signed by Noah.

20       Q.   Okay.   And the only testimony that you had

21  available to you from Mr. Lucas and Mr. Bunting was

22  what was presented in the suspension review hearing

23  itself; is that a true statement?

24       A.   That is a true statement.

25       Q.   Now, Noah testified at that hearing,

1   correct?

2        A.    Correct.

3        Q.    You took his testimony into consideration,

4   did you not?

5        A.    Yes.

6        Q.    The drug test result was presented.  You

7   took that into consideration, did you not?

8        A.    I listened to it, yes, and reviewed it.

9        Q.    Anything else that you took into

10  consideration other than the things we've identified

11  as the two written documents and the testimonies in

12  the hearing?

13       A.    No.

14       Q.    Do you remember in the hearing I asked you

15  as the presiding officer what the standard proof was

16  going to be in the school board's determination as

17  to whether or not Noah was guilty or not?

18       A.    I do not recall.

19       Q.    Do you ever recall the -- whether or not

20  the school board ever identified what standard they

21  were going to use in determining whether or not Noah

22  was guilty, what standard of proof?

23       A.    I don't recall.

24       Q.    There was a public -- it wasn't public.

25  There was part of a hearing that a court reporter

1   transcribed what took place verbatim, correct?

2       A.   Say that again?

3       Q.   Part of Noah's suspension hearing on

4   February 5, 2013, was taken down by a court reporter

5   verbatim, correct?

6       A.   Correct.

7       Q.   You've never reviewed that transcript?

8       A.   No, I have not.

9       Q.   There was a portion of the proceedings

10  that were not transcribed in which Noah and his

11  representatives were not present and participated,

12  correct?

13          MS. GOGGIN-WARD:   Objection, compound.

14      Q.   Okay.  We had a hearing, the court

15  reporter took down everything that was said, and

16  then did the school board go to a different location

17  in this building without Noah and his

18  representatives to discuss Noah's case?

19      A.   Yes.

20      Q.   Who was present?

21      A.   My recollection, the school board members

22  that were present at the hearing along with Kenny

23  Lee and our general counsel Mr. Funk.

24      Q.   No one else?

25      A.   No.

1      Q.   Was there any information provided in

2   those proceedings that Noah and his representatives

3   were not participants of that had not been discussed

4   in the session in which we have a verbatim

5   transcription?

6           MS. GOGGIN-WARD:   Objection to any

7   discussion or information provided in the closed

8   door session per the ruling of Judge Baker, and we

9   can certify it if you like, and I'm directing my

10  client not to answer.

11          MR. TAGUE:   Okay.   I guess double certify

12  it.

13  BY MR. TAGUE:

14      Q.   Do you dispute the findings in the drug

15  testing that Noah could not have ingested the Ativan

16  prescription medication on either January 25, 2013,

17  or January 24, 2013?

18      A.   No.

19      Q.   Okay, let me see.   Exhibit No. --

20          THE WITNESS:   What you got in your hand.

21          MS. GOGGIN-WARD:   I got it.

22      Q.   -- 1, who prepared that?

23      A.   I have no idea.

24      Q.   Were you aware of any requests made by

25  Noah or his family for information from the school

1   district to prepare for the suspension hearing?

2        A.   No.

3        Q.   Do you know that a request was made for

4   information and denied?

5        A.   Do not recall.

6             MR. TAGUE:  Just give me a minute and let

7   me confer and I think I'm just about done.

8             MS. GOGGIN-WARD:  Okay.

9             (Recess at 10:29 a.m. to 10:32 a.m.)

10  BY MR. TAGUE:

11       Q.   As you deal with a school board or as you

12  have dealt with matters as school board president

13  that have involved teachers and staff members, are

14  you prone to believe a principal is more credible

15  than a student?

16            MS. GOGGIN-WARD:  Object to the form of

17  the question, foundation.  You can tell him.

18       A.   We hire administrators under the

19  presumption that they are going to tell the truth,

20  yes.

21       Q.   And be the same thing with a

22  superintendent?

23       A.   Yes.

24       Q.   And same thing with staff members?

25       A.   Yes.

1       Q.   With respect to your conclusions that you

2  told us about that Noah was, in fact, guilty of

3  possessing a drug at school, there's different

4  standards of proof, and I understand that you don't

5  remember the discussion about it, but did you feel

6  you needed to find Noah was guilty beyond a

7  reasonable doubt?

8            MS. GOGGIN-WARD:   Object to the form of

9  the question and foundation.   It calls for a legal

10  conclusion.   You can answer if you know.

11       A.   State the question again.

12       Q.   Sure.   When you ultimately believed that

13  Noah took prescription drugs at school -- I'm sorry,

14  possessed prescription drugs at school --

15       A.   Okay, that's --

16       Q.   -- and you did that based upon what you

17  told us you considered and didn't consider, my

18  question is did you believe that the administration

19  needed to prove Noah guilty beyond a reasonable

20  doubt or did Noah need to prove his innocence beyond

21  a reasonable doubt?

22       A.   I based my decision on the testimony of

23  the administration plus the signature on the notice

24  of suspension by Noah Dietchweiler, his admission.

25       Q.   So you believe his signature on the notice

1  of suspension was a confession.

2       A.   I'll go back to my basis of the testimony

3  of the administration and his signature, and I do

4  believe in the testimony of the administration he

5  admitted to possessing the drugs.

6       Q.   You have it in front of you.

7       A.   Uh-huh.

8       Q.   The notice of student disciplinary action.

9       A.   Uh-huh.

10      Q.   Obviously Noah signed that.  The -- what

11  on that document do you believe is an acknowledgment

12  by Noah that he was guilty of possession of drugs or

13  consumption of drugs?

14            MS. GOGGIN-WARD:  Objection, document

15  speaks for itself.  Asked and answered.

16      A.   Because it states that specifically your

17  child has been suspended for possession of drugs.

18      Q.   And consumption, right?  Says consumption.

19      A.   It says possession and consumption, yes.

20      Q.   Okay.  And so you believe that since Noah

21  signed that, he confessed to possessing drugs and

22  consuming drugs.

23            MS. GOGGIN-WARD:  Objection, asked and

24  answered.

25      A.   Yes.

1          Q.    But we know for a fact he didn't consume
2    the drugs because of the drug report, correct?
3               MS. GOGGIN-WARD:  Objection, form of the
4    question and foundation.
5          Q.    Didn't you just state that you accepted
6    the results of the drug testing?
7          A.    I wasn't going to dispute them.
8               MR. TAGUE:  Okay, that's all I have.
9               MS. GOGGIN-WARD:  I have a couple.
10              EXAMINATION BY
11              MS. GOGGIN-WARD:
12         Q.    Let's take a look at this letter in
13    Exhibit 1, second to last page of Exhibit 1.  You
14    testified that that was the notice that was sent to
15    Mr. and Mrs. Dietchweiler by Kenny Lee about the
16    hearing; is that right?
17         A.    Yes.
18         Q.    Okay.  And plaintiff's counsel asked you
19    some questions about the form of that notice.  Do
20    you recall those questions?
21         A.    Yes.
22         Q.    Okay.  Did Mr. and Mrs. Dietchweiler
23    appear at the hearing?
24         A.    Yes, they did.
25         Q.    Did they present testimony at the hearing?

1       A.   Yes, I do believe so.

2       Q.   Did they present evidence at that hearing

3  of the drug test results?

4       A.   Yes, they did.

5       Q.   Did they cross-examine the witnesses that

6  were presented by the school?

7       A.   I don't recall, but I -- I don't recall.

8       Q.   Meaning did they ask questions?

9       A.   Yes, they asked questions.

10      Q.   And did they make arguments to the school

11  board following the presentation of evidence,

12  appearance and arguments?

13      A.   Yes.

14      Q.   Looking at Exhibit 8 for identification

15  which was identified as the student handbook,

16  looking at page -- I lost it.  About the criminal

17  procedures.  Oh, here we go.  They're not page

18  numbered.  Looking at number -- looks like it's page

19  57 at the bottom, number 3, it says possession of

20  illegal drugs and controlled substances.  Do you see

21  that?

22      A.   Yes.

23      Q.   It says the number of offenses will

24  accumulate during the student's GRS.  Do you know

25  what GRS is?

