**E-FILED**
Monday, 15 December, 2014  03:32:57 PM
Clerk, U.S. District Court, ILCD

# In The Matter Of:

## *NOAH DIETCHWEILER v.*
## *STEVE LUCAS*

---

## *JAMES BUNTING*
### *November 18, 2014*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Original File 1118bunj.txt

Min-U-Script® with Word Index

1

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE CENTRAL DISTRICT OF ILLINOIS
2             URBANA DIVISION

3

4

5   NOAH DIETCHWEILER, by        )
    Michael Dietchweiler, his    )
6   father and next friend;      )
    and ANN DIETCHWEILER          )
7                                  )  No. 2013-CV-2062
        Plaintiffs,              )
8                                  )
                                  )
9    vs.                         )
                                  )
    STEVE LUCAS, in his          )
10  official and individual      )
    capacities, et al.,          )
11                                )
        Defendants.              )
12

13

14

15
            DEPOSITION OF JAMES BUNTING
16              November 18, 2014
                  12:30 p.m.
17

18

19        Becky L. Jessup:  CSR # 084-004343

20     Area Wide Reporting and Video Conferencing
                301 West White Street
21           Champaign, Illinois   61820
                  (800) 747-6789
22

23

24

2

1                              INDEX

2

    APPEARANCES:

3

    For the Plaintiff:

4

              Mr. Michael Tague
5             FLYNN, PALMER, TAGUE & JACOBSON
              Attorneys at Law
6             402 West Church Street
              Champaign, Illinois  61820

7

8   For the Defendant:

9             Ms. Shari D. Goggin-Ward
              LAW OFFICES OF COZZI & GOGGIN-WARD
10            Attorneys at Law
              27201 Bella Vista Parkway, Suite 410
11            Warrenville, Illinois  60555-1619

12
    Also Present:
13            Michael Dietchweiler

14
              EXAMINATION BY:
15
              Mr. Tague . . . . . Page 4
16            Ms. Goggin-Ward . . . . . Page 67

17

18            EXHIBITS: None marked.

19

20

21

22

23

24

3

1                         STIPULATION

2

3           IT IS HEREBY EXPRESSLY STIPULATED AND AGREED

4    by and between the parties that the deposition of JAMES

5    BUNTING may be taken on November 18, 2014, at the

6    Iroquois County CUSD #9, 1411 W. Lafayette Street,

7    Watseka, Illinois pursuant to the Rules of the Federal

8    Court and the Rules of Federal Procedure governing said

9    depositions.

10

11          IT IS FURTHER STIPULATED that the

12   necessity for calling the Court Reporter for

13   impeachment purposes is waived.

14

15

16

17

18

19

20

21

22

23

24

4

```
 1                    12:36 p.m.
 2                  JAMES BUNTING,
 3     the witness herein, having been first duly sworn to
 4     tell the truth, the whole truth and nothing but the
 5     truth, was examined and testified as follows:
 6
 7     EXAMINATION,
 8          QUESTIONS BY MR. TAGUE:
 9          Q.   Would you please state your full name?
10          A.   James Bunting.
11          Q.   Do you have a middle name?
12          A.   James Alan Bunting.
13          Q.   And is it a --
14          A.   A-l-a-n.
15          Q.   What is your date of birth?
16          A.   01/14/71.
17          Q.   I am going to ask you questions today about
18     Noah Dietchweiler's case.  The court reporter is going
19     to take down everything verbatim.  So it is important
20     we not speak at the same time.
21               If you will try to wait until my question is
22     done before you answer, that will be great.  And then I
23     will try to wait and ask the next question until you
24     are done answering.
```

5

1        All of your responses need to be verbal.  If

2   you shake your head, we may not know what you mean when

3   we read the transcript back.  It is okay if you do it.

4   We may just say is that yes or no.  Have you ever had

5   your deposition taken before?

6       A.   Once.  A long time ago.

7       Q.   So it should be pretty much the same.  And if

8   at any time we need to take a break, you don't hear

9   something I say or don't understand something I say,

10  just let us know and we will either repeat it or have

11  the court reporter read it back.  Where do you live?

12      A.   In Watseka.

13      Q.   What is your address?

14      A.   544 S. 5th Street, Watseka.

15      Q.   Do you live there with anyone else?

16      A.   My wife and three kids.

17      Q.   Are any of your kids over the age of 18?

18      A.   No.

19      Q.   What is your wife's name?

20      A.   Janet.

21      Q.   Do you have any adult relatives that live in

22  the Central District of Illinois?

23      A.   Central?

24      Q.   That would be -- where is the Bunting family

6

1  from?

2       A.   The Braidwood/Wilmington area.

3       Q.   Do you have any relatives in Iroquois County

4  or vicinity?

5       A.   I have a cousin in Watseka.

6       Q.   Any relatives that do not have the last name

7  Bunting?  Is your cousin a Bunting?

8       A.   No.

9       Q.   What would that family name be?

10      A.   Ripley.

11      Q.   You currently are principal of Watseka High

12  School, correct?

13      A.   Yes.

14      Q.   When did you get that job?

15      A.   I think this is my fourth year.

16      Q.   Where did you attend college?

17      A.   Eastern Illinois University and Joliet Junior

18  College.

19      Q.   When did you get your bachelor's degree?

20      A.   '94, '95.  Somewhere in there.

21      Q.   Do you have any formal education after your

22  bachelor's degree?

23      A.   Master's degree from Eastern Illinois

24  University and I have a, my specialist degree from

7

1    Eastern Illinois University.

2         Q.   When did you receive those?

3         A.   I don't remember exactly.   Around 2000 my

4    master's and two years ago for my specialist's degree.

5         Q.   When did you first start in public education?

6         A.   That would have been around '95.   Right when I

7    got done with school.

8         Q.   And where did you first work?

9         A.   Worked in Freeport for a half a year.   Got

10   hired December and finished the year out and then came

11   to Watseka.   Been here ever since.

12        Q.   Did you start Watseka as a teacher?

13        A.   Yes.

14        Q.   How long were you a teacher before you became

15   an administrator in any capacity?

16        A.   I was five years as a teacher.

17        Q.   And your first administrator's position was

18   where and what?

19        A.   Was at the middle school and Watseka as the

20   principal.

21        Q.   Then you were principal at the middle school

22   until you became principal at the high school?

23        A.   Correct.

24        Q.   Do you remember who was on the school board

8

1   when you were hired as principal?

2       A.   No.

3       Q.   What formal training or education do you have

4   relating to student disciplinary matters?

5       A.   Well, the classes that I had in college for

6   that.

7       Q.   Any seminars, continuing education, anything

8   else after you got your master's?

9       A.   Not that I can recall a specific one that I

10  took.

11      Q.   Now when you were principal at the middle

12  school, did you have occasion to have to deal with

13  student disciplinary matters?

14      A.   Um-hum, yes.

15      Q.   And did you ever have to deal with suspensions

16  at the middle school level?

17      A.   Yes.

18      Q.   Were the suspension procedures the same or

19  different at the middle school than when you came on at

20  the high school?

21      A.   I believe they were the same.  Handbooks were

22  the same.

23      Q.   Now the Watseka High School had a student

24  handbook in 2012-2013, did it not?

9

1      A.    Yes.

2          Q.    Do you know when that handbook was approved?

3          A.    The school board approves them every year.

4    Which month and day, couldn't tell you which one.

5          Q.    Do you know when the last time the student

6    handbook for the high school was amended or changed

7    prior to the 2012-2013 year?

8          A.    Every year they get amended and adjusted

9    depending on if state law changes or not or board

10   policy changes.  So every year there could be changes

11   and amendments to it.

12         Q.    Do you know when the last time there would

13   have been amendments or changes in the area of

14   disciplinary procedures?

15         A.    I can't recall.

16         Q.    Is there a committee that deals with the

17   handbook?

18         A.    There is a board policy committee that all of

19   the recommendations from the district goes to for all

20   handbook changes throughout the district before they go

21   to the school board for formal adoption.

22         Q.    Who is on that committee?

23         A.    Couldn't tell you.

24         Q.    Are you on it?

10

1      A.   No.   They are board members.   School board
2   members.
3      Q.   Are there any administrators on that
4   committee?
5      A.   We participate in the meeting because we bring
6   our recommendations to them of what needs to change,
7   but no, because that is a board policy committee.
8      Q.   And do you know if there are archival records
9   or minutes of those minutes that exist?
10      A.   I couldn't tell you.
11      Q.   Who heads that committee?
12      A.   Mr. Lee with the board members.
13      Q.   In January of 2013 there were policies and
14   procedures in effect relating to student discipline and
15   specifically suspensions, were there not?
16      A.   Not sure what you are asking me.
17      Q.   There was a student handbook that was in
18   effect in January of 2013, was there not?
19      A.   Yes.
20      Q.   And that student handbook contained the
21   board's policies and procedures governing student
22   suspensions, did it not?
23      A.   Yes.
24      Q.   Were there any other policies or procedures to

1    your knowledge that govern student suspensions that
2    were not in the Watseka High handbook?
3         A.   Not that I know of.
4         Q.   Did you become familiar with those procedures
5    prior to January 23, 2013?
6         A.   Yes.
7         Q.   And did you have occasion to participate in
8    student disciplinary matters that included suspensions
9    prior to January 23, 2013?
10        A.   So you are asking me if I sat in and helped
11   with discipline and suspensions before 2013?
12        Q.   Correct.
13        A.   Yes.
14        Q.   How frequently would that occur?
15        A.   At the high school level?  A couple of times a
16   year.  At the middle school level, every suspension
17   there was.
18        Q.   And is that because you had a dean of students
19   at the high school?
20        A.   Correct.
21        Q.   What was your role in student suspensions then
22   at Watseka High School in 2012-2013?
23        A.   What do you mean by role?
24        Q.   Well, did you typically get involved in the

12

1   investigation?

2       A.   Usually, yes.  If it was a serious matter.   If

3   it was a matter where a student missed a detention or

4   something like that, no.

5       Q.   Fights would be serious?

6       A.   Yeah.

7       Q.   Drugs at school would be serious?

8       A.   Yes.

9       Q.   And approximately how many of those had you

10  participated in since you have been principal at

11  Watseka?

12      A.   I don't know.  I would say a few every year.

13      Q.   Did you believe -- well, let me ask you, in

14  January of 2013, did you feel you were familiar enough

15  with the board's policies and procedures on how to

16  handle drug offenses and potential suspensions so you

17  didn't need to refresh your recollection of what was in

18  the handbook?

19           Let me strike and ask you:  Did you learn --

20  you learned that something unusual happened on January

21  25, 2013, correct?

22      A.   Yes.  If you are referring to this case.

23      Q.   Well, would you agree that somebody bringing

24  pills to school would be an unusual event at Watseka?

13

1      A.    Absolutely.

2      Q.    And had anybody ever brought pills to Watseka

3  prior to that occasion?

4      A.    I don't know.

5      Q.    So January 25, 2013 you learned that there was

6  a claim that somebody had brought pills to school?

7      A.    Correct.

8      Q.    When did you learn that?

9      A.    Would have been around lunchtime somewhere.

10     Q.    From whom did you learn that?

11     A.    From Mr. Lucas.

12     Q.    Had you been present at lunch that day?

13     A.    I believe I was in the cafeteria that day.

14     Q.    You didn't observe anything out of the

15  ordinary at lunch?

16     A.    I did not.

17     Q.    You learned from Mr. Lucas that there was an

18  allegation that somebody brought pills to school.  Did

19  you then take occasion to pull the student handbook out

20  and review what procedures should be implemented?

21     A.    No.  I do not believe we pulled the student

22  handbook out.

23     Q.    And is that because you thought you were

24  familiar enough with the procedure that that wasn't

14

1  necessary?

2       A.   Yes.

3       Q.   What did Mr. Lucas tell you he had learned?

4       A.   He had learned that I believe he said that

5  there was a student that saw someone pass some pills to

6  someone during lunch and brought that to his attention.

7            And he came to me and then we brought that

8  student in and questioned him and searched him and

9  found a couple of pills on him.

10      Q.   And did that happen immediately, Lucas tells

11  you and then you and he immediately confront the child

12  who allegedly brought it to school?

13      A.   Yes.

14      Q.   And where did then your interview of the child

15  take place?

16      A.   In Mr. Lucas's office.

17      Q.   And do you remember what time that was

18  approximately?

19      A.   No.  Around lunchtime.

20      Q.   Who retrieved the child?  Did somebody go get

21  him out of class?

22      A.   I don't remember which, who got him.  I know I

23  didn't go get him so I am assuming Mr. Lucas did.

24      Q.   And then you and Mr. Lucas and the child are

15

1  present and there is a discussion, correct?

2      A.   Yes.

3      Q.   Who did the interrogation of the student?

4      A.   Probably both of us asked questions of him.

5      Q.   Do you remember what questions were asked and

6  what answers were given?

7      A.   I remember we asked him if he had pills.  If

8  those are the exact words, I don't know about that.  I

9  can't remember if he said yes or no.

10          And then we I am sure said, well, then we are

11  going to have to search you.  And so we did.  And I

12  remember finding the pills I believe were in his socks.

13  He was trying to hide them when we did that.

14          And then we also found a little piece of

15  paper in there that had some names on it with some

16  money.  And he told us those were the people that he

17  gave pills to and how much money they owed him for the

18  pills.  And then he told us the people he gave them to.

19      Q.   So you asked him or you searched him?  And how

20  did that happen?  Did you ask him to do certain things

21  and he complied?

22      A.   Correct.  Yes.  We asked him.  Pull his

23  pockets out.  We asked him to take his shoes off.  We

24  looked inside his shoes.  We asked him to take off his

16

1   socks and then we found the pills and we had him put

2   his shoes and socks back on.

3       Q.   And were the pills in any type of a container?

4       A.   No.  I don't believe so.

5       Q.   So how many pills were there?

6       A.   I believe there was two white pills.

7       Q.   And now they were in his sock?

8       A.   I believe so.

9       Q.   And how did you learn that there were pills in

10   the sock?  He took his sock off and dump them out?

