# In The Matter Of:
*DIETCHWEILER v.*
*STEVE LUCAS ET AL*

*KENNETH LEE*
*October 17, 2014*

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Original File 1017LEEK.txt
Min-U-Script® with Word Index

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  STATE OF ILLINOIS

 3
     NOAH DIETCHWEILER, by MICHAEL      )
 4   DIETCHWEILER, his father and       )
     next friend, and ANN DIETCHWEILER) )
 5      Plaintiffs,                     )
                                        )
 6        vs.                           ) No. 2013-CV-2062
                                        )
 7   STEVE LUCAS, in his official and   )
     individual capacities;             )
 8   JAMES BUNTING, in his official     )
     and individual capacities;         )
 9   KENNETH LEE, in his official       )
     and individual capacities;         )
10   IROQUOIS COUNTY COMMUNITY UNIT     )
     SCHOOL DISTRICT NO. 9, IROQUOIS    )
11   COUNTY ILLINOIS; JAMES BRUNS,      )
     in his official capacity; DON      )
12   BECKER, in his official capacity;  )
     BRENNA JOHNSON, in her official    )
13   capacity; CRYSTAL BLAIR, in her    )
     official capacity; BOB BURD, in    )
14   his official capacity; KIRK        )
     McTAGGART, in his official         )
15   capacity; and DEE SCHIPPERT,       )
     in her official capacity,          )
16      Defendants.                     )
17   -----------------------------
18
19            DEPOSITION OF KENNETH LEE
                  October 17, 2014
20                   10:52 AM
21
22
23        June Haeme:  RMR, CRR, CSR # 084-003038
24     Area Wide Reporting and Video Conferencing
                301 West White Street
25            Champaign, Illinois  61820
                   800.747.6789
```

---

**Page 2**

```
 1                    INDEX
 2
 3   APPEARANCES:
 4   For the Plaintiff:
          Michael Tague
 5        Attorney at Law
          Flynn, Palmer & Tague Law Offices
 6        402 West Church Street
          P.O. Box 1517
 7        Champaign, IL  61824-1517
          217.352.5181
 8        fpt5law@aol.com
 9   For the Defendant:
          Shari D. Goggin-Ward
10        Attorney at Law
          Law Offices of Lawrence Cozzi
11        27201 Bella Vista Parkway, Suite 410
          Warrenville, IL  60555-1619
12        630.393.2145
          shari.goggin-ward@libertymutual.com
13   Also Present:
          Michael Dietchweiler
14
15   EXAMINATION BY:
          Mr. Tague................  5, 80
16        Ms. Goggin-Ward..........  75
17
18   EXHIBITS:
          Exhibit No. 10...........  32
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1              CERTIFIED QUESTIONS
 2   Page 59:
     BY MR. TAGUE:
 3        Q.  Did you approve the protocols?
 4   Page 61:
     BY MR. TAGUE:
 5        Q.  Ultimately the school board came back and
     made a decision.  Did you make any recommendation as
 6   to the disposition --
          MS. GOGGIN-WARD:  Objection to any --
 7        Q.  -- prior to them making that
     determination?
 8
     Page 66:
 9   BY MR. TAGUE:
          Q.  Okay.  Do you know what standard of proof
10   the school district adopted in determining whether
     or not Noah was in possession of pills?
11
     Page 87:
12   BY MR. TAGUE:
          Q.  Okay.  The drug testing results that were
13   presented, was there any discussion about whether or
     not those testing procedures were proper or improper
14   or fallible or infallible?
          A.  With who?
15        Q.  Well, with anyone.
          A.  Well, with myself and legal counsel.
16        Q.  Okay.  And did that occur prior to the
     hearing or after?
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1                 STIPULATION
 2
 3        IT IS HEREBY EXPRESSLY STIPULATED AND
 4   AGREED by and between the parties that the
 5   deposition of KENNETH LEE may be taken on October
 6   17, 2014, at the Iroquois County CUSD #9, 1411 West
 7   Lafayette Street, Watseka, Illinois, pursuant to the
 8   Rules of the Federal Court and the Rules of Federal
 9   Procedure governing said depositions.
10
11
12        IT IS FURTHER STIPULATED that the
13   necessity for calling the Court Reporter for
14   impeachment purposes is waived.
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1          (Commencing at 10:52 a.m.)
2          KENNETH LEE,
3  having first been duly sworn, testified as follows:
4          EXAMINATION BY
5      MR. TAGUE:
6      Q.  Would you please state your full name?
7      A.  Kenneth Christopher Lee.
8      Q.  Let the record reflect that this is the
9  deposition of Kenneth Lee taken pursuant to the
10 applicable Federal Rules of Civil Procedure.
11          Have you ever had your deposition taken
12 before?
13     A.  No, sir.
14     Q.  Have you ever testified in court before?
15     A.  No, sir.
16     Q.  I'm going to give you a few rules of
17 procedure so that we can do this as efficiently as
18 possible.  I'm going to ask you questions.  She's
19 going to take down the questions and the answers
20 verbatim.  I need to have all of the dialogue
21 verbal.  If you shake your head, we may know what
22 you mean here, but we wouldn't be able to read it
23 back.
24     A.  Yes, sir.
25     Q.  So if you indicate something that isn't

Page 6

1  clear if we read it back, I'll ask you to give a
2  response that we can all know what you mean.
3          If at any time you don't understand a
4  question I ask you, tell me, I'll be happy to
5  rephrase it or we can have the court reporter read
6  the question back.  If -- the other thing that we
7  need to make sure that we're doing, we can't talk at
8  the same time.  She can only take one person down at
9  a time.  So I will ask my questions, I'll try not to
10 start another question until you're done answering,
11 and you need to try not to start your answer before
12 I'm done asking the question.
13          Do you have any questions about those
14 procedures?
15     A.  No, sir.
16     Q.  If you need to take a break for any
17 reason, let us know.  We don't think have any time
18 constraints, so we will try to get this done as
19 quickly as possible, but we don't need to make
20 things uncomfortable for anybody.
21          What is your address and telephone number?
22     A.  Personal?
23     Q.  Well, the -- let's start your business
24 address is what?
25     A.  1411 West Lafayette Street, Watseka,

Page 7

1  Illinois.
2      Q.  And your telephone number?
3      A.  815-432-4931.
4      Q.  Where do you live?  Where is your
5  residence?
6      A.  445 South Sixth Street, Unit B, Watseka,
7  Illinois.
8      Q.  What's the last four digits of your social
9  security number?
10     A.  8705.
11     Q.  Who do you reside with?
12     A.  Myself.
13     Q.  Do you have any adult relatives in the
14 immediate vicinity, let's say within a hundred mile
15 radius?
16     A.  Yes.
17     Q.  Do any of them have a last name other than
18 Lee?
19     A.  Yes.
20     Q.  Could you tell me what families we could
21 bump into if they would be called for jury duty?
22     A.  How big of -- a hundred miles from here?
23     Q.  Yes.
24     A.  Okay.
25     Q.  You have a big family?

Page 8

1      A.  Well, no, but I was born and raised in
2  Paxton, Illinois.
3      Q.  Okay.
4      A.  So Lee, Johnson, Kirk, Ross.
5      Q.  Are those all names of sisters who have
6  married names or --
7      A.  Are you talking -- oh, you meant
8  immediately, just like my mother, father and
9  brother?
10     Q.  Okay, you have a mother, father and
11 brother?
12     A.  Yes, that's it.
13     Q.  And the relatives --
14     A.  Those were cousins, I'm sorry, sir.
15     Q.  Okay.  So those are cousins, okay.  The --
16 do you currently hold any elected public office?
17     A.  No.
18     Q.  Have you ever held an elected public
19 office?
20     A.  No.
21     Q.  The -- you currently are superintendent of
22 Iroquois Community Unit School District No. 9?
23     A.  Yes.
24     Q.  If I refer to it as the Watseka School
25 District or the school district, will that be okay

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

Page 9

1 with you?
2 A. Yes.
3 Q. When did you become the superintendent?
4 A. July 1st, 2010.
5 Q. Who was -- the Board of Education
6 ultimately hired you, correct?
7 A. Yes.
8 Q. Who was on the Board of Education when you
9 were hired?
10 A. Scott Watts was board president, Bob Burd
11 was board vice-president, Don Becker was the
12 secretary of the Board of Education. Members were
13 James Bruns, Jim Reynolds, Crystal Blair.
14 Q. Okay.
15 A. And I'm missing one.
16 Q. Current member?
17 A. Is that seven?
18 Q. I didn't count them either.
19 A. Okay.
20 Q. What year were you hired?
21 A. 2010.
22 Q. Had you been employed in the Watseka
23 schools prior to that time?
24 A. No.
25 Q. Where were you employed prior to?

Page 10

1 A. McLean County School District No. 5.
2 Q. Okay. Is this the first superintendent's
3 job that you've had?
4 A. Yes.
5 Q. Okay. What's the extent of your formal
6 education?
7 A. I have a bachelor's degree from Eastern
8 Illinois University, a master's degree from Illinois
9 State University, and educational specialist degree
10 from Eastern Illinois University.
11 Q. Did you have all of those in January 2013?
12 A. Yes.
13 Q. What was your first job after you
14 completed your formal education?
15 A. My educational specialist degree, the last
16 degree I have?
17 Q. Well, let's say did you become a school
18 teacher at some time?
19 A. Yes.
20 Q. When was that?
21 A. Fall of 1999.
22 Q. And did you take your first job while
23 continuing education or had you completed all the
24 education?
25 A. No, I continued education through my

Page 11

1 teaching career and obtained those last two degrees
2 while teaching and being an administrator.
3 Q. Okay. How long did you teach before going
4 into administration?
5 A. Six years.
6 Q. Where was that at?
7 A. Normal Community West High School and
8 Normal Community High School.
9 Q. Okay. What did you teach?
10 A. Business.
11 Q. And you ultimately moved from teaching to
12 administration?
13 A. Yes.
14 Q. What was your first administrator's job?
15 A. I was assistant principal at Kingsley
16 Junior High School.
17 Q. Prior to becoming assistant principal, had
18 you while you were a teacher been involved in any
19 disciplinary matters?
20 A. While I was teaching?
21 Q. Yes.
22 A. Like did I get in trouble?
23 Q. Well, let's ask that. Were you ever
24 disciplined or reprimanded in any fashion?
25 A. No.

Page 12

1 Q. Were you ever involved in any incidents in
2 which students got in trouble and you had to be
3 involved?
4 A. Well, I mean I ran my own classroom, so
5 yes. I mean I issued detentions or would write
6 discipline referrals if it were something more
7 severe than warranted a detention.
8 Q. Okay. And were you involved in any major
9 infractions in which suspensions or expulsions were
10 involved while you were teaching?
11 A. As -- as a result of a discipline referral
12 I may have filled out, a student may have been
13 suspended.
14 Q. Okay. Any of those related to drug
15 activity?
16 A. Not anything that I can remember, no.
17 Q. Okay. When you became principal at the
18 junior high school you told us about, how long did
19 you have that job?
20 A. I was an assistant principal at the junior
21 high school for two years.
22 Q. And the -- what were your duties at that
23 time?
24 A. Discipline and athletics.
25 Q. And did you have to deal with any

**Page 13**

1  drug-related matters while you were assistant
2  principal?
3     **A. On occasion.**
4     Q. The -- what was the procedure that they
5  used at the junior high when you were assistant
6  principal if someone was accused of a drug offense?
7     **A. Accused of a drug offense, we would**
8  **investigate.**
9     Q. Okay. And was there a written procedure
10  or protocol that you had relative to the type of
11  investigation that you were supposed to do?
12     **A. Yes.**
13     Q. Is it the same as Watseka's policy?
14     **A. All handbooks are a little different.**
15     Q. Okay. The -- approximately how many of
16  those would you have been involved with?
17     **A. 25.**
18     Q. Okay. Were there -- is the procedure --
19  well, let me ask you, what was the procedure? Would
20  you typically get a report from a faculty member or
21  another student that they saw something? Is that
22  how the situation usually happens?
23     **A. Sometimes, yes.**
24     Q. Okay. If that happens, the -- then back
25  when you were assistant principal, what would you

**Page 14**

1  do?
2     **A. I would call that student in and talk to**
3  **them.**
4     Q. Okay. And how would you go about -- was
5  there a set procedure, a set series of questions?
6  How would you go about doing that?
7     **A. I'd have a conversation with that student**
8  **and I'd ask him questions pertaining to the report.**
9     Q. Okay. And then what would you do once you
10  talked with the student?
11     **A. Well, it depended if it mattered, if there**
12  **was something found during that discussion that**
13  **would warrant a search or would warrant sending them**
14  **back to class or would warrant discipline.**
15     Q. Okay. You ultimately went to another job
16  or did you go to another job while you were at
17  Normal?
18     **A. Yes. After the assistant principalship at**
19  **Kingsley Junior High School, I was the associate**
20  **principal at Parkside Junior High School.**
21     Q. Okay. And what was the difference between
22  an assistant principal and associate principal?
23     **A. You went from a ten month contract to a 12**
24  **month contract and I added responsibilities**
25  **pertaining to all of the supervision of the building**

**Page 15**

1  structure as well.
2     Q. Okay. And then did you take another
3  position after that at Normal before coming here --
4     **A. Yes.**
5     Q. -- to Watseka?
6     **A. I was the principal at Parkside Junior**
7  **High School.**
8     Q. Okay. And how did your duties change
9  going to principal?
10     **A. I went from more of a management type**
11  **position to an instructional leader.**
12     Q. And then you left that principalship to
13  become superintendent here?
14     **A. Yes, sir.**
15     Q. When you came here to Watseka, what --
16  other than on-the-job training, what specific formal
17  instruction did you have in dealing with
18  disciplinary infractions of students?
19     **A. On-the-job training.**
20     Q. Okay. Have you ever had any formal
21  instruction, seminars, workshops, involving student
22  disciplinary procedures?
23     **A. Yes.**
24     Q. Before you came here to Watseka, after or
25  both?

**Page 16**

1     **A. Before.**
2     Q. Okay. And when was that and what did you
3  have?
4     **A. I -- I don't know exactly when, but the**
5  **Illinois Principals Association used to have Brian**
6  **Schwartz who is the legal counsel give seminars.**
7     Q. You don't remember any specific
8  instructional material or topics, is that a fair
9  statement?
10     **A. He would talk about student rights and**
11  **things like that.**
12     Q. Okay. Now, Watseka has a student handbook
13  that contains policies relating to student
14  discipline and disciplinary procedures, does it not?
15     **A. Yes.**
16     Q. And it's published on your website?
17     **A. Yes.**
18     Q. Printed and given to every student at
19  Watseka?
20     **A. I'm not so sure right now if it's still**
21  **printed and given to them, but I know that it's on**
22  **the website and they sign off that they'll review**
23  **it, yes.**
24     Q. Okay. When's the last time it's changed?
25     **A. We converted to the Illinois Principals**

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

Page 17

1 Associations policy alignment for the '13-'14 school
2 year.
3 Q. Okay. Now, the '13-'14 school year would
4 be the year after Noah's incident?
5 A. Yes.
6 Q. So the current version of the handbook is
7 different than the one that was in effect in January
8 and February 2013?
9 A. Yes.
10 Q. Where is the old procedures or the old
11 handbook archived in the Watseka School District?
12 A. I have a copy in my office.
13 Q. Okay. The -- and is it still available
14 electronically, do you know?
15 A. I'm sure it is.
16 Q. Okay. Are you aware of any specific
17 changes to disciplinary suspension procedures in the
18 new handbook from the old one?
19 A. The main thing was is that it is — it
20 aligned 100 percent to PRESS, which is the policy
21 services that are for the -- provided to us by the
22 Illinois Association of School Boards.
23 Q. Do you know whether or not it was intended
24 that there be any substantive changes in the
25 suspension procedure protocols between the old

Page 18

1 version and the new version that you have?
2 A. No, what it did was align us with board
3 policy better.
4 Q. You're aware that there is a statute that
5 spells out requirements for student disciplinary
6 procedures, are you not?
7 A. Yes.
8 Q. Were you familiar with that back in
9 January and February of 2013?
10 A. Yes.
11 Q. Exhibit No. 8 I believe is an
12 electronically printed version of your Watseka
13 Community High School book and it starts on -- I
14 think this is -- lines up with page 42 and 43 of the
15 printed version.
16 A. Okay.
17 Q. But in any event, on this electronic
18 version I've flagged what I think is page 43 --
19 A. Okay.
20 Q. -- on the exhibit, so I think this starts
21 on 42. There's a section that starts with
22 suspension and then it goes through page 43 and
23 following.
24           MS. GOGGIN-WARD: Do you have the date of
25 the one you're showing him? Effective dates.

Page 19

1 Q. I printed this from your website when we
2 did our Rule 26(a) disclosures. Let me ask you, the
3 -- from time to time, would the electronic version
4 be updated?
5 A. The electronic version would be updated in
6 May generally if there were any changes that were
7 presented to the Board of Education from the
8 handbook committee.
9 Q. Okay. Do you know whether there were any
10 changes submitted to the handbook committee between
11 January of 2013 until you went to the new version?
12 A. No, there were no -- the changes were
13 converting to PRESS.
14 Q. Okay. The -- my question is, as you look
15 at these suspension proceedings --
16 A. Uh-huh.
17 Q. -- you were familiar with them at the
18 time?
19 A. Yes.
20 Q. Is there anything in these that, you know,
21 were not -- I guess my question is, is there
22 anything in here that wasn't in effect when Noah's
23 disciplinary proceeding came up?
24 A. No.
25 Q. Okay. The incident on January 25, 2013,

Page 20

1 was not the first time that you had to deal with
2 allegations that somebody was involved with drugs at
3 school, was it?
4 A. No.
5 Q. How frequently had you dealt with that
6 subject matter prior to January of 2013?
7 A. Not, not frequent.
8 Q. Would we be talking under a dozen times?
9 A. At Watseka?
10 Q. Right.
11 A. Yes. Also, you know, I don't handle those
12 individual discipline proceedings at the building
13 level.
14 Q. Okay. So had you ever been involved --
15 well, let me ask you. Let's say prior to this
16 incident in January 2013, if there is an incident in
17 the school -- are you actually located at the
18 school?
19 A. No.
20 Q. Okay. So you're usually in the day here
21 in this building?
22 A. Yes.
23 Q. How would you -- or was there a policy or
24 a procedure in which if something happens during the
25 school day you are to be notified?

