E-FILED
Monday, 15 December, 2014  03:32:57 PM
Clerk, U.S. District Court, ILCD

# In The Matter Of:

## *DIETCHWEILER v.*
## *STEVE LUCAS ET AL*

---

## *BOB BURD*
## *October 24, 2014*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Original File 1024burb.TXT
Min-U-Script® with Word Index

1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
2                  STATE OF ILLINOIS

3

    NOAH DIETCHWEILER, by            )
4   Michael Dietchweiler, his       )
    father and next friend; and     )
5   ANN DIETCHWEILER,               )
              Plaintiffs,           )  No.  2013-CV-2062
6             vs.                   )
    STEVE LUCAS, in his             )
7   official and individual         )
    capacities; JAMES BUNTING,      )
8   in his official and             )
    individual capacities;          )
9   KENNETH LEE, in his             )
    official and individual         )
10  capacities; IROQUOIS COUNTY     )
    COMMUNITY UNIT SCHOOL           )
11  DISTRICT NO. 9, IROQUOIS        )
    COUNTY, ILLINOIS; JAMES         )
12  BRUNS, in his official          )
    capacity; DON BECKER, in        )
13  his official capacity;          )
    BRENNA JOHNSON, in her          )
14  official capacity; CRYSTAL      )
    BLAIR, in her official          )
15  capacity; BOB BURD, in his      )
    official capacity; KIRK         )
16  McTAGGERT, in his official      )
    capacity; and DEE              )
17  SCHIPPERT, in her official      )
    capacity,                       )
18          Defendants.             )

19              DEPOSITION OF BOB BURD
                  October 24, 2014
20                  12:27 PM

21      Amy Prillaman Buhr:  CSR #084-003275
     Area Wide Reporting and Video Conferencing
22             301 West White Street
             Champaign, Illinois   61820
23               (800) 747-6789

24

2

```
1                          INDEX

2
         APPEARANCES:
3
                 FLYNN, PALMER, TAGUE, LYKE & JACOBSON
4                BY: Mr. Michael J. Tague
                 402 West Church Street
5                Champaign, Illinois 61824-1517
                 (217) 352-5181
6                Appearing for the Plaintiffs

7                LAW OFFICES OF LAWRENCE COZZI
                 BY:  Ms. Veronica Masaitis
8                27201 Bella Vista Parkway, Suite 410
                 Warrenville, Illinois  60555
9                (630) 791-6407
                 shari.goggin-ward@libertymutual.com
10               Appearing for the Defendants

11               ALSO PRESENT:
                 Michael Dietchweiler
12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

1                      INDEX, continued:

2

3    Examination                                    Page

4     BY: MR. MICHAEL J. TAGUE:                       5

5             (No exhibits marked.)

6

7          QUESTIONS INSTRUCTED NOT TO ANSWER
         Page                              Line
8
     When did you learn that    19          24
9    there had been suspensions
     at Watseka High School on
10   January 25, 2013?
     Was that the only          22          10
11   disciplinary hearing that
     day?
12   Did anyone ever tell you   40           5
     at any time that they gave
13   pills to Noah?
     The documents that we      56           6
14   looked at from Exhibit 3,
     the first one behind the
15   tab Response to Request to
     Production No. 1, did you
16   consider that document in
     your decision?
17

18

19

20

21

22

23

24

4

1                          STIPULATION

2

3              IT IS HEREBY EXPRESSLY STIPULATED AND
   AGREED by and between the parties that the deposition
   of BOB BURD may be taken on October 24, 2014, at
4  Iroquois County CUSD No. 9, 1411 West Lafayette,
   Watseka, Illinois, pursuant to the Rules of the
5  Federal Court and the Rules of Federal Procedure
   governing said depositions.
6              IT IS FURTHER STIPULATED that the
   necessity for calling the Court Reporter for
7  impeachment purposes is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1            (Commencing at 12:28 p.m.)

2                      BOB BURD,

3     having been first duly sworn, testified as follows:

4     EXAMINATION,

5     BY: MR. MICHAEL J. TAGUE:

6         Q.   Would you state your name, please.

7         A.   Bob Burd.

8         Q.   Have you ever had your deposition taken

9     before?

10        A.   No.

11        Q.   Has anybody ever explained to you what

12    we're going to do here today?

13        A.   Yes.

14        Q.   Okay.  Is that this morning --

15        A.   Yes.

16        Q.   -- or before that?

17             I'm going to ask you questions about Noah

18    Dietchweiler's case.  We're going to take everything

19    down as a verbatim transcript, so everything needs to

20    be verbal.  I'll ask you questions.  I'll try to not

21    ask another question until you're done answering and

22    if you'll try to not start your answer until I'm done

23    asking it, okay?

24        A.   Okay.

6

1          Q.    If you nod your head or shake your head or
2     say uh-huh, we probably know what you mean as we are
3     sitting here, but it's difficult to read it back and
4     know exactly what we mean.  So we may -- one of the
5     attorneys may say does that mean yes or no and if you
6     keep that in mind, it will go quicker if you make all
7     your responses verbally.
8          A.    Okay.
9          Q.    Do you have any questions about the
10    procedure before we start?
11         A.    Not at this time.
12         Q.    Okay.  If during the course of the
13    proceedings you need to use the restroom, I think we
14    have water, I know Mr. Lee can provide water, say so.
15    We don't have to see how long everybody can sit here
16    without moving or using the restroom.  So just tell
17    us, okay?
18         A.    Sure.
19         Q.    What's your address and phone number?
20         A.    My home address is 22 Cedar Wood Drive in
21    Watseka, Illinois, 60970.
22         Q.    And your phone number?
23         A.    Area code (815) 432-4502.
24         Q.    What's the extent of your formal education?

7

1          A.    I have a Bachelor of Science degree from

2     the University of Illinois.

3          Q.    When did you receive that?

4          A.    December of 1984.

5          Q.    Have you taken any postgraduate courses or

6     done any postgraduate work?

7          A.    No.

8          Q.    Do you reside with anyone at the

9     residential address you told me about?

10         A.    Yes.  My wife.

11         Q.    Do you have any adult children?

12         A.    By adult children, I have a 23-year-old and

13    a 22-year-old.  And if by definition an 18-year-old

14    defines, yes, we do.

15         Q.    Okay.  Do those children all have the last

16    name Burd?

17         A.    Yes, they do.

18         Q.    Do you have any relatives in the Central

19    District of Illinois who do not have the last name of

20    Burd?

21         A.    Relatives by being direct family?

22         Q.    Siblings.

23         A.    Yes.

24         Q.    Okay.  What are their names and where do

8

1    they live?

2             MS. MASAITIS:  Could we go off the record

3    for one second?  I need to take a call really fast.

4             (Whereupon a break was taken and the

5    deposition continued as follows:)

6        Q.   I think we were at -- I was going to have

7    you identify your siblings who lived in the Central

8    District of Illinois.

9        A.   Not by the Burd name, which would be

10   Mary Taylor and I don't have her exact -- she's rural

11   Sidell, I can tell you that, but I can't give you the

12   exact road number.

13       Q.   That's fine.  And is that the only one?

14       A.   That's -- yeah, that wouldn't be of this

15   last name, yes.

16       Q.   What is your trade or occupation?

17       A.   I'm a financial representative.

18       Q.   Where do you work?

19       A.   Country Financial here in Watseka.

20       Q.   How long have you done that?

21       A.   Almost 21 years.  20 years plus.

22       Q.   When did you first become a school board

23   member?

24       A.   It would have been the spring of 1999.

9

1       Q.   And were you elected or appointed?

2       A.   I was elected.

3       Q.   And who was the superintendent when you

4    were elected?

5       A.   Martin Getty.

6       Q.   Have you been on school board ever since?

7       A.   Yes, I have.

8       Q.   Have you been an officer on the board at

9    any time?

10      A.   Yes, vice president.

11      Q.   When was that?

12      A.   Good question.  We get that -- I can't

13   remember when it turned.  We went from four years,

14   then we had a brief two-year stint.  I can say for my

15   last two terms, so I would say at least seven years.

16   Might be a little bit longer than that.

17      Q.   Were you on the school board when Mr. Lee

18   was hired?

19      A.   Yes, I was.

20      Q.   And did you support his hiring?

21      A.   Yes, I did.

22      Q.   Were you on the school board when

23   Mr. Bunting was hired?

24      A.   Yes.

1       Q.   Did you support his hiring?

2       A.   Yes.

3       Q.   Were you on the school board when Mr. Lucas

4  was hired?

5       A.   Yes.

6       Q.   And did you support his hiring?

7       A.   Yes.

8       Q.   Have either -- well, first, has Mr. Bunting

9  ever been disciplined by the school board?

10         MS. MASAITIS:  Objection as to relevance.

11  You can go ahead and answer if you can.

12       A.   Not that I can recall.

13  BY MR. TAGUE:

14       Q.   Who evaluates Mr. Bunting's job

15  performance?

16       A.   Mr. Lee.

17       Q.   Does the school board receive those

18  evaluations and make determinations relative to

19  things like salary increases?

20       A.   Yes.

21       Q.   And how about Mr. Lucas?

22       A.   Yes.  The same.  Mr. Lee and Mr. Bunting, I

23  think, collectively evaluate.

24       Q.   Okay.  In January and February of 2013, you

1    were still on the school board, correct?

2         A.   Yes, I was.

3         Q.   And the -- were there any changes in school

4    board membership composition in

5    January/February 2013?

6         A.   Not that I recall.  I think the board

7    makeup was exactly as it is today.

8         Q.   Okay.  So if I asked you who you remembered

9    on the school board, it would be pretty easy because

10   it's the same ones?

11        A.   It's the same seven that we have today,

12   correct.

13        Q.   Prior to January 25, 2013, had you

14   participated in any student disciplinary proceedings?

15        A.   Any student disciplinary hearings

16   throughout my tenure as a school board member?

17        Q.   Okay.  That's an okay qualification.  So

18   since you have been a school board member, prior to

19   January 25, 2013, did you participate in any student

20   disciplinary proceedings?

21        A.   Yes, I have.

22        Q.   Do you remember how many?

23        A.   No.  I can't recall that.

24        Q.   Can you -- is it a handful?  Can you give

1   me any indication if it was a common occurrence or a

2   rare occurrence?

3        A.   No.   I'd say in -- well, I'm going on 16

4   years, so I've been almost 16 years and I -- I can't

5   recall them all, but for that reason I'm thinking it

6   was probably really literally a handful.

7        Q.   And some would have been before Mr. Lee was

8   superintendent, is that a fair statement, or do you

9   remember?

10       A.   Yes.   Some would have been when

11  Mr. Bianchetta was.

12       Q.   Has the procedure changed from the first

13  time you had occasion to participate until Noah's

14  proceeding?

15           MS. MASAITIS:   I'm going to object as to

16  relevance.   Beyond the scope.

17       A.   I don't recall change, no.

18  BY MR. TAGUE:

19       Q.   Have you, as a school board member, ever

20  been involved in crafting the suspension procedure

21  protocols for the school district?

22       A.   No.

23       Q.   Watseka High School had a student handbook

24  in January 2013, did it not?

13

1      A.    Student handbook, yes.

2      Q.    And was that something that the school

3  board previously approved?

4      A.    Correct.

5      Q.    When is the -- when was the handbook that

6  would have been in existence on January 25, 2013,

7  approved by the school district?

8      A.    It would have been -- any revisions are

9  usually made prior to the school year.  So it usually

10  happens in the spring or -- late spring, early

11  summer, before it gets published.  So that way each

12  student receives it prior to the school year

13  starting.

14      Q.    Does the school board have a committee that

15  reviews that handbook on an annual basis as to

16  whether or not there would be any changes to it?

17      A.    It's actually not just the school board but

18  it's -- it's a member of the faculty, administrators

19  and a board member or maybe two board members.

20      Q.    Were you ever on that group that would go

21  over the school district --

22      A.    I have been on the handbook committee in

23  the past.  I can't recall exactly what year, but I

24  know I have been on it in the past.

14

1        Q.    Do you know when the high school first had
2    a handbook?
3        A.    No.
4        Q.    Was one in existence when you became a
5    school board member?
6        A.    To my knowledge it was.
7        Q.    Is there an officer or a depository person
8    who would have the handbooks for the various years
9    that go back to the point when you first became a
10   school board member?
11       A.    It would be the unit office.
12       Q.    And that would be Mr. Lee?
13       A.    At present, yes.
14       Q.    Do you remember any changes to the
15   disciplinary procedure for suspensions in the Watseka
16   student handbook during your tenure as a school board
17   member?
