E-FILED
Monday, 15 December, 2014  03:32:58 PM
Clerk, U.S. District Court, ILCD

# In The Matter Of:

*DIETCHWEILER v.*
*STEVE LUCAS ET AL*

---

*JAMES BRUNS*
*October 17, 2014*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Original File 1017BRUJ.txt
Min-U-Script® with Word Index

1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                      STATE OF ILLINOIS

 3

     NOAH DIETCHWEILER, by MICHAEL    )
 4   DIETCHWEILER, his father and     )
     next friend, and ANN DIETCHWEILER)
 5        Plaintiffs,                  )
                                       ) No. 2013-CV-2062
 6            vs.                      )
                                       )
 7   STEVE LUCAS, in his official and )
     individual capacities;           )
 8   JAMES BUNTING, in his official   )
     and individual capacities;       )
 9   KENNETH LEE, in his official     )
     and individual capacities;       )
10   IROQUOIS COUNTY COMMUNITY UNIT   )
     SCHOOL DISTRICT NO. 9, IROQUOIS  )
11   COUNTY ILLINOIS; JAMES BRUNS,    )
     in his official capacity; DON    )
12   BECKER, in his official capacity;)
     BRENNA JOHNSON, in her official  )
13   capacity; CRYSTAL BLAIR, in her  )
     official capacity; BOB BURD, in  )
14   his official capacity; KIRK      )
     McTAGGART, in his official       )
15   capacity; and DEE SCHIPPERT,     )
     in her official capacity,        )
16        Defendants.                 )
     -------------------------------

17

18

19            DEPOSITION OF JAMES BRUNS
                   October 17, 2014
20                     8:00 AM

21

22

23       June Haeme:  RMR, CRR, CSR # 084-003038
       Area Wide Reporting and Video Conferencing
24              301 West White Street
              Champaign, Illinois  61820
25                   800.747.6789
```

2

1                          INDEX

2     APPEARANCES:

3     For the Plaintiff:
                 Michael Tague
4                Attorney at Law
                 Flynn, Palmer & Tague Law Offices
5                402 West Church Street
                 P.O. Box 1517
6                Champaign, IL  61824-1517
                 217.352.5181
7                fpt5law@aol.com

8     For the Defendant:
                 Shari D. Goggin-Ward
9                Attorney at Law
                 Law Offices of Lawrence Cozzi
10               27201 Bella Vista Parkway, Suite 410
                 Warrenville, IL  60555-1619
11               630.393.2145
                 shari.goggin-ward@libertymutual.com
12
      Also Present:
13               Michael Dietchweiler

14
      EXAMINATION BY:
15               Mr. Tague................ 5, 74
                 Ms. Goggin-Ward.......... 72
16

17
      EXHIBITS:
18               No. 1.................... 32
                 No. 2....................  5
19               No. 3....................  5
                 No. 4.................... 52
20               No. 5....................  5
                 No. 6....................  5
21               No. 7....................  5
                 No. 8.................... 17
22               No. 9.................... 60

23

24

25

1                    CERTIFIED QUESTIONS

2

3    Page 54:

4    BY MR. TAGUE:

5         Q.    Did your attorney tell you that was the

6    answer?

7

8    Page 68:

9    BY MR. TAGUE:

10        Q.    Was there any information provided in

11   those proceedings that Noah and his representatives

12   were not participants of that had not been discussed

13   in the session in which we have a verbatim

14   transcription?

15

16

17

18

19

20

21

22

23

24

25

4

1                    **STIPULATION**

2

3

4

5            IT IS HEREBY EXPRESSLY STIPULATED AND

6    AGREED by and between the parties that the

7    deposition of JAMES BRUNS may be taken on October

8    17, 2014, at the Iroquois County CUSD #9, 1411 West

9    Lafayette Street, Watseka, Illinois, pursuant to the

10   Rules of the Federal Court and the Rules of Federal

11   Procedure governing said depositions.

12

13

14            IT IS FURTHER STIPULATED that the

15   necessity for calling the Court Reporter for

16   impeachment purposes is waived.

17

18

19

20

21

22

23

24

25

1          (Exhibits No. 1 through 8 were marked by

2    the court reporter.)

3          (Commencing at 8:40 a.m.)

4                    JAMES BRUNS,

5    having first been duly sworn, testified as follows:

6          EXAMINATION BY

7          MR. TAGUE:

8      Q.   Would you state your name?

9      A.   James Bruns.

10     Q.   Okay, Mr. Bruns.  Let the record reflect

11   that this is the deposition of James Bruns taken

12   pursuant to the applicable Federal Rules of Civil

13   Procedure.

14          Would you please spell your last name?

15     A.   B-R-U-N-S.

16     Q.   Have you ever had your deposition taken

17   before?

18     A.   No.

19     Q.   Have you ever testified in court before?

20     A.   No.

21     Q.   I'm going to just go over a few general

22   ground rules so that we can make this go as

23   efficiently as possible.  I'm going to ask you

24   questions.  Some will be about background, some will

25   be about specifically the Watseka School District,

6

1   and some will be specifically about Noah's

2   disciplinary proceeding.  If at any time you don't

3   understand a question I ask you, tell me so.  I'll

4   be happy to repeat it.  We could have her read it

5   back.  It's important that you understand my

6   question because I'm not going to be likely able to

7   come back and ask you again if there's any

8   ambiguity.

9           We have to do everything verbally.  She's

10   going to make a verbatim transcript.  If there's a

11   nod of the head, a shake, an uh-uh, uh-huh, the -- I

12   will ask you to say does that mean yes or no, what

13   does your gesture mean, so that we don't have any

14   ambiguities when we all read it back.

15           If for any reason the -- you don't feel

16   the environment is conducive to us communicating,

17   let us know.  We can have breaks for the restroom,

18   if you need something to drink because you've been

19   talking for a long time, just let us know and

20   hopefully we can accommodate that here, and we'll do

21   it to the best of our ability since the school is

22   hosting us.

23           Do you have any questions about the

24   procedure?

25       A.   No.

7

1      Q.   Okay.  Did you do anything to prepare for
2  the deposition today other than simply showing up?
3      A.   No.
4      Q.   Did you review any documents between
5  Noah's suspension review hearing and today?
6      A.   No.
7      Q.   Have you spoken with Superintendent Lee
8  about this matter since the suspension review
9  hearing of Noah?
10     A.   No.
11     Q.   What is your address?
12     A.   2234 North 2430 East Road, Watseka,
13  Illinois, 60970.
14     Q.   Is that in Iroquois County?
15     A.   Yes.
16     Q.   What's your telephone number?
17     A.   815-432-2908.
18     Q.   What are the last four digits of your
19  social security number?
20     A.   8985.
21     Q.   Do you have any plans of moving from the
22  community in the next year?
23     A.   No.
24     Q.   Do you reside with anyone at the residence
25  you gave me?

8

1    A.    Yes.

2    Q.    Who resides with you?

3    A.    My spouse.

4    Q.    Okay.  And her name is?

5    A.    Connie.

6    Q.    Other than relatives that would have the

7  same last name as you, do you have any relatives in

8  east central -- well, how about Illinois?  I'm

9  interested if we might bump into any of your

10  relatives when we're picking a jury.

11    A.    I have two siblings or two daughters, so

12  -- and they live in Illinois, so...

13    Q.    Okay, what are their names?

14    A.    Laura Bruns.

15    Q.    Where does she live?

16    A.    She lives in Watseka.

17    Q.    Okay.

18    A.    And the other daughter is Leah Kanouce and

19  she lives in Germantown Hills.

20    Q.    Okay.  Do you have any siblings that live

21  in Illinois?

22    A.    Yes, actually I do.  I've got a sister.

23    Q.    And what's her name?  Where's she live?

24    A.    Carol Clark and she lives in Sheldon,

25  rural Sheldon.

9

1      Q.    And what county is that in?

2      A.    Iroquois.

3      Q.    Okay.  Other than a position with the

4  Watseka School District -- let me back up.  The

5  official name of the school district, is that

6  Iroquois County Community Unit School District No.

7  9?

8      A.    Correct.

9      Q.    If I use the term Watseka School District,

10  is that okay with you?

11      A.    That's fine with me.

12      Q.    Okay.  So I'll use the Watseka School

13  District in lieu of the official name which is more

14  of a tongue twister for me.  Other than your

15  affiliation with the school district, what's your

16  trade or occupation?

17      A.    I'm a banker.

18      Q.    And are you currently employed?

19      A.    Yes.

20      Q.    Which bank?

21      A.    Iroquois Farmers State Bank.

22      Q.    Do you have any employment or occupational

23  endeavors other than banking and whatever you do for

24  the school district?

25      A.    No.

10

1        Q.    What's the extent of your formal

2    education?

3        A.    College degree.

4        Q.    And where did you obtain that at?

5        A.    Illinois State University.

6        Q.    What year?

7        A.    1980.

8        Q.    Is that a bachelor's degree?

9        A.    Yeah, bachelor of science.

10       Q.    And what was that degree in?

11       A.    It was in business administration and a

12   minor in accounting.

13       Q.    Do you currently serve any -- in any

14   political office?

15       A.    No.

16       Q.    Are you affiliated with the school

17   district now?

18       A.    Yes.

19       Q.    Okay.  So you were elected to the school

20   board, were you not?

21       A.    Correct.

22       Q.    And when were you so elected?

23       A.    I think I was appointed in, I can't

24   remember the exact year, I'm thinking around 2007,

25   8.  I finished a term of somebody that had left the

11

1    board.

2        Q.   Okay.  And then you were elected

3    thereafter?

4        A.   Correct.

5        Q.   And were you elected once or twice?

6        A.   Once.

7        Q.   Okay, so what year did that term run?

8        A.   Well, let's see, I expire in -- let's see.

9    I've got two more years, so I expire in '16, that's

10   four years, so '12, I got elected in 2012.

11       Q.   Okay.  And then you filled out an

12   unexpired term prior to that election?

13       A.   Right, correct.

14       Q.   And have you ever held any elected office

15   other than school board member?

16       A.   No.

17       Q.   Have you ever run for public office other

18   than school board?

19       A.   No.

20       Q.   When did you actually begin -- well, let

21   me back up.  Are you currently the president of the

22   school board?

23       A.   Yes.

24       Q.   When did you become the president of the

25   school board?

12

1      A.   I do believe it was 2011, but I'm not

2 exactly sure.

3      Q.   And were you elected just once or are you

4 elected every year?

5      A.   Elected every two years.

6      Q.   When -- was Superintendent Lee hired while

7 you were on the school board?

8      A.   Yes.

9      Q.   What year was he hired?

10     A.   2010.

11     Q.   Okay.  Were you on the school board when

12 Steve Lucas was hired by the school district?

13     A.   Yes.

14     Q.   And what year was he hired?

15     A.   I do not recall.

16     Q.   Okay.  Who was involved in your

17 appointment to the school board?  Was there somebody

18 who nominated you, solicited you, how did you -- how

19 did that happen?

20     A.   Someone had approached me of possibly

21 joining the board, yes.

22     Q.   Was that someone affiliated with the

23 school district?

24     A.   Yes.

25     Q.   And did you apply and have interviews?

13

