E-FILED
Monday, 15 December, 2014  03:32:58 PM
Clerk, U.S. District Court, ILCD

# In The Matter Of:

## *DIETCHWEILER v.*
## *STEVE LUCAS ET AL*

---

### *DON BECKER*
### *October 17, 2014*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Original File 1017BECD.txt
Min-U-Script® with Word Index

1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
2                  STATE OF ILLINOIS

3

    NOAH DIETCHWEILER, by MICHAEL      )
4   DIETCHWEILER, his father and       )
    next friend, and ANN DIETCHWEILER)
5        Plaintiffs,                   )
                                       ) No. 2013-CV-2062
6              vs.                      )
                                       )
7   STEVE LUCAS, in his official and )
    individual capacities;             )
8   JAMES BUNTING, in his official     )
    and individual capacities;         )
9   KENNETH LEE, in his official       )
    and individual capacities;         )
10  IROQUOIS COUNTY COMMUNITY UNIT     )
    SCHOOL DISTRICT NO. 9, IROQUOIS    )
11  COUNTY ILLINOIS; JAMES BRUNS,      )
    in his official capacity; DON      )
12  BECKER, in his official capacity;)
    BRENNA JOHNSON, in her official    )
13  capacity; CRYSTAL BLAIR, in her    )
    official capacity; BOB BURD, in )
14  his official capacity; KIRK        )
    McTAGGART, in his official         )
15  capacity; and DEE SCHIPPERT,       )
    in her official capacity,          )
16       Defendants.                   )
    ------------------------------

17

18
                  DEPOSITION OF DON BECKER
19                     October 17, 2014
                          2:00 PM
20

21

22

23      June Haeme:  RMR, CRR, CSR # 084-003038
        Area Wide Reporting and Video Conferencing
24               301 West White Street
              Champaign, Illinois  61820
25                   800.747.6789

2

1                          INDEX

2    APPEARANCES:

3    For the Plaintiff:
                 Michael Tague
4                Attorney at Law
                 Flynn, Palmer & Tague Law Offices
5                402 West Church Street
                 P.O. Box 1517
6                Champaign, IL   61824-1517
                 217.352.5181
7                fpt5law@aol.com

8    For the Defendant:
                 Shari D. Goggin-Ward
9                Attorney at Law
                 Law Offices of Lawrence Cozzi
10               27201 Bella Vista Parkway, Suite 410
                 Warrenville, IL   60555-1619
11               630.393.2145
                 shari.goggin-ward@libertymutual.com
12
     Also Present:
13               Michael Dietchweiler

14

15   EXAMINATION BY:
                 Mr. Tague................  5
16

17
     EXHIBITS:
18               No. 5A...................  35

19

20

21

22

23

24

25

3

1                    CERTIFIED QUESTIONS

2

3    Page 40:

4    BY MR. TAGUE:

5         Q.    My question was that was there any closed

6    session discussion about the disciplinary events of

7    January 25, 2013, after the hearings on February

8    5th, 2013, that did not have an attorney discussing

9    the matter under the exception to the Open Meetings

10   Act to discuss threatened litigation?

11

12   Page 41:

13   BY MR. TAGUE:

14        Q.    Were there any meetings that you attended

15   that disciplinary matters of 20 -- of January 25,

16   2013, were discussed in which no attorney was

17   present?

18

19

20

21

22

23

24

25

4

1                    STIPULATION

2

3

4

5          IT IS HEREBY EXPRESSLY STIPULATED AND

6   AGREED by and between the parties that the

7   deposition of DON BECKER may be taken on October 17,

8   2014, at the Iroquois County CUSD #9, 1411 West

9   Lafayette Street, Watseka, Illinois, pursuant to the

10  Rules of the Federal Court and the Rules of Federal

11  Procedure governing said depositions.

12

13

14          IT IS FURTHER STIPULATED that the

15  necessity for calling the Court Reporter for

16  impeachment purposes is waived.

17

18

19

20

21

22

23

24

25

5

1                    (Commencing at 2:05 p.m.)

2                         DON BECKER,

3   having first been duly sworn, testified as follows:

4              EXAMINATION BY

5              MR. TAGUE:

6        Q.   Okay.  Could you please state your name?

7        A.   Don Becker.

8        Q.   Spell your last name please.

9        A.   B-E-C-K-E-R.

10       Q.   And have you ever had your deposition

11   taken before?

12       A.   No, I haven't.

13       Q.   Have you ever testified in court before?

14       A.   No.

15       Q.   I'm going to go over a couple of rules

16   that we all try to follow to make things go

17   efficiently.  She's going to take a verbatim

18   transcript of everything that is said.  That means

19   that I need to make myself clear to you.  If you

20   don't understand a question, don't hear it, do not

21   hesitate to tell us.  There's different ways we can

22   communicate.  I can have her read it back verbatim

23   since she has it on real-time, I can repeat the

24   question, rephrase it, but speak up.  Otherwise,

25   I'll have to assume you understand the question.

6

1          We're going to take down everything
2    verbally.  If you shake your head, you make a
3    gesture, we won't know what necessarily that means
4    by reading it back, so we'll have you respond
5    verbally.  In normal conversation it's very common
6    you might shake your head.  If we say does that mean
7    yes or no, it's because we want to get it accurate.
8          I need to finish my question before you
9    answer.  You need to wait until I finish the
10   question before you start to answer.  She can only
11   type one person --
12       A.   Sure.
13       Q.   -- efficiently at a time.  I've seen her
14   type two at a time, but she doesn't like it, so
15   we'll try to make it easy on her.  And if either of
16   us violate that rule, somebody will say something.
17   We're not trying to be jerks about it.  We just need
18   to try to make things as efficient as possible.
19          Do you have any questions about the
20   procedures?
21       A.   No.
22       Q.   Okay.  What is your address and telephone
23   number?
24       A.   My address is 108 Loveridge Lane, Watseka.
25       Q.   Your phone number is what?

7

1    A.    815-432-4862.

2    Q.    What are the last four digits of your

3    social security number?

4    A.    0949.

5    Q.    Who do you reside with?

6    A.    My wife.

7    Q.    Do you have any adult children?

8    A.    I have adult children, but they don't live

9    at home.  They're in school or one's married.

10    Q.    Okay.  Are any of them in the Central

11    District of Illinois?

12    A.    No, they aren't.

13    Q.    Do you have any adult relatives in the

14    Central District of Illinois that have a last name

15    other than Becker?

16    A.    No.

17    Q.    Okay.  You're currently on the school

18    district board?

19    A.    Yes.

20    Q.    When did you first become a school board

21    member?

22    A.    Probably have to be eight years ago.

23    Q.    Were you elected?

24    A.    I was appointed at the time and then gone

25    through two elections.

8

```
1          Q.   Okay.   Who appointed you?
2          A.   It was the school board at that time.
3          Q.   Who was on the school board?
4          A.   Scott Watts was the president at that
5     time, Jim Reynolds, I believe -- I can't remember
6     who else was on the school board at that time.
7          Q.   If we needed to know that, there's a --
8          A.   There's a record, uh-huh.
9          Q.   And who was superintendent when you first
10    came on board?
11         A.   Mr. Bianchetta.
12         Q.   So Mr. Lee became the superintendent and
13    was hired while you were on the school board?
14         A.   Yes.
15         Q.   Did you vote to hire him?
16         A.   Yes.
17         Q.   Were there any dissents?
18         A.   I don't know.
19         Q.   Okay.
20         A.   Don't remember.
21         Q.   Again, if we needed to know that, there
22    would be a record of that?
23         A.   (Nods head.)
24         Q.   That's yes?
25         A.   Yes, sorry.
```

1            MS. GOGGIN-WARD:   It's okay.

2        Q.   In January of 2013 you were on the school

3    board, were you not?

4        A.   Yes.

5        Q.   Did you serve in any capacity as an

6    officer of the board?

7        A.   Secretary.

8        Q.   Okay.  And what were your duties as

9    secretary of the board different from the other

10   board members?

11       A.   At that night or in January?

12       Q.   Well, in --

13       A.   Whatever time?

14       Q.   During January of 2013.

15       A.   I -- no different than during regular

16   meetings.

17       Q.   Okay.  And what were your duties at

18   regular meetings as the secretary of the school

19   board?

20       A.   Regular meetings, there's no difference

21   than any other night other than I sign papers to

22   verify activity done.

23       Q.   Okay.

24       A.   Monetary transactions, things of that

25   nature.

10

1       Q.    So the administrative staff prepares
2    documents --
3       A.    Yes.
4       Q.    -- that the board approves and you're the
5    person who signs?
6       A.    Yes.
7       Q.    Okay.  And with respect to disciplinary
8    hearings, it's the same duties?
9       A.    It would be no different than any other
10   board member.
11      Q.    Okay.  On February 5, 2013, there was a
12   disciplinary hearing for Noah Dietchweiler, correct?
13      A.    Yes.
14      Q.    You attended that in the capacity as a
15   school board member, correct?
16      A.    Yes.
17      Q.    Were there any other disciplinary hearings
18   that day?
19      A.    I believe there was another one.
20      Q.    Was it before or after Noah's?
21      A.    That I don't remember.
22      Q.    Now, you're confident when you say there
23   was one other or may there have been more than one?
24      A.    I believe there was two.  That's all I
25   know.