74

1      A.    Glenn Raymond School.

2      Q.    Oh.  Or WCHS?

3      A.    Watseka Community High School.

4      Q.    School career, is that what it says?

5      A.    Yes.

6      Q.    And it says, A, first offense, students

7   will automatically be suspended for the possession,

8   sale or use of drugs for one calendar year.  Is that

9   what it says?

10      A.    Yes.

11      Q.    Was Noah suspended for one calendar year

12   here?

13      A.    No.

14      Q.    And it says the suspension will begin

15   immediately upon confession or when the participant

16   is found guilty by school authorities.  Do you see

17   that?

18      A.    Yes.

19           MS. GOGGIN-WARD:  And that's all I have.

20           REEXAMINATION BY

21           MR. TAGUE:

22      Q.    At the -- are you aware that subsequent to

23   the school board suspension review hearing the

24   plaintiffs, the Dietchweiler family, have spoken

25   with members of the McKay family and have been told

1    that the prescription medication was not filled

2    until a time after the supposed confession by Noah?

3          MS. GOGGIN-WARD:  Object to the form of

4    the question.  Go ahead.

5          A.    I was unaware of that.

6          Q.    Okay.  How could Noah Dietchweiler's

7    family prepare for the allegations that Noah took

8    prescription medication on a day other than January

9    25, 2013, if the school district did not provide

10   that information in the written notice that the

11   offense date was the day before January 25, 2013?

12         MS. GOGGIN-WARD:  Object to the form of

13   the question.

14         A.    I have no idea.

15         Q.    Well, very early in the deposition you

16   assumed that the offense was January 25, 2013, did

17   you not?

18         A.    I said I wasn't aware of the exact date.

19         Q.    Okay.  And Noah Dietchweiler's family was

20   never apprised of the alleged exact date prior to

21   the suspension review hearing of February 5, 2013.

22   That's a true statement, is it not?

23         A.    I have no idea.  I don't know when they

24   were notified or when they weren't or what

25   information they were told.

76

1          Q.   Okay.   There's nothing about a date other
2     than January 25 on the notice of student
3     disciplinary action, is there?
4          A.   That's what the disciplinary action notice
5     says.
6          Q.   You're not aware of any documentation, are
7     you, that would indicate that the Dietchweilers were
8     told that possession or consumption of drugs
9     occurred on a date different than January 25, '13 --
10         A.   No.
11         Q.   -- are you?   Okay.
12              MR. TAGUE:   That's all I have.
13              MS. GOGGIN-WARD:   We'll reserve.
14              (Adjourned at 10:43 a.m.)
15
16
17
18
19
20
21
22
23
24
25

77

1    STATE OF ILLINOIS    )
                          )SS
2    COUNTY OF FORD       )

3

              I, June Haeme, a Notary Public in and for
4    the County of Ford, State of Illinois, do hereby
     certify that JAMES BUNTING, the deponent herein, was
5    by me first duly sworn to tell the truth, the whole
     truth and nothing but the truth, in the
6    aforementioned cause of action.
              That the following deposition was taken on
7    behalf of the Plaintiff at the Iroquois County CUSD
     #9, 1411 West Lafeyette Street, Watseka, Illinois,
8    on October 17, 2014.
              That the said deposition was taken down in
9    stenograph notes and afterwards reduced to
     typewriting under my instruction; that the
10   deposition is a true record of the testimony given
     by the deponent; and that it was agreed by and
11   between the witness and attorneys that said
     signature on said deposition would not be waived.
12            I do further certify that I am a
     disinterested person in this cause of action; that I
13   am not a relative, or otherwise interested in the
     event of this action, and am not in the employ of
14   the attorneys for either party.
              IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my notarial seal this 23rd day of
     October, 2014.

16

17

18

19                      JUNE HAEME, CSR
                        NOTARY PUBLIC
20

21
     "OFFICIAL SEAL"
22   June Haeme
     Notary Public, State of Illinois
23   My Commission Expires:
     September 27, 2016
24

25

78

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
2                      STATE OF ILLINOIS

3
    NOAH DIETCHWEILER, by MICHAEL      )
4   DIETCHWEILER, his father and       )
    next friend,and ANN DIETCHWEILER,)
5                                      )
         Plaintiffs,                   ) No. 2013-CV-2062
6                                      )
              vs.                      )
7                                      )
    STEVE LUCAS, in his official and )
8   individual capacities; et al.,     )
                                       )
9        Defendants.                   )
    -----------------------------

10

11
              This is to certify that I have read the
12  transcript of my deposition taken by June Haeme,
    CSR, in the above-entitled cause, and that the
13  foregoing transcript taken on October 17, 2014,
    accurately states the questions asked and the
14  answers given by me, with the exception of the
    corrections noted, if any, on the attached errata
15  sheet(s).

16

17                      JAMES BUNTING

18
    Subscribed and Sworn before
19
    me the     day of                  , 2014.
20
                        , Notary Public
21

22

23
         Area Wide Reporting and Video Conferencing
24         301 West White Street, Champaign, IL 61820
                      800.747.6789
25

## $

**$10 (1)**
61:4
**$4 (1)**
61:4
**$5 (1)**
61:4
**$8 (1)**
61:4

## A

**A1 (1)**
38:12
**ability (2)**
6:21;57:3
**able (2)**
6:6;18:22
**academic (1)**
52:5
**accept (1)**
54:5
**accepted (4)**
30:2;53:20,22;72:5
**accommodate (1)**
6:20
**accordance (2)**
18:11;49:9
**according (1)**
42:9
**accounting (1)**
10:12
**accumulate (1)**
73:24
**accurate (1)**
25:7
**accused (2)**
51:25;53:24
**acknowledgment (1)**
71:11
**acquired (1)**
46:25
**acquiring (1)**
51:25
**Action (5)**
38:4;65:19;71:8;
76:3,4
**activities (2)**
15:19;16:23
**activity (7)**
14:17;15:3,4,5,6;
17:21;45:2
**actual (6)**
32:7;34:13,25;
35:13;46:6;62:16
**actually (19)**
8:22;11:20;21:23;
23:24;24:7;27:11,15;
30:15;32:21;33:4;
34:19;39:24;46:21;
53:20;56:23;59:14;

**62:12,14;64:23**
**address (1)**
7:11
**Adjourned (1)**
76:14
**administration (11)**
10:11;15:2;43:4,16;
44:24;45:10,12;
70:18,23;71:3,4
**administrators (2)**
17:19;69:18
**admission (2)**
57:23;70:24
**admit (1)**
56:14
**admitted (5)**
56:7,11;57:10;
58:19;71:5
**admitting (1)**
55:23;58:3
**advised (1)**
34:15
**affiliated (2)**
10:16;12:22
**affiliation (1)**
9:15
**afterwards (1)**
22:11
**again (18)**
6:7;14:20;15:23;
20:12;28:13;34:3;
36:20;37:18;43:8,13;
45:1;49:4;51:9;52:7;
55:12;59:4;67:2;
70:11
**against (4)**
36:17;38:10;50:3;
54:2
**agenda (4)**
26:10,16,17;27:4
**agree (1)**
64:6
**ahead (5)**
28:11,12;36:19;
55:3;75:4
**allegations (2)**
54:2;75:7
**alleged (2)**
57:19;75:20
**allegedly (2)**
56:14;57:15
**along (2)**
29:9;67:22
**ambiguities (1)**
6:14
**ambiguity (1)**
6:8
**amended (1)**
41:18
**and/or (1)**
42:2
**answered (11)**
34:3;37:3;40:4;

**49:4;53:18;58:7;64:7,**
**15,22;71:15,24**
**appear (1)**
72:23
**appearance (1)**
73:12
**applicable (1)**
5:12
**apply (1)**
12:25
**appointed (4)**
10:23;13:4,6,8
**appointment (2)**
12:17;13:6
**apprised (1)**
75:20
**approached (1)**
12:20
**approve (2)**
19:13;26:12
**approved (2)**
19:21;26:17
**approximately (1)**
54:1
**arguments (2)**
73:10,12
**around (2)**
10:24;33:5
**assembly (1)**
52:13
**assume (4)**
14:12;27:20;32:9;
49:8
**assumed (3)**
29:5,9;75:16
**assuming (2)**
33:8;46:14
**assumption (1)**
29:12
**Ativan (2)**
53:4;68:15
**attached (1)**
61:12
**attention (1)**
45:6
**attorney (4)**
54:13,18,21,24
**attorney/client (2)**
54:9,11
**authorities (2)**
51:4;74:16
**automatic (1)**
36:8
**automatically (1)**
74:7
**available (4)**
23:14,16;46:21;
65:21
**award (1)**
52:12
**aware (26)**
14:2,22;15:2;17:1,
15;28:22;35:9,11;