11      A.   No.  He took his sock off and somehow they

12   ended up in his hand.  And I remember Coach Lucas said,

13   hey, what is in your hand now and he had the pills in

14   there.

15      Q.   Did you search his locker?

16      A.   I don't remember.

17      Q.   What did you find when he emptied his pockets?

18      A.   I know we found that little piece of paper

19   with the names of the students that he later told us

20   that he had given the pills to that owed him money.

21   And I can't recall what else we found in there, if

22   anything.

23      Q.   Was the, so the piece of paper came out of his

24   pocket?

17

1        A.    I believe so.

2        Q.    Did he have any money on him?

3        A.    I don't know.

4        Q.    Did you ask him where he had given pills to

5    students at?

6        A.    I can't remember if we asked him exactly or

7    not.  I remember we asked him to give a statement and

8    he wrote it down but I don't remember.

9        Q.    In Exhibit No. 3, looks like a photocopy of a

10   piece of paper with names and some dollar signs and

11   amounts, correct?

12       A.    Correct.

13       Q.    And what is that document?

14       A.    That looks like the piece of paper that came

15   out of that we got from the student.

16       Q.    And who took possession of the original of

17   that paper?

18       A.    I don't remember if I did or if Mr. Lucas did.

19   One of us did.

20       Q.    And did you do anything with that piece of

21   paper after January 25, 2013?

22       A.    I don't know.

23       Q.    Did you speak with or ask the student who had

24   brought the pills to school what the exchange rate was

18

1  for pills and money?

2      A.   I can't remember if I did or I didn't.  That

3  would have been a logical question maybe to ask but I

4  can't remember if I asked that question or not.

5      Q.   Ultimately the student wrote a statement.

6  That statement was written at your request?

7      A.   Yes.  We asked him to give a statement.

8      Q.   And he wrote that and there is a phone number

9  on there.  Who wrote that phone number?

10     A.   I don't know.

11     Q.   Do you know whose phone number it is?

12     A.   I have no idea.

13     Q.   And then did this student write anything else

14  down or provide any other statements?

15     A.   Not that I know of.

16     Q.   Was the interview recorded in any fashion?

17     A.   No.

18     Q.   What happened to the original of that

19  document?

20     A.   I don't know.

21     Q.   Now at Watseka High School, do you have a

22  computer available to you?

23     A.   Yes.

24     Q.   And is it a desktop computer in your office?

19

1     A.    A laptop.

2     Q.    And do you have e-mail?

3     A.    Um-hum.

4     Q.    What is your e-mail address?

5     A.    jbunt@watseka-u9.k12.il.us.

6     Q.    Is your computer hooked up to a district

7  network?

8     A.    Um-hum.  Yes.

9     Q.    Now you receive I take it e-mails and send

10 e-mails from that computer with that address?

11    A.    Yes.

12    Q.    Do you have any other e-mail addresses?

13    A.    I think I have one at home that I haven't

14 checked for years.  Couldn't even tell you what the

15 address is.

16    Q.    What is the archival system for e-mails that

17 you would send or receive?  Are all of your e-mail

18 stored on the district's server?

19    A.    You would have to ask our tech coordinator.

20 Whatever the state law is that we have to have for our

21 archiving e-mails is what we have.

22    Q.    Did you ever create any e-mails and send them

23 to anyone relating to the events of January 25, 2013

24 and the pills at school?

20

1       A.    The only thing I would have sent was if they
2    wanted things scanned and sent here to Mr. Lee for this
3    case would be, yes.
4       Q.    Do you know whether or not that actually
5    happened, whether there was anything scanned and sent
6    to Mr. Lee?
7       A.    Yeah.  I know there was stuff scanned and sent
8    to Mr. Lee.
9       Q.    What was scanned and sent to Mr. Lee?
10      A.    These documents that are here.  The ones that
11   I know you showed me.
12      Q.    And anything else that you can remember?
13      A.    Not that I know of.
14      Q.    Now ultimately, well, we will get that to him
15   in a minute.  So this student, you finished speaking
16   with him.  And was his parent or guardian notified?
17      A.    Yes.
18      Q.    And his grandmother came to school, did she
19   not?
20      A.    Yes.
21      Q.    Was anything discussed relative to the pills
22   after the grandmother arrived and before she took the
23   student home from school?
24      A.    I don't remember.

1       Q.   Was there any written summary of the evidence
2   or written -- Exhibit 12.  That document ultimately was
3   prepared for that student, was it not?
4       A.   Yes.
5       Q.   Was there any other writing prepared and
6   provided to that student's grandmother other than
7   Exhibit 12?
8       A.   I don't believe so.
9       Q.   What happened then after that child's
10  grandmother took him home from school?
11      A.   We then started investigating and talking to
12  the children that were named by that student.
13      Q.   Did you speak with everyone during the course
14  of that day on the statement that M. M. provided to
15  you?
16      A.   Yes.  I believe so.
17      Q.   Do you remember the order or the sequence of
18  which students were spoke with?
19      A.   Exactly, no.  I know Noah was one of the last
20  ones.
21      Q.   Was he the last one?
22      A.   I am not positive about that.
23      Q.   Were all of the students on M. M.'s statement
24  that we looked at suspended?

22

1      A.   I don't believe one of them was.

2      Q.   You met with that student?

3      A.   We met with all of them.

4      Q.   And so you met with that student and discussed

5   it with him and made a decision not to suspend him?

6      A.   He said he did not take any pills, did not

7   have any pills.  So we didn't have any evidence to

8   suspend him.

9      Q.   Other than Michael's statement?

10      A.   Correct.

11      Q.   Does the school district provide you with a

12   telephone?

13      A.   Yes.

14      Q.   You have one in your office, a landline?

15      A.   Yeah.

16      Q.   What is its number and extension?

17      A.   The normal school number is (815) 432-2486.

18   And then the other line that I believe comes in is

19   (815) 432-6885.

20           And then there is a direct line to my phone

21   which I never call it.  432-6 -- I don't know if it is

22   6881.  I know it is 6883, something like that, is the

23   other line that comes in to the school building.

24      Q.   And do you have a specific extension number?

23

1      A.    No.

2          Q.    If someone calls you and you're not in your

3      office, do you have voicemail on that?

4      A.    No.

5          Q.    Have an answering machine?

6      A.    No.  Secretaries take my messages, write them

7      down for me and I return them.  There is a voicemail if

8      no one is in the office after hours that would leave it

9      for the office but not one specifically for me.

10         Q.    Do you have a cell phone that the district

11     provides you?

12     A.    Yes.

13         Q.    What is the number?

14     A.    (815) 383-9130.

15         Q.    Do you know whether or not phone calls to that

16     number are itemized on the statement that the district

17     gets?

18     A.    Have no idea.

19         Q.    Do you know what phone provider provides that

20     service?

21     A.    I believe it is Sprint.

22         Q.    And does it have voicemail on it?

23     A.    Yes.

24         Q.    And so somebody that calls your cell phone, if

24

1   you don't answer it, they can leave a voicemail?

2        A.    Yes.

3        Q.    Do you check those?

4        A.    Very rarely because it doesn't always work but

5   maybe once a week or so but hasn't been a voicemail

6   left there for a long time.

7        Q.    When did you alert Mr. Lee that there was a

8   problem with a student bringing pills to school?

9        A.    Probably right after we finished

10  investigating.

11       Q.    So that would have been after the last student

12  was spoken with?

13       A.    No.  Probably right after we finished with M.

14  M. as you call him.  Probably then.

15       Q.    And do you know whether he was called from the

16  office or your cell phone?

17       A.    I don't remember.

18       Q.    Do you know whether or not you called him or

19  Mr. Lucas called him?

20       A.    I am sure I called him but I don't remember

21  exactly calling him but I am sure I called him and not

22  Mr. Lucas.

23       Q.    Do you remember what you told him?

24       A.    Not exactly.  Probably something to the effect

1   that we had an issue here with a student with some

2   pills at school, investigated it and now we called the

3   police, turning him over and then we are going to, we

4   have more people we need to talk to.

5       Q.   So you called the police while Mike, while M.

6   M. was still there?

7       A.   Yes.

8       Q.   And did the police take him away or did they

9   allow him to leave with his grandmother?

10      A.   That I don't remember which one.  Because

11  after they got there, I left that up to them.  So I

12  don't know if he left with them or with his grandma.  I

13  really don't remember.

14      Q.   Was there any questioning by the police of M.

15  M. at the school to your knowledge?

16      A.   I think there was a little if I remember

17  right.

18      Q.   Were you present or Mr. Lucas present?

19      A.   Yes.  I believe I was in the room.

20      Q.   And what do you remember to the best of your

21  knowledge what was asked and answered?

22      A.   I honestly can't remember.  I am assuming

23  questions about the pills and where he got them from

24  and things like that.

26

1    Q.   Were the pills turned over to the police as

2  evidence?

3    A.   I believe so.   I know we wouldn't have kept

4  them.

5    Q.   Was the piece of paper and the statement

6  provided to the police?

7    A.   I believe it was.   That has been a long time

8  ago but I believe we gave them a copy of the statement

9  because they usually ask for a statement in other cases

10  that, when I have had to deal with the police in other

11  ones they have asked for a statement from the students.

12    Q.   And so the only thing, well, was there

13  anything given to them other than the two documents

14  that we have looked at earlier in your deposition?

15    A.   I don't believe we gave them a copy of the

16  suspension notice, no.   The police.

17    Q.   You gave them a copy of the list of names with

18  dollar signs on it?

19    A.   I believe we did but I am not positive.

20    Q.   During the course of your discussions with M.

21  M., did you learn where the pills had come from?

22    A.   Sorry?   Repeat that for me.

23    Q.   Did you learn where the pills came from?

24    A.   I believe Michael told us that he took them.

27

1          MS. GOGGIN-WARD:  Just say M. M.

2          A.    That I believe the student said that he took

3    them from his mother at home out of her cabinet.

4    BY MR. TAGUE:

5          Q.    And did you learn what the substance was?

6          A.    I can't remember exactly what the name of it

7    was now.  I remember what the name when we checked and

8    said it was a narcotic.  That is all I remember.

9          Q.    And where did you learn what the substance

10   was?  From the student himself or police or?

11         A.    I believe the student told us what it was and

12   then I believe the police told us that it was a

13   narcotic.

14         Q.    And this was all before the student was either

15   taken away by the police or left school?

16         A.    Yes.

17         Q.    Did you ever speak with anyone from the police

18   department after January 25, 2013 about the incident?

19         A.    I don't believe so.

20         Q.    Do you know whatever happened in the police

21   case?

22         A.    No.

23         Q.    You then proceeded to have a discussion with

24   one of the other students who was on M. M.'s statement,

28

1  correct?

2       A.   Yeah.  We had conversations with all of them.

3       Q.   Did you pull them all out of class at the same

4  time or how did you proceed?

5       A.   I believe we pulled them all out of class and

6  put them in separate areas so they couldn't talk to one

7  another.

8       Q.   And do you remember when Noah was pulled out

9  of class?

10      A.   The same time as the rest of them.

11      Q.   And how long did the interview of M. M. last?

12      A.   I don't know if it lasted 15, 20 minutes

13  probably.

14      Q.   So you spoke with everyone.  You spoke with

15  numerous students on M. M.'s list prior to Noah,

16  correct?

17      A.   Yes.

18      Q.   And did any of them implicate Noah?

19      A.   I don't remember.

20      Q.   With respect to the other students who

21  admitted possession of pills, did you learn where each

22  student came into possession of the pills?

23      A.   No.  I don't remember.

24      Q.   Were they all, did they all receive or

1    indicate they received possession during the lunch hour

2    on the 25th?

3        A.    I don't remember.  I know at school.

4        Q.    Did any of them indicate that they received

5    pills on a date other than January 25?

6        A.    I don't remember.

7        Q.    Did Michael indicate to you what days he

8    brought his mother's prescription to school?

9        A.    No.  I don't believe so.

10        Q.    Were any other written statements obtained

11    from any of the other students that you spoke with?

12        A.    A written statement like M. M. had in here?

13        Q.    Yes.

14        A.    No.  I don't believe so.

15        Q.    For each student that was suspended, a form of

16    disciplinary action which is the same form that we

17    looked at as Exhibit 12 was provided to each student.

18    Would that be a correct statement?

19        A.    Yes.

20        Q.    Obviously the names would be different,

21    correct?

22        A.    Correct.

23        Q.    Other than those documents that were prepared,

24    which were the notices of student disciplinary action,

1   were those students that were suspended, was any other

2   paperwork created on January 25, 2013?

3       A.    No.  Not that I know of.

4       Q.    Now ultimately you brought Noah in to your

5   office?

6       A.    Not my office Mr. Lucas's office.

7       Q.    What class was he taken out of?

8       A.    I couldn't tell you.

9       Q.    Would there be a record of that?

10      A.    There should be a schedule but knowing which

11  period it was exactly that we brought him out, lunch

12  hour is our 5th hour.

13           So it could have been 5th or 6th hour

14  depending on which lunch it was if it was first lunch

15  or second lunch.  So if it was that or 6th hour.  I am

16  guessing 5th or 6th hour.

17      Q.    And is there a 7th and 8th hour?

18      A.    There is, yes.

19      Q.    And you are saying it was either 5th or 6th.

20  Could it have been 7th or 8th?

21      A.    Could have, yes.  Probably not 8th because

22  that is the last period of the day.  And I am sure it

23  was before 8th hour.  That is why I am saying 5th or

24  6th.