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

Page 21

1    A.  My principals use their discretion and
2  will give me a heads up if there is something going
3  on that they think I should know about, yes.
4    Q.  And so there's no written policy.  It's
5  your belief that they will exercise good judgment.
6    A.  Yes.
7    Q.  So there may be some incidents that
8  happened at the school involving drugs that you
9  would not be notified of?
10    A.  Generally if it's drug possession or
11  consumption, I am notified.
12    Q.  Okay.  On January 25, 2013, there
13  apparently was something that happened at Watseka
14  High School.  When did you become aware that there
15  was an irregularity that was antithetical to good
16  conduct of your students?
17    A.  I would say early that afternoon.
18    Q.  How did you become aware?
19    A.  I received a phone call.
20    Q.  From whom?
21    A.  Mr. Bunting.
22    Q.  And what do you remember him telling you?
23    A.  I remember him telling me that he had a
24  student in his office who had admitted to selling
25  some pills and that he had a list of students who I

Page 22

1  believe he said at that time their initials were on
2  and he wanted me to be aware of that.  He also said
3  that the student had I believe two white pills on
4  him.
5    Q.  Okay.  And the -- were any -- the exact
6  number of students involved revealed at that time?
7    A.  I believe he told me there were seven.
8    Q.  And did he give you any details of what
9  they had done or what they intended to do to get to
10  the full extent of the problem?
11    A.  He said they were going to start
12  questioning students.
13    Q.  Okay.  Did you go to the school that day?
14    A.  Yes.
15    Q.  For this reason or for unrelated?
16    A.  No, I went towards the end of the day to
17  see how his investigation had gone.
18    Q.  Okay.  And approximately when did you
19  arrive there?
20    A.  Oh, I would -- I would say around four
21  o'clock, 4:15.
22    Q.  Okay.  Had you received any updates
23  between the time you first learned of the incident
24  and going to the school yourself?
25    A.  Not that I can remember.

Page 23

1    Q.  When you got to the school, where were
2  they at in their investigation?
3    A.  I believe there was one student waiting
4  for a ride still in the main office and Noah and his
5  mother were exiting the front door.
6    Q.  Okay.  Did you speak with Noah or his
7  mother?
8    A.  No.
9    Q.  Did you speak with any student that day?
10    A.  No.
11    Q.  Okay.  Did -- okay, so you go into the
12  school and with whom did you meet or speak?
13    A.  There was still a student in Mr. Lucas's
14  office as well as a student in the main office, and
15  I asked that they come out of Mr. Lucas's office and
16  I just asked him how things were going.
17    Q.  Okay.  And was Mr. Lucas the only one you
18  had that conversation with?
19    A.  No, Mr. Lucas and Mr. Bunting.
20    Q.  Okay, no one else was present since you
21  excused the students?
22    A.  No, we did not excuse the students.  I
23  asked that the two gentlemen leave the office and we
24  stood in the middle of the hallway.
25    Q.  Okay.  So the -- how long did this

Page 24

1  conversation last?
2    A.  A minute.
3    Q.  And what was their response?
4    A.  They said that they were still working on
5  it and that things had been, you know, going for as
6  good as they could.
7    Q.  Did they tell you how many students had
8  been interrogated?
9    A.  Not that I recall.
10    Q.  Did they tell you anything about the
11  details of what, where or when that they hadn't
12  already told you in that initial conversation?
13    A.  No.
14    Q.  Okay.  So what did you then do?
15    A.  I said okay, well, let me know how it all
16  ends up.
17    Q.  And then went about your other business?
18    A.  Yes.
19    Q.  Did you have other business in the
20  building or was that the end of your day?
21    A.  I left the building.
22    Q.  Was that a Friday?
23    A.  Yes.
24    Q.  So that did you have any duties with the
25  district yet that day other than whatever may happen

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

Page 25

1  with this investigation?
2      A.  I came back out to the office.
3      Q.  Okay.  And worked 'til quitting time I
4  take it?
5      A.  Yes.
6      Q.  I understand there might have been a dance
7  or something at the high school that night.  Did you
8  have any --
9      A.  I don't, I didn't -- if there was, I did
10  not go.
11      Q.  Okay.  So once you got back here and
12  worked on other things, did you contact anyone
13  affiliated with the school district to alert them as
14  to the existence of this investigation?
15      A.  I contacted the board president, told him
16  that we had an issue of a sale of drugs at the
17  school.
18      Q.  Okay.  Anything more than that?
19      A.  No.
20      Q.  And what was his response?
21      A.  He said, well, let me know how it goes.
22      Q.  Okay.  Did you receive any further
23  information on the 25th?
24      A.  Not that I recall, no.
25      Q.  When did you then learn more about what

Page 26

1  happened on the 25th?
2      A.  I believe the morning of the 26th I was
3  forwarded an email from Mrs. Dietchweiler that she
4  had sent to Mr. Bunting.
5      Q.  Okay.
6      A.  As far as information pertaining to
7  anything.
8      Q.  Okay, the -- and so you got that email.
9  What was the gist of that email?
10      A.  That Mrs. Dietchweiler and Noah had went
11  home and spoken with Mr. Dietchweiler, and he did
12  not -- he said that he did not take drugs, and they
13  went and got a urine test, I believe some flight
14  surgeons were involved, and that they were asking
15  for an appeal.
16      Q.  Okay.  Anything else?
17      A.  In that email?
18      Q.  Well, okay, let's ask that.  Anything else
19  in the email?
20      A.  It was a very lengthy email.  I do not
21  remember all of it.
22      Q.  Okay, you still have it?
23      A.  Yes.
24      Q.  Okay.  Then the -- when did you next speak
25  with anyone affiliated with the school district

Page 27

1  about the incidents on January 25?
2      A.  Monday morning.
3      Q.  Did you go to the school?
4      A.  No.  Mr. Bunting called me.
5      Q.  Okay.  And he called you and just you and
6  he were involved in the conversation?
7      A.  Yes.
8      Q.  What -- how long was that conversation?
9      A.  A few minutes.
10      Q.  Okay.  What did he tell you about the
11  incident?
12      A.  I believe that he told me that Mr.
13  Dietchweiler had been in that morning to see him and
14  share the results of the urine test.
15      Q.  Okay.  Did he tell you what the results
16  were?
17      A.  He said that Mr. Dietchweiler told him the
18  results were negative.
19      Q.  Okay.  And did you yet have a copy of the
20  actual report?
21      A.  No.
22      Q.  What else, if anything, was discussed in
23  that conversation?
24      A.  I believe he told me that he had told Mr.
25  Dietchweiler if he wanted to appeal to contact me.

Page 28

1      Q.  Okay.  Did he tell you that he told the
2  Dietchweilers to leave the school or he'd call the
3  police?
4      A.  No.
5      Q.  That wouldn't be normal procedure, would
6  it?
7      A.  To tell a parent to leave the school or
8  they were going to call the police?
9      Q.  Right.
10      A.  Not unless they were unruly.
11      Q.  Did you learn anything else in that
12  conversation?
13      A.  No.
14      Q.  Did anything else come to your attention
15  that Monday relating to the investigation and
16  disciplinary actions that arose out of the incident
17  of January 25, 2013?
18      A.  Not to my knowledge, no.
19      Q.  Okay.  When's the next time that you
20  received additional information or were involved
21  with the incidents of January --
22      A.  I spoke with Mr. Dietchweiler either
23  Monday night or Tuesday night.  I don't recall
24  exactly what day.
25      Q.  Okay.  Did you call him or did he call

Page 29

1  you?
2  **A. He called my office.**
3  Q. And what did he --
4  **A. Or he called my office and I called him**
5  **back. I don't remember that for certain.**
6  Q. Okay. What was the -- how long was the
7  conversation when you ultimately spoke with him?
8  **A. Five or ten minutes.**
9  Q. What was said during that conversation by
10  each of you?
11  **A. Mr. Dietchweiler explained that he had had**
12  **a drug test and I believe the next morning was**
13  **scheduled for a polygraph test for Noah and he**
14  **wanted to meet with me to discuss those results.**
15  Q. Okay. And did you schedule a meeting?
16  **A. No, sir.**
17  Q. Why not?
18  **A. Because I was aware of Mr. Dietchweiler's**
19  **profession from meeting him prior and him being at**
20  **Pride Night is when I first met him and I told him**
21  **that I would need to call my legal counsel.**
22  Q. Okay. And I take it you did that?
23  **A. Yes, sir.**
24  Q. That's Mr. Funk?
25  **A. Yes, sir.**

Page 30

1  Q. What did you do then next?
2  **A. I received -- I waited -- well, I called**
3  **Mr. Funk and then we received a letter of appeal I**
4  **believe from Mr. Dietchweiler asking for a board**
5  **review.**
6  Q. Had you up to that point in time received
7  anything from the building as far as details of the
8  investigation, who was involved?
9  **A. Yes. When I knew that there was going to**
10  **be appeal, I had asked both Mr. Bunting and Mr.**
11  **Lucas to send me a summary of the occurrences of**
12  **that day.**
13  Q. Okay. And they then -- okay, so you knew
14  there was going to be an appeal.
15  **A. Uh-huh, I knew there'd be a hearing. I'm**
16  **sorry for interrupting.**
17  Q. Okay. And then they -- after you knew
18  that there would be an appeal, you asked them to
19  provide you with a summary of --
20  **A. Yes.**
21  Q. -- what occurred? The -- and did one or
22  the other prepare such a summary for you?
23  **A. Yes.**
24  Q. And how was it delivered to you? Was it a
25  letter, email?

Page 31

1  **A. Email.**
2  Q. Okay. I don't remember that document
3  being produced.
4  **A. It was in the packet at the hearing.**
5  Q. Okay, this is the package from the
6  hearing.
7  **A. Okay.**
8  Q. Show me which document that is.
9  **MS. GOGGIN-WARD: Go ahead, look at it.**
10  **A. I don't see it in here.**
11  Q. Could it have been in a package of one of
12  the other hearings that night?
13  **A. I don't know.**
14  Q. Okay. What -- who authored it?
15  **A. Mr. Bunting.**
16  Q. And did Mr. Lucas provide you with a
17  similar document?
18  **A. I believe so.**
19  Q. And the -- so as you sit here today, you
20  received an email from Mr. Bunting about what
21  happened. You received an email from Mr. Lucas
22  about what happened.
23  **A. Yes.**
24  Q. Do you have those emails?
25  **A. I'm sure I do.**

Page 32

1  **MR. TAGUE: Counsel, can we have them?**
2  **MS. GOGGIN-WARD: If -- yeah, that's fine.**
3  (Recess at 11:27 a.m. to 11:32 a.m.)
4  (Exhibit No. 10 was marked by the court
5  reporter.)
6  **BY MR. TAGUE:**
7  Q. Exhibit No. 10 is the email that you told
8  us about that came from Mr. Bunting.
9  **A. Uh-huh.**
10  Q. You printed it off for us here today. It
11  was not in the suspension materials package at
12  Noah's hearing, was it?
13  **A. No.**
14  Q. Now, I know you printed this off. When
15  did you receive this?
16  **A. May I go look at the email?**
17  Q. Sure, uh-huh.
18  (Brief pause.)
19  **A. That was sent Monday morning, the 28th.**
20  Q. And it was sent by Mr. --
21  **A. Bunting.**
22  Q. -- Bunting. Did you receive one from Mr.
23  Lucas --
24  **A. No.**
25  Q. -- ever?

Page 33

1     MS. GOGGIN-WARD: Let him finish the
2  question before you answer.
3     A.  I'm sorry, I'm sorry.
4     Q.  That's okay.
5     A.  I know, I apologize.
6     Q.  What, if anything, did you do when you
7  received this?
8     A.  I read it.
9     Q.  After reading it, did you do anything
10  specific in reaction to it?
11     A.  No, I filed it.
12     Q.  Okay.  When is the next receipt of
13  information that you received concerning this
14  incident?
15     A.  The next receipt of information concerning
16  the incident would have been my conversation with
17  Mr. Dietchweiler.
18     Q.  Okay.  Now, we've talked about Noah and
19  his involvement.  Up to this conversation you had
20  with Mr. Dietchweiler, had you had any input or any
21  interaction with any of the family members of other
22  children involved in the July 25th incident?
23     A.  Not that I can recall.
24     MS. GOGGIN-WARD: January.  You said July.
25     Q.  I meant January.  And you thought I meant

Page 34

1  January --
2     A.  Yes.
3     Q.  -- when you answered the question?
4     A.  Yes, sir.
5     Q.  Okay.  So you had a conversation with Mr.
6  Dietchweiler.  Where was that?  How did that take
7  place?
8     A.  That was by phone, the one that I
9  mentioned earlier.
10     Q.  Okay.  Then what's the next involvement
11  that you had in the investigation or any of the
12  disciplinary proceedings?
13     A.  If I remember correctly, the next step was
14  that we received correspondence from Mr.
15  Dietchweiler out here for all the board members.
16     Q.  Okay.
17     A.  Actually, if I remember correctly, the
18  moment that I was speaking of is when he was serving
19  papers, so that's after the hearing.
20     Q.  Serving --
21     A.  That would have been after the hearing, so
22  that's not the next step.  The next step would have
23  been that we -- that we continued with setting up a
24  hearing, so I would have notified the board
25  president that we would need to have a hearing.

Page 35

1     Q.  Okay.  Now, you ended up setting up a
2  hearing for Noah?
3     A.  Yes.
4     Q.  And there was at least one other hearing
5  set up for another student, correct?
6     A.  Yes.
7     Q.  Michael McKay's hearing was right before
8  Noah's hearing, correct?
9     THE WITNESS: Am I allowed to speak about
10  other students?
11     MS. GOGGIN-WARD: You can say that there
12  was a hearing.
13     THE WITNESS: Okay.
14     Q.  Just one?
15     A.  No, there were more.
16     Q.  How many hearings were there?
17     A.  Four.
18     Q.  And there would be board minutes
19  reflecting the results of all four of those
20  meetings, would there not?
21     A.  Yes.
22     Q.  And they would redact the student's
23  identifying name, correct?
24     A.  We would redact them, yes.
25     Q.  All right.  Were they all suspension

Page 36

1  review hearings or were some expulsion hearings?
2     A.  I can't remember if there were exactly
3  four.  I could go look up, look that up for you, but
4  I believe two of them were expulsions and one or two
5  was a suspension.
6     Q.  Okay.  And Noah would have been one of the
7  suspension reviews.
8     A.  Yes.
9     Q.  Okay.  Okay, so you're scheduling the
10  hearings we talked about.  Who then went about
11  accumulating documentary evidence for presentation
12  at those hearings?
13     A.  I did.
14     Q.  Was the documentation the same in all of
15  the hearings?
16     A.  Yes.
17     Q.  What did you ask for to put together
18  documentary packages to present at the hearings?
19     A.  Anything pertaining to it and then at that
20  point anything that our legal counsel would have
21  asked for.
22     Q.  Okay.  And ultimately Exhibit No. 1 is the
23  documentary package prepared for Noah's hearing,
24  correct?
25     A.  Yes.

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

Page 37

1  Q.  And other than the first page, everything
2  after that would be the same for all the hearings?
3  A.  Yes.
4  Q.  And Exhibit No. 10 --
5  A.  Yes.
6  Q.  -- was not in there?
7  A.  No.
8  Q.  Do you remember whether it was presented
9  at any of the hearings?
10  A.  No.
11  Q.  You don't remember or it was not?
12  A.  I thought that it was presented at the
13  hearing, but it must not have been because this was
14  what was handed out by our legal counsel.
15  Q.  Okay.  So you put together the documentary
16  package.  Was there any other summary or
17  communications that you provided -- well, let me
18  back up.
19      You put together the documents.  You make
20  arrangements for time and place for the hearing and
21  send out notices to the families.  You did all that,
22  correct?
23  A.  Yes.
24  Q.  And I'm not saying you personally did.
25  You or your administrative staff did.

Page 38

1  A.  Yes.
2  Q.  Was there any, then, communication sent to
3  the Board of Education prior to the hearing
4  concerning the hearing?
5  A.  No.  And this document here was prepared
6  by our attorney's office.  I -- I -- I gather any
7  documents, and then he would, his office would have
8  decided what went into the packets.
9  Q.  Okay.  Now, when you gathered the
10  documents or gathered information or documents, we
11  know you had No. 10.  Do you know whether or not you
12  sent that along to the attorney?
13  A.  I do not recall if I sent that to the
14  attorney or not.
15  Q.  As we look at -- maybe we can just go
16  through the list.  There's six delineated tab items.
17  The tab 1, 2 and 3 are different board policies.
18  A.  Uh-huh.
19  Q.  Did you actually pull out the excerpts and
20  provide them to the attorney or did -- since he had
21  the policies, that is his work product?
22  A.  That is his product.
23  Q.  Okay.  Number 4 is the Iroquois County
24  High School student handbook pages, correct?
25  A.  Yes.

Page 39

1  Q.  And this was what, from the printed
2  materials or the website?
3  A.  That would have been a printed version off
4  of the website.
5  Q.  Okay.  And did you provide the excerpts or
6  did you provide the whole handbook?
7  A.  I would have provided the whole handbook.
8  Q.  Okay.  So then number 5, the notice of
9  student disciplinary action, that then you received
10  from the building and sent on?
11  A.  Yes.
12  Q.  Okay.  Who created -- let's look at that
13  one.  It is a form letter from the principal.  It
14  looks like that of course has things written in.
15  Who developed that letter?
16  A.  I do not know.
17  Q.  The -- was that the one that -- it has
18  your name on it too.  Is that one approved by you
19  for use in these type of incidents?
20  A.  That had been what was in place prior to
21  my coming here and they had just changed the name.
22  Q.  Okay.  Who provided that to you?
23  A.  Mr. Bunting.
24  Q.  Okay.  And then there is another document
25  that is number 6 and that is a letter generated by

Page 40

1  you, correct?
2  A.  Yes.
3  Q.  Okay.  Is there any other documents
4  provided to you from the building as you were
5  accumulating information to put together a document
6  package?
7  A.  I received a copy of the note that Michael
8  had.
9  Q.  Okay.  And that note, let me show you
10  Exhibit No. 3.  The second page of it is something
11  different, but the fourth page of that I believe --
12      MS. GOGGIN-WARD:  There you go.
13  A.  Yes.
14  Q.  -- is a handwritten note from Michael
15  McKay and you received that from the building.
16  A.  Yes, I have seen both of these.
17  Q.  When did you receive it?
18  A.  In between January 25th and before the
19  hearing.
20  Q.  And was that sent along to Mr. Funk?
21  A.  I don't recall if I sent that to Mr. Funk
22  or not.
23  Q.  It wasn't part of the document package or
24  submitted in the Dietchweiler suspension review, was
25  it?