18       A.    There may have been revisions, but I can't
19   recall to specifics what they were.
20       Q.    And if we needed or wanted to know the
21   answer to that, we would go to the unit office, ask
22   Mr. Lee to see if those records exist?
23       A.    Correct.
24       Q.    After the school district approved the high

1   school handbook that would have been in effect for

2   the fall 2013 semester -- now this happened in

3   January, so are we still in the fall semester or are

4   we already into the spring semester of the '13-14

5   school year?

6       A.   January of '13 would constitute the '12-13

7   school year.

8       Q.   Okay.

9       A.   So it would be the spring semester of the

10  '12-13 school year.

11      Q.   And the handbook was not changed or revised

12  from the fall semester to the spring semester?

13      A.   No, the handbook is not changed during the

14  school year.

15      Q.   Okay.  Did you have occasion to read or

16  review the student high school handbook prior to

17  February 5, 2013?

18          MS. MASAITIS:  I'm going to object as to

19  form.  Vague.

20      A.   I didn't review it, no, prior to that.

21  BY MR. TAGUE:

22      Q.   Are you aware that it has procedures for

23  suspension and expulsions?

24          MS. MASAITIS:  I'm going to object as to

16

1    form.   Vague.

2    BY MR. TAGUE:

3        Q.    Prior to February 5, 2013, were you -- did

4    you know or not know whether or not the high school

5    handbook had written policies and procedures

6    governing student suspensions?

7        A.    Yes.

8        Q.    It had provisions, did it not?

9            MS. MASAITIS:   I'm going to object as to

10   form.   And I think it also incapable of definition as

11   to what constitutes perfect.   So if you can answer

12   it.

13   BY MR. TAGUE:

14       Q.    Let me ask the question.   The student

15   handbook, what was the purpose of the student

16   handbook?

17       A.    The purpose of the student handbook, in my

18   view, would be a guide to policies and procedures for

19   students to adhere to and conduct while attending

20   Unit 9 schools.

21       Q.    And there was a section that dealt with

22   suspension procedures, was there not?

23       A.    There is in our handbook.

24       Q.    And the school district approved that

1    handbook, which was inclusive of those suspension

2    procedures, before the beginning of the 2013/2014

3    school year, did they not?

4            MS. MASAITIS:  I'm going to object as to

5    relevance.  The 2013/2014 school year is not even at

6    issue.

7    BY MR. TAGUE:

8        Q.   I'm sorry.  I meant the 2012/2013 school

9    year.

10       A.   Yes.

11       Q.   In Exhibit 8 that we worked with in the

12   last set of depositions, that's the court reporter's

13   binders.

14       A.   That one is holding it up.

15       Q.   I have flagged what we had.  Looking at

16   this before, I believe it was cross-referenced to

17   page 43 of the handbook, it talks about suspension

18   procedures.  And I would like for you to look at the

19   suspension procedures and ask you if those were the

20   ones applicable in January and February of 2013.

21       A.   When you say applicable, you mean to the

22   school year?  Do you mean to the reference to this

23   case?

24       Q.   Well, my -- I guess let me ask a question.

1    Were those the published suspension procedures in the

2    Watseka High Handbook for 2012/2013?

3          A.    To the best of my knowledge.

4          Q.    And it goes on to the next page?

5               MS. MASAITIS:  What is your question now?

6    BY MR. TAGUE:

7          Q.    Have you looked at it enough to --

8               MS. MASAITIS:  Your question was with

9    regard to page 1.  Do you have a different question

10   now with regard to this page?

11   BY MR. TAGUE:

12         Q.    The suspension procedures start on the

13   pages flagged 43 and go on to the next page, do they

14   not?

15               MS. MASAITIS:  He's saying to the best of

16   his knowledge he believes this to be the case, but

17   it's not actually placed into a handbook for the

18   2012/2013 year.  So --

19   BY MR. TAGUE:

20         Q.    Well, let me ask you that.  For the

21   2012/2013 school year, the school district had a

22   policy that existed that governed student suspension

23   procedures, did it not?

24               MS. MASAITIS:  I'm sorry.  The school what?

19

1        Q.   The school district had a procedure or

2    policy -- scratch that.

3             The school district had a policy that

4    governed student suspension procedure, did it not?

5        A.   It did.

6        Q.   And it was in writing, was it not?

7        A.   It was.

8        Q.   And it was put into the Watseka High School

9    Handbook, was it not?

10       A.   It was.

11       Q.   And my question is that beginning on the

12   flagged page 43 and the next page, and may even go

13   into the third page, the question is is that the

14   written policy that was in effect on January 25,

15   2013?

16       A.   It appears to be to the best of my

17   knowledge.

18       Q.   Other than being a school board member,

19   have you ever been elected to any other political

20   offices?

21       A.   No.

22       Q.   Have you ever run for any?

23       A.   No.

24       Q.   When did you learn that there had been

1   suspensions at Watseka High School on January 25,

2   2013?

3           MS. MASAITIS:  I'm going to object as to

4   anything that calls for any information with regard

5   to any other student other than your client pursuant

6   to the Student Records Act, Open Meetings Act.  So if

7   you want to ask him anything with regard to your

8   client specifically, that's fine, but he is not going

9   to be testifying as to any other students.

10          MR. TAGUE:  Are you instructing him not to

11  answer that question?

12          MS. MASAITIS:  Yes, because you are asking

13  it with regard to more than one student.

14          MR. TAGUE:  We'll need to certify that.

15  BY MR. TAGUE:

16      Q.   Because I wasn't asking names or anything

17  else.  All I was asking is when you became aware that

18  there was an issue on January 25, 2013.

19          MS. MASAITIS:  And you are assuming he

20  became aware.  But regardless.

21      A.   What date was I made aware?

22      Q.   Correct.

23      A.   I can't recall the date.  I just know that

24  I received notice that we had a hearing.

1          Q.    Okay.

2          A.    But I can't recall, you know, exact date.

3          Q.    So the -- the first indication that you had

4     that there had been suspensions at Watseka High

5     School came when you received the notice of Noah's

6     suspension hearing?

7          A.    Correct.

8          Q.    Okay.  And you had no written

9     communications relating to Noah's situation prior to

10    receiving that notice; is that correct?

11         A.    Absolutely none.

12         Q.    And no verbal communications with anyone?

13         A.    Absolutely none.

14         Q.    So the notice that you received, who

15    provided that to you?

16         A.    Mr. Lee.

17         Q.    And what -- what was in that notice?

18         A.    I don't recall everything other than notice

19    of meeting date and time.

20         Q.    Did it provide any identification of which

21    students or what students were involved?

22         A.    No.  Actually we were not -- we don't -- my

23    recollection of all my hearings is we are -- we are

24    notified generically that there is a student

22

1    discipline hearing and we show up and then are
2    presented with the information at the -- at the
3    subsequent hearing.
4        Q.   Okay.  So there was a hearing relating to
5    Noah Dietchweiler's case on February 5 of 2013,
6    correct?
7        A.   If that's the dates, yeah.  Pardon me for
8    not looking at specifics, but if that's what they
9    indicate, yes.
10       Q.   Was that the only disciplinary hearing that
11   day?
12            MS. MASAITIS:  Again, I'm going to object
13   to the extent that it calls for information with
14   regard to any other student.  He's not going to be
15   testifying as to any other student pursuant to the
16   Student Records Act and the Open Meetings Act and I'm
17   going to instruct him not to answer.
18            MR. TAGUE:  Need to certify that question
19   too.
20   BY MR. TAGUE:
21       Q.   So Noah's hearing --
22            MS. MASAITIS:  And before you certify the
23   question, you have to have the deponent say that he's
24   not going to answer the question upon the advice of

23

1    his counsel.

2    BY MR. TAGUE:

3         Q.   Well, are you going to answer the question?

4         A.   No.

5              MR. TAGUE:  So certify that question.

6    BY MR. TAGUE:

7         Q.   Did she tell you not to answer any

8    questions before you came in here today?

9         A.   I'm sorry?

10        Q.   Did your attorney tell you --

11             MS. MASAITIS:  You can't ask him that.

12   That's privileged information.

13   BY MR. TAGUE:

14        Q.   When Noah's hearing started, who was

15   present?

16        A.   As I recall, all seven board members were

17   present.  Mr. Lee.  I believe our school district

18   attorney, Jeff Funk.  Mr. and Mrs. Dietchweiler were

19   there, along with Noah.  And I believe you were

20   there.  And I think you had a court reporter.  Was

21   not the same person, as I recall.  And there might

22   have been, I can't recall, Mr. Lucas and Mr. Bunting,

23   excuse me.  Other than that, I can't recall all that

24   might have been there.

24

1      Q.   Okay.  So there was a court reporter there

2 present at the hearing, correct?

3      A.   (Witness nods head).

4      Q.   Do you know if the court reporter actually

5 prepared a verbatim transcript of the proceeding?

6         MS. MASAITIS:  I'm going to object as to

7 calls for form, foundation.  Calls for speculation on

8 his part.  And counsel has also produced -- it's been

9 produced to him a copy of the transcript of that

10 proceeding pursuant to the judge's order.  You

11 produced one in your Rule 26 disclosure.

12 BY MR. TAGUE:

13      Q.   And so the question is do you know whether

14 a verbatim transcript was prepared of Noah's

15 proceeding.

16         MS. MASAITIS:  If you know the answer, you

17 can answer.

18      A.   I -- I am assuming, but I don't -- I mean

19 I'm not aware.

20 BY MR. TAGUE:

21      Q.   Have you actually looked at the transcript?

22      A.   That entire transcript of that hearing?

23      Q.   Yes.

24      A.   No.

1      Q.   Have you looked at portions of it?

2      A.   Not aware.

3      Q.   Okay.  It was also, to my understanding,

4  tape recorded.  Is that your recollection?

5      A.   Yes.  Hearings are recorded.

6      Q.   Did you ever listen to the proceedings?

7      A.   No.

8      Q.   What did you do prior to the deposition

9  today to prepare for giving the deposition?

10      A.   Nothing.

11      Q.   Okay.  Have you reviewed any records prior

12  to us starting the deposition this afternoon?

13      A.   No.

14      Q.   What documents do you remember were

15  provided to the participants in Noah Dietchweiler's

16  hearing in which the court reporter was present?

17      A.   What documents provided, to whom are you

18  referring?

19      Q.   Okay.  Were there documents provided to the

20  family?

21      A.   To my recollection they were.

22      Q.   And were they also provided to the school

23  board members?

24      A.   Yes, they were.

26

1        Q.   Were there any documents provided to school
2    board members that were not provided to the family?
3        A.   Not that I recall.
4        Q.   I'm going to have you look at Exhibit
5    No. 1.  And my question is, and take as much time as
6    you need to look through that, if you remember that
7    being the package of materials that were provided to
8    the participants in the meeting.
9        A.   Did you say participants?
10       Q.   Yes.  And I mean the family members.
11       A.   I'm not aware of what they were or weren't
12   provided.
13       Q.   Okay.  So my specific question is were you
14   provided as a school board member with that document?
15       A.   I don't recall.
16       Q.   Okay.  One of the documents that was in
17   that package, the contents say that there was a
18   Notice of Student Disciplinary Action, dated
19   January 25, 2013.  The document, I believe that was
20   behind that tab, is this one I have in front of you
21   that says Watseka High School Notice of Student
22   Disciplinary Action.
23       A.   Okay.
24       Q.   Was that one of the documents that were

1    presented at the disciplinary hearing for Noah?

2        A.    I believe it was.

3        Q.    Had you seen that document prior to its

4    presentation at the suspension review hearing?

5        A.    No.

6        Q.    What was your understanding of what this

7    document was?

8        A.    This was a notice delivered to Noah's

9    parents, notifying them of the suspension of Noah.

10       Q.    Okay.  Was there, to your knowledge, any

11   document presented at that school board meeting

12   relating to Noah's suspension that was testified to

13   or your understanding generated on the 25th itself

14   other than this document?

15       A.    I don't recall.

16       Q.    Do you know whether there was a document

17   purporting to be the notice of the charges to the

18   student, a written notice of charges to the student,

19   that was given to Noah on January 25, 2013?

20       A.    Let me repeat just so I understand.  Are

21   you asking if I was aware that notice was given to

22   Noah regarding his suspension?

23       Q.    Okay.  My specific question is, at the

24   suspension review hearing for Noah, did you see a

28

1    document that was a written explanation of the

2    evidence and charges against Noah that was

3    purportedly given to him on January 25, 2013?