```
 1   How did that process happen?
 2        A.   They just asked me if I'd be interested in
 3   running and I said I'd think about it.  And then it
 4   was up to me to -- no, I guess since they appointed
 5   me, yeah, I said I probably would take the
 6   appointment if I was appointed.
 7        Q.   Do you remember who was on the school
 8   district board when you were appointed?
 9        A.   Not all of them, no.
10        Q.   Okay.  Can you tell me the ones you do
11   remember?
12        A.   I think at that time Mr. Watts, Mr. Burd,
13   let me think, Mr. Reynolds, possibly Sherry Brutlag.
14   I'm not a hundred percent sure on that one.
15        Q.   Okay.
16        A.   Then I can't remember the rest.
17        Q.   In January 2013, let's say January 1st,
18   2013, to March 1st of 2013, you were the president
19   of the school board, correct?
20        A.   Correct.
21        Q.   Mr. Lee was the superintendent, correct?
22        A.   Yes.
23        Q.   And Steve Lucas was a dean of students and
24   teacher at Watseka High School, correct?
25        A.   Yes.
```

14

1      Q.   Prior to January -- let me back up.  You

2  became aware that there was an incident at Watseka

3  High School in the lunchroom involving a controlled

4  substance or narcotics or at least a violation of

5  the school policy relating to drugs, correct?

6      A.   Yes.

7      Q.   When did you first learn that there had

8  been an incident on January 25?

9      A.   I don't remember the exact date.

10     Q.   Was it the same day?

11     A.   Don't remember if it was or not, no, I

12  don't remember.  I assume Kenny informed me shortly

13  after the occurrence, but as far as exact date, I do

14  not recall.

15     Q.   Had there ever been similar incidents

16  prior to this one on January 25, 2013, involving a

17  high school investigation of drug activity at school

18  prior to the one that we're talking about on January

19  25, 2013?

20     A.   Restate that again.

21     Q.   Sure.  Prior to this incident on January

22  25, 2013, had you ever become aware that there had

23  been other previous investigations about exchange of

24  drugs at school?

25     A.   No.

1        Q.   So this is the first time that you became

2   aware that the administration had investigated drug

3   activity at school?

4        A.   Drug activity as far as?

5        Q.   Well, any type of drug activity.

6        A.   Any kind of drug activity?

7        Q.   Right.

8        A.   I can't recall any before then.

9        Q.   Okay.  Had there been any suspensions or

10   expulsions of students for violation of the student

11   code of conduct relating to drugs prior to January

12   25, 2013, while you were on the school board?

13        A.   While I was on the school board?

14        Q.   Yes.

15        A.   Yes, I do believe there was.

16        Q.   Okay.  And was the school board involved

17   in that at all?

18        A.   Involved in the --

19        Q.   Well, how many activities are we talking

20   about?  Do you recall one, more than one?

21        A.   I can only recall one.

22        Q.   Okay.  And what year was that?

23        A.   I -- there again, I can't remember

24   specifically exactly what year it was.

25        Q.   And did it involve a student being

16

1   suspended or expelled or do you remember?

2        A.   Did it involve a student?

3        Q.   A student or more than one student

4   being --

5        A.   Expelled.

6        Q.   -- suspended or expelled.

7        A.   I do believe so, yes.

8        Q.   And what do you remember about the

9   procedures or protocols in that case?

10       A.   I don't remember.

11       Q.   Would it be a fair statement that when

12  this incident happened on January 25, 2013, you were

13  not familiar with the custom and practice or was

14  there a custom and practice to your knowledge as to

15  how these investigations and procedures would be

16  handled?

17            MS. GOGGIN-WARD:   Object to the form of

18  the question, compound.

19       Q.   Well, let me break it down.   Prior to

20  January 25, 2013, were you familiar with any

21  investigation, custom or practice in the Watseka

22  School District relating to investigation of drug

23  activities?

24       A.   No.

25       Q.   Was there a policy or practice or are you

17

1   just saying you're not aware of what it was?

2        A.   I -- I guess I'm confused by the question.

3   Restate -- I'm not sure what you're asking.

4        Q.   Well, what I'm asking is is the -- I think

5   you indicated that to your knowledge there was one

6   investigation involving breach of the student policy

7   and code of conduct relating to drugs at school

8   prior to January 25, 2013.

9        A.   Okay.  Now, let me rephrase it.  Are you

10  saying investigation is a hearing?

11       Q.   No, I'm asking --

12       A.   Oh, okay, because that's totally different

13  then.

14       Q.   Right, the -- so first I want to know are

15  you aware of any investigations other than the one

16  you've told us about?

17       A.   No.

18       Q.   So my question is, did you know what the

19  custom and practice was for the administrators at

20  Watseka High School to utilize in investigating drug

21  activity at the high school?

22       A.   No.

23       Q.   This is Exhibit No. 8, and as I was

24  preparing today, I wanted to make three copies of

25  everything.  That's one that didn't get three copies

18

1    made.  I printed that off of the district's website

2    when we were doing our Rule 26(a) disclosures and I

3    believe that that is the Watseka High School

4    handbook from the electronic version.

5              Such a document existed, did it not, a

6    handbook for --

7         A.    I know one does, yes.

8         Q.    Okay.  And it was printed and bound, let

9    me see this one, something like this here

10   (indicating) in the copy that Mike has.  Is that in

11   accordance with your knowledge?

12        A.    Yes.

13        Q.    Did you have any involvement in

14   preparation of the contents of that handbook?

15        A.    Any involvement in the preparation of it?

16   No.

17        Q.    Is it the same handbook that existed -- or

18   let me ask you, has the handbook changed from the

19   time that you became a school board member to

20   present?

21        A.    Yes.  There have been changes.

22        Q.    Who would be able to determine the -- what

23   all the changes were in the handbook from the time

24   you came on board until present?

25        A.    That would be in the minutes of the board

1  meetings.

2      Q.   Okay.  Was there a particular officer or

3  employee of the school district that would be in

4  charge of reviewing the handbook from year to year

5  and recommending changes to the board?

6      A.   You would have to ask Mr. Lee about that,

7  the superintendent.

8      Q.   So your best --

9      A.   I know --

10     Q.   -- belief is Mr. Lee would be the person

11 that would know the answer to that if anybody.

12     A.   Right, correct.

13     Q.   Do you as a school board review or approve

14 the handbook that is to be delivered to high school

15 students each year?

16     A.   Yes.

17     Q.   And when was the last time that the

18 handbook was reviewed prior to January 25, 2013?

19     A.   You'd have to look at the board minutes

20 to --

21     Q.   Was the handbook approved prior to the

22 start of school each year?

23     A.   I can't recall that either, if it's prior

24 or during, you know, or -- I don't know exactly

25 when.

20

1      Q.   Okay.  And so the one version might be
2   only for one year or maybe for multiple years.  That
3   you just don't know, correct?
4      A.   Correct.
5      Q.   The -- prior to January 25, 2013, did you
6   have a copy of the handbook in your possession?
7      A.   No.
8      Q.   Any issues that you had to deal with as a
9   school board member come up prior to January --
10  prior to January 25, 2013, in which you needed to
11  refer to the student handbook?
12     A.   Restate that again because I --
13     Q.   Okay.  While you were a school board
14  member and prior to January 25, 2013, had you had to
15  deal with any school board business in which you
16  needed to review the high school handbook?
17     A.   Not that I can recall.
18     Q.   Did you review the high school handbook
19  before Noah's suspension review hearing?
20     A.   No.
21     Q.   Prior to January 25, 2013, had you -- what
22  had you done to learn what your duties were as a
23  school board member and what you would need to learn
24  or what skills you would need to develop to do your
25  duties as a school board member?

21

1      A.    What did I do?

2      Q.    Yes.

3      A.    Nothing.

4      Q.    Have you ever taken any workshops or

5  training or seminars on school board governance?

6      A.    I go to the school board convention every

7  year, take classes.

8      Q.    Okay.  And so you went to how many of

9  those prior to January 25, 2013?  Did you go every

10  year?

11      A.    I go every year.

12      Q.    And you've done that every year since

13  you've been on the school board?

14      A.    Yes.

15      Q.    Have they had any training or seminars on

16  how to deal with student disciplinary

17  investigations?

18      A.    None that I can recall, but like I say,

19  that's been probably five years, six years that I've

20  gone, gone to different classes, so I --

21      Q.    Okay.  So you don't recall?

22      A.    I don't recall.

23      Q.    Okay.  And if we wanted to actually see

24  what the curricula was for those seminars, do you

25  still have the course materials for any of the

22

1   years?

2       A.   No.

3       Q.   I asked you about investigations.  Do you

4   remember any programs, workshops, seminars, courses

5   that you took at the school board meetings that

6   would involve how school boards should conduct

7   disciplinary hearings?

8       A.   Not that I can recall, no.

9       Q.   Okay.  At some time after January -- I

10  shouldn't say after.  Either on January 25, 2013, or

11  afterwards, you learned that there had been student

12  disciplinary investigations or an investigation

13  relating to an incident on January 25, 2013, did you

14  not?

15      A.   Yes.

16      Q.   Okay.  And from whom did you learn that

17  there had been an unusual event at Watseka High?

18      A.   From the superintendent.

19      Q.   What was the form of that communication?

20      A.   Phone call.

21      Q.   Okay.  He called you from -- do you know

22  where he was at when he called you?

23      A.   No.  I -- no.

24      Q.   Did he call you on your home phone, your

25  cell phone, or where were you at when he called you?

23

1      A.   I do believe it was probably at my work
2   phone, but I'm not exactly sure.
3      Q.   When someone calls you at the bank, do you
4   usually have clerical people answer the phone?
5      A.   Yes.
6      Q.   Is there a protocol where the people that
7   answer the phone at your bank would document all of
8   the incoming calls?
9      A.   No.
10      Q.   So if somebody called the bank, they would
11   get a receptionist.  Would it be one person
12   specifically or could it be a variety of people?
13      A.   Could be a variety of people.
14      Q.   Okay, so whoever is available to answer
15   the phone answers the phone.  If they ask for you,
16   they'll find out if you're available.  Is that a
17   fair statement?
18      A.   Yes.
19      Q.   They would tell you who was calling and
20   you would decide whether or not you could take the
21   call or not.
22      A.   Yes.
23      Q.   Okay.  The -- your bank, does it have a
24   system that exists so that if we wanted to actually
25   match up Superintendent Lee's phone call with yours,

24

1    we would have a database to do that?

2          A.    Other than the phone records, I don't know

3    of any.  We don't have a recording system or

4    anything like that, so --

5          Q.    Okay.  The -- do you remember whether or

6    not he called you and you had to call him back or if

7    he actually called and got through to you?

8          A.    Don't recall.

9          Q.    Okay.  What did he tell you to the best of

10   your recollection?

11         A.    To the best of my recollection, he said

12   that we had a discipline issue at the high school

13   and that there would probably be a hearing on it.

14   That's the best of my recollection.

15         Q.    Did he tell you what the event was and

16   what they did to find out who all was involved?

17         A.    He didn't tell me what it was or who was

18   involved.

19         Q.    Did he tell you how many students were

20   involved?

21         A.    No.

22         Q.    Do you remember if he told you the date of

23   the incident?

24         A.    No.

25         Q.    And the -- did you respond to him at all?

25

1      A.    He just said he'd let me know further.

2      Q.    Okay.  Now, we had ultimately a

3  disciplinary hearing that involved Noah here in this

4  building, correct?

5      A.    Correct.

6      Q.    And I believe that that was on February 5,

7  2013.  Is that accurate?

8      A.    If that's what the records state.  I don't

9  recall the exact date.

10     Q.    Okay.  My question is did you have any

11  discussions with anyone between that initial

12  telephone conversation you told me about and the

13  evening of the proceedings at six o'clock p.m. on

14  February 5, 2013?

15     A.    No.

16     Q.    Did you receive any written communications

17  from anyone relative to the disciplinary matter or

18  matters prior to February 5, 2013?

19     A.    No.

20     Q.    How did you know that there was going to

21  be a hearing on that date and time?

22     A.    Because Kenny had informed me that there

23  was going to be a hearing.

24     Q.    Okay.  Did he inform you there was going

25  to be a hearing or more than one hearing?

26

1      A.    He just informed me that there -- best of
2  my recollection, there was going to be a hearing.
3      Q.    Okay.  And so he told you a time and a
4  place and said be here for a hearing.
5      A.    Correct.
6      Q.    Did you receive any written documentation
7  relating to the hearing prior to showing up on
8  February 5?
9      A.    No.
10      Q.    Who prepared the agenda for the hearing?
11      A.    Kenny or superintendent.
12      Q.    And did you approve it?
13      A.    I reviewed it, yes, so I guess if you're
14  saying if there -- I did receive anything, it would
15  be the hearing process, the steps, yes.
16      Q.    Okay.  So he prepared an agenda, you
17  approved it, and that agenda reflected that there
18  would be more than one hearing, did it not?
19      A.    I don't recall, but if it -- if there was
20  more than one, then it did.  I really don't
21  remember.
22      Q.    Well, were there more than one hearing
23  that evening?
24      A.    I do believe there was.
25      Q.    How many?

27

1     A.   I really don't remember.  Two?

2     Q.   Okay.  And then you were provided a --

3     A.   I don't remember.

4     Q.   Other than the agenda -- and maybe I

5 misunderstood.  You were provided with some form of

6 document that would identify what the procedure

7 would be?

8     A.   Correct.

9     Q.   And who prepared that?

10     A.   Kenny did, our superintendent.

11     Q.   Now, do you know if he actually did that

12 himself or somebody else prepared that?

13     A.   That I do not know.

14     Q.   Okay.  That particular document, do you

15 know whether or not it was actually presented at the

16 Dietchweiler hearing on February 5?

17     A.   Presented to who?

18     Q.   Well, presented to the family and

19 presented as part of the record of the proceedings.

20     A.   I -- I don't recall, but I assume we

21 followed all the procedures that were on that

22 document, so...

23     Q.   Okay.  The -- and why were you given that

24 document, do you know?

25     A.   To have an order to follow, a procedure to

28

1  follow.

2      Q.  Okay.  So the superintendent provided you

3  with a procedure with the expectation that you would

4  be the presiding hearing officer and you were to

5  implement that procedure.

6      A.  Yes.

7      Q.  Did you compare that procedure with the

8  required procedure in the student handbook?

9          MS. GOGGIN-WARD:  Object to the form of

10  the question.  You can answer.

11          THE WITNESS:  I can go ahead and answer?

12          MS. GOGGIN-WARD:  Go ahead, yes.

13      A.  Restate it again.

14      Q.  Did you compare the procedure that Mr. Lee

15  gave you to any procedure in the student handbook?

16      A.  No.

17      Q.  Did you know that there was a procedure

18  that was spelled out in the student handbook?

19      A.  No.

20      Q.  Did you know that there was a procedure

21  spelled out by state statute?

22      A.  I knew -- I'm aware that there is a

23  procedure that's classified by state statute, yes.

24      Q.  The -- did you review the state statute or

25  ask someone to give you the state statute so you

1    could review the procedure Mr. Lee gave you to

2    determine whether it was in conformance with that

3    statute?

4        A.    No.

5        Q.    Is it a fair statement that you assumed

6    Mr. Lee knew what the state statute was and what was

7    in the handbook and that the procedures he gave you

8    would comply with those requirements?

9        A.    I assumed that he did that along with

10   talking to our general counsel.

11       Q.    Okay.  And why did you make that

12   assumption if you really hadn't had any of these

13   procedures before?

14       A.    Hadn't had any what procedures?

15   Disciplinary procedures?

16       Q.    You hadn't -- well, had you ever had any

17   disciplinary procedures before this one with Noah on

18   February 5, 2013, in which Mr. Lee had given the

19   procedures and you followed those in some type of a

20   hearing?

21       A.    And I think I stated before that, yes, we

22   had one.

23       Q.    Okay.  And was it the same process

24   followed where he gave you procedures?

25       A.    The same process was followed, yes.

1        Q.   And the same process was followed by you

2    that you just accepted his procedures and that they

3    were in conformance with your handbook and the state

4    statutes?

5        A.   Yes.

6        Q.   Did you discuss the procedures with Mr.

7    Lee or Mr. Funk prior to the Dietchweiler hearing on

8    February 5?

9        A.   Yes, I think Kenny and I did go over the

10   procedures.

11       Q.   Okay.  When was that?

12       A.   Right before the meeting if I recall.

13       Q.   The same day?

14       A.   Yes.

15       Q.   Was it actually here you came early and

16   went over things?

17       A.   Yes.

18       Q.   Okay.  In the student handbook, there is a

19   section and I've marked it here with a yellow flag

20   that says P43.  It says suspension procedures.  It

21   starts with part of that page, then follows on the

22   next page.  And you can take as much time as you

23   need to look at that, but my question to you is can

24   you tell whether or not that was the same procedure

25   that Mr. Lee gave you?

1      A.   I can't tell.

2      Q.   Up at the top, this provision number C,

3   would you look at that?

4           MS. GOGGIN-WARD:  Just C you want him to

5   look at?

6           MR. TAGUE:  Uh-huh.

7           MS. GOGGIN-WARD:  Okay.

8      Q.   Okay?  Isn't it a correct statement that

9   Watseka schools and Watseka High School had a policy

10  that stated, using the verb shall, directed what

11  form of notice to the parents of a suspension should

12  be?

13     A.   Registered or certified mail, is that what

14  you're referring to?

15     Q.   No, what I'm -- let me just state that --

16  I'm not going to read everything into the record,

17  but this says the superintendent or principal shall

18  notify the student's parents of the suspension.  The

19  notification shall be in the form of verbal contact

20  and a written letter to the parents that shall be

21  sent by registered or certified mail.  Then it says

22  the letter shall be in the following format.  Then

23  it spells out a format in that.

24           So my question is that Watseka had a

25  policy that mandated how the format of the notice of

1  suspension to the parents was to be.  That's a

2  correct statement, is it not?

3       A.   From what I can tell, yes.

4       Q.   Okay.  I do have, I believe, copies of

5  these.  Plaintiff's Exhibit No. 1, the last page is

6  blank, but the second to last page which I'm showing

7  you, that is the actual notice of suspension that

8  was given to Noah's parents, is it not?

9       A.   I assume it is.  I have not seen it.

10       Q.   Well, let me ask you.  This Exhibit 1, if

11  you look at the first page of it, this was the

12  booklet that was given to everyone at Noah's

13  suspension review hearing.  There was such a notice

14  that was given, was there not?

15       A.   A notice given to who?

16       Q.   I'm sorry, there was such a booklet that

17  was given to everyone the night of the suspension,

18  was there not?

19       A.   I don't recall, but yeah.

20       Q.   Okay.  You haven't reviewed the transcript

21  of the proceedings that indicate you actually gave

22  one to everybody?

23       A.   Well, no, I haven't reviewed it since that

24  night, no, ever.

25       Q.   You don't dispute that it was handed out.

33

1      A.   No, I'm not disputing it at all.

2      Q.   You just don't remember it.

3      A.   I don't remember, yeah.

4      Q.   And you don't remember that you actually

5 passed them around to everybody.

6      A.   No, I don't.

7      Q.   Okay.  So the -- my question is, you're

8 assuming that that is -- you don't dispute that that

9 is the --

10     A.   No, I'm not --

11     Q.   -- document?

12     A.   -- disputing this letter, no.

13     Q.   Okay.  Well, my question is, it's not in

14 the format prescribed by your book, is it?  By your

15 handbook.

16     A.   Well, I'd have to read this and look at it

17 and look at this also.

18     Q.   You never did that before?

19     A.   No, I didn't send this out.  Mr. Lee did.

20     Q.   Okay.  And you --

21     A.   The superintendent.

22     Q.   You never compared them even though we

23 pointed that out at the hearing and objected that

24 this was not in the format of your handbook?

25     A.   No.

34

1      Q.    It's not the same format, is it?

2            MS. GOGGIN-WARD:  Objection, asked and

3    answered.  You can tell him again.

4      A.    Yeah, it -- I mean just look -- I'd have

5    to sit down and verbally look at it and go line by

6    line, but...

7      Q.    There's no mention in there, is there,

8    that this is pursuant to Section 10-22.6 of the

9    Illinois School Code and the discipline policy of

10   Iroquois Community Unit School District No. 4[sic]?

11     A.    No, there's no mention of that in the

12   letter.

13     Q.    And there's no language in the actual

14   notice that was given by Mr. Lee that states you

15   were advised that Noah Dietchweiler is or was

16   suspended for the following specific reasons, is

17   there?

18     A.    No, not in the letter.

19     Q.    Now, that is actually a provision that is

20   in the format and directed by your school handbook,

21   is it not?

22     A.    Yes.

23     Q.    And, in fact, the -- there is no

24   indication as to what Noah was charged with that was

25   going to be reviewed, is there, in the actual

35

1   notice?

2       A.   In this letter?

3       Q.   Correct.

4       A.   No.

5       Q.   You don't know whether or not the statute

6   that is referred to in the handbook as 10-22.6 of

7   the school code requires the same thing as your

8   policy or not, is that a correct statement?

9       A.   Am I aware of that?

10      Q.   Correct.

11      A.   No, I'm not aware of it.

12      Q.   Do you know why Superintendent Lee

13  prepared the actual notice to the parents in the

14  form that was given to the Dietchweilers rather than

15  in the format set forth as a requirement in your

16  handbook?

17      A.   No.

18      Q.   In the handbook there is also a provision

19  that -- up here at the top, and if you need to look

20  at the previous page you can, it talks about the

21  drug policy, and what I'm interested in -- talks

22  about suspension procedures, and it -- right before

23  D on the page I have flagged it says you will have

24  the right -- wait a minute, which one?

25      A.   Right before D?

1           MS. GOGGIN-WARD:   There is no D.

2      Q.   I'm sorry.

3      A.   You showed me this, the top of this, and

4  you said if -- that's B.   There is no D.

5      Q.   Yeah, I'm sorry.   Here's what I'm

6  interested in.   If a person has been found guilty of

7  use, if a drug test is presented, there would be an

8  automatic reconsideration.   Were you aware that that

9  policy existed in your handbook?

10     A.   No.

11     Q.   Were you aware that Mr. Lee had the

12 negative drug test in his possession the day after,

13 the first business day after Noah was suspended?

14     A.   No, I wasn't aware of it.

15     Q.   Are you aware that Mr. Lee did not reopen

16 the investigation and did not reconsider the charges

17 against Noah before the suspension review hearing?

18          MS. GOGGIN-WARD:   Objection, compound,

19 charges possession and ingestion.   Go ahead.

20     A.   What was the question again?

21          MR. TAGUE:   Read it back.

22          (Requested portion of the deposition was

23 read by the court reporter.)

24     A.   No.

25     Q.   And you didn't even know that he had a