11

1       Q.    So your best recollection is that there
2   were three altogether or just two?
3       A.    No, just two.
4       Q.    Okay.  And the other one was before Noah?
5       A.    I said I --
6       Q.    Okay, you didn't --
7       A.    -- don't recall.
8       Q.    Don't remember, okay.  Now, if we wanted
9   to know that, the records of the school district and
10  the minutes would tell us for sure, correct?
11      A.    Yes.
12      Q.    Were there any disciplinary hearings
13  subsequent to January 25, 2013, on a different day
14  than February 5?
15      A.    I don't recall.
16      Q.    Okay.  When did you learn that there had
17  been something occur at the school that might result
18  in discipline of students on January 25, 2013?
19      A.    When the meeting was called.
20      Q.    Okay.  And so that would have been a few
21  days before February 5?
22      A.    Correct.
23      Q.    What were you provided other than -- well,
24  let me ask you, how did you learn that there was
25  going to be a meeting to consider discipline?

1        A.    That I don't recall, whether it was -- I
2   don't recall the way it was notified.
3        Q.    How does -- was this a special meeting?
4        A.    I don't recall.  I believe so, yes.
5        Q.    Okay.  How were special meetings scheduled
6   for the Watseka School District?
7        A.    Typically by letter.
8        Q.    Okay.  Is there a poll taken by the
9   superintendent or his secretary to find out if
10  enough people are available beforehand?
11       A.    I assume so.
12       Q.    Were you called sometime after January 25,
13  2013, to find out if you were available on February
14  5th?
15       A.    The date I don't know.
16       Q.    Okay.  Is that typically what would happen
17  is that before a special meeting you would get a
18  call to see if you were available?
19       A.    Yes.
20       Q.    Now, do they usually pick dates and say
21  can you make it or do they usually say we need to do
22  a special meeting within this time frame, tell us
23  your availability?
24       A.    Yes.
25       Q.    The latter?

13

1        A.    They pick dates, are you available.

2        Q.    Okay.  Who usually do you talk to when

3   they're checking on available dates?

4        A.    Could be Mr. Lee, his secretary, one of

5   those people.

6        Q.    Okay.  So my specific question is did Lee

7   usually do that himself, did his secretary usually

8   do that or was there no real pattern?

9        A.    There's no real pattern.

10       Q.    Okay.  Do you remember who actually

11  contacted you to find out if you were available on

12  this occasion for the meeting of February 5th?

13       A.    No, I don't.

14       Q.    Would there be any record that would be

15  available for us to find that out?

16       A.    No, I don't know if there's a record.

17       Q.    And to find out if you're available, that

18  would be by usually a telephone call or is it by

19  email or --

20       A.    Usually telephone call.

21       Q.    Okay.  Is it sometimes by email?

22       A.    Sometimes by email, yes.

23       Q.    Okay.  Is it possible that there would be

24  an email communication relating to the scheduling of

25  this hearing on February 5th?

14

1        A.    I don't know.

2        Q.    Do you have the ability to -- well, are

3    your emails from that vintage archived?

4        A.    No, they aren't.

5        Q.    Do you have an email from the school

6    district as a school board member?

7        A.    A separate email?

8        Q.    Yes.

9        A.    No, I don't.

10        Q.    So if Mr. Lee's secretary was going to

11    email you, they would email you at your personal

12    email?

13        A.    Yes.

14        Q.    Or business email?

15        A.    Yes.

16        Q.    What is that?

17        A.    Currently it's beckerd44@gmail.com.

18        Q.    What was it in January and February of

19    2013?

20        A.    That I don't know.  It was a different

21    email.

22        Q.    Different provider?

23        A.    It changed, yes, yes.

24        Q.    Okay.  So after you had some conversation

25    relating to availability of dates, you actually

15

 1   received a notice of the board meeting and agenda?

 2        A.   Yes.

 3        Q.   And how was that delivered to you?

 4        A.   I assume by mail.

 5        Q.   Okay.  Do you have a pick-up mailbox here

 6   at the --

 7        A.   No.

 8        Q.   -- district office?  Now, you had an email

 9   at that time.  Just can't remember what the address

10   was.  Are you sure that this notice was received to

11   you by mail or could it have come to you by email or

12   just can't say?

13        A.   I don't recollect on that.

14        Q.   Okay.  Do you know if the -- what -- do

15   you remember what the subject matter of the meeting

16   was to be?

17        A.   It -- the subject matter, if I don't

18   remember the meeting notice, I don't -- can't say

19   for sure on that.

20        Q.   Okay.  So your best recollection is you

21   showed up and didn't know what it was about until

22   you arrived here?

23        A.   The subject matter, no, I do not.

24        Q.   Okay.  But you would have received an

25   agenda with the notice or no?

1       A.    Would have received some kind of notice

2    for the meeting, yes.

3       Q.    What do you remember about the meeting

4    that happened -- well, I think maybe you said you

5    don't know whether Noah's hearing was first or

6    second?

7       A.    (Shakes head).  Excuse me.  No, I don't.

8       Q.    So let's talk about Noah's hearing.  Do

9    you remember who was present?

10      A.    Other than the board members?

11      Q.    Were all the board members present?

12      A.    I believe so.

13      Q.    Who else was present that was affiliated

14    with the school district?

15      A.    I believe their attorney was, the school

16    district attorney was.

17      Q.    And anyone else?

18      A.    I don't remember beyond that.

19      Q.    Was Mr. Lee present?

20      A.    Yes.

21      Q.    Was Mr. Lucas present?

22      A.    Yes.

23      Q.    Was Mr. Bunting present?

24      A.    Yes.

25      Q.    Was anyone else that you can remember?

1     A.    As I remember, you were present and Mr.

2   Dietchweiler was present and I believe Noah.   Beyond

3   that, no, I don't remember.

4     Q.    You remember Noah being present?

5     A.    I believe he was.

6     Q.    And how about Mrs. Dietchweiler?

7     A.    I'm not sure on that.

8     Q.    Court reporter was there, was she not, or

9   do you remember?

10     A.    I don't remember.

11     Q.    How was the meeting with Noah recorded or

12   documented, do you remember?

13     A.    No, I don't.

14     Q.    Have you ever seen a transcript of the

15   proceedings?

16     A.    No, I haven't.

17     Q.    Are you aware one exists?

18     A.    I don't know if one exists.

19     Q.    Did you receive any materials relating to

20   the disciplinary hearings prior to arriving at the

21   building here for the hearings?

22     A.    No, I didn't.

23     Q.    Do you remember documents being handed out

24   by school district representatives relating to

25   Noah's disciplinary hearing?

18

1      A.    Do I remember this document?  I don't
2  specifically remember that document, no.
3      Q.    The -- but do you remember that there was
4  some package of documents delivered by somebody
5  representing the school district for use at the
6  hearing?
7      A.    At the hearing, yes.
8      Q.    Okay.  You just don't recollect the actual
9  document itself?
10      A.    No, I don't.
11      Q.    Do you remember anything about what
12  documents were in there?
13      A.    No, I don't.
14      Q.    This document has several things in there.
15  One is a document entitled Notice of Student
16  Disciplinary Action.  Do you remember that document?
17      A.    Yes, I do remember this document.
18      Q.    Okay.  First time you saw it was at the
19  hearing?
20      A.    Yes.
21      Q.    And was that the last time you've seen it
22  until today?
23      A.    Yes.
24      Q.    And here is a letter of January 30, 2013.
25  Have you seen that document before?

19

1     A.    I don't remember on this one.

2     Q.    Okay.  Show you Exhibit No. 3, the second

3  page.  Do you know what that is?

4     A.    No, I don't.

5     Q.    Was that a document that was presented at

6  Noah's disciplinary hearing?

7     A.    I haven't seen that before.

8     Q.    Ever?

9     A.    Not that I can recall.

10     Q.    This is a document that appears to be a

11  statement by Michael McKay.  Have you ever seen that

12  document?

13     A.    No, I haven't.

14     Q.    Do you remember whether or not Noah

15  Dietchweiler's family presented any documents at the

16  suspension hearing?

17     A.    I don't recall.

18     Q.    Do you remember that there was a drug

19  testing report submitted?

20     A.    Again, I don't recall.

21     Q.    Who do you remember provided testimony of

22  what happened?

23     A.    I believe Mr. Bunting and Mr. Lucas.

24     Q.    Anybody else?

25     A.    Not that I can recall.

1        Q.    Other than being a school board member, do
2   you hold any other political offices?
3        A.    No, I don't.
4        Q.    Have you ever been elected to public
5   office other than school board?
6        A.    No, I haven't.
7        Q.    What's your trade or occupation?
8        A.    I'm an FBFM field man, which is a farm
9   business farm management field man.
10       Q.    And what does such a person do generally?
11       A.    We do consulting work for farmers as far
12   as doing income tax work and financial comparisons.
13       Q.    Okay.  January 25, 2013, were you aware
14   that Watseka High School had a student handbook?
15       A.    At what date?
16       Q.    January 25, 2013.
17       A.    Yes.
18       Q.    Did you know what was in it?
19       A.    I have not thoroughly read the handbook,
20   no.
21       Q.    Did you read portions of the handbook
22   relating to disciplinary procedures prior to the
23   suspension hearing of February 5, 2013?
24       A.    No.
25       Q.    Did you read the provisions of the student

21

1   handbook relating to disciplinary proceedings during

2   the course of the hearing on Noah Dietchweiler?

3        A.   That I don't recall.

4        Q.   Have you looked at them since?

5        A.   I don't recall that.

6        Q.   I could ask you a bunch of questions about

7   showing you portions of the handbook, ask you if

8   that existed at the time of Noah's suspension

9   hearing, and if you think it would refresh your

10  recollection as to whether or not you were familiar

11  with the provision, we could do that, but if you

12  tell me that we can go through them but you wouldn't

13  be able to tell me whether you remember those

14  provisions or not, I won't go through them.