**36:8,11,14,15;41:20;**
**44:25;45:9,10;51:13,**
**17;52:8,11;62:6,9;**
**68:24;74:22;75:18;**
**76:6**

## B

**bachelor (1)**
10:9
**bachelor's (1)**
10:8
**back (21)**
6:5,7,14;9:4;11:21;
14:1;24:6;36:21;37:4;
40:6;43:14;46:5;
47:10;48:15,17;
49:12;59:5,20;61:17;
62:22;71:2
**background (1)**
5:24
**Baker (1)**
68:8
**bank (6)**
9:20,21;23:3,7,10,
23
**banker (1)**
9:17
**banking (1)**
9:23
**based (6)**
47:10;58:14,20;
63:14;70:16,22
**basis (6)**
38:14;39:2,8;48:12;
53:3;71:2
**became (6)**
14:2;15:1;18:19;
44:24;45:9,10
**become (2)**
11:24;14:22
**begin (2)**
11:20;74:14
**belief (4)**
19:10;53:25;54:3;
59:8
**below (1)**
38:23
**best (14)**
6:21;19:8;24:9,11,
14;26:1;44:3,8,9;
46:5,6,8;57:3;60:6
**beyond (3)**
70:6,19,20
**blank (1)**
32:6
**board (48)**
10:20;11:1,15,18,
22,25;12:7,11,17,21;
13:8,19;15:12,13,16;
18:19,24,25;19:5,13,
19;20:9,13,15,23,25;
21:5,6,13;22:5;41:21,

**23;42:12;49:9,18;**
**50:20;62:5;63:11,12;**
**64:3,21;66:20;67:16,**
**21;69:11,12;73:11;**
**74:23**
**boards (1)**
22:6
**board's (1)**
66:16
**book (1)**
33:14
**booklet (2)**
32:12,16
**both (2)**
37:3;56:12
**bottom (1)**
73:19
**bound (1)**
18:8
**breach (1)**
17:6
**break (2)**
16:19;61:21
**breaks (1)**
6:17
**BRUNS (5)**
5:4,9,10,11;8:14
**B-R-U-N-S (1)**
5:15
**Brutlag (1)**
13:13
**building (2)**
25:4;67:17
**bump (1)**
8:9
**Bunting (9)**
47:25;49:5;56:4,7;
57:7,13;58:14;65:17,
21
**Burd (1)**
13:12
**business (3)**
10:11;20:15;36:13
**buy (1)**
48:6

## C

**calendar (2)**
74:8,11
**call (5)**
22:20,24;23:21,25;
24:6;62:2
**called (7)**
22:21,22,25;23:10;
24:6,7;56:23
**calling (2)**
23:19;50:24
**calls (5)**
23:3,8;54:8,10;70:9
**came (2)**
18:24;30:15;47:15;
56:3

**can (28)**
5:22;6:17,20;13:10;
15:21;20:17;21:18;
22:8;28:10,11;30:22,
23;32:3;34:3;35:20;
41:22;44:15,17,19;
49:1;50:8,19;54:21;
58:7;59:3;68:9;69:17;
70:10