2:13-cv-02062-HAB  # 36-7  Page 32 of 78

1        Q.   So 8th hour would be what time slot on the
2    clock?
3        A.   8th hour is about 2:35 until a little after 3.
4    3:05.  3:10.
5        Q.   And 7th would be what time frame?
6        A.   48 minutes before 2:35.  So whatever that
7    figures to be there.
8        Q.   And then if we wanted to know 6th and 5th, we
9    just need to subtract 48 minutes from that?
10       A.   Pretty much.  The lunch hours are different
11   because there is an A lunch and a B lunch.  So that
12   class period is a little longer.
13       Q.   Now is the class period 48 minutes or is 48 --
14       A.   The class period is 48.  The lunch hour is 30
15   minutes.
16       Q.   And passing periods are how long?
17       A.   3, 4 minutes.
18       Q.   So if we took the beginning time from 8th hour
19   and took 50 or 51 minutes from that, that would give us
20   an approximate time?
21       A.   Probably, yeah.
22       Q.   And who retrieved Noah from class?
23       A.   I don't remember if it was Mr. Lucas or I.
24   One of us did.

32

1       Q.   And do you know where Noah was sequestered
2  before you actually spoke with him?
3       A.   I think he was in the office.
4       Q.   Your office?
5       A.   In the main office of the building I believe.
6       Q.   Okay.  And do you remember where all of the
7  other kids would have been placed?
8       A.   There would have been some in there.   I
9  believe some we put in the guidance office I believe
10  are the two spaces we used.
11       Q.   What were the children told when they were
12  removed from class why they were being removed from
13  class?
14       A.   I don't remember if we told them anything.
15       Q.   Did any of the students question why are you
16  removing me from class?
17       A.   No.  I don't believe so.  I honestly don't
18  remember to be honest with you.
19       Q.   If a child is removed from class for some
20  reason other than discipline, is there a hall pass and
21  a record kept of that?
22       A.   If a student needs to leave class, in their
23  agenda book there is a place for a teacher to write a
24  pass, yes.

1      Q.   And if you remove a student for whatever

2   reason, is there a record kept of that?

3      A.   No.

4      Q.   How did you determine the order of students

5   that would be questioned?

6      A.   I don't know if we discussed that, an order.

7      Q.   The original reporter of the lunchroom

8   incident identified two students.  Did that student not

9   do that or do you know that?  Some student that was not

10  on the list reported seeing an exchange of pills,

11  correct?

12     A.   Correct.

13     Q.   And you knew that because that student told

14  that to Mr. Lucas and he related to it to you, correct?

15     A.   Correct.

16     Q.   So the first student interview was the person

17  giving the pills which was M. M., correct?

18     A.   Correct.

19     Q.   Was the second person the student identified

20  by the reporter as the student receiving the pills at

21  lunch?

22     A.   I am still not following you.

23     Q.   The student saw two students involved in an

24  exchange of pills?

34

1      A.    Right.

2      Q.    Michael was the first one you spoke with?

3         MS. GOGGIN-WARD: Objection.  Used the word

4 Michael.

5      A.    Correct.

6 BY MR. TAGUE:

7      Q.    M. M. was the first one you spoke with,

8 correct?

9      A.    Yes.

10      Q.    And was the second one you spoke with the

11 child who was reportedly receiving the pills?

12      A.    I don't remember.

13      Q.    Did you go in the order of the names that

14 Michael provided in his list?

15      A.    I have no idea.

16      Q.    Who determined the order?  Was that you or Mr.

17 Lucas?

18      A.    I am assuming we did, yes, because we are the

19 ones that interviewed him.

20      Q.    But you had no reason other than random

21 selection as to which ones you spoke with?

22      A.    I believe so.

23      Q.    When did you first become acquainted with

24 Noah?

35

1       A.    Freshman in our school.

2       Q.    And other than being a student in your school,

3   had you had any interaction with him at all?

4       A.    Outside of school?

5       Q.    Did you have any interaction with him outside

6   of school?

7       A.    No.

8       Q.    In school other than seeing him in and about

9   the hallways and in class, did you ever have him in

10  your office for a discussion?

11      A.    Probably.  I have had lots of kids in my

12  office for a discussion.

13      Q.    Did you remember such a discussion with Noah?

14      A.    The only discussion I could ever remember with

15  Noah if I think back would have been possibly around

16  prom time when him and another girl wanted to go to

17  prom.

18          Him and his girlfriend that were freshmen and

19  they each said they were going with juniors and

20  seniors.  And I remember having a discussion with I

21  believe him and his girlfriend about that because prom

22  was for upper classmen and they were each saying they

23  were going with someone else.  So I questioned them

24  about that because it was brought to my attention.

36

1        Q.   What was the result of that?  Did they go?

2        A.   Yeah.  They went to prom.

3        Q.   Other than that interaction, did you ever have

4 any occasion to have a one-on-one type of discussion?

5        A.   In my office I don't believe so.

6        Q.   What did you know about Noah's academic record

7 prior to January 2013?

8        A.   Good student.

9        Q.   Did he have any discipline problems other than

10 this incident on January?

11        A.   Not that I know of.

12        Q.   Were you aware that he was considering leaving

13 Watseka for Culver Military Academy?

14        A.   Sure.  His dad had contacted me and I helped

15 fill out forms so that they could get him in there.

16        Q.   That was prior to January of 2013?

17        A.   I believe so.

18        Q.   Now you would have had then contact with Mr.

19 Dietchweiler concerning that request?

20        A.   Yes.

21        Q.   How many times did you meet with him or

22 discuss with him that?

23        A.   A couple of times.

24        Q.   And was there anything that you thought was

1    out of the ordinary in any of those interactions?

2          A.    No.

3          Q.    Noah ultimately is brought to Mr. Lucas's

4    office on January 25, 2013, correct?

5          A.    Correct.

6          Q.    You and Mr. Lucas and Noah are present,

7    correct?

8          A.    Correct.

9          Q.    Later Mrs. Dietchweiler came to the school but

10   initially just the three of you, correct?

11         A.    Correct.

12         Q.    There wasn't any recording made of the

13   discussions that ensued in Mr. Lucas's office relating

14   to Noah, were there?

15         A.    No.

16         Q.    Was Noah provided with a copy or shown the

17   list of students with names and numbers on it?

18         A.    I don't believe so.

19         Q.    Was Noah shown M. M.'s written statement

20   implicating other students and Noah in receiving pills

21   at school?

22         A.    No.  I don't think we showed it to him.

23         Q.    Did you search Noah?

24         A.    No.

1      Q.   Why not?

2      A.   Because Noah admitted to taking the pills.

3      Q.   Okay.  Did you search any other students that

4  you interviewed other than M. M.?

5      A.   No.

6      Q.   Now one student said he didn't take pills.

7  Did you search him?

8      A.   No.  I don't believe we did.

9      Q.   Who questioned Noah?

10      A.   Both of us.  Mr. Lucas and I.

11      Q.   Who spoke first?

12      A.   I believe Mr. Lucas did.

13      Q.   And had Noah said anything prior to Mr. Lucas

14  beginning to speak?

15      A.   No.  I don't believe so.

16      Q.   Did Noah say anything to the effect what is

17  this all about, why did you take me out of class?

18  Anything of that nature?

19      A.   He could have.  But I honestly don't remember.

20      Q.   What did Mr. Lucas say to Noah?

21      A.   Exactly, I couldn't tell you what he said.

22  Probably something to the effect that, you know, we

23  have talked to some people, everybody has been honest

24  with us.  Need you to be honest with us.  Probably

39

1    something to that effect.

2        Q.   Did Mr. Lucas specifically tell him that you

3    were seen receiving pills at school?

4        A.   I don't recall.

5        Q.   Did Mr. Lucas indicate that a student had

6    provided a written statement that Noah had been given

7    pills at school?

8        A.   I don't remember.

9        Q.   Did Mr. Lucas indicate to Noah the type of

10   substance or the number of pills that M. M. had

11   indicated were distributed to him?

12       A.   I don't remember either.

13       Q.   Was M. M.'s name specifically mentioned during

14   that interview?

15       A.   It could have been but I don't remember if it

16   was or not.  I don't believe it was.  It was, you know,

17   a student told us if I remember right but honestly

18   can't remember.  That was a long time ago.

19       Q.   So who actually -- to the best of your

20   recollection, what did Mr. Lucas say before anyone else

21   spoke?

22       A.   I think I just said that.

23       Q.   You can't remember anything else?

24       A.   No.  Not that I can remember.

40

1     Q.  Did you speak before Noah replied?

2     A.  I don't believe so.

3     Q.  Did Noah ultimately reply to what Mr. Lucas

4 told him?

5     A.  Yes.

6     Q.  And to the best of your ability, well, let me

7 ask you:  Do you remember verbatim what Noah said?

8     A.  No.  Just like I said, I can't remember

9 verbatim what Mr. Lucas said.

10    Q.  And you can't remember verbatim what you said?

11    A.  That is a long time ago.

12    Q.  So Noah responds.  What did he say?

13    A.  Told us that he had taken, he had received

14 some pills, that he had taken them.  And then I believe

15 I said something to the effect did you know what you

16 were taking.  For some reason it sticks in my head that

17 he thought he was taking a medicine for ADD.

18    Q.  Okay.  And you say he had taken pills.  What

19 do you mean by that?  That he ingested pills?

20    A.  Yes.

21    Q.  Did he actually say I swallowed the pills or

22 what was the exact --

23    A.  I don't remember.

24    Q.  But you are confident in the context of the

41

1   conversation he was telling you that he had ingested
2   pills?
3         A.   That he received them and that he took them.
4         Q.   And did he tell you where he received the
5   pills?
6         A.   I can't remember.
7         Q.   Did he indicate to you when he received pills?
8         A.   No.  I don't remember.
9         Q.   Did he indicate to you from whom he received
10  pills?
11        A.   Yes.  He said he got them from M. M.
12        Q.   Did he indicate to you how many pills he
13  received?
14        A.   No.
15        Q.   Did he indicate to you how many pills he
16  ingested?
17        A.   No.
18        Q.   Now did you make any assumptions as to when
19  Noah was confessing to receiving and ingesting pills?
20        A.   Make any assumptions?
21        Q.   Did you believe it happened on January 25?
22        A.   Didn't know what day it happened.  Said he
23  received them at school from M. M.  And then he was
24  very cooperative and then I believe we thanked him for

42

1  being honest and we said, you know, we got to -- he

2  said his mom was outside and we contacted mom and she

3  came in.

4          And when she came in, she asked if we would,

5  if dad could be called.  I said certainly.  We got dad

6  on speakerphone, told him what happened.  Gave him the

7  suspension notice.

8          And if I remember right at that time dad

9  tried to work a deal with us that if he wouldn't be

10 suspended, he would home school him the rest of the

11 year and wouldn't come back to Watseka High School.

12 Something.  Those might not be the exact words but

13 something to that effect.

14     Q.  Was the notice of disciplinary action as it

15 relates to Noah's case actually prepared before Mr.

16 Dietchweiler was called?

17     A.  I don't remember.

18     Q.  Do you know when it was signed?

19     A.  Before everybody left.  I know it was signed.

20 When during that time, I don't remember.

21     Q.  Was any other document prepared from the time

22 Noah began discussing the matter with you and Mr. Lucas

23 and the time that Mrs. Dietchweiler left with Noah?

24     A.  No.  Not that I know of.

1    Q.   Ultimately -- well, let me back up.  After the
2  last student was interviewed, did you prepare any notes
3  reflecting what you did and what you found during the
4  course of your investigation on January 25, 2013?
5    A.   On that day?
6    Q.   Yes.
7    A.   No.  I am sure I didn't.
8    Q.   Were there any documents to your knowledge
9  that came into existence other than the written
10 statement of M. M. and the notices of disciplinary
11 action prepared for each student who was ultimately
12 suspended?
13   A.   I don't believe so.
14   Q.   That was a Friday, was it not?
15   A.   I don't remember.  I can look back at the
16 calendar.
17   Q.   When did you then speak with Mr. Lee after the
18 last student was interviewed?
19   A.   I believe Mr. Lee stopped by after school and
20 asked how everything went.  And I said pretty well,
21 everybody was pretty cooperative.
22   Q.   Did you tell him the details of how many
23 students were involved, how many were suspended?
24   A.   I am sure I did.

44

1      Q.   Did you ask Mr. Lucas to prepare any memoranda

2  or summary of what occurred?

3      A.   Not on that day, no.  I believe I did when I

4  knew there was going to be an appeal to the suspension

5  then, yes.

6      Q.   When did you learn there was going to be an

7  appeal to the suspension?

8      A.   I don't know if it was when Mr. Dietchweiler

9  came in was the following Monday, whenever, a few days

10 later.

11     Q.   To your knowledge no written materials were

12 created between the time that you interviewed the last

13 person and until you had some contact with Mr.

14 Dietchweiler; is that correct?

15     A.   I believe so.

16     Q.   Now is there a computer system in which data

17 relating to student's suspensions is entered?

18     A.   Yes.

19     Q.   What is that?

20     A.   It is called Power School.

21     Q.   And who enters the data relating to a

22 student's suspension into that system?

23     A.   Into that?  Mr. Lucas does that for

24 discipline.

45

1      Q.   And do you know whether or not he did that for

2  the suspensions that occurred on January 25, 2013?

3      A.   I am assuming he did.

4      Q.   Did you ever look at that database to

5  determine what is in there relating to suspensions that

6  occurred on January 25, 2013?

7      A.   No.  I don't believe so.

8      Q.   Is there a printout of that material that is

9  put together and provided to the school board?

10      A.   Unless it was in the packet, I don't remember

11  one ever being printed out for the school board.

12      Q.   Does the school board look at suspensions

13  statistics on an annual or semester basis?

14      A.   I don't believe so.

15      Q.   You learned, well, did you have any contact

16  with any of the students or their families between the

17  time that you last interviewed students on the 25th and

18  the first contact you had with Mr. Dietchweiler?

19      A.   We met with all the parents that day.

20      Q.   After that day?

21      A.   Either on the phone or that came in.  I meet

22  with lots of parents throughout the year but pertaining

23  to that, I don't recall.

24      Q.   My specific question is:  For any student or

46

1    parent of a student that was suspended on January 25,

2    after that date and until you met with Mr.