Page 41

1   A.  No.
2   Q.  Was it submitted in any of them that day?
3   A.  No.
4   Q.  The second page of this exhibit, what is
5   that?
6   A.  The second page is a note that I was told
7   Michael had on his person saying who owed him money.
8   Q.  Okay.  And you received that from the
9   building?
10  A.  Yes.
11  Q.  Was that sent on to Mr. Funk?
12  A.  I don't recall if I sent these to Mr. Funk
13  or not.
14  Q.  Okay.  That was not included in the
15  document package or presented at Noah's hearing, was
16  it?
17  A.  No.
18  Q.  Any of them?
19  A.  Not that I recall.
20  Q.  Okay.  Now, No. 10 indicated that they --
21      MS. GOGGIN-WARD:  This.
22  Q.  -- actually found two pills on Michael
23  when they searched him.  Do you know whatever
24  happened to those pills?
25  A.  I don't recall.

Page 42

1   Q.  Do you know what --
2   A.  I'm sorry to interrupt you, but I think
3   that they gave those to the police.
4   Q.  Okay.  And do you know how many pills
5   Michael had and distributed?
6   A.  I do not.
7   Q.  Did anybody ever ask or find out how much
8   Mr. McKay was selling or receiving for the pills?
9   A.  I do not recall that.
10  Q.  Are you aware of any other documents that
11  were prepared by anyone at the building level
12  concerning the details of their investigation and
13  the incident of January 25?
14  A.  No.
15  Q.  You ultimately -- this is Plaintiff's
16  Exhibit No. 7.  And I'm interested in the exhibits,
17  Exhibit No. 2 to the complaint.
18      MS. GOGGIN-WARD:  Do you have a page
19  number?  Okay.  I've got it.
20  Q.  You received that correspondence from Mr.
21  Dietchweiler, did you not?
22  A.  Yes.
23  Q.  What did you do with it?
24  A.  Sent it to my counsel.
25  Q.  When you received that letter from Mr.

Page 43

1   Dietchweiler, what details did you or had you been
2   told about what happened in the interrogation of
3   Noah?
4       MS. GOGGIN-WARD:  Just object to the form
5   of the question.  If you understand, you can answer.
6   A.  Would you repeat the question please?
7   Q.  Sure.  We went through what -- several
8   conversations that you had, Exhibit No. 10 that you
9   received, the documents that you received and passed
10  on to Mr. Funk to prepare the hearing documentary
11  package.  Did that all happen before January 30 or
12  after?
13  A.  Before.
14  Q.  Okay.  So my question is on January 30,
15  other than the documents that you received, other
16  than the phone calls that you received and this
17  memo, did you have any other contact in which you
18  learned details of the incident of January 25?
19  A.  No.
20  Q.  When did you learn that there was an
21  assertion that Noah had confessed to taking pills
22  the day before?
23  A.  An assertion that Noah admitted to taking
24  pills the day before?
25  Q.  Correct.

Page 44

1   A.  I don't know that I ever heard that.
2   Q.  Okay.  Were you aware at some point in
3   time that Noah had, according Mr. Bunting and Mr.
4   Lucas, confessed to having pills?
5   A.  Yes.
6   Q.  In fact, that is in your memo or the memo
7   that was issued, that Mr. Bunting indicated Mr.
8   Lucas told him that he needed to be honest with us
9   or the punishment would be worse.  Let me ask you
10  about that.  What could have been the worst
11  punishment had Noah denied that he had taken the
12  pills?
13  A.  Well, if he -- if there's no proof,
14  there's no punishment.
15  Q.  Right.  So the -- but Lucas told him he
16  needed to be honest or the punishment would be
17  worse, so if he told him he didn't take the pills,
18  the punishment would potentially be zero if he
19  believed him.
20  A.  Potentially.
21  Q.  And if they didn't believe him, the
22  punishment wouldn't have been more severe than if he
23  had admitted it, would it?
24  A.  Well, I don't know if they would have
25  recommended more than what he received.  I can't

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

Page 45

1  speak for them.
2      Q.  For receiving pills, has anyone ever been
3  punished more than ten days?
4      A.  I would certainly not recommend an
5  expulsion for that.
6      Q.  And had you ever recommended an expulsion
7  for someone who received pills but denied that they
8  received pills?
9      A.  Not that I'm aware of, no.
10     Q.  So that's a false statement, isn't it?
11 The punishment could not have been worse.
12         MS. GOGGIN-WARD: Object to the form of
13 the question and foundation.
14     Q.  And you can answer unless she tells you
15 not to.
16         MS. GOGGIN-WARD: Go ahead.
17     A.  I can't speak if that was a false
18 statement. I mean you can still -- you can expel if
19 you want. I wouldn't have expelled. He may have
20 thought I would have, but I would not have.
21     Q.  So the -- anyway, it goes on. It says Mr.
22 Lucas told him that he needed to be honest with us
23 or the punishment would be worse. Noah informed us
24 that he received pills from Michael McKay and took
25 them because he was having a hard time staying

Page 46

1  awake.
2          Now, I don't see where there's any
3  indication of where Noah supposedly said he took the
4  pills or when he took them. That's not in there, is
5  it?
6      A.  No.
7          MS. GOGGIN-WARD: Objection, the document
8  speaks for itself. Go ahead.
9      Q.  The -- so did you assume it was on the
10 25th in the lunchroom?
11     A.  I wasn't in there for the conversations,
12 so I mean by reading that, it's what you would gain
13 from that.
14     Q.  Okay. During the suspension review
15 hearing, Mr. Lucas testified that Noah informed us
16 he received pills from a student the day before
17 during school and took them because he was having a
18 hard time staying awake. He actually said that at
19 the hearing, did he not?
20     A.  If it's in the transcript. So I'm -- I
21 was mistaken when I said I had never heard that
22 before. I'm sorry, I didn't remember that.
23     Q.  Okay. But you never heard that before he
24 stated this in the hearing, correct?
25     A.  Not that I remember, no.

Page 47

1      Q.  Do you know if anybody else knew that the
2  supposed confession was for the day before January
3  25th?
4      A.  The conversation was with Noah and Mr.
5  Bunting and Mr. Lucas, so I would think that it
6  would just be those three that would know the --
7  what happened in there.
8      Q.  In the document package --
9          MS. GOGGIN-WARD: This one?
10     Q.  -- under tab 5, that document was provided
11 to the Dietchweilers to your understanding, was it
12 not?
13     A.  Yes.
14     Q.  Do you know when in the process of Noah's
15 interrogation that document was prepared and
16 presented?
17     A.  I do not know that.
18     Q.  Okay. In your procedures on the
19 suspension procedures, it starts out with -- it says
20 prior to the imposition of a suspension the
21 following procedures shall be observed. Then this
22 was the policy in effect at Watseka High School, was
23 it not?
24     A.  I don't see where -- where are you reading
25 from, I'm sorry?

Page 48

1      Q.  (Indicating). As set forth in paragraph B
2  below.
3      A.  Yes.
4      Q.  Prior to the imposition, the following
5  procedures will be observed.
6      A.  Yes.
7      Q.  Starts out "The suspending official shall
8  give the student verbal and written notice of the
9  charges which constitute the basis for the proposed
10 suspension and a summary of evidence which supports
11 such charges."
12         The only information that you have or that
13 you had prior to the hearing was this No. 10,
14 correct?
15     A.  Yes.
16     Q.  And the --
17     A.  Sir?
18     Q.  Okay.
19     A.  Those notes, I had seen those notes as
20 well, the letter from Michael. I had seen those
21 prior to the hearing.
22     Q.  Okay. So the -- so you saw those prior to
23 the hearing and you saw this. Okay. Do you know
24 whether or not the -- Mr. Lucas or Mr. Bunting told
25 Noah that they found Michael McKay in possession of

Page 49

1  two white pills and a paper with his name on it?
2  **A. Do I know that?**
3  Q. Yes.
4  **A. Is it in there?**
5  Q. (Handing document.)
6  **A. So you're asking me if Mr. Lucas told Noah**
7  **that they had found Michael McKay in possession of**
8  **two white pills.**
9  Q. Correct.
10  **A. Not to my knowledge.**
11  Q. Do you know whether they told Noah that
12  Michael McKay had a paper in his possession that had
13  his name on it with a reference to a dollar amount?
14  **A. I do not know.**
15  Q. So you don't know whether they did that
16  either verbally or in writing, correct?
17  **A. No.**
18  Q. If they did it in writing, they never gave
19  it to you, correct?
20  **A. Correct.**
21  Q. Now, there is a statement that Mr. Lucas
22  explained to Noah that we know what happened due to
23  speaking to the other students and they were all
24  honest with us. He did tell you that, correct?
25  **A. That was in there, yes.**

Page 50

1  Q. Okay. But other than that, and he told
2  him -- so that's all that you can say about what you
3  knew Lucas or Bunting actually told Noah verbally,
4  correct?
5  **A. Yes.**
6  Q. What writing are you aware of that Noah
7  received prior to the actual suspension itself?
8  **A. I don't know if he received this before or**
9  **after the actual he was told he was suspended.**
10  Q. When is it supposed to be done?
11  **A. Well, it says here prior that you would**
12  **get something in writing.**
13  Q. Okay. That didn't happen, did it?
14  **MS. GOGGIN-WARD:** Objection, asked and
15  answered.
16  **A. I don't know when he --**
17  **MS. GOGGIN-WARD:** Go ahead, you can tell
18  him again.
19  Q. Okay. My question is the -- other --
20  well, this document on its face says that Noah
21  Dietchweiler has been suspended. That is the actual
22  form that is the result of the investigation, is it
23  not?
24  **A. Yes.**
25  Q. Okay. So once that's prepared, Mr. Lucas

Page 51

1  signs it, it's given to the parents, that child is
2  suspended.
3  **A. Yes.**
4  Q. Okay. Now, I know that they ask the
5  student to sign because the student needs to say
6  whether or not they want to make up work or not,
7  correct?
8  **A. Yes.**
9  Q. That form was not created to -- well, let
10  me ask you. Where on that form does it say that the
11  student admits that he's guilty of the infraction?
12  **MS. GOGGIN-WARD:** Objection, document
13  speaks for itself.
14  Q. Can you answer that?
15  **THE WITNESS:** Am I supposed to answer
16  that?
17  **MS. GOGGIN-WARD:** Yeah, go ahead.
18  **THE WITNESS:** Oh, okay.
19  **MS. GOGGIN-WARD:** I'm just saying the
20  document speaks for itself --
21  **A. Okay, it says --**
22  **MS. GOGGIN-WARD:** -- but you can answer.
23  **A. -- the student suspension hearing was held**
24  **on 1/25/13 and attended by Steven Lucas and Noah.**
25  **At this hearing, Noah was afforded his procedural**

Page 52

1  **due process student rights, the opportunity to**
2  **present a defense, to explain the circumstances of**
3  **the actions in question and/or prove innocence.**
4  Q. Okay, and the -- and that's what it says.
5  **A. Yes.**
6  Q. The only thing that you're aware of that
7  Noah allegedly said is contained in this memo,
8  correct?
9  **A. Yes.**
10  Q. And you don't know whether he had an
11  opportunity to speak to the Michael McKay statement?
12  You don't know that, do you?
13  **A. I do --**
14  **MS. GOGGIN-WARD:** Object to the form of
15  the question, speak to it.
16  Q. Okay. During the interrogation that Lucas
17  and Bunting did of Noah, you don't know whether they
18  presented the written statement of Michael McKay for
19  him to respond to, do you?
20  **A. I do not know that.**
21  Q. You do not know whether they told him that
22  he was given pills during lunch on January 25 and
23  asked to respond to it, correct?
24  **A. I do not know that.**
25  Q. He was -- to your knowledge, you don't

Page 53

1 know whether or not he was actually presented with
2 the list which had numbers on it, correct?
3 **A. I would not know that.**
4 Q. Okay. Prior to this document, you have no
5 information that anything else in writing was given
6 to Noah or his parents, do you?
7 **A. Other than this document, not to my**
8 **knowledge.**
9 Q. Okay.
10 **THE WITNESS:** That's the code of conduct.
11 **MS. GOGGIN-WARD:** Okay.
12 Q. Going on with this Exhibit No. 8, in
13 number C at the top, there is an indication of the
14 form of notice that is supposed to be provided, does
15 it not? You can look at that one later --
16 **A. Okay.**
17 Q. -- but my question is going to be there is
18 a prescribed form under the policy as to what the
19 notice of suspension is supposed to look like and
20 what it's supposed to contain.
21 **A. Yes.**
22 Q. Why did this document that was the actual
23 notice of student disciplinary action not conform to
24 that format?
25 **A. That was our mistake.**

Page 54

1 Q. And that also policy spells out the form
2 of the notice of hearing right, does it not?
3 **MS. GOGGIN-WARD:** Object to the form of
4 the last question too. It's not delineated hearing
5 versus notice of the charges.
6 **MR. TAGUE:** I agree. We got a hearing,
7 but we weren't told what the charges were.
8 **MS. GOGGIN-WARD:** No, I'm not going to
9 argue. I'm objecting to the form of the question.
10 Go ahead if you can answer it.
11 **BY MR. TAGUE:**
12 Q. Well, my question is that there was no
13 notice by registered or certified mail that
14 conformed with the format prescribed in your policy.
15 **A. For the suspension?**
16 Q. Correct.
17 **A. That is correct.**
18 Q. And is there a reason for that?
19 **A. There was a mistake.**
20 Q. In that policy, along with the notice,
21 there is supposed to be sent a copy of the board
22 policy for student discipline --
23 **MS. GOGGIN-WARD:** I'm sorry.
24 Q. -- correct?
25 **MS. GOGGIN-WARD:** Where are you looking?

Page 55

1 Q. Okay, the last -- right before D, it says
2 a copy of board policy entitled student
3 disciplinary -- student discipline policy is
4 enclosed. That was not enclosed or provided with
5 anything sent to the Dietchweilers, was it?
6 **A. No.**
7 Q. And again, that was a mistake?
8 **A. That would have been -- that should have**
9 **been included with the notice, yes.**
10 Q. Okay. Based upon what you know, the board
11 policy was created so that the board policy
12 reflected the notice that -- same notice that was
13 required by the state statute recited in that
14 subpart C, correct?
15 **MS. GOGGIN-WARD:** Object to the form of
16 the question.
17 **A. Could you -- could you ask me that again**
18 **please?**
19 Q. Sure. There's a state statute that
20 prescribes what needs to be in a notice of
21 suspension or expulsion, correct?
22 **A. Yes.**
23 Q. And that's contained in the school code
24 Section 10-22.8?
25 **A. Well, 10-22 --**

Page 56

1 Q. 6.
2 **A. -- 6 of the discipline policy, that is**
3 **just -- that's more of our discipline policy not so**
4 **much the procedure that would say -- when it says**
5 **pursuant to Section 10-22.6 of the Illinois School**
6 **Code and the Student Discipline Policy of Iroquois**
7 **County, name of student that is suspended from**
8 **attendance at Iroquois Community Unit School**
9 **District No. 9 for a period of blank days, the**
10 **effective date is, okay? So the policy is I -- the**
11 **policy is about the discipline not about the**
12 **procedures to my knowledge.**
13 Q. Okay. So you don't know what the statute
14 specifically requires as far as notice?
15 **A. No, but what we have prescribed in here is**
16 **the expectation.**
17 Q. Okay. So you were aware of the drug test
18 results. Did you ever actually receive a copy of
19 that before February 5, 2013?
20 **A. Not to my knowledge.**
21 Q. And did the family offer to provide that
22 to you?
23 **MS. GOGGIN-WARD:** Objection to your client
24 talking to my client during his testimony.
25 **MR. DIETCHWEILER:** Well, can we go off the

Page 57

1 record a second?
2     MS. GOGGIN-WARD: No.
3     MR. DIETCHWEILER: Ken, I sent it to you
4 in that letter with all the attachments. I mean I
5 just don't want you to make a mistake here.
6     THE WITNESS: Sure.
7     MR. DIETCHWEILER: And you got it.
8     THE WITNESS: Shari, if I received it,
9 then I received it, and I'm not -- I am not -- I'm
10 not arguing about that, or if I received it, I
11 received it. So that's my mistake if I received it
12 and I apologize.
13 BY MR. TAGUE:
14     Q. Okay. The -- if -- if you received it --
15 well, let me ask you, do you know whether or not or
16 why it wasn't in the document package to the Board
17 of Education?
18     A. That was because of our legal counsel.
19     Q. Okay. Would it be -- would there be a
20 record that would, that could refresh your
21 recollection as to whether or not or, in fact,
22 received it and sent it along with the other things
23 you told us you sent along?
24     A. To Mr. Funk?
25     Q. Yes.

Page 58

1     A. I don't know, but I'm not disputing that I
2 didn't receive the results.
3     Q. You just don't know whether or not you
4 passed it along?
5     A. I do not. Maybe Mr. Funk would know.
6     Q. Who -- okay. What involvement did you
7 have in developing the suspension hearing procedures
8 and protocols once you sent out the notice that
9 there would be a suspension review hearing?
10     A. Well, Mr. Funk prepared all of it.
11     Q. Okay. Did you have any input?
12     A. Well, sure.
13     Q. What input do you remember having?
14     A. I remember just asking him to prepare
15 everything and then we also -- he does a script, so
16 I did not prepare the script.
17     Q. Okay. And the script was -- would be to
18 provide to the board president to follow those
19 procedures?
20     A. Yes.
21     Q. And he ran them by you for approval or
22 simply ran them by you for just so you'd be aware?
23     MS. GOGGIN-WARD: Objection if you're
24 calling for what Mr. Funk told him. It's
25 attorney/client privilege. I'm directing my client

Page 59

1 not to answer.
2     Q. Did you approve the protocols?
3     MS. GOGGIN-WARD: Same objection.
4     MR. TAGUE: Certify that.
5 BY MR. TAGUE:
6     Q. Did you have discussions about the
7 protocols with anyone other than your attorney?
8     A. I would have given them to Mr. Bruns and
9 told him that this is the script that he needs to
10 follow.
11     Q. Okay. Did -- was there any change or
12 input from him or did he simply accept them?
13     A. No, he accepted them.
14     Q. So you were at Noah's suspension hearing
15 on February 5, 2013, correct?
16     A. Yes.
17     Q. There were other hearings that day, were
18 there not?
19     A. There were.
20     Q. Was Noah's name mentioned in any of those
21 prior hearings?
22     A. Not to my knowledge.
23     Q. And I think we already covered this, but
24 in all those other hearings there was no documents
25 submitted other than the ones you've told us about

Page 60

1 already.
2     A. Yes.
3     Q. There's a verbatim record of what happened
4 before the board went to deliberate in private.
5 Have you reviewed that at all?
6     A. The verbatim?
7     Q. Right.
8     A. No, I have not.
9     Q. Do you have a copy of it?
10     A. I'm sure I do.
11     Q. Did you review anything in preparation for
12 your deposition here today?
13     A. I glanced at a few things.
14     Q. What did you look at?
15     A. Well, I read that statement actually.
16     Q. Okay. Anything else?
17     A. Not that I can recall.
18     Q. Other than with your attorneys, have you
19 discussed this case since February of 2013?
20     A. No.
21     Q. Okay, so the board went back and
22 deliberated. Who was present in those
23 deliberations?
24     A. I believe all board members were present
25 that evening as well as legal counsel.