4         A.    I can't specifically recall.

5         Q.    The school district policy as reflected in

6    the Watseka High School Handbook provided that the

7    student was to be provided with written notice of the

8    charges and evidence against him, did it not?

9         A.    In the policy that we reviewed earlier, is

10   that what you're asking?

11        Q.    Correct.

12        A.    That is correct.

13        Q.    And what document did you see at Noah's

14   suspension review hearing that you believe complied

15   with that requirement in the student handbook?

16        A.    I don't recall.

17        Q.    Did you believe it was this document here

18   we are looking at, which is the notice of the

19   disciplinary action actually taken?

20        A.    I'm not sure.

21        Q.    And I think this was behind tab 6, but it's

22   a letter dated January 30, 2013, to

23   Mr. and Mrs. Dietchweiler from Superintendent Lee.

24   When did you first see that document?

29

1        A.    In the packet at the hearing.

2        Q.    Okay.  Do you remember who testified in the

3    suspension review hearing?

4        A.    Yes, I do.

5        Q.    Who testified?

6        A.    Mr. Bunting, Mr. Lucas.

7        Q.    And anyone else?

8        A.    I don't -- you know, I'm not the legal

9    expert as you all are, but I don't know if you would

10   call it testifying, but Noah did give a statement as

11   far as things that took place.

12       Q.    Okay.  And what -- we looked at documents

13   that you had.  During the course of that hearing, did

14   you have written results of a drug test?

15       A.    Now, this was -- I guess I'm recounting.

16   February 5th, is that what we are talking about?

17       Q.    Yes.

18       A.    I believe they were provided, yes, as I

19   recall.

20       Q.    And what was your understanding of what the

21   documents were and what they showed?

22       A.    The drug test, as I recall, was negative.

23       Q.    Showing that there had been no drugs in

24   Noah's system on the 25th?

1      A.   I don't know as far as dates relevant.  I
2  just remember that there was a -- I believe it was an
3  FAA doctor, I don't know, something along that line,
4  that was -- but I don't remember as far as specific
5  dates.  That I can't recall.
6      Q.   What was your belief as to what Noah was
7  charged with?
8      A.   Possession.
9      Q.   Was he charged with consumption?
10      A.   I don't recall that it was consumption.  As
11  I recall, it was possession as the basis for the
12  suspension.
13      Q.   Okay.  Did you believe that consumption did
14  not occur based upon what was presented in the
15  hearing?
16          MS. MASAITIS:  I'm going to object.  I
17  think that it calls for information that would be
18  considered part of the Closed Meetings Act and so I
19  would instruct him not to answer.
20  BY MR. TAGUE:
21      Q.   Was there any evidence presented in Noah's
22  suspension hearing before you went into deliberations
23  that Noah had consumed drugs?
24      A.   I don't recall consumption.

31

1          Q.   I'm showing you the document we looked at
2     before, which is the notice of suspension, and it
3     says he's suspended for possession of drugs,
4     consumption of drugs.  So does that refresh your
5     recollection that consumption was one of the charges
6     against Noah?
7                MS. MASAITIS:  I'm sorry.  What was the
8     question, does it refresh your recollection?
9     BY MR. TAGUE:
10         Q.   Does it refresh your recollection.
11         A.   I'm not -- I guess I'm not about the
12    refreshing.  What I recall is the main premise was
13    possession.
14         Q.   And what was your understanding of the date
15    that Noah possessed the drug?
16         A.   I don't recall the specific date.  Whatever
17    date the actions took place and the phone calls were
18    made and the subsequent meetings with the parents.
19         Q.   What was your understanding of how Noah
20    came in possession of drugs?
21         A.   It was through another student.
22         Q.   Okay.  Do you know what type of drug or
23    type of substance we are talking about or that -- I'm
24    sorry -- what --

1    A.    I don't even recall at the time.   Yeah, I

2  don't recall.

3    Q.    Was it pills?

4    A.    It was a pill, yes.

5    Q.    Okay.  And do you know how many he had --

6    A.    No.

7    Q.    -- in his possession?

8    A.    I don't even know if that was ever brought

9  up how many.

10    Q.    And do you know where he came in possession

11  of the pills?

12    A.    I just know -- I don't know where he

13  became -- I mean I know where he was found to be in

14  possession was at the school, but I mean I don't know

15  where he obtained those, no.

16    Q.    You don't remember any testimony or

17  evidence as to whether he obtained the pills in

18  school or outside of school?

19    A.    No, I don't recall that.

20    Q.    And do you know whether or not he obtained

21  the pills from another student?

22    A.    That was my understanding.

23    Q.    Where in the school the transfer took place

24  you don't know?

33

1          A.    I don't recall, no.

2          Q.    And what part of the school day, you don't

3     recall that either?

4          A.    No.  I just remember it was during the day

5     and that's -- yeah.

6          Q.    Okay.  In Exhibit No. 3, there is a page

7     that says Response to Request For Production No. 1,

8     and a photocopy of a handwritten piece of paper.

9     Have you ever seen that document before?

10         A.    I can't recall.

11         Q.    Behind it is Response to Request For

12    Production No. 2 and there is a handwritten statement

13    with the name Michael McKay.  Have you ever seen that

14    document before?

15         A.    I don't recall that, no.

16         Q.    I'm going to show you what's been marked

17    Exhibit No. 4.  Do you remember receiving written

18    questions about what you -- about the case, called

19    interrogatories?

20         A.    Yes.  But don't ask me when I received it

21    because that I don't recall.  I do remember receiving

22    it.

23         Q.    Did you receive them from your attorney or

24    from whom did you receive them, do you remember?

1          MS. MASAITIS:   I'm sorry.   What was the
2     question?
3     BY MR. TAGUE:
4          Q.   Do you remember from whom you received
5     them?
6          A.   I don't recall.  I just remember receiving
7     them.
8          Q.   Okay.  And the -- ultimately I have come to
9     the portion that says "Defendant Bob Burd's answers
10    to plaintiff's interrogatories."  The first page of
11    this portion of Exhibit 4 starts out with the --
12    there is an interrogatory, then there is an answer
13    where we're asking for identification and you provide
14    where you live and where you -- I guess your
15    residence.  Correct?
16         A.   Uh-huh.
17         Q.   The -- now --
18              MS. MASAITIS:  You have to say yes.
19         A.   Yes.
20    BY MR. TAGUE:
21         Q.   There's more questions there.  And the
22    questions have a portion where there's an answer
23    after each one and you provided -- well, let me ask
24    you.  Interrogatory No. 2 asks what is the brand

35

1    name, generic name of the drug Noah Dietchweiler was

2    accused of taking and/or possessing which was the

3    alleged basis for his suspension.  And there's an

4    answer provided.

5              And my question to you is where did you get

6    the information to have this answer directed or this

7    answer in response to interrogatory No. 2 directed to

8    you?

9         A.   I don't recall where that information came

10   from.

11        Q.   When you received the interrogatories, were

12   the places where answers were provided blank or was

13   there information that was already on there?

14             MS. MASAITIS:  I think that calls for

15   attorney-client privilege.

16        Q.   I guess it depends on what your answer is.

17   Did you receive blank questions and then you put

18   answers down or did you receive the questions with

19   answers already on there?  And I won't ask you who

20   put the answers on there.  I just want to know if you

21   formulated the answers or if you did not.

22             MS. MASAITIS:  Well, they are sent to your

23   attorney and your attorney -- I mean discovery is

24   served by an attorney.  So an attorney sends the

36

1    interrogatories to their client.  I think that's well

2    established in any case.  So you can just tell him

3    you were assisted by counsel and that should put it

4    to rest.

5           MR. TAGUE:  Don't tell him how to answer a

6    question.  That is unethical and completely

7    unacceptable.  You can tell him don't answer a

8    question or you can have him answer the question

9    subject to your objection.

10          MS. MASAITIS:  I'm going to interpose an

11   objection for the record that he was assisted by

12   counsel, as were all of the defendants, with the

13   discovery and I'm going to interpose the objection

14   and I'm going to instruct him not to answer then.

15          MR. TAGUE:  Okay.

16   BY MR. TAGUE:

17       Q.   You don't know what the drug is that Noah

18   took?

19          MS. MASAITIS:  Don't know -- I'm going to

20   object as to form.  Are you talking about in the

21   sense of its chemical compound or what the specific

22   name was?

23   BY MR. TAGUE:

24       Q.   Do you know what the name of the substance

37

1   that Noah is accused of having taken is?

2       A.   As reported here, it's Ativan.  I don't

3   know how you pronounce it.

4       Q.   With respect to No. 3, No. 3 asks, "State

5   the day and time Noah Dietchweiler was accused of

6   taking or possessing drugs which was the alleged

7   basis for his suspension."  And then there is, after

8   an objection, it says "Without waiving said

9   objection, defendant states January 25, 2013, at

10  approximately 3:00 PM, Noah Dietchweiler was informed

11  of the allegations against him."

12           And my question, where did you get that

13  information?

14      A.   That would have been information provided

15  to us.

16      Q.   Okay.  It was something somebody told you

17  rather than you knew of your own personal knowledge

18  or investigation?

19      A.   Yeah, we --

20           MS. MASAITIS:  I'm going to object.  Calls

21  for attorney-client privilege.

22           MR. TAGUE:  I'm not asking him from whom he

23  got it, I'm just asking if he got it from somebody

24  else.

38

1          A.    It was not personal if that's what you're
2     asking.
3     BY MR. TAGUE:
4          Q.    Well, the -- you ultimately signed a
5     verification on February 20, 2014, did you not?
6          A.    Of this information?  That would be my
7     signature, yes.
8          Q.    Yes.  Did you look at the questions and
9     answers before you signed that?
10         A.    Yes, I did.
11         Q.    And you believed that information was true?
12         A.    To the best of my knowledge.
13         Q.    And what I want to know is, what is the
14    basis of your knowledge?  You didn't witness any of
15    the events on January 25, 2013, did you?
16         A.    I'm sorry.  Would you rephrase that?
17         Q.    Yeah.  You didn't witness any of the events
18    of January 25, 2013, that occurred at Watseka High
19    School, did you?
20         A.    And these are involving Noah; is that
21    correct?
22         Q.    Well, I'll ask you as to Noah.  You
23    weren't -- let me just ask you, were you at the high
24    school on January 25, 2013?

1      A.   Not on that day, no.

2      Q.   Were you on -- at the high school on

3 January 24, 2013?

4      A.   I was not at the school on that day either.

5      Q.   You never saw Noah receive pills from

6 another student, did you?

7      A.   No, I did not.

8      Q.   Did you ever hear from anyone who purports

9 to have handed Noah pills?

10          MS. MASAITIS:  I'm going to object.  I

11 think it calls for the testimony, opinions of other

12 students or other information as to other students

13 and that would be subject to privilege pursuant to

14 the Student Records Act and the exception 2(c) of the

15 Open Meetings Act for student disciplinary

16 proceedings.  So I am going to instruct him not to

17 answer.

18          MR. TAGUE:  Let me ask the first question,

19 I'm going to ask that question again.

20 BY MR. TAGUE:

21      Q.   Did you hear from any person in Noah's

22 suspension hearing that they delivered pills to Noah?

23      A.   So are you asking if I heard from a

24 student?

40

1          Q.    Well, I'm asking if anybody -- well, let me
2     ask you another way.  Did anyone testify at Noah's
3     suspension hearing that they gave Noah pills?
4          A.    I don't recall that.
5          Q.    Did anyone ever tell you at any time that
6     they gave pills to Noah?
7               MS. MASAITIS:  And I'm going to object to
8     the extent it calls for any testimony or knowledge
9     presented as to other students or evidence of minors
10    pursuant to the Student Records Act or the Open
11    Meetings exception.
12              (Whereupon a break was taken and the
13    deposition continued as follows:)
14    BY MR. TAGUE:
15         Q.    I asked you a question, your attorney
16    objected to it.  I'm going to put on the record this
17    is a 19.83 proceeding.  We are attempting to
18    ascertain whether or not there was information
19    considered by the tribunal that decided Noah's case
20    that was outside of the noticed hearing.  I asked the
21    first question, was there any testimony of somebody
22    saying I gave Noah pills in Noah's hearing, the
23    answer was no.  The question was if he ever heard
24    from anybody else that they gave Noah pills, and the

1    witness has been instructed not to answer that.

2              So you are going to persist in that

3    instruction?

4              MS. MASAITIS:  Yeah.

5              MR. TAGUE:  Certify that.

6         A.   Back to -- you mentioned that first

7    question, you said anybody in the testimony.