```
 1   policy that that was necessary?
 2           MS. GOGGIN-WARD:  Objection, asked and
 3   answered.  As to both charges or one?
 4           MR. TAGUE:  Read the question back.
 5           (Requested portion of the deposition was
 6   read by the court reporter.)
 7           MS. GOGGIN-WARD:  Same objection.
 8       A.   No.
 9           MR. TAGUE:  Are you going to instruct him
10   not to answer it?
11           MS. GOGGIN-WARD:  No, not right now.
12   BY MR. TAGUE:
13       Q.   Prior to the hearing on February 5, 2013,
14   you didn't know anything about the details of how
15   the investigation happened or what the interrogation
16   of Noah was?
17       A.   No.
18       Q.   The policy that you have again that talks
19   about the suspension procedures, A says that verbal
20   and written notice of the charges shall be provided.
21   What do you know -- well, do you know whether or not
22   that was done?
23       A.   Yes, I know the written notice was.
24       Q.   Okay.  And the written notice of the
25   charges is in Exhibit 1.
```

38

1          MR. DIETCHWEILER:  It's No. 5.  This one

2     (indicating).

3        Q.    Is it not?  And that is the -- it says on

4     the top Notice of Student Disciplinary Action, it

5     says to Mr. and Mrs. Dietchweiler, and it says

6     1/25/13, correct?

7        A.    Yes.

8        Q.    And it's your testimony that that was the

9     notice of -- the written notice of the charges

10    against Noah that was given to him?  And what I'm

11    interested in is your suspension procedures under

12    A1.  It says the suspending official shall give the

13    student verbal and written notice of the charges

14    which constitute the basis for the discipline,

15    correct?

16          MS. GOGGIN-WARD:  Which question do you

17    want him to answer?

18       A.    Yeah.

19       Q.    Well --

20       A.    What is the question?

21       Q.    Okay.  You have a suspension procedure

22    that states, A, except as set forth under

23    subparagraph B below, prior to the imposition of a

24    suspension, the following procedures shall be

25    observed.  1, the suspending official shall give the

39

1   student verbal and written notice of the charges

2   which constitute the basis for the proposed

3   suspension and a summary of evidence which supports

4   such charges.  Your policy provides that, correct?

5       A.   Yes.

6       Q.   And you're saying this document is the

7   written notice of charges which constituted the

8   basis of the proposed suspension.

9       A.   Yes.

10      Q.   And that wasn't given to him prior to the

11  suspension though, was it?

12      A.   I can't answer that because I wasn't there

13  when he was there and --

14      Q.   Well --

15      A.   -- they were there.  I don't know exactly

16  when it was given to him.

17      Q.   Okay.  Doesn't the plain language of that

18  document state you are suspended?

19          MS. GOGGIN-WARD:  Objection.  The document

20  speaks for itself.

21      Q.   Well, let me ask you, do you believe that

22  there's an interpretation, reasonable interpretation

23  of that document that it was given to him prior to

24  his actually being suspended?

25          MS. GOGGIN-WARD:  Same objection.

1      Q.   Was Noah given a written notice of his
2   suspension?
3           MS. GOGGIN-WARD:  Objection, asked and
4   answered.
5           MR. TAGUE:  He didn't answer that one.
6   Read that one back.
7           (Requested portion of the deposition was
8   read by the court reporter.)
9      A.   And I said as far as I know they gave him
10   one that day.  I wasn't there, I think that was my
11   response, I wasn't there to see or verify that he
12   received this written notice.
13      Q.   Okay.  He received that written notice.
14   You don't know whether he received that before they
15   suspended him or after they suspended him, do you?
16      A.   No.
17      Q.   Okay.  And the language of that --
18      A.   Wasn't there.
19      Q.   -- document says this is to notify that
20   your child has been suspended, correct?
21      A.   That's what the notice reads.
22      Q.   Okay.  Okay, your suspension procedures go
23   on to state that the suspending official shall give
24   the student an opportunity to explain the incident
25   after he is given the verbal and written notice of

1   the charges, correct?  That's what your policy says.

2        A.   If that's what it says, that's what it

3   says.

4        Q.   But he had already been suspended when he

5   had that opportunity, isn't that a correct

6   statement?

7        A.   I wasn't at that proceeding, so --

8        Q.   Okay.

9        A.   I don't know if he stated his case before

10  or after or when.

11       Q.   Okay.

12       A.   Or even the incident.

13       Q.   This notice indicates that Noah was

14  suspended for it says possession of drugs,

15  consumption of drugs, correct?

16       A.   That's what it says on the statement.

17       Q.   Okay.  Do you know whether or not the

18  charges were ever amended prior to the suspension

19  review hearing on February 5th?

20       A.   Not that I'm aware of --

21       Q.   Did the board --

22       A.   -- or can I recall.  I --

23       Q.   Okay.  Did the Board of Education find in

24  its review hearing Noah was guilty of consumption of

25  drugs?

42

1          A.    I don't recall if it was consumption
2     and/or possession or just possession.
3          Q.    You saw the drug testing documents, did
4     you not?
5          A.    Yes.
6          Q.    Did you not believe them?
7          A.    I -- they were irrelevant to me.
8          Q.    Why were they irrelevant to you?
9          A.    Because possession of drugs, according to
10    the testimony, was all I needed as far as a
11    suspension.
12         Q.    Okay.  So your school board hearing on
13    February 5th, 2013, for Noah's suspension review
14    happened.  There was at least one hearing before
15    that, was there not?
16         A.    I don't recall the order.
17         Q.    Okay.  So if I ask you what was presented
18    in the other hearings that was the same as Noah's
19    hearing, you couldn't answer that question?
20         A.    No, I could not.
21         Q.    And if I asked you the question what was
22    presented in the other hearings that was not
23    presented in Noah's hearing, you couldn't answer
24    that either, could you?
25         A.    No, I could not.

43

1      Q.   What is your understanding happened on

2   January 25, 2013?

3      A.   We had a disciplinary hearing.  The

4   administration stated their case.

5           MS. GOGGIN-WARD:  No, you have to listen

6   to the question.

7           THE WITNESS:  Oh, okay.

8           MS. GOGGIN-WARD:  Ask him again.

9      Q.   What is your understanding of what

10  happened on January 25, 2013?

11          MS. GOGGIN-WARD:  The hearing was on

12  February 5th.

13     A.   Oh, okay.  What date was it again?

14     Q.   Okay, let me back up.  There was an

15  incident in which student or students was involved

16  in what the administration felt was a violation of

17  the drug policies and student disciplinary code

18  relating to drug policies that happened on January

19  25, 2013, correct?

20     A.   Correct.

21     Q.   And you don't remember how many students

22  were involved?

23     A.   No, I don't.

24     Q.   It was more than one, was it not?

25     A.   Correct.

44

1    Q.   What is your understanding of what
2  happened that started the investigation?
3    A.   My best recollection is that one
4  individual had some drugs and other individuals
5  either purchased or took -- not took but got some of
6  the drugs from this other individual.
7    Q.   Okay.  The -- when did it happen and where
8  did it happen to the best of your knowledge?
9    A.   The best of my knowledge, it was January
10 25th, 2013.
11   Q.   Okay, and do you know what substance was
12 involved?
13   A.   Don't recall, no.
14   Q.   Was it heroin?
15   A.   Not that I can recall.
16   Q.   Cocaine?
17   A.   Not that I can recall.
18   Q.   Marijuana?
19   A.   Not that I can recall.
20   Q.   Was it a prescription medication?
21   A.   I don't know if it was prescription or
22 not.
23   Q.   And what did you ultimately learn was the
24 circumstances under which the administration became
25 aware of the problem?

45

1          A.    State that again.

2          Q.    Okay.   There was an activity at school.

3          A.    Okay.

4          Q.    Did -- was it your understanding that a

5     staff member witnessed this problem or how did the

6     problem come to the attention of --

7          A.    I don't recall --

8          Q.    -- the school?

9          A.    -- how it became aware, how the

10    administration became aware of it.  I do not recall

11    at this time.

12         Q.    Okay.  Do you know what the administration

13    then did to find out the details of the -- and

14    circumstances of the incident?

15         A.    All I know is they performed an

16    investigation.  I don't know how they did the

17    investigation or...

18         Q.    Okay.  Now, you said you don't know how.

19    Is that you don't remember how they did it or you

20    really don't know how they did it?

21         A.    I don't know exactly the procedures they

22    followed during the investigation --

23         Q.    Okay.

24         A.    -- because I was not there.

25         Q.    Okay.  Those procedures were discussed at

46

1  Noah's suspension review hearing, were they not?

2      A.   I honestly don't recall.

3      Q.   How was Noah involved in this incident to

4  your understanding?

5      A.   To my best recollection without going back

6  and reviewing the actual minutes, my best

7  recollection is he purchased some drugs, but that's

8  my best recollection.

9      Q.   Okay.  And what is your recollection of

10  when Noah purchased drugs and from whom?

11     A.   I don't recall exactly the individual's

12  name who it was, don't recall that, and exactly when

13  as far as day, don't recall that either.  I'm

14  assuming it was the same day as the notice was given

15  to him, but I can't recall.

16     Q.   Do you remember that this involved an

17  incident on the 25th that purportedly happened at

18  lunch?

19     A.   Don't recall.

20     Q.   What evidence do you remember was

21  available that Noah was involved in actually

22  purchasing drugs?

23     A.   I do not recall.

24     Q.   Do you remember at the hearing there was

25  testimony that -- from Mr. Lucas that Noah acquired

47

1   drugs on a different date than January 25, 2013?

2        A.   I don't recall.

3        Q.   Do you recall that we were quite upset

4   that we were not told that the incident was the day

5   before the lunchroom incident?

6        A.   No, I don't recall.

7        Q.   Well, obviously we could show you or you

8   could read the transcript, but let me ask you, what

9   would you need to refresh your recollection as to

10  what you based -- well, let me back up.

11            You ultimately voted to uphold the

12  suspension, correct?

13       A.   Yes.

14       Q.   As we sit here today, you can't give me

15  any details as to why you came to the conclusion

16  that you should have voted that way?

17       A.   As far as specific details, no.

18       Q.   Okay.  Is it -- do you remember that Noah

19  denied that he possessed or consumed drugs at

20  school?

21       A.   Do not recall.

22       Q.   Whose testimony did you rely upon in

23  concluding that he was guilty of possession or

24  consumption of drugs at school?

25       A.    Mr. Bunting and Mr. Lucas.

1      Q.    But you don't remember what they told you?

2      A.    Not verbatim and word for word, no.

3      Q.    Okay.

4      A.    Other than the fact that he was in

5  possession of drugs.

6      Q.    Okay.  Did they tell you they saw him buy

7  the drugs?

8      A.    I don't recall.

9      Q.    Did they tell you what their source of his

10  involvement was, some other student witness

11  identified him, that he confessed, or what was the

12  basis that they concluded that Noah had been in

13  possession or consumed drugs?

14      A.    I don't recall specifically without going

15  back and looking at the transcript.

16      Q.    And you chose to believe them -- well, let

17  me back up.  You don't deny, do you, that Noah

18  denied that he possessed or took drugs?

19            MS. GOGGIN-WARD:  Objection.  When?

20      Q.    Any time.

21      A.    I don't recall him denying if that's what

22  you're asking me.  I don't recall at the hearing

23  that night him denying.  And I'm not saying he

24  didn't, didn't say he denied it, but I don't recall.

25      Q.    Okay.  You simply cannot tell me why you

49

1  chose to believe that Noah was involved in this, can

2  you?

3          MS. GOGGIN-WARD:  Objection, asked and

4  answered.  Tell him again.

5     A.    I went on the testimony of Mr. Bunting and

6  Mr. Lucas and their investigation.

7     Q.    And you can't -- well, let me ask you.

8  You assume that their investigation was in

9  accordance with state law and the board policy,

10  correct?

11    A.    Yes.