15       A.   I can definitely tell you that.

16       Q.   Okay.  Have you ever seen Exhibit 10?

17       A.   I don't remember that, so no, I don't

18  recall that, no.

19       Q.   And so I'm specifically interested in, was

20  that a document that was presented at the hearing

21  for Noah Dietchweiler?

22       A.   I don't recall if it was.

23            MR. DIETCHWEILER:  Looking for

24  interrogatories?

25            MR. TAGUE:  Uh-huh.

22

1          MS. GOGGIN-WARD:  Michael, they're right

2     in front of him.

3          MR. TAGUE:  Yes, but I was looking for my

4     copy.

5     BY MR. TAGUE:

6       Q.   Do you remember what Noah Dietchweiler was

7     charged with doing?

8       A.   Other than he was accused of selling

9     drugs.

10      Q.   Okay.  And the -- is that the extent of

11    what you remember, that he was selling drugs?  Do

12    you remember whether he was also accused of being

13    under the influence of drugs?

14      A.   The details I don't remember anymore.

15      Q.   Okay.  Do you know whether or not there

16    was more than one charge?

17      A.   That I don't remember.

18      Q.   So if I ask you if it started out two

19    charges and ended up affirmed on one charge, you

20    can't answer that either?

21      A.   You're correct.

22      Q.   Do you know what substance was involved in

23    the discipline of Noah Dietchweiler?

24      A.   I don't recall the substance.

25      Q.   If he were selling drugs, why wasn't he

23

1   expelled?

2       A.    The details, again, like I said, I don't

3   remember the details to answer that.

4       Q.    Okay.  Do you believe that the school

5   district in its suspension review affirmed the

6   suspension against Noah for selling drugs on January

7   25, 2015 -- I'm sorry, 2013, January 25, 2013.

8       A.    What was the question again?

9            (Requested portion of the deposition was

10  read by the court reporter.)

11      A.    I believe that's what was the result of

12  the hearing.

13      Q.    Okay.  And would I be correct that the

14  basis of -- well, let me ask you.  Did you vote in

15  favor of that?

16            MS. GOGGIN-WARD:  Objection.  Anything

17  that happened in the closed door session you're not

18  allowed to testify to pursuant to the court order.

19  Direct you not to answer that question.

20      Q.    It didn't happen in the closed session.

21  Did you vote in favor of that?

22            MS. GOGGIN-WARD:  If you recall.

23      A.    I don't recall.

24      Q.    Okay.  Was there any different evidence to

25  your recollection presented in the other hearing or

24

1   hearings on the night of February 5, 2013, that was

2   not part of Noah's hearing?

3          A.   I don't recall.

4          Q.   You don't remember any of the testimony of

5   Mr. Bunting or Mr. Lucas?

6          A.   I don't recall their testimony.

7          Q.   So if I asked whether you believed them or

8   not, you couldn't answer that either?

9          A.   I could answer that that I rely on their

10  testimony.

11         Q.   If the record of the vote was seven to

12  zero in favor of affirming, you wouldn't dispute

13  that, would you?

14         A.   No.

15         Q.   Okay, I want you to look at Exhibit No. 4.

16  Let's get to your portion.  Oh, here you go,

17  somebody already took you to it.  Written questions

18  were previously sent out to everyone and written

19  answers were provided, and if you go through all of

20  the questions, I'm looking at a page that said you

21  verified your answers on February 24, 2014.

22         A.   Yes.

23         Q.   Okay.  In Interrogatory No. 2 it was asked

24  what was the substance Noah was accused of taking or

25  possessing.  And the answer was it was identified as

25

1   Ativan.  How did you learn that?  Did somebody tell

2   you that?

3           MS. GOGGIN-WARD:  Just object that it

4   calls for attorney/client privileged information.

5   If anybody other than your attorney told you that,

6   then you can tell him.  Do you understand the

7   question?

8       Q.   The question is how did you learn that the

9   drug was Ativan?

10      A.   Only way I would have learned it, at the

11  meeting --

12      Q.   Okay.

13      A.   -- that night.

14      Q.   And so you actually remembered on February

15  24th that the drug was Ativan and do you still

16  remember it that way?

17      A.   At this point, that's the only way it

18  would remind me at that point what it was.  Prior to

19  that, I didn't remember.

20      Q.   Okay.  In Interrogatory No. 8, the written

21  question was:  Identify when the list of students

22  owing money for drugs set forth in Plaintiff's A(ii)

23  of Defendant's Rule 26 initial disclosures was.  A

24  was given to Noah Dietchweiler or referred to in the

25  school board hearing concerning Noah Dietchweiler;

26

1    and B, which was referred to in the school board

2    hearing.  It states that the note was discussed when

3    Mr. Tague was questioning Mr. Bunting.  Is that

4    something you remembered when you put these

5    interrogatory answers together?

6        A.   I don't recall.

7        Q.   In Interrogatory No. 9 we ask you if the

8    letter of Michael McKay identifying the students to

9    whom he had provided pills was, and I'm interested

10   in the first, A, when it was given to Noah

11   Dietchweiler, and the answer was it was not given to

12   Noah but it was given to Noah's counsel.  On what do

13   you base that statement "However, it was given to

14   Noah's counsel?"  Did you see that happen?

15       A.   I don't recall that.

16       Q.   Okay.  You don't recall the list, do you?

17       A.   Not at this point, no, I don't recall.

18       Q.   And you -- and you really can't say

19   whether the list was the document on Exhibit 3 I

20   asked you about before?

21       A.   At this point, no, I don't recall.

22       Q.   Were you on the school board when Mr.

23   Bunting was hired?

24       A.   For -- when I was on the school board, he

25   was already employed.

27

1      Q.    Okay.  So he was principal before you

2  became a school board member?

3      A.    No, he was principal -- he was already

4  here to the district and he was employed as a

5  principal while I was on the school board.

6      Q.    Okay.  So he was what before that, a

7  teacher?

8      A.    He was a principal at the junior high.

9      Q.    Okay.

10      A.    Glenn Raymond.

11      Q.    And then he became principal of the high

12  school while you were a school board member.

13      A.    Yes.

14      Q.    And did you vote for him to get that job?

15      A.    I -- yes.

16      Q.    Mr. Lucas, when did he come with the

17  school district?

18      A.    I don't recall the date.

19      Q.    Were you on the school board when he was

20  hired?

21      A.    Yes.

22      Q.    Did you vote for him?

23      A.    That I don't recall.

24      Q.    Had you as a school board member

25  participated in any expulsion or suspension

28

1    proceedings prior to the ones on February 5, 2013?

2         A.    Yes.

3         Q.    How many?

4         A.    The number I could not tell you.

5         Q.    Okay.  What was the procedure on those

6    prior occasions, do you remember?

7         A.    As far as what?

8         Q.    Well, the -- you told me about how the

9    district tried to come up with a date that would

10   work for everybody.  Is that the same procedure --

11        A.    Yes.

12        Q.    -- for the other ones?  Then there would

13   be a notice and agenda sent to the school board

14   members.  Was that -- the procedure the same?

15        A.    Yes.

16        Q.    And the one we were at, ultimately the

17   school board would be there and elect a presiding

18   officer.  Is that the same procedure?

19        A.    I would say yes.

20        Q.    And in our situation, the board president

21   was the presiding officer.  Is that how you

22   remembered the other ones?

23        A.    Yes.

24        Q.    There were -- Mr. Lee was present, so is

25   that how you remember the other ones?

29

1      A.    That I don't recall.

2      Q.    And Mr. Funk was present and presented for

3   the board.  Do you remember that's how the other

4   ones happened?

5      A.    That I can't say for sure, no.

6      Q.    Do you know whether or not there are

7   minutes with the names of the students redacted that

8   would answer that question as to who all was

9   present?

10     A.    I don't know.

11     Q.    My specific question is was the same

12  procedure that was utilized in Noah Dietchweiler's

13  proceeding utilized in the prior proceedings?

14     A.    As far as I can recall, yes.

15     Q.    Okay.  Has there been any disciplinary

16  hearings relating to suspensions or expulsions since

17  February 5, 2013?

18     A.    That I don't recall.

19     Q.    Have there been any changes in the school

20  board policies relating to suspension and expulsion

21  proceedings since January 25, 2013?

22     A.    I don't recall that at all.

23     Q.    Has the student handbook changed since

24  January 25, 2013?

25     A.    I'm -- I believe it has, but the details

30

1  of the changes I don't recall.

2       Q.    Before you became a school board member,

3  what training or seminars or instruction did you

4  receive as to what your duties would be and how you

5  should perform them?

6       A.    At the time of Mr. Bianchetta we had

7  sessions with him on training on how meetings are

8  handled and financial training on as far as the

9  school board goes, their funding sources and things.

10      Q.    And that was before you became a school

11  board member?

12      A.    That would have been shortly after I was

13  appointed.

14      Q.    Okay.  What handbook, job description,

15  statutory duties were you provided after you were

16  appointed on the board to assist you in performing

17  your job?

18      A.    We had a handbook to our disposal.  Other

19  than that, it was working with the superintendent to

20  clarify issues.

21      Q.    And the handbook you had, was that

22  something the district prepared, was it something

23  the school board association prepared or who

24  prepared that document?

25      A.    The district.

31

1    Q.    You still have it?

2    A.    I said I had it for our -- at our

3  disposal.  I don't have one.

4    Q.    Okay, so you weren't provided a personal

5  copy?

6    A.    That I don't recall.

7    Q.    So I think what you're telling me is one

8  is here in this building that you can look at?