**career (1)**
74:4

**Carol (1)**
8:24

**case (4)**
16:9;41:9;43:4;
67:18

**cell (1)**
22:25

**central (1)**
8:8

**certificate (1)**
52:12

**certified (2)**
31:13,21

**Certify (5)**
54:17,20;55:4;68:9,
11

**chain (1)**
55:8

**changed (1)**
18:18

**changes (3)**
18:21,23;19:5

**charge (1)**
19:4

**charged (1)**
34:24

**charges (13)**
36:16,19;37:3,20,
25;38:9,13;39:1,4,7;
41:1,18;50:3

**child (2)**
40:20;71:17

**children (2)**
50:10;51:3

**chose (2)**
48:16;49:1

**circumstances (2)**
44:24;45:14

**circumstancial (1)**
55:7

**Civil (1)**
5:12

**claimed (1)**
56:7

**Clark (1)**
8:24

**classes (2)**
21:7,20

**classified (1)**
28:23

**clerical (1)**
23:4

**client (1)**
68:10

**closed (1)**
68:7

**Cocaine (1)**
44:16

**code (5)**
15:11;17:7;34:9;
35:7;43:17

**College (1)**
10:3

**Commencing (1)**
5:3

**communicating (1)**
6:16

**communication (1)**
22:19

**communications (1)**
25:16

**community (4)**
7:22;9:6;34:10;
74:3

**compare (2)**
28:7,14

**compared (1)**
33:22

**comply (1)**
29:8

**compound (3)**
16:18;36:18;67:13

**concerning (1)**
63:13;64:21

**concluded (1)**
48:12

**concluding (1)**
47:23

**conclusion (4)**
47:15;58:13;59:18;
70:10

**conclusions (1)**
70:1

**conducive (1)**
6:16

**conduct (3)**
15:11;17:7;22:6

**confer (1)**
69:7

**confessed (4)**
48:11;57:19;58:15;
71:21

**confession (5)**
58:20,25;71:1;
74:15;75:2

**conformance (2)**
29:2;30:3

**confused (1)**
17:2

**Connie (1)**
8:5

**consider (2)**
65:16;70:17

**consideration (7)**
65:5,8,13,15;66:3,7,

10

**considered (1)**
70:17

**constitute (2)**
38:14;39:2

**constituted (1)**
39:7

**consume (1)**
72:1

**consumed (2)**
47:19;48:13

**consuming (1)**
71:22

**consumption (10)**
41:15,24;42:1;
47:24;58:9;71:13,18,
18,19;76:8

**contact (1)**
31:19

**contained (1)**
50:4

**contents (1)**
18:14

**controlled (2)**
14:3;73:20

**convention (1)**
21:6

**conversation (1)**
25:12

**copies (3)**
17:24,25;32:4

**copy (2)**
18:10;20:6

**correctly (1)**
62:14

**counsel (5)**
29:10;63:3,21;
67:23;72:18

**County (1)**
7:14;9:1,6

**couple (1)**
72:9

**course (2)**
21:25;52:16

**courses (1)**
22:4

**court (11)**
5:2,19;36:23;37:6;
40:8;59:7;60:10;
61:19;66:25;67:4,14

**credible (1)**
69:14

**criminal (2)**
51:4;73:16

**cross-examine (1)**
73:5

**currently (3)**
9:18;10:13;11:21

**curricula (1)**
21:24

**custody (1)**
55:8

**custom (4)**

16:13,14,21;17:19

**D**

**database (1)**
24:1

**date (17)**
14:9,13;24:22;25:9,
21;43:13;47:1;53:7,
11;54:4;57:14,17;
75:11,18,20;76:1,9

**daughter (1)**
8:18

**daughters (1)**
8:11

**day (12)**
14:10;30:13;36:12,
13;40:10;46:13,14;
47:4;53:23;57:21;
75:8,11

**deal (4)**
20:8,15;21:16;
69:11

**dealt (1)**
69:12

**dean (1)**
13:23

**decide (1)**
23:20

**decided (1)**
60:21

**decision (4)**
62:5;65:9,12;70:22

**defendant (1)**
65:3

**Defendant's (1)**
52:15

**defining (1)**
63:1

**degree (3)**
10:3,8,10

**delivered (1)**
19:14

**denied (4)**
47:19;48:18,24;
69:4

**deny (1)**
48:17

**denying (2)**
48:21,23

**deposition (9)**
5:11,16;7:2;36:22;
37:5;40:7;59:6;61:18;
75:15

**details (6)**
37:14;45:13;47:15,
17;56:5;57:1

**determination (1)**
66:16

**determine (2)**
18:22;29:2

**determining (1)**
66:21

**develop (1)**
20:24

**Dietchweiler (17)**
27:16;30:7;34:15;
38:1,5;49:19;50:2;
52:2;54:17,20,23;
55:2;64:21;70:24;
72:12,22;74:24

**Dietchweilers (2)**
35:14;76:7

**Dietchweiler's (4)**
51:6,10;75:6,19

**different (9)**
17:12;21:20;47:1;
60:16;61:8,9;67:16;
70:3;76:9

**digits (1)**
7:18

**Direct (1)**
54:15

**directed (2)**
31:10;34:20

**directing (1)**
68:9

**directly (1)**
49:18

**disciplinary (17)**
6:2;21:16;22:7,12;
25:3,17;29:15,17;
38:4;43:3,17;51:7,11;
65:19;71:8;76:3,4

**discipline (3)**
24:12;34:9;38:14

**disclosures (1)**
18:2

**discuss (2)**
30:6;67:18

**discussed (2)**
45:25;68:3

**discussion (4)**
57:1,4;68:7;70:5

**discussions (1)**
25:11

**dispute (5)**
32:25;33:8;64:24;
68:14;72:7

**disputing (2)**
33:1,12

**District (17)**
5:25;9:4,5,6,9,13,
15,24;10:17;12:12,
23;13:8;16:22;19:3;
34:10;69:1;75:9

**district's (1)**
18:1

**document (22)**
18:5;23:7;27:6,14,
22,24;33:11;39:6,18,
19,23;40:19;58:6;
60:1;63:1;64:20;
65:5,7,13;71:11,14

**documentation (1)**
26:6;76:6

documents (11)
  7:4;42:3;50:2;
  51:14;60:14,24;
  62:13,15,17;65:16;
  66:11
done (4)
  20:22;21:12;37:22;
  69:7
door (1)
  68:8
double (1)
  68:11
doubt (3)
  70:7,20,21
down (4)
  16:19;34:5;67:4,15
DP (1)
  61:4
drink (1)
  6:18
drug (28)
  14:17;15:2,4,5,6;
  16:22;17:20;35:21;
  36:7,12;42:3;43:17,
  18;53:2,2,10,11,14,
  19,21;58:22;59:1;
  66:6;68:14;70:3;72:2,
  6;73:3
drugs (40)
  14:5,24;15:11;17:7;
  41:14,15,25;42:9;
  44:4,6;46:7,10,22;
  47:1,19,24;48:5,7,13,
  18;50:6,18,21;51:18;
  58:9,9,13,16;70:13,
  14;71:5,12,13,17,21,
  22;72:2;73:20;74:8;
  76:8
duly (1)
  5:5
during (5)
  19:24;45:22;52:16;
  57:8;73:24
duties (2)
  20:22,25

                E

early (2)
  30:15;75:15
East (2)
  7:12;8:8
education (2)
  10:2;41:23
efficiently (1)
  5:23
either (7)
  19:23;22:10;42:24;
  44:5;46:13;58:14;
  68:16
elected (9)
  10:19,22;11:2,5,10,
  14;12:3,4,5

election (1)
  11:12
electronic (1)
  18:4
else (4)
  27:12;62:18;66:9;
  67:24
emergency (2)
  50:17,22
employed (1)
  9:18
employee (1)
  19:3
employment (1)
  9:22
endeavors (1)
  9:23
environment (1)
  6:16
equals (2)
  61:4,4
even (3)
  33:22;36:25;41:12
evening (2)
  25:13;26:23
event (2)
  22:17;24:15
eventually (1)
  65:12
everybody (2)
  32:22;33:5
everyone (2)
  32:12,17
evidence (7)
  39:3;46:20;55:7,7,
  9;73:2,11
exact (7)
  10:24;14:9,13;25:9;
  57:17;75:18,20
exactly (10)
  12:2;15:24;19:24;
  23:2;39:15;45:21;
  46:11,12;56:16;59:22
EXAMINATION (2)
  5:6;72:10
except (1)
  38:22
exchange (1)
  14:23
exchanged (1)
  51:19
exemplary (1)
  52:13
Exhibit (14)
  17:23;32:5,10;
  37:25;50:4;52:15,18;
  60:10;61:13;62:22;
  68:19;72:13,13;73:14
Exhibits (1)
  5:1
existed (4)
  18:5,17;36:9;59:15
existence (1)

62:9
exists (1)
  23:24
expectation (1)
  28:3
expelled (3)
  16:1,5,6
expire (2)
  11:8,9
explain (1)
  40:24
expulsion (1)
  51:15
expulsions (1)
  15:10
extent (1)
  10:1

                F

fact (5)
  34:23;48:4;49:13;
  70:2;72:1
fair (4)
  16:11;23:17;29:5;
  65:6
familiar (2)
  16:13,20
family (6)
  27:18;68:25;74:24,
  25;75:7,19
far (9)
  14:13;15:4;40:9;
  42:10;46:13;47:17;
  59:9;63:20;64:10
Farmers (1)
  9:21
February (20)
  25:6,14,18;26:8;
  27:16;29:18;30:8;
  37:13;41:19;42:13;
  43:12;51:7,15;52:3;
  53:8,16;54:4;65:1;
  67:4;75:21
Federal (1)
  5:12
feel (2)
  6:15;70:5
felt (1)
  43:16
few (1)
  5:21
filled (3)
  11:11;65:1;75:1
find (5)
  23:16;24:16;41:23;
  45:13;70:6
findings (1)
  68:14
fine (1)
  9:11
finished (1)
  10:25

first (10)
  5:5;14:7;15:1;
  17:14;32:11;36:13;
  52:18;56:13;57:5;
  74:6
five (1)
  21:19
flag (1)
  30:19
flagged (1)
  35:23
follow (3)
  27:25;28:1;49:18
followed (7)
  27:21;29:19,24,25;
  30:1;45:22;49:14
following (4)
  31:22;34:16;38:24;
  73:11
follows (2)
  5:5;30:21
forgot (1)
  53:16
form (14)
  16:17;22:19;27:5;
  28:9;31:11,19;35:14;
  58:5;69:16;70:8;72:3,
  19;75:3,12
formal (1)
  10:1
format (8)
  31:22,23,25;33:14,
  24;34:1,20;35:15
forth (2)
  35:15;38:22
found (3)
  36:6;58:21;74:16
foundation (3)
  69:17;70:9;72:4
four (2)
  7:18;11:10
front (1)
  71:6
Funk (2)
  30:7;67:23
further (1)
  25:1

                G

gave (8)
  7:25;28:15;29:1,7,
  24;30:25;32:21;40:9
general (3)
  5:21;29:10;67:23
Germantown (1)
  8:19
gesture (1)
  6:13
given (21)
  27:23;29:18;32:8,
  12,14,15,17;34:14;
  35:14;38:10;39:10,

16,23;40:1,25;46:14;
  62:25;63:2,2,20,25
Glenn (1)
  74:1
GOGGIN-WARD (44)
  16:17;28:9,12;31:4,
  7;34:2;36:1,18;37:2,
  7,11;38:16;39:19,25;
  40:3;43:45,8,11;48:19;
  49:3;54:8,15,18,22,
  25;55:3;58:5;59:2;
  61:21;67:13;68:6,21;
  69:8,16;70:8;71:14,
  23;72:3,9,11;74:19;
  75:3,12;76:13
good (1)
  52:8
governance (1)
  21:5
Greyson (1)
  61:4
ground (1)
  5:22
group (1)
  57:15
GRS (2)
  73:24,25
guess (6)
  13:4;17:2;26:13;
  64:12,13;68:11
guilty (11)
  36:6;41:24;47:23;
  60:22;66:17,22;70:2,
  6,19;71:12;74:16

                H

hand (1)
  68:20
handbook (28)
  18:4,6,14,17,18,23;
  19:4,14,18,21;20:6,
  11,16,18;28:8,15,18;
  29:7;30:3,18;33:15,
  24;34:20;35:6,16,18;
  36:9;73:15
handed (1)
  32:25
handled (1)
  16:16
happen (4)
  12:19;13:1;44:7,8
happened (11)
  16:12;37:15;42:14;
  43:1,10,18;44:2;
  46:17;57:1,4;63:4
happy (1)
  6:4
head (1)
  6:11
hear (1)
  56:2
hearing (57)

7:5,9;17:10;20:19;
24:13;25:3,21,23,25,
25;26:2,4,7,10,15,18,
22;27:16;28:4;29:20;
30:7;32:13;33:23;
36:17;37:13;41:19,
24;42:12,14,19,23;
43:3,11;46:1,24;
48:22;50:1;51:7,11,
15;56:6;63:11;65:22,
25;66:12,14,25;67:3,
14,22;69:1;72:16,23,
25;73:2;74:23;75:21
hearings (3)
22:7;42:18,22
held (1)
11:14
Here's (1)
36:5
heroin (1)
44:14
hide (1)
60:17
High (14)
13:24;14:3,17;
17:20,21;18:3;19:14;
20:16,18;22:17;
24:12;31:9;52:6;74:3
Hills (1)
8:19
himself (1)
27:12
hire (1)
69:18
hired (4)
12:6,9,12,14
home (1)
22:24
honestly (1)
46:2
hopefully (1)
6:20
hosting (1)
6:22
hundred (1)
13:14