3    Dietchweiler, did you have contact with anyone?

4        A.   No.  I don't believe so.

5        Q.   How were you contacted by the Dietchweilers?

6    Phone, meeting, what happened?

7        A.   I believe Mr. Dietchweiler came in to the

8    office and wanted to share some information.  And I

9    told him that the suspension, there is a hearing if you

10   want to appeal a suspension.

11           And if you need to do that, you can contact

12   Mr. Lee I believe.  I don't know if those were my exact

13   words.  And then he left.

14       Q.   Did you know what type of information he

15   wanted to share with you?

16       A.   I believe he mentioned something about a drug

17   test.  And I said same thing.  I said there is an

18   appeal process for a suspension.  And if he wants to do

19   that then, you know, set that up through Mr. Lee.

20       Q.   Was the meeting cordial?

21       A.   Yes.

22       Q.   You didn't have to ask him to leave the

23   premises, did you?

24       A.   No.

1      Q.   Did you ever have any contact with Mr.

2   Dietchweiler or any of the Dietchweiler family then

3   between that time and the actual suspension hearing

4   itself?

5      A.   Not that I know of.

6      Q.   Do you know whether or not Mr. Dietchweiler

7   followed your advice and went to see Mr. Lee?

8      A.   I am assuming he did because we had a

9   suspension hearing.

10      Q.   How did you learn that there was going to be a

11   suspension hearing?

12      A.   I don't remember.

13      Q.   Did you receive an e-mail telling you to be at

14   a certain place on a certain date?

15      A.   I don't know if I got an e-mail or if Mr. Lee

16   said, told us when the suspension hearing was going to

17   be.

18      Q.   You learned that there was going to be a

19   suspension review hearing.  Ultimately Exhibit 10 was

20   created.  Have you ever seen that document before?

21      A.   It looks familiar.

22      Q.   It looks familiar?  Does that mean that you

23   might have or might not have or is that a document that

24   you actually had seen before today?

48

1        A.    It looks like something I probably typed.

2        Q.    You are the author of that?

3        A.    I think so.

4        Q.    When was it prepared?

5        A.    I am sure after the suspension when I found

6    out there was going to be a suspension hearing so I

7    could type it up and remember the facts from the case.

8        Q.    And with whom did you share that?

9        A.    Probably Mr. Lee, Mr. Lucas to make sure that

10   I had the facts straight.  Because him and I were the

11   ones that did the investigation.

12       Q.    Do you remember actually providing a copy of

13   that to Mr. Lucas?

14       A.    I don't remember if I gave him the specific

15   copy or not or if I handed it to him and said look this

16   over and see if I have things right or if I missed

17   something.

18       Q.    Do you believe there was a meeting in which

19   you and Mr. Lucas discussed this specific memorandum?

20       A.    I don't remember for sure but it would make

21   sense that I would do that.

22       Q.    Do you know whether or not there was any

23   editing as a result of your conversation with Mr.

24   Lucas?

49

1     A.   I don't remember.

2     Q.   How was it delivered to Mr. Lee?  Do you know?

3     A.   I don't remember if I e-mailed it to him or

4  gave it to him.  I don't remember.

5     Q.   Do you remember whether or not you typed it

6  and made a hard copy and somehow got a hard copy to Mr.

7  Lee or if that was put into an e-mail text that you

8  sent to Mr. Lee?

9     A.   I don't remember.

10     Q.   Do you know why didn't you sign it?

11     A.   I don't know.

12     Q.   Do you know whether or not Mr. Lee shared that

13  with anyone?

14     A.   I have no idea.

15     Q.   You ultimately were asked to come to a

16  suspension review hearing for Noah.  Were you asked to

17  attend any other student disciplinary proceedings?

18     A.   If there is going to be a suspension hearing

19  and it deals with any of my, a student from my

20  building, I am always invited.

21     Q.   Were there any other hearings that took place

22  involving any other student on M. M.'s list other than

23  Noah?

24     A.   I believe we had another one.

50

1       Q.   And did that involve M. M. himself?

2       A.   Well, that one and then I believe there was

3   another -- I believe there was another family that

4   appealed that.

5       Q.   Do you know, M. M. ultimately was expelled,

6   was he not?

7       A.   Yes.

8       Q.   And the other student that had a suspension

9   hearing, was that suspension upheld also?

10      A.   Yes.  I believe so.

11      Q.   What were you asked to bring to the suspension

12  review hearing for Noah?

13      A.   I don't remember.  Myself.  I know I showed

14  up.

15      Q.   Were you asked to bring any documents?

16      A.   I don't remember.

17      Q.   Were you asked to bring that Exhibit No. 10?

18      A.   I said I don't know if I brought that or gave

19  that to him ahead of time.

20      Q.   My question is:  Do you remember being asked

21  to bring that regardless of whether you gave that to

22  him ahead of time or not?

23      A.   No.  I don't remember.

24      Q.   The statement of M. M. that he wrote out, were

1    you asked to bring that to the hearing?

2         A.   I don't remember being asked to bring it.

3         Q.   Had you provided that document to Mr. Lee

4    prior to the suspension review hearing for Noah?

5         A.   Probably.

6         Q.   I understand you said probably. Does that

7    mean you don't know for sure?

8         A.   Well, I would assume probably yes because

9    there was a packet of information that was put together

10   for it.

11        Q.   Okay. Did you see the package of information

12   that was put together for Noah's hearing?

13        A.   The night of the hearing.

14        Q.   Exhibit 1 is that package. And this is the

15   package you are referring to?

16        A.   That looks like the same package, yes.

17        Q.   Were you given that package? Were you given a

18   copy of the package?

19        A.   Huh?

20        Q.   Were you given a copy of that package at the

21   hearing?

22        A.   Yeah. I believe I was given a copy of that.

23        Q.   Did you take it home and keep it?

24        A.   I don't remember.

52

1      Q.   Did you take it to home?

2      A.   I wouldn't have taken it home.  I know that.

3      Q.   Did you take it to your office and keep it for

4  further reference?

5      A.   I could have.

6      Q.   So no one has asked you yet but if somebody

7  asked you, you could go to your office and see if you

8  still have a copy of it?

9      A.   I possibly could.  I would have to look.

10      Q.   And that would not be at Noah's student record

11  file, would it?

12      A.   No.

13      Q.   It would be in a working file that you had

14  simply because you were involved in the matter and

15  ultimately there was litigation?

16      A.   Um-hum.

17      Q.   I want you to look at that document.  Take as

18  much time as you want.  Because the two documents being

19  the list of students with names and numbers and the

20  written statement of Michael McKay is not in that

21  package.  So I want you to look at it.  And my question

22  is:  Do you dispute that statement or agree with it?

23      A.   Dispute what statement?

24      Q.   Well, you I believe indicate that you believe

1   M. M.'s written statement and the list of students with

2   the names and the amount of money owed were in a

3   package distributed at the school board suspension

4   review hearing.  That was your belief, was it not?

5       A.   If this is what was in the packet then that is

6   what was in the packet.

7       Q.   Okay.  But am I correct that the reason you

8   didn't bring a copy of M. M.'s statement and the list

9   with money owed is because no one asked you and you

10  assumed they already had it?

11      A.   I don't know about that.

12      Q.   Why didn't you bring a copy then to the

13  suspension review hearing?

14      A.   I don't know.

15      Q.   Did you ever learn from any source that the

16  date that Noah allegedly received and consumed pills at

17  school was a day other than January 25, 2015?

18      A.   I don't know if it was or it wasn't.

19      Q.   You were at the suspension review hearing,

20  were you not?

21      A.   Yes, I was.

22      Q.   And didn't Mr. Lucas testify that Noah stated

23  in the meeting that you were present that he received

24  and consumed a pill the day before?

1      A.    That sounds correct.

2      Q.    Is that the first time you heard that at that

3  suspension review hearing?

4      A.    I don't remember.

5      Q.    The 24th wasn't mentioned in Exhibit 10, is

6  it?

7      A.    I don't see the 24th in there.

8      Q.    The actual notice of student disciplinary

9  action, this is one of the documents.  It was in the

10 package on Exhibit 1.  That is actually a copy that was

11 provided to Noah and his mother on the 25th, correct?

12     A.    Correct.

13     Q.    I didn't see the 24th mentioned there.  Is the

14 24th mentioned on that document?

15     A.    I don't see the 24th.

16     Q.    In Exhibit No. 2?

17           MS. GOGGIN-WARD: You are calling it a group

18 exhibit?  All of the answers to interrogatories?

19 BY MR. TAGUE:

20     Q.    Yeah.  Exhibit No. 2, a group exhibit there.

21 That had all of the interrogatory answers of the school

22 administrators.

23           And I am going to turn to the first page on

24 the ones directed to you.  You have seen this document

1  before, have you not?

2      A.    Yes.

3      Q.    And ultimately if you flip a few pages through

4  that, there is a verification?

5      A.    Um-hum.

6      Q.    So ultimately you read, well, let me ask you:

7  You read the answers to the interrogatories and the

8  questions, correct?

9      A.    Yes.

10     Q.    And then you ultimately signed this

11 verification that the matters were true and correct to

12 the best of your belief, correct?

13     A.    Yes.

14     Q.    Going back to the second page, the second

15 question asks what the drug was and there is an answer

16 that indicates the drug was identified as Ativan.  How

17 did you learn that?

18     A.    I believe the police officers or from Michael,

19 or sorry, M. M.

20     Q.    I am looking at the second one but my question

21 doesn't necessarily relate to that but my question to

22 you is:  The only accuser other than Noah's own

23 statements that Noah had taken or had received or taken

24 Ativan was M. M., correct?

56

1      A.    I believe so.

2      Q.    In looking at Interrogatory No. 4, there was a

3   question and then an answer made to the question.  And

4   we have talked about M. M.'s statement, M. M.'s list

5   with student's names on it.

6           My question is:  After you have looked at

7   that question and answer, is there any other documents

8   or physical evidence that was involved in the pills at

9   school that we haven't talked about?

10     A.    I don't believe so.

11     Q.    Now you ultimately read this question, read

12  the answer and verified it, correct?

13     A.    Correct.

14     Q.    If you turn to the next page, we ask about the

15  list of students owing money and whether that was given

16  to Noah.  And the answer was taking given to to mean

17  handed or provided to specifically Noah Dietchweiler.

18  The document was not given to Noah but it was given to

19  Noah's counsel.

20          And what do you mean by that, that that it

21  was given to Noah's counsel?  My question is who, when

22  and where?

23     A.    Since you had a copy of it back here you

24  showed me.  I don't know when it was given to you.  But

1  it was given to his counsel.  I am assuming it was you.

2      Q.   Now you never observed that happen and you

3  didn't do that, correct?  You didn't see me actually

4  receive the document?

5      A.   No.

6      Q.   And you didn't give me the document, correct?

7      A.   No.

8      Q.   So the basis of that information is what

9  somebody has told you and the answer says it was given

10  to Noah's counsel but you don't know, well, do you know

11  by whom and when it was given to Noah's counsel?

12          MS. GOGGIN-WARD: Objection, form and

13  compound.  If you understand the question, you can

14  answer it.

15  BY MR. TAGUE:

16      Q.   I will break it down.  Do you know when the

17  statement was allegedly -- well, you are right.  It was

18  given to us because I have it.  But do you know when I

19  received it?

20      A.   No.

21      Q.   And you don't know from whom it was received,

22  correct?

23      A.   No.

24      Q.   It was not given to me prior to the hearing to

58

1   your knowledge, was it?  Or do you know?

2        A.   I don't know.

3        Q.   Now 9 is the same line of questioning with M.

4   M.'s statement identifying students that he allegedly

5   gave pills to.

6             And essentially your answer is the same, it

7   was not given directly to Noah but it was given to

8   Noah's counsel.  And you assumed it was given to me,

9   you just don't know by whom and when?

10       A.   Yes.

11       Q.   Now in Interrogatory No. 8, you indicate that

12  in the last part of the answer to B that the note was

13  discussed when Mr. Tague was questioning Mr. Bunting.

14  So I take it that is from your direct knowledge?

15       A.   Who is Mr. Tague?

16       Q.   That is me.

17       A.   Okay.  Sorry.  I believe, yeah.

18       Q.   And my question is -- and let me back up.

19  Your answer says the note was discussed when Mr. Tague

20  was questioning Mr. Bunting.  And do you remember that

21  happening or not?

22       A.   I am assuming that happened at the hearing

23  when you were questioning me.

24       Q.   You say you assume it happened.  Do you

1   actually remember it happening?

2       A.   Do I remember it specifically, I don't know.

3   That was a long time ago.

4       Q.   You haven't reviewed the transcript of the

5   suspension review hearing?

6       A.   No.

7       Q.   You know -- did you know that one exists?

8       A.   Well, I don't know if this court reporter was

9   there but I know there was a court reporter there.

10      Q.   Now when we asked about the M. M. statement in

11  subpart B, we asked if he was referred to in the school

12  board concerning, hearing, concerning Noah.

13           And your answer was I do not recall the

14  letter being referred to in the school board meeting

15  concerning Noah.

16      A.   Right.

17      Q.   That is your statement?

18      A.   Yes.

19      Q.   Now that is because it didn't happen or you

20  just don't remember one way or the other?

21      A.   I don't remember one way or the other.

22      Q.   Interrogatory No. 18, sorry, 15, we ask about

23  statements -- I believe these are the same people on

24  Michael's, or sorry, M. M.'s list, that at least some

1    of them are.

2            Now I was interested in if there were any

3    first written statements that exist from any of these

4    students.  And I think we have asked questions and the

5    answer to that is no, there is no written statements,

6    correct?

7        A.    From any of these people?

8        Q.    Correct.

9        A.    Besides Michael McKay?

10            MS. GOGGIN-WARD: Can't say that.

11        A.    Gosh darn it.  Sorry.

12            MS. GOGGIN-WARD: Besides M. M.

13        A.    Yes.

14    BY MR. TAGUE:

15        Q.    And the only verbal statements that we

16    received that you received during the course of your

17    interviews with other students, none of them other than

18    M. M. identified Noah, correct?

19        A.    I don't recall if they did or didn't during

20    the interviews.