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

---

Page 61

1  Q.  And yourself?
2  A.  Yes.
3  Q.  Were you present during the whole time?
4  A.  Yes.
5  Q.  Ultimately the school board came back and
6  made a decision.  Did you make any recommendation as
7  to the disposition --
8       MS. GOGGIN-WARD: Objection to any --
9  Q.  -- prior to them making that
10  determination?
11      MS. GOGGIN-WARD: Objection to any
12  references to anything that occurred in the closed
13  door session pursuant to Judge Baker's prior ruling
14  and order of court, and we're directing our client
15  not to answer.
16      MR. TAGUE: We'll need to certify that one
17  also.
18  Q.  Did you form any conclusions after having
19  heard all the evidence as to what happened?
20  A.  The conclusion was that the suspension was
21  upheld.
22  Q.  Okay.  And did you conclude that Noah
23  actually consumed drugs?
24  A.  I don't know.
25  Q.  You did not accept the scientific testing

---

Page 62

1  as conclusive proof that he did not ingest these
2  types of pills that Mike McKay had?
3  A.  I believe that the suspension was for
4  possession.
5  Q.  The initial charges was for suspension --
6  I'm sorry, for possession and consumption though,
7  were they not?
8  A.  Yes.
9  Q.  So it's your belief that the -- that the
10  suspension was only upheld on possession?
11  A.  I believe that's what the suspension --
12  the motion read.
13  Q.  Okay.  Now, the -- what -- I guess when
14  did -- from your knowledge of the evidence, when did
15  Noah actually possess these pills?  What day?
16      MS. GOGGIN-WARD: Objection, relevance,
17  foundation.
18      MR. TAGUE: Okay, want to read the
19  question back?
20      (Requested portion of the deposition was
21  read by the court reporter.)
22  A.  I have that there, that's what I was
23  reading off of, that was the facts that they
24  had given me, that he had admitted to having
25  possession of those pills.

---

Page 63

1  Q.  And whether it happened on the 25th or the
2  24th, until we talked about what's in the
3  transcript, you really didn't know that there was a
4  controversy about different days?
5  A.  No.
6  Q.  Do you know whether or not Noah was
7  searched?
8  A.  I do not know that.
9  Q.  Do you know if any of the other students
10  were searched other than Michael McKay?
11  A.  I do not know that.
12  Q.  Okay.  You don't know what the quantity of
13  pills Noah had?
14  A.  I don't recall that, no.
15  Q.  Okay.  You don't know what the alleged
16  exchange rate was for pills for dollars?
17  A.  Not that I recall.
18  Q.  So how the numbers on the list
19  equate to numbers of pills, nobody investigated that
20  to your knowledge?
21  A.  Not to my knowledge.
22  Q.  There's no documentation of what the pills
23  Noah supposedly had looked like, correct?
24  A.  Not that I'm aware of.
25  Q.  Do you know if it was ever quantified how

---

Page 64

1  many pills that Michael McKay actually brought to
2  school for distribution?
3  A.  If there was, I don't remember.
4  Q.  At the hearing, the principal testified,
5  correct?
6  A.  Yes.
7  Q.  The -- and the -- you don't dispute
8  anything that -- I can ask you about the verbatim
9  record, but if it's in the verbatim record, you
10  wouldn't dispute it happened, would you?
11  A.  No, I'd trust that.
12  Q.  Okay, do you remember Mr. Bunting
13  testified at Noah's hearing that there were no notes
14  taken during the course of the investigation or
15  summaries prepared concerning Noah?
16  A.  Is that what it says?  I don't remember
17  the exact hearing.
18  Q.  Okay.  So if Mr. Bunting says in the
19  hearing he prepared a summary but didn't provide it
20  to anyone, that's obviously not true because he sent
21  it to you.
22  A.  He did send me a summary, yes.
23  Q.  In the hearing, Mr. Bunting indicated that
24  Noah told him he had taken --
25      MR. DIETCHWEILER: It's actually Lucas.

---

Page 65

1    Q. Oh, let me -- okay, on page 13 of the
2  transcript.
3    A. **Do we have a copy of the transcript?**
4    **MS. GOGGIN-WARD:** No.
5    **MR. TAGUE:** We don't have one here, but I
6  know you --
7    **MS. GOGGIN-WARD:** Yeah, I have one.
8    **MR. DIETCHWEILER:** Here's another one,
9  Mike.
10    **MS. GOGGIN-WARD:** You can just read it and
11  then show it to him.
12    Q. Well, I have --
13    A. **Thank you.**
14    Q. -- an extra copy. I'm not going to give
15  that to you, but I'll hand it to you.
16    **MS. GOGGIN-WARD:** Page 13?
17    **MR. TAGUE:** Page 13 of the transcript.
18    Q. It says here Mr. Lucas said: Noah
19  informed us that he received pills from another --
20  I'm sorry, pills from a student the day before
21  during school and took them because he was having a
22  hard time staying awake. And Mr. Funk said: And
23  this happened on the 25th, so the day before would
24  have been the 24th. And he says: Yes.
25    Isn't that the only indication in the

Page 66

1  record of the proceedings that it happened on the
2  24th rather than the 25th?
3    **MS. GOGGIN-WARD:** Object to the form of
4  the question. Document speaks for itself.
5    Q. Okay. Well, let me ask you. Your
6  knowledge is that -- to your knowledge, is there
7  anywhere else where that fact is documented that the
8  possession was the 24th rather than the 25th?
9    A. **To the best of my memory, yes.**
10    Q. Okay. Do you know what standard of proof
11  the school district adopted in determining whether
12  or not Noah was in possession of pills?
13    **MS. GOGGIN-WARD:** Object to the form of
14  the question, calls for documents or opinions that
15  may have been revealed in the closed door session.
16  Direct my client not to answer pursuant to Judge
17  Baker's order.
18    **MR. TAGUE:** Certify that.
19    Q. Was the standard of proof ever discussed
20  as to how the board should consider the evidence as
21  to a determination of whether or not Noah was guilty
22  or not other than in the closed door deliberations
23  of the school board?
24    **MS. GOGGIN-WARD:** Same objection as it
25  applies to any conversations he or any other member

Page 67

1  or any of my clients discussed with their other
2  counsel Mr. Funk.
3    Q. Other than conversations with Mr. Funk in
4  private, other than the deliberations in the closed
5  school board hearing in which there were
6  deliberations, was the question of what was the
7  proper standard of proof to be applied discussed?
8    A. **With Mr. Bunting.**
9    Q. Okay. You discussed with Mr. Bunting
10  when?
11    A. **Would have been the week after that Friday**
12  **that the suspensions occurred.**
13    Q. Okay.
14    A. **When I asked him why it was getting**
15  **appealed, he said that -- I said, you know, that**
16  **these are what the assertions are, and he said,**
17  **well, he admitted to it in my office that he had had**
18  **them and took them, so I mean the standard of proof**
19  **would have been the admittance.**
20    Q. Okay. So that's the, the basis -- the
21  standard of proof would be whether or not a fact was
22  proven, could be in a criminal case beyond a
23  reasonable doubt, in a civil case by a preponderance
24  of evidence, in some cases by clear and convincing
25  evidence. Do you know whether or not the degree of

Page 68

1  proof necessary to find him guilty was discussed
2  with anyone other than in an attorney/client private
3  conversation or at this deliberation?
4    A. **Not that I'm aware of.**
5    Q. And if I asserted that I raised that with
6  Mr. Funk in the open session and he refused to tell
7  us, you wouldn't dispute that, would you?
8    A. **What page is it on? I don't remember**
9  **that, the hearing.**
10    **MR. TAGUE:** Mike, do you remember whether
11  I asked that at the beginning or the end?
12    **MR. DIETCHWEILER:** It was at the end.
13  Here it is right here. Page 101, lines 14 through
14  20.
15    Q. Start at line 14. Okay, I asked him what
16  the burden of proof would be and he never answered
17  that question, did he?
18    A. **No.**
19    Q. Were you -- did you know anything about
20  the drug that ultimately was involved?
21    A. **I just remember them saying that I believe**
22  **it was the police told them that it was Ativan. I**
23  **don't know anything about Ativan.**
24    Q. It was a prescription medication though,
25  correct, or do you know?

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

**Page 69**

1  A. I'm assuming so, yes.
2  Q. And --
3  A. I believe it was taken from somebody's
4  mother.
5  Q. There was no indication in anything that
6  I've seen that there was a prescription bottle
7  found. Do you know anything whether or not --
8  A. No, I would agree with that, that I don't
9  have any indication that there was a bottle found
10 either.
11 Q. Okay. I asked you if you knew whether
12 anyone else was searched. I think you said no.
13 A. I don't know.
14 Q. Okay. The -- and you don't know how many
15 pills were distributed or received by any of the
16 other students involved on the 25th, correct?
17 A. Not that I'm aware of, no.
18 Q. And -- okay.
19     MR. TAGUE: Let me just have a minute.
20     MS. GOGGIN-WARD: Sure.
21     (Recess at 12:37 p.m. to 12:40 p.m.)
22 BY MR. TAGUE:
23 Q. Okay, I'm looking at Exhibit No. 2.
24 A. Okay.
25 Q. And I think the first part of this we had

**Page 70**

1  propounded written questions, written answers were
2  put together, and I -- no page numbers. One, two,
3  three -- looks like on the seventh page you actually
4  verified that the answers were true to the best --
5  A. Yes.
6  Q. -- of your knowledge and belief. Okay.
7  We ask in No. 3 the day and time Noah was accused of
8  taking or possessing drugs.
9  A. Uh-huh.
10 Q. And then you indicate that at about 3:00
11 p.m. Noah was informed of the allegations against
12 him. That -- but the extent of your knowledge of
13 how he was informed is really No. 10 and then the
14 actual notice of suspension that we talked about.
15 A. Well, I take objection, calls -- state the
16 date and time Noah was accused would have been when
17 I -- the time that I thought that Noah was meeting
18 with Mr. Bunting and them, and since I got to the
19 high school around 4:00ish, I figured that around
20 3:00ish he had begun meeting with those guys.
21 Q. Okay. And actually, you know, that wasn't
22 the purpose I was asking the question.
23 A. Oh, I'm sorry.
24 Q. The purpose of the question was that you
25 state Noah was informed of the allegations against

**Page 71**

1  him, and I think you've answered this fully, but I
2  just want to be absolutely sure. The allegations
3  against him to your knowledge are based upon the
4  detail in Exhibit No. 10 that you provided us today
5  and the actual notice of suspension which was one of
6  the tab documents, I think tab number 6, of your
7  suspension hearing package, correct?
8  A. Yes.
9  Q. Okay. In Interrogatory No. 8, the list of
10 students owing the money, we talked about that in
11 Exhibit No. 3, and the question said when was that
12 given to him and it says it wasn't
13 given to Noah but it was given to Noah's counsel.
14 And my question is who did you mean by Noah's
15 counsel? I take it me?
16 A. Uh-huh. Yes.
17 Q. Okay. And that was not given to us at the
18 hearing though, was it?
19 A. The note wasn't given to you at the
20 hearing?
21 Q. That's my --
22 A. A copy of it?
23 Q. Yeah, that's my -- that's a correct
24 statement, it was not given to us at the --
25 A. Okay.

**Page 72**

1  Q. Not given to --
2  A. Was it provided to you prior?
3  Q. Well, first I'll ask that question. Was
4  it provided to us prior to the hearing?
5  A. I don't remember when you received it.
6  You -- did you -- I mean you've got it. Would you
7  have received it from Mr. Funk?
8  Q. Well, my question is the -- we can ask
9  other people obviously, but to your knowledge, you
10 don't know of any -- you don't know one way or the
11 other whether it was given to me prior to the
12 hearing. That's a correct statement, is it not?
13 A. I do not know the exact date when you got
14 that if you didn't get it on the 5th. I was under
15 the impression that you got it at the hearing.
16 Q. Okay, so --
17 A. A copy of it at the hearing, not the
18 actual note.
19 Q. Okay. So the -- and the reason for -- am
20 I correct that the reason for your answer No. 8 at
21 the time you made it I think, which was in February
22 of this year, was you thought it was part of the
23 document package that was in all the suspension and
24 expulsion hearings, correct?
25 A. I thought -- if you would have gotten it,

Page 73

1  I just thought that you would have gotten it at the
2  hearing. I know that our lawyer, right, our lawyer
3  wanted to make --
4     Q.  Right, I think I made a photocopy of it,
5  but --
6     A.  Okay, so how did you get — fine, I'm not
7  asking the questions. I'm sorry, I apologize.
8        MR. DIETCHWEILER: Off the record. So you
9  know, when -- we asked her for it after the lawsuit.
10       THE WITNESS: Okay.
11       MR. TAGUE: Right.
12       THE WITNESS: I apologize.
13       MR. DIETCHWEILER: Six months after the
14  lawsuit.
15       THE WITNESS: I apologize.
16       MS. GOGGIN-WARD: You have nothing to
17  apologize for, okay.
18       MR. DIETCHWEILER: He might.
19  BY MR. TAGUE:
20     Q.  Okay, and then on Interrogatory No. 9,
21  that's the letter of Michael McKay, referred to as
22  MM in the question or in the -- this document at
23  least, and it says here -- it says, "I became aware
24  of the letter on or about January 25, 2013."
25       MS. GOGGIN-WARD: Is that a question?

Page 74

1     Q.  Well, let me phrase it this way. The --
2  we asked you in Question No. 9, it says, "Identify
3  when the letter of MM identifying the students to
4  whom he had provided pills set forth in Plaintiff
5  A(ii) of Defendant's Rule 26 disclosures was," and C
6  was, "the first date and time that the defendants
7  became aware of the letter."
8        Now, of course you're one of the
9  defendants, so I -- on C, the answer is "See each
10  individual defendant's answer." Then it says "I
11  became aware of the letter on or about January 25,
12  2013." So my question is was that your written
13  answer to that question?
14     A.  Yes, that's when I was made aware of the
15  letter.
16     Q.  Okay. And based upon what you've told us
17  about the brief conversations that you had, when --
18  in what conversation, what communication did you
19  learn about the letter the day of the incident
20  itself?
21       MS. GOGGIN-WARD: I'm sorry, was there
22  another question?
23       MR. TAGUE: Yeah, read it back.
24       (Requested portion of the deposition was
25  read by the court reporter.)

Page 75

1  BY MR. TAGUE:
2     Q.  Okay, let me change it so that it's clear.
3  You previously told us that you had a brief
4  conversation with the principal that something was
5  going on on the 25th --
6     A.  Uh-huh.
7     Q.  -- correct?
8        MS. GOGGIN-WARD: You have to say yes or
9  no.
10    A.  Yes.
11       MS. GOGGIN-WARD: There you go.
12    Q.  But I believe you also told us that you
13  were not provided any information as to the details
14  of the investigation on that day.
15    A.  Details, yeah. Yes. I was aware that
16  they had found a student as I told you earlier who
17  had a list on him.
18    Q.  Okay.
19       MR. TAGUE: That's all the questions I
20  have.
21       MS. GOGGIN-WARD: I just have a couple.
22       EXAMINATION BY
23       MS. GOGGIN-WARD:
24    Q.  Getting back to what was marked as Exhibit
25  8 for identification and taking a look at subsection

Page 76

1  C where it says the superintendent or principal
2  shall notify the student's parents of the
3  suspension, do you see that?
4     A.  Yes.
5     Q.  First of all, were Noah and his mother
6  provided a copy of the notice of student
7  disciplinary action on the day of the action itself,
8  January 25th of 2013?
9     A.  I was not in the room, but it's -- I was
10  told yes.
11    Q.  And who were you told by?
12    A.  Well, a copy of it. I mean our
13  principal --
14    Q.  Sure.
15    A.  -- would give them. That's what they're
16  supposed to do. They have it here. So I would
17  certainly think, yes, that that is when that was
18  given and when it happened, but not being there I
19  hate to --
20    Q.  And in addition to that, you also provided
21  a letter on January 30th, 2013, notifying the
22  parents, Mr. and Mrs. Dietchweiler, pursuant to the
23  school discipline policy of Iroquois County, knowing
24  that they requested review of the suspension for
25  your son, you gave them a date and time of that

Page 77

1  suspension, of the review hearing; is that correct?
2  **A. Yes.**
3  Q. And where it was to take place; is that
4  correct?
5  **A. Yes, yes.**
6  Q. And that Noah was entitled to be
7  represented by counsel.
8  **A. Yes.**
9  Q. And that you also had an enclosure; is
10 that correct?
11 **A. Yes.**
12 Q. And what was that enclosure?
13 **A. Well, I give the letter to my secretary**
14 **and then she would put generally the policy, our**
15 **discipline policy, in with it.**
16 Q. Okay. So a copy of the school board
17 policy under paragraph C was then provided to Mr.
18 and Mrs. Dietchweiler on January 30th of 2013.
19 **A. It certainly should have been, yes.**
20 Q. Okay. And the enclosure indicates that it
21 was.
22 **A. She should have put it in there, yes. I**
23 **mean I didn't -- I give it to her and she mails it.**
24 Q. Assuming she followed that.
25 **A. Absolutely.**

Page 78

1  Q. Okay. And assuming the secretary actually
2  shoved everything correctly in the envelope, then a
3  copy of the school board policy entitled Student
4  Discipline Policy is enclosed was met pursuant to
5  paragraph C; is that correct?
6  **A. Yes.**
7  Q. So that would not have been a mistake,
8  correct, if it was sent to her?
9  **A. Yes.**
10 Q. All right. There was also some questions
11 about the penalty for drug possession and then the
12 penalty for lying about drug possession. And
13 looking at Exhibit 10, it states "Mr. Lucas
14 explained to Noah that we know about what happened
15 due to speaking to the other students and they were
16 all honest with us. Mr. Lucas told him that he
17 needed to be honest with us or the punishment would
18 be worse." Do you see that?
19 **A. Yes.**
20 Q. So did that imply that if he lied about
21 drug possession and he actually possessed drugs,
22 then the punishment will be worse than just
23 possessing drugs?
24 **A. That was the intent.**
25 Q. For lying, correct?