8              MS. MASAITIS:  Your question was did

9    anybody testify --

10        A.   Testify --

11             MS. MASAITIS:  -- in Noah's hearing.

12        A.   And that I didn't answer.

13             MR. TAGUE:  Yes, you did.

14             MS. MASAITIS:  You did.  That's correct.

15   Because there were no -- that would be something

16   that -- that's fine.  We'll stand on that.

17             MR. DIETCHWEILER:  With all due respect to

18   the attorneys and everybody here, there's a record.

19   If you guys can't agree as to what was said, have the

20   court reporter read it back.  But I think it's

21   ridiculous to sit here and waste time and money when

22   we have a transcript of the proceedings and somebody

23   to read it back.

24             MS. MASAITIS:  That's fine.  And that was a

1   perfectly fine question because that's something he

2   can testify to as to Noah's proceeding because we

3   know who was there and what was said and that's fine.

4   And that's a perfectly fine question.  He's not going

5   to give or render any testimony as to other students,

6   other minors.  That's correct.

7             MR. TAGUE:  You're going --

8             MR. DIETCHWEILER:  Just make the record for

9   each one.

10  BY MR. TAGUE:

11      Q.   I'm going to ask you some questions so that

12  we have a full record of this.  The --

13      A.   Can I interrupt just for a moment?  How

14  long do you think they're going to take because I

15  would love to take a bathroom break if it's going to

16  be too long.

17            MR. TAGUE:  Go ahead.

18            (Whereupon a break was taken and the

19  deposition continued as follows:)

20  BY MR. TAGUE:

21      Q.   At any public portion of a school board

22  meeting did anyone indicate to you that they

23  delivered pills to Noah Dietchweiler?

24      A.   They being a person physically in

1     possession of those pills?

2          Q.   Correct.

3               MS. MASAITIS:  I'm sorry.  Read the

4     question back again.

5               (Whereupon the requested portion of the

6     record was read by the reporter.)

7               MS. MASAITIS:  I'm sorry.  I need

8     clarification of that.  Does that include attorneys?

9     Does that include other minor students?  I think

10    that -- that question needs to be clarified.

11              MR. TAGUE:  I don't think it needs -- I'm

12    not clarifying it at all.

13              MS. MASAITIS:  Then I'm going to instruct

14    him not to answer.

15              MR. TAGUE:  It is in a public session.  It

16    cannot possibly be an attorney-client privilege if

17    it's in a public session.

18              MS. MASAITIS:  The attorney is there and

19    there's also a closed session that was conducted.

20    And you're asking a general, vague question, and so,

21    yes, I'm going to assert the privilege and so that's

22    fine.  If you don't want to clarify the question,

23    then certify the question, we'll take it before the

24    judge.

1          MR. TAGUE:  I'm going to ask the question

2    again because it was plain the first time and it will

3    be plain this time too.

4          MS. MASAITIS:  The question is plain.  If

5    you don't like it, I am instructing him not to

6    answer.

7          MR. TAGUE:  You just said the question

8    wasn't plain.

9          MS. MASAITIS:  I asked you to clarify it

10   because you said anyone.

11         MR. TAGUE:  Put on the record she's yelling

12   at me.

13         MS. MASAITIS:  I asked to you clarify the

14   question.  You refused to clarify.  You said anyone.

15   I asked you who is anyone.  My objection was that

16   it's vague, it's unclear and could include lots of

17   different people.

18         MR. DIETCHWEILER:  For the record, this is

19   Mike Dietchweiler, and I am saying that I take

20   offense to people yelling during depositions and,

21   quite frankly, I'm not -- I don't have any medical

22   condition that has my ears more tender than somebody

23   else, but when you yell at me, counsel, across the

24   table, that physically hurts me and I think that you

45

1   should confine your comments to ordinary argument

2   without raising your voice.

3           MR. TAGUE:  Can you go back and read the

4   original question?

5           MS. MASAITIS:  Well, you know what, the

6   next deposition we have, I think I'm going to do a

7   motion that you can't keep whispering in your

8   client's ear telling him what objections to make,

9   what to write.  You are telling him how to do his job

10  as an attorney.  If you want to be the attorney and

11  represent your son as an attorney of record, have him

12  step out of the case and you represent your son.

13          MR. DIETCHWEILER:  You know, counsel, I

14  could do a supplemental -- I could do a supplemental

15  appearance and I don't have a problem doing that.

16  But there is no rule in any local rules of the

17  Central District or any rule of Civil Procedure or

18  any case under the Federal Rules decisions that I am

19  aware of that a client cannot talk to his attorney

20  during a deposition.  And over 34 years of my

21  practice, counsel, that happens very regularly and is

22  an ordinary procedure in depositions.

23          I have not disrupted these proceedings as

24  you have.  I have not prompted any witness to talk or

46

1   say anything such as you have.   You've been putting
2   words in this man's mouth and you've told him what to
3   say on various occasions.
4            MS. MASAITIS:   I've not told him not to say
5   anything.
6            MR. DIETCHWEILER:   That is untrue.
7            MS. MASAITIS:   I made objections for the
8   record.
9            MR. DIETCHWEILER:   That is untrue.
10           MS. MASAITIS:   I asked him to clarify your
11  testimony.   That's all I have done.
12           MR. DIETCHWEILER:   That's absolutely false.
13  I have sat here and listened to you do it.   And if
14  it's on the record, it's on the record.   You have
15  instructed him how to answer questions.
16  BY MR. TAGUE:
17       Q.   Let me ask the question, Mr. Burd.   I'm
18  only interested in a public session.   We're going to
19  go before the judge and we'll talk about the other
20  closed sessions, closed to the general public.   So my
21  question is, in an open meeting -- and let me ask
22  you, you understand the difference between an open
23  and a closed meeting, do you not?   You have been on
24  the school board for many years.

47

1      A.   Yes.

2      Q.   So I don't want you to tell me anything

3  right now in response to this question about what

4  happened in closed meetings in which the public was

5  not present.  But my question is in any open meeting

6  did you hear from anyone who indicated they gave

7  drugs to Noah Dietchweiler?

8      A.   I don't recall that.

9      Q.   And my next question is that at any time,

10  other than in a meeting -- well, let me just ask you

11  generally.

12         At any time, other than a closed session

13  school board meeting or in discussions with your

14  attorneys, has anyone told you that they gave drugs

15  to Noah Dietchweiler?

16         MS. MASAITIS:  And I'm going to object as

17  to the form of the question.  I think it could call

18  for attorney-client privilege.  I think it also can

19  call for Student Records Act and also the Closed

20  Meeting exception.

21  BY MR. TAGUE:

22      Q.   Let me ask the question because I wish to

23  exclude all of those things.  I don't want you to

24  tell me about closed session hearing, I don't want

48

1    you to tell me anything that happened in the presence

2    of your attorney.  What I want to know is, has

3    anybody ever told you, except in those closed

4    hearings or when your attorney has been present or an

5    employee of the attorney, anybody in the attorney's

6    office, anybody affiliated with the attorney, have

7    they told you that they delivered drugs to Noah

8    Dietchweiler?

9        A.    I don't recall.

10        Q.    What do you remember Mr. Bunting testifying

11    to about Noah's involvement in the pills?

12        A.    Mr. Bunting's involvement?

13        Q.    No.  I'm glad you asked that because what

14    I'm interested in, Mr. Bunting, I believe you

15    indicated, testified -- well, he -- maybe I haven't

16    asked that question.  Mr. Bunting was present at

17    Noah's hearing, correct?

18        A.    Correct.

19        Q.    Mr. Lucas was present at Noah's hearing,

20    correct?

21        A.    Correct.

22        Q.    Did Mr. Bunting testify at Noah's hearing?

23        A.    That's a great question and I am trying to

24    recall.  I know Mr. Lucas testified.  As I recall,

49

1   Mr. Bunting did, but -- yeah.

2        Q.   Okay.  Now, the way you answered that, and

3   if this is a fair assessment, tell me, if it's not,

4   tell me too, you have a clear recollection that

5   Mr. Lucas testified; is that a fair statement?

6        A.   Yes.

7        Q.   But you -- your recollection as to whether

8   Mr. Bunting did isn't so clear?

9        A.   Yeah.  I can't remember exactly, you know,

10  verbatim who said what.

11       Q.   Okay.  So Mr. Bunting and Mr. Lucas both

12  testified.  Is what you're telling me is that you

13  can't, as we sit here today, differentiate what you

14  remember Lucas said versus what Bunting said?

15       A.   That would be a fair statement.

16       Q.   And those are the -- are those the only two

17  administrators who at Noah's hearing indicated they

18  had knowledge of what happened at the high school?

19       A.   Correct.

20       Q.   Okay.  To the best of your recollection,

21  what do you remember those individuals testified to

22  as to Noah's involvement with pills at Watseka High

23  School?

24       A.   That he was found to be in possession.

1          Q.    Okay.  And is that verbatim what you

2     remember them saying or was there details of what the

3     circumstances of the possession were?

4          A.    There were details and I think that

5     drugs -- unfortunately I'm not in that business so I

6     don't deal with pharmaceuticals, so I can't recall.

7     But as I see it in the printed transcript, yes, that

8     was the drug referenced from what I recall.

9          Q.    Okay.  And was there testimony as to where

10    the drugs were delivered to Noah?

11         A.    That part I don't recall exactly.

12         Q.    Was there testimony as to the -- in Noah's

13    hearing as to who provided the drugs to Noah?

14         A.    I don't recall that.

15         Q.    Was there testimony on when?  Was there

16    testimony when Noah was delivered pills?

17         A.    Did you say was there testimony?

18         Q.    Yes.

19         A.    Well, in regards to the day that he was

20    found to be in possession, that was what was reported

21    at the hearing.

22         Q.    Was there testimony that the -- the date

23    that Noah received pills was the same day that the

24    investigation occurred and he was suspended?

51

1       A.   To the best of my knowledge.

2       Q.   Yes, to the best of your knowledge?  You

3 said to the best of your knowledge, but then you

4 didn't say yes or no.

5       A.   To the best of my knowledge it occurred on

6 the same day.

7       Q.   Which would have been Friday, January 25,

8 2013?

9       A.   If that's the date, yes.

10       Q.   Do you know whether or not Noah was

11 searched on January 25, 2013, for drugs on his

12 person?

13       A.   I don't recall.

14       Q.   Do you know whether or not Noah's locker

15 was searched on January 25, 2013?

16       A.   I don't recall.

17       Q.   Do you know whether or not there was any

18 effort made by Mr. Bunting or Mr. Lucas to determine

19 whether he was under the influence of drugs on

20 January 25, 2013?

21       A.   Repeat that, please.

22       Q.   Sure.  Do you remember whether or not there

23 was any evidence presented -- and I'm saying evidence

24 presented at Noah's hearing, so I'll limit my

52

1    questions to that.  But was there any evidence that

2    you recollect at Noah's suspension hearing that

3    Mr. Lucas or Mr. Bunting did anything to medically

4    determine whether Noah was under the influence of a

5    drug or a narcotic substance?

6         A.    I don't recall.

7         Q.    Do you remember whether there was testimony

8    as to what -- well, what is your recollection of what

9    the testimony was from -- from Mr. Bunting and

10   Mr. Lucas?

11        A.    Sorry.

12        Q.    I'll start over.

13        A.    Thanks.

14        Q.    Do you recollect whether or not, from the

15   testimony from Mr. Lucas and Mr. Bunting -- let me

16   just strike and start all over.

17            From the testimony of Mr. Lucas and

18   Mr. Bunting at Noah's hearing, did they describe how

19   the interrogation of Noah occurred, what they asked

20   him and what his responses were?

21        A.    I don't recall details.

22        Q.    Do you remember testimony from either

23   Mr. Bunting or Mr. Lucas in which they claimed Noah

24   admitted possession of drugs?

53

1        A.    Yes, I do recall that.

2        Q.    Okay.  What do you remember, to the best of

3    your recollection, was said and who said it?

4        A.    That Noah admitted in Mr. Lucas's office

5    that he was in possession.

6        Q.    And possession of what?  When and where?

7    Do you remember if those details came out?

8        A.    All of the details I don't recall.  I just

9    remember him -- from the testimony that was recited

10   to us that he was in possession of drugs.  Again, the

11   Ativan.

12       Q.    And you don't remember whether Mr. Lucas or

13   Mr. Bunting indicated that they heard that admission

14   from Noah?

15       A.    As I recall, it was Mr. Lucas.

16       Q.    Okay.  And do you remember Noah making

17   statements at the hearing?