12    Q.    You didn't go back and investigate for

13  yourself whether or not that was -- that, in fact,

14  they had followed the policy, did you?

15    A.    No.

16    Q.    Did you ever ask anyone other than --

17  well, let me ask you.  Did you ever ask Mr. Lee

18  directly did you follow the school board policy in

19  the suspension procedures for Noah Dietchweiler?

20    A.    No.

21    Q.    Did you ever ask Mr. Lucas that same

22  question?

23    A.    No.

24    Q.    Did you ever ask anybody that question?

25    A.    No.

50

1      Q.   At the suspension hearing of Noah

2  Dietchweiler, were there any documents presented to

3  support the charges against Noah that are not

4  contained in this Exhibit 1?

5      A.   I -- I have no idea.

6      Q.   There was no physical drugs produced, was

7  there?

8      A.   Not that I can recall, no.

9      Q.   Do you know whether or not any of the

10  children implicated in the investigation were

11  searched?

12      A.   I do not know.

13      Q.   Do you know whether or not anyone's locker

14  was searched?

15      A.   I do not recall.

16      Q.   Do you know whether or not anyone was

17  taken to the emergency room upon suspicion that they

18  ingested drugs on January 25, 2013?

19      A.   Not that I can recall.

20      Q.   Do you know what the school board policy

21  is if someone is suspected of ingesting drugs?

22  Whether or not they're taken to the emergency room?

23      A.   I do not know.

24      Q.   What is policy on calling police, do you

25  know that?

51

1        A.    No.

2        Q.    Do you know whether or not any of the

3    children involved in this instant on January 25,

4    2013, were referred to the criminal authorities?

5        A.    I do not know.

6        Q.    Was Noah Dietchweiler's name mentioned in

7    any disciplinary hearing on February 5, 2013, other

8    than his own?

9        A.    State that again.

10       Q.    Was Noah Dietchweiler's name mentioned in

11   any disciplinary hearing other than the one

12   involving his own suspension review?

13       A.    Not that I'm aware of.

14       Q.    Were there any documents introduced in any

15   suspension or expulsion hearing on February 5, 2013,

16   other than Noah's own?

17       A.    Not that I'm aware of.

18       Q.    Do you know what quantity of drugs was

19   exchanged on January 25, 2013?

20       A.    No.

21       Q.    Do you know how many -- well, let me ask

22   you, do you remember that it was -- involved pills?

23       A.    Yes.

24       Q.    Okay.  Do you know how many pills Noah was

25   accused of acquiring?

52

1       A.    No.

2       Q.    Had you known Noah Dietchweiler prior to

3   February 5, 2013?

4       A.    No.

5       Q.    What did you learn about Noah's academic

6   reputation at Watseka High School at any time?

7       A.    Restate that again.

8       Q.    Okay.  Were you aware that Noah was a good

9   student?

10      A.    No.

11      Q.    Were you aware that the -- after January

12  25, 2013, Noah received a certificate award at a

13  school assembly for being an exemplary student?

14      A.    No.

15      Q.    Let me show you Defendant's Exhibit No. 4.

16  During the course of these proceedings some written

17  questions were submitted and I believe that the

18  first several pages of this exhibit are written

19  answers that were provided and I think the seventh

20  page of that is where you signed, correct?

21      A.    Yes, that's my signature.

22      Q.    Okay.  So you looked at the questions and

23  the answers and then verified that they were true

24  and correct, correct?

25      A.    Yes.

1        Q.    Interrogatory No. 2, the question was

2   asked what was the drug, and the answer is the drug

3   which was one of the basis for Noah's suspension was

4   identified as Ativan.

5        A.    Okay.

6        Q.    Okay.  So that was a question and the

7   answer.  And the date of the verification was

8   February 25, 2014.

9        A.    Okay.

10        Q.    So you remembered what the drug was on

11   that date but don't remember the drug today?

12        A.    No.

13        Q.    That's not a correct statement or you knew

14   what the drug was on the 25th?

15        A.    I must have talked to somebody about it at

16   that time, but I've since forgot it since February

17   25th.  I never --

18        Q.    Okay.  So my question is when you answered

19   that question, did somebody tell you what the drug

20   was and you just accepted that or did you actually

21   remember that that's what the drug was?

22        A.    I accepted that.

23        Q.    Okay.  Then on No. 3 we ask the day and

24   time Noah was accused, and then the -- you state on

25   information and belief, January 25, 2013, at

1  approximately 3:00 p.m. Noah was informed of the

2  allegations against him.  Okay, now you say on

3  information and belief.  Is that because you didn't

4  know on that date of February 2014, somebody told

5  you and you said I accept it?

6      A.    Yes.

7      Q.    Who told you the answer to that question?

8            MS. GOGGIN-WARD:  Objection, calls for

9  privilege, attorney/client privilege.

10           MR. TAGUE:  Well, it calls for

11 attorney/client privilege if you or somebody in your

12 office told him.

13     Q.    Did your attorney tell you that was the

14 answer?

15           MS. GOGGIN-WARD:  Same objection.  Direct

16 him not to answer.

17           MR. DIETCHWEILER:  Certify the question.

18           MS. GOGGIN-WARD:  You're not the attorney

19 here, sir.

20           MR. DIETCHWEILER:  I asked him to certify

21 the question and I can talk to my attorney.

22           MS. GOGGIN-WARD:  Never said you couldn't.

23           MR. DIETCHWEILER:  And don't -- well,

24 don't get in the way of me talking to my attorney.

25           MS. GOGGIN-WARD:  I'm not getting in the

55

1  way, sir.

2       MR. DIETCHWEILER:  I think you are, ma'am.

3       MS. GOGGIN-WARD:  Go ahead.

4       MR. TAGUE:  Do certify that one.

5  BY MR. TAGUE:

6       Q.   Okay, No. 4, we wanted to know all

7  physical evidence, circumstancial evidence and

8  statements of Noah and a chain of custody for the

9  physical evidence, and you provided an answer after

10  an objection.  Is that information that you

11  remembered or did somebody tell you that?

12       A.   Restate the question again.

13       Q.   Okay, my question is that there was a

14  written question which obviously you've read.  There

15  was a written answer.

16       A.   Uh-huh.

17       Q.   My question to you is is the written

18  answer something that you remembered or did you take

19  that statement from information provided to you?

20       A.   I remembered pretty much all of that

21  answer, yes.

22       Q.   Okay, so you remembered that Noah made a

23  statement admitting he received pills from Michael

24  McKay --

25       A.   Yes.

56

1        Q.   -- and took them?  Okay.  And where did
2   you hear that Noah made that statement?
3        A.   That came out of the testimony from Mr.
4   Lucas or Mr. Bunting, one of the two.
5        Q.   Okay.  And you remember more details of
6   that statement at the hearing as to when and where
7   Mr. Lucas or Mr. Bunting claimed Noah admitted
8   taking pills from Michael McKay and ingesting them?
9        A.   You mean when he did it or --
10       Q.   Yes.
11       A.   -- when he admitted to it?
12       Q.   Well, I want to know the answer to both,
13  so let's start with the first one.  When did he
14  allegedly admit he received and ingested pills?
15       A.   I do believe it was in the office.  I
16  don't know exactly what time, specific time.
17       Q.   Okay.  So this was when they were
18  interrogating -- well, it's your understanding they
19  interrogated Noah on January 25, 2013?
20       A.   My understanding was they investigated the
21  situation.
22       Q.   Okay.  So you don't know whether or not
23  they actually called Noah in to speak with him?
24       A.   No, I know they did that, yes.
25       Q.   Okay, and -- but you don't know all of the

1   details of what happened in that discussion?

2        A.   Not every word, no.

3        Q.   Okay.  Tell me to the best of your ability

4   what you remember happened in that discussion.

5   First of all, who was present to your understanding?

6        A.   My understanding was Mr. Lucas, Mr.

7   Bunting and Noah and his mother.

8        Q.   Okay.  So during that meeting it's your

9   understanding while all of them were present that

10  Noah admitted receiving pills from Michael McKay and

11  ingesting them?

12       A.   My recollection, that's what the report

13  says and that's what Mr. Bunting and Mr. Lucas said.

14       Q.   Okay.  And do you remember what date Noah

15  allegedly told this group that he received the pills

16  from Michael McKay and ingested them?

17       A.   Not the exact date, no.

18       Q.   Okay.  Do you remember that it was not --

19  well, let me ask you.  Was it alleged he confessed

20  to taking and receiving pills on the 25th or some

21  other day?

22       A.   I don't recall.  What's the report say?

23       Q.   The report doesn't talk about an admission

24  at all.  You say the report.  What report are you

25  talking about?

58

1     A.   The notice, the notice of suspension.

2     Q.   Okay.  The notice of suspension doesn't

3 refer to admitting to taking, ingesting pills at

4 all, does it?

5          MS. GOGGIN-WARD:  Objection, form of the

6 question, the document speaks for itself, but you

7 can answer.  Oh, and asked and answered as well.

8     A.   It says he's being suspended for

9 possession of drugs, consumption of drugs.

10    Q.   Okay, but it doesn't --

11    A.   With his signature.

12    Q.   Okay.  He -- so is it a correct statement

13 that your conclusion that Noah possessed drugs at

14 school is based upon either Mr. Bunting or Mr. Lucas

15 relating that Noah confessed to possessing and

16 taking drugs?

17    A.   Yes.

18    Q.   Now, the statement here indicated that

19 supposedly Noah admitted to receiving and taking

20 pills, and based upon that recitation of confession,

21 you found that he should be suspended.  But we had

22 the drug test that was there also.  So do you

23 believe that Noah simply possessed pills and did not

24 take them or do you believe this recitation of

25 confession that he received and took the pills in

59

1    spite of the drug test?

2            MS. GOGGIN-WARD:  Objection, irrelevant.

3    You can answer.

4        A.   State the question again.

5            MR. TAGUE:  Read it back.

6            (Requested portion of the deposition was

7    read by the court reporter.)

8        A.   My belief is that he possessed the pills,

9    and as far as whether he took them or didn't take

10   them was irrelevant.

11       Q.   Okay, you go on in that answer to state

12   that there was a statement made by MM, which I'm

13   sure is Michael McKay, and that statement was a

14   statement that you actually had or somebody told you

15   existed?

16       A.   I don't recall.

17       Q.   And what was the statement that Michael

18   McKay made that led you to the conclusion that he

19   possessed pills?

20       A.   Without going back to the minutes and

21   transcripts specifically, I couldn't tell you

22   exactly word for word what the statement was.

23       Q.   Was it written?

24       A.   I do not recall.

25       Q.   Then you go, the paper provided by MM with

1   Noah's name on it.  Okay, you had that document, did

2   you not?

3        A.    Had what document?

4        Q.    Well, you refer to a paper provided by MM

5   with Noah's name on it.  What is that?

6        A.    My best recollection is MM had a paper

7   with a list of names on it.

8        Q.    Okay.  Have you ever seen that?

9        A.    Don't recall, but...

10            (Exhibit No. 9 was marked by the court

11   reporter.)

12   BY MR. TAGUE:

13        Q.    Okay, let me show you No. 9.  These were

14   documents that were produced that we asked for.  Is

15   that what we're talking about?

16        A.    You've got two different ones here.

17        Q.    Okay.  Not trying to hide anything.

18   That's the -- a written statement from Michael

19   McKay, correct?

20        A.    Looks like it, yes.

21        Q.    Okay.  So you had that when you decided

22   that Noah was guilty of possession?

23        A.    Don't recall, but if saying -- I don't

24   recall if it was included in the documents or not.

25        Q.    Have you ever seen that before today?

61

1      A.   I can't -- I can't recall, cannot

2  remember.

3      Q.   Now, that's a document that has -- says

4  Greyson equals $8, Noah equals $10, DP $5, Kunce $4.

5  Is that what you refer to in your answer as the

6  paper provided by MM with Noah's name on it?

7      A.   I do not recall.

8      Q.   So you don't know why there are different

9  numbers for different people?

10      A.   No.

11      Q.   Do you know whether or not the list with

12  numbers and the written statement that is attached

13  to Exhibit No. 9 were provided to Noah or Noah's

14  parents prior to Noah signing the suspension

15  notification on January 25, 2013?