9    A.    Available, uh-huh.  Yes.

10    Q.    Have you ever looked at it?

11    A.    Yes.

12    Q.    Have you ever reviewed it relating to

13  student disciplinary matters?

14    A.    That I don't recall.

15    Q.    Are you aware that there is a section of

16  the Illinois statutes known as the school code that

17  govern the operation of school districts in

18  Illinois?

19    A.    I don't recall that.

20    Q.    So if I asked you if you ever read any

21  portions of the school code relating to discipline

22  of students, you have to say I don't remember?

23    A.    I'm going to have to say I -- I'm sure

24  I've read it, but I don't recall the details of it

25  at this time.

1      Q.    Why do you think -- or you said you're
2   sure you read it?
3      A.    I assume because we read a number of
4   things over the years on other issues and that's why
5   I say I assume I read it because we do review the
6   handbook.
7      Q.    And review it with whom, when and where?
8      A.    Would be at a meeting.
9      Q.    Okay.  And if the handbook was reviewed at
10  a meeting, there would be minutes of that.
11     A.    Yes.
12     Q.    Have you ever been to any seminars or
13  training since becoming a school board member in
14  which the workshops or curricula involved student
15  disciplinary procedures?
16     A.    No.
17     Q.    Have any been offered?
18     A.    Not that I'm aware of.
19     Q.    Exhibit No. 7, that document is the
20  complaint that's been filed in this action.  Have
21  you ever read that complaint?
22     A.    No, I haven't.
23     Q.    I can show it to you if you need to, but
24  did you ultimately -- an answer was filed to that
25  complaint, I can show it to you, but have you ever

33

1   seen the answer to the complaint?  (Showing
2   document).
3       A.   No, I haven't.
4       Q.   Show you Plaintiff's Exhibit -- show you
5   Plaintiff's Exhibit No. 5.  Have you ever seen that
6   document before?
7       A.   I have a signature on it, so apparently
8   yes.
9       Q.   Because attached to it is an attestation
10  where you've signed on December 30, 2013.
11      A.   Yes.
12      Q.   Correct?
13      A.   Uh-huh.
14      Q.   And in that attestation you indicated you
15  read the answers to the request to admit and that
16  the facts set forth in that document are true and
17  correct to the best of your knowledge and belief,
18  correct?
19      A.   Correct, that's what it says.
20      Q.   Okay.  If you go to the first page of
21  that, the first statement is that the laboratory
22  report of Quest Diagnostics attached was genuine,
23  true and correct.
24          MS. GOGGIN-WARD:  Do you have a question?
25      Q.   Yeah, and the response was admit.  So you

34

1  believe that to be a correct statement?

2      MS. GOGGIN-WARD:  We'll just object that

3  this document was directed to all defendants at the

4  same time.  It was not specific to each defendant.

5  So the answers that are contained in all of these

6  are the collective response of all of the defendants

7  not individual.  But if he knows the answer to this

8  specific question, then please go ahead.

9      Q.  Okay.  Let me go back to the attestation.

10  You stated the facts set forth therein are true and

11  correct to the best of your knowledge and belief.

12  Is there something about that you didn't understand?

13      A.  No.

14      Q.  Okay.  So you read No. 1 which was the

15  statement that is set forth in No. 1, correct?

16      A.  Yes.

17      Q.  And the response was admit.  And my

18  question to you is, is that true and correct to the

19  best of your knowledge or belief or not true and

20  correct to the best of your knowledge and belief?

21      A.  At this time I don't remember, but at the

22  time apparently it was.

23      Q.  Okay.  And we said the same thing in No. 2

24  that deals with the letter of Dr. Olofsson.  Is your

25  answer the same?

35

1        A.    Again, at this time I don't remember the

2    details.  At the time, I must have at the time.

3        Q.    No. 3, Dr. Betlej's letter of January 29,

4    2013, is your response the same as my questioning as

5    to No. 1?

6        A.    Again, I don't recall.

7             MS. GOGGIN-WARD:  Just for the record,

8    too, none of the attachments that were attached to

9    the request to admit were in Exhibit 5, so if you

10   want to show him those, you can show him those too.

11            MR. TAGUE:  Why don't you mark that?  What

12   is it, No. 5?

13            MS. GOGGIN-WARD:  11.  Are you going

14   sequentially throughout the -- oh, this is 5.

15            MR. TAGUE:  Can you mark that 5A?

16            (Exhibit No. 5A was marked by the court

17   reporter.)

18   BY MR. TAGUE:

19       Q.    Okay.  5A is a copy of the first request

20   to admit, and going back I guess to my foundational

21   question, the -- when you signed the attestation

22   that we talked about, you were provided with the

23   request to admit and the exhibit, were you not?

24       A.    That's a question I -- what was the

25   question again?

1          Q.   Okay.  We sent a request to admit which is
2    5A and then ultimately responses were made to that
3    request to admit which is Exhibit 5 and you attested
4    to the responses.  My foundational question is that
5    before you signed the attestation you had the
6    statements and -- in the request to admit and the
7    exhibits, did you not?
8               MS. GOGGIN-WARD:  What statements?
9               MR. TAGUE:  The request to admit
10   statements 1, 2, 3, 4, whatever.
11              MS. GOGGIN-WARD:  Oh, I'm sorry, an actual
12   question, okay.  Did you have the documents
13   attached --
14        A.   No.
15              MS. GOGGIN-WARD:  -- if you remember?
16        A.   No, I don't remember that.  I don't.
17        Q.   You gave two answers that were a little
18   bit different.  You said no.  I don't remember.
19        A.   No, I don't remember if these documents
20   were attached to this one.
21        Q.   Okay.  In No. 4, the statement in No. 4 is
22   that no written notice was given to Noah
23   Dietchweiler on January 25, 2013, of the charges
24   which constituted the basis for the proposed
25   suspension prior to the decision to suspend him.

1    The response was deny.  My question to you is as you

2    sit here today what do you remember was the basis

3    for your attestation that deny was a true statement?

4         A.   That I don't recall.

5         Q.   No. 5 is a statement that no written

6    notice was given to Noah Dietchweiler on January 25,

7    2013, of the evidence -- the evidence which

8    supported the charges prior to the decision to

9    suspend him.  The response is deny.  What do you

10   remember was the reason that you attested to the

11   fact that that was a correct statement?

12        A.   I don't recall at this time.

13        Q.   Okay.  Now, I can read No. 6 or I can

14   trust you to read it.  My questions will be the

15   same.  Statement No. 6, there's a denial.  Do you

16   remember the basis for your attestation of the

17   denial?

18        A.   I don't recall.

19        Q.   Would the same be true for No. 7?

20        A.   I don't recall.

21        Q.   No. 8 talks about the list of students

22   owing money for drugs.  We say it was not introduced

23   into evidence at Noah Dietchweiler's school board

24   meeting or hearing, and the second sentence says,

25   "Without waiving said objection, Defendant states

1   the list of students was used during the hearing

2   that was held."

3           You believed that to be true at the time

4   you signed these?

5       A.   I do not recall that specific.

6       Q.   Now, No. 9 asks the same question about a

7   letter from Michael McKay and the same statement was

8   that the letter was utilized during the hearing.  Do

9   you remember that happening?

10      A.   Again, I don't recall.

11      Q.   No. 10 states that Noah Dietchweiler was

12  not informed of the list of students owing money for

13  drugs until the -- until September 16, 2013.  And

14  the second part of that is that -- it says, "Without

15  waiving said objections, denied."

16          What information do you have that would

17  support your attestation that that's not -- well,

18  that deny was the correct response?

19      A.   Again, the details of that I don't

20  remember.

21      Q.   Okay.  No. 12, we state that the

22  transcript of the proceedings attached to our

23  plaintiff's initial disclosures was genuine, true

24  and correct, and the response is admit.  My question

25  is you didn't -- did you have the transcript to look

39

1   at to attest that that was a correct statement?

2        A.   That I don't recall.

3        Q.   After Noah's suspension hearing and prior

4   to the filing of the lawsuit, did the school board

5   discuss the disciplinary incident or the

6   disciplinary proceedings that arose out of the

7   events of January 25, 2013?

8        A.   Did we discuss it?

9        Q.   Yes.

10            MS. GOGGIN-WARD:   You're talking about

11   between January 25th -- I'm sorry, 2/5 of '13 and

12   March 15 of '13?

13            MR. TAGUE:   Yes.

14            MS. GOGGIN-WARD:   Okay.

15        A.   In closed session we talked about it.

16        Q.   Okay.   And subsequent to that time --

17   well, subsequent to the filing of the complaint, did

18   you as a school board discuss the incident?

19        A.   I don't believe so.

20        Q.   Was the closed session discussion with

21   your attorneys relating to a threat of litigation?

22            MS. GOGGIN-WARD:   Objection to anything

23   discussed in closed session pursuant to the court

24   order of Judge Baker other than it happened.   Direct

25   my client not to answer.

40

1          MR. TAGUE:   What about Judge Baker's order
2    said anything about any meetings other than the
3    disciplinary hearings?
4          MS. GOGGIN-WARD:   I'm directing him not to
5    answer.
6          MR. TAGUE:   Well, I understand you're
7    directing him not --
8          MS. GOGGIN-WARD:   On the basis of
9    attorney/client privilege as well.
10         MR. DIETCHWEILER:   Just certify the
11   question, Mike, and move on.
12         MR. TAGUE:   Well, I want to explore this
13   because the judge probably expects us to try to not
14   have to come back and do depositions again.
15   BY MR. TAGUE:
16     Q.   My question was that was there any closed
17   session discussion about the disciplinary events of
18   January 25, 2013, after the hearings on February
19   5th, 2013, that did not have an attorney discussing
20   the matter under the exception to the Open Meetings
21   Act to discuss threatened litigation?
22         MS. GOGGIN-WARD:   I have the same
23   objection.
24     A.   Under the advice of counsel, I can't
25   answer.