I

idea (4)
50:5;68:23;75:14,
23
identification (1)
73:14
identified (5)
48:11;53:4;66:10,
20;73:15
identify (2)
27:6;63:23
identifying (1)
63:24
illegal (1)
73:20

Illinois (6)
7:13;8:8,12,21;
10:5;34:9
immediately (1)
74:15
implement (1)
28:5
implicated (2)
50:10;62:19
important (1)
6:5
imposition (1)
38:23
incident (14)
14:2,8,21;16:12;
22:13;24:23;40:24;
41:12;43:15;45:14;
46:3,17;47:4,5
incidents (1)
14:15
included (1)
60:24
incoming (1)
23:8
indicate (2)
32:21;76:7
indicated (2)
17:5;58:18
indicates (1)
41:13
indicating (2)
18:10;38:2
indication (1)
34:24
individual (2)
44:4,6
individuals (1)
44:4
individual's (1)
46:11
inform (1)
25:24
information (10)
53:25;54:3;55:10,
19;68:1,7,25;69:4;
75:10,25
informed (4)
14:12;25:22;26:1;
54:1
ingested (4)
50:18;56:14;57:16;
68:15
ingesting (4)
50:21;56:8;57:11;
58:3
ingestion (1)
36:19
initial (1)
25:11
innocence (1)
70:20
instant (1)
51:3

instruct (1)
37:9
interested (5)
8:9;13:2;35:21;
36:6;38:11
interpretation (2)
39:22,22
interrogated (1)
56:19
interrogating (1)
56:18
interrogation (1)
37:15
Interrogatory (2)
53:1;65:2
interviews (1)
12:25
into (9)
8:9;31:16;65:5,7,
13,15;66:3,7,9
introduced (1)
51:14
investigate (1)
49:12
investigated (2)
15:2;56:20
investigating (1)
17:20
investigation (15)
14:17;16:21,22;
17:6,10;22:12;36:16;
37:15;44:2;45:16,17,
22;49:6,8;50:10
investigations (6)
14:23;16:15;17:15;
21:17;22:3,12
involve (3)
15:25;16:2;22:6
involved (17)
12:16;15:16,18;
24:16,18,20;25:3;
43:15,22;44:12;46:3,
16,21;49:1;51:3,22;
69:13
involvement (3)
18:13,15;48:10
involving (4)
14:3,16;17:6;51:12
Iroquois (5)
7:14;9:2,6,21;34:10
irrelevant (1)
42:7,8;59:2,10
issue (1)
24:12
issues (1)
20:8

J

JAMES (3)
5:4,9,11
January (40)
13:17,17;14:1,8,16,

18,21;15:11;16:12,
20;17:8;19:18;20:5,9,
10,14,21;21:9;22:9,
10,13;43:2,10,18;
44:9;47:1;50:18;51:3,
19;52:11;53:25;
56:19;61:15;68:16,
17;75:8,11,16;76:2,9
joining (1)
12:21
Judge (1)
68:8
jury (1)
8:10

K

Kanouce (1)
8:18
Kenny (7)
14:12;25:22;26:11;
27:10;30:9;67:22;
72:15
kind (1)
15:6
knew (3)
28:22;29:6;53:13
knowledge (5)
16:14;17:5;18:11;
44:8,9
known (1)
52:2
Kunce (1)
61:4

L

language (3)
34:13;39:17;40:17
last (7)
5:14;7:18;8:7;
19:17;32:5,6;72:13
Laura (1)
8:14
law (1)
49:9
Leah (1)
8:18
learn (6)
14:7;20:22,23;
22:16;44:23;52:5
learned (1)
22:11
least (2)
14:4;42:14
led (1)
59:18
Lee (20)
7:7;12:6;13:21;
19:6,10;28:14;29:1,6,
18;30:7,25;33:19;
34:14;35:12;36:11,
15;49:17;63:6;67:23;

72:15
Lee's (1)
23:25
left (1)
10:25
legal (1)
70:9
letter (10)
31:20,22;33:12;
34:12,18;35:2;62:24;
63:23;65:10;72:12
lieu (1)
9:13
likely (1)
6:6
line (1)
34:5,6
list (3)
60:7;61:11;63:10;
65:3
listen (1)
43:5
listened (1)
66:8
live (4)
8:12,15,20,23
lives (3)
8:16,19,24
location (1)
67:16
locker (1)
50:13
long (1)
6:19
look (12)
19:19;30:23;31:3,5;
32:11;33:16,17;34:4,
5;35:19;62:23;72:12
looked (2)
52:22;62:24
looking (5)
48:15;65:2;73:14,
16,18
Looks (2)
60:20;73:18
lost (1)
73:16
Lucas (13)
12:12;13:23;46:25;
47:25;49:6,21;56:4,7;
57:6,13;58:14;65:17,
21
lunch (1)
46:18
lunchroom (2)
14:3;47:5

M

ma'am (1)
55:2
mail (1)
31:13,21

making (1)
65:11
mandated (1)
31:25
many (7)
15:19;21:8;24:19;
26:25;43:21;51:21,24
March (1)
13:18
Marijuana (1)
44:18
marked (3)
5:1;30:19;60:10
match (1)
23:25
materials (1)
21:25
matter (2)
7:8;25:17
matters (2)
25:18;69:12
maybe (2)
20:2;27:4
McKay (11)
55:24;56:8;57:10,
16;59:13,18;60:19;
62:7,19;63:24;74:25
mean (5)
6:12,13;34:4;56:9;
65:8
Meaning (1)
73:8
medication (4)
44:20;68:16;75:1,8
meeting (6)
30:12;57:8;63:13;
64:4,13,21
meetings (2)
19:1;22:5
member (7)
11:15;18:19;20:9,
14,23,25;45:5
members (4)
67:21;69:13,24;
74:25
mention (2)
34:7,11
mentioned (2)
51:6,10
Michael (10)
55:23;56:8;57:10,
16;59:13,17;60:18;
62:6,19;63:24
might (2)
8:9;20:1
Mike (1)
18:10
minor (1)
10:12
minute (2)
35:24;69:6
minutes (4)
18:25;19:19;46:6;

59:20
misunderstood (1)
27:5
MM (5)
59:12,25;60:4,6;
61:6
money (1)
65:4
more (11)
9:13;11:9;15:20;
16:3;25:25;26:18,20,
22;43:24;56:5;69:14
mother (1)
57:7
moving (1)
7:21
Mrs (3)
38:5;72:15,22
much (2)
30:22;55:20
multiple (1)
20:2
must (1)
53:15

**N**

name (13)
5:8,14;8:4,7,23;9:5,
13;46:12;51:6,10;
60:1,5;61:6
names (3)
8:13;60:7;62:10
narcotics (1)
14:4
necessary (1)
37:1
need (8)
6:18;20:23,24;
30:23;35:19;47:9;
61:25;70:20
needed (5)
20:10,16;42:10;
70:6,19
negative (1)
36:12
next (2)
7:22;30:22
night (3)
32:17,24;48:23
Noah (77)
7:9;25:3;29:17;
34:15,24;36:13,17;
37:16;38:10;40:1;
41:13,24;46:3,10,21,
25;47:18;48:12,17;
49:1,19;50:1,3;51:6,
10,24;52:2,8,12;
53:24;54:1;55:8,22;
56:2,7,19,23;57:7,10,
14;58:13,15,19,23;
60:22;61:4,13,14;
62:20,25;63:11,13;

64:1,21;65:19,25;
66:17,21;67:10,17;
68:2,15,25;70:2,6,13,
19,20,24;71:10,12,20;
74:11;75:2,6,7,19
Noah's (19)
6:1;7:5;20:19;32:8,
12;42:13,18,23;46:1;
51:16;52:5;53:3;60:1,
5;61:6,13;63:3;67:3,
18
nod (1)
6:11
nominated (1)
12:18
None (1)
21:18
North (1)
7:12
notice (37)
31:11,25;32:7,13,
15;34:14;35:1,13;
37:20,23,24;38:4,9,9,
13;39:1,7;40:1,12,13,
21,25;41:13;46:14;
58:1,1,2;63:20;65:18;
70:23,25;71:8;72:14,
19;75:10;76:2,4
notification (2)
31:19;61:15
notified (1)
75:24
notify (2)
31:18;40:19
number (6)
7:16,19;31:2;73:18,
19,23
numbered (1)
73:18
numbers (4)
61:9,12;62:10,24