21            (Whereupon a break was taken and the

22            deposition continued as follows:)

23    BY MR. TAGUE:

24        Q.    What license or certificate do you have

1   currently for public education?

2        A.    I have a Type 75 for administrator and I don't

3   remember what the type is to be a superintendent and is

4   that a Type 9 I believe I have for my elementary

5   education.

6        Q.    When did you receive those?

7        A.    Whatever I said earlier.  '95, 2000 and then

8   just a couple of years ago for my superintendency.

9        Q.    Have you ever been convicted of a crime?

10       A.    No.  I don't believe so.

11       Q.    Do you know if any of the defendants have been

12  convicted of a felony?

13       A.    I have no idea.

14       Q.    I have turned to Exhibit 5.  The document is

15  entitled Defendant's Responses to Plaintiff's First

16  Request to Admit.  Have you ever seen that document

17  before?

18       A.    The one with Mr. Lucas's name on it?

19       Q.    Well, I think that we just used your name, et

20  al, because you appear first but I believe that

21  ultimately --

22       A.    Is that the one we just talked about earlier

23  that I signed?

24            MS. GOGGIN-WARD: Yes.

62

1      A.    Then yes.

2   BY MR. TAGUE:

3      Q.    I think we talked about your interrogatory

4   answers.   This document has an attestation and I

5   believe that is your signature, is it not?

6      A.    That is not my signature.

7           MS. GOGGIN-WARD:  He is Mr. Bunting, not Mr.

8   Lucas.

9   BY MR. TAGUE:

10     Q.    Sorry.

11     A.    That is my signature.

12     Q.    Okay.  So on December 26 of 2013 you signed an

13  attestation for these responses to requests to admit;

14  is that correct?

15     A.    Yes.

16     Q.    And No. 5 statement is that no written notice

17  was given to Noah Dietchweiler on January 25, 2013 of

18  the evidence which supports the charges prior to the

19  decision to suspend him.  And response is that that

20  statement is denied.

21     A.    Yes.

22     Q.    You believe that denial to be an accurate

23  response to that?

24     A.    We gave him a suspension notice, yes.

1      Q.   So that is the one document that was in

2   Exhibit 1 that was the form of notice of student

3   suspension?

4      A.   Yes.

5      Q.   That was the only thing provided to Noah on

6   the 25th in writing, correct?

7      A.   In writing.

8      Q.   No. 9, the statement is the letter of M. M.,

9   although his real name is in this document, identifying

10   the students to whom he had provided pills was not

11   introduced into evidence at Dietchweiler's school board

12   meeting hearing.

13         And the answer eventually is Defendant states

14   the letter was utilized during the hearing that was

15   held.  Do you remember the letter utilized in some

16   fashion during the February 5, 2013 hearing?

17      A.   I don't remember.

18      Q.   A complaint was filed by the Dietchweilers.

19   Have you read the complaint?

20      A.   From front to back?  No.

21      Q.   You read the parts that pertain to you?

22      A.   (Nodding.)

23      Q.   Is that correct?

24      A.   Yes.

64

1      Q.    Do you know who actually prepared Exhibit No.

2    1?

3      A.    No.

4      Q.    Do you know whether that exhibit was an

5    exhibit utilized at any other disciplinary hearing

6    other than Noah's?

7      A.    This specific one with his name on it?

8      Q.    Correct.

9      A.    No.  I don't believe it was.

10     Q.    Do you believe that there was the same

11   document with a different cover page that was used at

12   other hearings?

13     A.    I believe some of this stuff in this document

14   was used at another one because the student discipline

15   stuff that was in there, yes.

16     Q.    In Exhibit 1, the actual version of it, the

17   photocopy with the tabs but there is a table of

18   contents and tabs.

19           The document behind the first ten is a board

20   policy.  And that is, were you asked, well, actually

21   there is three board policies.

22           Were you asked to collect those board

23   policies and provide them to whoever compiled this

24   document?

65

1      A.   No.  I don't believe so.

2      Q.   Do you have a board policy book in your

3 office?

4      A.   Yes.  Every school building in the district

5 has a board policy in the office.

6      Q.   And it is a policy book that has a collection

7 of all the board policies through the entire district?

8      A.   Correct.

9      Q.   And this one refers to policy seven colon one

10 ninety two hundred and two ten.  I take it there is

11 other board policies that start out 1, 2, etc.?

12     A.   Yes.

13     Q.   Do you know whether or not any of these board

14 policies were provided to the Dietchweiler family prior

15 to the suspension review hearing on February 5?

16     A.   I have no idea.  Not from me.

17     Q.   Are they public documents to your knowledge?

18     A.   I believe they are.

19     Q.   If somebody wanted to see the board policy

20 book, a citizen with little to do and they came to your

21 office and said I would like to look at the board

22 policy, is that something they would be given?

23     A.   It wouldn't bother me.

24     Q.   And then the Iroquois County High School

1  student handbook is behind No. 4.  Were you asked to

2  pull those excerpts?

3       A.   I believe I was asked to pull those pages,

4  yes.

5       Q.   And to whom did you provide them?

6       A.   I believe I provided them to Mr. Lee.

7       Q.   No. 5 is the notice of student disciplinary

8  action and then 6 is the notice of suspension review.

9  You would have provided No. 5 to Mr. Lee?

10      A.   Yes.

11      Q.   No. 6?

12      A.   Looks like it came from Mr. Lee.

13      Q.   You weren't asked to prepare that?

14      A.   No.

15      Q.   The policy manual that I just asked you about,

16 who is the author of that?

17      A.   I believe that comes from Press which is an

18 organization I think the district pays for a service to

19 provide board policy changes or corrections or to make

20 sure it stays with -- looking for the right word I

21 guess -- the new laws that go with schools.

22           MR. TAGUE:  Okay.  Those are all the

23 questions I have.

24           MS. GOGGIN-WARD: I have a couple.

1   EXAMINATION,

2        QUESTIONS BY MS. GOGGIN-WARD:

3        Q.   Exhibit 10, I believe Noah's and Plaintiff's

4   counsel asked you as to whether or not January 24 is

5   referred to in that document and you said no, correct?

6        A.   Yes.

7        Q.   Personally when preparing this document, did

8   it matter to you whether or not Noah had taken or

9   ingested pills on the 24th or 25th or any other day on

10  school premises?

11       A.   No.

12       Q.   Why not?

13       A.   Because he admitted to taking them from

14  somebody and having them in his possession.

15       Q.   And that in your mind validated the

16  suspension?

17       A.   Yes.

18            MS. GOGGIN-WARD: That is all I have.

19            MR. TAGUE: No further questions.

20            MS. GOGGIN-WARD: We'll reserve.

21            (The deposition concluded at 2:23 p.m.)

22

23

24

68

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
2                      URBANA DIVISION

3

4    NOAH DIETCHWEILER, by        )
     Michael Dietchweiler, his    )
5    father and next friend;      )
     and ANN DIETCHWEILER         )
6                                 )   No. 2013-CV-2062
          Plaintiffs,             )
7                                 )
      vs.                         )
8                                 )
     STEVE LUCAS, in his          )
9    official and individual      )
     capacities, et al.,          )
10                                )
          Defendants.             )
11

12
          This is to certify that I have read the transcript
13   of my deposition taken in the above-entitled cause, and
     that the foregoing transcript taken on
14   November 18, 2014 accurately states the questions asked
     and the answers given by me, with the exception of the
15   corrections noted, if any, on the attached errata
     sheet(s).
16

17

18                    JAMES BUNTING

19

20   Subscribed and Sworn before
     me this _____ day of _____, 2014.
21

22   Notary Public

23

24

69

```
 1   STATE OF ILLINOIS    )
                          )   SS
 2   COUNTY OF VERMILION  )

 3        I, BECKY L. JESSUP, CSR, do hereby certify that
     JAMES BUNTING, the deponent herein, was by me first
 4   duly sworn to tell the truth, the whole truth and
     nothing but the truth in the aforementioned cause of
 5   action.
          That the foregoing deposition was taken on behalf
 6   of the Plaintiff, on November 18, 2014.
          That said deposition was taken down in stenograph
 7   notes and afterwards reduced to typewriting under my
     instruction; and that the typewritten transcript is a
 8   true and accurate record of the testimony given by said
     deponent; and that it was agreed by and between the
 9   witness and attorneys that said signature on said
     deposition would not be waived.
10        I do hereby certify that I am a disinterested
     person in this cause of action; that I am not a
11   relative or attorney of any of the parties, or
     otherwise interested in the event of this cause of
12   action, and am not in the employ of the attorneys for
     either party.
13        IN WITNESS WHEREOF, I have hereunto set my hand and
     affixed my notarial seal this 1st day of December,
14   2014.

15

16
                    Becky L. Jessup, CSR
17

18

19

20

21

22

23

24
```

NOAH DIETCHWEILER v.
STEVE LUCAS

JAMES BUNTING
November 18, 2014

**A**

**ability (1)**
40:6
**Absolutely (1)**
13:1
**academic (1)**
36:6
**Academy (1)**
36:13
**accurate (1)**
62:22
**accuser (1)**
55:22
**acquainted (1)**
34:23
**action (6)**
29:16,24;42:14;
43:11;54:9;66:8
**actual (3)**
47:3;54:8;64:16
**actually (12)**
20:4;32:2;39:19;
40:21;42:15;47:24;
48:12;54:10;57:3;
59:1;64:1,20
**ADD (1)**
40:17
**address (2)**
5:13;19:4,10,15
**addresses (1)**
19:12
**adjusted (1)**
9:8
**administrator (2)**
7:15;61:2
**administrators (2)**
10:3;54:22
**administrator's (1)**
7:17
**Admit (1)**
61:16;62:13
**admitted (3)**
28:21;38:2;67:13
**adoption (1)**
9:21
**adult (1)**
5:21
**advice (1)**
47:7
**age (1)**
5:17
**agenda (1)**
32:23
**ago (7)**
5:6;7:4;26:8;39:18;
40:11;59:3;61:8
**agree (2)**
12:23;52:22
**ahead (2)**
50:19,22
**al (1)**

61:20
**Alan (1)**
4:12
**A-l-a-n (1)**
4:14
**alert (1)**
24:7
**allegation (1)**
13:18
**allegedly (4)**
14:12;53:16;57:17;
58:4
**allow (1)**
25:9
**although (1)**
63:9
**always (2)**
24:4;49:20
**amended (2)**
9:6,8
**amendments (2)**
9:11,13
**amount (1)**
53:2
**amounts (1)**
17:11
**annual (1)**
45:13
**answered (1)**
25:21
**appeal (4)**
44:4,7;46:10,18
**appealed (1)**
50:4
**appear (1)**
61:20
**approved (1)**
9:2
**approves (1)**
9:3
**approximate (1)**
31:20
**approximately (2)**
12:9;14:18
**archival (1)**
10:8;19:16
**archiving (1)**
19:21
**area (2)**
6:2;9:13
**areas (1)**
28:6
**Around (5)**
7:3,6;13:9;14:19;
35:15
**arrived (1)**
20:22
**assume (2)**
51:8;58:24
**assumed (2)**
53:10;58:8
**assuming (7)**
14:23;25:22;34:18;

45:3;47:8;57:1;58:22
**assumptions (2)**
41:18,20
**Ativan (2)**
55:16,24
**attend (2)**
6:16;49:17
**attention (2)**
14:6;35:24
**attestation (2)**
62:4,13
**author (2)**
48:2;66:16
**available (1)**
18:22
**aware (1)**
36:12
**away (2)**
25:8;27:15

**B**

**bachelor's (2)**
6:19,22
**back (11)**
5:3,11;16:2;35:15;
42:11;43:1,15;55:14;
56:23;58:18;63:20
**basis (2)**
45:13;57:8
**became (2)**
7:14,22
**become (2)**
11:4;34:23
**began (1)**
42:22
**beginning (2)**
31:18;38:14
**behind (2)**
64:19;66:1
**belief (2)**
53:4;55:12
**Besides (2)**
60:9,12
**best (4)**
25:20;39:19;40:6;
55:12
**birth (1)**
4:15
**board (27)**
7:24;9:3,9,18,21;
10:1,1,7,12;45:9,11,
12;53:3;59:12,14;
63:11;64:19,21,22;
65:2,5,7,11,13,19,21;
66:19
**board's (2)**
10:21;12:15
**book (4)**
32:23;65:2,6,20
**both (2)**
15:4;38:10
**bother (1)**

65:23
Braidwood/Wilmington (1)
6:2
**break (3)**
5:8;57:16;60:21
**bring (9)**
10:5;50:11,15,17,
21;51:1,2;53:8,12
**bringing (2)**
12:23;24:8
**brought (13)**
13:2,6,18;14:6,7,
12;17:24;29:8;30:4,
11;35:24;37:3;50:18
**building (4)**
22:23;32:5;49:20;
65:4
**BUNTING (9)**
4:2,10,12;5:24;6:7,
7;58:13,20;62:7

**C**

**cabinet (1)**
27:3
**cafeteria (1)**
13:13
**calendar (1)**
43:16
**call (2)**
22:21;24:14
**called (10)**
24:15,18,19,20,21;
25:2,5;42:5,16;44:20
**calling (2)**
24:21;54:17
**calls (3)**
23:2,15,24
**came (9)**
7:10;8:19;14:7;
16:23;17:14;20:18;
26:23;28:22;37:9;
42:3,4;43:9;44:9;
45:21;46:7;65:20;
66:12
**can (7)**
8:9;20:12;24:1;
39:24;43:15;46:11;
57:13
**capacity (1)**
7:15
**case (6)**
4:18;12:22;20:3;
27:21;42:15;48:7
**cases (1)**
26:9
**cell (3)**
23:10,24;24:16
**Central (2)**
5:22,23
**certain (3)**
15:20;47:14,14
**certainly (1)**