Page 79

1  **A. Yes.**
2  Q. I think you indicated that a copy of the
3  drug testing wasn't included in Exhibit 1 that was
4  provided at the hearing for Noah on February 5th; is
5  that correct? It wasn't in this exhibit, correct?
6  **A. If it's -- if it's not in here, then it**
7  **wasn't in here.**
8  Q. Okay. Did plaintiffs provide a copy of
9  that to everybody at the hearing?
10 **A. I don't recall.**
11 Q. Okay. Do you know if they talked about it
12 at the hearing?
13 **A. I believe it was brought up, yes.**
14 Q. Okay. And if they did actually provide a
15 copy of the negative drug testing at the hearing,
16 you have no reason to dispute that that actually was
17 provided, correct?
18 **A. I don't recall if it was provided or not.**
19 Q. The transcript that was provided to you, I
20 think it was on page 13 where Mr. Lucas was asked by
21 a board member: You're saying when you called him
22 in he admitted to taking pills. Was it the day
23 before or when supposedly that he admitted to what?
24 Say it again.
25     Mr. Lucas: All right, Noah informed us

Page 80

1  that he received pills from a student the day before
2  during school and took them because he was having a
3  hard time staying awake.
4     Do you see that?
5  **A. Uh-huh, yes.**
6  Q. Did it matter to you in your determination
7  as to whether or not Noah possessed pills if it
8  happened on January 24th or if it happened on
9  January 25th?
10 **A. No.**
11 Q. Why not?
12 **A. Because possession's possession.**
13 Q. Did it matter how many pills he possessed?
14 **A. No.**
15 Q. Did it matter what the exchange rate was
16 for those pills?
17 **A. No.**
18 Q. Did it matter what the appearance of those
19 pills were?
20 **A. No.**
21     **MS. GOGGIN-WARD: That's all I have.**
22     REEXAMINATION BY
23     **MR. TAGUE:**
24 Q. Mr. Lee, if there was a prescription
25 stolen, it would be important to know whether it was

Page 81

1 a month's supply or more, correct?
2 **A. Yes.**
3 Q. You're aware that Ativan is a controlled
4 substance and cannot be filled for more than 30
5 days?
6 **A. I -- I am now.**
7 Q. Okay. And if the exchange rate was a
8 dollar per pill, if you added up all the dollars on
9 the list, there's no way it could have happened if
10 the kid was found with two still in possession,
11 correct?
12 **MS. GOGGIN-WARD:** Objection, foundation.
13 **A. I don't -- I didn't -- I didn't memorize**
14 **the numbers, I'm sorry.**
15 Q. So the exchange rate would be important as
16 to whether or not the statements made by the kid who
17 stole the pills were credible or not.
18 **A. Unless he stole from more than one person.**
19 Q. Okay. Nobody bothered to find that out,
20 did they?
21 **A. No.**
22 Q. Nobody told us that the pills were
23 supposedly taken on the 24th so we could have asked
24 the parents when the prescription was filled,
25 correct?

Page 82

1 **A. I'm sorry, can you repeat that?**
2 Q. Isn't that a correct statement? Nobody
3 told us prior to the hearing that the supposed
4 exchange with Noah happened on the 24th.
5 **A. I was not in the room at the high school,**
6 **but from what you guys say, no.**
7 Q. Okay. And so we did not have an
8 opportunity to actually determine whether or not the
9 prescription that he stole was even in existence
10 prior to the 24th or the 25th, correct?
11 **MS. GOGGIN-WARD:** Objection, foundation,
12 calls for speculation. How would he know what you
13 knew?
14 **MR. TAGUE:** Read the question back.
15 (Requested portion of the deposition was
16 read by the court reporter.)
17 **MS. GOGGIN-WARD:** Same objection.
18 **BY MR. TAGUE:**
19 Q. My point is, if the prescription was
20 filled the evening of the 24th, that couldn't be
21 true. You accept that statement, do you not?
22 **MS. GOGGIN-WARD:** Objection, calls for
23 speculation and foundation.
24 Q. Just calls for either you are a rational
25 person who follows logic or simply -- okay, read the

Page 83

1 question back and then if you understand the
2 question you should answer it.
3 (Requested portion of the deposition was
4 read by the court reporter.)
5 Q. And by that, I mean this statement that he
6 received the drug the day before and took it.
7 **A. Well, I would think that if someone might**
8 **skip taking a pill on the 15th and there were extra**
9 **ones or something, I don't -- I don't know. I can't**
10 **say that for certain, that when the prescription's**
11 **being filled would have anything to do with**
12 **possessing or consuming pills.**
13 Q. Now, this statement here says that Noah
14 actually received and took the pills and did you
15 believe took meant something different than actually
16 ingesting them?
17 **A. No.**
18 Q. Okay. So this statement, based upon the
19 scientific evidence, that he took -- received the
20 pills and took it is not a correct statement,
21 correct? Might have received the pill, but it was
22 disproved that he took it.
23 **MS. GOGGIN-WARD:** Object to the form of
24 the question. It was just proved or disproved?
25 Q. The scientific evidence proved that the

Page 84

1 pill was not taken on the 24th, did it not?
2 **MS. GOGGIN-WARD:** Object to the form of
3 the question. If you get it, go ahead.
4 **A. Can you read that back please?**
5 (Requested portion of the deposition was
6 read by the court reporter.)
7 **A. If -- if he had a drug test that was**
8 **ordered by somebody else and took and said negative**
9 **and that was all supervised and things like that,**
10 **then -- and it said that there was absolutely no**
11 **drugs in his system and that's scientific proof, I**
12 **don't know what is scientific proof or not, that he**
13 **didn't ingest them and he said that he took them,**
14 **then those are conflicting.**
15 Q. Okay.
16 **MR. TAGUE:** Is Exhibit 10 there?
17 **MS. GOGGIN-WARD:** Yes.
18 **MR. TAGUE:** Should be a marked one
19 someplace.
20 **MS. GOGGIN-WARD:** He has it somewhere.
21 There it is.
22 **BY MR. TAGUE:**
23 Q. In Exhibit No. 10 Mr. Bunting indicates to
24 you that Mr. Lucas starts out his conversation
25 stating that they've spoken to other students,

Page 85

1  correct?
2  **A.  Yes.**
3  Q.  And that they knew everything that
4  happened, correct?
5  **A.  Mr. Lucas explained to Noah that we know**
6  **what happened due to speaking to the other students.**
7  Q.  Okay.  He to your knowledge never actually
8  disclosed to Noah what they knew had happened from
9  the other students.
10  **A.  I was not in that room, so I do not know.**
11  Q.  And then he says you need to be honest
12  with us or the punishment would be worse.
13  **A.  Yes.**
14  Q.  And you testified that that evidenced his
15  intent to tell Noah that he would be punished for
16  lying.
17  **A.  Yes.**
18  Q.  What punishment could Noah have received
19  for lying?
20  **A.  For lying?**
21  Q.  Yes.
22  **A.  In addition to a suspension?**
23  Q.  Yes.
24  **A.  Well, they could have recommended an**
25  **expulsion.**

Page 86

1  Q.  For denying that you took drugs and
2  finding that there was, in fact, one drug or one
3  pill possessed.
4  **A.  Yeah, if someone lied plus it was found**
5  **that someone possessed, they could recommend that.**
6  Q.  Okay.  And who would recommend that?
7  **A.  Mr. Bunting.**
8  Q.  Would recommend that to you?
9  **A.  Yes.**
10  Q.  And you would categorically deny that and
11  not send the recommendation on to the school board,
12  correct?
13  **A.  Yes, I don't believe I would send that on**
14  **to the board.**
15  Q.  And the -- you indicated in questioning
16  that it was Mr. Lucas's intent to get him to tell
17  the truth.  You don't know what Mr. Lucas's intent
18  was, do you?
19  **A.  No.**
20  Q.  Could have been his intent to get him to
21  cop to a confession for something he didn't do,
22  correct?
23      **MS. GOGGIN-WARD:** Objection to the form of
24  the question.
25  **A.  I don't know his --**

Page 87

1      **MS. GOGGIN-WARD:** Go ahead, you can tell
2  him.
3  **A.  I don't know his intent.**
4  Q.  The only thing you can go on is this is
5  what he told me, we've explored what he didn't tell
6  you, and that will have to be sorted out by the
7  courts and the jury.
8  **A.  Yes.**
9  Q.  Okay.  Have you been presented in the past
10  with drug test results by students or their families
11  in an attempt to get a reversal or mitigation of
12  punishment?
13  **A.  Not that I remember.**
14  Q.  Okay.  The drug testing results that were
15  presented, was there any discussion about whether or
16  not those testing procedures were proper or improper
17  or fallible or infallible?
18  **A.  With who?**
19  Q.  Well, with anyone.
20  **A.  Well, with myself and legal counsel.**
21  Q.  Okay.  And did that occur prior to the
22  hearing or after?
23      **MS. GOGGIN-WARD:** Object to the form of
24  the question.  Attorney/client privilege.
25      **MR. TAGUE:** It's been waived when he

Page 88

1  answered that he discussed it with --
2      **MR. DIETCHWEILER:** You're not asking for
3  the content anyway, so that's just not a proper --
4  Q.  And I just -- well, the question -- okay,
5  I think it's been waived.  I think you should answer
6  it.
7      **MS. GOGGIN-WARD:** I'm directing him not to
8  answer.
9      **MR. TAGUE:** Certify that.
10  Q.  And -- well, does that refresh your
11  recollection now that you had it before the hearing,
12  the actual test results?
13      **MS. GOGGIN-WARD:** Does what refresh your
14  recollection?
15  Q.  Well, I think you did not remember what --
16  **A.  I did not dispute that Mr. Dietchweiler**
17  **said that I got it before the hearing.  I'm not**
18  **disputing that.**
19  Q.  Okay.  I may have one more question.  Do
20  you have any opinions one way or the other
21  concerning the quality or validity of drug testing
22  that was done on January 25, 2013, for Noah
23  Dietchweiler?
24  **A.  I would think that if we were going to**
25  **take a drug test into play that we would want -- our**

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

Page 89

1  school district would want to be the ones that
2  administer it.
3      Q.  Okay.  Were you aware that there was a
4  frozen sample of the specimens that were taken and
5  that those were made available to the school
6  district?
7      A.  I believe so, yes.
8      Q.  And why didn't the school district have
9  its own testing done?
10     A.  Well, because we had an admittance of
11  guilt.
12         MR. TAGUE: Okay, that's all I have.
13         MS. GOGGIN-WARD: I just have one.  Did
14  you ever get the results of the polygraph test?
15     A.  No.
16         MS. GOGGIN-WARD: That's all I have.
17         MR. DIETCHWEILER: Read the transcript,
18  counsel.
19         MS. GOGGIN-WARD: We'll reserve signature.
20         (Adjourned at 1:07 p.m.)
21
22
23
24
25

Page 90

1   STATE OF ILLINOIS    )
                         )SS
2   COUNTY OF FORD       )
3
4      I, June Haeme, a Notary Public in and for
    the County of Ford, State of Illinois, do hereby
5   certify that KENNETH LEE, the deponent herein, was
    by me first duly sworn to tell the truth, the whole
6   truth and nothing but the truth, in the
    aforementioned cause of action.
7      That the following deposition was taken on
    behalf of the Plaintiff at the Iroquois County CUSD
8   #9, 1411 West Lafayette Street, Watseka, Illinois,
    on October 17, 2014.
9      That the said deposition was taken down in
    stenograph notes and afterwards reduced to
10  typewriting under my instruction; that the
    deposition is a true record of the testimony given
11  by the deponent; and that it was agreed by and
    between the witness and attorneys that said
12  signature on said deposition would not be waived.
       I do further certify that I am a
13  disinterested person in this cause of action; that I
    am not a relative, or otherwise interested in the
14  event of this action, and am not in the employ of
    the attorneys for either party.
15     IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my notarial seal this 23rd day of
16  October, 2014.
17
18
19            JUNE HAEME, CSR
              NOTARY PUBLIC
20
21
22  "OFFICIAL SEAL"
    June Haeme
23  Notary Public, State of Illinois
    My Commission Expires:
24  September 27, 2016
25

Page 91

1          IN THE UNITED STATES DISTRICT COURT
2            FOR THE CENTRAL DISTRICT OF ILLINOIS
               STATE OF ILLINOIS
3
4   NOAH DIETCHWEILER, by MICHAEL    )
    DIETCHWEILER, his father and     )
    next friend, and ANN DIETCHWEILER,)
5                                    )
        Plaintiffs,                  )  No. 2013-CV-2062
6                                    )
        vs.                          )
7                                    )
    STEVE LUCAS, in his official and )
8   individual capacities; et al.,   )
                                     )
9       Defendants.                  )
    -----------------------------    )
10
11         This is to certify that I have read the
12  transcript of my deposition taken by June Haeme,
    CSR, in the above-entitled cause, and that the
13  foregoing transcript taken on October 17, 2014,
    accurately states the questions asked and the
14  answers given by me, with the exception of the
    corrections noted, if any, on the attached errata
15  sheet(s).
16
17            KENNETH LEE
18
19  Subscribed and Sworn before
20  me the     day of            , 2014.
21                       , Notary Public
22
23
24      Area Wide Reporting and Video Conferencing
25      301 West White Street, Champaign, IL 61820
             800.747.6789

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

## A

able (1)
5:22
absolutely (3)
71:2;77:25;84:10
accept (1)
59:12;61:25;82:21
accepted (1)
59:13
according (1)
44:3
accumulating (2)
36:11;40:5
accused (4)
13:6,7;70:7,16
action (4)
39:9;53:23;76:7,7
actions (2)
28:16;52:3
activity (1)
12:15
actual (9)
27:20;50:7,9,21;
53:22;70:14;71:5;
72:18;88:12
actually (23)
20:17;34:17;38:19;
41:22;46:18;50:3;53:1;
56:18;60:15;61:23;
62:15;64:1,25;70:3,21;
78:1,21;79:14,16;82:8;
83:14,15;85:7
added (2)
14:24;81:8
addition (1)
76:20;85:22
additional (1)
28:20
address (2)
6:21,24
Adjourned (1)
89:20
administer (1)
89:2
administration (2)
11:4,12
administrative (1)
37:25
administrator (1)
11:2
administrator's (1)
11:14
admits (1)
51:11
admittance (2)
67:19;89:10
admitted (7)
21:24;43:23;44:23;
62:24;67:17;79:22,23
adopted (1)
66:11

adult (1)
7:13
affiliated (2)
25:13;26:25
afforded (1)
51:25
afternoon (1)
21:17
again (4)
50:18;55:7,17;79:24
against (3)
70:11,25;71:3
agree (2)
54:6;69:8
ahead (8)
31:9;45:16;46:8;
50:17;51:17;54:10;
84:3;87:1
Aii (1)
74:5
alert (1)
25:13
align (1)
18:2
aligned (1)
17:20
alignment (1)
17:1
allegations (4)
20:2;70:11,25;71:2
alleged (1)
63:15
allegedly (1)
52:7
allowed (1)
35:9
along (6)
38:12;40:20;54:20;
57:22,23;58:4
amount (1)
49:13
and/or (1)
52:3
answered (5)
34:3;50:15;68:16;
71:1;88:1
antithetical (1)
21:15
apologize (6)
33:5;57:12;73:7,12,
15,17
apparently (1)
21:13
appeal (6)
26:15;27:25;30:3,10,
14,18
appealed (1)
67:15
appearance (1)
80:18
applicable (1)
5:10
applied (1)

67:7
applies (1)
66:25
approval (1)
58:21
approve (1)
59:2
approved (1)
39:18
approximately (2)
13:15;22:18
archived (1)
17:11
argue (1)
54:9
arguing (1)
57:10
arose (1)
28:16
around (3)
22:20;70:19,19
arrangements (1)
37:20
arrive (1)
22:19
asserted (1)
68:5
assertion (2)
43:21,23
assertions (1)
67:16
assistant (8)
11:15,17;12:20;13:1,
5,25;14:18,22
associate (2)
14:19,22
Association (2)
16:5;17:22
Associations (1)
17:1
assume (1)
46:9
assuming (3)
69:1;77:24;78:1
athletics (1)
12:24
Ativan (3)
68:22,23;81:3
attachments (1)
57:4
attempt (1)
87:11
attendance (1)
56:8
attended (1)
51:24
attention (1)
28:14
attorney (4)
38:12,14,20;59:7
attorney/client (3)
58:25;68:2;87:24
attorneys (1)

60:18
attorney's (1)
38:6
authored (1)
31:14
available (2)
17:13;89:5
awake (4)
46:1,18;65:22;80:3
aware (23)
17:16;18:4;21:14,18;
22:2;29:18;42:10;44:2;
45:9;50:6;52:6;56:17;
58:22;63:24;68:4;
69:17;73:23;74:7,11,
14;75:15;81:3;89:3

## B

bachelor's (1)
10:7
back (18)
5:23;6:1,6;13:24;
14:14;18:8;25:2,11;
29:5;37:18;60:21;61:5;
62:19;74:23;75:24;
82:14;83:1;84:4
Baker's (2)
61:13;66:17
Based (4)
55:10;71:3;74:16;
83:18
basis (2)
48:9;67:20
became (4)
12:17;73:23;74:7,11
Becker (1)
9:11
become (5)
9:3;10:17;15:13;
21:14,18
becoming (1)
11:17
beginning (1)
68:11
begun (1)
70:20
belief (3)
21:5;62:9;70:6
below (1)
48:2
best (2)
66:9;70:4
better (1)
18:3
beyond (1)
67:22
big (2)
7:22,25
Blair (1)
9:13
blank (1)
56:9

Board (32)
9:5,8,10,11,12;18:2;
19:7;25:15;30:4;34:15,
24;35:18;38:3,17;
54:21;55:2,10,11;
57:16;58:18;60:4,21,
24;61:5;66:20,23;67:5;
77:16;78:3;79:21;
86:11,14
Boards (1)
17:22
Bob (1)
9:10
book (1)
18:13
born (1)
8:1
both (3)
15:25;30:10;40:16
bothered (1)
81:19
bottle (2)
69:6,9
break (1)
6:16
Brian (1)
16:5
Brief (3)
32:18;74:17;75:3
brother (2)
8:9,11
brought (1)
64:1;79:13
Bruns (2)
9:13;59:8
building (11)
14:25;20:12,21;
24:20,21;30:7;39:10;
40:4,15;41:9;42:11
bump (1)
7:21
Bunting (25)
21:21;23:19;26:4;
27:4;30:10;31:15,20;
32:8,21,22;39:23;44:3,
7;47:5;48:24;50:3;
52:17;64:12,18,23;
67:8,9;70:18;84:23;
86:7
Burd (1)
9:10
burden (1)
68:16
business (4)
6:23;11:10;24:17,19