18       A.    Briefly.  I don't recall details.

19       Q.    Do you remember that he denied that he

20   admitted to possession of drugs?

21       A.    I don't recall all the details.

22       Q.    What do you recollect -- let me ask you.

23   Do you remember anything else about the testimony of

24   Mr. Lucas or Mr. Bunting that you believed relevant

54

1    in a determination that Noah possessed drugs at

2    school?

3              MS. MASAITIS:  I'm sorry.  Can you read the

4    question back again?

5              (Whereupon the requested portion of the

6    record was read by the reporter.)

7              MS. MASAITIS:  And I'm going to object to

8    the extent that it calls for a weighing of what was

9    considered in deliberations and I'm going to instruct

10   the witness not to answer.  It calls for a school

11   board determination.

12   BY MR. TAGUE:

13       Q.   Did you hear anything else in the

14   proceedings of Noah Dietchweiler that related to how

15   he came into possession of pills at school that we

16   haven't already discussed?

17       A.   I don't recall.

18       Q.   Do you remember whether or not Noah and the

19   family put on a defense?

20       A.   What do you mean as far as defense?

21       Q.   Well, did they respond -- well, let me ask

22   you.  Do you remember whether or not they agreed that

23   Noah possessed pills at school?

24       A.   I don't recall all the details.  I know

1    that Mr. Dietchweiler did present the drug admission

2    screening, lab screening, during the testimony.

3        Q.   So there was evidence presented by the

4    family that Noah did not have drugs in his system?

5    That's a correct statement?

6        A.   That's correct.

7        Q.   And the --

8        A.   The statement of he presented the lab

9    screening, yes, was correct.

10       Q.   And the lab screening was done on the

11   evening of January 25, 2013, was it not?

12       A.   According -- if that's what the report

13   says, yeah.  I don't recall, but if that's what the

14   information is.

15       Q.   You don't recall the details on the report,

16   but you didn't dispute the information in the report?

17       A.   I did not dispute that.

18       Q.   Was there any other statements made on

19   Noah's behalf that he wasn't guilty of a disciplinary

20   infraction presented by Noah or his representatives?

21       A.   I don't recall all the details, no.

22       Q.   Do you recall an objection that was made

23   during the course of the proceedings that the family

24   claimed they were learning for the first time that

56

1    there was evidence being presented that the

2    occurrence happened the day before January 25, 2013?

3         A.   Yeah, I might have recalled something along

4    that line.  I think Mr. Dietchweiler made opposition

5    to something relevant to dates.

6         Q.   The documents that we looked at from

7    Exhibit 3, the first one behind the tab Response to

8    Request to Production No. 1, did you consider that

9    document in your decision?

10            MS. MASAITIS:  I'm going to object and I'm

11   going to instruct him not to answer because it calls

12   for consideration and weighing of the deliberations

13   and what went into the deliberations and that is

14   privileged pursuant to the exception to the Open

15   Meetings Act.

16            MR. TAGUE:  And you are instructing him not

17   to answer it, I take it?

18            MS. MASAITIS:  Yes.

19   BY MR. TAGUE:

20        Q.   And you're not going to answer that

21   question based upon what counsel has just said?

22        A.   I am not going to answer that question.

23            MR. TAGUE:  Okay.  Go ahead and certify

24   that one.

1    BY MR. TAGUE:

2        Q.    Going back to Exhibit No. 4.

3        A.    Do I get paid for being your assistant for

4    this?

5        Q.    You get paid the same amount you get as a

6    school board member.

7        A.    There you go.  I thought I would at least

8    get double.

9        Q.    I'm looking at the interrogatory No. 12.

10       A.    Twelve?

11       Q.    Yes.  Interrogatory No. 12.  Interrogatory

12   No. 12 states, "Did any defendant rely upon the list

13   of students owing money for drugs?"  And the list is

14   the one that we just looked at in No. 3.  And then

15   you answer that you did take the document into

16   consideration.  Is that a truthful statement as you

17   sit here today?

18            MS. MASAITIS:  Are you asking is that the

19   answer that it purports to be that's stated on the

20   interrogatory?

21            MR. TAGUE:  I -- read the question back and

22   I want the record to reflect there was a pause as the

23   witness was thinking and then an objection that I

24   believe is a key for him to not answer the question.

58

1          MS. MASAITIS:  No, I didn't say for him not

2     to answer the question.  So I don't think that you

3     should infer that into the record.

4              (Whereupon the requested portion of the

5     record was read by the reporter.)

6              MS. MASAITIS:  Well, technically I mean

7     there is an objection to the question that it says

8     relied upon.  So -- but --

9     BY MR. TAGUE:

10         Q.   Do you understand the question?

11         A.   Not totally, no.

12         Q.   Is that an accurate statement that you did

13    take the list that was the handwritten list with

14    names and dollar amounts on it, you took that -- or

15    you relied upon that document in the decision made as

16    to Noah's suspension?

17             MS. MASAITIS:  I'm going to object as to it

18    mischaracterizes the evidence.  Also it misstates the

19    response because that's the substance of the

20    objection that's made there in the interrogatory

21    response.

22             MR. TAGUE:  Let me start over so we can do

23    this.

24    BY MR. TAGUE:

1      Q.    The question said, did any defendant rely

2  upon the list of students owing money for drugs.  And

3  you knew you were a defendant, correct?

4      A.    Correct.  But by stating any defendant, it

5  could have been any one of the seven of us.

6      Q.    And I accept that too.  And the -- but the

7  statement that is made is this defendant did not take

8  the document into consideration.  And this defendant,

9  when you answered the interrogatories, meant you, did

10  it not?

11      A.    I didn't see where it said this defendant.

12  It says did any defendant.

13      Q.    I want you to look at the answer.  The

14  answer says -- it says "Without waiving said

15  objection", then it says "this defendant did take the

16  document into consideration."

17           And my question to you is was that your

18  answer when you verified that the information was

19  true and correct to the best of your knowledge and

20  belief?

21      A.    Could I have a second with my counsel?

22      Q.    I -- I think you have the right to confer

23  with your counsel, but I do want to let the record

24  reflect I can't conceive of any legitimate reason to

60

1   need legal advice on a very simple question of was

2   that his answer to the interrogatory question when he

3   certified the answers.

4            (Whereupon a break was taken and the

5   deposition continued as follows:)

6   BY MR. TAGUE:

7        Q.   Do you remember the question?

8        A.   Yes, I do recall.

9        Q.   Okay.  And what's your answer?

10       A.   That is the way I answered the question,

11  yes.

12       Q.   And my question is was that answer

13  erroneous and you wish to change it today or is that

14  still your answer?

15       A.   No, that answer is accurate.

16       Q.   Okay.  No. 13, that question said did any

17  defendant rely upon the letter of M. M. identifying

18  the students to whom he had provided pills.  That's

19  the other one we looked at that was Exhibit 3.  And

20  your answer, when you verified your responses,

21  stated, again, this defendant did take the document

22  into consideration.

23       A.   Yes.

24       Q.   And that was your answer then --

61

1      A.    Yes.

2      Q.    -- and is it still your answer today?

3      A.    Yes.

4      Q.    Have you spoken with anyone other than your

5   attorneys or their helpers about Noah Dietchweiler's

6   case after February 5, 2013?

7      A.    Would you rephrase that, please?  You said

8   helpers?

9      Q.    Well, the -- I just -- I can't ask you if

10   you've -- I think I can ask you if you have talked to

11   your attorneys, but I can't ask you what you told

12   your attorneys, so I'm not interested in going there.

13   But the attorneys would include their paralegals,

14   their secretaries, other employees that they have

15   that may not be an attorney.

16          So my question is other than people with

17   the insurance company, the attorneys for you and the

18   school district, my question is have you discussed

19   Noah Dietchweiler's case with anyone subsequent to

20   February 5, 2013?

21      A.    No.

22      Q.    And that would include you haven't

23   discussed this with another board member in which an

24   attorney was not present?

62

1              A.    Is this in reference to executive session?

2              Q.    No.   What I want to know is outside of a

3       formal board meeting, have you discussed this matter

4       with any of your fellow board members in which an

5       attorney hasn't been present?

6              A.    No.

7                    MR. TAGUE:   Thank you, Mr. Burd.   I have no

8       further questions of you right now.

9                    MS. MASAITIS:   I don't have any questions.

10      We will waive signature.

11      (Concluding at 2:20 p.m.)

12      AND FURTHER THE DEPONENT SAITH NOT

13                          (Signature Waived)
                            _____
14                          BOB BURD

15

16

17

18

19

20

21

22

23

24

63

1     STATE OF ILLINOIS  )
                         )
2     COUNTY OF VERMILION)

3
            I, Amy Prillaman Buhr, a Certified Shorthand
4     Reporter, in and for the County of Vermilion, State
      of Illinois, do hereby certify that BOB BURD, the
5     deponent herein, was by me first duly sworn to tell
      the truth, the whole truth and nothing but the truth,
6     in the aforementioned cause of action.
                  That the foregoing deposition was taken on
7     behalf of the Plaintiff, at the offices of Iroquois
      County CUSD No. 9, 1411 West Lafayette, Watseka,
8     Illinois, on October 24, 2014;
            That said deposition is a true record of the
9     testimony given by the deponent and was taken down in
      stenograph notes and afterwards reduced to
10    typewriting under my instruction; and that it was
      agreed by and between the witness and attorneys that
11    said signature on said deposition would be waived.
            I do hereby certify that I am a disinterested
12    person in this cause of action; that I am not a
      relative of any party or any attorney of record in
13    this cause, or an attorney for any party herein, or
      otherwise interested in the event of this action, and
14    am not in the employ of the attorneys for either
      party.
15          IN WITNESS WHEREOF, I have hereunto set my hand
      this 30th day of October, 2014.