16      A.   What was the question?  Am I --

17           MR. TAGUE:  Read it back.

18           (Requested portion of the deposition was

19  read by the court reporter.)

20      A.   No.

21           MS. GOGGIN-WARD:  Want to take a break,

22  get some water?

23           THE WITNESS:  Is that all right?

24           MR. TAGUE:  No, that's okay, yeah.  No, I

25  told you any time we need to do that --

62

1          THE WITNESS:  Yeah, and I've got to make a

2   phone call.

3          (Recess at 10:11 a.m. to 10:14 a.m.)

4   BY MR. TAGUE:

5      Q.   Before the board made its decision to

6   uphold the suspension, you were aware of the Michael

7   McKay statement, were you not?

8      A.   Yes.

9      Q.   You were aware of the existence of the

10  paper with the names and numbers on it, correct?

11     A.   Yes.

12     Q.   You can't tell me whether you actually saw

13  the documents before then or not, did I understand

14  that correctly, or did you actually see the

15  documents?

16     A.   I do not recall seeing the actual

17  documents.

18     Q.   Okay.  Do you know if anyone else other

19  than Michael McKay and his statement implicated

20  Noah?

21     A.   I do not recall.

22     Q.   Okay, I want you to go back to the Exhibit

23  No. 4 and look at Question No. 9.  We asked about

24  the letter with the numbers that you've just looked

25  at.  We asked when that was given to Noah.  And

1    ultimately after objection and defining what -- how

2    you want the answer given is stated "It was given to

3    Noah's counsel."  Now, is that something you know

4    happened or did somebody relate that to you?

5         A.   Someone related that to me.

6         Q.   Was it Mr. Lee?

7         A.   I do not recall.

8         Q.   You don't remember who did that?

9         A.   No.

10        Q.   Then we asked was that list referred to in

11   the school board hearing relating to Noah, and you

12   said it was not referred to in the school board

13   meeting concerning Noah.  Now, you were there, so is

14   that answer based upon your recollection of having

15   been present or did somebody tell you that?

16        A.   You're still talking about Question 9?

17        Q.   Question 9.

18        A.   B?

19        Q.   Uh-huh.

20        A.   As far as a notice being given to his

21   counsel, correct?

22        Q.   No, the -- I'm asking for B now.  In A,

23   the specific question says identify when the letter

24   of Michael McKay identifying the students to whom he

25   had provided pills was, and then in A we ask given

64

1    to Noah and we talked about that, but the B part of

2    that question was --

3        A.   Was it referred to in the school board

4    meeting.

5        Q.   Right, and you said it was not.  And I

6    know you were there.  I think you agree you were

7    there.  My question is when you answered that

8    question, did you remember that or did somebody tell

9    you that?

10       A.   As far as the answer on this?

11       Q.   Correct.

12       A.   At that time I guess I remember it not

13   being in the meeting I guess.

14       Q.   I'm sorry, you remember --

15       A.   Well, I remember -- I answered this

16   question, so --

17       Q.   Okay, and --

18       A.   That's what you're referring to.

19       Q.   Yeah, and my question is the answer was

20   that the document was not referred to in the school

21   board meeting concerning Noah Dietchweiler, and my

22   question is when you answered this question did you

23   actually remember that or was that something

24   somebody told you and you didn't dispute it?

25       A.   Can't remember, don't recall.  Because

1   this was filled out in February?  Yeah.

2       Q.  Okay.  Then looking at Interrogatory 12,

3   we asked if any defendant relied upon the list of

4   students owing money, and you state that you did not

5   take the document into consideration.

6       A.  That's a fair statement.

7       Q.  You didn't take the document into

8   consideration.  What do you mean?

9       A.  On my decision.

10       Q.  Okay.  No. 13, we asked you the letter

11   that you've seen, did you rely upon that in making

12   your decision, and you eventually say you did not

13   take that document into consideration.

14       A.  That is correct.

15       Q.  So what did you take into consideration if

16   you did not consider those two documents?

17       A.  The testimony of Mr. Lucas and Mr. Bunting

18   and the signature on the notice of student

19   disciplinary action signed by Noah.

20       Q.  Okay.  And the only testimony that you had

21   available to you from Mr. Lucas and Mr. Bunting was

22   what was presented in the suspension review hearing

23   itself; is that a true statement?

24       A.  That is a true statement.

25       Q.  Now, Noah testified at that hearing,

66

1    correct?

2        A.    Correct.

3        Q.    You took his testimony into consideration,

4    did you not?

5        A.    Yes.

6        Q.    The drug test result was presented.   You

7    took that into consideration, did you not?

8        A.    I listened to it, yes, and reviewed it.

9        Q.    Anything else that you took into

10   consideration other than the things we've identified

11   as the two written documents and the testimonies in

12   the hearing?

13       A.    No.

14       Q.    Do you remember in the hearing I asked you

15   as the presiding officer what the standard proof was

16   going to be in the school board's determination as

17   to whether or not Noah was guilty or not?

18       A.    I do not recall.

19       Q.    Do you ever recall the -- whether or not

20   the school board ever identified what standard they

21   were going to use in determining whether or not Noah

22   was guilty, what standard of proof?

23       A.    I don't recall.

24       Q.    There was a public -- it wasn't public.

25   There was part of a hearing that a court reporter

1    transcribed what took place verbatim, correct?

2         A.    Say that again?

3         Q.    Part of Noah's suspension hearing on

4    February 5, 2013, was taken down by a court reporter

5    verbatim, correct?

6         A.    Correct.

7         Q.    You've never reviewed that transcript?

8         A.    No, I have not.

9         Q.    There was a portion of the proceedings

10   that were not transcribed in which Noah and his

11   representatives were not present and participated,

12   correct?

13           MS. GOGGIN-WARD:   Objection, compound.

14        Q.    Okay.  We had a hearing, the court

15   reporter took down everything that was said, and

16   then did the school board go to a different location

17   in this building without Noah and his

18   representatives to discuss Noah's case?

19        A.    Yes.

20        Q.    Who was present?

21        A.    My recollection, the school board members

22   that were present at the hearing along with Kenny

23   Lee and our general counsel Mr. Funk.

24        Q.    No one else?

25        A.    No.

1     Q.   Was there any information provided in

2   those proceedings that Noah and his representatives

3   were not participants of that had not been discussed

4   in the session in which we have a verbatim

5   transcription?

6          MS. GOGGIN-WARD:  Objection to any

7   discussion or information provided in the closed

8   door session per the ruling of Judge Baker, and we

9   can certify it if you like, and I'm directing my

10  client not to answer.

11         MR. TAGUE:  Okay.  I guess double certify

12  it.

13  BY MR. TAGUE:

14    Q.   Do you dispute the findings in the drug

15  testing that Noah could not have ingested the Ativan

16  prescription medication on either January 25, 2013,

17  or January 24, 2013?

18    A.   No.

19    Q.   Okay, let me see.  Exhibit No. --

20         THE WITNESS:  What you got in your hand.

21         MS. GOGGIN-WARD:  I got it.

22    Q.   -- 1, who prepared that?

23    A.   I have no idea.

24    Q.   Were you aware of any requests made by

25  Noah or his family for information from the school

69

1  district to prepare for the suspension hearing?

2       A.    No.

3       Q.    Do you know that a request was made for

4  information and denied?

5       A.    Do not recall.

6            MR. TAGUE:   Just give me a minute and let

7  me confer and I think I'm just about done.

8            MS. GOGGIN-WARD:   Okay.

9            (Recess at 10:29 a.m. to 10:32 a.m.)

10  BY MR. TAGUE:

11       Q.    As you deal with a school board or as you

12  have dealt with matters as school board president

13  that have involved teachers and staff members, are

14  you prone to believe a principal is more credible

15  than a student?

16            MS. GOGGIN-WARD:   Object to the form of

17  the question, foundation.   You can tell him.

18       A.    We hire administrators under the

19  presumption that they are going to tell the truth,

20  yes.

21       Q.    And be the same thing with a

22  superintendent?

23       A.    Yes.

24       Q.    And same thing with staff members?

25       A.    Yes.

70

1      Q.   With respect to your conclusions that you

2  told us about that Noah was, in fact, guilty of

3  possessing a drug at school, there's different

4  standards of proof, and I understand that you don't

5  remember the discussion about it, but did you feel

6  you needed to find Noah was guilty beyond a

7  reasonable doubt?

8           MS. GOGGIN-WARD:   Object to the form of

9  the question and foundation.   It calls for a legal

10  conclusion.   You can answer if you know.

11      A.   State the question again.

12      Q.   Sure.   When you ultimately believed that

13  Noah took prescription drugs at school -- I'm sorry,

14  possessed prescription drugs at school --

15      A.   Okay, that's --

16      Q.   -- and you did that based upon what you

17  told us you considered and didn't consider, my

18  question is did you believe that the administration

19  needed to prove Noah guilty beyond a reasonable

20  doubt or did Noah need to prove his innocence beyond

21  a reasonable doubt?

22      A.   I based my decision on the testimony of

23  the administration plus the signature on the notice

24  of suspension by Noah Dietchweiler, his admission.

25      Q.   So you believe his signature on the notice

1  of suspension was a confession.

2      A.   I'll go back to my basis of the testimony

3  of the administration and his signature, and I do

4  believe in the testimony of the administration he

5  admitted to possessing the drugs.

6      Q.   You have it in front of you.

7      A.   Uh-huh.

8      Q.   The notice of student disciplinary action.

9      A.   Uh-huh.

10     Q.   Obviously Noah signed that.  The -- what

11 on that document do you believe is an acknowledgment

12 by Noah that he was guilty of possession of drugs or

13 consumption of drugs?

14         MS. GOGGIN-WARD:  Objection, document

15 speaks for itself.  Asked and answered.

16     A.   Because it states that specifically your

17 child has been suspended for possession of drugs.

18     Q.   And consumption, right?  Says consumption.

19     A.   It says possession and consumption, yes.

20     Q.   Okay.  And so you believe that since Noah

21 signed that, he confessed to possessing drugs and

22 consuming drugs.

23         MS. GOGGIN-WARD:  Objection, asked and

24 answered.

25     A.   Yes.

72

1        Q.    But we know for a fact he didn't consume
2    the drugs because of the drug report, correct?
3            MS. GOGGIN-WARD:  Objection, form of the
4    question and foundation.
5        Q.    Didn't you just state that you accepted
6    the results of the drug testing?
7        A.    I wasn't going to dispute them.
8            MR. TAGUE:  Okay, that's all I have.
9            MS. GOGGIN-WARD:  I have a couple.
10           EXAMINATION BY
11           MS. GOGGIN-WARD:
12       Q.    Let's take a look at this letter in
13    Exhibit 1, second to last page of Exhibit 1.  You
14    testified that that was the notice that was sent to
15    Mr. and Mrs. Dietchweiler by Kenny Lee about the
16    hearing; is that right?
17       A.    Yes.
18       Q.    Okay.  And plaintiff's counsel asked you
19    some questions about the form of that notice.  Do
20    you recall those questions?
21       A.    Yes.
22       Q.    Okay.  Did Mr. and Mrs. Dietchweiler
23    appear at the hearing?
24       A.    Yes, they did.
25       Q.    Did they present testimony at the hearing?

73

1        A.    Yes, I do believe so.

2        Q.    Did they present evidence at that hearing

3    of the drug test results?

4        A.    Yes, they did.

5        Q.    Did they cross-examine the witnesses that

6    were presented by the school?

7        A.    I don't recall, but I -- I don't recall.

8        Q.    Meaning did they ask questions?

9        A.    Yes, they asked questions.

10       Q.    And did they make arguments to the school

11   board following the presentation of evidence,

12   appearance and arguments?

13       A.    Yes.

14       Q.    Looking at Exhibit 8 for identification

15   which was identified as the student handbook,

16   looking at page -- I lost it.  About the criminal

17   procedures.  Oh, here we go.  They're not page

18   numbered.  Looking at number -- looks like it's page