41

1          MR. TAGUE:  Okay.  Certify that question.
2      Q.   Were there any meetings that you attended
3  that disciplinary matters of 20 -- of January 25,
4  2013, were discussed in which no attorney was
5  present?
6      A.   Under closed session, so I can't answer
7  anything.
8      Q.   Well, I disagree with that.  Your attorney
9  will either tell you to answer the question or not
10  answer the question.
11          MS. GOGGIN-WARD:  You're just asking if an
12  attorney was present?
13          MR. TAGUE:  If there was any meetings in
14  which the events of January 25, 2013, were discussed
15  in which no attorney was present.
16          MS. GOGGIN-WARD:  Same objection.  Not
17  only to attorney/client privilege but also under the
18  Open Meetings Act.  I'll direct him not to answer.
19  You can certify it.
20      A.   Under the direction of counsel, I am not
21  going to answer.
22      Q.   And you're going to certify it.  Were
23  there any meetings that you had subsequent to
24  February 5, 2013, which you attended in which anyone
25  was present that was not an attorney for the school

42

1    district or an employee of the school district?

2            MS. GOGGIN-WARD:  For any purpose

3    whatsoever?

4        Q.   Relating to the disciplinary incident or

5    incidents of January 25, 2013.

6            MS. GOGGIN-WARD:  Same objections.

7            MR. TAGUE:  How on earth would that be

8    objectionable if there was somebody there that was

9    not a member of the school district or an attorney?

10           MS. GOGGIN-WARD:  You said or employee of

11   the school district.

12           MR. TAGUE:  I said who was not.

13           MS. GOGGIN-WARD:  I'm not going to argue

14   with you, Mike.  If you want to certify the

15   question, certify the question.

16           MR. TAGUE:  I'm going to ask the question

17   again because this is ridiculous.

18   BY MR. TAGUE:

19       Q.   My question is were you ever at any

20   meetings in which the disciplinary proceedings or

21   the incident of January 25, 2013, was discussed in

22   which a person was present and that person was not

23   an attorney for the school district, a board member

24   or an employee of the school district?

25           MS. GOGGIN-WARD:  How is it possible to

1    have a board member meeting without a board member?

2            MR. TAGUE:   It's very possible.   He could

3    have met with a guy on the street and talked about

4    it.

5            MS. GOGGIN-WARD:   Okay.

6        Q.   My question is were there any such

7    meetings?

8        A.   No.

9        Q.   Okay.

10           MR. TAGUE:   Let me just have a couple

11   minutes.

12           MS. GOGGIN-WARD:   Sure.

13           (Recess at 3:06 p.m. to 3:08 p.m.)

14           MR. TAGUE:   I have no further questions.

15           MS. GOGGIN-WARD:   I've got nothing.   We'll

16   reserve.

17           (Adjourned at 3:08 p.m.)

18

19

20

21

22

23

24

25

44

```
 1   STATE OF ILLINOIS    )
                          )SS
 2   COUNTY OF FORD       )

 3
              I, June Haeme, a Notary Public in and for
 4   the County of Ford, State of Illinois, do hereby
     certify that DON BECKER, the deponent herein, was by
 5   me first duly sworn to tell the truth, the whole
     truth and nothing but the truth, in the
 6   aforementioned cause of action.
              That the following deposition was taken on
 7   behalf of the Plaintiff at the Iroquois County CUSD
     #9, 1411 West Lafeyette Street, Watseka, Illinois,
 8   on October 17, 2014.
              That the said deposition was taken down in
 9   stenograph notes and afterwards reduced to
     typewriting under my instruction; that the
10   deposition is a true record of the testimony given
     by the deponent; and that it was agreed by and
11   between the witness and attorneys that said
     signature on said deposition would not be waived.
12            I do further certify that I am a
     disinterested person in this cause of action; that I
13   am not a relative, or otherwise interested in the
     event of this action, and am not in the employ of
14   the attorneys for either party.
              IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my notarial seal this 23rd day of
     October, 2014.
16

17

18

19                       JUNE HAEME, CSR
                         NOTARY PUBLIC
20

21
     "OFFICIAL SEAL"
22   June Haeme
     Notary Public, State of Illinois
23   My Commission Expires:
     September 27, 2016
24

25
```

45

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
2                        STATE OF ILLINOIS

3

     NOAH DIETCHWEILER, by MICHAEL     )
4    DIETCHWEILER, his father and      )
     next friend,and ANN DIETCHWEILER,)
5                                      )
          Plaintiffs,                  ) No. 2013-CV-2062
6                                      )
              vs.                      )
7                                      )
     STEVE LUCAS, in his official and )
8    individual capacities; et al.,    )
                                       )
9          Defendants.                 )
     --------------------------------

10

11

12              This is to certify that I have read the
     transcript of my deposition taken by June Haeme,
13   CSR, in the above-entitled cause, and that the
     foregoing transcript taken on October 17, 2014,
14   accurately states the questions asked and the
     answers given by me, with the exception of the
15   corrections noted, if any, on the attached errata
     sheet(s).

16

17                         DON BECKER

18
     Subscribed and Sworn before
19
     me the     day of                , 2014.
20
                              , Notary Public
21

22

23
          Area Wide Reporting and Video Conferencing
24          301 West White Street, Champaign, IL 61820
                          800.747.6789
25

## A

**ability (1)**
14:2
**able (1)**
21:13
**accurate (1)**
6:7
**accused (3)**
22:8,12;24:24
**Act (2)**
40:21;41:18
**Action (2)**
18:16;32:20
**activity (1)**
9:22
**actual (2)**
18:8;36:11
**actually (3)**
13:10;14:25;25:14
**address (3)**
6:22,24;15:9
**Adjourned (1)**
43:17
**administrative (1)**
10:1
**admit (11)**
33:15,25;34:17;
35:9,20,23;36:1,3,6,9;
38:24
**adult (3)**
7:7,8,13
**advice (1)**
40:24
**affiliated (1)**
16:13
**affirmed (2)**
22:19;23:5
**affirming (1)**
24:12
**Again (11)**
8:21;19:20;23:2,8;
35:1,6,25;38:10,19;
40:14;42:17
**against (1)**
23:6
**agenda (3)**
15:1,25;28:13
**ago (1)**
7:22
**ahead (1)**
34:8
**Aii (1)**
25:22
**allowed (1)**
23:18
**altogether (1)**
11:2
**anymore (1)**
22:14
**apparently (2)**
33:7;34:22

**appears (1)**
19:10
**appointed (4)**
7:24;8:1;30:13,16
**approves (1)**
10:4
**archived (1)**
14:3
**argue (1)**
42:13
**arose (1)**
39:6
**arrived (1)**
15:22
**arriving (1)**
17:20
**assist (1)**
30:16
**association (1)**
30:23
**assume (5)**
5:25;12:11;15:4;
32:3,5
**Ativan (3)**
25:1,9,15
**attached (6)**
33:9,22;35:8;36:13,
20;38:22
**attachments (1)**
35:8
**attended (3)**
10:14;41:2,24
**attest (1)**
39:1
**attestation (8)**
33:9,14;34:9;35:21;
36:5;37:3,16;38:17
**attested (2)**
36:3;37:10
**attorney (11)**
16:15,16;25:5;
40:19;41:4,8,12,15,
25;42:9,23
**attorney/client (3)**
25:4;40:9;41:17
**attorneys (1)**
39:21
**availability (2)**
12:23;14:25
**available (9)**
12:10,13,18;13:1,3,
11,15,17;31:9
**aware (4)**
17:17;20:13;31:15;
32:18

## B

**back (5)**
5:22;6:4;34:9;
35:20;40:14
**Baker (1)**
39:24

**Baker's (1)**
40:1
**base (1)**
26:13
**basis (5)**
23:14;36:24;37:2,
16;40:8
**became (5)**
8:12;27:2,11;30:2,
10
**BECKER (3)**
5:2,7;7:15
**B-E-C-K-E-R (1)**
5:9
**beckerd44@gmailcom (1)**
14:17
**become (1)**
7:20
**becoming (1)**
32:13
**beforehand (1)**
12:10
**belief (4)**
33:17;34:11,19,20
**best (6)**
11:1;15:20;33:17;
34:11,19,20
**Betlej's (1)**
35:3
**beyond (2)**
16:18;17:2
**Bianchetta (2)**
8:11;30:6
**bit (1)**
36:18
**board (47)**
7:18,20;8:2,3,6,10,
13;9:3,6,9,10,19;10:4,
10,15;14:6;15:1;
16:10,11;20:1,5;
25:25;26:1,22,24;
27:2,5,12,19,24;
28:13,17,20;29:3,20;
30:2,9,11,16,23;
32:13;37:23;39:4,18;
42:23;43:1,1
**building (2)**
17:21;31:8
**bunch (1)**
21:6
**Bunting (5)**
16:23;19:23;24:5;
26:3,23
**business (2)**
14:14;20:9