**O**

Object (6)
16:17;28:9;69:16;
70:8;75:3,12
objected (1)
33:23
Objection (20)
34:2;36:18;37:2,7;
39:19,25;40:3;48:19;
49:3;54:8,15;55:10;
58:5;59:2;63:1;67:13;
68:6;71:14,23;72:3
observed (1)
38:25
obtain (1)
10:4
obviously (3)
47:7;55:14;71:10
occupation (1)
9:16

occupational (1)
9:22
occurred (1)
76:9
occurrence (1)
14:13
o'clock (1)
25:13
off (1)
18:1
offense (3)
74:6;75:11,16
offenses (1)
73:23
office (5)
10:14;11:14,17;
54:12;56:15
officer (3)
19:2;28:4;66:15
official (5)
9:5,13;38:12,25;
40:23
once (3)
11:5;6;12:3
one (39)
13:14;14:16,18;
15:20,20,21;16:3;
17:5,15,25;18:7,9;
20:1,2;23:11;25:25;
26:18,20,22;29:17,22;
32:22;35:24;37:3;
38:1;40:5,6,10;42:14;
43:24;44:3;51:11;
53:3;55:4;56:4,13;
67:24;74:8,11
ones (2)
13:10;60:16
only (3)
15:21;20:2;65:20
opportunity (2)
40:24;41:5
order (2)
27:25;42:16
out (12)
11:11;23:16;24:16;
28:18,21;31:23;
32:25;33:19,23;
45:13;56:3;65:1
over (3)
5:21;30:9,16
owing (1)
65:4
own (3)
51:8,12,16

**P**

P43 (1)
30:20
page (12)
30:21,22;32:5,6,11;
35:20,23;52:20;
72:13;73:16,17,18

pages (1)
52:18
paper (5)
59:25;60:4,6;61:6;
62:10
parents (7)
31:11,18,20;32:1,8;
35:13;61:14
part (5)
27:19;30:21;64:1;
66:25;67:3
participant (1)
74:15
participants (1)
68:3
participated (1)
67:11
particular (2)
19:2;27:14
passed (1)
33:5
people (5)
23:4,6,12,13;61:9
per (1)
68:8
percent (1)
13:14
performed (1)
45:15
person (3)
19:10;23:11;36:6
Phone (11)
22:20,24,25;23:2,4,
7,15,15,25;24:2;62:2
physical (3)
50:6;55:7,9
picking (1)
8:10
pills (15)
51:22,24;55:23;
56:8,14;57:10,15,20;
58:3,20,23,25;59:8,
19;63:25
place (2)
26:4;67:1
plain (1)
39:17
plaintiffs (1)
74:24
Plaintiff's (2)
32:5;72:18
plans (1)
7:21
please (1)
5:14
plus (1)
70:23
pm (2)
25:13;54:1
pointed (1)
33:23
police (1)
50:24

**policies (2)**
  43:17,18
**policy (18)**
  14:5;16:25;17:6;
  31:9,25;34:9;35:8,21;
  36:9;37:1,18;39:4;
  41:1;49:9,14,18;
  50:20,24
**political (1)**
  10:14
**portion (6)**
  36:22;37:5;40:7;
  59:6;61:18;67:9
**position (1)**
  9:3
**possessed (7)**
  47:19;48:18;58:13,
  23;59:8,19;70:14
**possessing (4)**
  58:15;70:3;71:5,21
**possession (18)**
  20:6;36:12,19;
  41:14;42:2,2,9;47:23;
  48:5,13;58:9;60:22;
  71:12,17,19;73:19;
  74:7;76:8
**possible (1)**
  5:23
**possibly (2)**
  12:20;13:13
**practice (5)**
  16:13,14,21,25;
  17:19
**preparation (2)**
  18:14,15
**prepare (3)**
  7:1;69:1;75:7
**prepared (6)**
  26:10,16;27:9,12;
  35:13;68:22
**preparing (1)**
  17:24
**prescribed (1)**
  33:14
**prescription (7)**
  44:20,21;68:16;
  70:13,14;75:1,8
**present (10)**
  18:20,24;57:5,9;
  63:15;67:11,20,22;
  72:25;73:2
**presentation (1)**
  73:11
**presented (12)**
  27:15,17,18,19;
  36:7;42:17,22,23;
  50:2;65:22;66:6;73:6
**president (4)**
  11:21,24;13:18;
  69:12
**presiding (2)**
  28:4;66:15
**presumption (1)**

**pretty (1)**
  55:20
**previous (2)**
  14:23;35:20
**principal (2)**
  31:17;69:14
**printed (2)**
  18:1,8
**prior (28)**
  11:12;14:1,16,18,
  21;15:11;16:19;17:8;
  19:18,21,23;20:5,9,
  10,14,21;21:9;25:18;
  26:7;30:7;37:13;
  38:23;39:10,23;
  41:18;52:2;61:14;
  75:20
**privilege (3)**
  54:9,9,11
**probably (4)**
  13:5;21:19;23:1;
  24:13
**problem (3)**
  44:25;45:5,6
**Procedure (16)**
  5:13;6:24;27:6,25;
  28:3,5,7,8,14,15,17,
  20,23;29:1;30:24;
  38:21
**procedures (23)**
  16:9,15;27:21;29:7,
  13,14,15,17,19,24;
  30:2,6,10,20;35:22;
  37:19;38:11,24;
  40:22;45:21,25;
  49:19;73:17
**proceeding (2)**
  6:2;41:7
**proceedings (6)**
  25:13;27:19;32:21;
  52:16;67:9;68:2
**process (5)**
  13:1;26:15;29:23,
  25;30:1
**produced (2)**
  50:6;60:14
**programs (1)**
  22:4
**prone (1)**
  69:14
**proof (3)**
  66:15,22;70:4
**proposed (2)**
  39:2,8
**protocol (1)**
  23:6
**protocols (1)**
  16:9
**prove (2)**
  70:19,20
**provide (1)**
  75:9

**provided (14)**
  27:2,5;28:2;37:20;
  52:19;55:9,19;59:25;
  60:4;61:6,13;63:25;
  68:1,7
**provides (1)**
  39:4
**provision (3)**
  31:2;34:19;35:18
**public (3)**
  11:17;66:24,24
**purchased (3)**
  44:5;46:7,10
**purchasing (1)**
  46:22
**purportedly (1)**
  46:17
**pursuant (2)**
  5:12;34:8

**Q**

**quantity (1)**
  51:18
**quite (1)**
  47:3

**R**

**rather (1)**
  35:14
**Raymond (1)**
  74:1
**read (16)**
  6:4,14;31:16;33:16;
  36:21,23;37:4,6;40:6,
  8;47:8;55:14;59:5,7;
  61:17,19
**reads (1)**
  40:21
**really (4)**
  26:20;27:1;29:12;
  45:20
**reason (1)**
  6:15
**reasonable (4)**
  39:22;70:7,19,21
**reasons (1)**
  34:16
**recall (64)**
  12:15;14:14;15:8,
  20,21;19:23;20:17;
  21:18,21,22;22:8;
  24:8;25:9;26:19;
  27:20;30:12;32:19;
  41:22;42:1,16;44:13,
  15,17,19;45:7,10;
  46:2,11,12,13,15,19,
  23;47:2,3,6,21;48:8,
  14,21,22,24;50:8,15,
  19;57:22;59:16,24;
  60:9,23,24;61:1,7;
  62:16,21;63:7;64:25;