42:5
**certificate (1)**
60:24
**change (1)**
10:6
**changed (1)**
9:6
**changes (6)**
9:9,10,10,13,20;
66:19
**charges (1)**
62:18
**check (1)**
24:3
**checked (2)**
19:14;27:7
**child (6)**
14:11,14,20,24;
32:19;34:11
**children (2)**
21:12;32:11
**child's (1)**
21:9
**citizen (1)**
65:20
**claim (1)**
13:6
**class (16)**
14:21;28:3,5,9;
30:7;31:12,13,14,22;
32:12,13,16,19,22;
35:9;38:17
**classes (1)**
8:5
**classmen (1)**
35:22
**clock (1)**
31:2
**Coach (1)**
16:12
**collect (1)**
64:22
**collection (1)**
65:6
**college (3)**
6:16,18;8:5
**colon (1)**
65:9
**committee (6)**
9:16,18,22;10:4,7,
11
**compiled (1)**
64:23
**complaint (2)**
63:18,19
**complied (1)**
15:21
**compound (1)**
57:13
**computer (5)**
18:22,24;19:6,10;
44:16
**concerning (4)**

36:19;59:12,12,15
**concluded (1)**
67:21
**confessing (1)**
41:19
**confident (1)**
40:24
**confront (1)**
14:11
**considering (1)**
36:12
**consumed (2)**
53:16,24
**contact (7)**
36:18;44:13;45:15,
18;46:3,11;47:1
**contacted (3)**
36:14;42:2;46:5
**contained (1)**
10:20
**container (1)**
16:3
**contents (1)**
64:18
**context (1)**
40:24
**continued (1)**
60:22
**continuing (1)**
8:7
**conversation (2)**
41:1;48:23
**conversations (1)**
28:2
**convicted (2)**
61:9,12
**cooperative (2)**
41:24;43:21
**coordinator (1)**
19:19
**copy (16)**
26:8,15,17;37:16;
48:12,15;49:6,6;
51:18,20,22;52:8;
53:8,12;54:10;56:23
**cordial (1)**
46:20
**corrections (1)**
66:19
**counsel (7)**
56:19,21;57:1,10,
11;58:8;67:4
**County (2)**
6:3;65:24
**couple (5)**
11:15;14:9;36:23;
61:8;66:24
**course (4)**
21:13;26:20;43:4;
60:16
**court (4)**
4:18;5:11;59:8,9
**cousin (2)**

6:5,7
**cover (1)**
64:11
**create (1)**
19:22
**created (3)**
30:2;44:12;47:20
**crime (1)**
61:9
**Culver (1)**
36:13
**currently (2)**
6:11;61:1

**D**

**dad (4)**
36:14;42:5,5,8
**darn (1)**
60:11
**data (2)**
44:16,21
**database (1)**
45:4
**date (5)**
4:15;29:5;46:2;
47:14;53:16
**day (13)**
9:4;13:12,13;21:14;
30:22;41:22;43:5;
44:3;45:19,20;53:17,
24;67:9
**days (2)**
29:7;44:9
**deal (4)**
8:12,15;26:10;42:9
**deals (2)**
9:16;49:19
**dean (1)**
11:18
**December (2)**
7:10;62:12
**decision (2)**
22:5;62:19
**Defendant (1)**
63:13
**defendants (1)**
61:11
**Defendant's (1)**
61:15
**degree (5)**
6:19,22,23,24;7:4
**delivered (1)**
49:2
**denial (1)**
62:22
**denied (1)**
62:20
**department (1)**
27:18
**depending (2)**
9:9;30:14
**deposition (4)**

5:5;26:14;60:22;
67:21
**desktop (1)**
18:24
**details (1)**
43:22
**detention (1)**
12:3
**determine (2)**
33:4;45:5
**determined (1)**
34:16
**Dietchweiler (15)**
36:19;37:9;42:16,
23;44:8,14;45:18;
46:3,7;47:2,2,6;
56:17;62:17;65:14
**Dietchweilers (2)**
46:5;63:18
**Dietchweiler's (2)**
4:18;63:11
**different (4)**
8:19;29:20;31:10;
64:11
**direct (2)**
22:20;58:14
**directed (1)**
54:24
**directly (1)**
58:7
**disciplinary (12)**
8:4,13;9:14;11:8;
29:16,24;42:14;
43:10;49:17;54:8;
64:5;66:7
**discipline (6)**
10:14;11:11;32:20;
36:9;44:24;64:14
**discuss (1)**
36:22
**discussed (6)**
20:21;22:4;33:6;
48:19;58:13,19
**discussing (1)**
42:22
**discussion (8)**
15:1;27:3;35:10,
12,13,14,20;36:4
**discussions (1)**
26:20;37:13
**dispute (2)**
52:22,23
**distributed (1)**
39:11;53:3
**District (10)**
5:22;9:19,20;19:6;
22:11;23:10,16;65:4,
7;66:18
**district's (1)**
19:18
**document (24)**
17:13;18:19;21:2;
42:21;47:20,23;51:3;

52:17;54:14,24;
56:18;57:4,6;61:14,
16;62:4;63:1,9;64:11,
13,19,24;67:5,7
**documents (9)**
20:10;26:13;29:23;
43:8;50:15;52:18;
54:9;56:7;65:17
**dollar (2)**
17:10;26:18
**done (3)**
4:22,24;7:7
**down (5)**
4:19;17:8;18:14;
23:7;57:16
**drug (4)**
12:16;46:16;55:15,
16
**Drugs (1)**
12:7
**duly (1)**
4:3
**dump (1)**
16:10
**during (11)**
14:6;21:13;26:20;
29:1;39:13;42:20;
43:3;60:16,19;63:14,
16

**E**

**earlier (3)**
26:14;61:7,22
**Eastern (3)**
6:17,23;7:1
**editing (1)**
48:23
**education (6)**
6:21;7:5;8:3,7;61:1,
5
**effect (8)**
10:14,18;24:24;
38:16,22;39:1;40:15;
42:13
**either (5)**
5:10;27:14;30:19;
39:12;45:21
**elementary (1)**
61:4
**else (8)**
5:15;8:8;16:21;
18:13;20:12;35:23;
39:20,23
**e-mail (7)**
19:2,4,12,17;47:13,
15;49:7
**e-mailed (1)**
49:3
**e-mails (5)**
19:9,10,16,21,22
**emptied (1)**
16:17

**ended (1)**
16:12
**enough (2)**
12:14;13:24
**ensued (1)**
37:13
**entered (1)**
44:17
**enters (1)**
44:21
**entire (1)**
65:7
**entitled (1)**
61:15
**essentially (1)**
58:6
**et (1)**
61:19
**etc (1)**
65:11
**even (1)**
19:14
**event (1)**
12:24
**events (1)**
19:23
**eventually (1)**
63:13
**everybody (3)**
38:23;42:19;43:21
**everyone (2)**
21:13;28:14
**evidence (6)**
21:1;22:7;26:2;
56:8;62:18;63:11
**exact (4)**
15:8;40:22;42:12;
46:12
**exactly (8)**
7:3;17:6;21:19;
24:21,24;27:6;30:11;
38:21
**EXAMINATION (2)**
4:7;67:1
**examined (1)**
4:5
**excerpts (1)**
66:2
**exchange (3)**
17:24;33:10,24
**Exhibit (20)**
17:9;21:2,7;29:17;
47:19;50:17;51:14;
54:5,10,16,18,20,20;
61:14;63:2;64:1,4,5,
16;67:3
**exist (2)**
10:9;60:3
**existence (1)**
43:9
**exists (1)**
59:7
**expelled (1)**

NOAH DIETCHWEILER v.
STEVE LUCAS

JAMES BUNTING
November 18, 2014

50:5
extension (2)
22:16,24

**F**

facts (2)
48:7,10
familiar (5)
11:4;12:14;13:24;
47:21,22
families (1)
45:16
family (5)
5:24;6:9;47:2;50:3;
65:14
fashion (2)
18:16;63:16
February (2)
63:16;65:15
feel (1)
12:14
felony (1)
61:12
few (3)
12:12;44:9;55:3
Fights (1)
12:5
figures (1)
31:7
file (2)
52:11,13
filed (1)
63:18
fill (1)
36:15
find (1)
16:17
finding (1)
15:12
finished (4)
7:10;20:15;24:9,13
first (17)
4:3;7:5,8,17;30:14;
33:16;34:2,7,23;
38:11;45:18;54:2,23;
60:3;61:15,20;64:19
five (1)
7:16
flip (1)
55:3
followed (1)
47:7
following (2)
33:22;44:9
follows (2)
4:5;60:22
form (4)
29:15,16;57:12;
63:2
formal (3)
6:21;8:3;9:21
forms (1)

36:15
found (7)
14:9;15:14;16:1,18,
21;43:3;48:5
fourth (1)
6:15
frame (1)
31:5
Freeport (1)
7:9
frequently (1)
11:14
Freshman (1)
35:1
freshmen (1)
35:18
Friday (1)
43:14
front (1)
63:20
full (1)
4:9
further (2)
52:4;67:19

**G**

gave (12)
15:17,18;26:8,15,
17;42:6;48:14;49:4;
50:18,21;58:5;62:24
gets (1)
23:17
girl (1)
35:16
girlfriend (2)
35:18,21
given (25)
15:6;16:20;17:4;
26:13;39:6;51:17,17,
20,22;56:15,16,18,18,
21,24;57:1,9,11,18,
24;58:7,7,8;62:17;
65:22
giving (1)
33:17
goes (1)
9:19
GOGGIN-WARD (12)
27:1;34:3;54:17;
57:12;60:10,12;
61:24;62:7;66:24;
67:2,18,20
Good (1)
36:8
Gosh (1)
60:11
govern (1)
11:1
governing (1)
10:21
grandma (1)
25:12

grandmother (5)
20:18,22;21:6,10;
25:9
great (1)
4:22
group (2)
54:17,20
guardian (1)
20:16
guess (1)
66:21
guessing (1)
30:16
guidance (1)
32:9

**H**

half (1)
7:9
hall (1)
32:20
hallways (1)
35:9
hand (2)
16:12,13
handbook (12)
8:24;9:2,6,17,20;
10:17,20;11:2,12:18;
13:19,22;66:1
Handbooks (1)
8:21
handed (2)
48:15;56:17
handle (1)
12:16
happen (4)
14:10;15:20;57:2;
59:19
happened (11)
12:20;18:18;20:5;
21:9;27:20;41:21,22;
42:6;46:6;58:22,24
happening (2)
58:21;59:1
hard (2)
49:6,6
head (2)
5:2;40:16
heads (1)
10:11
hear (1)
5:8
heard (1)
54:2
hearing (29)
46:9;47:3,9,11,16,
19;48:6;49:16,18;
50:9,12;51:1,4,12,13,
21;53:4,13,19;54:3;
57:24;58:22;59:5,12;
63:12,14,16;64:5;
65:15

hearings (2)
49:21;64:12
held (1)
63:15
helped (2)
11:10;36:14
herein (1)
4:3
hey (1)
16:13
hide (1)
15:13
High (12)
6:11;7:22;8:20,23;
9:6;11:2,15,19,22;
18:21;42:11;65:24
himself (2)
27:10;50:1
hired (1)
7:10;8:1
home (8)
19:13;20:23;21:10;
27:3;42:10;51:23;
52:1,2
honest (4)
32:18;38:23,24;
42:1
honestly (4)
25:22;32:17;38:19;
39:17
hooked (1)
19:6
hour (12)
29:1;30:12,12,13,
15,16,17,23;31:1,3,
14,18
hours (2)
23:8;31:10
Huh (1)
51:19
hundred (1)
65:10

**I**

idea (6)
18:12;23:18;34:15;
49:14;61:13;65:16
identified (4)
33:8,19;55:16;
60:18
identifying (2)
58:4;63:9
Illinois (4)
5:22;6:17,23;7:1
immediately (2)
14:10,11
implemented (1)
13:20
implicate (1)
28:18
implicating (1)
37:20

important (2)
4:19
incident (3)
27:18;33:8;36:10
included (1)
11:8
indicate (11)
29:1,4,7;39:5,9;
41:7,9,12,15;52:24;
58:11
indicated (1)
39:11
indicates (1)
55:16
information (5)
46:8,14;51:9,11;
57:8
ingested (4)
40:19;41:1,16;67:9
ingesting (1)
41:19
initially (1)
37:10
inside (1)
15:24
interaction (3)
35:3,5;36:3
interactions (1)
37:1
interested (1)
60:2
interrogation (1)
15:3
interrogatories (1)
54:18;55:7
interrogatory (5)
54:21;56:2;58:11;
59:22;62:3
interview (5)
14:14;18:16;28:11;
33:16;39:14
interviewed (6)
34:19;38:4;43:2,18;
44:12;45:17
interviews (2)
60:17,20
into (6)
28:22;43:9;44:22,
23;49:7;63:11
introduced (1)
63:11
investigated (1)
25:2
investigating (2)
21:11;24:10
investigation (3)
12:1;43:4;48:11
invited (1)
49:20
involve (1)
50:1
involved (5)
11:24;33:23;43:23;

(3) extension - involved

52:14;56:8
**involving (1)**
49:22
**Iroquois (2)**
6:3;65:24
**issue (1)**
25:1
**itemized (1)**
23:16

## J

**JAMES (3)**
4:2,10,12
**Janet (1)**
5:20
**January (24)**
10:13,18;11:5,9;
12:14,20;13:5;17:21;
19:23;27:18;29:5;
30:2;36:7,10,16;37:4;
41:21;43:4;45:2,6;
46:1;53:17;62:17;
67:4
**jbunt@watseka-u9k12ilus (1)**
19:5
**job (1)**
6:14
**Joliet (1)**
6:17
**Junior (1)**
6:17
**juniors (1)**
35:19

## K

**keep (2)**
51:23;52:3
**kept (3)**
26:3;32:21;33:2
**kids (4)**
5:16,17;32:7;35:11
**knew (2)**
33:13;44:4
**knowing (1)**
30:10
**knowledge (8)**
11:1;25:15,21;43:8;
44:11;58:1,14;65:17