## C

call (7)
14:2;21:19;28:2,8,
25,25;29:21
called (8)
7:21;27:4,5;29:2,4,4;

30:2;79:21
**calling (1)**
58:24
**calls (6)**
43:16;66:14;70:15;
82:12,22,24
**came (6)**
15:15,24;19:23;25:2;
32:8;61:5
**can (29)**
5:17;6:2,5,8;12:16;
22:25;32:1;33:23;
35:11;38:15;43:5;
45:14,18,18;50:2,17;
51:14,22;53:15;54:10;
56:25;60:17;64:8;
65:10;72:8;82:1;84:4;
87:1,4
**career (1)**
11:1
**case (3)**
60:19;67:22,23
**cases (1)**
67:24
**categorically (1)**
86:10
**certain (2)**
29:5;83:10
**certainly (3)**
45:4;76:17;77:19
**certified (1)**
54:13
**Certify (4)**
59:4;61:16;66:18;
88:9
**change (3)**
15:8;59:11;75:2
**changed (2)**
16:24;39:21
**changes (5)**
17:17,24;19:6,10,12
**charges (5)**
48:9,11;54:5,7;62:5
**child (1)**
51:1
**children (1)**
33:22
**Christopher (1)**
5:7
**circumstances (1)**
52:2
**Civil (2)**
5:10;67:23
**class (1)**
14:14
**classroom (1)**
12:4
**clear (3)**
6:1;67:24;75:2
**client (5)**
56:23,24;58:25;
61:14;66:16
**clients (1)**

67:1
**closed (4)**
61:12;66:15,22;67:4
**code (3)**
53:10;55:23;56:6
**coming (2)**
15:3;39:21
**Commencing (1)**
5:1
**committee (2)**
19:8,10
**communication (2)**
38:2;74:18
**communications (1)**
37:17
**Community (5)**
8:22;11:7,8;18:13;
56:8
**complaint (1)**
42:17
**completed (2)**
10:14,23
**concerning (6)**
33:13,15;38:4;42:12;
64:15;88:21
**conclude (1)**
61:22
**conclusion (1)**
61:20
**conclusions (1)**
61:18
**conclusive (1)**
62:1
**conduct (2)**
21:16;53:10
**confessed (2)**
43:21;44:4
**confession (2)**
47:2;86:21
**conflicting (1)**
84:14
**conform (1)**
53:23
**conformed (1)**
54:14
**consider (1)**
66:20
**constitute (1)**
48:9
**constraints (1)**
6:18
**consumed (1)**
61:23
**consuming (1)**
83:12
**consumption (2)**
21:11;62:6
**contact (3)**
25:12;27:25;43:17
**contacted (1)**
25:15
**contain (1)**
53:20

**contained (2)**
52:7;55:23
**contains (1)**
16:13
**content (1)**
88:3
**continued (2)**
10:25;34:23
**continuing (1)**
10:23
**contract (2)**
14:23,24
**controlled (1)**
81:3
**controversy (1)**
63:4
**conversation (18)**
14:7;23:18;24:1,12;
27:6,8,23;28:12;29:7,
9;33:16,19;34:5;47:4;
68:3;74:18;75:4;84:24
**conversations (5)**
43:8;46:11;66:25;
67:3;74:17
**converted (1)**
16:25
**converting (1)**
19:13
**convincing (1)**
67:24
**cop (1)**
86:21
**copy (18)**
17:12;27:19;40:7;
54:21;55:2;56:18;60:9;
65:3,14;71:22;72:17;
76:6,12;77:16;78:3;
79:2,8,15
**correctly (3)**
34:13,17;78:2
**correspondence (1)**
34:14;42:20
**counsel (14)**
16:6;29:21;32:1;
36:20;37:14;42:24;
57:18;60:25;67:2;
71:13,15;77:7;87:20;
89:18
**count (1)**
9:18
**County (4)**
10:1;38:23;56:7;
76:23
**couple (1)**
75:21
**course (3)**
39:14;64:14;74:8
**court (9)**
5:14;6:5;32:4;61:14;
62:21;74:25;82:16;
83:4;84:6
**courts (1)**
87:7

**cousins (2)**
8:14,15
**covered (1)**
59:23
**created (3)**
39:12;51:9;55:11
**credible (1)**
81:17
**criminal (1)**
67:22
**Crystal (1)**
9:13
**Current (2)**
9:16;17:6
**currently (2)**
8:16,21

## D

**dance (1)**
25:6
**date (6)**
18:24;56:10;70:16;
72:13;74:6;76:25
**dates (1)**
18:25
**day (25)**
20:20,25;22:13,16;
23:9;24:20,25;28:24;
30:12;41:2;43:22,24;
46:16;47:2;59:17;
62:15;65:20,23;70:7;
74:19;75:14;76:7;
79:22;80:1;83:6
**days (4)**
45:3;56:9;63:4;81:5
**deal (2)**
12:25;20:1
**dealing (1)**
15:17
**dealt (1)**
20:5
**decided (1)**
38:8
**decision (1)**
61:6
**defendants (2)**
74:6,9
**Defendant's (2)**
74:5,10
**defense (1)**
52:2
**degree (6)**
10:7,8,9,15,16;67:25
**degrees (1)**
11:1
**deliberate (1)**
60:4
**deliberated (1)**
60:22
**deliberation (1)**
68:3
**deliberations (4)**

60:23;66:22;67:4,6
**delineated (2)**
38:16;54:4
**delivered (1)**
30:24
**denied (2)**
44:11;45:7
**deny (1)**
86:10
**denying (1)**
86:1
**depended (1)**
14:11
**deposition (8)**
5:9,11;60:12;62:20;
74:24;82:15;83:3;84:5
**detail (1)**
71:4
**details (8)**
22:8;24:11;30:7;
42:12;43:1,18;75:13,
15
**detention (1)**
12:7
**detentions (1)**
12:5
**determination (3)**
61:10;66:21;80:6
**determine (1)**
82:8
**determining (1)**
66:11
**developed (1)**
39:15
**developing (1)**
58:7
**dialogue (1)**
5:20
**Dietchweiler (32)**
26:3,10,11;27:13,17,
25;28:22;29:11;30:4;
33:17,20;34:6,15;
40:24;42:21;43:1;
50:21;56:25;57:3,7;
64:25;65:8;68:12;73:8,
13,18;76:22;77:18;
88:2,16,23;89:17
**Dietchweilers (4)**
28:2;47:11;55:5;
71:12
**Dietchweiler's (1)**
29:18
**difference (1)**
14:21
**different (6)**
13:14;17:7;38:17;
40:11;63:4;83:15
**digits (1)**
7:8
**Direct (1)**
66:16
**directing (1)**
58:25;61:14;88:7

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

disciplinary (13)
  11:19;15:18,22;
  16:14;17:17;18:5;
  19:23;28:16;34:12;
  39:9;53:23;55:3;76:7
discipline (15)
  12:6,11,24;14:14;
  16:14;20:12;54:22;
  55:3;56:2,3,6,11;
  76:23;77:15;78:4
disciplined (1)
  11:24
disclosed (1)
  85:8
disclosures (2)
  19:2;74:5
discretion (1)
  21:1
discuss (1)
  29:14
discussed (8)
  27:22;60:19;66:19;
  67:1,7,9;68:1;88:1
discussion (2)
  14:12;87:15
discussions (1)
  59:6
disposition (1)
  61:7
disproved (2)
  83:22,24
dispute (5)
  64:7,10;68:7;79:16;
  88:16
disputing (2)
  58:1;88:18
distributed (2)
  42:5;69:15
distribution (1)
  64:2
District (13)
  8:22,25,25;10:1;
  17:11;24:25;25:13;
  26:25;56:9;66:11;89:1,
  6,8
document (23)
  31:2,8,17;38:5;
  39:24;40:5,23;41:15;
  46:7;47:8,10,15;49:5;
  50:20;51:12,20;53:4,7,
  22;57:16;66:4;72:23;
  73:22
documentary (5)
  36:11,18,23;37:15;
  43:10
documentation (2)
  36:14;63:22
documented (1)
  66:7
documents (11)
  37:19;38:7,10,10;
  40:3;42:10;43:9,15;
  59:24;66:14;71:6

dollar (2)
  49:13;81:8
dollars (2)
  63:16;81:8
Don (1)
  9:11
done (7)
  6:10,12,18;22:9;
  50:10;88:22;89:9
door (4)
  23:5;61:13;66:15,22
doubt (1)
  67:23
down (2)
  5:19;6:8
dozen (1)
  20:8
drug (19)
  12:14;13:6,7;21:10;
  29:12;56:17;68:20;
  78:11,12,21;79:3,15;
  83:6;84:7;86:2;87:10,
  14;88:21,25
drug-related (1)
  13:1
drugs (10)
  20:2;21:8;25:16;
  26:12;61:23;70:8;
  78:21,23;84:11;86:1
due (4)
  49:22;52:1;78:15;
  85:6
duly (1)
  5:3
during (12)
  14:12;20:24;29:9;
  46:14,17;52:16,22;
  56:24;61:3;64:14;
  65:21;80:2
duties (3)
  12:22;15:8;24:24
duty (1)
  7:21

E

earlier (2)
  34:9;75:16
early (1)
  21:17
Eastern (2)
  10:7,10
Education (11)
  9:5,8,12;10:6,14,23,
  24,25;19:7;38:3;57:17
educational (2)
  10:9,15
effect (2)
  17:7;19:22;47:22
Effective (2)
  18:25;56:10
efficiently (1)
  5:17

either (5)
  9:18;28:22;49:16;
  69:10;82:24
elected (2)
  8:16,18
electronic (3)
  18:17;19:3,5
electronically (2)
  17:14;18:12
else (12)
  23:20;26:16,18;
  27:22;28:11,14;47:1;
  53:5;60:16;66:7;69:12;
  84:8
email (12)
  26:3,8,9,17,19,20;
  30:25;31:1,20,21;32:7,
  16
emails (1)
  31:24
employed (2)
  9:22,25
enclosed (3)
  55:4,4;78:4
enclosure (1)
  77:9,12,20
end (4)
  22:16;24:20;68:11,
  12
ended (1)
  35:1
ends (1)
  24:16
entitled (3)
  55:2;77:6;78:3
envelope (1)
  78:2
equate (1)
  63:19
even (1)
  82:9
evening (2)
  60:25;82:20
event (1)
  18:17
everybody (1)
  79:9
evidence (9)
  36:11;48:10;61:19;
  62:14;66:20;67:24,25;
  83:19,25
evidenced (1)
  85:14
exact (3)
  22:5;64:17;72:13
exactly (3)
  16:4;28:24;36:2
EXAMINATION (2)
  5:4;75:22
excerpts (2)
  38:19;39:5
exchange (5)
  63:16;80:15;81:7,15;

82:4
excuse (1)
  23:22
excused (1)
  23:21
exercise (1)
  21:5
Exhibit (21)
  18:11,20;32:4,7;
  36:22;37:4;40:10;41:4;
  42:16,17;43:8;53:12;
  69:23;71:4,11;75:24;
  78:13;79:3,5;84:16,23
exhibits (1)
  42:16
existence (2)
  25:14;82:9
exiting (1)
  23:5
expectation (1)
  56:16
expel (1)
  45:18
expelled (1)
  45:19
explain (1)
  52:2
explained (4)
  29:11;49:22;78:14;
  85:5
explored (1)
  87:5
expulsion (6)
  36:1;45:5,6;55:21;
  72:24;85:25
expulsions (2)
  12:9;36:4
extent (3)
  10:5;22:10;70:12
extra (2)
  65:14;83:8

F

face (1)
  50:20
fact (5)
  44:6;57:21;66:7;
  67:21;86:2
facts (1)
  62:23
faculty (1)
  13:20
fair (1)
  16:8
Fall (1)
  10:21
fallible (1)
  87:17
false (2)
  45:10,17
familiar (2)
  18:8;19:17

families (1)
  7:20;37:21;87:10
family (3)
  7:25;33:21;56:21
far (3)
  26:6;30:7;56:14
fashion (1)
  11:24
father (2)
  8:8,10
February (7)
  17:8;18:9;56:19;
  59:15;60:19;72:21;
  79:4
Federal (1)
  5:10
few (3)
  5:16;27:9;60:13
figured (1)
  70:19
filed (1)
  33:11
filled (5)
  12:12;81:4,24;82:20;
  83:11
find (3)
  42:7;68:1;81:19
finding (1)
  86:2
fine (2)
  32:2;73:6
finish (1)
  33:1
first (13)
  5:3;10:2,13,22;
  11:14;20:1;22:23;
  29:20;37:1;69:25;72:3;
  74:6;76:5
Five (1)
  29:8
flagged (1)
  18:18
flight (1)
  26:13
follow (2)
  58:18;59:10
followed (1)
  77:24
following (3)
  18:23;47:21;48:4
follows (2)
  5:3;82:25
form (20)
  39:13;43:4;45:12;
  50:22;51:9,10;52:14;
  53:14,18;54:1,3,9;
  55:15;61:18;66:3,13;
  83:23;84:2;86:23;
  87:23
formal (4)
  10:5,14;15:16,20
format (2)
  53:24;54:14

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

**forth (2)**
48:1;74:4
**forwarded (1)**
26:3
**found (9)**
14:12;41:22;48:25;
49:7;69:7,9;75:16;
81:10;86:4
**foundation (5)**
45:13;62:17;81:12;
82:11,23
**four (5)**
7:8;22:20;35:17,19;
36:3
**fourth (1)**
40:11
**frequent (1)**
20:7
**frequently (1)**
20:5
**Friday (2)**
24:22;67:11
**front (1)**
23:5
**frozen (1)**
89:4
**full (2)**
5:6;22:10
**fully (1)**
71:1
**Funk (16)**
29:24;30:3;40:20,21;
41:11,12;43:10;57:24;
58:5,10,24;65:22;67:2,
3;68:6;72:7
**further (1)**
25:22

**G**

**gain (1)**
46:12
**gather (1)**
38:6
**gathered (2)**
38:9,10
**gave (3)**
42:3;49:18;76:25
**generally (3)**
19:6;21:10;77:14
**generated (1)**
39:25
**gentlemen (1)**
23:23
**gist (1)**
26:9
**given (16)**
16:18,21;51:1;52:22;
53:5;59:8;62:24;71:12,
13,13,17,19,24;72:1,
11;76:18
**glanced (1)**
60:13

**goes (3)**
18:22;25:21;45:21
**GOGGIN-WARD (66)**
18:24;31:9;32:2;
33:1,24;35:11;40:12;
41:21;42:18;43:4;
45:12,16;46:7;47:9;
50:14,17;51:12,17,19,
22;52:14;53:11;54:3,8,
23,25;55:15;56:23;
57:2;58:23;59:3;61:8,
11;62:16;65:4,7,10,16;
66:3,13,24;69:20;
73:16,25;74:21;75:8,
11,21,23;80:21;81:12;
82:11,17,22;83:23;
84:2,17,20;86:23;87:1,
23;88:7,13;89:13,16,19
**good (3)**
21:5,15;24:6
**guess (2)**
19:21;62:13
**guilt (1)**
89:11
**guilty (3)**
51:11;66:21;68:1
**guys (2)**
70:20;82:6

**H**

**hallway (1)**
23:24
**hand (1)**
65:15
**handbook (9)**
16:12;17:6,11,18;
19:8,10;38:24;39:6,7
**handbooks (1)**
13:14
**handed (1)**
37:14
**Handing (1)**
49:5
**handle (1)**
20:11
**handwritten (1)**
40:14
**happen (3)**
24:25;43:11;50:13
**happened (24)**
21:8,13;26:1;31:21,
22;41:24;43:2;47:7;
49:22;60:3;61:19;63:1;
64:10;65:23;66:1;
76:18;78:14;80:8,8;
81:9;82:4;85:4,6,8
**happens (3)**
13:22,24;20:24
**happy (1)**
6:4
**hard (4)**
45:25;46:18;65:22;

80:3
**hate (1)**
76:19
**head (1)**
5:21
**heads (1)**
21:2
**heard (4)**
44:1;46:21,23;61:19
**hearing (59)**
30:15;31:4,6;32:12;
34:19,21,24,25;35:2,4,
7,8,12;36:23;37:13,20;
38:3,4;40:19;41:15;
43:10;46:15,19,24;
48:13,21,23;51:23,25;
54:2,4,6;58:7,9;59:14;
64:4,13,17,19,23;67:5;
68:9;71:7,18,20;72:4,
12,15,17;73:2;77:1;
79:4,9,12,15;82:3;
87:22;88:11,17
**hearings (14)**
31:12;35:16;36:1,1,
10,12,15,18;37:2,9;
59:17,21,24;72:24
**held (2)**
8:18;51:23
**Here's (1)**
65:8
**High (16)**
11:7,8,16;12:18,21;
13:5;14:19,20;15:7;
18:13;21:14;25:7;
38:24;47:22;70:19;
82:5
**hired (3)**
9:6,9,20
**hold (1)**
8:16
**home (1)**
26:11
**honest (7)**
44:8,16;45:22;49:24;
78:16,17;85:11
**hundred (1)**
7:14,22

**I**

**identification (1)**
75:25
**Identify (1)**
74:2
**identifying (2)**
35:23;74:3
**Illinois (10)**
7:1,7;8:2;10:8,8,10;
16:5,25;17:22;56:5
**immediate (1)**
7:14
**immediately (1)**
8:8

**imply (1)**
78:20
**important (2)**
80:25;81:15
**imposition (2)**
47:20;48:4
**impression (1)**
72:15
**improper (1)**
87:16
**incident (13)**
17:4;19:25;20:16,16;
22:23;27:11;28:16;
33:14,16,22;42:13;
43:18;74:19
**incidents (5)**
12:1;21:7;27:1;
28:21;39:19
**included (3)**
41:14;55:9;79:3
**indicate (1)**
5:25;70:10
**indicated (5)**
41:20;44:7;64:23;
79:2;86:15
**indicates (2)**
77:20;84:23
**Indicating (1)**
48:1
**indication (5)**
46:3;53:13;65:25;
69:5,9
**individual (2)**
20:12;74:10
**infallible (1)**
87:17
**information (10)**
25:23;26:6;28:20;
33:13,15;38:10;40:5;
48:12;53:5;75:13
**informed (7)**
45:23;46:15;65:19;
70:11,13,25;79:25
**infraction (1)**
51:11
**infractions (2)**
12:9;15:18
**ingest (2)**
62:1;84:13
**ingesting (1)**
83:16
**initial (2)**
24:12;62:5
**initials (1)**
22:1
**innocence (1)**
52:3
**input (4)**
33:20;58:11,13;
59:12
**instruction (2)**
15:17,21
**instructional (2)**