16

17          _____

                  AMY PRILLAMAN BUHR, CSR, FCRR
18

19

20

21

22

23

24

**A**

Absolutely (3)
21:11,13;46:12
accept (1)
59:6
According (1)
55:12
accurate (2)
58:12;60:15
accused (3)
35:2;37:1,5
across (1)
44:23
Act (10)
20:6,6;22:16,16;
30:18;39:14,15;
40:10;47:19;56:15
Action (3)
26:18,22;28:19
actions (1)
31:17
actually (6)
13:17;18:17;21:22;
24:4,21;28:19
address (3)
6:19,20;7:9
adhere (1)
16:19
administrators (2)
13:18;49:17
admission (2)
53:13;55:1
admitted (3)
52:24;53:4,20
adult (2)
7:11,12
advice (2)
22:24;60:1
affiliated (1)
48:6
afternoon (1)
25:12
Again (7)
22:12;39:19;43:4;
44:2;53:10;54:4;
60:21
against (4)
28:2,8;31:6;37:11
agree (1)
41:19
agreed (1)
54:22
ahead (3)
10:11;42:17;56:23
allegations (1)
37:11
alleged (2)
35:3;37:6
Almost (2)
8:21;12:4
along (3)

23:19;30:3;56:3
amount (1)
57:5
amounts (1)
58:14
and/or (1)
35:2
annual (1)
13:15
answered (3)
49:2;59:9;60:10
appearance (1)
45:15
appears (1)
19:16
applicable (2)
17:20,21
appointed (1)
9:1
approved (4)
13:3,7;14:24;16:24
approximately (1)
37:10
Area (1)
6:23
argument (1)
45:1
ascertain (1)
40:18
assert (1)
43:21
assessment (1)
49:3
assistant (1)
57:3
assisted (2)
36:3,11
assuming (2)
20:19;24:18
Ativan (2)
37:2;53:11
attempting (1)
40:17
attending (1)
16:19
attorney (19)
23:10,18;33:23;
35:23,23,24,24;40:15;
43:18;45:10,11,19;
48:2,4,5,6;61:15,24
attorney-client (4)
35:15;37:21;43:16;
47:18
attorneys (9)
6:5;41:18;43:8;
47:14;61:5,11,12,13,
17
attorney's (1)
48:5
aware (9)
15:22;20:17,20,21;
24:19;25:2;26:11;
27:21;45:19

**B**

Bachelor (1)
7:1
back (10)
6:3;14:9;41:6,20,
23;43:4;45:3;54:4;
57:2,21
based (2)
30:14;56:21
basis (5)
13:15;30:11;35:3;
37:7;38:14
bathroom (1)
42:15
became (5)
14:4,9;20:17,20;
32:13
become (1)
8:22
beginning (2)
17:2;19:11
behalf (1)
55:19
behind (4)
26:20;28:21;33:11;
56:7
belief (2)
30:6;59:20
believes (1)
18:16
best (11)
18:3,15;19:16;
38:12;49:20;51:1,2,3,
5;53:2;59:19
Beyond (1)
12:16
Bianchetta (1)
12:11
binders (1)
17:13
bit (1)
9:16
blank (2)
35:12,17
board (35)
8:22;9:6,8,17,22;
10:3,9,17;11:1,4,6,9,
16,18;12:19;13:3,14,
17,19,19;14:5,10,16;
19:18;23:16;25:23;
26:2,14;27:11;42:21;
46:24;47:13;54:11;
57:6;61:23
BOB (3)
5:2,7;34:9
both (1)
49:11
brand (1)
34:24
break (5)
8:4;40:12;42:15,18;

60:4
brief (1)
9:14
Briefly (1)
53:18
brought (1)
32:8
Bunting (21)
9:23;10:8,22;23:22;
29:6;48:10,14,16,22;
49:1,8,11,14;51:18;
52:3,9,15,18,23;
53:13,24
Bunting's (2)
10:14;48:12
BURD (6)
5:2,7;7:16,20;8:9;
46:17
Burd's (1)
34:9
business (1)
50:5

**C**

call (4)
8:3;29:10;47:17,19
called (1)
33:18
calls (13)
20:4;22:13;24:7,7;
30:17;31:17;35:14;
37:20;39:11;40:8;
54:8;10;56:11
came (7)
21:5;23:8;31:20;
32:10;35:9;53:7;
54:15
can (21)
6:14,15;8:11;9:14;
10:11,11,12;11:24,24;
16:11;24:17;36:2,7,8;
42:2,13;45:3;47:18;
54:3;58:22;61:10
case (11)
5:18;17:23;18:16;
22:5;33:18;36:2;
40:19;45:12,18;61:6,
19
Cedar (1)
6:20
Central (3)
7:18;8:7;45:17
certified (1)
60:3
certify (7)
20:14;22:18,22;
23:5;41:5;43:23;
56:23
change (2)
12:17;60:13
changed (3)
12:12;15:11,13

changes (3)
11:3;13:16;14:14
charged (2)
30:7,9
charges (5)
27:17,18;28:2,8;
31:5
chemical (1)
36:21
children (3)
7:11,12,15
circumstances (1)
50:3
Civil (1)
45:17
claimed (2)
52:23;55:24
clarification (1)
43:8
clarified (1)
43:10
clarify (5)
43:22;44:9,13,14;
46:10
clarifying (1)
43:12
clear (2)
49:4,8
client (4)
20:5,8;36:1;45:19
client's (1)
45:8
Closed (10)
30:18;43:19;46:20,
20,23;47:4,12,19,24;
48:3
code (1)
6:23
collectively (1)
10:23
Commencing (1)
5:1
comments (1)
45:1
committee (2)
13:14,22
common (1)
12:1
communications (2)
21:9,12
company (1)
61:17
completely (1)
36:6
complied (1)
28:14
composition (1)
11:4
compound (1)
36:21
conceive (1)
59:24
condition (1)

44:22
**conduct (1)**
16:19
**conducted (1)**
43:19
**confer (1)**
59:22
**confine (1)**
45:1
**consider (1)**
56:8
**consideration (5)**
56:12;57:16;59:8,
16;60:22
**considered (3)**
30:18;40:19;54:9
**constitute (1)**
15:6
**constitutes (1)**
16:11
**consumed (1)**
30:23
**consumption (6)**
30:9,10,13,24;31:4,
5
**contents (1)**
26:17
**continued (4)**
8:5;40:13;42:19;
60:5
**copy (1)**
24:9
**counsel (10)**
23:1;24:8;36:3,12;
44:23;45:13,21;
56:21;59:21,23
**Country (1)**
8:19
**course (3)**
6:12;29:13;55:23
**courses (1)**
7:5
**court (6)**
17:12;23:20;24:1,4;
25:16;41:20
**crafting (1)**
12:20
**cross-referenced (1)**
17:16

**D**

**date (9)**
20:21,23;21:2,19;
31:14,16,17;50:22;
51:9
**dated (2)**
26:18;28:22
**dates (4)**
22:7;30:1,5;56:5
**day (10)**
22:11;33:2,4;37:5;
39:1,4;50:19,23;51:6;

56:2
**deal (1)**
50:6
**dealt (1)**
16:21
**December (1)**
7:4
**decided (1)**
40:19
**decision (2)**
56:9;58:15
**decisions (1)**
45:18
**Defendant (13)**
34:9;37:9;57:12;
59:1,3,4,7,8,11,12,15;
60:17,21
**defendants (1)**
36:12
**defense (2)**
54:19,20
**defines (1)**
7:14
**definition (2)**
7:13;16:10
**degree (1)**
7:1
**deliberations (4)**
30:22;54:9;56:12,
13
**delivered (6)**
27:8;39:22;42:23;
48:7;50:10,16
**denied (1)**
53:19
**depends (1)**
35:16
**deponent (1)**
22:23
**deposition (10)**
5:8;8:5;25:8,9,12;
40:13;42:19;45:6,20;
60:5
**depositions (3)**
17:12;44:20;45:22
**depository (1)**
14:7
**describe (1)**
52:18
**details (10)**
50:2,4;52:21;53:7,
8,18,21;54:24;55:15,
21
**determination (2)**
54:1,11
**determinations (1)**
10:18
**determine (2)**
51:18;52:4
**Dietchweiler (20)**
23:18;28:23;35:1;
37:5,10;41:17;42:8,
23;44:18,19;45:13;

46:6,9,12;47:7,15;
48:8;54:14;55:1;56:4
**Dietchweiler's (5)**
5:18;22:5;25:15;
61:5,19
**difference (1)**
46:22
**different (2)**
18:9;44:17
**differentiate (1)**
49:13
**difficult (1)**
6:3
**direct (1)**
7:21
**directed (2)**
35:6,7
**disciplinary (11)**
11:14,15,20;14:15;
22:10;26:18,22;27:1;
28:19;39:15;55:19
**discipline (1)**
22:1
**disciplined (1)**
10:9
**disclosure (1)**
24:11
**discovery (2)**
35:23;36:13
**discussed (3)**
54:16;61:18,23
**discussions (1)**
47:13
**dispute (2)**
55:16,17
**disrupted (1)**
45:23
**District (14)**
7:19;8:8;12:21;
13:7,21;14:24;16:24;
18:21;19:1,3;23:17;
28:5;45:17;61:18
**doctor (1)**
30:3
**document (20)**
26:14,19;27:3,7,11,
14,16;28:1,13,17,24;
31:1;33:9,14;56:9;
57:15;58:15;59:8,16;
60:21
**documents (9)**
25:14,17,19;26:1,
16,24;29:12,21;56:6
**dollar (1)**
58:14
**done (6)**
5:21,22;7:6;8:20;
46:11;55:10
**double (1)**
57:8
**down (2)**
5:19;35:18
**Drive (1)**

6:20
**drug (9)**
29:14,22;31:15,22;
35:1;36:17;50:8;52:5;
55:1
**drugs (21)**
29:23;30:23;31:3,4,
20;37:6;47:7,14;48:7;
50:5,10,13;51:11,19;
52:24;53:10,20;54:1;
55:4;57:13;59:2
**due (1)**
41:17
**duly (1)**
5:3
**during (9)**
6:12;14:16;15:13;
29:13;33:4;44:20;
45:20;55:2,23

**E**

**ear (1)**
45:8
**earlier (1)**
28:9
**early (1)**
13:10
**ears (1)**
44:22
**easy (1)**
11:9
**education (1)**
6:24
**effect (2)**
15:1;19:14
**effort (1)**
51:18
**either (4)**
10:8;33:3;39:4;
52:22
**elected (4)**
9:1,2,4;19:19
**else (7)**
20:17;29:7;37:24;
40:24;44:23;53:23;
54:13
**employee (1)**
48:5
**employees (1)**
61:14
**enough (1)**
18:7
**entire (1)**
24:22
**erroneous (1)**
60:13
**established (1)**
36:2
**evaluate (1)**
10:23
**evaluates (1)**
10:14

**evaluations (1)**
10:18
**even (1)**
17:5;19:12;32:1,8
**evening (1)**
55:11
**events (2)**
38:15,17
**everybody (2)**
6:15;41:18
**evidence (11)**
28:2,8;30:21;32:17;
40:9;51:23,23;52:1;
55:3;56:1;58:18
**exact (3)**
8:10,12;21:2
**exactly (5)**
6:4;11:7;13:23;
49:9;50:11
**EXAMINATION (1)**
5:4
**except (1)**
48:3
**exception (4)**
39:14;40:11;47:20;
56:14
**exclude (1)**
47:23
**excuse (1)**
23:23
**Exhibit (8)**
17:11;26:4;33:6,17;
34:11;56:7;57:2;
60:19
**exist (1)**
14:22
**existed (1)**
18:22
**existence (1)**
13:6;14:4
**expert (1)**
29:9
**explained (1)**
5:11
**explanation (1)**
28:1
**expulsions (1)**
15:23
**extent (4)**
6:24;22:13;40:8;
54:8

**F**

**FAA (1)**
30:3
**faculty (1)**
13:18
**fair (4)**
12:8;49:3,5,15
**fall (3)**
15:2,3,12
**false (1)**

46:12
**family (7)**
7:21;25:20;26:2,10;
54:19;55:4,23
**far (4)**
29:11;30:1,4;54:20
**fast (1)**
8:3
**February (9)**
10:24;15:17;16:3;
17:20;22:5;29:16;
38:5;61:6,20
**Federal (1)**
45:18
**financial (2)**
8:17,19
**fine (8)**
8:13;20:8;41:16,24;
42:1,3,4;43:22
**first (15)**
5:3;8:22;10:8;
12:12;14:1,9;21:3;
28:24;34:10;39:18;
40:21;41:6;44:2;
55:24;56:7
**flagged (3)**
17:15;18:13;19:12
**follows (5)**
5:3;8:5;40:13;
42:19;60:5
**form (6)**
15:19;16:1,10;24:7;
36:20;47:17
**formal (1)**
6:24
**formulated (1)**
35:21
**found (3)**
32:13;49:24;50:20
**foundation (1)**
24:7
**four (1)**
9:13
**frankly (1)**
44:21
**Friday (1)**
51:7
**front (1)**
26:20
**full (1)**
42:12
**Funk (1)**
23:18

**G**

**gave (6)**
40:3,6,22,24;47:6,
14
**general (2)**
43:20;46:20
**generally (1)**
47:11

generated (1)
27:13
generic (1)
35:1
generically (1)
21:24
gets (1)
13:11
Getty (1)
9:5
given (3)
27:19,21;28:3
giving (1)
25:9
glad (1)
48:13
goes (1)
18:4
Good (1)
9:12
governed (2)
18:22;19:4
governing (1)
16:6
great (1)