19   57 at the bottom, number 3, it says possession of

20   illegal drugs and controlled substances.  Do you see

21   that?

22       A.    Yes.

23       Q.    It says the number of offenses will

24   accumulate during the student's GRS.  Do you know

25   what GRS is?

1      A.    Glenn Raymond School.

2      Q.    Oh.  Or WCHS?

3      A.    Watseka Community High School.

4      Q.    School career, is that what it says?

5      A.    Yes.

6      Q.    And it says, A, first offense, students

7  will automatically be suspended for the possession,

8  sale or use of drugs for one calendar year.  Is that

9  what it says?

10      A.    Yes.

11      Q.    Was Noah suspended for one calendar year

12  here?

13      A.    No.

14      Q.    And it says the suspension will begin

15  immediately upon confession or when the participant

16  is found guilty by school authorities.  Do you see

17  that?

18      A.    Yes.

19          MS. GOGGIN-WARD:  And that's all I have.

20          REEXAMINATION BY

21          MR. TAGUE:

22      Q.    At the -- are you aware that subsequent to

23  the school board suspension review hearing the

24  plaintiffs, the Dietchweiler family, have spoken

25  with members of the McKay family and have been told

75

1    that the prescription medication was not filled

2    until a time after the supposed confession by Noah?

3             MS. GOGGIN-WARD:  Object to the form of

4    the question.  Go ahead.

5        A.    I was unaware of that.

6        Q.    Okay.  How could Noah Dietchweiler's

7    family prepare for the allegations that Noah took

8    prescription medication on a day other than January

9    25, 2013, if the school district did not provide

10   that information in the written notice that the

11   offense date was the day before January 25, 2013?

12            MS. GOGGIN-WARD:  Object to the form of

13   the question.

14       A.    I have no idea.

15       Q.    Well, very early in the deposition you

16   assumed that the offense was January 25, 2013, did

17   you not?

18       A.    I said I wasn't aware of the exact date.

19       Q.    Okay.  And Noah Dietchweiler's family was

20   never apprised of the alleged exact date prior to

21   the suspension review hearing of February 5, 2013.

22   That's a true statement, is it not?

23       A.    I have no idea.  I don't know when they

24   were notified or when they weren't or what

25   information they were told.

1      Q.   Okay.  There's nothing about a date other

2  than January 25 on the notice of student

3  disciplinary action, is there?

4      A.   That's what the disciplinary action notice

5  says.

6      Q.   You're not aware of any documentation, are

7  you, that would indicate that the Dietchweilers were

8  told that possession or consumption of drugs

9  occurred on a date different than January 25, '13 --

10      A.   No.

11      Q.   -- are you?  Okay.

12          MR. TAGUE:  That's all I have.

13          MS. GOGGIN-WARD:  We'll reserve.

14          (Adjourned at 10:43 a.m.)

15

16

17

18

19

20

21

22

23

24

25

77

1    STATE OF ILLINOIS    )
                          )SS
2    COUNTY OF FORD       )

3

4            I, June Haeme, a Notary Public in and for
     the County of Ford, State of Illinois, do hereby
     certify that JAMES BUNTING, the deponent herein, was
5    by me first duly sworn to tell the truth, the whole
     truth and nothing but the truth, in the
6    aforementioned cause of action.
             That the following deposition was taken on
7    behalf of the Plaintiff at the Iroquois County CUSD
     #9, 1411 West Lafeyette Street, Watseka, Illinois,
8    on October 17, 2014.
             That the said deposition was taken down in
9    stenograph notes and afterwards reduced to
     typewriting under my instruction; that the
10   deposition is a true record of the testimony given
     by the deponent; and that it was agreed by and
11   between the witness and attorneys that said
     signature on said deposition would not be waived.
12           I do further certify that I am a
     disinterested person in this cause of action; that I
13   am not a relative, or otherwise interested in the
     event of this action, and am not in the employ of
14   the attorneys for either party.
             IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my notarial seal this 23rd day of
     October, 2014.

16

17

18

19                       JUNE HAEME, CSR
                         NOTARY PUBLIC

20

21

     "OFFICIAL SEAL"
22   June Haeme
     Notary Public, State of Illinois
23   My Commission Expires:
     September 27, 2016

24

25

78

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE CENTRAL DISTRICT OF ILLINOIS
2                       STATE OF ILLINOIS

3
     NOAH DIETCHWEILER, by MICHAEL        )
4    DIETCHWEILER, his father and         )
     next friend, and ANN DIETCHWEILER,)
5                                         )
          Plaintiffs,                     )  No. 2013-CV-2062
6                                         )
              vs.                         )
7                                         )
     STEVE LUCAS, in his official and )
8    individual capacities; et al.,       )
                                          )
9         Defendants.                     )
     -----------------------------

10

11
               This is to certify that I have read the
12   transcript of my deposition taken by June Haeme,
     CSR, in the above-entitled cause, and that the
13   foregoing transcript taken on October 17, 2014,
     accurately states the questions asked and the
14   answers given by me, with the exception of the
     corrections noted, if any, on the attached errata
15   sheet(s).

16

17                        JAMES BUNTING

18
     Subscribed and Sworn before
19
     me the     day of                    , 2014.
20
                          , Notary Public
21

22

23
          Area Wide Reporting and Video Conferencing
24        301 West White Street, Champaign, IL 61820
                        800.747.6789
25

**$**

**$10 (1)**
61:4
**$4 (1)**
61:4
**$5 (1)**
61:4
**$8 (1)**
61:4

**A**

**A1 (1)**
38:12
**ability (2)**
6:21;57:3
**able (2)**
6:6;18:22
**academic (1)**
52:5
**accept (1)**
54:5
**accepted (4)**
30:2;53:20,22;72:5
**accommodate (1)**
6:20
**accordance (2)**
18:11;49:9
**according (1)**
42:9
**accounting (1)**
10:12
**accumulate (1)**
73:24
**accurate (2)**
25:7
**accused (2)**
51:25;53:24
**acknowledgment (1)**
71:11
**acquired (1)**
46:25
**acquiring (1)**
51:25
**Action (5)**
38:4;65:19;71:8;
76:3,4
**activities (2)**
15:19;16:23
**activity (7)**
14:17;15:3,4,5,6;
17:21;45:2
**actual (6)**
32:7;34:13,25;
35:13;46:6;62:16
**actually (19)**
8:22;11:20;21:23;
23:24;24:7;27:11,15;
30:15;32:21;33:4;
34:19;39:24;46:21;
53:20;56:23;59:14;

**62:12,14;64:23**
**address (1)**
7:11
**Adjourned (1)**
76:14
**administration (11)**
10:11;15:2;43:4,16;
44:24;45:10,12;
70:18,23;71:3,4
**administrators (2)**
17:19;69:18
**admission (1)**
57:23;70:24
**admit (1)**
56:14
**admitted (5)**
56:7,11;57:10;
58:19;71:5
**admitting (1)**
55:23;58:3
**advised (1)**
34:15
**affiliated (2)**
10:16;12:22
**affiliation (1)**
9:15
**afterwards (1)**
22:11
**again (18)**
6:7;14:20;15:23;
20:12;28:13;34:3;
36:20;37:18;43:8,13;
45:1;49:4;51:9;52:7;
55:12;59:4;67:2;
70:11
**against (4)**
36:17;38:10;50:3;
54:2
**agenda (4)**
26:10,16,17;27:4
**agree (1)**
64:6
**ahead (5)**
28:11,12;36:19;
55:3;75:4
**allegations (2)**
54:2;75:7
**alleged (2)**
57:19;75:20
**allegedly (2)**
56:14;57:15
**along (2)**
29:9;67:22
**ambiguities (1)**
6:14
**ambiguity (1)**
6:8
**amended (1)**
41:18
**and/or (1)**
42:2
**answered (11)**
34:3;37:3;40:4;

**49:4;53:18;58:7;64:7,
15,22;71:15,24**
**appear (1)**
72:23
**appearance (1)**
73:17
**applicable (1)**
5:12
**apply (1)**
12:25
**appointed (4)**
10:23;13:4,6,8
**appointment (2)**
12:17;13:6
**apprised (1)**
75:20
**approached (1)**
12:20
**approve (2)**
19:13;26:12
**approved (2)**
19:21;26:17
**approximately (1)**
54:1
**arguments (2)**
73:10,12
**around (2)**
10:24;33:5
**assembly (1)**
52:13
**assume (4)**
14:12;27:20;32:9;
49:8
**assumed (3)**
29:5,9;75:16
**assuming (2)**
33:8;46:14
**assumption (1)**
29:12
**Ativan (2)**
53:4;68:15
**attached (1)**
61:12
**attention (1)**
45:6
**attorney (4)**
54:13,18,21,24
**attorney/client (2)**
54:9,11
**authorities (2)**
51:4;74:16
**automatic (1)**
36:8
**automatically (1)**
74:7
**available (4)**
23:14,16;46:21;
65:21
**award (1)**
52:12
**aware (26)**
14:2,22;15:2;17:1,
15;28:22;35:9,11;

**36:8,11,14,15;41:20;
44:25;45:9,10;51:13,
17;52:8,11;62:6,9;
68:24;74:22;75:18;
76:6**

**B**

**bachelor (1)**
10:9
**bachelor's (1)**
10:8
**back (21)**
6:5,7,14;9:4;11:21;
14:1;24:6;36:21;37:4;
40:6;43:14;46:5;
47:10;48:15,17;
49:12;59:5,20;61:17;
62:22;71:2
**background (1)**
5:24
**Baker (1)**
68:8
**bank (6)**
9:20,21;23:3,7,10,
23
**banker (1)**
9:17
**banking (1)**
9:23
**based (6)**
47:10;58:14,20;
63:14;70:16,22
**basis (6)**
38:14;39:2,8;48:12;
53:3;71:2
**became (6)**
14:2;15:1;18:19;
44:24;45:9,10
**become (2)**
11:24;14:22
**begin (2)**
11:20;74:14
**belief (4)**
19:10;53:25;54:3;
59:8
**below (1)**
38:23
**best (14)**
6:21;19:8;24:9,11,
14;26:1;44:3,8,9;
46:5,6,8;57:3;60:6
**beyond (3)**
70:6,19,20
**blank (1)**
32:6
**board (48)**
10:20;11:1,15,18,
22,25;12:7,11,17,21;
13:8,19;15:12,13,16;
18:19,24,25;19:5,13,
19;20:9,13,15,23,25;
21:5,6,13;22:5;41:21,

**23;42:12;49:9,18;
50:20;62:5;63:11,12;
64:3,21;66:20;67:16,
21;69:11,12;73:11;
74:23**
**boards (1)**
22:6
**board's (1)**
66:16
**book (1)**
33:14
**booklet (2)**
32:12,16
**both (2)**
37:3;56:12
**bottom (1)**
73:19
**bound (1)**
18:8
**breach (1)**
17:6
**break (2)**
16:19;61:21
**breaks (1)**
6:17
**BRUNS (5)**
5:4,9,10,11;8:14
**B-R-U-N-S (1)**
5:15
**Brutlag (1)**
13:13
**building (2)**
25:4;67:17
**bump (1)**
8:9
**Bunting (9)**
47:25;49:5;56:4,7;
57:7,13;58:14;65:17,
21
**Burd (1)**
13:12
**business (3)**
10:11;20:15;36:13
**buy (1)**
48:6

**C**

**calendar (2)**
74:8,11
**call (5)**
22:20,24;23:21,25;
24:6;62:2
**called (7)**
22:21,22,25;23:10;
24:6,7;56:23
**calling (2)**
23:19;50:24
**calls (5)**
23:3,8;54:8,10;70:9
**came (5)**
18:24;30:15;47:15;
56:3

**can (28)**
  5:22;6:17,20;13:10;
  15:21;20:17;21:18;
  22:8;28:10,11;30:22,
  23;32:3;34:3;35:20;
  41:22;44:15,17,19;
  49:1;50:8,19;54:21;
  58:7;59:3;68:9;69:17;
  70:10
**career (1)**
  74:4
**Carol (1)**
  8:24
**case (4)**
  16:9;41:9;43:4;
  67:18
**cell (1)**
  22:25
**central (1)**
  8:8
**certificate (1)**
  52:12
**certified (2)**
  31:13,21
**Certify (5)**
  54:17,20;55:4;68:9,
  11
**chain (1)**
  55:8
**changed (1)**
  18:18
**changes (3)**
  18:21,23;19:5
**charge (1)**
  19:4
**charged (1)**
  34:24
**charges (13)**
  36:16,19;37:3,20,
  25;38:9,13;39:1,4,7;
  41:1,18;50:3
**child (2)**
  40:20;71:17
**children (2)**
  50:10;51:3
**chose (2)**
  48:16;49:1
**circumstances (2)**
  44:24;45:14
**circumstancial (1)**
  55:7
**Civil (1)**
  5:12
**claimed (1)**
  56:7
**Clark (1)**
  8:24
**classes (2)**
  21:7,20
**classified (1)**
  28:23
**clerical (1)**
  23:4

**client (1)**
  68:10
**closed (1)**
  68:7
**Cocaine (1)**
  44:16
**code (5)**
  15:11;17:7;34:9;
  35:7;43:17
**College (1)**
  10:3
**Commencing (1)**
  5:3
**communicating (1)**
  6:16
**communication (1)**
  22:19
**communications (1)**
  25:16
**community (4)**
  7:22;9:6;34:10;
  74:3
**compare (2)**
  28:7,14
**compared (1)**
  33:22
**comply (1)**
  29:8
**compound (3)**
  16:18;36:18;67:13
**concerning (1)**
  63:13;64:21
**concluded (1)**
  48:12
**concluding (1)**
  47:23
**conclusion (4)**
  47:15;58:13;59:18;
  70:10
**conclusions (1)**
  70:1
**conducive (1)**
  6:16
**conduct (3)**
  15:11;17:7;22:6
**confer (1)**
  69:7
**confessed (4)**
  48:11;57:19;58:15;
  71:21
**confession (5)**
  58:20,25;71:1;
  74:15;75:2
**conformance (2)**
  29:2;30:3
**confused (1)**
  17:2
**Connie (1)**
  8:5
**consider (2)**
  65:16;70:17
**consideration (7)**
  65:5,8,13,15;66:3,7,

10
**considered (1)**
  70:17
**constitute (2)**
  38:14;39:2
**constituted (1)**
  39:7
**consume (1)**
  72:1
**consumed (2)**
  47:19;48:13
**consuming (1)**
  71:22
**consumption (10)**
  41:15,24;42:1;
  47:24;58:9;71:13,18,
  18,19;76:8
**contact (1)**
  31:19
**contained (1)**
  50:4
**contents (1)**
  18:14
**controlled (2)**
  14:3;73:20
**convention (1)**
  21:6
**conversation (1)**
  25:12
**copies (3)**
  17:24,25;32:4
**copy (2)**
  18:10;20:6
**correctly (1)**
  62:14
**counsel (5)**
  29:10;63:3,21;
  67:23;72:18
**County (3)**
  7:14;9:1,6
**couple (1)**
  72:9
**course (2)**
  21:25;52:16
**courses (1)**
  22:4
**court (11)**
  5:2,19;36:23;37:6;
  40:8;59:7;60:10;
  61:19;66:25;67:4,14
**credible (1)**
  69:14
**criminal (2)**
  51:4;73:16
**cross-examine (1)**
  73:5
**currently (3)**
  9:18;10:13;11:21
**curricula (1)**
  21:24
**custody (1)**
  55:8
**custom (4)**

16:13,14,21;17:19

**D**

**database (1)**
  24:1
**date (17)**
  14:9,13;24:22;25:9,
  21;43:13;47:1;53:7,
  11;54:4;57:14,17;
  75:11,18,20;76:1,9
**daughter (1)**
  8:18
**daughters (1)**
  8:11
**day (12)**
  14:10;30:13;36:12,
  13;40:10;46:13,14;
  47:4;53:23;57:21;
  75:8,11
**deal (4)**
  20:8,15;21:16;
  69:11
**dealt (1)**
  69:12
**dean (1)**
  13:23
**decide (1)**
  23:20
**decided (1)**
  60:21
**decision (4)**
  62:5;65:9,12;70:22
**defendant (1)**
  65:3
**Defendant's (1)**
  52:15
**defining (1)**
  63:1
**degree (3)**
  10:3,8,10