## C

**call (3)**
12:18;13:18,20
**called (2)**
11:19;12:12
**calls (1)**

**25:4**
**came (1)**
8:10
**can (20)**
5:21,22,23;6:10;
12:21;16:25;19:9,25;
21:12,15;25:6;29:14;
31:8;32:23,25;35:10,
15;37:13,13;41:19
**capacity (2)**
9:5;10:14
**Central (2)**
7:10,14
**certify (3)**
40:10;41:1,19,22;
42:14,15
**changed (2)**
14:23;29:23
**changes (2)**
29:19;30:1
**charge (2)**
22:16,19
**charged (1)**
22:7
**charges (3)**
22:19;36:23;37:8
**checking (1)**
13:3
**children (2)**
7:7,8
**clarify (1)**
30:20
**clear (1)**
5:19
**client (1)**
39:25
**closed (7)**
23:17,20;39:15,20,
23;40:16;41:6
**code (2)**
31:16,21
**collective (1)**
34:6
**Commencing (1)**
5:1
**common (1)**
6:5
**communicate (1)**
5:22
**communication (1)**
13:24
**comparisons (1)**
20:12
**complaint (5)**
32:20,21,25;33:1;
39:17
**concerning (1)**
25:25
**confident (1)**
10:22
**consider (1)**
11:25
**constituted (1)**

**36:24**
**consulting (1)**
20:11
**contacted (1)**
13:11
**contained (1)**
34:5
**conversation (2)**
6:5;14:24
**copy (3)**
22:4;31:5;35:19
**counsel (4)**
26:12,14;40:24;
41:20
**couple (2)**
5:15;43:10
**course (1)**
21:2
**court (6)**
5:13;17:8;23:10,18;
35:16;39:23
**currently (2)**
7:17;14:17
**curricula (1)**
32:14

## D

**date (4)**
12:15;20:15;27:18;
28:9
**dates (4)**
12:20;13:1,3;14:25
**day (2)**
10:18;11:13
**days (1)**
11:21
**deals (1)**
34:24
**December (1)**
33:10
**decision (2)**
36:25;37:8
**defendant (2)**
34:4;37:25
**defendants (2)**
34:3,6
**Defendant's (1)**
25:23
**definitely (1)**
21:15
**delivered (2)**
15:3;18:4
**denial (2)**
37:15,17
**denied (1)**
38:15
**deny (4)**
37:1,3,9;38:18
**deposition (2)**
5:10;23:9
**depositions (1)**
40:14

**description (1)**
30:14
**details (7)**
22:14;23:2,3;29:25;
31:24;35:2;38:19
**Diagnostics (1)**
33:22
**Dietchweiler (15)**
10:12;17:2,6;21:2,
21,23;22:6,23;25:24,
25;26:11;36:23;37:6;
38:11;40:10
**Dietchweiler's (3)**
19:15;29:12;37:23
**difference (1)**
9:20
**different (9)**
5:21;9:9,15;10:9;
11:13;14:20,22;
23:24;36:18
**digits (1)**
7:2
**Direct (3)**
23:19;39:24;41:18
**directed (1)**
34:3
**directing (2)**
40:4,7
**direction (1)**
41:20
**disagree (1)**
41:8
**disciplinary (20)**
10:7,12,17;11:12;
17:20,25;18:16;19:6;
20:22;21:1;29:15;
31:13;32:15;39:5,6;
40:3,17;41:3;42:4,20
**discipline (4)**
11:18,25;22:23;
31:21
**disclosures (2)**
25:23;38:23
**discuss (4)**
39:5,8,18;40:21
**discussed (5)**
26:2;39:23;41:4,14;
42:21
**discussing (1)**
40:19
**discussion (2)**
39:20;40:17
**disposal (2)**
30:18;31:3
**dispute (1)**
24:12
**dissents (1)**
8:17
**District (23)**
7:11,14,18;11:9;
12:6;14:6;15:8;16:14,
16;17:24;18:5;23:5;
27:4,17;28:9;30:22,

25;42:1,1,9,11,23,24
**districts (1)**
31:17
**document (19)**
18:1,2,9,14,15,16,
17,25;19:5,10,12;
21:20;26:19;30:24;
32:19;33:2,6,16;34:3
**documented (1)**
17:12
**documents (7)**
10:2;17:23;18:4,12;
19:15;36:12,19
**DON (2)**
5:2,7
**done (1)**
9:22
**door (1)**
23:17
**down (1)**
6:1
**Dr (2)**
34:24;35:3
**drug (3)**
19:18;25:9,15
**drugs (8)**
22:9,11,13,25;23:6;
25:22;37:22;38:13
**duly (1)**
5:3
**During (5)**
9:14,15;21:1;38:1,8
**duties (5)**
9:8,17;10:8;30:4,15

**E**

**earth (1)**
42:7
**easy (1)**
6:15
**efficient (1)**
6:18
**efficiently (2)**
5:17;6:13
**eight (1)**
7:22
**either (4)**
6:15;22:20;24:8;
41:9
**elect (1)**
28:17
**elected (2)**
7:23;20:4
**elections (1)**
7:25
**else (5)**
8:6;16:13,17,25;
19:24
**email (13)**
13:19,21,22,24;
14:5,7,11,11,12,14,
21;15:8,11

**emails (1)**
14:3
**employed (2)**
26:25;27:4
**employee (3)**
42:1,10,24
**ended (1)**
22:19
**enough (1)**
12:10
**entitled (1)**
18:15
**events (3)**
39:7;40:17;41:14
**everybody (1)**
28:10
**everyone (1)**
24:18
**evidence (4)**
23:24;37:7,7,23
**EXAMINATION (1)**
5:4
**exception (1)**
40:20
**Excuse (1)**
16:7
**Exhibit (11)**
19:2;21:16;24:15;
26:19;32:19;33:4,5;
35:9,16,23;36:3
**exhibits (1)**
36:7
**existed (1)**
21:8
**exists (2)**
17:17,18
**expects (1)**
40:13
**expelled (1)**
23:1
**explore (1)**
40:12
**expulsion (2)**
27:25;29:20
**expulsions (1)**
29:16
**extent (1)**
22:10

**F**

**fact (1)**
37:11
**facts (2)**
33:16;34:10
**familiar (1)**
21:10
**family (1)**
19:15
**far (4)**
20:11;28:7;29:14;
30:8
**farm (2)**

20:8,9
**farmers (1)**
20:11
**favor (3)**
23:15;21;24:12
**FBFM (1)**
20:8
**February (15)**
10:11;11:14,21;
12:13;13:12,25;
14:18;20:23;24:1,21;
25:14;28:1;29:17;
40:18;41:24
**few (1)**
11:20
**field (2)**
20:8,9
**filed (2)**
32:20,24
**filing (2)**
39:4,17
**financial (2)**
20:12;30:8
**find (5)**
12:9,13;13:11,15,
17
**finish (2)**
6:8,9
**first (9)**
5:3;7:20;8:9;16:5;
18:18;26:10;33:20,
21;35:19
**follow (1)**
5:16
**follows (1)**
5:3
**forth (4)**
25:22;33:16;34:10,
15
**foundational (2)**
35:20;36:4
**four (1)**
7:2
**frame (1)**
12:22
**front (1)**
22:2
**funding (1)**
30:9
**Funk (1)**
29:2
**further (1)**
43:14

**G**

**gave (1)**
36:17
**generally (1)**
20:10
**genuine (2)**
33:22;38:23
**gesture (1)**

6:3
**given (7)**
25:24;26:10,11,12,
13;36:22;37:6
**Glenn (1)**
27:10
**goes (1)**
30:9
**GOGGIN-WARD (28)**
9:1;22:1;23:16,22;
25:3;33:24;34:2;35:7,
13;36:8,11,15;39:10,
14,22;40:4,8,22;
41:11,16;42:2,6,10,
13,25;43:5,12,15
**govern (1)**
31:17
**guess (1)**
35:20
**guy (1)**
43:3

**H**

**handbook (11)**
20:14,19,21;21:1,7;
29:23;30:14,18,21;
32:6,9
**handed (1)**
17:23
**handled (1)**
30:8
**happen (3)**
12:16;23:20;26:14
**happened (5)**
16:4;19:22;23:17;
29:4;39:24
**happening (1)**
38:9
**head (4)**
6:2,6;8:23;16:7
**hear (1)**
5:20
**hearing (23)**
10:12;13:25;16:5,8;
17:25;18:6,7,19;19:6,
16;20:23;21:2,9,20;
23:12,25;24:2;25:25;
26:2;37:24;38:1,8;
39:3
**hearings (9)**
10:8;17;11:12;
17:20,21;24:1;29:16;
40:3,18
**held (1)**
38:2
**hesitate (1)**
5:21
**High (3)**
20:14;27:8,11
**himself (1)**
13:7
**hire (1)**

8:15
**hired (3)**
8:13;26:23;27:20
**hold (1)**
20:2
**home (1)**
7:9

**I**

**identified (1)**
24:25
**Identify (1)**
25:21
**identifying (1)**
26:8
**Illinois (4)**
7:11,14;31:16,18
**incident (4)**
39:5,18;42:4,21
**incidents (1)**
42:5
**income (1)**
20:12
**indicated (1)**
33:14
**individual (1)**
34:7
**influence (1)**
22:13
**information (2)**
25:4;38:16
**informed (1)**
38:12
**initial (2)**
25:23;38:23
**instruction (1)**
30:3
**interested (2)**
21:19;26:9
**interrogatories (1)**
21:24
**Interrogatory (4)**
24:23;25:20;26:5,7
**into (1)**
37:23
**introduced (1)**
37:22
**involved (2)**
22:22;32:14
**issues (2)**
30:20;32:4

**J**

**January (24)**
9:2,11,14;11:13,18;
12:12;14:18;18:24;
20:13,16;23:6,7;
29:21,24;35:3;36:23;
37:6;39:7,11;40:18;
41:3,14;42:5,21
**jerks (1)**