**receive (3)**
  25:16;26:6,14
**received (8)**
  40:12,13,14;52:12;
  55:23;56:14;57:15;
  58:25
**receiving (3)**
  57:10,20;58:19
**receptionist (1)**
  23:11
**Recess (2)**
  62:3;69:9
**recitation (2)**
  58:20,24
**recollection (14)**
  24:10,11,14;26:2;
  44:3;46:5,7,8,9;47:9;
  57:12;60:6;63:14;
  67:21
**recommending (1)**
  19:5
**reconsider (1)**
  36:16
**reconsideration (1)**
  36:8
**record (3)**
  5:10;27:19;31:16
**recording (1)**
  24:3
**records (2)**
  24:2;25:8
**REEXAMINATION (1)**
  74:20
**refer (4)**
  20:11;58:3;60:4;
  61:5
**referred (6)**
  35:6;51:4;63:10,12;
  64:3,20
**referring (2)**
  31:14;64:18
**reflect (1)**
  5:10
**reflected (1)**
  26:17
**refresh (1)**
  47:9
**Registered (2)**
  31:13,21
**relate (1)**
  63:4
**related (1)**
  63:5
**relating (9)**
  14:5;15:11;16:22;
  17:7;22:13;26:7;
  43:18;58:15;63:11
**relative (1)**
  25:17
**relatives (3)**
  8:6,7,10

**66:18,19,23;69:5;
  72:20;73:7,7
**relied (1)**
  65:3
**rely (2)**
  47:22;65:11
**remember (44)**
  10:24;13:7,11,16;
  14:9,11,12;15:23;
  16:1,8,10;22:4;24:5,
  22;26:21;27:1,3;33:2,
  3,4;43:21;45:19;
  46:16,20,24;47:18;
  48:1;51:22;53:11,21;
  56:5;57:4,14,18;61:2;
  63:8;64:8,12,14,15,
  23,25;66:14;70:5
**remembered (5)**
  53:10;55:11,18,20,
  22
**reopen (1)**
  36:15
**repeat (1)**
  6:4
**rephrase (1)**
  17:9
**report (6)**
  57:12,22,23,24,24;
  72:2
**reporter (10)**
  5:2;36:23;37:6;
  40:8;59:7;60:11;
  61:19;66:25;67:4,15
**representatives (3)**
  67:11,18;68:2
**reputation (1)**
  52:6
**request (1)**
  69:3
**Requested (5)**
  36:22;37:5;40:7;
  59:6;61:18
**requests (1)**
  68:24
**required (1)**
  28:8
**requirement (1)**
  35:15
**requirements (1)**
  29:8
**requires (1)**
  35:7
**reserve (1)**
  76:13
**reside (1)**
  7:24
**residence (1)**
  7:24
**resides (1)**
  8:2
**respect (1)**
  70:1
**respond (1)**
  24:25
**response (1)**

40:11
**rest (1)**
13:16
**Restate (6)**
14:20;17:3;20:12;
28:13;52:7;55:12
**restroom (1)**
6:17
**result (1)**
66:6
**results (2)**
72:6;73:3
**review (19)**
7:4,5,8;19:13;
20:16,18,19;28:24;
29:1;32:13;36:17;
41:19,24;42:13;46:1;
51:12;65:22;74:23;
75:21
**reviewed (7)**
19:18;26:13;32:20,
23;34:25;66:8;67:7
**reviewing (2)**
19:4;46:6
**Reynolds (1)**
13:13
**Right (13)**
11:13;15:7;17:14;
19:12;30:12;35:22,
24,25;37:11;61:23;
64:5;71:18;72:16
**Road (1)**
7:12
**room (2)**
50:17,22
**Rule (1)**
18:2
**Rules (2)**
5:12,22
**ruling (1)**
68:8
**run (2)**
11:7,17
**running (1)**
13:3
**rural (1)**
8:25

**S**

**sale (1)**
74:8
**same (18)**
8:7;14:10;18:17;
29:23,25;30:1,13,24;
34:1;35:7;37:7;39:25;
42:18;46:14;49:21;
54:15;69:21,24
**saw (3)**
42:3;48:6;62:12
**saying (6)**
17:1,10;26:14;39:6;
48:23;60:23

**School (92)**
5:25;6:21;9:4,5,6,9,
12,15,24;10:16,19;
11:15,18,22,25;12:7,
11,12,17,23;13:7,19,
24;14:3,5,17,17,24;
15:3,12,13,16;16:22;
17:7,20,21;18:3,19;
19:3,13,14,22;20:9,
13,15,16,18,23,25;
21:5,6,13;22:5,6;
24:12;31:9;34:9,10,
20;35:7;42:12;45:2,8;
47:20,24;49:18;
50:20;52:6,13;58:14;
63:11,12;64:3,20;
66:16,20;67:16,21;
68:25;69:11,12;70:3,
13,14;73:6,10;74:1,3,
4,16,23;75:9
**schools (1)**
31:9
**science (1)**
10:9
**searched (2)**
50:11,14
**second (2)**
32:6;72:13
**section (2)**
30:19;34:8
**security (1)**
7:19
**seeing (1)**
62:16
**seminars (4)**
21:5,15,24;22:4
**send (1)**
33:19
**sent (2)**
31:21;72:14
**serve (1)**
10:13
**session (2)**
68:4,8
**set (2)**
35:15;38:22
**seventh (1)**
52:19
**several (1)**
52:18
**shake (1)**
6:11
**shall (10)**
31:10,17,19,20,22;
37:20;38:12,24,25;
40:23
**Sheldon (2)**
8:24,25
**Sherry (1)**
13:13
**shortly (1)**
14:12
**show (3)**

47:7;52:15;60:13
**showed (1)**
36:3
**showing (3)**
7:2;26:7;32:6
**siblings (1)**
8:11,20
**signature (6)**
52:21;58:11;65:18;
70:23,25;71:3
**signed (4)**
52:20;65:19;71:10,
21
**signing (1)**
61:14
**similar (1)**
14:15
**simply (3)**
7:2;48:25;58:23
**sister (1)**
8:22
**sit (2)**
34:5;47:14
**situation (1)**
56:21
**six (2)**
21:19;25:13
**skills (1)**
20:24
**social (1)**
7:19
**solicited (1)**
12:18
**somebody (14)**
10:25;12:17;23:10;
27:12;53:15;19;54:4,
11;55:11;59:14;63:4,
15;64:8,24
**Someone (6)**
12:20,22;23:3;
28:25;50:21;63:5
**sorry (5)**
32:16;36:2,5;64:14;
70:13
**source (1)**
48:9
**speak (1)**
56:23
**speaks (3)**
39:20;58:6;71:15
**specific (4)**
34:16;47:17;56:16;
63:23
**specifically (7)**
5:25;6:1;15:24;
23:12;48:14;59:21;
71:16
**spell (1)**
5:14
**spelled (2)**
28:18,21
**spells (1)**
31:23

**spite (1)**
59:1
**spoken (2)**
7:7;74:24
**spouse (1)**
8:3
**staff (3)**
45:5;69:13,24
**standard (3)**
66:15,20,22
**standards (1)**
70:4
**start (2)**
19:22;56:13
**started (1)**
44:2
**starts (1)**
30:21
**state (22)**
5:8;9:21;10:5;25:8;
28:21,23,24,25;29:6;
30:3;31:15;39:18;
40:23;45:1;49:9;51:9;
53:24;59:4,11;65:4;
70:11;72:5
**stated (5)**
29:21;31:10;41:9;
43:4;63:2
**statement (28)**
16:11;23:17;29:5;
31:8;32:2;35:8;41:6,
16;53:13;55:19,23;
56:2,6;58:12,18;
59:12,13,14,17,22;
60:18;61:12;62:7,19;
65:6,23,24;75:22
**statements (1)**
55:8
**states (3)**
34:14;38:22;71:16
**statute (7)**
28:21,23,24,25;
29:3,6;35:5
**statutes (1)**
30:4
**steps (1)**
26:15
**Steve (2)**
12:12;13:23
**still (2)**
21:25;63:16
**student (27)**
15:10,25;16:2,3,3;
17:6;20:11;21:16;
22:11;28:8,15,18;
30:18;38:4,13;39:1;
40:24;43:15,17;
48:10;52:9,13;65:18;
69:15;71:8;73:15;
76:2
**students (9)**
13:23;15:10;19:15;
24:19;43:15,21;