## L

**landline (1)**
22:14
**laptop (1)**
19:1
**last (13)**
6:6;9:5,12;21:19,
21;24:11;28:11;
30:22;43:2,18;44:12;
45:17;58:12
**lasted (1)**

28:12
**later (3)**
16:19;37:9;44:10
**law (2)**
9:9;19:20
**laws (1)**
66:21
**learn (13)**
12:19;13:8,10;16:9;
26:21,23;27:5,9;
28:21;44:6;47:10;
53:15;55:17
**learned (7)**
12:20;13:5,17;14:3,
4;45:15;47:18
**least (1)**
59:24
**leave (5)**
23:8;24:1;25:9;
32:22;46:22
**leaving (1)**
36:12
**Lee (21)**
10:12;20:2,6,8,9;
24:7;43:17,19;46:12,
19;47:7,15;48:9;49:2,
7,8,12;51:3;66:6,9,12
**left (7)**
24:6;25:11,12;
27:15;42:19,23;46:13
**letter (4)**
59:14;63:8,14,15
**level (3)**
8:16;11:15,16
**license (1)**
60:24
**line (4)**
22:18,20,23;58:3
**list (12)**
26:17;28:15;33:10;
34:14;37:17;49:22;
52:19;53:1,8;56:4,15;
59:24
**litigation (1)**
52:15
**little (6)**
15:14;16:18;25:16;
31:3,12;65:20
**live (3)**
5:11,15,21
**locker (1)**
16:15
**logical (1)**
18:3
**long (9)**
5:6;7:14;24:6;26:7;
28:11;31:16;39:18;
40:11;59:3
**longer (1)**
31:12
**look (8)**
43:15;45:4,12;
48:15;52:9,17,21;

65:21
**looked (5)**
15:24;21:24;26:14;
29:17;56:6
**looking (3)**
55:20;56:2;66:20
**looks (7)**
17:9,14;47:21,22;
48:1;51:16;66:12
**lots (2)**
35:11;45:22
**Lucas (34)**
13:11,17;14:3,10,
23,24;16:12;17:18;
24:19,22;25:18;
31:23;33:14;34:17;
37:6;38:10,12,13,20;
39:2,5,9,20;40:3,9;
42:22;44:1,23;48:9,
13,19,24;53:22;62:8
**Lucas's (5)**
14:16;30:6;37:3,13;
61:18
**lunch (13)**
13:12,15;14:6;29:1;
30:11,14,14,15;31:10,
11,11,14;33:21
**lunchroom (1)**
33:7
**lunchtime (2)**
13:9;14:19

## M

**machine (1)**
23:5
**main (1)**
32:5
**manual (1)**
66:15
**many (7)**
12:9;16:5;36:21;
41:12,15;43:22,23
**Master's (3)**
6:23;7:4;8:8
**material (1)**
45:8
**materials (1)**
44:11
**matter (5)**
12:2,3;42:22;52:14;
67:8
**matters (4)**
8:4,13;11:8;55:11
**may (2)**
5:2,4
**maybe (2)**
18:3;24:5
**McKay (2)**
52:20;60:9
**mean (7)**
5:2;11:23;40:19;
47:22;51:7;56:16,20

**medicine (1)**
40:17
**meet (2)**
36:21;45:21
**meeting (7)**
10:5;46:6,20;48:18;
53:23;59:14;63:12
**members (3)**
10:1,2,12
**memoranda (1)**
44:1
**memorandum (1)**
48:19
**mentioned (5)**
39:13;46:16;54:5,
13,14
**messages (1)**
23:6
**met (5)**
22:2,3,4;45:19;46:2
**Michael (8)**
26:24;29:7;34:2,4,
14;52:20;55:18;60:9
**Michael's (2)**
22:9;59:24
**middle (7)**
4:11;7:19,21;8:11,
16,19;11:16
**might (3)**
42:12;47:23,23
**Mike (1)**
25:5
**Military (1)**
36:13
**mind (1)**
67:15
**minute (1)**
20:15
**minutes (9)**
10:9,9;28:12;31:6,
9,13,15,17,19
**missed (2)**
12:3;48:16
**mom (2)**
42:2,2
**Monday (1)**
44:9
**money (8)**
15:16,17;16:20;
17:2;18:1;53:2,9;
56:15
**month (1)**
9:4
**more (1)**
25:4
**mother (2)**
27:3;54:11
**mother's (1)**
29:8
**Mrs (2)**
37:9;42:23
**M's (12)**
21:23;27:24;28:15;

37:19;39:13;49:22;
53:1,8;56:4,4;58:4;
59:24
**much (4)**
5:7;15:17;31:10;
52:18
**Myself (1)**
50:13

## N

**name (12)**
4:9,11;5:19;6:6,9;
27:6,7;39:13;61:18,
19;63:9;64:7
**named (1)**
21:12
**names (10)**
15:15;16:19;17:10;
26:17;29:20;34:13;
37:17;52:19;53:2;
56:5
**narcotic (2)**
27:8,13
**nature (1)**
38:18
**necessarily (1)**
55:21
**necessary (1)**
14:1
**need (7)**
5:1,8;12:17;25:4;
31:9;38:24;46:11
**needs (2)**
10:6;32:22
**network (1)**
19:7
**new (1)**
66:21
**next (2)**
4:23;56:14
**night (1)**
51:13
**ninety (1)**
65:10
**Noah (50)**
4:18;21:19;28:8,15,
18;30:4;31:22;32:1;
34:24;35:13,15;37:3,
6,14,16,19,20,23;
38:2,9,13,16,20;39:6,
9;40:1,3,7,12;41:19;
42:22,23;49:16,23;
50:12;51:4;53:16,22;
54:11;55:23;56:16,
17,18;58:7;59:12,15;
60:18;62:17;63:5;
67:8
**Noah's (12)**
36:6;42:15;51:12;
52:10;55:22;56:19,
21;57:10,11;58:8;
64:6;67:3

**Nodding (1)**
63:22
**none (1)**
60:17
**normal (1)**
22:17
**note (2)**
58:12,19
**notes (1)**
43:2
**notice (9)**
26:16;42:7,14;54:8;
62:16,24;63:2;66:7,8
**notices (2)**
29:24;43:10
**notified (1)**
20:16
**number (9)**
18:8,9,11;22:16,17,
24;23:13,16;39:10
**numbers (2)**
37:17;52:19
**numerous (1)**
28:15

**O**

**Objection (2)**
34:3;57:12
**observe (1)**
13:14
**observed (1)**
57:2
**obtained (1)**
29:10
**Obviously (1)**
29:20
**occasion (5)**
8:12;11:7;13:3,19;
36:4
**occur (1)**
11:14
**occurred (3)**
44:2;45:2,6
**off (4)**
15:23,24;16:10,11
**offenses (1)**
12:16
**office (25)**
14:16;18:24;22:14;
23:3,8,9;24:16;30:5,6,
6;32:3,4,5,9;35:10,12;
36:5;37:4,13;46:8;
52:3,7;65:3,5,21
**officers (1)**
55:18
**Once (2)**
5:6;24:5
**one (35)**
8:9;9:4;17:19;
19:13;21:19,21;22:1,
14;23:8,9;25:10;
27:24;28:6;31:24;

34:2,7,10;38:6;45:11;
49:24;50:2;52:6;53:9;
54:9;55:20;59:7,20,
21;61:18,22;63:1;
64:7,14;65:9,9
**one-on-one (1)**
36:4
**ones (7)**
20:10;21:20;26:11;
34:19,21;48:11;54:24
**only (6)**
20:1;26:12;35:14;
55:22;60:15;63:5
**order (5)**
21:17;33:4,6;34:13,
16
**ordinary (2)**
13:15;37:1
**organization (1)**
66:18
**original (3)**
17:16;18:18;33:7
**out (22)**
7:10;13:14,19,22;
14:21;15:23;16:10,
23;17:15;27:3;28:3,5,
8;30:7,11;36:15;37:1;
38:17;45:11;48:6;
50:24;65:11
**Outside (3)**
35:4,5;42:2
**over (4)**
5:17;25:3;26:1;
48:16
**owed (4)**
15:17;16:20;53:2,9
**owing (1)**
56:15
**own (1)**
55:22

**P**

**package (10)**
51:11,14,15,16,17,
18,20;52:21;53:3;
54:10
**packet (4)**
45:10;51:9;53:5,6
**page (4)**
54:23;55:14;56:14;
64:11
**pages (2)**
55:3;66:3
**paper (8)**
15:15;16:18,23;
17:10,14,17,21;26:5
**paperwork (1)**
30:2
**parent (2)**
20:16;46:1
**parents (2)**
45:19,22

**part (1)**
58:12
**participate (2)**
10:5;11:7
**participated (1)**
12:10
**parts (1)**
63:21
**pass (3)**
14:5;32:20,24
**passing (1)**
31:16
**pays (1)**
66:18
**people (6)**
15:16,18;25:4;
38:23;59:23;60:7
**period (5)**
30:11,22;31:12,13,
14
**periods (1)**
31:16
**person (3)**
33:16,19;44:13
**Personally (1)**
67:7
**pertain (1)**
63:21
**pertaining (1)**
45:22
**phone (11)**
18:8,9,11;22:20;
23:10,15,19,24;24:16;
45:21;46:6
**photocopy (2)**
17:9;64:17
**physical (1)**
56:8
**piece (7)**
15:14;16:18,23;
17:10,14,20;26:5
**pill (1)**
53:24
**pills (60)**
12:24;13:2,6,18;
14:5,9;15:7,12,17,18;
16:1,3,5,6,9,13,20;
17:4,24;18:1;19:24;
20:21;22:6,7;24:8;
25:2,23;26:1,21,23;
28:21,22;29:5;33:10,
17,20,24;34:11;
37:20;38:2,6;39:3,7,
10;40:14,18,19,21;
41:2,5,7,10,12,15,19;
53:16;56:8;58:5;
63:10;67:9
**place (4)**
14:15;32:23;47:14;
49:21
**placed (1)**
32:7
**Plaintiff's (2)**

61:15;67:3
**please (1)**
4:9
**pm (2)**
4:1;67:21
**pocket (1)**
16:24
**pockets (2)**
15:23;16:17
**police (14)**
25:3,5,8,14;26:1,6,
10,16;27:10,12,15,17,
20;55:18
**policies (9)**
10:13,21,24;12:15;
64:21,23;65:7,11,14
**policy (7)**
9:10,18;10:7;64:20;
65:2,5,6,9,19,22;
66:15,19
**position (1)**
7:17
**positive (2)**
21:22;26:19
**possession (5)**
17:16;28:21,22;
29:1;67:14
**possibly (2)**
35:15;52:9
**potential (1)**
12:16
**Power (1)**
44:20
**premises (2)**
46:23;67:10
**prepare (2)**
43:2;44:1;66:13
**prepared (8)**
21:3,5;29:23;42:15,
21;43:11;48:4;64:1
**preparing (1)**
67:7
**prescription (1)**
29:8
**present (6)**
13:12;15:1;25:18,
18;37:6;53:23
**Press (1)**
66:17
**pretty (4)**
5:7;31:10;43:20,21
**principal (7)**
6:11;7:20,21,22;
8:1,11;12:10
**printed (1)**
45:11
**printout (1)**
45:8
**prior (12)**
9:7;11:5,9;13:3;
28:15;36:7,16;38:13;
51:4;57:24;62:18;
65:14

**Probably (16)**
15:4;24:9,13,14,24;
28:13;30:21;31:21;
35:11;38:22,24;48:1,
9;51:5,6,8
**problem (1)**
24:8
**problems (1)**
36:9
**procedure (1)**
13:24
**procedures (8)**
8:18;9:14;10:14,21,
24;11:4;12:15;13:20
**proceed (1)**
28:4
**proceeded (1)**
27:23
**proceedings (1)**
49:17
**process (1)**
46:18
**prom (4)**
35:16,17,21;36:2
**provide (5)**
18:14;22:11;64:23;
66:5,19
**provided (16)**
21:6,14;26:6;29:17;
34:14;37:16;39:6;
45:9;51:3;54:11;
56:17;63:5,10;65:14;
66:6,9
**provider (1)**
23:19
**provides (2)**
23:11,19
**providing (1)**
48:12
**public (3)**
7:5;61:1;65:17
**pull (5)**
13:19;15:22;28:3;
66:2,3
**pulled (3)**
13:21;28:5,8
**put (7)**
16:1;28:6;32:9;
45:9;49:7;51:9,12

**R**

**random (1)**
34:20
**rarely (1)**
24:4
**rate (1)**
17:24
**read (8)**
5:3,11;55:6,7;
56:11,11;63:19,21
**real (1)**
63:9

really (1)
  25:13
reason (5)
  32:20;33:2;34:20;
  40:16;53:7
recall (7)
  8:9;9:15;16:21;
  39:4;45:23;59:13;
  60:19
receive (7)
  7:2;19:9,17;28:24;
  47:13;57:4;61:6
received (16)
  29:1,4;40:13;41:3,
  4,7,9,13,23;53:16,23;
  55:23;57:19,21;
  60:16,16
receiving (5)
  33:20;34:11;37:20;
  39:3;41:19
recollection (2)
  12:17;39:20
recommendations (2)
  9:19;10:6
record (5)
  30:9;32:21;33:2;
  36:6;52:10
recorded (1)
  18:16
recording (1)
  37:12
records (1)
  10:8
reference (1)
  52:4
referred (3)
  59:11,14;67:5
referring (2)
  12:22;51:15
refers (1)
  65:9
reflecting (1)
  43:3
refresh (1)
  12:17
regardless (1)
  50:21
relate (1)
  55:21
related (1)
  33:14
relates (1)
  42:15
relating (7)
  8:4;10:14;19:23;
  37:13;44:17,21;45:5
relative (1)
  20:21
relatives (3)
  5:21;6:3,6
remember (87)
  7:3,24;14:17,22;
  15:5,7,9,12;16:12,16;