15:11;16:8
**intended (2)**
17:23;22:9
**intent (6)**
78:24;85:15;86:16,
17,20;87:3
**interaction (1)**
33:21
**interested (1)**
42:16
**interrogated (1)**
24:8
**interrogation (3)**
43:2;47:15;52:16
**Interrogatory (2)**
71:9;73:20
**interrupt (1)**
42:2
**interrupting (1)**
30:16
**into (5)**
7:21;11:4;23:11;
38:8;88:25
**investigate (1)**
13:8
**investigated (1)**
63:19
**investigation (12)**
13:11;22:17;23:2;
25:1,14;28:15;30:8;
34:11;42:12;50:22;
64:14;75:14
**involved (16)**
11:18;12:1,3,8,10;
13:16;20:2,14;22:6;
26:14;27:6;28:20;30:8;
33:22;68:20;69:16
**involvement (3)**
33:19;34:10;58:6
**involving (2)**
15:21;21:8
**Iroquois (5)**
8:22;38:23;56:6,8;
76:23
**irregularity (1)**
21:15
**issue (1)**
25:16
**issued (2)**
12:5;44:7
**items (1)**
38:16

**J**

**James (1)**
9:13
**January (29)**
10:11;17:7;18:9;
19:11,25;20:6,16;
21:12;27:1;28:17,21;
33:24,25;34:1;40:18;
42:13;43:11,14,18;

47:2;52:22;73:24;
74:11;76:8,21;77:18;
80:8,9;88:22

**Jim (1)**
9:13

**job (7)**
10:3,13,22;11:14;
12:19;14:15,16

**Johnson (1)**
8:4

**Judge (2)**
61:13;66:16

**judgment (1)**
21:5

**July (3)**
9:4;33:22,24

**Junior (7)**
11:16;12:18,20;13:5;
14:19,20;15:6

**jury (2)**
7:21;87:7

**K**

**Ken (1)**
57:3

**KENNETH (3)**
5:2,7,9

**kid (2)**
81:10,16

**Kingsley (2)**
11:15;14:19

**Kirk (1)**
8:4

**knew (10)**
30:9,13,15,17;47:1;
50:3;69:11;82:13;85:3,
8

**knowing (1)**
76:23

**knowledge (17)**
28:18;49:10;52:25;
53:8;56:12,20;59:22;
62:14;63:20,21;66:6,6;
70:6,12;71:3;72:9;85:7

**L**

**Lafayette (1)**
6:25

**last (8)**
7:8,17;10:15;11:1;
16:24;24:1;54:4;55:1

**later (1)**
53:15

**lawsuit (2)**
73:9,14

**lawyer (2)**
73:2,2

**leader (1)**
15:11

**learn (4)**
25:25;28:11;43:20;

74:19
**learned (2)**
22:23;43:18
**least (2)**
35:4;73:23
**leave (3)**
23:23;28:2,7
**LEE (6)**
5:2,7,9;7:18;8:4;
80:24
**left (2)**
15:12;24:21
**legal (7)**
16:6;29:21;36:20;
37:14;57:18;60:25;
87:20
**lengthy (1)**
26:20
**letter (17)**
30:3,25;39:13,15,25;
42:25;48:20;57:4;
73:21,24;74:3,7,11,15,
19;76:21;77:13
**level (2)**
20:13;42:11
**lied (2)**
78:20;86:4
**line (1)**
68:15
**lines (2)**
18:14;68:13
**list (7)**
21:25;38:16;53:2;
63:18;71:9;75:17;81:9
**little (1)**
13:14
**live (1)**
7:4
**located (1)**
20:17
**logic (1)**
82:25
**long (5)**
11:3;12:18;23:25;
27:8;29:6
**look (11)**
19:14;31:9;32:16;
36:3,3;38:15;39:12;
53:15,19;60:14;75:25
**looked (1)**
63:23
**looking (3)**
54:25;69:23;78:13
**looks (2)**
39:14;70:3
**Lucas (27)**
23:17,19;30:11;
31:16,21;32:23;44:4,8,
15;45:22;46:15;47:5;
48:24;49:6,21;50:3,25;
51:24;52:16;64:25;
65:18;78:13,16;79:20,
25;84:24;85:5

**Lucas's (4)**
23:13,15;86:16,17
**lunch (1)**
52:22
**lunchroom (1)**
46:10
**lying (5)**
78:12,25;85:16,19,
20

**M**

**mail (1)**
54:13
**mails (1)**
77:23
**main (3)**
17:19;23:4,14
**major (1)**
12:8
**making (1)**
61:9
**management (1)**
15:10
**many (7)**
13:15;24:7;35:16;
42:4;64:1;69:14;80:13
**marked (3)**
32:4;75:24;84:18
**married (1)**
8:6
**master's (1)**
10:8
**material (1)**
16:8
**materials (2)**
32:11;39:2
**matter (5)**
20:6;80:6,13,15,18
**mattered (1)**
14:11
**matters (2)**
11:19;13:1
**may (10)**
5:21;12:12,12;19:6;
21:7;24:25;32:16;
45:19;66:15;88:19
**maybe (2)**
38:15;58:5
**McKay (12)**
40:15;42:8;45:24;
48:25;49:7,12;52:11,
18;62:2;63:10;64:1;
73:21
**McKay's (1)**
35:7
**McLean (1)**
10:1
**mean (13)**
5:22;6:2;12:4,5;
45:18;46:12;57:4;
67:18;71:14;72:6;
76:12;77:23;83:5

**meant (4)**
8:7;33:25,25;83:15
**medication (1)**
68:24
**meet (2)**
23:12;29:14
**meeting (4)**
29:15,19;70:17,20
**meetings (1)**
35:20
**member (4)**
9:16;13:20;66:25;
79:21
**Members (4)**
9:12;33:21;34:15;
60:24
**memo (1)**
43:17;44:6,6;52:7
**memorize (1)**
81:13
**memory (1)**
66:9
**mentioned (2)**
34:9;59:20
**met (2)**
29:20;78:4
**Michael (16)**
35:7;40:7,14;41:7,
22;42:5;45:24;48:20,
25;49:7,12;52:11,18;
63:10;64:1;73:21
**middle (1)**
23:24
**might (4)**
25:6;73:18;83:7,21
**Mike (3)**
62:2;65:9;68:10
**mile (1)**
7:14
**miles (1)**
7:22
**minute (2)**
24:2;69:19
**minutes (3)**
27:9;29:8;35:18
**missing (1)**
9:15
**mistake (6)**
53:25;54:19;55:7;
57:5,11;78:7
**mistaken (1)**
46:21
**mitigation (1)**
87:11
**MM (2)**
73:22;74:3
**moment (1)**
34:18
**Monday (4)**
27:2;28:15,23;32:19
**money (1)**
41:7;71:10
**month (2)**

14:23,24
**months (1)**
73:13
**month's (1)**
81:1
**more (13)**
12:6;15:10;25:18,25;
35:15;44:22,25;45:3;
56:3;81:1,4,18;88:19
**morning (5)**
26:2;27:2,13;29:12;
32:19
**mother (6)**
8:8,10;23:5,7;69:4;
76:5
**motion (1)**
62:12
**moved (1)**
11:11
**Mrs (4)**
26:3,10;76:22;77:18
**much (2)**
42:7;56:4
**must (1)**
37:13
**Myself (2)**
7:12;87:20

**N**

**name (9)**
5:6;7:17;35:23;
39:18,21;49:1,13;56:7;
59:20
**names (2)**
8:5,6
**necessary (1)**
68:1
**need (9)**
5:20;6:7,11,16,19;
29:21;34:25;61:16;
85:11
**needed (4)**
44:8,16;45:22;78:17
**needs (3)**
51:5;55:20;59:9
**negative (3)**
27:18;79:15;84:8
**new (3)**
17:18;18:1;19:11
**next (10)**
26:24;28:19;29:12;
30:1;33:12,15;34:10,
13,22,22
**night (5)**
25:7;28:23,23;29:20;
31:12
**Noah (57)**
23:4,6;26:10;29:13;
33:18;35:23;36:6;43:3,
21,23;44:3,11;45:23;
46:3,15;47:4;48:25;
49:6,11,22;50:3,6,20;

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

51:24,25;52:7,17;53:6;
61:22;62:15;63:6,13,
23;64:15,24;65:18;
66:12,21;70:7,11,16,
17,25;71:13;76:5;77:6;
78:14;79:4,25;80:7;
82:4;83:13;85:5,8,15,
18;88:22
**Noah's (12)**
17:4;19:22;32:12;
35:8;36:23;41:15;
47:14;59:14,20;64:13;
71:13,14
**nobody (4)**
63:19;81:19,22;82:2
**Normal (5)**
11:7,8;14:17;15:3;
28:5
**note (6)**
40:7,9,14;41:6;
71:19;72:18
**notes (3)**
48:19,19;64:13
**notice (18)**
39:8;48:8;53:14,19,
23;54:2,5,13,20;55:9,
12,12,20;56:14;58:8;
70:14;71:5;76:6
**notices (1)**
37:21
**notified (4)**
20:25;21:9,11;34:24
**notify (1)**
76:2
**notifying (1)**
76:21
**number (10)**
6:21;7:2,9;22:6;
38:23;39:8,25;42:19;
53:13;71:6
**numbers (5)**
53:2;63:18,19;70:2;
81:14

**O**

**object (10)**
43:4;45:12;52:14;
54:3;55:15;66:3,13;
83:23;84:2;87:23
**objecting (1)**
54:9
**Objection (16)**
46:7;50:14;51:12;
56:23;58:23;59:3;61:8,
11;62:16;66:24;70:15;
81:12;82:11,17,22;
86:23
**observed (2)**
47:21;48:5
**obtained (1)**
11:1
**obviously (2)**

64:20;72:9
**occasion (1)**
13:3
**occur (1)**
87:21
**occurred (3)**
30:21;61:12;67:12
**occurrences (1)**
30:11
**o'clock (1)**
22:21
**off (7)**
16:22;32:10,14;39:3;
56:25;62:23;73:8
**offense (2)**
13:6,7
**offer (1)**
56:21
**office (15)**
8:16,19;17:12;21:24;
23:4,14,14,15,23;25:2;
29:2,4;38:6,7;67:17
**official (1)**
48:7
**old (4)**
17:10,10,18,25
**once (1)**
14:9;25:11;50:25;
58:8
**one (36)**
6:8;9:15;17:7,18;
18:25;23:3,17,20;
30:21;31:11;32:22;
34:8;35:4,14;36:4,6;
39:13,17,18;47:9;
53:15;61:16;65:5,7,8;
70:2;71:5;72:10;74:8;
81:18;84:18;86:2,2;
88:19,20;89:13
**ones (3)**
59:25;83:9;89:1
**only (7)**
6:8;23:17;48:12;
52:6;62:10;65:25;87:4
**on-the-job (2)**
15:16,19
**open (1)**
68:6
**opinions (2)**
66:14;88:20
**opportunity (3)**
52:1,11;82:8
**order (2)**
61:14;66:17
**ordered (1)**
84:8
**out (17)**
12:12;18:5;23:15;
25:2;28:16;34:15;
37:14,21;38:19;42:7;
47:19;48:7;54:1;58:8;
81:19;84:24;87:6
**owed (1)**

41:7
**owing (1)**
71:10
**own (2)**
12:4;89:9

**P**

**package (13)**
31:5,11;32:11;36:23;
37:16;40:6,23;41:15;
43:11;47:8;57:16;71:7;
72:23
**packages (1)**
36:18
**packet (1)**
31:4
**packets (1)**
38:8
**page (17)**
18:14,18,22;37:1;
40:10,11;41:4,6;42:18;
65:1,16,17;68:8,13;
70:2,3;79:20
**pages (1)**
38:24
**paper (2)**
49:1,12
**papers (1)**
34:19
**paragraph (3)**
48:1;77:17;78:5
**parent (1)**
28:7
**parents (5)**
51:1;53:6;76:2,22;
81:24
**Parkside (2)**
14:20;15:6
**part (3)**
40:23;69:25;72:22
**passed (2)**
43:9;58:4
**past (1)**
87:9
**pause (1)**
32:18
**Paxton (1)**
8:2
**penalty (2)**
78:11,12
**people (1)**
72:9
**per (1)**
81:8
**percent (1)**
17:20
**period (1)**
56:9
**person (4)**
6:8;41:7;81:18;
82:25
**Personal (1)**

6:22
**personally (1)**
37:24
**pertaining (4)**
14:8;25;26:6;36:19
**phone (3)**
21:19;34:8;43:16
**photocopy (1)**
73:4
**phrase (1)**
74:1
**pill (5)**
81:8;83:8,21;84:1;
86:3
**pills (44)**
21:25;22:3;41:22,24;
42:4,8;43:21,24;44:4,
12,17;45:2,7,8,24;46:4,
16;49:1,8;52:22;62:2,
15,25;63:13,16,19,22;
64:1;65:19,20;66:12;
69:15;74:4;79:22;80:1,
7,13,16,19;81:17,22;
83:12,14,20
**place (4)**
34:7;37:20;39:20;
77:3
**Plaintiff (1)**
74:4
**plaintiffs (1)**
79:8
**Plaintiff's (1)**
42:15
**play (1)**
88:25
**please (4)**
5:6;43:6;55:18;84:4
**plus (1)**
86:4
**pm (4)**
69:21,21;70:11;
89:20
**point (4)**
30:6;36:20;44:2;
82:19
**police (4)**
28:3,8;42:3;68:22
**policies (3)**
16:13;38:17,21
**policy (27)**
13:13;17:1,20;18:3;
20:23;21:4;47:22;
53:18;54:1,14,20,22;
55:2,3,11,11;56:2,3,6,
10,11;76:23;77:14,15,
17;78:3,4
**polygraph (2)**
29:13;89:14
**portion (5)**
62:20;74:24;82:15;
83:3;84:5
**position (2)**
15:3,11

**possess (1)**
62:15
**possessed (5)**
78:21;80:7,13;86:3,5
**possessing (3)**
70:8;78:23;83:12
**possession (15)**
21:10;48:25;49:7,12;
62:4,6,10,25;66:8,12;
78:11,12,21;80:12;
81:10
**possession's (1)**
80:12
**possible (2)**
5:18;6:19
**potentially (2)**
44:18,20
**preparation (1)**
60:11
**prepare (4)**
30:22;43:10;58:14,
16
**prepared (8)**
36:23;38:5;42:11;
47:15;50:25;58:10;
64:15,19
**preponderance (1)**
67:23
**prescribed (3)**
53:18;54:14;56:15
**prescribes (1)**
55:20
**prescription (6)**
68:24;69:6;80:24;
81:24;82:9,19
**prescription's (1)**
83:10
**present (6)**
23:20;36:18;52:2;
60:22,24;61:3
**presentation (1)**
36:11
**presented (9)**
19:7;37:8,12;41:15;
47:16;52:18;53:1;87:9,
15
**president (4)**
9:10;25:15;34:25;
58:18
**PRESS (2)**
17:20;19:13
**previously (1)**
75:3
**Pride (1)**
29:20
**principal (17)**
11:15,17;12:17,20;
13:2,6,25;14:20,22,22;
15:6,9;39:13;64:4;
74:4;76:1,13
**Principals (3)**
16:5;25;21:1
**principality (2)**

14:18;15:12
**Printed (9)**
  16:18,21;18:12,15;
  19:1;32:10,14;39:1,3
**prior (25)**
  9:23,25;11:17;20:6,
  15;29:19;38:3;39:20;
  47:20;48:4,13,21,22;
  50:7,11;53:4;59:21;
  61:9,13;72:2,4,11;82:3,
  10;87:21
**private (3)**
  60:4;67:4;68:2
**privilege (2)**
  58:25;87:24
**problem (1)**
  22:10
**procedural (1)**
  51:25
**Procedure (11)**
  5:10,17;13:4,9,18,
  19;14:5;17:25;20:24;
  28:5;56:4
**procedures (14)**
  6:14;15:22;16:14;
  17:10,17;18:6;47:18,
  19,21;48:5;56:12;58:7,
  19;87:16
**proceeding (1)**
  19:23
**proceedings (4)**
  19:15;20:12;34:12;
  66:1
**process (2)**
  47:14;52:1
**produced (1)**
  31:3
**product (2)**
  38:21,23
**profession (1)**
  29:19
**proof (11)**
  44:13;62:1;66:10,19;
  67:7,18,21;68:1,16;
  84:11,12
**proper (3)**
  67:7;87:16;88:3
**proposed (1)**
  48:9
**propounded (1)**
  70:1
**protocol (1)**
  13:10
**protocols (4)**
  17:25;58:8;59:2,7
**prove (1)**
  52:3
**proved (2)**
  83:24,25
**proven (1)**
  67:22
**provide (10)**
  30:19;31:16;38:20;

39:5,6;56:21;58:18;
64:19;79:8,14
**provided (20)**
  17:21;37:17;39:7,22;
  40:4;47:10;53:14;55:4;
  71:4;72:2,4;74:4;
  75:13;76:6,20;77:17;
  79:4,17,18,19
**public (2)**
  8:16,18
**published (1)**
  16:16
**pull (1)**
  38:19
**punished (1)**
  45:3;85:15
**punishment (13)**
  44:9,11,14,16,18,22;
  45:11,23;78:17,22;
  85:12,18;87:12
**purpose (2)**
  70:22,24
**pursuant (6)**
  5:9;56:5;61:13;
  66:16;76:22;78:4
**put (7)**
  36:17;37:15,19;40:5;
  70:2;77:14,22

## Q

**quality (1)**
  88:21
**quantified (1)**
  63:25
**quantity (1)**
  63:12
**quickly (1)**
  6:19
**quitting (1)**
  25:3

## R

**radius (1)**
  7:15
**raised (2)**
  8:1;68:5
**ran (3)**
  12:4;58:21,22
**rate (4)**
  63:16;80:15;81:7,15
**rather (2)**
  66:2,8
**rational (1)**
  82:24
**reaction (1)**
  33:10
**read (18)**
  5:22;6:1,5;33:8;
  60:15;62:12,18,21;
  65:10;74:23,25;82:14,
  16,25;83:4;84:4,6;