48:23
group (1)
13:20
guess (5)
17:24;29:15;31:11;
34:14;35:16
guide (1)
16:18
guilty (1)
55:19
guys (1)
41:19

**H**

handbook (23)
12:23;13:1,5,15,22;
14:2,16;15:1,11,13,
16;16:5,15,16,17,23;
17:1,17;18:2,17;19:9;
28:6,15
handbooks (1)
14:8
handed (1)
39:9
handful (2)
11:24;12:6
handwritten (1)
33:8,12;58:13
happened (5)
15:2;47:4;48:1;
49:18;56:2
happens (2)
13:10;45:21
head (3)
6:1,1;24:3
hear (4)
39:8,21;47:6;54:13

heard (3)
39:23;40:23;53:13
hearing (36)
20:24;21:6;22:1,3,
4,10,21;23:14;24:2,
22;25:16;27:1,4,24;
28:14;29:1,3,13;
30:15,22;39:22;40:3,
20,22;41:11;47:24;
48:17,19,22;49:17;
50:13,21;51:24;52:2,
18;53:17
hearings (4)
11:15;21:23;25:5;
48:4
helpers (2)
61:5,8
High (16)
12:23;14:1,24;
15:16;16:4;18:2;19:8;
20:1;21:4;26:21;28:6;
38:18,23;39:2;49:18,
22
hired (3)
9:18,23;10:4
hiring (3)
9:20;10:1,6
holding (1)
17:14
home (1)
6:20
hurts (1)
44:24

**I**

identification (2)
21:20;34:13
identify (1)
8:7
identifying (1)
60:17
Illinois (4)
6:21;7:2,19;8:8
incapable (1)
16:10
include (5)
43:8,9;44:16;61:13,
22
inclusive (1)
17:1
increases (1)
10:19
indicate (2)
22:9;42:22
indicated (4)
47:6;48:15;49:17;
53:13
indication (2)
12:1;21:3
individuals (1)
49:21
infer (1)

58:3
**influence (2)**
51:19;52:4
**information (17)**
20:4;22:2,13;23:12;
30:17;35:6,9,13;
37:13,14;38:6,11;
39:12;40:18;55:14,
16;59:18
**informed (1)**
37:10
**infraction (1)**
55:20
**instruct (7)**
22:17;30:19;36:14;
39:16;43:13;54:9;
56:11
**instructed (2)**
41:1;46:15
**instructing (3)**
20:10;44:5;56:16
**instruction (1)**
41:3
**insurance (1)**
61:17
**interested (3)**
46:18;48:14;61:12
**interpose (2)**
36:10,13
**interrogation (1)**
52:19
**interrogatories (5)**
33:19;34:10;35:11;
36:1;59:9
**interrogatory (9)**
34:12,24;35:7;57:9,
11,11,20;58:20;60:2
**interrupt (1)**
42:13
**into (12)**
15:4;18:17;19:8,13;
30:22;54:15;56:13;
57:15;58:3;59:8,16;
60:22
**investigation (2)**
37:18;50:24
**involved (2)**
12:20;21:21
**involvement (3)**
48:11,12;49:22
**involving (1)**
38:20
**issue (2)**
17:6;20:18

**J**

**January (26)**
10:24;11:13,19;
12:24;13:6;15:3,6;
17:20;19:14;20:1,18;
26:19;27:19;28:3,22;
37:9;38:15,18,24;

39:3;51:7,11,15,20;
55:11;56:2
**January/February (1)**
11:5
**Jeff (1)**
23:18
**job (2)**
10:14;45:9
**judge (2)**
43:24;46:19
**judge's (1)**
24:10

**K**

**keep (2)**
6:6;45:7
**key (1)**
57:24
**knew (2)**
37:17;59:3
**knowledge (15)**
14:6;18:3,16;19:17;
27:10;37:17;38:12,
14;40:8;49:18;51:1,2,
3,5;59:19

**L**

**lab (3)**
55:2,8,10
**last (5)**
7:15,19;8:15;9:15;
17:12
**late (1)**
13:10
**learn (1)**
19:24
**learning (1)**
55:24
**least (2)**
9:15;57:7
**Lee (5)**
6:14;9:17;10:16,22;
12:7;14:12,22;21:16;
23:17;28:23
**legal (2)**
29:8;60:1
**legitimate (1)**
59:24
**letter (2)**
28:22;60:17
**limit (1)**
51:24
**line (2)**
30:3;56:4
**list (5)**
57:12,13;58:13,13;
59:2
**listen (1)**
25:6
**listened (1)**
46:13

literally (1)
12:6
little (1)
9:16
live (2)
8:1;34:14
lived (1)
8:7
local (1)
45:16
locker (1)
51:14
long (4)
6:15;8:20;42:14,16
longer (1)
9:16
look (5)
17:18;26:4,6;38:8;
59:13
looked (8)
18:7;24:21;25:1;
29:12;31:1;56:6;
57:14;60:19
Looking (4)
17:15;22:8;28:18;
57:9
lots (1)
44:16
love (1)
42:15
Lucas (18)
10:3,21;23:22;29:6;
48:19,24;49:5,11,14;
51:18;52:3,10,15,17,
23;53:12,15,24
Lucas's (1)
53:4

**M**

main (1)
31:12
makeup (1)
11:7
making (1)
53:16
man's (1)
46:2
many (4)
11:22;32:5,9;46:24
marked (1)
33:16
Martin (1)
9:5
Mary (1)
8:10
MASAITIS (55)
8:2;10:10;12:15;
15:18,24;16:9;17:4;
18:5,8,15,24;20:3,12,
19;22:12,22;23:11;
24:6,16;30:16;31:7;
34:1,18;35:14,22;

36:10,19;37:20;
39:10;40:7;41:4,8,11,
14,24;43:3,7,13,18;
44:4,9,13;45:5;46:4,7,
10;47:16;54:3,7;
56:10,18;57:18;58:1,
6,17
materials (1)
26:7
may (5)
6:4,5;14:18;19:12;
61:15
maybe (2)
13:19;48:15
McKay (1)
33:13
mean (12)
6:2,4,5;17:21,22;
24:18;26:10;32:13,
14,35:23;54:20;58:6
meant (2)
17:8;59:9
medical (1)
44:21
medically (1)
52:3
meeting (10)
21:19;26:8;27:11;
42:22;46:21,23;47:5,
10,13,20
Meetings (8)
20:6;22:16;30:18;
31:18;39:15;40:11;
47:4;56:15
member (13)
8:23;11:16,18;
12:19;13:18,19;14:5,
10,17;19:18;26:14;
57:6;61:23
members (5)
13:19;23:16;25:23;
26:2,10
membership (1)
11:4
mentioned (1)
41:6
MICHAEL (2)
5:5;33:13
Might (4)
9:16;23:21,24;56:3
Mike (1)
44:19
mind (1)
6:6
minor (1)
43:9
minors (2)
40:9;42:6
mischaracterizes (1)
58:18
misstates (1)
58:18
moment (1)

42:13
money (3)
41:21;57:13;59:2
more (3)
20:13;34:21;44:22
morning (1)
5:14
motion (1)
45:7
mouth (1)
46:2
moving (1)
6:16
Mrs (2)
23:18;28:23
much (1)
26:5

**N**

name (10)
5:6;7:16,19;8:9,15;
33:13;35:1,1;36:22,
24
names (3)
7:24;20:16;58:14
narcotic (1)
52:5
need (7)
6:13;8:3;20:14;
22:18;26:6;43:7;60:1
needed (1)
14:20
needs (2)
5:19;43:10,11
negative (1)
29:22
next (5)
18:4,13;19:12;45:6;
47:9
Noah (53)
5:17;22:5;23:19;
25:15;27:1,9,19,22,
24;28:2;29:10;30:6,
23;31:6,15,19;35:1;
36:17;37:1,5,10;
38:20,22;39:5,9,22;
40:3,6,22,24;42:23;
47:7,15;48:7;50:10,
13,16,23;51:10;52:4,
19,23;53:4,14,16;
54:1,14,18,23;55:4,
20;61:5,19
Noah's (30)
12:13;21:5,9;22:21;
23:14;24:14;27:8,12;
28:13;29:24;30:21;
39:21;40:2,19,22;
41:11;42:2;48:11,17,
19,22;49:17,22;
50:12;51:14,24;52:2,
18;55:19;58:16
nod (1)

6:1
nods (1)
24:3
none (2)
21:11,13
notice (15)
20:24;21:5,10,14,
17,18;26:18,21;27:8,
17,18,21;28:7,18;31:2
noticed (1)
40:20
notified (1)
21:24
notifying (1)
27:9
number (3)
6:19,22;8:12

**O**

object (17)
12:15;15:18,24;
16:9;17:4;20:3;22:12;
24:6;30:16;36:20;
37:20;39:10;40:7;
47:16;54:7;56:10;
58:17
objected (1)
40:16
Objection (12)
10:10;36:9,11,13;
37:8,9;44:15;55:22;
57:23;58:7,20;59:15
objections (2)
45:8;46:7
obtained (3)
32:15,17,20
occasion (2)
12:13;15:15
occasions (1)
46:3
occupation (1)
8:16
occur (1)
30:14
occurred (4)
38:18;50:24;51:5;
52:19
occurrence (3)
12:1,2;56:2
off (1)
8:2
offense (1)
44:20
office (4)
14:11,21;48:6;53:4
officer (2)
9:8;14:7
offices (1)
19:20
one (18)
6:4;8:3,13;14:4;
17:14;20:13;24:11;

26:16,20,24;31:5;
34:23;42:9;56:7,24;
57:14;59:5;60:19
ones (2)
11:10;17:20
only (4)
8:13;22:10;46:18;
49:16
Open (8)
20:6;22:16;39:15;
40:10;46:21,22;47:5;
56:14
opinions (1)
39:11
opposition (1)
56:4
order (1)
24:10
ordinary (2)
45:1,22
original (1)
45:4
out (3)
34:11;45:12;53:7
outside (2)
32:18;40:20
over (5)
13:21;45:20;52:12,
16;58:22
owing (2)
57:13;59:2
own (1)
37:17

**P**

package (2)
26:7,17
packet (1)
29:1
page (10)
17:17;18:4,9,10,13;
19:12,12,13;33:6;
34:10
pages (1)
18:13
paid (2)
57:3,5
paper (1)
33:8
paralegals (1)
61:13
Pardon (1)
22:7
parents (2)
27:9;31:18
part (4)
24:8;30:18;33:2;
50:11
participants (3)
25:15;26:8,9
participate (2)
11:19;12:13

**participated (1)**
11:14
**past (1)**
13:23,24
**pause (1)**
57:22
**people (3)**
44:17,20;61:16
**perfect (1)**
16:11
**perfectly (2)**
42:1,4
**performance (1)**
10:15
**persist (1)**
41:2
**person (5)**
14:7;23:21;39:21;
42:24;51:12
**personal (2)**
37:17;38:1
**pharmaceuticals (1)**
50:6
**phone (3)**
6:19,22;31:17
**photocopy (1)**
33:8
**physically (2)**
42:24;44:24
**piece (1)**
33:8
**pill (1)**
32:4
**pills (20)**
32:3,11,17,21;39:5,
9,22;40:3,6,22,24;
42:23;43:1;48:11;
49:22;50:16,23;
54:15,23;60:18
**place (3)**
29:11;31:17;32:23
**placed (1)**
18:17
**places (1)**
35:12
**plain (4)**
44:2,3,4,8
**plaintiff's (1)**
34:10
**please (3)**
5:6;51:21;61:7
**plus (1)**
8:21
**pm (2)**
5:1;37:10
**point (1)**
14:9
**policies (2)**
16:5,18
**policy (6)**
18:22;19:2,3,14;
28:5,9
**political (1)**

**19:19**
**portion (7)**
34:9,11,22;42:21;
43:5;54:5;58:4
**portions (1)**
25:1
**possessed (3)**
31:15;54:1,23
**possessing (2)**
35:2;37:6
**Possession (18)**
30:8,11;31:3,13,20;
32:7,10,14;43:1;
49:24;50:3,20;52:24;
53:5,6,10,20;54:15
**possibly (1)**
43:16
**postgraduate (2)**
7:5,6
**practice (1)**
45:21
**premise (1)**
31:12
**prepare (1)**
25:9
**prepared (2)**
24:5,14
**presence (1)**
48:1
**present (11)**
14:13;23:15,17;
24:2;25:16;47:5;48:4,
16,19;55:1;61:24
**presentation (1)**
27:4
**presented (12)**
22:2;27:1,11;30:14,
21;40:9;51:23,24;
55:3,8,20;56:1
**president (1)**
9:10
**pretty (1)**
11:9
**previously (1)**
13:3
**printed (1)**
50:7
**Prior (11)**
11:13,18;13:9,12;
15:16,20;16:3;21:9;
25:8,11;27:3
**privilege (6)**
35:15;37:21;39:13;
43:16,21;47:18
**privileged (2)**
23:12;56:14
**probably (2)**
6:2;12:6
**problem (1)**
45:15
**procedure (8)**
6:10;12:12,20;
14:15;19:1,4;45:17,

**22**
**procedures (10)**
15:22;16:5,18,22;
17:2,18,19;18:1,12,23
**proceeding (6)**
12:14;24:5,10,15;
40:17;42:2
**proceedings (9)**
6:13;11:14,20;25:6;
39:16;41:22;45:23;
54:14;55:23
**produced (3)**
24:8,9,11
**Production (3)**
33:7,12;56:8
**prompted (1)**
45:24
**pronounce (1)**
37:3
**protocols (1)**
12:21
**provide (3)**
6:14;21:20;34:13
**provided (19)**
21:15;25:15,17,19,
22;26:1,2,7,12,14;
28:6,7;29:18;34:23;
35:4,12;37:14;50:13;
60:18
**provisions (1)**
16:8
**public (6)**
42:21;43:15,17;
46:18,20;47:4
**published (2)**
13:11;18:1
**purportedly (1)**
28:3
**purporting (1)**
27:17