**delivered (1)**
  19:14
**denied (4)**
  47:19;48:18,24;
  69:4
**deny (1)**
  48:17
**denying (2)**
  48:21,23
**deposition (9)**
  5:11,16;7:2;36:22;
  37:5;40:7;59:6;61:18;
  75:15
**details (6)**
  37:14;45:13;47:15,
  17;56:5;57:1
**determination (1)**
  66:16
**determine (2)**
  18:22;29:2
**determining (1)**
  66:21

**develop (1)**
  20:24
**Dietchweiler (17)**
  27:16;30:7;34:15;
  38:1,5;49:19;50:2;
  52:2;54:17,20,23;
  55:2;64:21;70:24;
  72:15,22;74:24
**Dietchweilers (2)**
  35:14;76:7
**Dietchweiler's (4)**
  51:6,10;75:6,19
**different (9)**
  17:12;21:20;47:1;
  60:16;61:8,9;67:16;
  70:3;76:9
**digits (1)**
  7:18
**Direct (1)**
  54:15
**directed (2)**
  31:10;34:20
**directing (1)**
  68:9
**directly (1)**
  49:18
**disciplinary (17)**
  6:2;21:16;22:7,12;
  25:3,17;29:15,17;
  38:4;43:3,17;51:7,11;
  65:19;71:8;76:3,4
**discipline (3)**
  24:12;34:9;38:14
**disclosures (1)**
  18:2
**discuss (2)**
  30:6;67:18
**discussed (2)**
  45:25;68:3
**discussion (4)**
  57:1,4;68:7;70:5
**discussions (1)**
  25:11
**dispute (5)**
  32:25;33:8;64:24;
  68:14;72:7
**disputing (2)**
  33:1,12
**District (17)**
  5:25;9:4,5,6,9,13,
  15,24;10:17;12:12,
  23;13:8;16:22;19:3;
  34:10;69:1;75:9
**district's (1)**
  18:1
**document (22)**
  18:5;23:7;27:6,14,
  22,24;33:11;39:6,18,
  19,23;40:19;58:6;
  60:1,3;61:3;64:20;
  65:5,7,13;71:11,14
**documentation (1)**
  26:6;76:6

**documents (11)**
7:4;42:3;50:2;
51:14;60:14,24;
62:13,15,17;65:16;
66:11
**done (1)**
20:22;21:12;37:22;
69:7
**door (1)**
68:8
**double (1)**
68:11
**doubt (3)**
70:7,20,21
**down (4)**
16:19;34:5;67:4,15
**DP (1)**
61:4
**drink (1)**
6:18
**drug (28)**
14:17;15:2,4,5,6;
16:22;17:20;35:21;
36:7,12;42:3;43:17,
18;53:2,2,10,11,14,
19,21;58:22;59:1;
66:6;68:14;70:3;72:2,
6;73:3
**drugs (40)**
14:5,24;15:11;17:7;
41:14,15,25;42:9;
44:4,6;46:7,10,22;
47:1,19,24;48:5,7,13,
18;50:6,18,21;51:18;
58:9,9,13,16;70:13,
14;71:5,12,13,17,21,
22;72:2;73:20;74:8;
76:8
**duly (1)**
5:5
**during (5)**
19:24;45:22;52:16;
57:8;73:24
**duties (2)**
20:22,25

**E**

**early (2)**
30:15;75:15
**East (2)**
7:12;8:8
**education (2)**
10:2;41:23
**efficiently (1)**
5:23
**either (7)**
19:23;22:10;42:24;
44:5;46:13;58:14;
68:16
**elected (9)**
10:19,22;11:2,5,10,
14;12:3,4,5

**election (1)**
11:12
**electronic (1)**
18:4
**else (4)**
27:12;62:18;66:9;
67:24
**emergency (2)**
50:17,22
**employed (1)**
9:18
**employee (1)**
19:3
**employment (1)**
9:22
**endeavors (1)**
9:23
**environment (1)**
6:16
**equals (2)**
61:4,4
**even (3)**
33:22;36:25;41:12
**evening (2)**
25:13;26:23
**event (2)**
22:17;24:15
**eventually (1)**
65:12
**everybody (2)**
32:22;33:5
**everyone (2)**
32:12,17
**evidence (7)**
39:3;46:20;55:7,7,
9;73:2,11
**exact (7)**
10:24;14:9,13;25:9;
57:17;75:18,20
**exactly (10)**
12:2;15:24;19:24;
23:2;39:15;45:21;
46:11,12;56:16;59:22
**EXAMINATION (2)**
5:6;72:10
**except (1)**
38:22
**exchange (1)**
14:23
**exchanged (1)**
51:19
**exemplary (1)**
52:13
**Exhibit (14)**
17:23;32:5,10;
37:25;50:4;52:15,18;
60:10;61:13;62:22;
68:19;72:13,13;73:14
**Exhibits (1)**
5:1
**existed (4)**
18:5,17;36:9;59:15
**existence (1)**

62:9
**exists (1)**
23:24
**expectation (1)**
28:3
**expelled (3)**
16:1,5,6
**expire (2)**
11:8,9
**explain (1)**
40:24
**expulsion (1)**
51:15
**expulsions (1)**
15:10
**extent (1)**
10:1

**F**

**fact (5)**
34:23;48:4;49:13;
70:2;72:1
**fair (4)**
16:11;23:17;29:5;
65:6
**familiar (2)**
16:13,20
**family (6)**
27:18;68:25;74:24,
25;75:7,19
**far (9)**
14:13;15:4;40:9;
42:10;46:13;47:17;
59:9;63:20;64:10
**Farmers (1)**
9:21
**February (20)**
25:6,14,18;26:8;
27:16;29:18;30:8;
37:13;41:19;42:13;
43:12;51:7,15;52:3;
53:8,16;54:4;65:1;
67:4;75:21
**Federal (1)**
5:12
**feel (2)**
6:15;70:5
**felt (1)**
43:16
**few (1)**
5:21
**filled (3)**
11:11;65:1;75:1
**find (5)**
23:16;24:16;41:23;
45:13;70:6
**findings (1)**
68:14
**fine (1)**
9:11
**finished (1)**
10:25

**first (10)**
5:5;14:7;15:1;
17:14;32:11;36:13;
52:18;56:13;57:5;
74:6
**five (1)**
21:19
**flag (1)**
30:19
**flagged (1)**
35:23
**follow (3)**
27:25;28:1;49:18
**followed (7)**
27:21;29:19,24,25;
30:1;45:22;49:14
**following (4)**
31:22;34:16;38:24;
73:11
**follows (2)**
5:5;30:21
**forgot (1)**
53:16
**form (14)**
16:17;22:19;27:5;
28:9;31:11,19;35:14;
58:5;69:16;70:8;72:3,
19;75:3,12
**formal (1)**
10:1
**format (8)**
31:22,23,25;33:14,
24;34:1,20;35:15
**forth (2)**
35:15;38:22
**found (3)**
36:6;58:21;74:16
**foundation (3)**
69:17;70:9;72:4
**four (2)**
7:18;11:10
**front (1)**
71:6
**Funk (2)**
30:7;67:23
**further (1)**
25:1

**G**

**gave (8)**
7:25;28:15;29:1,7,
24;30:25;32:21;40:9
**general (3)**
5:21;29:10;67:23
**Germantown (1)**
8:19
**gesture (1)**
6:13
**given (21)**
27:23;29:18;32:8,
12,14,15,17;34:14;
35:14;38:10;39:10,

16,23;40:1,25;46:14;
62:25;63:2,2,20,25
**Glenn (1)**
74:1
**GOGGIN-WARD (44)**
16:17;28:9,12;31:4,
7;34:2;36:1,18;37:2,
7,11;38:16;39:19,25;
40:3;43:5,8,11;48:19;
49:3;54:8,15,18,22,
25;55:3;58:5;59:2;
61:21;67:13;68:6,21;
69:8,16;70:8;71:14,
23;72:3,9,11;74:19;
75:3,12;76:13
**good (1)**
52:8
**governance (1)**
21:5
**Greyson (1)**
61:4
**ground (1)**
5:22
**group (1)**
57:15
**GRS (2)**
73:24,25
**guess (6)**
13:4;17:2;26:13;
64:12,13;68:11
**guilty (11)**
36:6;41:24;47:23;
60:22;66:17,22;70:2,
6,19;71:12;74:16

**H**

**hand (1)**
68:20
**handbook (28)**
18:4,6,14,17,18,23;
19:4,14,18,21;20:6,
11,16,18;28:8,15,18;
29:7;30:3,18;33:15,
24;34:20;35:6,16,18;
36:9;73:15
**handed (1)**
32:25
**handled (1)**
16:16
**happen (4)**
12:19;13:1;44:7,8
**happened (11)**
16:12;37:15;42:14;
43:1,10,18;44:2;
46:17;57:1,4;63:4
**happy (1)**
6:4
**head (1)**
6:11
**hear (1)**
56:2
**hearing (57)**

7:5,9;17:10;20:19;
24:13;25:3,21,23,25,
25;26:2,4,7,10,15,18,
22;27:16;28:4;29:20;
30:7;32:13;33:23;
36:17;37:13;41:19,
24;42:12,14,19,23;
43:3,11;46:1,24;
48:22;50:1;51:7,11,
15;56:6;63:11;65:22,
25;66:12,14,25;67:3,
14,22;69:1;72:16,23,
25;73:2;74:23;75:21

hearings (3)
22:7;42:18,22
held (1)
11:14
Here's (1)
36:5
heroin (1)
44:14
hide (1)
60:17
High (14)
13:24;14:3,17;
17:20,21;18:3;19:14;
20:16,18;22:17;
24:12;31:9;52:6;74:3
Hills (1)
8:19
himself (1)
27:12
hire (1)
69:18
hired (4)
12:6,9,12,14
home (1)
22:24
honestly (1)
46:2
hopefully (1)
6:20
hosting (1)
6:22
hundred (1)
13:14

I

idea (4)
50:5;68:23;75:14,
23
identification (1)
73:14
identified (5)
48:11;53:4;66:10,
20;73:15
identify (2)
27:6;63:23
identifying (1)
63:24
illegal (1)
73:20

Illinois (6)
7:13;8:8,12,21;
10:5;34:9
immediately (1)
74:15
implement (1)
28:5
implicated (2)
50:10;62:19
important (1)
6:5
imposition (1)
38:23
incident (14)
14:2,8,21;16:12;
22:13;24:23;40:24;
41:12;43:15;45:14;
46:3,17;47:4,5
incidents (1)
14:15
included (1)
60:24
incoming (1)
23:8
indicate (2)
32:21;76:7
indicated (2)
17:5;58:18
indicates (1)
41:13
indicating (1)
18:10;38:2
indication (1)
34:24
individual (2)
44:4,6
individuals (1)
44:4
individual's (1)
46:11
inform (1)
25:24
information (10)
53:25;54:3;55:10,
19;68:1,7,25;69:4;
75:10,25
informed (4)
14:12;25:22;26:1;
54:1
ingested (4)
50:18;56:14;57:16;
68:15
ingesting (4)
50:21;56:8;57:11;
58:3
ingestion (1)
36:19
initial (1)
25:11
innocence (1)
70:20
instant (1)
51:3

instruct (1)
37:9
interested (5)
8:9;13:2;35:21;
36:6;38:11
interpretation (2)
39:22,22
interrogated (1)
56:19
interrogating (1)
56:18
interrogation (1)
37:15
Interrogatory (2)
53:1;65:2
interviews (1)
12:25
into (9)
8:9;31:16;65:5,7,
13,15;66:3,7,9
introduced (1)
51:14
investigate (1)
49:12
investigated (2)
15:2;56:20
investigating (1)
17:20
investigation (15)
14:17;16:21,22;
17:6,10;22:12;36:16;
37:15;44:2;45:16,17,
22;49:6,8;50:10
investigations (6)
14:23;16:15;17:15;
21:17;22:3,12
involve (3)
15:25;16:2;22:6
involved (17)
12:16;15:16,18;
24:16,18,20;25:3;
43:15,22;44:12;46:3,
16,21;49:1;51:3,22;
69:13
involvement (3)
18:13,15;48:10
involving (4)
14:3,16;17:6;51:12
Iroquois (5)
7:14;9:2,6,21;34:10
irrelevant (1)
42:7,8;59:2,10
issue (1)
24:12
issues (1)
20:8

J

JAMES (3)
5:4,9,11
January (40)
13:17,17;14:1,8,16,

18,21;15:11;16:12,
20;17:8;19:18;20:5,9,
10,14,21;21:9;22:9,
10,13;43:2,10,18;
44:9;47:1;50:18;51:3,
19;52:11;53:25;
56:19;61:15;68:16,
17;75:8,11,16;76:2,9
joining (1)
12:21
Judge (1)
68:8
jury (1)
8:10

K

Kanouce (1)
8:18
Kenny (7)
14:12;25:22;26:11;
27:10;30:9;67:22;
72:15
kind (1)
15:6
knew (3)
28:22;29:6;53:13
knowledge (5)
16:14;17:5;18:11;
44:8,9
known (1)
52:2
Kunce (1)
61:4

L

language (3)
34:13;39:17;40:17
last (7)
5:14;7:18;8:7;
19:17;32:5,6;72:13
Laura (1)
8:14
law (1)
49:9
Leah (1)
8:18
learn (6)
14:7;20:22,23;
22:16;44:23;52:5
learned (1)
22:11
least (2)
14:4;42:14
led (1)
59:18
Lee (20)
7:7;12:6;13:21;
19:6,10;28:14;29:1,6,
18;30:7,25;33:19;
34:14;35:12;36:11,
15;49:17;63:6;67:23;

72:15
Lee's (1)
23:25
left (1)
10:25
legal (1)
70:9
letter (10)
31:20,22;33:12;
34:12,18;35:2;62:24;
63:23;65:10;72:12
lieu (1)
9:13
likely (1)
6:6
line (2)
34:5,6
list (4)
60:7;61:11;63:10;
65:3
listen (1)
43:5
listened (1)
66:8
live (4)
8:12,15,20,23
lives (3)
8:16,19,24
location (1)
67:16
locker (1)
50:13
long (1)
6:19
look (12)
19:19;30:23;31:3,5;
32:11;33:16,17;34:4,
5;35:19;62:23;72:12
looked (2)
52:22;62:24
looking (5)
48:15;65:2;73:14,
16,18
Looks (2)
60:20;73:18
lost (1)
73:16
Lucas (13)
12:12;13:23;46:25;
47:25;49:6,21;56:4,7;
57:6,13;58:14;65:17,
21
lunch (1)
46:18
lunchroom (2)
14:3;47:5

M

ma'am (1)
55:2
mail (1)
31:13,21

**making (1)**
65:11
**mandated (1)**
31:25
**many (7)**
15:19;21:8;24:19;
26:25;43:21;51:21,24
**March (1)**
13:18
**Marijuana (1)**
44:18
**marked (3)**
5:1;30:19;60:10
**match (1)**
23:25
**materials (1)**
21:25
**matter (2)**
7:8;25:17
**matters (2)**
25:18;69:12
**maybe (2)**
20:2;27:4
**McKay (11)**
55:24;56:8;57:10,
16;59:13,18;60:19;
62:7,19;63:24;74:25
**mean (5)**
6:12,13;34:4;56:9;
65:8
**Meaning (1)**
73:8
**medication (4)**
44:20;68:16;75:1,8
**meeting (6)**
30:12;57:8;63:13;
64:4,13,21
**meetings (2)**
19:1;22:5
**member (7)**
11:15;18:19;20:9,
14,23,25;45:5
**members (4)**
67:21;69:13,24;
74:25
**mention (2)**
34:7,11
**mentioned (2)**
51:6,10
**Michael (10)**
55:23;56:8;57:10,
16;59:13,17;60:18;
62:6,19;63:24
**might (2)**
8:9;20:1
**Mike (1)**
18:10
**minor (1)**
10:12
**minute (2)**
35:24;69:6
**minutes (4)**
18:25;19:19;46:6;

59:20
**misunderstood (1)**
27:5
**MM (5)**
59:12,25;60:4,6;
61:6
**money (1)**
65:4
**more (11)**
9:13;11:9;15:20;
16:3;25:25;26:18,20,
22;43:24;56:5;69:14
**mother (1)**
57:7
**moving (1)**
7:21
**Mrs (3)**
38:5;72:15,22
**much (2)**
30:22;55:20
**multiple (1)**
20:2
**must (1)**
53:15

**N**

**name (13)**
5:8,14;8:4,7,23;9:5,
13;46:12;51:6,10;
60:1,5;61:6
**names (3)**
8:13;60:7;62:10
**narcotics (1)**
14:4
**necessary (1)**
37:1
**need (8)**
6:18;20:23,24;
30:23;35:19;47:9;
61:25;70:20
**needed (5)**
20:10,16;42:10;
70:6,19
**negative (1)**
36:12
**next (2)**
7:22;30:22
**night (3)**
32:17,24;48:23
**Noah (77)**
7:9;25:3;29:17;
34:15,24;36:13,17;
37:16;38:10;40:1;
41:13,24;46:3,10,21,
25;47:18;48:12,17;
49:1,19;50:1,3;51:6,
10,24;52:2,8,12;
53:24;54:1;55:8,22;
56:2,7,19,23;57:7,10,
14;58:13,15,19,23;
60:22;61:4,13,14;
62:20,25;63:11,13;

64:1,21;65:19,25;
66:17,21;67:10,17;
68:2,15,25;70:2,6,13,
19,20,24;71:10,12,20;
74:11;75:2,6,7,19
**Noah's (19)**
6:1;7:5;20:19;32:8,
12;42:13,18,23;46:1;
51:16;52:5;53:3;60:1,
5;61:6,13;63:3;67:3,
18
**nod (1)**
6:11
**nominated (1)**
12:18
**None (1)**
21:18
**North (1)**
7:12
**notice (37)**
31:11,25;32:7,13,
15;34:14;35:1,13;
37:20,23,24;38:4,9,9,
13;39:1,7;40:1,12,13,
21,25;41:13;46:14;
58:1,1,2;63:20;65:18;
70:23,25;71:8;72:14,
19;75:10;76:2,4
**notification (2)**
31:19;61:15
**notified (1)**
75:24
**notify (2)**
31:18;40:19
**number (6)**
7:16,19;31:2;73:18,
19,23
**numbered (1)**
73:18
**numbers (4)**
61:9,12;62:10,24

**O**

**Object (6)**
16:17;28:9;69:16;
70:8;75:3,12
**objected (1)**
33:23
**Objection (20)**
34:2;36:18;37:2,7;
39:19,25;40:3;48:19;
49:3;54:8,15;55:10;
58:5;59:2;63:1;67:13;
68:6;71:14,23;72:3
**observed (1)**
38:25
**obtain (1)**
10:4
**obviously (3)**
47:7;55:14;71:10
**occupation (1)**
9:16

**occupational (1)**
9:22
**occurred (1)**
76:9
**occurrence (1)**
14:13
**o'clock (1)**
25:13
**off (1)**
18:1
**offense (3)**
74:6;75:11,16
**offenses (1)**
73:23
**office (5)**
10:14;11:14,17;
54:12;56:15
**officer (3)**
19:2;28:4;66:15
**official (5)**
9:5,13;38:12,25;
40:23
**once (3)**
11:5,6;12:3
**one (39)**
13:14;14:16,18;
15:20,20,21;16:3;
17:5,15,25;18:7,9;
20:1,2;23:11;25:25;
26:18,20,22;29:17,22;
32:22;35:24;37:3;
38:1;40:5,6,10;42:14;
43:24;44:3;51:11;
53:3;55:4;56:4,13;
67:24;74:8,11
**ones (2)**
13:10;60:16
**only (3)**
15:21;20:2;65:20
**opportunity (2)**
40:24;41:5
**order (2)**
27:25;42:16
**out (12)**
11:11;23:16;24:16;
28:18,21;31:23;
32:25;33:19,23;
45:13;56:3;65:1
**over (3)**
5:21;30:9,16
**owing (1)**
65:4
**own (3)**
51:8,12,16

**P**

**P43 (1)**
30:20
**page (12)**
30:21,22;32:5,6,11;
35:20,23;52:20;
72:13;73:16,17,18

**pages (1)**
52:18
**paper (5)**
59:25;60:4,6;61:6;
62:10
**parents (7)**
31:11,18,20;32:1,8;
35:13;61:14
**part (5)**
27:19;30:21;64:1;
66:25;67:3
**participant (1)**
74:15
**participants (1)**
68:3
**participated (1)**
67:11
**particular (2)**
19:2;27:14
**passed (1)**
33:5
**people (5)**
23:4,6,12,13;61:9
**per (1)**
68:8
**percent (1)**
13:14
**performed (1)**
45:15
**person (3)**
19:10;23:11;36:6
**Phone (11)**
22:20,24,25;23:2,4,
7,15,15,25;24:2;62:2
**physical (3)**
50:6;55:7,9
**picking (1)**
8:10
**pills (15)**
51:22,24;55:23;
56:8,14;57:10,15,20;
58:3,20,23,25;59:8,
19;63:25
**place (2)**
26:4;67:1
**plain (1)**
39:17
**plaintiffs (1)**
74:24
**Plaintiff's (2)**
32:5;72:18