6:17
**Jim (1)**
8:5
**job (3)**
27:14;30:14,17
**Judge (3)**
39:24;40:1,13
**junior (1)**
27:8

**K**

**kind (1)**
16:1
**knowledge (4)**
33:17;34:11,19,20
**known (1)**
31:16
**knows (1)**
34:7

**L**

**laboratory (1)**
33:21
**Lane (1)**
6:24
**last (4)**
5:8;7:2,14;18:21
**latter (1)**
12:25
**lawsuit (1)**
39:4
**learn (4)**
11:16,24;25:1,8
**learned (1)**
25:10
**Lee (5)**
8:12;13:4,6;16:19;
28:24
**Lee's (1)**
14:10
**letter (7)**
12:7;18:24;26:8;
34:24;35:3;38:7,8
**list (6)**
25:21;26:16,19;
37:21;38:1,12
**litigation (2)**
39:21;40:21
**little (1)**
36:17
**live (1)**
7:8
**look (3)**
24:15;31:8;38:25
**looked (2)**
21:4;31:10
**Looking (3)**
21:23;22:3;24:20
**Loveridge (1)**
6:24
**Lucas (4)**

16:21;19:23;24:5;
27:16

**M**

**mail (2)**
15:4,11
**mailbox (1)**
15:5
**man (2)**
20:8,9
**management (1)**
20:9
**many (1)**
28:3
**March (1)**
39:12
**mark (2)**
35:11,15
**marked (1)**
35:16
**married (1)**
7:9
**materials (1)**
17:19
**matter (4)**
15:15,17,23;40:20
**matters (2)**
31:13;41:3
**may (1)**
10:23
**maybe (1)**
16:4
**McKay (3)**
19:11;26:8;38:7
**mean (1)**
6:6
**means (2)**
5:18;6:3
**meeting (17)**
11:19,25;12:3,17,
22;13:12;15:1,15,18;
16:2,3;17:11;25:11;
32:8,10;37:24;43:1
**meetings (13)**
9:16,18,20;12:5;
30:7;40:2,20;41:2,13,
18,23;42:20;43:7
**member (15)**
7:21;10:10,15;14:6;
20:1;27:2,12,24;30:2,
11;32:13;42:9,23;
43:1,1
**members (4)**
9:10;16:10,11;
28:14
**met (1)**
43:3
**Michael (4)**
19:11;22:1;26:8;
38:7
**might (2)**
6:6;11:17

**Mike (2)**
40:11;42:14
**minutes (4)**
11:10;29:7;32:10;
43:11
**Monetary (1)**
9:24
**money (3)**
25:22;37:22;38:12
**more (2)**
10:23;22:16
**move (1)**
40:11
**Mrs (1)**
17:6
**must (1)**
35:2
**myself (1)**
5:19

**N**

**name (3)**
5:6,8;7:14
**names (1)**
29:7
**nature (1)**
9:25
**necessarily (1)**
6:3
**need (6)**
5:19;6:8,9,17;
12:21;32:23
**needed (2)**
8:7,21
**night (4)**
9:11,21;24:1;25:13
**Noah (21)**
10:12;11:4;17:2,4,
11;19:14;21:2,21;
22:6,23;23:6;24:24;
25:24,25;26:10,12;
29:12;36:22;37:6,23;
38:11
**Noah's (10)**
10:20;16:5,8;17:25;
19:6;21:8;24:2;26:12,
14;39:3
**Nods (1)**
8:23
**none (1)**
35:8
**normal (1)**
6:5
**note (1)**
26:2
**notice (9)**
15:1,10,18,25;16:1;
18:15;28:13;36:22;
37:6
**notified (1)**
12:2
**number (5)**

6:23,25;7:3;28:4;
32:3

**O**

**object (1)**
25:3;34:2
**Objection (5)**
23:16;37:25;39:22;
40:23;41:16
**objectionable (1)**
42:8
**objections (2)**
38:15;42:6
**occasion (1)**
13:12
**occasions (1)**
28:6
**occupation (1)**
20:7
**occur (1)**
11:17
**offered (1)**
32:17
**office (2)**
15:8;20:5
**officer (3)**
9:6;28:18,21
**offices (1)**
20:2
**Olofsson (1)**
34:24
**one (16)**
6:11;10:19,23,23;
11:4;13:4;17:17,18;
18:15;19:1;22:16,19;
28:16;31:3,7;36:20
**ones (5)**
28:1,12,22,25;29:4
**one's (1)**
7:9
**only (4)**
6:10;25:10,17;
41:17
**Open (2)**
40:20;41:18
**operation (1)**
31:17
**order (3)**
23:18;39:24;40:1
**Otherwise (1)**
5:24
**out (9)**
12:9,13;13:11,15,
17;17:23;22:18;
24:18;39:6
**over (2)**
5:15;32:4
**owing (3)**
25:22;37:22;38:12

**P**

**DIETCHWEILER v.**
**STEVE LUCAS ET AL**

**DON BECKER**
**October 17, 2014**

**package (1)**
18:4
**page (3)**
19:3;24:20;33:20
**papers (1)**
9:21
**part (2)**
24:2;38:14
**participated (1)**
27:25
**pattern (2)**
13:8,9
**people (2)**
12:10;13:5
**perform (1)**
30:5
**performing (1)**
30:16
**person (5)**
6:11;10:5;20:10;
42:22,22
**personal (2)**
14:11;31:4
**phone (1)**
6:25
**pick (2)**
12:20;13:1
**pick-up (1)**
15:5
**pills (1)**
26:9
**Plaintiff's (4)**
25:22;33:4,5;38:23
**please (3)**
5:6,8;34:8
**pm (4)**
5:1;43:13,13,17
**point (4)**
25:17,18;26:17,21
**policies (1)**
29:20
**political (1)**
20:2
**poll (1)**
12:8
**portion (2)**
23:9;24:16
**portions (3)**
20:21;21:7;31:21
**possessing (1)**
24:25
**possible (4)**
6:18;13:23;42:25;
43:2
**prepared (3)**
30:22,23,24
**prepares (1)**
10:1
**present (17)**
16:9,11,13,19,21,
23;17:1,2,4;28:24;
29:2,9;41:5,12,15,25;
42:22

**presented (5)**
19:5,15;21:20;
23:25;29:2
**president (2)**
8:4;28:20
**presiding (2)**
28:17,21
**previously (1)**
24:18
**principal (5)**
27:1,3,5,8,11
**prior (9)**
17:20;20:22;25:18;
28:1,6;29:13;36:25;
37:8;39:3
**privilege (2)**
40:9;41:17
**privileged (1)**
25:4
**Probably (2)**
7:22;40:13
**procedure (5)**
28:5,10,14,18;
29:12
**procedures (3)**
6:20;20:22;32:15
**proceeding (1)**
29:13
**proceedings (8)**
17:15;21:1;28:1;
29:13,21;38:22;39:6;
42:20
**proposed (1)**
36:24
**provided (7)**
11:23;19:21;24:19;
26:9;30:15;31:4;
35:22
**provider (1)**
14:22
**provision (1)**
21:11
**provisions (2)**
20:25;21:14
**public (1)**
20:4
**purpose (1)**
42:2
**pursuant (2)**
23:18;39:23
**put (1)**
26:4

**Q**

**Quest (1)**
33:22

**R**

**Raymond (1)**
27:10
**read (15)**

5:22;20:19,21,25;
23:10;31:20,24;32:2,
3,5,21;33:15;34:14;
37:13,14
**reading (1)**
6:4
**real (2)**
13:8,9
**really (1)**
26:18
**real-time (1)**
5:23
**reason (1)**
37:10
**recall (42)**
11:7,15;12:1,2,4;
19:9,17,20,25;21:3,5,
18,22;22:24;23:22,
23;24:3,6;26:6,15,16,
17,21;27:18,23;29:1,
14,18,22;30:1;31:6,
14,19,24;35:6;37:4,
12,18,20;38:5,10;39:2
**receive (2)**
17:19;30:4
**received (5)**
15:1,10,24;16:1
**Recess (1)**
43:13
**recollect (2)**
15:13;18:8
**recollection (4)**
11:1;15:20;21:10;
23:25
**record (6)**
8:8,22;13:14,16;
24:11;35:7
**recorded (1)**
17:11
**records (1)**
11:9
**redacted (1)**
29:7
**referred (2)**
25:24;26:1
**refresh (1)**
21:9
**regular (3)**
9:15,18,20
**relating (12)**
13:24;14:25;17:19,
24;20:22;21:1;29:16,
20;31:12,21;39:21;
42:4
**relatives (1)**
7:13
**rely (1)**
24:9
**remember (55)**
8:5,20;10:21;11:8;
13:10;15:9,15,18;
16:3,9,18,25;17:1,3,4,
9,10,12,23;18:1,2,3,

11,16,17;19:1,14,18,
21;21:13,17;22:6,11,
12,14,17;23:3;24:4;
25:16,19;28:6,25;
29:3;31:22;34:21;
35:1;36:15,16,18,19;
37:2,10,16;38:9,20
**remembered (3)**
25:14;26:4;28:22
**remind (1)**
25:18
**repeat (1)**
5:23
**rephrase (1)**
5:24
**report (2)**
19:19;33:22
**reporter (1)**
17:8;23:10;35:17
**representatives (1)**
17:24
**representing (1)**
18:5
**request (8)**
33:15;35:9,19,23;
36:1,3,6,9
**Requested (1)**
23:9
**reserve (1)**
43:16
**reside (1)**
7:5
**respect (1)**
10:7
**respond (1)**
6:4
**response (8)**
33:25;34:6,17;35:4;
37:1,9;38:18,24
**responses (1)**
36:2,4
**result (2)**
11:17;23:11
**review (3)**
23:5;32:5,7
**reviewed (2)**
31:12;32:9
**Reynolds (1)**
8:5
**ridiculous (1)**
42:17
**right (1)**
22:1
**rule (2)**
6:16;25:23
**rules (1)**
5:15