63:24;65:4;74:6
**student's (2)**
31:18;73:24
**submitted (1)**
52:17
**subparagraph (1)**
38:23
**subsequent (1)**
74:22
**substance (2)**
14:4;44:11
**substances (1)**
73:20
**summary (1)**
39:3
**Superintendent (13)**
7:7;12:6;13:21;
19:7;22:18;23:25;
26:11;27:10;28:2;
31:17;33:21;35:12;
69:22
**support (1)**
50:3
**supports (1)**
39:3
**supposed (1)**
75:2
**supposedly (1)**
58:19
**sure (7)**
12:2;13:14;14:21;
17:3;23:2;59:13;
70:12
**suspected (1)**
50:21
**suspended (16)**
16:1,6;34:16;36:13;
39:18,24;40:15,15,20;
41:4,14;58:8,21;
71:17;74:7,11
**suspending (3)**
38:12,25;40:23
**suspension (43)**
7:5,8;20:19;30:20;
31:11,18;32:1,7,13,
17;35:22;36:17;
37:19;38:11,21,24;
39:3,8,11;40:2,22;
41:18;42:11,13;46:1;
47:12;49:19;50:1;
51:12,15;53:3;58:1,2;
61:14;62:6;65:22;
67:3;69:1;70:24;71:1;
74:14,23;75:21
**suspensions (1)**
15:9
**suspicion (1)**
50:17
**sworn (1)**
5:5
**system (2)**
23:24;24:3

JAMES BRUNS
October 17, 2014

**T**

**TAGUE (22)**
5:7;31:6;36:21;
37:4,9,12;40:5;54:10;
55:4,5;59:5;60:12;
61:17,24;62:4;68:11,
13;69:6,10;72:8;
74:21;76:12
**talk (2)**
54:21;57:23
**talked (2)**
53:15;64:1
**talking (8)**
6:19;14:18;15:19;
29:10;54:24;57:25;
60:15;63:16
**talks (3)**
35:20,21;37:18
**teacher (1)**
13:24
**teachers (1)**
69:13
**telephone (2)**
7:16;25:12
**term (4)**
9:9;10:25;11:7,12
**test (6)**
36:7,12;58:22;59:1;
66:6;73:3
**testified (4)**
5:5,19;65:25;72:14
**testimonies (1)**
66:11
**testimony (13)**
38:8;42:10;46:25;
47:22;49:5;56:3;
65:17,20;66:3;70:22;
71:2,4;72:25
**testing (1)**
42:3;68:15;72:6
**thereafter (1)**
11:3
**thinking (1)**
10:24
**though (2)**
33:22;39:11
**three (2)**
17:24,25
**today (5)**
7:2,5;17:24;47:14;
53:11;60:25
**told (18)**
17:16;24:22;25:12;
26:3;47:4;48:1;54:4,
7,12;57:15;59:14;
61:25;64:24;70:2,17;
74:25;75:25;76:8
**tongue (1)**
9:14
**took (14)**
22:5;44:5,5;48:18;

56:1;58:25;59:9;66:3,
7,9;67:1,15;70:13;
75:7
**top (4)**
31:2;35:19;36:3;
38:4
**totally (1)**
17:12
**trade (1)**
9:16
**training (2)**
21:5,15
**transcribed (2)**
67:1,10
**transcript (5)**
6:10;32:20;47:8;
48:15;67:7
**transcription (1)**
68:5
**transcripts (1)**
59:21
**true (4)**
52:23;65:23,24;
75:22
**truth (1)**
69:19
**trying (1)**
60:17
**twice (1)**
11:5
**twister (1)**
9:14
**two (9)**
8:11,11;11:9;12:5;
27:1;56:4;60:16;
65:16;66:11
**type (2)**
15:5;29:19

**U**

**uh-uh (1)**
6:11
**ultimately (5)**
25:2;44:23;47:11;
63:1;70:12
**unaware (1)**
75:5
**under (4)**
38:11,22;44:24;
69:18
**unexpired (1)**
11:12
**Unit (2)**
9:6;34:10
**University (1)**
10:5
**unusual (1)**
22:17
**up (13)**
7:2;9:4;11:21;13:4;
14:1;20:9;23:25;26:7;
31:2;35:19;43:14;

47:10;48:17
**uphold (2)**
47:11;62:6
**upon (9)**
47:22;50:17;58:14,
20;63:14;65:3,11;
70:16;74:15
**upset (1)**
47:3
**use (5)**
9:9,12;36:7;66:21;
74:8
**using (1)**
31:10
**usually (1)**
23:4
**utilize (1)**
17:20

**V**

**variety (2)**
23:12,13
**verb (1)**
31:10
**verbal (5)**
31:19;37:19;38:13;
39:1;40:25
**verbally (2)**
6:9;34:5
**verbatim (5)**
6:10;48:2;67:1,5;
68:4
**verification (1)**
53:7
**verified (1)**
52:23
**verify (1)**
40:11
**version (2)**
18:4;20:1
**violation (3)**
14:4;15:10;43:16
**voted (2)**
47:11,16

**W**

**wait (1)**
35:24
**water (1)**
61:22
**Watseka (17)**
5:25;7:12;8:16;9:4,
9,12;13:24;14:2;
16:21;17:20;18:3;
22:17;31:9,9,24;52:6;
74:3
**Watts (1)**
13:12
**way (3)**
47:16;54:24;55:1
**WCHS (1)**

74:2
**website (1)**
18:1
**weren't (1)**
75:24
**What's (5)**
7:16;8:23;9:15;
10:1;57:22
**Where's (1)**
8:23
**Whose (1)**
47:22
**without (4)**
46:5;48:14;59:20;
67:17
**WITNESS (6)**
28:11;43:7;48:10;
61:23;62:1;68:20
**witnessed (1)**
45:5
**witnesses (1)**
73:5
**word (5)**
48:2,2;57:2;59:22,
22
**work (1)**
23:1
**workshops (2)**
21:4;22:4
**written (24)**
25:16;26:6;31:20;
37:20,23,24;38:9,13;
39:1,7;40:1,12,13,25;
52:16,18;55:14,15,17;
59:23;60:18;61:12;
66:11;75:10

**Y**

**year (20)**
7:22;10:6,24;11:7;
12:4,9,14;15:22,24;
19:4,4,15,22;20:2;
21:7,10,11,12;74:8,11
**years (7)**
11:9,10;12:5;20:2;
21:19,19;22:1
**yellow (1)**
30:19

**1**

**1 (9)**
5:1;32:5,10;37:25;
38:25;50:4;68:22;
72:13,13
**1/25/13 (1)**
38:6
**10:11 (1)**
62:3
**10:14 (1)**
62:3
**10:29 (1)**

69:9
**10:32 (1)**
69:9
**10:43 (1)**
76:14
**10-22.6 (2)**
34:8;35:6
**12 (2)**
11:10;65:2
**13 (2)**
65:10;76:9
**16 (1)**
11:9
**1980 (1)**
10:7
**1st (2)**
13:17,18

**2**

**2 (1)**
53:1
**2007 (1)**
10:24
**2010 (1)**
12:10
**2011 (1)**
12:1
**2012 (1)**
11:10
**2013 (46)**
13:17,18,18;14:16,
19,22;15:12;16:12,
20;17:8;19:18;20:5,
10,14,21;21:9;22:10,
13;25:7,14,18;29:18;
37:13;42:13;43:2,10,
19;44:10;47:1;50:18;
51:4,7,15,19;52:3,12;
53:25;56:19;61:15;
67:4;68:16,17;75:9,
11,16,21
**2014 (2)**
53:8;54:4
**2234 (1)**
7:12
**24 (1)**
68:17
**2430 (1)**
7:12
**25 (34)**
14:8,16,19,22;
15:12;16:12,20;17:8;
19:18;20:5,10,14,21;
21:9;22:10,13;43:2,
10,19;47:1;50:18;
51:3,19;52:12;53:8,
25;56:19;61:15;
68:16;75:9,11,16;
76:2,9
**25th (5)**
44:10;46:17;53:14,
17;57:20

**26a (1)**
   18:2

**3**

**3 (2)**
   53:23;73:19
**3:00 (1)**
   54:1

**4**

**4 (3)**
   52:15;55:6;62:23
**4[sic] (1)**
   34:10

**5**

**5 (14)**
   25:6,14,18;26:8;
   27:16;29:18;30:8;
   37:13;38:1;51:7,15;
   52:3;67:4;75:21
**57 (1)**
   73:19
**5th (3)**
   41:19;42:13;43:12

**6**

**60970 (1)**
   7:13

**8**

**8 (4)**
   5:1;10:25;17:23;
   73:14
**8:40 (1)**
   5:3
**815-432-2908 (1)**
   7:17
**8985 (1)**
   7:20

**9**

**9 (7)**
   9:7;60:10,13;61:13;
   62:23;63:16,17