17:6,7,8,18;18:2,4;
20:12,24;21:17;
24:17,20,23;25:10,13,
16,20,22;27:6,7,8;
28:8,19,23;29:3,6;
31:23;32:6,14,18;
34:12;35:13,14,20;
38:19;39:8,12,15,17,
18,23,24;40:7,8,10,
23;41:6,8;42:8,17,20;
43:15;45:10;47:12;
48:7,12,14,20;49:1,3,
4,5,9;50:13,16,20,23;
51:2,24;54:4;58:20;
59:1,2,20,21;61:3;
63:15,17
remove (1)
  33:1
removed (3)
  32:12,12,19
removing (1)
  32:16
repeat (2)
  5:10;26:22
replied (1)
  40:1
reply (1)
  40:3
reported (1)
  33:10
reportedly (1)
  34:11
reporter (6)
  4:18;5:11;33:7,20;
  59:8,9
request (3)
  18:6;36:19;61:16
requests (1)
  62:13
reserve (1)
  67:20
respect (1)
  28:20
responds (1)
  40:12
response (2)
  62:19,23
responses (3)
  5:1;61:15;62:13
rest (2)
  28:10;42:10
result (2)
  36:1;48:23
retrieved (2)
  14:20;31:22
return (1)
  23:7
review (12)
  13:20;47:19;49:16;
  50:12;51:4;53:4,13,
  19;54:3;59:5;65:15;
  66:8
reviewed (1)

59:4
Right (11)
  7:6;24:9,13;25:17;
  34:1;39:17;42:8;
  48:16;57:17;59:16;
  66:20
Ripley (1)
  6:10
role (2)
  11:21,23
room (1)
  25:19

                    S

same (14)
  4:20;5:7;8:18,21,
  22;28:3,10;29:16;
  46:17;51:16;58:3,6;
  59:23;64:10
sat (1)
  11:10
saw (2)
  14:5;33:23
saying (3)
  30:19,23;35:22
scanned (4)
  20:2,5,7,9
schedule (1)
  30:10
School (66)
  6:12;7:7,19,21,22,
  24;8:12,16,19,20,23;
  9:3,6,21;10:1;11:15,
  16,19,22;12:7,24;
  13:6,18;14:12;17:24;
  18:21;19:24;20:18,
  23;21:10;22:11,17,
  23;24:8;25:2,15;
  27:15;29:3,8;35:1,2,4,
  6,8;37:9,21;39:3,7;
  41:23;42:10,11;
  43:19;44:20;45:9,11,
  12;53:3,17;54:21;
  56:9;59:11,14;63:11;
  65:4,24;67:10
schools (1)
  66:21
search (5)
  15:11;16:15;37:23;
  38:3,7
searched (2)
  14:8;15:19
second (6)
  30:15;33:19;34:10;
  55:14,14,20
Secretaries (1)
  23:6
seeing (2)
  33:10;35:8
selection (1)
  34:21
semester (1)

45:13
seminars (1)
  8:7
send (3)
  19:9,17,22
seniors (1)
  35:20
sense (1)
  48:21
sent (6)
  20:1,2,5,7,9;49:8
separate (1)
  28:6
sequence (1)
  21:17
sequestered (1)
  32:1
serious (3)
  12:2,5,7
server (1)
  19:18
service (2)
  23:20;66:18
set (1)
  46:19
seven (1)
  65:9
shake (1)
  5:2
share (3)
  46:8,15;48:8
shared (1)
  49:12
shoes (1)
  15:23,24;16:2
showed (4)
  20:11;37:22;50:13;
  56:24
shown (2)
  37:16,19
sign (1)
  49:10
signature (3)
  62:5,6,11
signed (5)
  42:18,19;55:10;
  61:23;62:12
signs (2)
  17:10;26:18
simply (1)
  52:14
slot (1)
  31:1
sock (4)
  16:7,10,10,11
socks (3)
  15:12;16:1,2
somebody (9)
  12:23;13:6,18;
  14:20;23:24;52:6;
  57:9;65:19;67:14
somehow (2)
  16:11;49:6

someone (4)
  14:5,6;23:2;35:23
Somewhere (2)
  6:20;13:9
Sorry (7)
  26:22;55:19;58:17;
  59:22,24;60:11;62:10
sounds (1)
  54:1
source (1)
  53:15
spaces (1)
  32:10
speak (7)
  4:20;17:23;21:13;
  27:17;38:14;40:1;
  43:17
speakerphone (1)
  42:6
speaking (1)
  20:15
specialist (1)
  6:24
specialist's (1)
  7:4
specific (6)
  8:9;22:24;45:24;
  48:14,19;64:7
specifically (6)
  10:15;23:9;39:2,13;
  56:17;59:2
spoke (11)
  21:18;28:14,14;
  29:11;32:2;34:2,7,10,
  21;38:11;39:21
spoken (1)
  24:12
Sprint (1)
  23:21
start (3)
  7:5,12;65:11
started (1)
  21:11
state (3)
  4:9;9:9;19:20
stated (1)
  53:22
statement (32)
  17:7;18:5,6,7;
  21:14,23;22:9;23:16;
  26:5,8,9,11;27:24;
  29:12,18;37:19;39:6;
  43:10;50:24;52:20,
  22,23;53:1,8;56:4;
  57:17;58:4;59:10,17;
  62:16,20;63:8
statements (3)
  18:14;29:10;55:23;
  59:23;60:3,5,15
states (1)
  63:13
statistics (1)
  45:13

NOAH DIETCHWEILER v.
STEVE LUCAS

JAMES BUNTING
November 18, 2014

stays (1)
66:20
sticks (1)
40:16
still (3)
25:6;33:22;52:8
stopped (1)
43:19
stored (1)
19:18
straight (1)
48:10
Street (1)
5:14
strike (1)
12:19
student (67)
8:4,13,23;9:5;
10:14,17,20,21;11:1,
8,21;12:3;13:19,21;
14:5,8;15:3;17:15,23;
18:5,13;20:15,23;
21:3,12;22:2,4;24:8,
11;25:1;27:2,10,11,
14;28:22;29:15,17,
24;32:22;33:1,8,9,13,
16,19,20,23;35:2;
36:8;38:6;39:5,17;
43:2,11,18;45:24;
46:1;49:17,19,22;
50:8;52:10;54:8;63:2;
64:14;66:1,7
students (28)
11:18;16:19;17:5;
21:18,23;26:11;
27:24;28:15,20;
29:11;30:1;32:15;
33:4,8,23;37:17,20;
38:3;43:23;45:16,17;
52:19;53:1;56:15;
58:4;60:4,17;63:10
student's (4)
21:6;44:17,22;56:5
stuff (3)
20:7;64:13,15
subpart (1)
59:11
substance (3)
27:5,9;39:10
subtract (1)
31:9
summary (2)
21:1;44:2
superintendency (1)
61:8
superintendent (1)
61:3
supports (1)
62:18
sure (13)
10:16;15:10;24:20,
21;30:22;36:14;43:7,
24;48:5,9,20;51:7;

66:20
suspend (3)
22:5,8;62:19
suspended (7)
21:24;29:15;30:1;
42:10;43:12,23;46:1
suspension (33)
8:18;11:16;26:16;
42:7;44:4,7,22;46:9,
10,18;47:3,9,11,16,
19;48:5,6;49:16,18;
50:8,9,11;51:4;53:3,
13,19;54:3;59:5;
62:24;63:3;65:15;
66:8;67:16
suspensions (12)
8:15;10:15,22;11:1,
8,11,21;12:16;44:17;
45:2,5,12
swallowed (1)
40:21
sworn (1)
4:3
system (3)
19:16;44:16,22

**T**

table (1)
64:17
tabs (2)
64:17,18
TAGUE (14)
4:8;27:4;34:6;
54:19;57:15;58:13,
15,19;60:14,23;62:2,
9;66:22;67:19
talk (2)
25:4;28:6
talked (5)
38:23;56:4,9;61:22;
62:3
talking (1)
21:11
teacher (4)
7:12,14,16;32:23
tech (1)
19:19
telephone (1)
22:12
telling (2)
41:1;47:13
tells (1)
14:10
ten (2)
64:19;65:10
test (1)
46:17
testified (1)
4:5
testify (1)
53:22
thanked (1)

41:24
thought (3)
13:23;36:24;40:17
three (3)
5:16;37:10;64:21
throughout (2)
9:20;45:22
times (3)
11:15;36:21,23
today (2)
4:17;47:24
together (3)
45:9;51:9,12
told (17)
15:16,18;16:19;
24:23;26:24;27:11,
12;32:11,14;33:13;
39:17;40:4,13;42:6;
46:9;47:16;57:9
took (12)
8:10;16:10,11;
17:16;20:22;21:10;
26:24;27:2;31:18,19;
41:3;49:21
training (1)
8:3
transcript (2)
5:3;59:4
tried (1)
42:9
true (1)
55:11
truth (3)
4:4,4,5
try (2)
4:21,23
trying (1)
15:13
turn (2)
54:23;56:14
turned (2)
26:1;61:14
turning (1)
25:3
two (9)
7:4;16:6;26:13;
32:10;33:8,23;52:18;
65:10,10
type (8)
16:3;36:4;39:9;
46:14;48:7;61:2,3,4
typed (2)
48:1;49:5
typically (1)
11:24

**U**

Ultimately (17)
18:5;20:14;21:2;
30:4;37:3;40:3;43:1,
11;47:19;49:15;50:5;
52:15;55:3,6,10;

56:11;61:21
Um-hum (5)
8:14;19:3,8;52:16;
55:5
University (3)
6:17,24;7:1
Unless (1)
45:10
unusual (2)
12:20,24
up (8)
16:12;19:6;25:11;
43:1;46:19;48:7;
50:14;58:18
upheld (1)
50:9
upper (1)
35:22
used (5)
32:10;34:3;61:19;
64:11,14
Usually (2)
12:2;26:9
utilized (1)
63:14,15;64:5

**V**

validated (1)
67:15
verbal (2)
5:1;60:15
verbatim (4)
4:19;40:7,9,10
verification (2)
55:4,11
verified (1)
56:12
version (1)
64:16
vicinity (1)
6:4
voicemail (5)
23:3,7,22;24:1,5

**W**

wait (2)
4:21,23
wants (1)
46:18
Watseka (16)
5:12,14;6:5,11;
7:11,12,19;8:23;11:2,
22;12:11,24;13:2;
18:21;36:13;42:11
way (2)
59:20,21
week (1)
24:5
weren't (1)
66:13
whenever (1)

44:9
Whereupon (1)
60:21
white (1)
16:6
whole (1)
4:4
whose (1)
18:11
wife (1)
5:16
wife's (1)
5:19
witness (1)
4:3
word (2)
34:3;66:20
words (3)
15:8;42:12;46:13
work (3)
7:8;24:4;42:9
Worked (1)
7:9
working (1)
52:13
write (3)
18:13;23:6;32:23
writing (3)
21:5;63:6,7
written (14)
18:6;21:1,2;29:10,
12;37:19;39:6;43:9;
44:11;52:20;53:1;
60:3,5;62:16
wrote (5)
17:8;18:5,8,9;50:24

**Y**

year (11)
6:15;7:9,10;9:3,7,8,
10;11:16;12:12;
42:11;45:22
years (4)
7:4,16;19:14;61:8

**0**

01/14/71 (1)
4:16

**1**

1 (6)
51:14;54:10;63:2;
64:2,16;65:11
10 (4)
47:19;50:17;54:5;
67:3
12 (3)
21:2,7;29:17
12:36 (1)
4:1

Min-U-Script®

**15 (2)**
  28:12;59:22
**18 (2)**
  5:17;59:22

**2**

**2 (3)**
  54:16,20;65:11
**2:23 (1)**
  67:21
**2:35 (2)**
  31:3,6
**20 (1)**
  28:12
**2000 (2)**
  7:3;61:7
**2012-2013 (3)**
  8:24;9:7;11:22
**2013 (21)**
  10:13,18;11:5,9,11;
  12:14,21;13:5;17:21;
  19:23;27:18;30:2;
  36:7,16;37:4;43:4;
  45:2,6;62:12,17;
  63:16
**2015 (1)**
  53:17
**23 (2)**
  11:5,9
**24 (1)**
  67:4
**24th (6)**
  54:5,7,13,14,15;
  67:9
**25 (15)**
  12:21;13:5;17:21;
  19:23;27:18;29:5;
  30:2;37:4;41:21;43:4;
  45:2,6;46:1;53:17;
  62:17
**25th (5)**
  29:2;45:17;54:11;
  63:6;67:9
**26 (1)**
  62:12

**3**

**3 (3)**
  17:9;31:3,17
**3:05 (1)**
  31:4
**3:10 (1)**
  31:4
**30 (1)**
  31:14
**383-9130 (1)**
  23:14

**4**

**4 (3)**

31:17;56:2;66:1
**432-2486 (1)**
  22:17
**432-6 (1)**
  22:21
**432-6885 (1)**
  22:19
**48 (5)**
  31:6,9,13,13,14

**5**

**5 (6)**
  61:14;62:16;63:16;
  65:15;66:7,9
**50 (1)**
  31:19
**51 (1)**
  31:19
**544 (1)**
  5:14
**5th (7)**
  5:14;30:12,13,16,
  19,23;31:8

**6**

**6 (2)**
  66:8,11
**6881 (1)**
  22:22
**6883 (1)**
  22:22
**6th (6)**
  30:13,15,16,19,24;
  31:8

**7**

**75 (1)**
  61:2
**7th (3)**
  30:17,20;31:5

**8**

**8 (1)**
  58:11
**815 (3)**
  22:17,19;23:14
**8th (7)**
  30:17,20,21,23;
  31:1,3,18

**9**

**9 (3)**
  58:3;61:4;63:8
**94 (1)**
  6:20
**95 (3)**
  6:20;7:6;61:7