89:17
**reading (4)**
  33:9;46:12;47:24;
  62:23
**really (2)**
  63:3;70:13
**reason (6)**
  6:17;22:15;54:18;
  72:19,20;79:16
**reasonable (1)**
  67:23
**recall (15)**
  24:9;25:24;28:23;
  33:23;38:13;40:21;
  41:12,19,25;42:9;
  60:17;63:14,17;79:10,
  18
**receipt (2)**
  33:12,15
**receive (6)**
  25:22;32:15,22;
  40:17;56:18;58:2
**received (45)**
  21:19;22:22;28:20;
  30:2,3,6;31:20,21;33:7,
  13;34:14;39:9;40:7,15;
  41:8;42:20,25;43:9,9,
  15,16;44:25;45:7,8,24;
  46:16;50:7,8;57:8,9,10,
  11,11,14,22;65:19;
  69:15;72:5,7;80:1;
  83:6,14,19,21;85:18
**receiving (2)**
  42:8;45:2
**Recess (2)**
  32:3;69:21
**recited (1)**
  55:13
**recollection (3)**
  57:21;88:11,14
**recommend (4)**
  45:4;86:5,6,8
**recommendation (2)**
  61:6;86:11
**recommended (3)**
  44:25;45:6;85:24
**record (8)**
  5:8;57:1,20;60:3;
  64:9,9;66:1;73:8
**redact (3)**
  35:22,24
**REEXAMINATION (1)**
  80:22
**refer (1)**
  8:24
**reference (1)**
  49:13
**references (1)**
  61:12
**referral (1)**
  12:11
**referrals (1)**
  12:6

**referred (1)**
  73:21
**reflect (1)**
  5:8
**reflected (1)**
  55:12
**reflecting (1)**
  35:19
**refresh (3)**
  57:20;88:10,13
**refused (1)**
  68:6
**registered (1)**
  54:13
**related (1)**
  12:14
**relating (2)**
  16:13;28:15
**relative (1)**
  13:10
**relatives (2)**
  7:13;8:13
**relevance (1)**
  62:16
**remember (26)**
  12:16;16:7;21:22,23;
  22:25;26:21;29:5;31:2;
  34:13,17;36:2;37:8,11;
  46:22,25;58:13,14;
  64:3,12,16;68:8,10,21;
  72:5;87:13;88:15
**repeat (2)**
  43:6;82:1
**rephrase (1)**
  6:5
**report (3)**
  13:20;14:8;27:20
**reporter (7)**
  6:5;32:5;62:21;
  74:25;82:16;83:4;84:6
**represented (1)**
  77:7
**reprimanded (1)**
  11:24
**Requested (6)**
  62:20;74:24;76:24;
  82:15;83:3;84:5
**required (1)**
  55:13
**requirements (1)**
  18:5
**requires (1)**
  56:14
**reserve (1)**
  89:19
**reside (1)**
  7:11
**residence (1)**
  7:5
**respond (2)**
  52:19,23
**response (3)**
  6:2;24:3;25:20

**responsibilities (1)**
  14:24
**result (2)**
  12:11;50:22
**results (11)**
  27:14,15,18;29:14;
  35:19;56:18;58:2;
  87:10,14;88:12;89:14
**revealed (1)**
  22:6;66:15
**reversal (1)**
  87:11
**review (9)**
  16:22;30:5;36:1;
  40:24;46:14;58:9;
  60:11;76:24;77:1
**reviewed (1)**
  60:5
**reviews (1)**
  36:7
**Reynolds (1)**
  9:13
**ride (1)**
  23:4
**right (15)**
  16:20;20:10;28:9;
  35:7,25;44:15;54:2;
  55:1;60:7;68:13;73:2,
  4,11;78:10;79:25
**rights (2)**
  16:10;52:1
**room (3)**
  76:9;82:5;85:10
**Ross (1)**
  8:4
**Rule (2)**
  19:2;74:5
**Rules (2)**
  5:10,16
**ruling (1)**
  61:13

## S

**sale (1)**
  25:16
**same (8)**
  6:8;13:13;36:14;
  37:2;55:12;59:3;66:24;
  82:17
**sample (1)**
  89:4
**saw (3)**
  13:21;48:22,23
**saying (5)**
  37:24;41:7;51:19;
  68:21;79:21
**schedule (1)**
  29:15
**scheduled (1)**
  29:13
**scheduling (1)**
  36:9

**School (57)**
8:22,24,25;10:1,17;
11:7,8,16;12:18,21;
14:19,20;15:7;17:1,3,
11,22;18:13;20:3,17,
18,25;21:8,14;22:13,
24;23:1,12;25:7,13,17;
26:25;27:3;28:2,7;
38:24;46:17;47:22;
55:23;56:5,8;61:5;
64:2;65:21;66:11,23;
67:5;70:19;76:23;
77:16;78:3;80:2;82:5;
86:11;89:1,5,8
**schools (1)**
9:23
**Schwartz (1)**
16:6
**scientific (5)**
61:25;83:19,25;
84:11,12
**Scott (1)**
9:10
**script (4)**
58:15,16,17;59:9
**search (1)**
14:13
**searched (4)**
41:23;63:7,10;69:12
**second (4)**
40:10;41:4,6;57:1
**secretary (2)**
9:12;77:13;78:1
**section (3)**
18:21;55:24;56:5
**security (1)**
7:9
**selling (2)**
21:24;42:8
**seminars (2)**
15:21;16:6
**send (5)**
30:11;37:21;64:22;
86:11,13
**sending (1)**
14:13
**sent (20)**
26:4;32:19,20;38:2,
12,13;39:10;40:20,21;
41:11,12;42:24;54:21;
55:5;57:3,22,23;58:8;
64:20;78:8
**series (1)**
14:5
**services (1)**
17:21
**serving (2)**
34:18,20
**session (3)**
61:13;66:15;68:6
**set (5)**
14:5,5;35:5;48:1;
74:4

**setting (2)**
34:23;35:1
**seven (2)**
9:17;22:7
**seventh (1)**
70:3
**several (1)**
43:7
**severe (2)**
12:7;44:22
**shake (1)**
5:21
**shall (3)**
47:21;48:7;76:2
**share (1)**
27:14
**Shari (1)**
57:8
**shoved (1)**
78:2
**Show (3)**
31:8;40:9;65:11
**showing (1)**
18:25
**sign (2)**
16:22;51:5
**signature (1)**
89:19
**signs (1)**
51:1
**similar (1)**
31:17
**simply (3)**
58:22;59:12;82:25
**sisters (1)**
8:5
**sit (1)**
31:19
**situation (1)**
13:22
**Six (3)**
11:5;38:16;73:13
**Sixth (1)**
7:6
**skip (1)**
83:8
**social (1)**
7:8
**somebody (2)**
20:2;84:8
**somebody's (1)**
69:3
**someone (5)**
13:6;45:7;83:7;86:4,
5
**someplace (1)**
84:19
**Sometimes (1)**
13:23
**somewhere (1)**
84:20
**son (1)**
76:25

**sorry (15)**
8:14;30:16;33:3,3;
42:2;46:22;47:25;
54:23;62:6;65:20;
70:23;73:7;74:21;
81:14;82:1
**sorted (1)**
87:6
**South (1)**
7:6
**speak (9)**
23:6,9,12;26:24;
35:9;45:1,17;52:11,15
**speaking (4)**
34:18;49:23;78:15;
85:6
**speaks (4)**
46:8;51:13,20;66:4
**specialist (2)**
10:9,15
**specific (4)**
15:16;16:7;17:16;
33:10
**specifically (1)**
56:14
**specimens (1)**
89:4
**speculation (2)**
82:12,23
**spells (2)**
18:5;54:1
**spoke (2)**
28:22;29:7
**spoken (2)**
26:11;84:25
**staff (1)**
37:25
**standard (5)**
66:10,19;67:7,18,21
**start (5)**
6:10,11,23;22:11;
68:15
**starts (6)**
18:13,20,21;47:19;
48:7;84:24
**state (6)**
5:6;10:9;55:13,19;
70:15,25
**stated (1)**
46:24
**statement (15)**
16:9;45:10,18;49:21;
52:11,18;60:15;71:24;
72:12;82:2,21;83:5,13,
18,20
**statements (1)**
81:16
**states (1)**
78:13
**stating (1)**
84:25
**statute (4)**
18:4;55:13,19;56:13

**staying (4)**
45:25;46:18;65:22;
80:3
**step (3)**
34:13,22,22
**Steven (1)**
51:24
**still (8)**
16:20;17:13;23:4,13;
24:4;26:22;45:18;
81:10
**stole (3)**
81:17,18;82:9
**stolen (1)**
80:25
**stood (1)**
23:24
**Street (2)**
6:25;7:6
**structure (1)**
15:1
**student (38)**
12:12;13:21;14:2,7,
10;15:21;16:10,12,13,
18;18:5;21:24;22:3;
23:3,9,13,14;35:5;
38:24;39:9;46:16;48:8;
51:5,5,11,23;52:1;
53:23;54:22;55:2,3;
56:6,7;65:20;75:16;
76:6;78:3;80:1
**students (20)**
12:2;15:18;21:16,25;
22:6,12;23:21,22;24:7;
35:10;49:23;63:9;
69:16;71:10;74:3;
78:15;84:25;85:6,9;
87:10
**student's (2)**
35:22;76:2
**subject (1)**
20:6
**submitted (4)**
19:10;40:24;41:2;
59:25
**subpart (1)**
55:14
**subsection (1)**
75:25
**substance (1)**
81:4
**substantive (1)**
17:24
**summaries (1)**
64:15
**summary (7)**
30:11,19,22;37:16;
48:10;64:19,22
**superintendent (4)**
8:21;9:3;15:13;76:1
**superintendent's (1)**
10:2
**supervised (1)**

84:9
**supervision (1)**
14:25
**supply (1)**
81:1
**supports (1)**
48:10
**supposed (10)**
13:11;47:2;50:10;
51:15;53:14,19,20;
54:21;76:16;82:3
**supposedly (4)**
46:3;63:23;79:23;
81:23
**sure (13)**
6:7;16:20;17:15;
31:25;32:17;43:7;
55:19;57:6;58:12;
60:10;69:20;71:2;
76:14
**surgeons (1)**
26:14
**suspended (5)**
12:13;50:9,21;51:2;
56:7
**suspending (1)**
48:7
**suspension (34)**
17:17,25;18:22;
19:15;32:11;35:25;
36:5,7;40:24;46:14;
47:19,20;48:10;50:7;
51:23;53:19;54:15;
55:21;58:7,9;59:14;
61:20;62:3,5,10,11;
70:14;71:5,7;72:23;
76:3,24;77:1;85:22
**suspensions (2)**
12:9;67:12
**sworn (1)**
5:3
**system (1)**
84:11

**T**

**tab (5)**
38:16,17;47:10;71:6,
6
**TAGUE (30)**
5:5;32:1,6;54:6,11;
57:13;59:4,5;61:16;
62:18;65:5,17;66:18;
68:10;69:19,22;73:11,
19;74:23;75:1,19;
80:23;82:14,18;84:16,
18,22;87:25;88:9;
89:12
**talk (3)**
6:7;14:2;16:10
**talked (7)**
14:10;33:18;36:10;
63:2;70:14;71:10;

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

79:11
talking (3)
  8:7;20:8;56:24
teach (2)
  11:3,9
teacher (2)
  10:18;11:18
teaching (5)
  11:1,2,11,20;12:10
telephone (2)
  6:21;7:2
telling (2)
  21:22,23
tells (1)
  45:14
ten (3)
  14:23;29:8;45:3
test (10)
  26:13;27:14;29:12,
  13;56:17;84:7;87:10;
  88:12,25;89:14
testified (6)
  5:3,14;46:15;64:4,
  13;85:14
testimony (1)
  56:24
testing (7)
  61:25;79:3,15;87:14,
  16;88:21;89:9
there'd (1)
  30:15
though (3)
  62:6;68:24;71:18
thought (7)
  33:25;37:12;45:20;
  70:17;72:22,25;73:1
three (2)
  47:6;70:3
til (1)
  25:3
times (1)
  20:8
today (4)
  31:19;32:10;60:12;
  71:4
together (5)
  36:17;37:15,19;40:5;
  70:2
told (41)
  12:18;22:7;24:12;
  25:15;27:12,17,24,24;
  28:1;29:20;32:7;41:6;
  43:2;44:8,15,17;45:22;
  48:24;49:6,11;50:1,3,
  9;52:21;54:7;57:23;
  58:24;59:9,25;64:24;
  68:22;74:16;75:3,12,
  16;76:10,11;78:16;
  81:22;82:3;87:5
took (16)
  45:24;46:3,4,17;
  65:21;67:18;80:2;83:6,
  14,15,19,20,22;84:8,

13;86:1
top (1)
  53:13
topics (1)
  16:8
towards (1)
  22:16
training (2)
  15:16,19
transcript (7)
  46:20;63:3;65:2,3,
  17;79:19;89:17
trouble (2)
  11:22;12:2
true (3)
  64:20;70:4;82:21
trust (1)
  64:11
truth (1)
  86:17
try (3)
  6:9,11,18
Tuesday (1)
  28:23
two (11)
  11:1;12:21;22:3;
  23:23;36:4,4;41:22;
  49:1,8;70:2;81:10
type (3)
  13:10;15:10;39:19
types (1)
  62:2
typically (1)
  13:20

U

ultimately (8)
  9:6;11:11;14:15;
  29:7;36:22;42:15;61:5;
  68:20
uncomfortable (1)
  6:20
under (5)
  20:8;47:10;53:18;
  72:14;77:17
Unit (3)
  7:6;8:22;56:8
University (3)
  10:8,9,10
unless (3)
  28:10;45:14;81:18
unrelated (1)
  22:15
unruly (1)
  28:10
up (16)
  18:14;19:23;21:2;
  24:16;30:6;33:19;
  34:23;35:1,1,5;36:3,3;
  37:18;51:6;79:13;81:8
updated (2)
  19:4,5

updates (1)
  22:22
upheld (2)
  61:21;62:10
upon (4)
  55:10;71:3;74:16;
  83:18
urine (1)
  26:13;27:14
use (2)
  21:1;39:19
used (2)
  13:5;16:5
usually (2)
  13:22;20:20

V

validity (1)
  88:21
verbal (2)
  5:21;48:8
verbally (2)
  49:16;50:3
verbatim (5)
  5:20;60:3,6;64:8,9
verified (1)
  70:4
version (10)
  17:6;18:1,1,12,15,
  18;19:3,5,11;39:3
versus (1)
  54:5
vice-president (1)
  9:11
vicinity (1)
  7:14

W

waited (1)
  30:2
waiting (1)
  23:3
waived (2)
  87:25;88:5
warrant (3)
  14:13,13,14
warranted (1)
  12:7
Watseka (14)
  6:25;7:6;8:24;9:22;
  15:5,15,24;16:12,19;
  17:11;18:12;20:9;
  21:13;47:22
Watseka's (1)
  13:13
Watts (1)
  9:10
way (4)
  72:10;74:1;81:9;
  88:20
website (5)

16:16,22;19:1;39:2,4
week (1)
  67:11
weren't (1)
  54:7
West (2)
  6:25;11:7
What's (4)
  7:8;10:5;34:10;63:2
When's (2)
  16:24;28:19
white (3)
  22:3;49:1,8
whole (3)
  39:6,7;61:3
within (1)
  7:14
WITNESS (10)
  35:9,13;51:15,18;
  53:10;57:6,8;73:10,12,
  15
work (2)
  38:21;51:6
worked (2)
  25:3,12
working (1)
  24:4
workshops (1)
  15:21
worse (7)
  44:9,17;45:11,23;
  78:18,22;85:12
worst (1)
  44:10
write (1)
  12:5
writing (5)
  49:16,18;50:6,12;
  53:5
written (8)
  13:9;21:4;39:14;
  48:8;52:18;70:1,1;
  74:12

Y

year (5)
  9:20;17:2,3,4;72:22
years (2)
  11:5;12:21

Z

zero (1)
  44:18

1

1 (3)
  36:22;38:17;79:3
1/25/13 (1)
  51:24
1:07 (1)

89:20
10 (12)
  32:4,7;37:4;38:11;
  41:20;43:8;48:13;
  70:13;71:4;78:13;
  84:16,23
10:52 (1)
  5:1
100 (1)
  17:20
101 (1)
  68:13
10-22 (1)
  55:25
10-22.6 (1)
  56:5
10-22.8 (1)
  55:24
11:27 (1)
  32:3
11:32 (1)
  32:3
12 (1)
  14:23
12:37 (1)
  69:21
12:40 (1)
  69:21
13 (4)
  65:1,16,17;79:20
13-'14 (2)
  17:1,3
14 (2)
  68:13,15
1411 (1)
  6:25
15th (1)
  83:8
1999 (1)
  10:21
1st (1)
  9:4

2

2 (3)
  38:17;42:17;69:23
20 (1)
  68:14
2010 (2)
  9:4,21
2013 (18)
  10:11;17:8;18:9;
  19:11,25;20:6,16;
  21:12;28:17;56:19;
  59:15;60:19;73:24;
  74:12;76:8,21;77:18;
  88:22
24th (10)
  63:2;65:24;66:2,8;
  80:8;81:23;82:4,10,20;
  84:1
25 (11)

DIETCHWEILER v.
STEVE LUCAS ET AL

KENNETH LEE
October 17, 2014

13:17;19:25;21:12;
27:1;28:17;42:13;
43:18;52:22;73:24;
74:11;88:22
**25th (15)**
25:23;26:1;33:22;
40:18;46:10;47:3;63:1;
65:23;66:2,8;69:16;
75:5;76:8;80:9;82:10
**26 (1)**
74:5
**26a (1)**
19:2
**26th (1)**
26:2
**28th (1)**
32:19

---

**3**

**3 (4)**
38:17;40:10;70:7;
71:11
**3:00 (1)**
70:10
**3:00ish (1)**
70:20
**30 (3)**
43:11,14;81:4
**30th (2)**
76:21;77:18

---

**4**

**4 (1)**
38:23
**4:00ish (1)**
70:19
**4:15 (1)**
22:21
**42 (2)**
18:14,21
**43 (3)**
18:14,18,22
**445 (1)**
7:6

---

**5**

**5 (5)**
10:1;39:8;47:10;
56:19;59:15
**5th (2)**
72:14;79:4

---

**6**

**6 (4)**
39:25;56:1,2;71:6

---

**7**

**7 (1)**

---

42:16

**8**

**8 (5)**
18:11;53:12;71:9;
72:20;75:25
**815-432-4931 (1)**
7:3
**8705 (1)**
7:10

---

**9**

**9 (4)**
8:22;56:9;73:20;
74:2