**purports (2)**
39:8;57:19
**purpose (2)**
16:15,17
**pursuant (6)**
20:5;22:15;24:10;
39:13;40:10;56:14
**put (7)**
19:8;35:17,20;36:3;
40:16;44:11;54:19
**putting (1)**
46:1

**Q**

**qualification (1)**
11:17
**quicker (1)**
6:6
**quite (1)**
44:21

**R**

**raising (1)**
45:2
**rare (1)**
12:2
**rather (1)**
37:17
**read (11)**
6:3;15:15;41:20,23;
43:3,6;45:3;54:3,6;
57:21;58:5
**really (2)**
8:3;12:6
**reason (2)**
12:5;59:24
**recall (62)**
10:12;11:6,23;12:5,
17;13:23;14:19;
20:23;21:2,18;23:16,
21,22,23;26:3,15;
27:15;28:4,16;29:19,
22;30:5,10,11,24;
31:12,16;32:1,2,19;
33:1,3,10,15,21;34:6;
35:9;40:4;47:8;48:9,
24,24;50:6,8,11,14;
51:13,16;52:6,21;
53:1,8,15,18,21;
54:17,24;55:13,15,21,
22;60:8
**recalled (1)**
56:3
**receive (7)**
7:3;10:17;33:23,24;
35:17,18;39:5
**received (7)**
20:24;21:5,14;
33:20;34:4;35:11;
50:23
**receives (1)**
13:12
**receiving (4)**
21:10;33:17,21;
34:6
**recited (1)**
53:9
**recollect (3)**
52:2,14;53:22
**recollection (11)**
21:23;25:4,21;31:5,
8,10;49:4,7,20;52:8;
53:3
**record (18)**
8:2;36:11;40:16;
41:18;42:8,12;43:6;
44:11,18;45:11;46:8,
14,14;54:6;57:22;
58:3,5;59:23
**recorded (2)**
25:4,5
**records (7)**

**14:22;20:6;22:16;
25:11;39:14;40:10;
47:19
**recounting (1)**
29:15
**reference (1)**
17:22
**referenced (1)**
50:8
**referring (1)**
25:18
**reflect (2)**
57:22;59:24
**reflected (1)**
28:5
**refresh (3)**
31:4,8,10
**refreshing (1)**
31:12
**refused (1)**
44:14
**regard (6)**
18:9,10;20:4,7,13;
22:14
**regarding (2)**
27:22
**regardless (1)**
20:20
**regards (1)**
50:19
**regularly (1)**
45:21
**related (1)**
54:14
**relating (3)**
21:9;22:4;27:12
**relative (1)**
10:18
**relatives (2)**
7:18,21
**relevance (3)**
10:10;12:16;17:5
**relevant (3)**
30:1;53:24;56:5
**relied (2)**
58:8,15
**rely (3)**
57:12;59:1;60:17
**remember (34)**
9:13;11:22;12:9;
14:14;25:14;26:6;
29:2;30:2,4;32:16;
33:4,17,21,24;34:4,6;
48:10;49:9,14,21;
50:2;51:22;52:7,22;
53:2,7,9,12,16,19,23;
54:18,22;60:7
**remembered (1)**
11:8
**render (1)**
42:5
**repeat (2)**
27:20;51:21

rephrase (2)
38:16;61:7
report (3)
55:12,15,16
reported (2)
37:2;50:20
reporter (8)
23:20;24:1,4;25:16;
41:20;43:6;54:6;58:5
reporter's (1)
17:12
represent (2)
45:11,12
representative (1)
8:17
representatives (1)
55:20
Request (3)
33:7,11;56:8
requested (3)
43:5;54:5;58:4
requirement (1)
28:15
reside (1)
7:8
residence (1)
34:15
residential (1)
7:9
respect (2)
37:4;41:17
respond (1)
54:21
Response (7)
33:7,11;35:7;47:3;
56:7;58:19,21
responses (3)
6:7;52:20;60:20
rest (1)
36:4
restroom (2)
6:13,16
results (1)
29:14
review (6)
15:16,20;27:4,24;
28:14;29:3
reviewed (2)
25:11;28:9
reviews (1)
13:15
revised (1)
15:11
revisions (2)
13:8;14:18
ridiculous (1)
41:21
right (2)
47:3;59:22
road (1)
8:12
Rule (3)
24:11;45:16,17

rules (2)
45:16,18
run (1)
19:22
rural (1)
8:10

S

salary (1)
10:19
same (7)
10:22;11:10,11;
23:21;50:23;51:6;
57:5
sat (1)
46:13
saw (1)
39:5
saying (5)
18:15;40:22;44:19;
50:2;51:23
school (76)
8:22;9:6,17,22;
10:3,9,17;11:1,3,9,16,
18;12:19,21,23;13:2,
7,9,12,14,17,21;14:1,
5,10,16,24;15:1,5,7,
10,14,16;16:4,24;
17:3,5,8,22;18:21,21,
24;19:1,3,8,18;20:1;
21:5;23:17;25:22;
26:1,14,21;27:11;
28:5,6;32:14,18,18,
23;33:2;38:19,24;
39:2,4;42:21;46:24;
47:13;49:18,23;54:2,
10,15,23;57:6;61:18
schools (1)
16:20
Science (1)
7:1
scope (1)
12:16
scratch (1)
19:2
screening (4)
55:2,2,9,10
searched (2)
51:11,15
second (2)
8:3;59:21
secretaries (1)
61:14
section (1)
16:21
semester (6)
15:2,3,4,9,12,12
sends (1)
35:24
sense (1)
36:21
sent (1)

35:22
served (1)
35:24
session (6)
43:15,17,19;46:18;
47:12,24
sessions (1)
46:20
set (1)
17:12
seven (4)
9:15;11:11;23:16;
59:5
shake (1)
6:1
show (2)
22:1;33:16
showed (1)
29:21
Showing (2)
29:23;31:1
Siblings (2)
7:22;8:7
Sidell (1)
8:11
signature (1)
38:7
signed (2)
38:4,9
simple (1)
60:1
sit (4)
6:15;41:21;49:13;
57:17
sitting (1)
6:3
situation (1)
21:9
somebody (5)
37:16,23;40:21;
41:22;44:22
son (2)
45:11,12
sorry (11)
17:8;18:24;23:9;
31:7,24;34:1;38:16;
43:3,7;52:11;54:3
specific (5)
26:13;27:23;30:4;
31:16;36:21
specifically (2)
20:8;28:4
specifics (2)
14:19;22:8
speculation (1)
24:7
spoken (1)
61:4
spring (6)
8:24;13:10,10;15:4,
9,12
stand (1)
41:16

start (6)
5:22;6:10;18:12;
52:12,16;58:22
started (1)
23:14
starting (2)
13:13;25:12
starts (1)
34:11
state (2)
5:6;37:4
stated (2)
57:19;60:21
statement (10)
12:8;29:10;33:12;
49:5,15;55:5,8;57:16;
58:12;59:7
statements (2)
53:17;55:18
states (2)
37:9;57:12
stating (1)
59:4
step (1)
45:12
still (4)
11:1;15:3;60:14;
61:2
stint (1)
9:14
strike (1)
52:16
student (35)
11:14,15,19;12:23;
13:1,12;14:16;15:16;
16:6,14,15,17;18:22;
19:4;20:5,6,13;21:24;
22:14,15,16;26:18,21;
27:18,18;28:7,15;
31:21;32:21;39:6,14,
15,24;40:10;47:19
students (12)
16:19;20:9;21:21,
21;39:12,12;40:9;
42:5;43:9;57:13;59:2;
60:18
subject (2)
36:9;39:13
subsequent (3)
22:3;31:18;61:19
substance (4)
31:23;36:24;52:5;
58:19
summer (1)
13:11
superintendent (3)
9:3;12:8;28:23
supplemental (2)
45:14,14
support (3)
9:20;10:1,6
Sure (3)
6:18;28:20;51:22

suspended (2)
31:3;50:24
suspension (27)
12:20;15:23;16:22;
17:1,17,19;18:1,12,
22;19:4;21:6;27:4,9,
12,22,24;28:14;29:3;
30:12,22;31:2;35:3;
37:7;39:22;40:3;52:2;
58:16
suspensions (4)
14:15;16:6;20:1;
21:4
sworn (1)
5:3
system (2)
29:24;55:4

T

tab (3)
26:20;28:21;56:7
table (1)
44:24
TAGUE (58)
5:5;10:13;12:18;
15:21;16:2,13;17:7;
18:6,11,19;20:10,14,
15;22:18,20;23:2,5,6,
13;24:12,20;30:20;
31:9;34:3,20;36:5,15,
16,23;37:22;38:3;
39:18,20;40:14;41:5,
13;42:7,10,17,20;
43:11,15;44:1,7,11;
45:3;46:16;47:21;
54:12;56:16,19,23;
57:1,21;58:9,22,24;
60:6
talk (3)
45:19,24;46:19
talked (1)
61:10
talking (3)
29:16;31:23;36:20
talks (1)
17:17
tape (1)
25:4
Taylor (1)
8:10
technically (1)
58:6
telling (3)
45:8,9;49:12
tender (1)
44:22
tenure (2)
11:16;14:16
terms (1)
9:15
test (2)
29:14,22

testified (9)
5:3;27:12;29:2,5;
48:15,24;49:5,12,21
testify (5)
40:2;41:9,10;42:2;
48:22
testifying (4)
20:9;22:15;29:10;
48:10
testimony (21)
32:16;39:11;40:8,
21;41:7;42:5;46:11;
50:9,12,15,16,17,22;
52:7,9,15,17,22;53:9,
23;55:2
Thanks (1)
52:13
thinking (2)
12:5;57:23
third (1)
19:13
thought (1)
57:7
throughout (1)
11:16
today (9)
5:12;11:7,11;23:8;
25:9;49:13;57:17;
60:13;61:2
told (8)
7:9;37:16;46:2,4;
47:14;48:3,7;61:11
took (5)
29:11;31:17;32:23;
36:18;58:14
totally (1)
58:11
trade (1)
8:16
transcript (8)
5:19;24:5,9,14,21,
22;41:22;50:7
transfer (1)
32:23
tribunal (1)
40:19
true (2)
38:11;59:19
truthful (1)
57:16
try (2)
5:20,22
trying (1)
48:23
turned (1)
9:13
Twelve (1)
57:10
two (3)
9:15;13:19;49:16
two-year (1)
9:14
type (2)

31:22,23

## U

ultimately (2)
34:8;38:4
unacceptable (1)
36:7
unclear (1)
44:16
under (3)
45:18;51:19;52:4
unethical (1)
36:6
unfortunately (1)
50:5
unit (3)
14:11,21;16:20
University (1)
7:2
untrue (2)
46:6,9
up (3)
17:14;22:1;32:9
upon (8)
22:24;30:14;56:21;
57:12;58:8,15;59:2;
60:17
use (1)
6:13
using (1)
6:16
usually (2)
13:9,9

## V

Vague (4)
15:19;16:1;43:20;
44:16
various (2)
14:8;46:3
verbal (2)
5:20;21:12
verbally (1)
6:7
verbatim (5)
5:19;24:5,14;49:10;
50:1
verification (1)
38:5
verified (2)
59:18;60:20
versus (1)
49:14
vice (1)
9:10
view (1)
16:18
voice (1)
45:2

## W

waiving (2)
37:8;59:14
waste (1)
41:21
water (2)
6:14,14
Watseka (12)
6:21;8:19;12:23;
14:15;18:2;19:8;20:1;
21:4;26:21;28:6;
38:18;49:22
way (4)
13:11;40:2;49:2;
60:10
weighing (2)
54:8;56:12
weren't (2)
26:11;38:23
What's (4)
6:19,24;33:16;60:9
Whereupon (7)
8:4;40:12;42:18;
43:5;54:5;58:4;60:4
whispering (1)
45:7
wife (1)
7:10
wish (2)
47:22;60:13
without (4)
6:16;37:8;45:2;
59:14
Witness (7)
24:3;38:14,17;41:1;
45:24;54:10;57:23
Wood (1)
6:20
words (1)
46:2
work (2)
7:6;8:18
worked (1)
17:11
write (1)
45:9
writing (1)
19:6
written (8)
16:5;19:14;21:8;
27:18;28:1,7;29:14;
33:17

## Y

year (13)
13:9,12,23;15:5,7,
10,14;17:3,5,9,22;
18:18,21
years (9)
8:21,21;9:13,15;

12:4,4;14:8;45:20;
46:24
yell (1)
44:23
yelling (2)
44:11,20

## 1

1 (4)
18:9;26:5;33:7;
56:8
12 (3)
57:9,11,12
12:28 (1)
5:1
12-13 (2)
15:6,10
13 (2)
15:6;60:16
13-14 (1)
15:4
16 (2)
12:3,4
18-year-old (1)
7:13
19.83 (1)
40:17
1984 (1)
7:4
1999 (1)
8:24

## 2

2 (3)
33:12;34:24;35:7
20 (2)
8:21;38:5
2012/2013 (4)
17:8;18:2,18,21
2013 (31)
10:24;11:5,13,19;
12:24;13:6;15:2,17;
16:3;17:20;19:15;
20:2,18;22:5;26:19;
27:19;28:3,22;37:9;
38:15,18,24;39:3;
51:8,11,15,20;55:11;
56:2;61:6,20
2013/2014 (2)
17:2,5
2014 (1)
38:5
21 (1)
8:21
22 (1)
6:20
22-year-old (1)
7:13
23-year-old (1)
7:12
24 (1)

39:3
25 (19)
11:13,19;13:6;
19:14;20:1,18;26:19;
27:19;28:3;37:9;
38:15,18,24;51:7,11,
15,20;55:11;56:2
25th (2)
27:13;29:24
26 (1)
24:11
2c (1)
39:14

## 3

3 (6)
33:6;37:4,4;56:7;
57:14;60:19
3:00 (1)
37:10
30 (1)
28:22
34 (1)
45:20

## 4

4 (3)
33:17;34:11;57:2
43 (3)
17:17;18:13;19:12
432-4502 (1)
6:23

## 5

5 (5)
15:17;16:3;22:5;
61:6,20
5th (1)
29:16

## 6

6 (1)
28:21
60970 (1)
6:21

## 8

8 (1)
17:11
815 (1)
6:23

## 9

9 (1)
16:20