**plans (1)**
7:21
**please (1)**
5:14
**plus (1)**
70:23
**pm (2)**
25:13;54:1
**pointed (1)**
33:23
**police (1)**
50:24

**policies (2)**
43:17,18
**policy (18)**
14:5;16:25;17:6;
31:9,25;34:9;35:8,21;
36:9;37:1,18;39:4;
41:1;49:9,14,18;
50:20,24
**political (1)**
10:14
**portion (6)**
36:22;37:5;40:7;
59:6;61:18;67:9
**position (1)**
9:3
**possessed (7)**
47:19;48:18;58:13,
23;59:8,19;70:14
**possessing (4)**
58:15;70:3;71:5,21
**possession (18)**
20:6;36:12,19;
41:14;42:2,2,9;47:23;
48:5,13;58:9;60:22;
71:12,17,19;73:19;
74:7;76:8
**possible (1)**
5:23
**possibly (2)**
12:20;13:13
**practice (5)**
16:13,14,21,25;
17:19
**preparation (2)**
18:14,15
**prepare (3)**
7:1;69:1;75:7
**prepared (6)**
26:10,16;27:9,12;
35:13;68:22
**preparing (1)**
17:24
**prescribed (1)**
33:14
**prescription (7)**
44:20,21;68:16;
70:13,14;75:1,8
**present (10)**
18:20,24;57:5,9;
63:15;67:11,20,22;
72:25;73:2
**presentation (1)**
73:11
**presented (12)**
27:15,17,18,19;
36:7;42:17,22,23;
50:2;65:22;66:6;73:6
**president (4)**
11:21,24;13:18;
69:12
**presiding (2)**
28:4;66:15
**presumption (1)**

**policies – response**

69:19
**pretty (1)**
55:20
**previous (2)**
14:23;35:20
**principal (2)**
31:17;69:14
**printed (2)**
18:1,8
**prior (28)**
11:12;14:1,16,18,
21;15:11;16:19;17:8;
19:18,21,23;20:5,9,
10,14,21;21:9;25:18;
26:7;30:7;37:13;
38:23;39:10,23;
41:18;52:2;61:14;
75:20
**privilege (3)**
54:9,9,11
**probably (4)**
13:5;21:19;23:1;
24:13
**problem (3)**
44:25;45:5,6
**Procedure (16)**
5:13;6:24;27:6,25;
28:3,5,7,8,14,15,17,
20,23;29:1;30:24;
38:21
**procedures (23)**
16:9,15;27:21;29:7,
13,14,15,17,19,24;
30:2,6,10,20;35:22;
37:19;38:11,24;
40:22;45:21,25;
49:19;73:17
**proceeding (2)**
6:2;41:7
**proceedings (6)**
25:13;27:19;32:21;
52:16;67:9;68:2
**process (5)**
13:1;26:15;29:23,
25;30:1
**produced (2)**
50:6;60:14
**programs (1)**
22:4
**prone (1)**
69:14
**proof (3)**
66:15,22;70:4
**proposed (2)**
39:2,8
**protocol (1)**
23:6
**protocols (1)**
16:9
**prove (2)**
70:19,20
**provide (1)**
75:9

**provided (14)**
27:2,5;28:2;37:20;
52:19;55:9,19;59:25;
60:4;61:6,13;63:25;
68:1,7
**provides (1)**
39:4
**provision (3)**
31:2;34:19;35:18
**public (3)**
11:17;66:24,24
**purchased (3)**
44:5;46:7,10
**purchasing (1)**
46:22
**purportedly (1)**
46:17
**pursuant (2)**
5:12;34:8**

**Q**

**quantity (1)**
51:18
**quite (1)**
47:3

**R**

**rather (1)**
35:14
**Raymond (1)**
74:1
**read (16)**
6:4,14;31:16;33:16;
36:21,23;37:4,6;40:6,
8;47:8;55:14;59:5,7;
61:17,19
**reads (1)**
40:21
**really (4)**
26:20;27:1;29:12;
45:20
**reason (1)**
6:15
**reasonable (4)**
39:22;70:7,19,21
**reasons (1)**
34:16
**recall (64)**
12:15;14:14;15:8,
20,21;19:23;20:17;
21:18,21,22;22:8;
24:8;25:9;26:19;
27:20;30:12;32:19;
41:22;42:1,16;44:13,
15,17,19;45:7,10;
46:2,11,12,13,15,19,
23;47:2,3,6,21;48:8,
14,21,22,24;50:8,15,
19;57:22;59:16,24;
60:9,23,24;61:1,7;
62:16,21;63:7;64:25;

66:18,19,23;69:5;
72:20;73:7,7
**receive (3)**
25:16;26:6,14
**received (8)**
40:12,13,14;52:12;
55:23;56:14;57:15;
58:25
**receiving (3)**
57:10,20;58:19
**receptionist (1)**
23:11
**Recess (2)**
62:3;69:9
**recitation (2)**
58:20,24
**recollection (14)**
24:10,11,14;26:2;
44:3;46:5,7,8,9;47:9;
57:12;60:6;63:14;
67:21
**recommending (1)**
19:5
**reconsider (1)**
36:16
**reconsideration (1)**
36:8
**record (3)**
5:10;27:19;31:16
**recording (1)**
24:3
**records (2)**
24:2;25:8
**REEXAMINATION (1)**
74:20
**refer (4)**
20:11;58:3;60:4;
61:5
**referred (6)**
35:6;51:4;63:10,12;
64:3,20
**referring (2)**
31:14;64:18
**reflect (1)**
5:10
**reflected (1)**
26:17
**refresh (1)**
47:9
**Registered (2)**
31:13,21
**relate (1)**
63:4
**related (1)**
63:5
**relating (9)**
14:5;15:11;16:22;
17:7;22:13;26:7;
43:18;58:15;63:11
**relative (1)**
25:17
**relatives (3)**
8:6,7,10

66:18,19,23;69:5;
72:20;73:7,7
**relied (1)**
65:3
**rely (2)**
47:22;65:11
**remember (44)**
10:24;13:7,11,16;
14:9,11,12;15:23;
16:1,8,10;22:4;24:5,
22;26:21;27:1,3;33:2,
3,4;43:21;45:19;
46:16,20,24;47:18;
48:1;51:22;53:11,21;
56:5;57:4,14,18;61:2;
63:8;64:8,12,14,15,
23,25;66:14;70:5
**remembered (5)**
53:10;55:11,18,20,
22
**reopen (1)**
36:15
**repeat (1)**
6:4
**rephrase (1)**
17:9
**report (6)**
57:12,22,23,24,24;
72:2
**reporter (10)**
5:2;36:23;37:6;
40:8;59:7;60:11;
61:19;66:25;67:4,15
**representatives (3)**
67:11,18;68:2
**reputation (1)**
52:6
**request (1)**
69:3
**Requested (5)**
36:22;37:5;40:7;
59:6;61:18
**requests (1)**
68:24
**required (1)**
28:8
**requirement (1)**
35:15
**requirements (1)**
29:8
**requires (1)**
35:7
**reserve (1)**
76:13
**reside (1)**
7:24
**residence (1)**
7:24
**resides (1)**
8:2
**respect (1)**
70:1
**respond (1)**
24:25
**response (1)**

DIETCHWEILER V.
STEVE LUCAS ET AL

JAMES BRUNS
October 17, 2014

40:11
rest (1)
  13:16
Restate (6)
  14:20;17:3;20:12;
  28:13;52:7;55:12
restroom (1)
  6:17
result (1)
  66:6
results (2)
  72:6;73:3
review (19)
  7:4,5,8;19:13;
  20:16,18,19;28:24;
  29:1;32:13;36:17;
  41:19,24;42:13;46:1;
  51:12;65:22;74:23;
  75:21
reviewed (7)
  19:18;26:13;32:20,
  23;34:25;66:8;67:7
reviewing (2)
  19:4;46:6
Reynolds (1)
  13:13
Right (13)
  11:13;15:7;17:14;
  19:12;30:12;35:22,
  24,25;37:11;61:23;
  64:5;71:18;72:16
Road (1)
  7:12
room (2)
  50:17,22
Rule (1)
  18:2
Rules (2)
  5:12,22
ruling (1)
  68:8
run (2)
  11:7,17
running (1)
  13:3
rural (1)
  8:25

**S**

sale (1)
  74:8
same (18)
  8:7;14:10;18:17;
  29:23,25;30:1,13,24;
  34:1;35:7;37:7;39:25;
  42:18;46:14;49:21;
  54:15;69:21,24
saw (3)
  42:3;48:6;62:12
saying (6)
  17:1,10;26:14;39:6;
  48:23;60:23

School (92)
  5:25;6:21;9:4,5,6,9,
  12,15,24;10:16,19;
  11:15,18,22,25;12:7,
  11,12,17,23;13:7,19,
  24;14:3,5,17,17,24;
  15:3,12,13,16;16:22;
  17:7,20,21;18:3,19;
  19:3,13,14,22;20:9,
  13,15,16,18,23,25;
  21:5,6,13;22:5,6;
  24:12;31:9;34:9,10,
  20;35:7;42:12;45:2,8;
  47:20,24;49:18;
  50:20;52:6,13;58:14;
  63:11,12;64:3,20;
  66:16,20;67:16,21;
  68:25;69:11,12;70:3,
  13,14;73:6,10;74:1,3,
  4,16,23;75:9
schools (1)
  31:9
science (1)
  10:9
searched (2)
  50:11,14
second (2)
  32:6;72:13
section (2)
  30:19;34:8
security (1)
  7:19
seeing (1)
  62:16
seminars (4)
  21:5,15,24;22:4
send (1)
  33:19
sent (2)
  31:21;72:14
serve (1)
  10:13
session (2)
  68:4,8
set (2)
  35:15;38:22
seventh (1)
  52:19
several (1)
  52:18
shake (1)
  6:11
shall (10)
  31:10,17,19,20,22;
  37:20;38:12,24,25;
  40:23
Sheldon (2)
  8:24,25
Sherry (1)
  13:13
shortly (1)
  14:12
show (3)

47:7;52:15;60:13
showed (1)
  36:3
showing (3)
  7:2;26:7;32:6
siblings (1)
  8:11,20
signature (1)
  52:21;58:11;65:18;
  70:23,25;71:3
signed (4)
  52:20;65:19;71:10,
  21
signing (1)
  61:14
similar (1)
  14:15
simply (3)
  7:2;48:25;58:23
sister (1)
  8:22
sit (2)
  34:5;47:14
situation (1)
  56:21
six (2)
  21:19;25:13
skills (1)
  20:24
social (1)
  7:19
solicited (1)
  12:18
somebody (14)
  10:25;12:17;23:10;
  27:12;53:15,19;54:4,
  11;55:11;59:14;63:4,
  15;64:8,24
Someone (6)
  12:20,22;23:3;
  28:25;50:21;63:5
sorry (5)
  32:16;36:2,5;64:14;
  70:13
source (1)
  48:9
speak (1)
  56:23
speaks (3)
  39:20;58:6;71:15
specific (4)
  34:16;47:17;56:16;
  63:23
specifically (7)
  5:25;6:1;15:24;
  23:12;48:14;59:21;
  71:16
spell (1)
  5:14
spelled (2)
  28:18,21
spells (1)
  31:23

spite (1)
  59:1
spoken (2)
  7:7;74:24
spouse (1)
  8:3
staff (3)
  45:5;69:13,24
standard (3)
  66:15,20,22
standards (1)
  70:4
start (2)
  19:22;56:13
started (1)
  44:2
starts (1)
  30:21
state (22)
  5:8;9:21;10:5;25:8;
  28:21,23,24,25;29:6;
  30:3;31:15;39:18;
  40:23;45:1;49:9;51:9;
  53:24;59:4,11;65:4;
  70:11;72:5
stated (5)
  29:21;31:10;41:9;
  43:4;63:2
statement (28)
  16:11;23:17;29:5;
  31:8;32:2;35:8;41:6,
  16;53:13;55:19,23;
  56:2,6;58:12,18;
  59:12,13,14,17,22;
  60:18;61:12;62:7,19;
  65:6,23,24;75:22
statements (1)
  55:8
states (3)
  34:14;38:22;71:16
statute (7)
  28:21,23,24,25;
  29:3,6;35:5
statutes (1)
  30:4
steps (1)
  26:15
Steve (2)
  12:12;13:23
still (1)
  21:25;63:16
student (27)
  15:10,25;16:2,3,3;
  17:6;20:11;21:16;
  22:11;28:8,15,18;
  30:18;38:4,13;39:1;
  40:24;43:15,17;
  48:10;52:9,13;65:18;
  69:15;71:8;73:15;
  76:2
students (9)
  13:23;15:10;19:15;
  24:19;43:15,21;

63:24;65:4;74:6
student's (2)
  31:18;73:24
submitted (1)
  52:17
subparagraph (1)
  38:23
subsequent (1)
  74:22
substance (2)
  14:4;44:11
substances (1)
  73:20
summary (1)
  39:3
Superintendent (13)
  7:7;12:6;13:21;
  19:7;22:18;23:25;
  26:11;27:10;28:2;
  31:17;33:21;35:12;
  69:22
support (1)
  50:3
supports (1)
  39:3
supposed (1)
  75:2
supposedly (1)
  58:19
sure (7)
  12:2;13:14;14:21;
  17:3;23:2;59:13;
  70:12
suspected (1)
  50:21
suspended (16)
  16:1,6;34:16;36:13;
  39:18,24;40:15,15,20;
  41:4,14;58:8,21;
  71:17;74:7,11
suspending (3)
  38:12,25;40:23
suspension (43)
  7:5,8;20:19;30:20;
  31:11,18;32:1,7,13,
  17;35:22;36:17;
  37:19;38:11,21,24;
  39:3,8,11;40:2,22;
  41:18;42:11,13;46:1;
  47:12;49:19;50:1;
  51:12,15;53:3;58:1,2;
  61:14;62:6;65:22;
  67:3;69:1;70:24;71:1;
  74:14,23;75:21
suspensions (1)
  15:9
suspicion (1)
  50:17
sworn (1)
  5:5
system (2)
  23:24;24:3

**T**

**TAGUE (22)**
5:7;31:6;36:21;
37:4,9,12;40:5;54:10;
55:4,5;59:5;60:12;
61:17,24;62:4;68:11,
13;69:6,10;72:8;
74:21;76:12
**talk (2)**
54:21;57:23
**talked (2)**
53:15;64:1
**talking (8)**
6:19;14:18;15:19;
29:10;54:24;57:25;
60:15;63:16
**talks (3)**
35:20,21;37:18
**teacher (1)**
13:24
**teachers (1)**
69:13
**telephone (2)**
7:16;25:12
**term (4)**
9:9;10:25;11:7,12
**test (6)**
36:7,12;58:22;59:1;
66:6;73:3
**testified (4)**
5:5,19;65:25;72:14
**testimonies (1)**
66:11
**testimony (13)**
38:8;42:10;46:25;
47:22;49:5;56:3;
65:17,20;66:3;70:22;
71:2,4;72:25
**testing (1)**
42:3;68:15;72:6
**thereafter (1)**
11:3
**thinking (1)**
10:24
**though (2)**
33:22;39:11
**three (2)**
17:24,25
**today (5)**
7:2,5;17:24;47:14;
53:11;60:25
**told (18)**
17:16;24:22;25:12;
26:3;47:4;48:1;54:4,
7,12;57:1;59:14;
61:25;64:24;70:2,17;
74:25;75:25;76:8
**tongue (1)**
9:14
**took (14)**
22:5;44:5,5;48:18;

56:1;58:25;59:9;66:3,
7,9;67:1,15;70:13;
75:7
**top (4)**
31:2;35:19;36:3;
38:4
**totally (1)**
17:12
**trade (1)**
9:16
**training (2)**
21:5,15
**transcribed (2)**
67:1,10
**transcript (5)**
6:10;32:20;47:8;
48:15;67:7
**transcription (1)**
68:5
**transcripts (1)**
59:21
**true (4)**
52:23;65:23,24;
75:22
**truth (1)**
69:19
**trying (1)**
60:17
**twice (1)**
11:5
**twister (1)**
9:14
**two (9)**
8:11,11;11:9;12:5;
27:1;56:4;60:16;
65:16;66:11
**type (2)**
15:5;29:19

**U**

**uh-uh (1)**
6:11
**ultimately (5)**
25:2;44:23;47:11;
63:1;70:12
**unaware (1)**
75:5
**under (4)**
38:11,22;44:24;
69:18
**unexpired (1)**
11:12
**Unit (2)**
9:6;34:10
**University (1)**
10:5
**unusual (1)**
22:17
**up (13)**
7:2;9:4;11:21;13:4;
14:1;20:9;23:25;26:7;
31:2;35:19;43:14;

47:10;48:17
**uphold (2)**
47:11;62:6
**upon (9)**
47:22;50:17;58:14,
20;63:14;65:3,11;
70:16;74:15
**upset (1)**
47:3
**use (5)**
9:9,12;36:7;66:21;
74:8
**using (1)**
31:10
**usually (1)**
23:4
**utilize (1)**
17:20

**V**

**variety (2)**
23:12,13
**verb (1)**
31:10
**verbal (5)**
31:19;37:19;38:13;
39:1;40:25
**verbally (2)**
6:9;34:5
**verbatim (5)**
6:10;48:2;67:1,5;
68:4
**verification (1)**
53:7
**verified (1)**
52:23
**verify (1)**
40:11
**version (2)**
18:4;20:1
**violation (3)**
14:4;15:10;43:16
**voted (2)**
47:11,16

**W**

**wait (1)**
35:24
**water (1)**
61:22
**Watseka (17)**
5:25;7:12;8:16;9:4,
9,12;13:24;14:2;
16:21;17:20;18:3;
22:17;31:9,9,24;52:6;
74:3
**Watts (1)**
13:12
**way (3)**
47:16;54:24;55:1
**WCHS (1)**

74:2
**website (1)**
18:1
**weren't (1)**
75:24
**What's (5)**
7:16;8:23;9:15;
10:1;57:22
**Where's (1)**
8:23
**Whose (1)**
47:22
**without (4)**
46:5;48:14;59:20;
67:17
**WITNESS (6)**
28:11;43:7;48:10;
61:23;62:1;68:20
**witnessed (1)**
45:5
**witnesses (1)**
73:5
**word (5)**
48:2,2;57:2;59:22,
22
**work (1)**
23:1
**workshops (2)**
21:4;22:4
**written (24)**
25:16;26:6;31:20;
37:20,23,24;38:9,13;
39:1,7;40:1,12,13,25;
52:16,18;55:14,15,17;
59:23;60:18;61:12;
66:11;75:10

**Y**

**year (20)**
7:22;10:6,24;11:7;
12:4,9,14;15:22,24;
19:4,4,15,22;20:2;
21:7,10,11,12;74:8,11
**years (7)**
11:9,10;12:5;20:2;
21:19,19;22:1
**yellow (1)**
30:19

**1**

**1 (9)**
5:1;32:5,10;37:25;
38:25;50:4;68:22;
72:13,13
**1/25/13 (1)**
38:6
**10:11 (1)**
62:3
**10:14 (1)**
62:3
**10:29 (1)**

69:9
**10:32 (1)**
69:9
**10:43 (1)**
76:14
**10-22.6 (2)**
34:8;35:6
**12 (2)**
11:10;65:2
**13 (2)**
65:10;76:9
**16 (1)**
11:9
**1980 (1)**
10:7
**1st (2)**
13:17,18

**2**

**2 (1)**
53:1
**2007 (1)**
10:24
**2010 (1)**
12:10
**2011 (1)**
12:1
**2012 (1)**
11:10
**2013 (46)**
13:17,18,18;14:16,
19,22;15:12;16:12,
20;17:8;19:18;20:5,
10,14,21;21:9;22:10,
13;25:7,14,18;29:18;
37:13;42:13;43:2,10,
19;44:10;47:1;50:18;
51:4,7,15,19;52:3,12;
53:25;56:19;61:15;
67:4;68:16,17;75:9,
11,16,21
**2014 (2)**
53:8;54:4
**2234 (1)**
7:12
**24 (1)**
68:17
**2430 (1)**
7:12
**25 (34)**
14:8,16,19,22;
15:12;16:12,20;17:8;
19:18;20:5,10,14,21;
21:9;22:10,13;43:2,
10,19;47:1;50:18;
51:3,19;52:12;53:8,
25;56:19;61:15;
68:16;75:9,11,16;
76:2,9
**25th (5)**
44:10;46:17;53:14,
17;57:20

**26a (1)**
  18:2

**3**

**3 (2)**
  53:23;73:19
**3:00 (1)**
  54:1

**4**

**4 (3)**
  52:15;55:6;62:23
**4[sic] (1)**
  34:10

**5**

**5 (14)**
  25:6,14,18;26:8;
  27:16;29:18;30:8;
  37:13;38:1;51:7,15;
  52:3;67:4;75:21
**57 (1)**
  73:19
**5th (3)**
  41:19;42:13;43:12

**6**

**60970 (1)**
  7:13

**8**

**8 (4)**
  5:1;10:25;17:23;
  73:14
**8:40 (1)**
  5:3
**815-432-2908 (1)**
  7:17
**8985 (1)**
  7:20

**9**

**9 (7)**
  9:7;60:10,13;61:13;
  62:23;63:16,17