**S**

**same (16)**
10:8;28:10,14,18;
29:11;34:4,23,25;

35:4;37:15,19;38:6,7;
40:22;41:16;42:6
**saw (1)**
18:18
**scheduled (1)**
12:5
**scheduling (1)**
13:24
**school (54)**
7:9,17,20;8:2,3,6,
13;9:2,18;10:15;11:9,
17;12:6;14:5,6;16:14,
15;17:24;18:5;20:1,5,
14;23:4;25:25;26:1,
1,22,24;27:2,5,12,12,
17,19,24;28:13,17;
29:19;30:2,9,10,23;
31:16,17,21;32:13;
37:23;39:4,18;41:25;
42:1,9,11,23,24
**Scott (1)**
8:4
**second (4)**
16:6;19:2;37:24;
38:14
**Secretary (7)**
9:7,9,18;12:9;13:4,
7;14:10
**section (1)**
31:15
**security (1)**
7:3
**selling (4)**
22:8,11,25;23:6
**seminars (1)**
30:3;32:12
**sent (3)**
24:18;28:13;36:1
**sentence (1)**
37:24
**separate (1)**
14:7
**September (1)**
38:13
**sequentially (1)**
35:14
**serve (1)**
9:5
**session (7)**
23:17,20;39:15,20,
23;40:17;41:6
**sessions (1)**
30:7
**set (4)**
25:22;33:16;34:10,
15
**seven (1)**
24:11
**several (1)**
18:14
**shake (2)**
6:2,6
**Shakes (1)**

DIETCHWEILER v.
STEVE LUCAS ET AL

DON BECKER
October 17, 2014

16:7
**shortly (1)**
30:12
**Show (7)**
19:2;32:23,25;33:4,
4;35:10,10
**showed (1)**
15:21
**showing (2)**
21:7;33:1
**sign (1)**
9:21
**signature (1)**
33:7
**signed (4)**
33:10;35:21;36:5;
38:4
**signs (1)**
10:5
**sit (1)**
37:2
**situation (1)**
28:20
**social (1)**
7:3
**somebody (5)**
6:16;18:4;24:17;
25:1;42:8
**sometime (1)**
12:12
**sometimes (2)**
13:21,22
**sorry (4)**
8:25;23:7;36:11;
39:11
**sources (1)**
30:9
**speak (1)**
5:24
**special (4)**
12:3,5,17,22
**specific (5)**
13:6;29:11;34:4,8;
38:5
**specifically (2)**
18:2;21:19
**Spell (1)**
5:8
**staff (1)**
10:1
**start (1)**
6:10
**started (1)**
22:18
**state (2)**
5:6;38:21
**stated (1)**
34:10
**statement (12)**
19:11;26:13;33:21;
34:1,15;36:21;37:3,5,
11,15;38:7;39:1
**statements (3)**

36:6,8,10
**states (3)**
26:2;37:25;38:11
**statutes (1)**
31:16
**statutory (1)**
30:15
**still (2)**
25:15;31:1
**street (1)**
43:3
**Student (6)**
18:15;20:14,25;
29:23;31:13;32:14
**students (8)**
11:18;25:21;26:8;
29:7;31:22;37:21;
38:1,12
**subject (3)**
15:15,17,23
**submitted (1)**
19:19
**subsequent (4)**
11:13;39:16,17;
41:23
**substance (3)**
22:22,24;24:24
**superintendent (4)**
8:9,12;12:9;30:19
**support (1)**
38:17
**supported (1)**
37:8
**Sure (9)**
6:12;11:10;15:10,
19;17:7;29:5;31:23;
32:2;43:12
**suspend (2)**
36:25;37:9
**suspension (9)**
19:16;20:23;21:8;
23:5,6;27:25;29:20;
36:25;39:3
**suspensions (1)**
29:16
**sworn (1)**
5:3

**T**

**TAGUE (23)**
5:5;21:25;22:3,5;
26:3;35:11,15,18;
36:9;39:13;40:1,6,12,
15;41:1,13;42:7,12,
16,18;43:2,10,14
**talk (2)**
13:2;16:8
**talked (3)**
35:22;39:15;43:3
**talking (1)**
39:10
**talks (1)**

37:21
**tax (1)**
20:12
**teacher (1)**
27:7
**telephone (1)**
6:22;13:18,20
**telling (1)**
31:7
**testified (2)**
5:3,13
**testify (1)**
23:18
**testimony (4)**
19:21;24:4,6,10
**testing (1)**
19:19
**therein (1)**
34:10
**thoroughly (1)**
20:19
**threat (1)**
39:21
**threatened (1)**
40:21
**three (1)**
11:2
**throughout (1)**
35:14
**today (2)**
18:22;37:2
**together (1)**
26:5
**told (2)**
25:5;28:8
**took (1)**
24:17
**trade (1)**
20:7
**training (4)**
30:3,7,8;32:13
**transactions (1)**
9:24
**transcript (4)**
5:18;17:14;38:22,
25
**tried (1)**
28:9
**true (9)**
33:16,23;34:10,18,
19;37:3,19;38:3,23
**trust (1)**
37:14
**try (4)**
5:16;6:15,18;40:13
**trying (1)**
6:17
**two (7)**
6:14;7:25;10:24;
11:2,3;22:18;36:17
**type (2)**
6:11,14
**Typically (2)**

12:7,16

**U**

**ultimately (3)**
28:16;32:24;36:2
**under (6)**
22:13;40:20,24;
41:6,17,20
**up (4)**
5:24;15:21;22:19;
28:9
**use (1)**
18:5
**used (1)**
38:1
**usually (7)**
12:20,21;13:2,7,7,
18,20
**utilized (3)**
29:12,13;38:8

**V**

**verbally (2)**
6:2,5
**verbatim (2)**
5:17,22
**verified (1)**
24:21
**verify (1)**
9:22
**vintage (1)**
14:3
**violate (1)**
6:16
**vote (6)**
8:15;23:14,21;
24:11;27:14,22

**W**

**wait (1)**
6:9
**waiving (2)**
37:25;38:15
**Watseka (3)**
6:24;12:6;20:14
**Watts (1)**
8:4
**way (4)**
12:2;25:10,16,17
**ways (1)**
5:21
**weren't (1)**
31:4
**What's (1)**
20:7
**whatsoever (1)**
42:3
**wife (1)**
7:6
**within (1)**

12:22
**Without (3)**
37:25;38:14;43:1
**work (3)**
20:11,12;28:10
**working (1)**
30:19
**workshops (1)**
32:14
**Written (5)**
24:17,18;25:20;
36:22;37:5

**Y**

**years (2)**
7:22;32:4

**Z**

**zero (1)**
24:12

**0**

**0949 (1)**
7:4

**1**

**1 (4)**
34:14,15;35:5;
36:10
**10 (2)**
21:16;38:11
**108 (1)**
6:24
**11 (1)**
35:13
**12 (1)**
38:21
**13 (2)**
39:11,12
**15 (1)**
39:12
**16 (1)**
38:13

**2**

**2 (3)**
24:23;34:23;36:10
**2/5 (1)**
39:11
**2:05 (1)**
5:1
**20 (1)**
41:3
**2013 (31)**
9:2,14;10:11;11:13,
18;12:13;14:19;
18:24;20:13,16,23;
23:7,7;24:1;28:1;

**DIETCHWEILER v.**
**STEVE LUCAS ET AL**

**DON BECKER**
October 17, 2014

| | |
|---|---|
| 29:17,21,24;33:10;<br>35:4;36:23;37:7;<br>38:13;39:7;40:18,19;<br>41:4,14,24;42:5,21 | 32:19;37:19 |
| **2014 (1)** | **8** |
| 24:21 | **8 (2)** |
| **2015 (1)** | 25:20;37:21 |
| 23:7 | **815-432-4862 (1)** |
| **24 (1)** | 7:1 |
| 24:21 | **9** |
| **24th (1)** | |
| 25:15 | **9 (2)** |
| **25 (17)** | 26:7;38:6 |
| 11:13,18;12:12;<br>20:13,16;23:7,7;<br>29:21,24;36:23;37:6;<br>39:7;40:18;41:3,14;<br>42:5,21 | |
| **25th (1)** | |
| 39:11 | |
| **26 (1)** | |
| 25:23 | |
| **29 (1)** | |
| 35:3 | |
| **3** | |
| **3 (4)** | |
| 19:2;26:19;35:3;<br>36:10 | |
| **3:06 (1)** | |
| 43:13 | |
| **3:08 (2)** | |
| 43:13,17 | |
| **30 (2)** | |
| 18:24;33:10 | |
| **4** | |
| **4 (4)** | |
| 24:15;36:10,21,21 | |
| **5** | |
| **5 (14)** | |
| 10:11;11:14,21;<br>20:23;24:1;28:1;<br>29:17;33:5;35:9,12,<br>14;36:3;37:5;41:24 | |
| **5A (4)** | |
| 35:15,16,19;36:2 | |
| **5th (4)** | |
| 12:14;13:12,25;<br>40:19 | |
| **6** | |
| **6 (2)** | |
| 37:13,15 | |
| **7** | |
| **7 (2)** | |

Min-U-Script®